UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

| | |
|---|---|
| LOUISE BAILEY, 4782 S. Holladay Blvd. Salt Lake City, Utah 84117, Individually, And On Behalf of All Other Similarly Situated Medicare Part B Beneficiaries )<br><br>      Plaintiffs,  )<br><br>   v.  )<br><br>MUTUAL OF OMAHA INSURANCE COMPANY, a Medicare Fiscal Intermediary, Medicare Division, P.O. Box 1602, Omaha, NE 68101; )<br><br>   and  )<br><br>MICHAEL O. LEAVITT, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, 200 Independence Avenue, S.W., Washington, D.C. 20201 )<br><br>   and  )<br><br>LESLIE V. NORWALK, ACTING ADMINISTRATOR, CENTERS FOR MEDICARE & MEDICAID SERVICES, 7500 Security Boulevard, Baltimore, MD  21244 )<br><br>      Defendants.  ) | **JURY REQUESTED**<br><br>Case No. _____ |

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by and through their counsel, upon personal knowledge as to their own acts and beliefs, and upon information and belief as to all matters based upon the investigation of counsel, allege as follows:

## I. INTRODUCTION

1.    This is a proposed class action of national significance brought by Plaintiff Louise Bailey, individually, and on behalf of other similarly situated Medicare Part B beneficiaries residing in skilled nursing facilities ("SNFs") (collectively, the "Plaintiffs") against Mutual of Omaha Insurance Company ("Mutual"), which acts as a Medicare fiscal intermediary and adjudicates the Medicare claims of Plaintiff Bailey and the proposed class members; the Secretary ("the Secretary") of the Department of Health and Human Services ("HHS"); and the Acting Administrator ("Acting Administrator") of the Centers for Medicare & Medicaid Services ("CMS") (collectively, the "Defendants"), who are responsible for administration of the Medicare program.

2.    The Plaintiffs sue the Defendants for their participation, and acquiescence in, the enforcement of coverage policies for blood glucose testing of Medicare beneficiaries that were recently declared invalid by operation of law.  These policies have been, and continue to be, imposed to deny coverage

for medically necessary tests that protect institutionalized diabetic patients from cardiovascular disease, heart attacks, strokes, developing blindness, lower-extremity infections that can result in the amputation of limbs, and even death. These same policies are contrary to a number of federal initiatives to combat diabetes and prevent complications of the disease, and create a significant disincentive for physicians and other caregivers to administer blood glucose tests to Medicare beneficiaries, including the Plaintiffs.

3.    Diabetes is a serious, life-threatening, chronic illness for which there is no cure. Approximately 21 million children and adults in the United States live with the disease, a number which is growing by an estimated eight percent each year. Approximately 10.3 million Americans over 60 years of age have diabetes, or more than 1 out of every 5 (20.9 percent). See Centers for Disease Control, National Diabetes Fact Sheet (2005). Almost 18 percent of nursing home patients have this debilitating disease. Like Plaintiff Bailey, hundreds of thousands of Medicare beneficiaries throughout the United States reside in Medicare-certified SNFs, where they receive care for their disease, including the administration of blood glucose tests.

4. Notwithstanding the promulgation by CMS of a National Coverage Determination ("NCD") on blood glucose testing and

numerous federal initiates to combat the debilitating effects of diabetes, which encourage frequent testing of blood glucose levels for diabetic patients, CMS and its fiscal intermediaries have made a concerted effort to deny Medicare coverage of blood glucose tests for SNF residents under the Medicare Part B benefit.  With respect to the Plaintiffs, CMS has allowed, and we believe supported, Mutual's enforcement of a Local Coverage Determination ("LCD") to deny coverage for blood glucose tests, seriously jeopardizing the health and safety of this fragile population of Medicare beneficiaries.

5. Plaintiff Bailey, as an aggrieved party, exercised her statutory administrative right to challenge the validity of Mutual's LCD on blood glucose testing before the HHS Departmental Appeals Board ("DAB"), wherein she showed that Mutual's record for the LCD was incomplete and wholly inadequate in terms of clinical and medical best practice evidence to support the denial of coverage, and that the LCD was inconsistent with the findings in the NCD promulgated by CMS. Plaintiff Bailey moved for summary judgment.

6. Just days before Mutual's response to the summary judgment motion was due, Mutual, with the acquiescence of CMS, withdrew the LCD in order to divest the Administrative Law Judge ("ALJ") of jurisdiction over her claim.

7. Mutual's withdrawal of the LCD was, in effect, an acknowledgement that the LCD lacked sufficient support from the medical evidence, and as a matter of law, equivalent to the ALJ invalidating the LCD and the policies set forth therein. Accordingly, Mutual's blood glucose testing LCD and the coverage policies stated therein no longer have any legal effect.

8. After withdrawal of its LCD, Mutual argued to the ALJ that Plaintiff Bailey's claims for blood glucose tests were reviewed based upon a standard of "medical necessity," which has yet to be defined, but is addressed in the LCD, and that Mutual does not reference the LCD in its claim denials. Based upon this position, we believe that Mutual will continue to apply the same coverage policies from the LCD during future claim reviews, despite the fact that those policies are now invalid as a matter of law and have been shown during the DAB appeal to be without any support from the medical literature, medical best practices, clinical guidelines, or other medical evidence.

9. Neither Mutual nor CMS have stated that any of Mutual's previous denials of coverage to thousands of other Medicare beneficiaries in the proposed class based upon the now invalid LCD will be reopened and reviewed.

10. In an effort by CMS to circumvent further the legal effect of the ALJ decision in Plaintiff Bailey's DAB appeal, and

despite the irrefutable absence of any supporting medical evidence, CMS finalized a new regulation, effective January 1, 2007, that will require physicians to certify the "medical necessity" of each blood glucose test for Medicare Part B beneficiaries to obtain Medicare payment for those tests under the clinical laboratory fee schedule.

11.  This CMS requirement codifies a policy that is similar to one or more of the coverage policies in Mutual's LCD on blood glucose testing that were challenged by Plaintiff Bailey in her LCD appeal Complaint.  Because those LCD policies have been invalidated as a result of Mutual's withdrawal of the LCD, Mutual can no longer enforce those policies as a matter of law. Moreover, the new regulation imposes a requirement, like those in the LCD acknowledged to be invalid, that is without any clinical support, conflicts with other federal initiatives to treat and prevent diabetes, is contrary to medical best practices, and, upon information and belief, will be used by Mutual to deny coverage for Plaintiff Bailey and other members of the class.

12.  Upon information and belief, Mutual will continue, with the knowledge and acquiescence of CMS, to act in violation of the Medicare statute and regulations, and the ALJ's Decision in the LCD appeal, and deny coverage for blood glucose testing to the Plaintiffs using the same policies and procedures set

forth in the LCD, for which there is no supporting medical evidence and, as a matter of law, are invalid.

13. As set forth in the attached Declaration of Dr. David L. Jackson (Exhibit 1):

- Blood glucose testing is a cornerstone of diabetes care for Medicare beneficiaries and is supported by accepted medical literature and recognized practice guidelines.

- Regular blood glucose testing is recognized as medically necessary to maintain tight control of blood glucose levels.

- It is a medical best practice for blood glucose test services to be provided to Medicare beneficiaries who need assistance with or cannot administer self-administer tests.

- CMS policies on blood glucose testing are contrary to the weight of accepted medical evidence and medical best practices.

- CMS policies on blood glucose testing are inconsistent with other federal initiatives to treat and prevent diabetes.

- CMS policies on blood glucose testing effectively deny coverage and create a significant disincentive to

caregivers to perform tests that are necessary to
protect institutionalized diabetics from suffering
heart attacks and strokes, developing blindness,
having their limbs amputated, or even death.

## II.  JURISDICTION AND VENUE

14.  This is an action for declaratory and injunctive
relief, and other relief arising under Title XVIII of the Social
Security Act, 42 U.S.C. §§ 1395 et seq. ("Medicare Act") and the
Due Process Clause of the Fifth Amendment to the United States
Constitution.  Plaintiffs are statutorily authorized to bring
this action by 42 U.S.C. § 1395oo(f) and 42 U.S.C. §
1395ff(f)(3).  Because Plaintiffs' claims raise "federal
questions" and duties owed the Plaintiffs by the United States,
the jurisdiction of this Court is founded upon 28 U.S.C. § 1331
and 28 U.S.C. § 1361.

15.  Venue lies in this judicial district pursuant to
42 U.S.C. § 1395oo(f)(1) and 28 U.S.C. § 1391(e).

## III.  PARTIES

16.  Plaintiff Louise Bailey is 72 years old and resides at
the Holladay Healthcare Center, a Medicare SNF.  She has severe
diabetes with blindness as a result of her illness.  Plaintiff
Bailey's physician has determined that she requires blood

glucose testing four times per day, and that this is medically necessary in order to maintain control over her blood glucose levels.  The other Plaintiffs are members of the proposed class, as further defined below.

17.  Defendant, Mutual of Omaha Insurance Company, is a Medicare Fiscal Intermediary, acting as an agent for CMS (formerly known as the Health Care Financing Administration ("HCFA")); and Defendant, Michael Leavitt, the Secretary of HHS, is responsible for administration of the Medicare program, through CMS, for which Defendant Leslie V. Norwalk is the Acting Administrator.

## IV. LEGAL FRAMEWORK

18.  The Medicare program is a federal health insurance program for people 65 years of age and older, certain younger disabled people, and people with kidney failure.  See 42 U.S.C. § 1395 et seq.  The Secretary is responsible for administering the Medicare program and exercises that responsibility through CMS.

19.  CMS in turn contracts with private insurance companies to perform certain audit, administrative, and payment functions with respect to the Medicare program.  See id. § 1395h.  Those organizations are referred to as "fiscal intermediaries" or

"intermediaries."  See id.  Mutual is the fiscal intermediary

that processes the Plaintiffs' Medicare claims for payment.

20.  Effective November 23, 2001, CMS promulgated the

National Coverage Determination ("NCD") to address Medicare

coverage of blood glucose testing.  Specifically, the NCD states

that "[f]requent home blood glucose testing by diabetic patients

should be encouraged," and that "[t]he convenience of the meter

or stick color method . . . has become a standard of care for

control of blood glucose, even in the inpatient setting."  66

Fed.Reg. 58,846 (Nov. 23, 2001).  The NCD also states that

"[d]epending upon the age of the patient, type of diabetes,

degree of control, complications of diabetes, and other co-

morbid conditions, more frequent testing than four times

annually may be reasonable and necessary. . . . [R]epeat testing

may be indicated where results are normal in patients with

conditions where there is a confirmed continuing risk of glucose

metabolism abnormality."  Taking into account the health factors

of institutionalized diabetics, nowhere in the NCD are there

specific limitations on the frequency of testing, and nowhere is

there mention of requiring an order for each blood glucose test

administered to patient with a "confirmed continuing risk of

glucose metabolism abnormality."  The NCD simply lists the

number of maladies that may require blood glucose testing and

reiterates that reasonable and necessary tests will be reimbursed. See id at 58,846, 58,848.

21. An NCD is a determination by CMS as to whether or not a particular service is covered nationally by Medicare. 42 C.F.R. § 405.1060(a)(1). An NCD is legally binding on all Medicare contractors, including carriers and fiscal intermediaries, as well as the DAB and its ALJs, among others. See id. § 405.1060(a)(4). A NCD takes precedence over decisions made on the local level by Medicare contractors, i.e., LCDs, including what were formerly known as Local Medical Review Policies ("LMRPs"), and other non-binding policies. An LMRP or LCD may not conflict with a national coverage decision once the national coverage decision is effective. If a national coverage decision conflicts with a previously established LMRP or LCD, the contractor must change its LMRP or LCD to conform to the national coverage decision. . . . The LMRP or LCD may not alter the NCD. 66 Fed. Reg. 58,788 (Nov. 23, 2001).

22. Mutual published an LCD on blood glucose testing as a single statement of the policies it would impose on claimants who submit Medicare claims for blood glucose tests. That LCD was titled Blood Glucose Testing, contractor's determination number 2001-B, LCD database ID number L19657, and LCD version number 5 was the last published version.

23.    Mutual's LCD conflicted with the NCD on blood glucose testing in numerous ways, including: (i) the LCD's emphasis on the word "routine" to deny coverage of a series of blood glucose tests for SNF residents – the NCD does not preclude regular and frequent blood glucose testing of SNF residents; (ii) the LCD's requirement that each test result be reported to the physician promptly – the NCD does not require "prompt" notification, which could interfere with frequent blood glucose testing that is encouraged by the NCD; and (iii) the LCD's statement that there can be no standing order for blood glucose testing for such services to be covered – the NCD specifically encourages frequent testing of blood glucose levels for diabetic patients, does not provide any specific limitations to testing, and acknowledges that specific diagnosis codes, such as diabetes, support repeat testing, especially where there is a confirmed continuing risk of glucose metabolism abnormality.

24.    The LCD record in the administrative proceeding initiated by Plaintiff Bailey shows that Mutual first had a draft of its LCD on blood glucose testing in December 2000.  The record also shows that Mutual finalized and distributed the LCD to providers on August 6, 2001.  Other documents in the LCD record show that Mutual was aware of the NCD as it was being developed, yet made no effort to revise its LCD to be consistent

with the NCD, as is required.  See 66 Fed. Reg. 58,788 (Nov. 23, 2001).

25.  Effective October 1, 2005, however, Mutual issued a notice that it would implement system edits to more readily identify all Medicare Part B claims for blood glucose testing so as to deny coverage for SNF residents.

26.  From the date the LCD was first published (August 6, 2001) to the date Mutual put in place system edits (October 1, 2005), and thereafter, Mutual has denied coverage for Medicare Part B claims for blood glucose tests provided to SNF residents on the basis of the policies reflected in its LCD.

27.  Therefore, from the original publication of Mutual's LCD on August 6, 2001 to the present, and continuing, on information and belief, into the future, Mutual has taken the position under its LCD that Medicare Part B claims of SNF residents for regular blood glucose tests are not covered services, even if they meet the medical standards of practice for such tests.

## V.  FACTUAL BACKGROUND OF PLAINTIFF BAILEY'S LCD CHALLENGE

28.  The Medicare Act entitles an aggrieved party to challenge an intermediary's policy by direct appeal to the DAB. 42 C.F.R. §§ 426.300, 426.320.  This appeal process is separate and distinct from an appeal by a beneficiary of a denied

Medicare claim, for which there is a separate claims appeal process.  See 42 C.F.R. § 426.310(a).  The Medicare Act also grants federal courts jurisdiction to consider an LCD-related challenge to the validity of a determination or ruling of the Secretary without exhausting administrative remedies if there are no material issues of fact in dispute.  See 42 U.S.C. § 1395ff(f)(3).

29.  On March 28, 2006, Plaintiff Bailey filed a complaint with the DAB, as an aggrieved party under 42 C.F.R. § 426.400. Plaintiff Bailey challenged the validity of Mutual's LCD on blood glucose testing as legal authority for denying Medicare coverage of her blood glucose tests.  Her complaint included substantial clinical and medical evidence supporting the invalidation of the challenged LCD.

30.  By order dated April 19, 2006, the ALJ certified that her complaint met the acceptability requirements set forth in 42 C.F.R. § 426.410(b)-(d).

31.  On July 18, 2006, Plaintiff Bailey filed the Aggrieved Party's Statement pursuant to 42 C.F.R. § 426.425(a), showing in great detail that the LCD record, which had been produced by Mutual, is incomplete and wholly inadequate to support the coverage policies enunciated in the LCD when evaluated under the reasonableness standard at 42 C.F.R. § 426.425(a).

32.  On July 18, 2006, Plaintiff Bailey also moved for
Summary Judgment on her claims to invalidate Mutual's LCD.

33.  A few days before its response was due, Mutual, on
August 11, 2006, upon information and belief with the knowledge
and acquiescence of CMS, withdrew the LCD as a scheme to divest
the ALJ of jurisdiction over Plaintiff Bailey's substantive
challenge of the coverage policies in the LCD.

34.  As part of Mutual's notice to the ALJ that it had
retired its LCD on blood glucose testing, Mutual then argued,
contrary to the plain language of the LCD, which had been
previously disseminated to healthcare providers, that the LCD is
not being used to deny claims for blood glucose testing
submitted by Plaintiff Bailey; rather, Mutual took the position
that the claims for blood glucose testing are denied if they are
not medically necessary.

35.  The ALJ declined to render any substantive relief to
Plaintiff Bailey and stated in his decision that Mutual's
withdrawal of its LCD deprived him of jurisdiction under the
regulations to further adjudicate the issues she had raised.

36.  Without an LCD, Plaintiff Bailey and all other
Plaintiffs were rendered unable to further utilize the LCD
appeal process to challenge the merits of the coverage policies
in the LCD, effectively exhausting their administrative
remedies.

## VI.  LEGAL EFFECT OF PLAINTIFF BAILEY'S LCD CHALLENGE

### A.  The LCD's Restrictive Coverage Policies Are Now Invalid By Operation Of Law

37.  Pursuant to 42 C.F.R. 426.460(b), Mutual's withdrawal of its blood glucose testing LCD has the same legal effect as an ALJ's decision to invalidate that LCD under the reasonableness standard.  Accordingly, the LCD and the policies incorporated therein – which all affected parties had understood to be Mutual's policy on blood glucose testing coverage – are now invalid as a matter of law, and those policies can no longer be applied to anyone.

38.  In addition, Mutual is required to reopen denied claims of Plaintiff Bailey and adjudicate those claims, and any new claims submitted for blood glucose testing services, without using the invalid policies reflected in the LCD, now that it is withdrawn.  Any and all claims submitted to Mutual by anyone for blood glucose testing services with dates of service on or after August 11, 2006 must be adjudicated without using the invalid policies in the LCD.

39.  CMS stated very clearly in the preamble to the rules governing these LCD appeal procedures that it is the policy or

policies discussed in the LCD that are invalid when the LCD is
retired, not just the document itself:

> Retiring an LCD or withdrawing an NCD would result in
> the retired/withdrawn *policy* no longer applying in the
> claims adjudication process for services rendered on
> or after the date that the *policy* is
> retired/withdrawn.  Moreover, the aggrieved party
> would be granted individual claim review.  Since a
> claimant would receive the same relief that would have
> been available had the adjudicator found that the
> relevant LCD or NCD was not valid, there would be no
> reason to continue the appeal.

*Medicare Program: Review of National Coverage Determinations and
Local Coverage Determinations; Final Rule*, 68 Fed. Reg. 63,692,
63,698 (November 7, 2003) (emphasis added).   CMS added that:

> When we retire/withdraw an LCD/NCD *we will not apply
> those policies for services furnished after the
> retirement/withdrawal date* and we will reprocess the
> aggrieved party's affected claims *without applying the
> retired/withdrawn policy*.

Id. (emphasis added).

40.  Mutual cannot deny claims for blood glucose testing
services on or after August 11, 2006 (i) using any of the
restrictive coverage policies discussed in the now-retired and
invalid LCD on blood glucose testing, or (ii) based on its
policy interpretations discussed in the LCD of other authorities
(including Transmittal AB-00-108, Medicare Claims Processing
Manual § 90.1, and 42 C.F.R. § 410.32).

**B.   Mutual's Deliberate Choice Not To Reference The LCD By Name On Claims Denials Is A Mere Technicality That Does Not Allow Mutual To Continue To Enforce The Invalid LCD Policies**

41.   The Medicare statute defines an LCD as "a determination by a fiscal intermediary or carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary—or carrier—wide basis under such parts, in accordance with section 1862(a)(1)(A)."  42 U.S.C. § 1395ff(f)(2)(B).

42.   Simply stated, an LCD is an official statement of the fiscal intermediary's policies on the coverage of specific items or services for Medicare reimbursement.  It applies to claims for the listed items or services whether the fiscal intermediary proclaims it on every claim determination, or chooses not to mention it on any.  It is binding on claimants until retired or otherwise invalidated.  And once it is no longer valid – as is the case here – the coverage policies enunciated in that LCD can no longer be enforced by the fiscal intermediary.

43.   Mutual's LCD on blood glucose testing is now retired and invalid, and so are all of its policies discussed in that LCD interpreting Medicare authorities (including Transmittal AB-00-108, Medicare Claims Processing Manual § 90.1, and 42 C.F.R. § 410.32) to establish when Mutual will and will not reimburse claims for blood glucose testing services.

44.   The restrictive coverage policies in Mutual's now-retired and invalid LCD on blood glucose testing can no longer be applied to providers and beneficiaries that Mutual services. The LCD was Mutual's attempt to reflect, in one document, its coverage limitations on blood glucose testing services.  Mutual started with the broadly permissive coverage policy of the NCD on blood glucose testing.  Mutual then added the restrictive coverage policy language from Transmittal AB-00-108 (*e.g.*, "prompt" notification of test results to the ordering physician).  Mutual finished with its own unsupported policy interpretations of Transmittal AB-00-108 (that "prompt" means before the next test); the Medicare Claims Processing Manual § 90.1 (which Mutual interprets to prohibit coverage of blood glucose testing for SNF residents, as opposed to coverage for beneficiaries in their own homes); and 42 C.F.R. § 410.32 (which Mutual interprets to prohibit standing physician orders for blood glucose testing).  Now that the LCD is retired and invalid, all of the coverage limitations on blood glucose testing services reflected in the LCD are unenforceable by law. Any other conclusion or result would be a total perversion of justice for Plaintiff Bailey and the thousands of other Medicare beneficiaries in the proposed class whose claims have been or will be denied.

C.   **Mutual Can Obtain No Support From The New CMS Regulation To Deny Claims For Blood Glucose Tests**

45.   Upon information and belief, CMS developed the new provision in the regulation that will require physicians to certify the medical necessity of each blood glucose test for Medicare beneficiaries beginning January 1, 2007, which was buried in the 2007 Medicare Physician Fee schedule rulemaking, to circumvent further the consequences of Mutual's invalid LCD. See 71 Fed. Reg. 69,624, 69,704-05 and 69,788 (Dec. 1 2006) (to be codified at 42 C.F.R. § 424(f)).

46.   Current clinical evidence, medical literature, and medical best practices support the medical necessity and reasonableness of a physician-prescribed protocol of repeat blood glucose monitoring in diabetic patients.  Requiring physicians to individually order and certify the medical necessity of each "finger stick" blood glucose test administered to a Part B-eligible nursing home resident is inconsistent with the Medicare statute and regulations, as well as longstanding CMS policy.

47.   More importantly, CMS provides no clearly articulated rationale in support of its policy, which deviates significantly from the current medical best practices in diabetes management, is contrary to other federal initiatives, and creates significant disincentive on professional care givers to utilize

these tests in managing the care of institutionalized diabetic patients.  (See Declaration of Dr. Jackson).

48.  Like the invalid LCD, this new regulation of CMS ignores current medical literature and clinical authorities and is inconsistent with numerous federal initiatives to combat diabetes and prevent complications of the disease.  These federal initiatives recognize the value of having the physician prescribe supplies and document the frequency of self-testing, without requiring physician review before each testing event.  Some of the key programs sponsored by the federal government include:

- The Centers for Disease Control and Prevention ("CDC") National Public Health Initiative on Diabetes and Women's Health (see http://www.cdc.gov/diabetes/projects/women.htm);

- The HHS Council on Health Disparities, which sponsors a number of programs designed to improve the health of minorities and underserved populations, including diabetes detection and prevention (see http://raceandhealth.hhs.gov); and

- The National Diabetes Education Program ("NDEP") (see http://www.cdc.gov/diabetes/ndep/index.htm)

When HHS launched NDEP in 2001, a joint federal program run by the National Institutes of Health and the CDC, the Secretary emphasized the importance of informing Medicare beneficiaries that they "can use their benefits to better monitor and manage their diabetes."  See "HHS Launches Diabetes Education Program

for Older Americans," HHS Press Release (May 3, 2001), <u>reprinted</u> <u>at</u> <u>http://www.hhs.gov/news/press/2001pres/20010503.html.pg1</u>. The NDEP supports routine monitoring of blood sugar levels by diabetics and their health care providers for use in an effective treatment plan for managing their disease.

49.  As a result of the LCD appeal, all new claims for blood glucose tests must be reviewed by Mutual without application of the LCD and its coverage policies.  Under the applicable regulatory scheme, Plaintiff Bailey's previously submitted claims are to be readjudicated by Mutual.  All other Plaintiffs in the proposed class should be afforded the same relief.

50.  Plaintiff Bailey alleges, on information and belief, that Mutual's review of her denied claims, her future claims, and the claims of the proposed class, will continue to be denied based upon the policies reflected in the invalid LCD – a clear violation of law.

## VII. <u>CLASS ACTION ALLEGATIONS</u>

51.  Plaintiff Bailey brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of herself and the Class comprised of:

> All Medicare Part B beneficiaries residing
> in SNFs who require blood glucose testing

and whose blood glucose test claims have
been or will be processed by Mutual during
the Class Period.

52.  The Class Period is from August 6, 2001, the effective

date of Mutual's LCD regarding blood glucose testing services,

now withdrawn, ad infinitum.

53.  The Class consists of numerous individuals throughout

the United States, making joinder impractical, in satisfaction

of Rule 23(a)(1).  The disposition of the claims of the Class

Members in a single class action will provide substantial

benefits to all parties and to the Court.

54.  The claims of the representative Plaintiff is typical

of the claims of the Class, as required by Rule 23(a)(3), in

that the representative Plaintiff, like all the Class, requires

blood glucose testing and has had (and reasonably anticipates

will have) such claims denied by Mutual based upon the withdrawn

LCD.

55.  The factual and legal bases of the Defendants'

misconduct are common to the Class and represent a common thread

of action in violation of statutory authority, arbitrary and

capricious agency action, and other misconduct resulting in

injury to Plaintiff and members of the Class.

56.  Plaintiff will fairly and adequately represent and

protect the interests of the Class, as required by Rule

23(a)(4).  Plaintiff has retained counsel with substantial

experience handling nationwide class actions.  Plaintiff and her counsel are committed to vigorously prosecuting the action on behalf of the Class, and have the financial resources to do so. Neither Plaintiff nor her counsel has any interest adverse to those of the Class.

57.  Defendants have acted on grounds generally applicable to Plaintiff and the Class and require Court imposition of uniform relief to ensure compatible standards of conduct toward the Class, thereby making appropriate declaratory and injunctive relief to the Class as a whole within the meaning of Rule 23(b)(2).

## VIII. CAUSES OF ACTION

### COUNT I

### VIOLATION OF THE MEDICARE ACT AND APPLICABLE REGULATIONS

58.  Paragraphs 1 through 57 are hereby incorporated by reference as if fully set forth herein.

59.  Mutual's LCD was an official statement of its policies on the coverage of blood glucose tests for Medicare beneficiaries.  The LCD applied to claims submitted by or on behalf of these beneficiaries for the listed items or services whether Mutual chose to indicate that on every claim determination, or chose not to mention it on any.  It is binding on claimants until retired or otherwise invalidated.  And once it is no longer valid – as is the case here – the coverage

policies enunciated in that LCD can no longer be enforced by Mutual.

60.  Mutual's withdrawal of its blood glucose testing LCD has the same legal effect as an ALJ decision to invalidate that LCD under the reasonableness standard, pursuant to 42 C.F.R. § 426.460(b).

61.  It is the policy or policies discussed in the LCD that are invalid when the LCD is retired, not just the document itself.

62.  Accordingly, the Defendants are acting in violation of the Medicare Act and regulations by continuing to enforce and/or acquiesce in the enforcement of the coverage policies by Mutual that were invalidated when the LCD was withdrawn.

**COUNT II**

**VIOLATION OF FIFTH AMENDMENT DUE PROCESS**

63.  Paragraphs 1 through 62 are hereby incorporated by reference as if fully set forth herein.

64.  Mutual's LCD on blood glucose testing, and the coverage policies discussed therein, are now invalid as a matter of law, pursuant to 42 C.F.R. § 426.460(b); 68 Fed. Reg. 63,692, 63,698 (November 7, 2003).

65.  Plaintiff Bailey has received notice through the DAB appeal process that the LCD is invalid, and the ALJ ordered that

her claims for blood glucose testing services be reviewed without application of the retired/withdrawn LCD, per 42 C.F.R. § 426.420(e)(1).

66.  Prior claims and subsequent claims for blood glucose testing now must be adjudicated by Mutual without application of the invalid LCD policies.  See id. § 426.460(b)(1)(iv).  This is a material fact about the LCD that affects Mutual's review of claims, claimants' submission of new claims, and claimants' decision-making on whether to appeal denied claims.

67.  Only Plaintiff Bailey has received notice of this fact.

68.  All Class members, and the providers who administer blood glucose testing services to the Class, should be informed of this fact so that they can appropriately submit claims and make informed decisions about whether to exercise their statutory and regulatory rights to challenge claims denied under the LCD policies.

69.  Accordingly, it is a continuing violation of Plaintiffs' right to due process under the Fifth Amendment of the United States Constitution that the Defendants have not issued some form of notice to effectively inform the Class, and the providers who administer blood glucose tests to the Class, of the following: (i) Mutual's LCD on blood glucose testing, and the policies stated therein, were declared invalid as a matter

of law by the ALJ's order dated September 19, 2006; (ii) Mutual
is prohibited from reviewing any new claims for blood glucose
testing under the LCD policies; and (iii) beneficiaries, and
providers acting on their behalf, have the right to seek
reversal of denied claims through the Medicare claims appeal
process.

## IX. RELIEF REQUESTED

WHEREFORE, Plaintiffs request:

(1)  A declaration that the restrictive coverage policies
in Mutual's LCD are invalid by law as a result of Mutual's
withdrawal of the LCD, and can no longer be applied to Plaintiff
Bailey and the Class.

(2)  A declaration that blood glucose testing services
provided to Plaintiff Bailey and the Class are medically
necessary when supported by a physician order or certification
for a prescribed series of blood glucose tests, furnished over a
limited period of time specified by the physician, to monitor an
individual's blood glucose level.

(3)  An Order directing Mutual to readjudicate previously
submitted Medicare Part B claims for blood glucose testing
service provided to Plaintiff Bailey and the Class and reprocess
those claims in accordance with declarations (1) and (2) above.

(4)  An Order directing Mutual to adjudicate newly submitted Medicare Part B claims for blood glucose testing service provided to Plaintiff Bailey and the Class and process those claims in accordance with declarations (1) and (2) above.

(5)  An Order creating a review process with a Magistrate of the Court to confirm that all claims adjudicated and readjudicated by Mutual pursuant to the three orders above are consistent with declarations (1) and (2) above.

(6)  An Order directing Defendants to issue some form of Notice to effectively inform Plaintiff Bailey, the Class, and their SNF providers, of the following:  (i) Mutual's LCD on blood glucose testing, and the policies stated therein, were declared invalid as a matter of law by the ALJ's order dated September 19, 2006; (ii) Mutual will reprocess blood glucose test claims previously submitted in accordance with declarations (1) and (2) above; (iii) Mutual will process new blood glucose test claims in accordance with declarations (1) and (2) above; and (iv) beneficiaries, and providers acting on their behalf, have the right to seek reversal of denied claims through the Medicare claims appeal process.

(7)  Legal fees and costs of this suit incurred by Plaintiffs; and

(8)  Such other relief as this Court deems just and appropriate.

Respectfully submitted,


*Thomas C. Fox*
_____
Thomas C. Fox
D.C. Bar #4473
REED SMITH LLP
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, D.C. 20005
(202) 414-9222

Counsel:
Carol C. Loepere
Antony B. Klapper
Jason M. Healy
Amanda Walker
REED SMITH LLP
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, D.C. 20005
(202) 414-9200


Dated:  December 15, 2006

# Exhibit 1

DECLARATION OF DAVID L. JACKSON, MD, PhD

I, David L. Jackson, do hereby declare under penalty of perjury, and state as follows:

I have been professionally involved in quality of care in geriatric medicine for the past 20 years, serving in various capacities, including in the past as Director of the State of Ohio Department of Health and as Director of the State of Ohio Department of Mental Retardation and Developmental Disabilities. I have also served on the Board of the Association of State and Territorial Health Officers. I received my Ph.D. with Distinction from Johns Hopkins University in 1966 and my M.D. degree from that institution in 1968. I completed my residency training in Internal Medicine and served as both Resident and Chief Resident in Neurology at Hopkins from 1968 through 1975.

I was a member of the Steering Committee for the National Quality Forum on advising CMS on creating the current public outcomes reporting for the nation's long term care facilities. In the past, I served as the Director of the Division of Critical Care Medicine and Professor of Medicine at Case Western Reserve University in Cleveland, Ohio. I also served as a member of the American Academy of Neurology National Ethics Committee and have written and lectured on the ethical issues in medicine nationally.

I currently hold an appointment as an Adjunct Professor of Medicine at the Johns Hopkins University School of Medicine in the Division of Geriatric Medicine. For the past fifteen years, I have worked both for providers and as an agent of the courts, state governments and the U.S. Department of Health and Human Services (DHHS) in a wide array of quality-related consulting engagements. These engagements relate to quality management and improvement issues in geriatric/long term care and have been conducted in more than 20 states. I have attached my academic curriculum vitae that provides more detail on my background and experience.

Set forth below is my professional opinion on the adverse medical and health care implications of the various policies that have been promulgated by the U.S. Department of Health & Human Services, Centers for Medicare & Medicaid Services, and applied by their Medicare fiscal intermediaries, such as Mutual of Omaha, in the area of blood glucose testing of patients in nursing facilities.

In sum, it is my professional opinion, and I would so testify at any hearing on behalf of the Plaintiff Louise Bailey and the class of Medicare beneficiaries as follows:

I.    THE DIABETES EPIDEMIC AND THE MEDICARE PART B POPULATION: BLOOD GLUCOSE TESTING (BGT) IS A CORNERSTONE OF DIABETES CARE AND SUPPORTED BY ACCEPTED MEDICAL LITERATURE AND RECOGNIZED PRACTICE GUIDELINES

Diabetes Mellitus (DM)/Type II is a disorder of carbohydrate metabolism that leads to abnormalities of fat and protein metabolism. It is the most common endocrinologic disorder and is the most prevalent endocrinologic disorder in individuals over the age of 55 years. According to statistics recently reported by David Eddy, M.D., Ph.D. at the 2001 Health Legacy Partnership Conference, Type II diabetes affects about 16 million people in the United States and it is estimated that approximately 6 million of these individuals have not yet been diagnosed. In addition, 20 million people have impaired glucose tolerance resulting in elevated fasting plasma glucose levels. The incidence of DM will increase over the next three decades as the graying of

America continues.  The impact of this disorder on quality of life and on economic costs is substantial.

Blood glucose testing to monitor glucose levels in the blood, as performed by patients and health care providers, is considered a cornerstone of diabetes care (See Position Statement: Tests of Glycemia in Diabetes, American Diabetes Association, Diabetes Care 25:S97-S99, Supp. 1 (Jan. 2002), pg. S97).  The results of both the individual test results and the patterns of sequential tests over time are used by the treating physician to assess the efficacy of therapy and to guide adjustments in medical nutrition therapy, exercise, and medications to achieve the best possible blood glucose control (See id).

Many clinical authorities advocate the use of sliding scale insulin administration supported by glucose testing for nursing home residents, although prolonged use of sliding scale insulin is not recommended (See Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pg. 26).  This approach uses a base dose of intermediate or long acting insulin, often with a dose of regular (fast acting) insulin, supplemented by regular insulin administered by the nurse based on the patient's blood sugar and the treating physician's orders.  The established best practice is for the physician to set the frequency of the testing and a range of insulin doses based on the blood glucose values of the specific patient.  The specific parameters for very high or very low blood glucose values ("critical results") are also set for the individual patient in the physician's orders for that patient. Any blood glucose value that is above/below the critical threshold for that patient must be immediately communicated to the treating physician.  The treating physician also reviews the results of multiple glucose tests over time as a batch to evaluate the patterns of response to the insulin therapy.

Blood glucose testing (or monitoring), a measurement of glucose in the blood that can be done at any time on a portable machine, has long been used to assess blood glucose levels for diabetics.  Blood glucose testing is typically performed by placing a drop of blood on a reagent strip, which uses a chemical substance to react to the amount of glucose in the blood.  The portable machine then reads the strip and displays the results as a number on a digital display.  Physicians are notified when glucose values are above or below the specified parameters. Adjustments are made to the base (and supplemental) dose when the physician deems such a change is necessary.  This treatment protocol is essentially the same whether the patient is being treated at home, as a hospital inpatient, or in a skilled nursing facility ("SNF").  This approach is consistent with the policy established in the National Coverage Decision ("NCD") on blood glucose testing.

This type of glucose testing is particularly important in elderly patients where their age and other co-morbidities have compromised the body's homeostatic ability to maintain a normal and stable body state.  To help elderly diabetics maintain a homeostatic state, the AMDA clinical practice model for management of diabetic patients recommends a blood glucose test be taken on admission, bedside glucose testing be performed several times a day (more frequently if the patient's glucose level is poorly controlled), daily blood glucose review, and physician alert when values fall below or above the recommended range or a range indicated in the physician-ordered protocol of blood glucose monitoring (See id. pgs. 11, 27-28, 39-42).  The American Diabetes Association also recommends blood glucose testing of type 1 diabetics three or more times daily (See Standards of Medical Care in Diabetes, American Diabetes Association, Diabetes Care 2004, Vol. 27, pg. S20; Position Statement: Tests of Glycemia in Diabetes, American Diabetes Association, Diabetes Care 25:S97-S99, Supp. 1 (Jan. 2002), pg. S97).  Such glucose testing should not be confused with screening tests, routine or standing orders.  Regular testing, when prescribed as part of a treatment protocol specifically designed to meet the needs of the individual beneficiary, is medically necessary to avoid certain short and long-term complications of diabetes, and to assess the efficacy of ongoing treatment. Such tight control of

blood glucose in diabetics has been shown in many papers in the peer-reviewed medical literature to improve outcomes and decrease the likelihood of complications that can lead to disability, poor quality of life and death (e.g. vision loss, renal failure, heart attacks, etc.).

The medical literature clearly indicates that day-to-day control of insulin levels reduces the severity of existing consequences of diabetes, and can prevent the onset of new symptoms and complications. Diabetes is common in the nursing home setting, with over 18 percent of nursing home residents having this disease (See Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pg. 2). The literature demonstrates that nursing home patients have a high prevalence of cognitive and physical impairment and need help in daily activities and maintaining recommended dietary and exercise regimens. The prevalence of these impairments is higher among diabetic nursing home patients than in the nursing home population as a whole, which increases the complexity of diabetes management, and makes it unlikely that these patients can manage their diabetes on their own (See id. pg. 3). Diabetic nursing home residents are susceptible to hyperglycemia (high levels of blood glucose that can lead to impaired cognition, decreased pain perception, impaired vision, increased the risk of infections and potentially increase risk for falls) and hypoglycemia (low levels of blood glucose, which, untreated, can cause falls or permanent neurological impairment) (See id. Nursing home residents are frequently unable to perceive or communicate hypoglycemic symptoms (See id. "Frequent monitoring of blood glucose levels is critical to avoid hypoglycemia and its consequences." Subacute Care for Seniors: Management of Elderly Diabetic Patients In the Subacute Care Setting, A. Lee, MD, Clinics In Geriatric Medicine, 16:4 (Nov. 2000), reprinted at http://home.mdconsult.com, pg. 8).

Treatment guidelines for diabetes published by numerous medical societies establish that glucose monitoring is reasonable and necessary for the treatment of diabetes patients, and leave the frequency of the testing to the medical judgment of the treating physician, based on the patient's individual circumstances (See Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), see especially pgs. 39-41). Regular blood glucose testing is part of an overall, individualized treatment care plan for diabetes management, along with a meal plan, activity and physical therapy, treatment with oral antidiabetic agents and/or insulin, foot/wound care, and pain management (See id. pg. 16). Regular monitoring of blood glucose levels helps patients achieve target ranges for blood glucose control; reduce the risk of lower-extremity infections, ulcers, and limb loss; control pain and neuropathic symptoms; and reduce the progression of other diabetic complications (See id. pgs. 16-17).

The insulin needs of patients with diabetes can vary from one patient to another, from day to day, even from hour to hour. Most nursing home patients have type 2 diabetes but a sizable proportion have combined therapy that includes the administration of insulin for the management of their diabetes . Regular testing is particularly important for these patients because blood glucose levels frequently vary depending on the time of day, as demonstrated in a study conducted by the National Institute of Diabetes and Digestive and Kidney Diseases and Social, and Scientific Systems, Inc., published in the December 27, 2000, Journal of the American Medical Association (See Diurnal Variation in Fasting Plasma Glucose, JAMA (Dec. 27, 2000), pg. 5; see also Merck Manual of Diagnosis and Therapy § 2, Ch. 13, pgs. 9-10 (discussing the "dawn phenomenon")).

During the past decade, clinical trials have demonstrated the importance of glycemic control, as measured through regular blood glucose testing, to prevent and reduce the complications of diabetes (See The Importance of Tight Glycemic Control, J.E. Gerich, MD, The American Journal of Medicine, 118:9A (September 2005), reprinted at http://home.mdconsult.com, pg. 4). Several new therapeutic agents have become available to

improve and monitor glycemic control in patients with type 2 diabetes, including less painful and continuous monitoring devices (See id). Although this technology is not widely used at the present time, the optimization of glycemic control by any means has been shown to be cost-effective. See id. Regular blood glucose testing with home use devices has been shown to be less expensive in the long run than the costs of surgery and other treatments for patients who develop complications due to poor glycemic control. However, despite the advances in monitoring devices and therapeutic agents, at least one study suggests that there has not been a corresponding improvement in glycemic control for diabetic patients (See id). The likely explanations for this include "lack of time and resources due to reimbursement considerations, for physicians to treat patients with diabetes," provide needed education, and other factors (See id).

II.    REGULAR BLOOD GLUCOSE TESTING IS RECOGNIZED AS MEDICALLY NECESSARY TO MAINTAIN TIGHT CONTROL OF BLOOD GLUCOSE LEVELS

A series of clinical studies have demonstrated that "tight" control of glucose levels leads to significant decreases in the incidence of complications seen over time in many diabetic patients. **It is important to note that the patient population in today's long term care (LTC) facility is substantially older and more medically complex than in the past ("older and sicker").** Today's LTC patient with DM is older and has more co-morbid conditions than the average LTC facility patient with DM a decade ago. According to a study published in the *Journal of Cardiovascular Nursing*, April 1, 2000, titled "Patient Problems and Nurse Interventions During Acute Care and Discharge Planning," the frequency of problems that individuals over the age of 65 experienced averaged 8.6 problems during the acute care stay that required nurse attention and care planning. In this study, 68% of the nursing interventions associated with these problems related to surveillance activities. The most frequently cited surveillance activity was drawing lab specimens. The number of patient problems demonstrated in this study is also consistent with the number of patient problems identified via the Resident Assessment Instrument (RAI) process.

In comments provided to the Centers for Medicare and Medicaid Services (CMS) on the Resident Assessment Protocol (RAP), the American Health Care Association (AHCA) reported that with each Minimum Data Set (MDS) assessment, approximately 6 to 10 RAPs are generated. This constitutes about 50% of the RAI RAPs that can be triggered for care planning. In 6 of the 17 provided RAPs, DM is listed as an "internal risk factor." Among these six are the more commonly triggered RAPs. There is thus a current need for monitoring that is mandated by the RAI process and a growing need for more intense management of blood glucose levels for an increasing number of residents in LTC facilities who have DM.

III.    IT IS A MEDICAL BEST PRACTICE FOR BGT SERVICES TO BE PROVIDED TO MEDICARE PART B BENEFICIARIES WHO NEED ASSISTANCE WITH OR CANNOT SELF-ADMINISTER TESTS

As noted above, there is ample medical evidence to establish that frequent determination of blood glucose in the diabetic patient, especially those frail elderly patients in SNF's, is associated with fewer complications and better outcomes than patients with less "tight" control of their blood glucose. The goal of this entire debate should be to ensure that care that meets the standard of "best medical practice" is provided to all Medicare beneficiaries and Medicaid-covered individuals in SNFs, while ensuring that there are adequate safeguards in place to avoid any "gaming" of the system. Certainly it is clear that no test should be paid for unless the results are used to help make clinical management decisions for the patient. These goals can all be met without creating the disincentives and counter-productive signals to the professional team caring for these patients that is created by the current CMS rule.

The technology now exists and can be effectively operated by health care providers at LTC facilities and elsewhere to determine blood glucose levels rapidly and accurately using blood obtained from a finger stick and processed by a simple to calibrate glucometer. This technology and approach facilitates feedback of the results of the blood glucose value to facility professional staff, including the treating physician. It can also assist with the identification of trends as early as possible without basing a judgment about the next dose of insulin for that patient on a single, isolated blood glucose value, if the test result may not reflect any real "trend" in the patient's clinical course. For example, at 4 PM one day, a patient may have a moderately elevated blood glucose results that is not in the "critical value" range. Such a single test result could be due to the patient eating some food not on his/her diet earlier that day while on a leave of absence from the SNF with a family member. For the physician to act on that single value, without evaluating the data in the context of other glucose values over time, would not be the best medical practice. Such a patient should not be immediately treated with additional insulin. If the patient were given an increased insulin dose based on that one blood glucose value, and on the ensuing day he/she did not eat the same "off diet" foods at the same time, the patient would be at real risk for the occurrence of serious hypoglycemia.

Hence it truly is important to evaluate any glucose test results that are in a "critical range" in real time. However, any suggestion that every individual blood glucose value not in a critical range must be communicated immediately to the physician seems to me to be in error on one of two fronts. Either it is based on an assumption that unless the physician is notified immediately of the test results, he/she will not be able to use the data in any meaningful way in the management of the patient. This is patently not true. The other possible assumption seems to be that a test results not in a critical range is not of value in the management of the diabetic patient. This also fails to meet any relevant clinical standard of practice. It should also be emphasized that, independent of any test results, if a SNF (or any) patient "just isn't acting normally" in the relevant nurse's judgment, this observation should be communicated to the treating physician in as timely a fashion as a "critical value" test result. These technologies, and solid clinical practice standards, support using both critical values and patterns of non-critical values of blood glucose in making the most timely and highest quality decisions regarding the delivery of treatments that require the glucose value to help determine the next steps (e.g., the precise amount of additional insulin, if any, that should be administered to the individual patient).

I have personally been involved with developing practice protocols for BGT. These protocols are based on medical best practices for BGT. It is my opinion that when BGT services are provided to LCT residents and other Medicare Part B patients in keeping with at least a number of the following parameters, that BGT services are medically necessary.

There are four levels of clinical situations where glucometer/finger stick glucose monitoring in LTC residents is indicated. These situations are based on patient acuity, clinical judgment, patient diet, patient activity levels and standards of practice for clinical management of patients with DM. The four levels of DM patients include:

A.    Level I – Patients with unstable DM (blood glucose values of < 60 mg% or > 350 mg% or with signs and/or symptoms of hypo- or hyper-glycemia). These patients often require finger stick glucose monitoring to be performed at least 3 or more times per day. The physician orders for this level include specific circumstances that will mandate immediate physician notification (e.g. notify physician immediately for glucose levels less than 60 mg% or more than 350 mg%). The specific levels noted for immediate notification under such a "sliding scale" order are clearly dependent on individual patient characteristics and physician judgment.

The physician's order may also call for the administration of differing amounts of additional medications (e.g. insulin for blood glucose levels that are in certain ranges. That is to say, as an example, give no additional insulin for a determination of between 60 and 150mg%,

give 4 units of regular insulin subcutaneous if blood glucose is between 151 and 250 mg% and give 8 units of regular insulin subcutaneous for a determination between 251 and 350mg%). If the glucose level is greater than 350 mg%, the physician in this hypothetical case would be called immediately, according to the instructions in the Sliding Scale orders, and specific orders obtained from the treating physician for how best to respond.

In all these patients, the pattern of all the glucose determinations over time - and not just any of individual data point along the time line - is of critical importance in the management of the patient's DM. The physician must review the pattern of these values over time to determine if the diet, activity level and/or hypoglycemic drug regime is appropriate or ought to be changed (or if the situation is stabilizing and monitoring frequency can be safely decreased). Hence, the physician's order for this category of individual with DM also should reflect that the facility staff shall notify the physician of all the individual determinations at a time interval specified in the physician's order for the individual patient/resident, whether or not any of the levels had previously triggered an immediate notification. For this level of monitoring intensity, the frequency of physician notification and review, in my view, should be every 24 to 48 hours. The more acutely ill (unstable) the patient, the shorter the frequency of notification. The more stable the patient, the less frequent the notification ordered for blood glucose values that fall within the above range.

B.    Level II – Patients with a significant clinical risk for blood glucose instability, as determined by the attending physician, but who are more stable than the patients noted under Level I noted above. These individuals may or may not have any current fluctuation in glucose levels. For this level to be supported, the patient's glucose values could, for example, either be in the range of (>300 mg% but < 359 mg%) or (< 80 mg% but > 60 mg%) **or** the patient would have a specific medical reason for being at risk for blood glucose instability (e.g. acute urinary tract infection, steroid medications, etc.). The patients in this level may have blood glucose monitoring performed between one (1) and three (3) times per day. Again, as described above, the same type of sliding scale order may be written that allows immediate notification for levels that are very low or very elevated. At Level II, the physician would order notification of the pattern of blood glucose values for his/her evaluation in a range of (e.g.) every 2 to every 3 days.

C.    Level III – Patients who are relatively stable, but still exhibit some risk for fluctuations in glucose control (although with less probability and/or lower magnitude of fluctuations). In these individuals, the monitoring frequency would be between one per day to twice per week. In this circumstance, the physician notification of all determinations would be at a frequency between every three 3 to 7 days, depending on the patient's stability and clinical context.

D.    Level IV – Routine glucose monitoring for relatively stable patients with DM: These patients would demonstrate no blood glucose values outside the ranges noted above and would not exhibit any of the specific clinical factors that would generate a risk for such instability. These patients could have monitoring less than 2/week.

**EXAMPLE:**  An individual who historically has relatively stable insulin dependent diabetes mellitus (blood glucose values normally in 150 to 180 mg% range). The physician's initial orders were to check blood glucose levels by finger stick once per week. This individual would be at Level IV under the proposed approach.

This individual then develops an acute urinary tract infection (UTI), with fever and an increased risk for glucose fluctuations. The individual would then transition to Level II, after the appropriate new orders are received from the physician. The physician orders that glucose values be measured three (3) times per day for clinical management during this period of increased risk. The order calls for notification of the physician immediately for specific glucose values that are

in specified emergency ranges. The order also requires that the physician be notified of all the glucose values recorded at least every 48 hours. The blood glucose values for this resident over the next two days are in the 200 to 275 mg% range. None are in the "emergency" range, requiring "stat" notification.

This individual then progresses to develop signs and symptoms of hyperglycemia, with a blood glucose value of 375 mg% (in the "emergency range of >350 mg%). The physician is notified immediately by the staff, in accordance with the orders. A new order is received that calls for additional insulin to be administered immediately. In addition, the glucose values are to be obtained four (4) times per day. Notification of all the values is ordered to be communicated to the physician at least every 24 hours. The individual has filled the criteria for a Level I patient during this time period.

Over the next several days, the blood glucose values begin to improve, although they are still elevated (235 to 275 mg%). The fever has subsided and the individual is on appropriate antibiotics for the infection. The frequency of glucose determinations is reduced by a new order from the physician to three (3) times per day and notification of all results is ordered to be communicated to the physician at least every 2 days (Level III). This status is continued over a four-day period. During the last 72 hours of this period, the blood glucose values are generally in the 180 to 220 mg% range, with none >235 or <150 mg%. The patient appears to be making an uncomplicated recovery from the UTI. The physician then orders the frequency of blood glucose determinations to be reduced to two (2) times per week. (back to Level IV).

This clinical example is presented to demonstrate how this process can accomplish the following:

- Ensure that good medical practice is supported by the overall framework and approach to patient management.

- Ensure that the physician has access to all the information needed to make optimal clinical management decisions in a timely fashion, and

- Ensure that there are easily understood criteria that will clearly distinguish between "routine monitoring" (analogous to the home setting for stable diabetic patients) and measurement of glucose values that are needed and used for real time management of the patient's disease when glucose instability is present or there is a documented increased risk of such instability occurring.

Physicians should be expected to review all blood glucose determinations at intervals that reflect the relevant time frame within which clinical management decisions need to be made.

The framework outlined here for management of diabetic patients in the LTC population of increasingly frail individuals is consistent with accepted clinical practice. It creates a framework and expectation for effective communication between the physician and the facility staff concerning the relevant laboratory data. This approach also creates a series of opportunities for the physician to review the appropriateness of the treatment regime, dietary intake, activity level, clinical management and the frequency of monitoring required for each individual patient.

The use of the clinical "levels" approach to glucose monitoring provides increased opportunity for the physician to review sequentially the on-going appropriateness of the management plan and the level of intensity of monitoring. This approach is consonant with quality clinical management and testing. It can also provide CMS with adequate safeguards against excessive ordering of unnecessary tests or not having the physician appropriately use the data generated by the tests in the management of the patient.

IV.    CMS POLICIES TO DATE ON BGT ARE CONTRARY TO THE WEIGHT OF
       MEDICAL EVIDENCE AND MEDICAL BEST PRACTICES

       CMS has a clear opportunity to place itself at the forefront of combating diabetes in the
nursing home population. However, Program Memorandum AB-00-108 and the recent Final
Rule on BGT (to be codified at 42 C.F.R. § 424.24(f)) is precisely the type of reimbursement
policy that discourages regular blood glucose testing. Rather than encourage the necessary
monitoring of blood glucose levels in Part B SNF residents by covering these tests, these policies
establish administrative burdens that would effectively deny coverage, creating a disincentive to
perform these tests. Moreover, these policies directly contradict best practices and instead call
for an unworkable, misguided and impractical approach to treating diabetes. These CMS
policies fail to provide the governmental support that is needed to protect institutionalized
diabetics from suffering heart attacks and strokes, developing blindness, requiring the
amputation of limbs, and experiencing other complications that require costly medical
intervention.

       A.    Requiring Orders for Each Individual Blood Glucose Test is Not Best Medical
             Practices

       The established best practice is for the physician to set the frequency of the testing and a
range for the blood glucose values of the specific patient. Physicians are notified when glucose
values go above or below the specified parameters. Adjustments are made to the base (and
supplemental) insulin dose(s) when necessary. This treatment protocol is essentially the same
whether the patient is being treated at home, as a hospital inpatient, or in a SNF. It is consistent
with existing Medicare requirements and the policy of many fiscal intermediaries. As discussed
below, there is no rational basis to apply a more restrictive policy to the administration of blood
glucose testing to SNF residents than to ambulatory beneficiaries performing self-testing at
home, particularly considering that SNF residents are less capable of such tasks – as reflected in
the fact that they require 24-hour care in nursing homes that offer skilled nursing care and other
services.

       Adherence to the current best practices for glucose testing is particularly important in the
care of elderly patients whose age and underlying medical problems together have made them
more frail and more prone to fluctuations in many test results, such as blood glucose values. To
manage elderly diabetics optimally, AMDA recommends frequent blood glucose monitoring
(vide supra) These carefully designed clinical practices are clearly "reasonable and necessary"
for the ongoing diagnosis and treatment of diabetes in institutionalized beneficiaries.

       Clearly, physicians will and should follow the best practice in this area. Thus,
compelling SNFs to phone a physician for each patient, sometimes up to three and four times a
day, for an order for the next test to be done in a few hours (in order to achieve coverage under
the rubric of the Final Rule) is in actuality telling physicians how to practice medicine, and more
importantly, telling them how to practice it inappropriately and badly.[1] Accordingly, the Final
Rule is contrary to the best practices of medicine, it is not patient-centered, contradicts the plain
requirements of the Act, and is a marked departure from the long-standing policy of the agency.

---

[1]    The Social Security Act expressly mandates that federal agencies are not authorized to
       "exercise any supervision or control over the practice of medicine or the manner in which
       medical services are provided." Social Security Act § 1801 (codified at 42 U.S.C. §
       1395).

B.    A Physician's Treatment Protocol Does Not Constitute a "Standing Order"

CMS has stated in the Final Rule that a physician's "standing order" is not sufficient to order a series of blood glucose testing services. I am concerned that CMS is improperly interpreting a physician-prescribed protocol of blood glucose monitoring, including sliding scale insulin dosage determination by glucose monitoring, as a "standing order" or as "routine testing." If these general principles are misunderstood or misapplied, SNFs would be required to obtain a new physician order for each blood glucose test, which in many cases is done two to three times a day. In short, I believe that any interpretation of physician-prescribed protocols of blood glucose monitoring as "standing orders" is clearly, in my view, in error.

In diabetes management, "standing order prescriptions" are designed to control unplanned conditions. Conversely, prescriptions for glucose monitoring are individualized, patient-specific and are designed to maintain a as stable a blood glucose status as possible. The difference between these two medical treatment strategies is essentially "medical event management" (as represented by standing orders) versus "medical diagnosis and management" (as represented by glucose monitoring via sliding scale to determine insulin dose). Unlike "standing orders" which are aimed at attempting to respond to unplanned/acute conditions, glucose monitoring in the sliding scale scenario strives to maintain glucose stability, which is particularly important in minimizing many complications of chronic diabetes. Moreover, a physician's determination that a series of blood glucose tests administered over a limited period time is reasonable and necessary to detect and then both treat and manage the abnormal blood glucose levels seen in diabetic patients, should not be discounted as a "standing order" that, hence, does not qualify for reimbursement of the testing services.

The American Healthways, Inc. (formerly the Diabetes Treatment Centers of America) developed best practice guidelines for the inpatient management of patients with diabetes. In this model, "standing orders" consist of developing protocols for responding to hypoglycemia, intravenous insulin infusion instructions, perioperative diabetic assessments and insulin pump management. These standing orders are needed to address situations where abrupt or unplanned conditions precipitate deterioration of metabolic glucose control, resulting in acute complications like diabetic ketoacidosis, hypoglycemia, and other adverse outcomes, and where immediate action by the staff at the bedside under the orders of the treating physician is required clinically. As is evident, there is a significant difference between "standing orders" and a beneficiary-specific blood glucose monitoring and treatment protocol, yet CMS continually fails to recognize such a distinction, and that misunderstanding has persisted with the Final Rule.

Even if CMS considers a blood glucose monitoring protocol to be a "standing order," such an order would continue to reflect a physician's independent judgment that the prescribed tests are "reasonable and necessary" to diagnose and treat diabetes and therefore covered under Medicare Part B. In its Compliance Program Guidance for Clinical Laboratories, the Office of Inspector General (the "OIG") for HHS clearly states that "standing orders are not prohibited in connection with an extended course of treatment . . . ." 63 Fed. Reg. 45,076, 45,081. The OIG does not suggest that laboratory testing performed pursuant to a "standing order", including blood glucose testing, is itself not reasonable and necessary. Rather, the OIG's concern is that, in some cases, a physician's initial determination that testing is medically necessary may not be adequately updated or reviewed. In the context of blood glucose monitoring in SNFs, it is our experience that physicians who order glucose monitoring in connection with an extended course of treatment for diabetic nursing home beneficiaries are periodically monitoring both the test results over time and the continuing need for the sliding scale management orders. Thus, a carefully planned protocol for blood glucose testing, reviewed periodically by the treating physician, does not present the potential concerns highlighted by the OIG and, accordingly, would satisfy the "reasonable and necessary" requirements of the Medicare statute and regulations. A protocol of blood glucose monitoring for a SNF resident may itself be reasonable

and necessary to generate a pattern of results over time, often more valuable in patient management than any single test that is administered pursuant to the prescribed plan of treatment.

C.    CMS Policies Place Unnecessary Administrative Burdens On Providers And Physicians

The Final Rule requirement that treating physicians specifically certify in real time each individual blood glucose test prescribed for a SNF beneficiary would undoubtedly create unnecessary administrative burdens for both physicians and SNF personnel.  Treating diabetes using blood glucose testing in a hospital, SNF, or home, is best managed by trend analysis, not test-to-test adjustments.  It is generally of little use to provide individual test results to, and obtain a new order from, the physician after each test, except when the results are outside the "crisis level" parameters set in the existing sliding scale orders by the physician; in such cases, as with any significant change in condition, the physician would, of course, be promptly notified.  Under current best practices, it is most useful for the physician to review trends of test results over time in order to determine whether insulin dosage modification is medically necessary (See Managing Diabetes in the Long-Term Care Setting:  Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pgs. 28).

Nevertheless, the Final Rule as crafted will impose additional, unreasonable requirements that would not serve to improve the health of Medicare beneficiaries.  Instead of adhering to current best practices, the Final Rule would require repeat communications between the SNF and the physician, as many as three or four times per day, for each diabetic SNF resident whose physician has prescribed a protocol of ongoing blood glucose monitoring.  As a physician who treats diabetic Medicare SNF residents in his/her clinical practice observes, it "would be impractical and, in my opinion, (medically) unnecessary for me to write a separate order for each blood glucose test to be administered to [my patient], or to be notified of the results of each test".

The Final Rule will also create a tremendous burden on SNFs and their nursing staff and fails to take into consideration the realities of caring for Medicare beneficiaries who suffer from this common and debilitating disease.  Most SNF residents have blood glucose testing schedules that follow similar time frames and, thus, the Final Rule will require nurses to call physicians for every diabetic patient at the same time.  In other words, even if SNFs reported each individual test result to each diabetic resident's physician – and then waited for the physician to certify the next scheduled test – it is doubtful that this process would further the agency's ostensible goal of increasing physician involvement in diabetes management.  Time taken to report individual tests also impedes necessary consultation and input from interdisciplinary care team members that have a critical role in the patient's diabetes management.  Moreover, as discussed below, the requirement that each blood glucose test be supported by an individual physician order would impose a significant paperwork burden on providers and fiscal intermediaries.  Consequently, the Final Rule will not serve to further the health needs of Part B beneficiaries, but would merely impose additional burdens on those practitioners and SNF personnel currently following best practices in treating diabetes in nursing home residents.  CMS should encourage physicians and SNFs to continue using current best practices in treating Medicare Part B beneficiaries, not frustrate such efforts by imposing unnecessary administrative burdens on these providers.

V.    CMS POLICIES TO DATE ON BGT ARE INCONSISTENT WITH OTHER FEDERAL INITIATIVES TO TREAT AND PREVENT DIABETES

Coverage requirements under Medicare Part B for BGT must be supported by current medical literature and clinical authorities.  With the Program Memo, and now with the Final Rule, that simply is not the case.  Moreover, these coverage policies are inconsistent with numerous federal initiatives to combat diabetes and prevent complications of the disease.  A

number of these programs recognize the value of having the physician prescribe supplies and document the frequency of self-testing, without requiring physician review before each testing event. Some of the key programs sponsored by the federal government include:

- The Centers for Disease Control and Prevention ("CDC") National Public Health Initiative on Diabetes and Women's Health (see http://www.cdc.gov/diabetes/projects/women.htm);

- The HHS Council on Health Disparities, which sponsors a number of programs designed to improve the health of minorities and underserved populations, including diabetes detection and prevention (see http://raceandhealth.hhs.gov); and

- The National Diabetes Education Program ("NDEP") (see http://www.cdc.gov/diabetes/ndep/index.htm).

When HHS launched NDEP in 2001, a joint federal program run by the National Institutes of Health and the CDC, the Secretary emphasized the importance of informing Medicare beneficiaries that they "can use their benefits to better monitor and manage their diabetes." See "HHS Launches Diabetes Education Program for Older Americans," HHS Press Release (May 3, 2001), reprinted at http://www.hhs.gov/news/press/2001pres/20010503.html, pg. 1. The NDEP supports routine monitoring of blood sugar levels by diabetics and their health care providers for use in an effective treatment plan for managing their disease. See id. These policies are even more important for diabetic patients residing in nursing homes considering the significant impact that diabetes can have on this vulnerable Medicare population.

Nonetheless, the Final Rule will frustrate the objectives of these vital federal initiatives by imposing additional hurdles to regular blood glucose testing in SNF residents. The Final Rule also runs counter to the recommendations of the American Diabetes Association that, given the importance of blood glucose testing to diabetes care, government and third-party payers "should strive to make the procedure readily accessible and affordable for all patients who require it" (See Position Statement: Tests of Glycemia In Diabetes, American Diabetes Association, Diabetes Care 25:S97-S99, Supp. 1 (Jan. 2002), pg. S97). CMS needs coverage policies that are consistent with the significant efforts that the federal government has undertaken to prevent and combat diabetes.

David L. Jackson, MD. PhD.    11/30/06

David L. Jackson, MD. PhD.    Date

# Curriculum Vitae of Dr. Lawrence Jackson, M.D., Ph. D.

## DAVID LAWRENCE JACKSON, M.D., Ph.D.

**President**
Jackson and Associates Inc
410-602-4020
E-mail: drdave999@aol.com

HOME ADDRESS
6817 Old Pimlico Road
Baltimore, Maryland  21209

## EXPERIENCE:

**Dr. Jackson has served in leadership positions in multiple health care organizations, ranging from public health/health policy, academic medicine, information systems-related entrepreneurial ventures focused on enhancing the quality of geriatric health services to the medical ethics of new medical technologies.**

**1987 to 2003, then 2003 to Present:**
**President**, Jackson and Associates (changed to J+A Inc. in 2003), a geriatric health care consulting firm focusing on quality of care issues.  Led teams of professionals on scores of engagements working on quality related issues in over 20 states for state government agencies and many LTC provider organizations, as well as an agent of the court. Currently selected as External Quality Monitor for project with Office of Inspector General, DHHS

**1994 – PRESENT:**
**Adjunct Professor of Medicine**, Division of Geriatric Medicine; Department of Medicine, Johns Hopkins University School of Medicine, Baltimore, Maryland (pro bono).

**March 2001 to May 2005:**
**National Medical Director**: HCR-Manor Care: Toledo, Ohio:  Focused on corporate strategies for enhancing the involvement of physicians and Medical Directors in LTC and on clinical quality improvement initiatives.

**1997-2000**
**CEO and Chairman**, HealthWare Solutions International, Inc., Developing JAVA-based, web-enabled Long Term Care and Assisted Living Quality Management Information Systems, (Baltimore).

**1998-2000**
Member (founding **Chairman** for 1998-99), Maryland Health Care Foundation (Private-Public sector initiative on health care for the un-insured)
**1989-1997**
**Chairman and CEO**, AssurQual, Inc. (Founder): Long Term Care Quality Management Information Systems,
**1988-1990**
**Senior VP and then President**, APACHE Medical Systems, Inc., ICU Quality Assurance System, Washington, D.C.

**1989-1995**
**Clinical Professor**, Department of Medicine, The Ohio State University, Columbus, Ohio.

**1986**
**Candidate** for U.S. Congress, 15th District, Columbus, Ohio.

**1983-1986**
**Director**, Ohio Department of Health, Columbus, Ohio.

**1985**
**Director**, Ohio Department of Mental Retardation and Developmental Disabilities, Columbus, Ohio.

**1980-1983**
**Director**, Center for the Critically Ill: Chief, Division of Critical Care, Department of Medicine, Case Western Reserve University, University Hospitals of Cleveland, Cleveland, Ohio.

**1975-1981; 1981-1983; 1983--1985**

**Assistant, Associate, and then Full Professor of Medicine**, Case Western Reserve University School of Medicine, University Hospitals of Cleveland, Cleveland, Ohio.

**1973-1974**
**White House Fellow**: Special Asst. to the Administrator, U.S. Environmental Protection Agency, Washington, D.C.

## EDUCATION:

Johns Hopkins University: A.B., 1961
Johns Hopkins University: Ph.D., 1966, Ph.D. with Distinction
Johns Hopkins University School of Medicine: M.D., 1968

## MILITARY SERVICE:

**1969-1971**
Lieutenant Commander, U.S. Navy Medical Corps. Research: Respiratory effects of cold helium/oxygen in deep sea diving, Naval Medical Research Institute, Washington, D.C.

## HONOR AND AWARDS:
Member of CMS Technical Expert Panel (TEP) on Impact of Staffing/Workforce on Quality in geriatric care
Member Steering Committee for National Quality Forum/CMS Review of Quality Measures in LTC (2001-02)
Member of multiple national task force groups focusing on LTC quality issues over past 5 years (e.g. AMDA, AHCA, etc.)
Member, White House Task Force Working Group on Health Care Reform; both Quality and Information Systems, (1993)
Board member, Association of State and Territorial Health Officers
Phi Beta Kappa (Junior Year); Alpha Omega Alpha (Johns Hopkins)
Teacher of the Year Award, Department of Medicine, Case Western Reserve University
Delegate, (1980) and Alternate, (1992) Democratic Convention
Recipient, National Institutes of Health Grant (RO-1) for neurophysiological research 1981-1983
Fellow, U.S., Endowment for the Humanities (Bio-Medical Ethics) at Kennedy Center for Biomedical Ethics
Recipient, Ohio Department of Health Centennial Award for contributions to Public Health (1986)
Recipient Annual Award for Contributions to MR/DD in State of Ohio (1985), Ohio Private Residential Association
Member, multiple NIH Grant Review Panels; former Counselor to the Pan American Medical Association

## PROFESSIONAL SOCITIES:

American Health Planning Association (Former Board Member)
American College of Physicians (Fellow)
American Academy of Neurology: Served on National Ethics Committee and Legislative Affairs Committee.
American Medical Association (former)
Johns Hopkins Medical and Surgical Association
White House Fellows Association
Former member of Society of Critical Care Medicine, serving as Associate Editor of <u>CRITICAL CARE MEDICINE</u>
American Medical Directors Association (Ethics Committee member)

## PRESENTATIONS AND PAPERS:

Many papers, books, chapters, and National/International presentations on topics ranging from geriatric health care and Quality Management/Health care reform to basic neurophysiology, biomedical ethics and public health.

**REFERENCES**: Available upon request

# *CURRICULUM VITAE*

## DAVID LAWRENCE JACKSON, M.D., Ph.D.

**SUMMARY OF EXPERIENCE:**

**Dr. Jackson has served in leadership positions in multiple health care organizations, ranging from large organizations in crisis to smaller, entrepreneurial entities. He currently has been approved by the US DHSS to serve as the External Quality Monitor for almost 100 LTC sites under the terms of a Corporate Integrity Agreement between the provider organization and the US government. He has achieved national and regional recognition for his contributions in the fields of public health and health policy, bioethical implications of new technologies and the "Edge of Life", scientific research in the neurosciences, and the measurement and management of quality in health care systems.**

| | |
|---|---|
| **ADDRESS:** | **6917 Old Pimlico Road**<br>**Baltimore, Maryland 21209 USA** |
| **BIRTH:** | **October 27, 1939** |
| **MARITAL STATUS:** | **Married to Doty S. Jackson, R.N.**<br>**Two children**: Elizabeth Jackson Westman (born September 28, 1977) and Katherine Minh Jackson (born March 20, 1998) |
| **EDUCATION:** | **B.A., Johns Hopkins University** – 1961<br>**Ph.D. with Distinction, Johns Hopkins University**, Department of Physiology - 1966<br>**M.D., Johns Hopkins University School of Medicine** – 1968 |
| **INTERNSHIP and RESIDENCIES:** | **Intern,** Osler Medical Service, Johns Hopkins Hospital – 1968-1969;<br>**Assistant Resident,** Department of Medicine, Johns Hopkins Hospital – 1971-1972;<br>**Assistant Resident,** Department of Neurology, Johns Hopkins Hospital – 1972-1973;<br>**White House Fellowship,** Special Assistant to Administrator, U.S. Environmental Protection Agency – 1973-1974;<br>**Senior Resident and Chief Resident,** Department of Neurology, Johns Hopkins Hospital – 1974-1976. |

**PROFESSIONAL**

**November 1986 to Present: President, Jackson & Associates Inc;**
Quality of health care delivery and strategic planning consulting engagements for scores of organizations over past fifteen years. Currently serving as Quality Monitor for two LTC organizations for US DHSS Office of Inspector General.

**July 1995 to Present: Adjunct Professor of Medicine, Johns Hopkins University,** Baltimore, MD (Division of Geriatric Medicine)

**May 2005 to Present: Senior Medical Consultant: HCR Manor Care:**
Working on physician communications, clinical Information Systems, new technology evaluation and prescription drug use/formulary development.

**March 2001 to May 2005: National Medical Director: HCR-Manor Care:**
Efforts focused on increasing physician involvement and initiating quality improvement
initiatives across a multi-billion dollar health care organization.

**September 1989 to December 2000: Chairman and Chief Executive Officer,
HealthWare Solutions International, Inc.** Baltimore, MD.
Web-enabled Long Term Care Information Systems

**June 1998 to July 2000: Chairman and Member, Board of Directors, Maryland
Health Care Foundation.** Public-Private sector initiative on health care services for
the uninsured.

**June 1988 to 1994: Clinical Professor of Medicine, the Ohio State University College
of Medicine,** Columbus, OH.

**1983 to 1994: Clinical Professor of Preventive Medicine, the Ohio State University
School of Medicine,** Columbus, OH.

**1983 to 1992: Member, American Academy of Neurology Ethics Committee**

**1982 to 1986: NIH External Merit Review Committee:  Head Trauma Center
Program,** Bethesda, MD

**January 1988 to 1990: Senior V.P. and President (One of Co-Founders), APACHE
Medical Systems, Inc.,** Washington, D.C. (now publicly traded acute care quality
management information technology firm).

**January 1986 to November 1986: Candidate for U.S. Congress**

**September 1985 to November 1985: Interim Director, Ohio Department of Mental
Retardation and Developmental Disabilities.**  Led a team to restore public confidence
in this major department of state government (>3,000 employees and annual budget of
>$300 million) following a series of patient abuse scandals. Advocacy organizations
recognized his contributions to this effort with several service awards after the effort was
completed.

**1983 to January 1986: Director, Ohio Department of Health** (Cabinet Office, State
Government; >1000 employees and budget of $150 million annually). Elected to National
Board of Association of State and Territorial Health Officers by peers. Generally
recognized for building the Ohio Department of Health into one of the best public health
departments in the nation, starting a series of nationally recognized, innovative programs
in (e.g.) early HIV-AIDS education and prevention (in 1983) and the ethical implications
of the distribution of scarce resources (a state-wide program to manage solid organ
transplantation, with the collaboration of University Hospital of Cleveland, the Cleveland
Clinic, Ohio State University Hospitals and the University of Cincinnati Hospital).

**1983 to 1985: Professor of Medicine, Case Western Reserve University,** Cleveland,
OH

**1981 to 1983: Director, Center for the Critically Ill, University Hospitals of Cleveland**, Cleveland, OH.  With Dr. Stuart Youngner, was co-founder and first Director of this nationally recognized center for the study of ethics in critical care medicine.

**1980 to 1983: Chairman, American Academy of Neurology Course**, Critical Care Neurology, National Meeting, New Orleans, Los Angeles and Washington, D.C.

**1981 to 1984: Member, Biomedical Research External Review Committee** for Oak Ridge Associated Universities

**1980 to 1983: Chief, Division of Critical Care, Department of Medicine, Case Western Reserve University, University Hospitals of Cleveland**, Cleveland, OH

**1980 to 1983: Associate Professor, Department of Neurology, Case Western Reserve University, University Hospitals of Cleveland**, Cleveland, OH

**1979 to June 1983: Associate Professor, Department of Medicine, Case Western Reserve University, University Hospitals of Cleveland**, Cleveland, OH

**1977 to 1980: Co-Chief, Division of Clinical Pharmacology and Critical Care Medicine, Department of Medicine, Case Western Reserve University**, Cleveland, OH

**April 1983: Director, Critical Care Neurology Symposium**, Center for Critically Ill

**1980:  Member NIH Technical Merit Review Panel**, Head Trauma Centers Program

**1976 and 1979: Faculty Member, American Academy of Neurology** National Meeting Review Course

**1975 to 1979:  Assistant Professor of Medicine and Neurology, Case Western Reserve University, School of Medicine, University Hospitals of Cleveland**, Cleveland, OH

**1974 to 1981: Consultant to Administrator and Assistant Administrator for Research and Development, Environmental Protection Agency**, Washington, D.C.

**MILITARY SERVICE**

**1969 – 1971: Lieutenant Commander, U.S. Navy Medical Corps:**
First-class navy deep-sea diver and conducted research on the respiratory effects of cold helium/oxygen in deep-sea diving

**HONORS AND AWARDS**

**Centennial Award for Contribution to Public Health in Ohio**, 1986:
Ohio Department of Health – For Conceiving Statewide Ohio Consortium for Solid Organ Transplantation. One of 12 awardees, including Dr. Albert Sabin and Dr, Henry Heimlich.

**White House Fellow 1983-74;** Special Assistant to the Administrator, Honorable Russell Train

**Teacher of the Year Award, 1977 Dept. of Medicine, University Hospitals of Cleveland**

**Fellow in Bioethics: National Endowment for the Humanities,** Kennedy Institute, Washington, D.C. – 1981;

**Phi Beta Kappa (Junior year) Tufts University,** Medford, MA.

**Alpha Omega Alpha 1968, Johns Hopkins University School of Medicine** Baltimore, MD.

**Undersea Medical Society** (elected member) 1970.

**Counselor to Pan American Medical Association (Environmental Health)** – 1975;

**Meritorious Service Award, Ohio Private Residential Association** – 1986;

**Annual Public Service Award , Ohio Association of Retarded Citizens** – 1986;

**Award for Contributions to head trauma services, Ohio Association of the National Head Injury Foundation** – 1989.

**LICENSURE & BOARD CERTIFICATION:**

Licensed in Ohio
Board Certified – Internal Medicine (Fellow of the American College of Physicians)
Board Eligible – Neurology

**PROFESSIONAL SOCIETIES:**

1976 to Present: **American College of Physicians** (FACP)

2001 to present: American Medical Director Association (AMDA): Member, National Ethics Committee; 2004 through 2006

1986 to 2000: **American Medical Association**

1986 to 1997: **Ohio State Medical Association**

1986 to 1997: **Franklin County and Columbus Academy of Medicine**

1985 to 1999: **American Health Planning Association**; (Board Member and President elect 1985 to 1995)

1981 to 1996: **Society for Health and Human Values**

1978 – 1983: **Cleveland Medical Library Association,**

1976 – 1986: **Society for Critical Care Medicine** (elected)

1976 – 1985: **American Federation for Clinical Research**

1975 – 1983: **Pan American Medical Society**

1975 to Present: **Johns Hopkins Medical and Surgical Association**

1974 to Present: **American Academy of Neurology** (associate)

1974 to Present: **White House Fellows Association**

1971 – 1979: **Undersea Medical Society** (elected)

**COMMITTEE APPOINTMENTS:**

September 2003 to Present: Member, **Johns Hopkins University School of Medicine Admissions Committee**

March 2002 through 2006: Member of **Advisory Board to Lipitz Center for Integrated Health, Johns Hopkins School of Public Health.**

2001-2003: Member, **National Steering Committee for National Quality Forum/ CMS** LTC and sub acute care performance measures project

1998-2000: **Maryland Health Care Foundation: Board member and founding Chairman** (public-private sector health care initiatives for the uninsured in Maryland).

1999-2000: **Task Force on Malpractice Crisis in Long Term Care**, Federation of Insurance and Corporate Counsels national project.

1998: **Chairman, Task force on Medicaid reimbursement for academic medical centers in Maryland**

1988 to 1995: **Member, American Academy of Neurology Legislative Affairs Committee**

1988 to 1995: Member, **Academy of Medicine of Franklin County and Columbus Ethics Committee**

1987 – 1990: Member, **Ohio Sate Medical Association Judicial and Professional Relations Committee**

1986 – 1990: **Reviewer, AIDS impact study proposals**, National Center Health Services Research

1983 to 1996: Member, **American Academy of Neurology Ethics Committee**

1981-1983: **Chairman, Executive Committee, Center for the Critically Ill, University Hospitals of Cleveland**

1981: **Member, Chairman, Department of Anatomy Search Committee: Case Western Reserve University**

1981 – 1985: **Member, Committee on Ethical/Philosophical Curriculum Development, Case Western Reserve Univ. Medical School**

**1980: Member, Chairman, Department of Anesthesiology Search Committee, Case Western Reserve University**

**1980 – 1983: Member, Fellowship Committee,** American Heart Association Northeast Ohio Affiliate

**1980 – 1985: Member, Northeast Ohio Council on Emergency Medical Services**

**1980: Member, American College of Physicians Medical Knowledge Self Assessment Program V: Neurology Section,** Patient Management Program Section

**1979 – 1984: Extracranial/Intracranial Bypass Multi-Center Study:** Neurologist for Center 31 (University Hospitals of Cleveland).

**1979 – 1985: Member, Advisory Committee, Department of Medicine, Case Western Reserve University,** Cleveland, OH

**1979 – 1980: Member, House Staff Liaison Committee, Department of Medicine, University Hospitals of Cleveland**

**1979 – 1980: Member, Computer Committee, Case Western Reserve University**

1979: Member, **Delegation of Former White House Fellows,** hosted by the Chinese People's Institute of Foreign Affairs

**1978 – 1979: Member, Resuscitation Committee, University Hospitals of Cleveland** (Former Chairman)

**1976 – 1982: Chairman, University Hospitals of Cleveland  Medical ICU Committee**

## PUBLICATIONS

1. Jackson DL:  A Hypothalamic Region Responsive to Localized Injection of Pyrogens.  Ph.D. Thesis, Johns Hopkins University, 1967.

2. Jackson DL:  A Hypothalamic Region Responsive to Localized Injection of Pyrogens.  J Neurophysiol 1967; 30: 586-602.

3. Jackson DL, Tauber, J, Rawlins JSP:  Evaluation of NSRDL Heater Pump Performance Characteristics and Reliability.  Naval Medical Research Institute Report No. 1, August, 1969.

4. Greenbaum L, Dickson K, Jackson DL, Evans D:  Toxicological and Physiological Effects of Bromotrifluoromethane. Toxicol Appl Pharmacol 1972; 21:  1-11.

5. Wands J, Mann R, Jackson DL, Butler T:  Fatal Community Acquired Herellia Pneumonia in Chronic Renal Failure. Am Rev Resp Dis 1983; 108:  964-967.

6. Jackson DL, Newill V:  The Strengths and Weaknesses of Population Studies in Assessing Environmental Health Effects.  International Symposium on Recent Advances in the Assessment of the Health Effects of Environmental Pollution 1984; 1:  161-180.

7. Jackson DL, Dominick D, Samuels S:  Working paper on regulatory options, Appendix 9, in Decision Making for Regulating Chemicals in the Environment.  Washington, D.C., National Research Council, National Academy of Sciences, 1975.

8. Davies JC III, Fairbanks R, Freeman AM III, et al:  Decision Making for Regulating Chemicals in the Environment. A report prepared by the Committee on Principles of Decision Making of Regulations Chemicals in the Environment. Washington, D.C., National Academy of Sciences, 1975.

9. Spivak JL, Jackson DL:  Pellagra:  An Analysis of 18 Patients and a Review of the Literature.  Johns Hopkins Med J 1977; 140:  295-309.

10. Jackson DL, Beraducci J:  Accidental Carbon Monoxide Poisoning:  A Growing Home Hazard.  Medical Times 1978; 106:  26-37

11. Jackson DL, Dole WP:  Total Cerebral Ischemia:  A New Model System for the Study of Post-Cardiac Arrest Brain Damage. Stroke 1979; 10:  38-43.

12. Youngner S, Jackson DL, Allen ML:  Staff Attitudes Towards the Care of the Critically Ill in the Medical ICU.  Crit Care Med 1979; 7:  35-43.

13. Jackson DL, Youngner S:  Patient Autonomy and Death with Dignity:  Some Clinical Caveats.  N Eng J Med 1979; 301 (8):  404-408.

14. Jackson DL, Satyamurti S, Davis L, Drachman DB:  Isaac's Syndrome with Laryngeal Involvement – An Unusual Presentation of Myokymia.  Neurology 1979; 29:  1612-1615.

15. Johnson PL, Drake CL, Fay JA, Jackson DLL, et al:  A Report Prepared by the National Academy of Sciences Committees on Priorities in Environmental Research and Development.  Washington, D.C., National Academy of Sciences, 1979.

16. Griggs RC, Baxter BW, Brennan RW, Conomy J., et al: Neurology: An Annotated Bibliography of Recent Literature. Ann Int Med 1979; 91: 658-663.

17. Jackson DL, Lin SR: Question of Methodology with Labeled Microspheres (letter). Stroke 1979; 10 (4): 480.

18. Jackson DL: Terror in the ICU (letter). Forum of Medicine 1979; 1: 7.

19. Youngner S, Jackson DL: Death with Dignity (letter). N Engl J Med 1980; 302: 126.

20. Jackson DL, Youngner S: Patient Autonomy and Death with Dignity, Jurimetrics Journal, 20: 348-359, 1980.

21. Jackson DL, Menges H: Accidental Carbon Monoxide Poisoning: A Growing Hazard. J Am Med Assoc 1980; 243: 772-774.

22. Allen M, Youngner S, Jackson DL: Closing the Communication Gap between Physicians and Nurses in the ICU Setting. Heart/Lung 1980; 9: 836-840.

23. Youngner S, Jackson DL, Raddich W: Family Wishes and Patient Autonomy. Hastings Center Report 1980; 10: 21-22.

24. Jackson DL, Dole WP, McGloin J, Rosenblatt JI: Total Cerebral Ischemia: A New Model System for Micro-Circulatory Studies. Stroke 1981; 12: 66-72.

25. Jackson DL, Youngner S: Autonomy and the Need to Preserve Life (invited comments). Hastings Center Report 1982; 12: 44.

26. Dole W, Jackson DL, Rosenblatt JI, Thompson WL: Relative Error and Variability in Blood Flow Measurements with Radiolabeled Microspheres. Am J Physiol 1982; 243 H371-H378

27. Jackson DL, Youngner SJ: Patient Autonomy and Refusal of Life Saving Therapy (invited comments). Hastings Center Report 1982; 12: 44.

28. Rosenblatt JU, Jackson DL, Dole WP, Thompson WL: On Uniform Approximation of Poison Varieties by Normal Ones. J of Statistical Planning and Inference, 1983; 7.

29. Youngner S, Jackson DL, Coulton C, et al: A National Survey of Hospital Ethics Committees. Crit Care Med 1983; 11: 902-905.

30. Jackson DL, Korbin J, Youngner S, et al: Fatal Outcome in Untreated Adolescent Ulcerative Colitis: An Unusual Case of Child Neglect. Crit Care Med 1983; 11: 832-833.

31. Franklin C, Jackson DL: Discharge Decision-making in a Medical ICU: Characteristics of Unexpected Readmissions. Crit Care Med 1983; 11: 51-55.

32. Wolfson SK Jr, Yonas H, Jackson DL, Gur D, Miller DM, Good WF, Boehnke M, Latchaw RE: Experimental and Clinical Experience with Two and Three Dimensional Imaging of Xe-CT Local Cerebral Blood Flow (LCBF). J Cereb Blood Flow Metab 1983; 3 (Suppl): 131.

33. Youngner S, Korbin J, Jackson DL: Ethical and Social Perspectives in Critical Care. Crit Care Med 1983; 11: 834.

34. Wongmonkolrit JJ, McPherson SL, El-Naggar A, et al: Acute Fulminant Toxoplasma Meningoencephalitis in a Homosexual Man. Acta Neuropatho (Berl) 1983.

35. Youngner S, Coulton C, Welton R, Juknialis B, Jackson DL: ICU visiting policies. Crit Care Med 1984; 12: 7.

36. Coulton C, McClish D, Doremus H, Smookler S, Powell S, Jackson DL: Implications of DRG's for Intensive Care. Crit Care Med, March 1984.

37. Koch KA, Jackson DL, Schmiedl M, et al: Effect of Thiopental Therapy on Cerebral Blood Flow Following Total Cerebral Ischemia. Crit Care Med 1984; 12: 90-95.

38. Koch KA, Jackson DL, Schmiedl M, Rosenblatt JI: Total Cerebral Ischemia: Effect on Alterations in Arterial PCO on Cerebral Micro-circulation. J Cerebral Blood Flow Metab 1984; 4: 343-349.

39. Youngner SJ, Coulton C, Juknialis BW, Jackson DL: Patient's Attitudes toward Hospital Ethics Committees. Law Medicine & Health Care, 1984; 12 (1): 21-25.

40. Yonas H, Wolfson SK Jr, Gur D, Latchaw RE, Good WF, Leanza R, Jackson DL, Janeta PJ, Reinmuth OM: Clinical Experience with the Use of Xenon-enhanced CT Blood Flow Mapping in Cerebral Vascular Disease. Stroke 1984; 15 (3): 443.

41. McClish D, Russo A, Franklin C, Jackson DL, Lewandowski W, Alcover IA: Profile of Medical ICU and Ward Patients in an Acute Care Hospital. Crit Care Med 1985; 13: 381-386.

42. Youngner S, Allen M, Bartlett E, Cascorbi H, Hau T, Jackson DL, Mahowalk M, Martin B, Youngner S: Psychosocial and Ethical Implications of Organ Retrieval. N Eng J Med 1985 (August 1); 313: 321-324.

43. Henning R, McClish D, Daly B, Nearman H, Franklin C, Jackson DL: Clinical characteristics and resource utilization of ICU patients: Implications for organization of intensive care. Crit Care Med 1987; 15: 3.

## BOOKS, CHAPTERS, REVIEWS, EDITORIALS, ETC.

1. Jackson DL, Buckley J (eds): Proceedings of Symposium of Exposure Assessment. Washington, DC, Environmental Protection Agency. 1979.

2. Jackson DL, Griggs R, Baxter B, et al: Neurology in Kay CG (ed): Medical Knowledge, Self Assessment Program V. Philadelphia, American College of Physicians, 1980, pp 329-351.

3. Jackson DL: Selected topics in critical care neurology, in Shoemaker WC, Thompson WL (eds): Critical Care Medicine (Vol 1). Fullerton, CA, Society of Critical Care Medicine, 1980, I (M): 1-47.

4. Davis LE, Jackson DL, Gothe B: Neurological Infections and Respiratory Dysfunction, in Weiner WJ (ed): Respiratory Dysfunction in Neurological Disease. Mt. Kisco, NY, Futura Publishing Co., 1980, pp 41-70.

5. Spivak J, Jackson DL: Pellagra: An Analysis of 18 patients and a review of the literature, in Carpenter KJ (ed): Benchmark Papers in Biochemistry: Pellagra. Stroudsburg, PA, Hutchinson Ross Publishing Co, 1981, pp 345-359.

6. Jackson DL, Youngner SJ: Patient autonomy and "death with dignity" in Abrams N, Buckner MD (eds): Medical Ethics: A Clinical Textbook for the Health Care Professions. Cambridge, MA, The MIT Press, 1982.

7. Youngner SJ, Jackson DL, Coulton C, et al: A national survey of hospital ethics committees, in the Deciding to Forgo Life-Sustaining Treatment, A Report of the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research. Washington, DC, U.S. Government Printing Office, 1983, pp 443-457.

8. Jackson DL: Critical Care Neurology in Shoemaker WC, Thompson WH (eds): Critical Care Medicine, 1984.

9. Jackson DL: Ethical decisions in the Intensive Care Unit, in Back N, Brewer GJ, Eijsvoogel VP, et al (eds): Progress in Clinical and Biological Research. Vol 139: Difficult Decisions in Medical Ethics: The Fourth Volume in a Series on Ethics, Humanism, and Medicine. New York, Alan R. Liss, Inc., 1983, pp 125-135.

10. Jackson DL, LaManna JF: Neurologic implications of cardiopulmonary resuscitation in Henning RJ, Jackson DL (eds): Critical Care Neurology and Neurosurgery. New York, Praeger Publishing, 1984, in press.

11. Youngner SJ, Coulton C, Juknialis BW, Jackson DL: Institutional Ethics Committees and Health Care Decision Making: Part II Review of Existing Institutional Ethics Committees and Comparison with Prognosis and Research Committees, Chapter 6. Edited by Cranford RE and Doudera AE. Published in cooperation with the American Society of Law and Medicine, Health Administration Press, Ann Arbor, MI, 1984.

12. Annas GJ, Etley Er, Jackson DL: The Introduction of Major Organ Transplantation on the State Level: Ethical and Practical Considerations in the Development of Public Policy.

13. Youngner SJ, Bartlett ET, Human Death and High Technology: The Failure of the Whole Brain Formulations. Henning RJ and Jackson DL (eds): Critical Care Neurology and Neurosurgery.

14. Coulton C, McClish D, Doremus H, Powell S, Smookler, Jackson DL: Implications of DRG Payment for Medical Intensive Care. Medical Care August 1985, Vol 23, No 8, pp 977-985.

**NOTE**: Dr. Jackson has written multiple op-ed and editorial articles focusing on the use of information technologies in geriatric health care and quality management strategies in long term care (in publications such as **Contemporary Long Term Care**, **McKnights**, **Provider**, etc.)

## ABSTRACTS

1. Thompson WL, Gurley HT, Lutz BA, Jackson DL, et al: Inefficacy of gluccorticoids in shock (Double-blind study).

2. Jackson DL, Dole WP: A minimally invasive model system for total cerebral ischemia. Fed Proc 1977; 36: 582.

3. Dole WP, Jackson DL, Thompson WL: Sources of error in microsphere methodology. Fred Proc 1977; 36: 580.

4. Dole WP, Jackson DL, Rosenblatt JI, Thompson WL: An Approach to reducing sources of error in microsphere methodology. Clin Resch 1977; 25: 332A.

5. Youngner S, Allen M, Jackson DL: Comparison of nurse/physician attitudes on decision making in a medical intensive care unit. Clin Resch 1977; 25: 332A.

6. Jackson DL, Spivak JL: Pellagra: An often neglected complication of malnutrition in urban society. Clin Resch 1977; 25: 393A.

7. Jackson DL, Dole WP, Rosenblatt JI, Thompson WL: Radioactive microspheres: An analysis of sources of error and their use in the study of microcirculatory abnormalities following total cerebral ischemia, in Proc Fifth Pharmacol Toxicol Symposium, National Institutes of General Medical Sciences, 1977, p 58.

8. Dole WP, Jackson DL: Brain damage after cardiac resuscitation: Failure of cerebral reperfusion. Clin Resch 1978; 26: 3A.

9. Koch KA, Jackson DL, Rosenblatt J, et al: Total cerebral ischemia (TCI): Natural History of regional brain blood flow. Fed Proc 1978; 37: 228A

10. Koch K, Jackson DL, Thompson WL, Schmiedl M: Total cerebral ischemia (TCI): Therapy with hydoxyethyl starch and dopamine. Clin Resch 1978; 26: 29A.

11. Jackson DL, Satyamurti S, Davis LE, Drachman DB: Isaac's syndrome: Vocal cord myokymia as a source of symptoms, IV International Congress of Neuromuscular Diseases. Montreal, September 17-21, 1978.

12. Youngner S, Jackson DL: Patient autonomy and the right to die: some clinical caveats. Crit Care Med 1979; 7: 131A.

13. Jackson DL, Koch KA, Schmiedl M, et al: Total cerebral ischemia; Regional cerebral blood flow following thiopental therapy. Crit Care Med 1979; 7: 145.

14. Koch KA, Schmiedl M, Jackson DL, et al: Total cerebral ischemia: Sensitivity of the globally damaged brain to arterial PCO2 variations. Fed Proc 1979; 38: 368.

15. Jackson DL, Dole WP, Rosenblatt JI, et al: Redistribution of systemic organ blood flow following global ischemia. Fed Proc 1979; 38: 368.

16. Koch K, Jackson DL, Rosenblatt JI, et al: Total cerebral ischemia: The effect of vasodilator therapy on post-ischemic brain damage. Clin Resch 1979; 27: 235A.

17. Jackson DL, McGloin J, Dole WP: Total cerebral ischemia: A new model system for micro-circulatory studies. Eur Crit Care 1978.

18. Youngner S, Jackson DL:  Survey of house office and teaching faculty attitudes towards patient autonomy in an academic medical intensive care unit.  Crit Care Med 1980; 8:  260A.

19. Franklin C, Jackson DL, Koch K:  Retrospective analysis of MICU readmissions.  Crit Care Med 1981; 9:  263.

20. Nemoto E, Jackson DL, Willi J, Koch K:  Impaired reperfusion:  Effect of barbiturate therapy after total cerebral ischemia in monkeys.  Crit Care Med 1981; 9:  183.

21. Jackson DL, Dole WP, Friday K, et al:  Effect of indomethacin on coronary reactive hyperemia following ischemia:  Mechanism for ventricular fibrillation during increased left ventricular afterload.  Clin Resch 1981; 30:  574A.

22. Jackson DL, Friday K, Wilson JH, Rosenblatt JI:  Calcium ionophore antagonists and the impaired reperfusion phenomenon following total cerebral ischemia (TCI).  Crit Care Med 1981; 10:  206.

23. Jackson DL, Smith M, Wilson NJ:  1-benzyl imidazole inhibition of thromboxane synthesis:  Effect on impaired cerebral perfusion following total cerebral ischemia.  Clin Resch 1982; 30:  409A.

24. Youngner S, Jackson DL, Coulton C, et al:  Formation of hospital ethics committees by large (>400 bed) hospitals in the continental United States (1981).  Clin Resch 1982; 30:  309A.

25. Allen MA, Daly B, Jackson DL, et al:  Allocation of nursing resources in critical care.  Crit Care Med 1982; 10:  213.

26. Wolfson SK, Yonas H, Jackson DL, et al:  Experimental and clinical experience with two and three dimensional imaging of Xenon-CT local cerebral blood flow (LCBF).  Cerebral Blood Flow Metab (Suppl) 1983.

27. Youngner SJ, Jackson DL, Coulton C, et al:  Ethics Committees:  The patient's perspective.  Clin Resch 1983; 31261A.

28. Youngner SJ, Jackson DL, Coulton C, et al:  Regional survey of intensive care unit visiting policies.  Crit Care Med 1983; 11:  238A.

29. Coulton C, McClish D, Doremus H, Smookler S, Powell S, Jackson DL: Implications of DRG's for intensive care.  Crit Care Med 1984; 12:  332.

30. Romeo SA, McCracken KA, Crumrine RC, Jackson DL, LaManna JC:  Capillary mean transit time, regional cerebral blood flow and regional cerebral blood volume after recovery from total cerebral ischemia in dogs.  The Physiologist 1984; 27:  265.

31. Wolfson SK Jr, Gur D, Yonas H, Jackson DL, Good WF, Latchaw RE, Kennedy WH, Cook EE, Good BD:  Proceedings of the devices and technology branch contractor's meeting proceedings, Washington, DC, NIH Pub. 1984; 84:  1659 p 89.

32. Coulton C, McClish DK, Doremus H, Smookler S, Powell S, Jackson DL:  Implications of DRG's for Intensive Care Units.  Crit Care Med 1984; 12.

33. Powell S, Jackson DL, McClish D:  Diagnostic organ system evaluation (Dose) and intensive care unit (ICU) patient classification system:  Potential for use in prospective payment.  Clin Resch 1983; 31:  2.

## PRESENTATIONS

1. Rawlins JSP, Jackson DL, Tauber J: Diver heating: problems and progress. Third International Symposium on Underwater Medicine, LaSpezia, Italy, June 1980.

2. Jackson DL, Rawlins JSP, Tauber J: Respiratory heat loss in hyperbaric atmospheres. Third International Meeting on Hyperbaric and Underwater Physiology, Marseilles, France, June, 1970.

3. Hoke B, Flynn B, Jackson DL, Alexander: Effect of breathing cold helium at 1000 feet sea water pressure. Fourth International Symposium on Underwater Medicine, Freeport, Bahamas, August, 1982.

4. Jackson DL, Newill V: The strengths and weaknesses of population studies in assessing environmental health effects. Presented at Plenary Session, First International Symposium on Recent Advances in the Assessment of the Health Effects of Environmental Pollution. Sponsored by the World Health Organization and US Environmental Protection Agency and the Commission of the European Communities, Paris, France, June 1974.

5. Jackson DL: Neurology in the Intensive Care Unit, American Academy of Neurology Course Presentation, Toronto, April 1976.

6. Jackson DL: Critical Care Neurology. Presented at Ohio State Medical Association, Cincinnati, Ohio, May 1976.

7. Jackson DL, Dole WP: A Minimally Invasive Model System for Total Cerebral Ischemia. Presented at the Federation of American Societies for Experimental Biology, Chicago, April 1977.

8. Dole WP, Jackson DL, Thompson WL: Source of error in microsphere methodology. Presented at the Federation of American Societies for Experimental Biology, Chicago, April 1977.

9. Jackson DL, Rosenblatt JI: Seminar on use of radiolabelled microspheres in blood flow studies: Practical analytical considerations. Wright Patterson Air Force Research Laboratory/University of Dayton Physiology Department, Dayton, Ohio, July 1977.

10. Jackson DL, McGloin J, Dole WP: Total Cerebral Ischemia: A new model system for micro-circulatory studies. Presented at the Proceedings of the second World Congress on Intensive Care, Paris, France, September 1977.

11. Jackson DL, Dole WP, Rosenblatt JI, Thompson WL: Radioactive microspheres: An analysis of sources of error and their use in the study of micro-circulatory abnormalities following total cerebral ischemia. Presented at the Fifth Pharmacology Toxicology Symposium. National Institutes of General Medical Sciences, Washington, DC, November 1977.

12. Jackson DL: New concepts in pathophysiology and treatment of total cerebral ischemia. Neurology Grand Rounds, University of New Mexico School of Medicine, January 1978.

13. Jackson DL: Satyamurti S, David L. Drachman D: Isaac's syndrome: Vocal cord myokymia as a source of symptoms. IV International Congress on Neuromuscular Diseases, Montreal, Quebec, Canada, September 1978.

14. Dole WP, Jackson DL: Brain damage after cardiac resuscitation: Failure of cerebral reperfusion. American Federation for Clinical Research, 1978.

15. Koch KA, Jackson DL, Rosenblatt J, Dole W, Thompson WL: Total cerebral ischemia (TCI): Natural history of regional brain blood flow. FASEB National Meeting, Atlantic City, N.J., April 1978.

16. Koch KA, Jackson DL, Thompson WL, Schmiedl M: Total cerebral ischemia (TCI): Therapy with hydroxyethyl starch and dopamine. American Federation for Clinical Research 1978.

17. Jackson DL: Acute metabolic encephalopathies. American Academy of Neurology, April 1979.

18. Jackson DL: Neurology in the ICU. American Academy of Neurology, 1979.

19. Koch KA, Schmiedl, M, Jackson DL, Rosenblatt JI, Thompson WL: Total cerebral ischemia: Sensitivity of the globally damaged brain to arterial PC02 variations. FASEB Spring Meeting, Dallas, Texas, April 2, 1979.

20. Jackson DL, Dole WP, Rosenblatt JI, Koch KA, Thompson WL: Redistribution of systemic organ blood flow following global ischemia. FASEB Spring Meeting, Dallas, Texas, April 2, 1979.

21. Koch KA, Jackson DL, Rosenblatt JI, Schmiedl M, Thompson WL: Total Cerebral Ischemia: The effect of vasodilator therapy on post-ischemic brain damage. American Federation for Clinical Research, Washington, DC, May 7, 1979.

22. Youngner S, Jackson DL: Patient autonomy and the right to die: Some clinical caveats. Eighth Annual Symposium of the Society of Critical Care Medicine, San Francisco, May 27-30, 1979.

23. Jackson DL, Koch KA, Schmiedl M, Thompson WL, Rosenblatt JI: Total Cerebral Ischemia: Regional cerebral blood flow following thiopental therapy. Eighth Annual Symposium of the Society of Critical Care Medicine, San Francisco, May 27-30, 1979.

24. Jackson DL, Buckley J: Co-Chairmen: Workshop on Exposure Assessment. Environmental Protection Agency, Baltimore, MD, January 1979.

25. Jackson DL: Acute metabolic encephalopathies: course presentation. American Academy of Neurology, Chicago, May 1979.

26. Jackson DL: Neurological complications of cardiac arrest. Cardiology Grand Rounds, Massachusetts General Hospital, Boston, MA, May 1979.

27. Jackson DL: Pathophysiology and management of acute thermal stress. American Academy of Neurology, 1980.

28. Jackson DL: Frontiers in treatment of global cerebral ischemia. Invited lecture, Neurology Grand Rounds, University of Texas, San Antonio, January 1980.

29. Jackson DL: Pathophysiology and therapy of acute thermal stress. Course lecture, American Academy of Neurology National Meetings, New Orleans, April 1980.

30. Youngner S, Jackson DL: Survey of house officer and teaching faculty attitudes towards patient autonomy in an academic medical intensive care unit. Society of Critical Care Medicine National Meeting, San Antonio, TX, May 1980.

31. Jackson DL: Critical Care Neurology: Breakfast luncheon and workshop sessions (2), at Society of Critical Care Medicine Meeting, San Antonio, TX, May 1980.

32. Jackson DL: Pathophysiology of CNS damage following cardiac arrest. American Heart Association NE Ohio Affiliate, Research meeting, May 1980.

33. Jackson DL:  Global Cerebral Ischemia, Neurology Grand Rounds, Invited Lecture, Wayne State University School of Medicine, Detroit, Michigan, July 1980.

34. Jackson DL:  Nemoto:  Effect on thiopental therapy on impaired reperfusion phenomenon in monkeys after total cerebral ischemia.  Society of Critical Care Medicine Meeting, Washington, DC, May 1981.

35. Franklin C, Jackson DL:  Discharge and decision making in intensive care.  Society of Critical Care Medicine Meeting, Washington, DC, May 1981.

36. Jackson DL:  Patient autonomy and professional responsibility.  National Endowment of Humanities Seminar on Medical Ethics, Kennedy Institute, Washington, DC, June 1981.

37. Jackson DL:  The ICU and the emergency room.  Trauma Symposium, Department of Surgery, Case Western Reserve University, Cleveland, Ohio, June 1981.

38. Jackson DL:  Cerebral resuscitation.  Tri State Critical Care Society, November 1981.

39. Jackson DL:  Ethical implications of acute brain damage.  Tri State Critical Care Society, November 1981.

40. Jackson DL:  Update on cerebral resuscitation.  Critical Care Neurology, April 1981.

41. Jackson DL, Friday K, Wilson NJ, Rosenblatt JI:  Calcium ionosphere antagonists and the impaired reperfusion phenomenon following total cerebral ischemia (TCI).  Society of Critical Care Medicine Meeting, St. Louis, June 1982.

42. Jackson DL, Smith M, Wilson NJ:  1-benzyl imidazole inhibition of thromboxane synthesis:  Effect on impairing cerebral perfusion following total cerebral ischemia.  AFCE meeting, Washington, DC, April 1982.

43. Allen MA, Daly B, Jackson DL, et al:  Allocation of nursing resources in critical care.  Society of Critical Care Medicine Meeting, St. Louis, June 1982.

44. Jackson DL:  Intensive Care:  Challenges in a large referral community hospital.  Youngstown, Ohio, March 1982.

45. Jackson DL:  Ethical considerations when a patient refuses life saving treatment.  University of Michigan Annual Ethics Symposium, March 1982.

46. Jackson DL:  Patient autonomy and professional responsibility.  St. Francis Society, International Symposium on Medical Ethics, Washington, DC, March 1982.

47. Jackson DL:  Ethical dilemmas in critical care medicine.  Women's Health Day, Cleveland, Ohio, April 1982.

48. Jackson DL:  New methodologies for measurement of cerebral blood flow.  Neurosurgery Grand Rounds, University Hospitals of Cleveland, September 1982.

49. Jackson DL:  Patient autonomy: A clinician's perspective.  Symposium on Ethical Dilemmas at the End of Life, Cleveland, Ohio, October 1982.

50. Jackson DL:  Pathophysiology and therapy of global cerebral ischemia.  Critical Care Medicine Research Conference, Johns Hopkins Hospital, Baltimore, Maryland, October 1982.

51. Jackson DL: Ethical controversies in intensive care units. Symposium on Medical Ethics Michigan State University, Saginaw, Michigan, November 1982.

52. Latchaw RE, Yonas H, Wolfson SK, Jackson DL, et al: Experimental and clinical experience with two- and three-dimensional imaging of Xe-CT local cerebral blood flow (LCBF). The American Society of Neuroradiology Annual Meeting, San Francisco, California, June 4-8 1983.

53. Coulton C, McClish D, Doremus H, Smookler S, Powell S, Jackson DL: Implications of DRG's for intensive care. Society of Critical Care Medicine Annual Meeting, San Francisco, California, June 1984.

54. Romeo SA, McCracken KA, Crumrine RC, Jackson DL, LaManna JC: Capillary mean transit time, regional cerebral blood flow, and regional cerebral blood volume after recovery from total cerebral ischemia in dogs. 35th Annual Fall Meeting of the American Physiology Society, Lexington, Kentucky, August 1984

55. Yonas H, Wolfson SK Jr, Jackson DL, Gur D, Miller DN, Good WF, Boehnke M, Latchaw RE: Solid construction of blood flow mapping. Scientific Exhibit presented at the Cushing Meeting in Neurological Surgery, Washington, DC, May 1983.

56. Yonas H, Wolfson SK Jr, Jackson DL, Gur D, Miller DN, Good WF, Boehnke M, Latchaw RE. Experimental and clinical experience with Xe-CT local blood flow mapping. Scientific Exhibit presented at the Cushing Meeting in Neurological Surgery, Washington, DC, May 1983.

57. Jackson DL: Ethical and Social Dimensions of Critical Care Neurology. American Academy of Neurology, 1984.

58. Bouxsein P, Getson J, Jackson DL, Kudrle R (Panelists). Working Paper 5 Medicare – Medicare at Age 20: Its Past, Present and Future by TR Marmor.

59. Henning R, McClish DK, Daly B, Nearman H, Franklin C, Jackson DL: Clinical and Demographic Characteristics of SICU and MICU Patients. Presented at this Annual Meeting of the Society of Critical Care Medicine, Chicago, Illinois, May 1985.

60. Jackson DL: Assuring Quality in Long Term Care. Nebraska Health Care Association, April 1992.

61. Jackson DL: End-of-Life Issues. 1992 AOPHA Spring Retreat, Panel Discussion. Cuyahoga Fall, Ohio, May 1992.

**Note: Dr. Jackson has delivered scores of presentations at national and regional Professional Quality of Health Care and Long Term Care/Assisted Living conferences during the past 10+ years. These include presentations at the American Medical Directors Association (2003, 2004 and 2005), the annual meeting of Covenant Dove senior services organization (2003 to Present), the HCR Manor Care Annual Leadership Conference (2002, 2003, 2004 and 2005), the American Health Care Association (2002), the American Association of Homes and Services for the Aging (2000), Federation of Insurance and Corporate Counsels' National Task Force on the Crisis in Long Term Care Malpractice Seminar (2000), the Business Week Healthcare CIO Summit at Phoenix, AZ (1999), the E-healthcare conference in Chicago (1999), and at the Risk Management Conference sponsored by the American Health Care Association in Chicago (November 1998). Topics for these presentations have included health care reform, medical ethics, quality of care challenges in both critical care and geriatric settings and the inter-connections amongst government, academic medicine and the private sector.**

## CONTINUING MEDICAL EDUCATION PRESENTATIONS

1. Jackson DL: Subclavian steal. Medical Grand Rounds, 1975.

2. Jackson DL: Acute therapy of seizure disorder and stroke. Therapeutics Conference, 1976.

3. Jackson DL: COMA-Differential diagnosis and neurological examination of comatose patient. Therapeutics Conference, 1976.

4. Jackson DL: Management of drug overdose and poisoning. Therapeutics Conference, 1976.

5. Jackson DL: Management of transient ischemic attacks. Medicine 1976, Department of Medicine, May 1976.

6. Jackson DL, Beraducci AL: Carbon Monoxide Poisoning. Medical Grand Rounds, 1977.

7. Jackson DL: COMA-Differential diagnosis and neurologic examination of the comatose patient. Therapeutics Conference 1977.

8. Jackson DL: Apoplexy through the ages: from Hippocrates to the CAT scan. Medical Grand Rounds, 1977.

9. Jackson DL: Cardiac arrest and its neurological complications. Medicine, May 1977.

10. Jackson DL: Approach to the comatose patient. Medicine, 1977, Department of Medicine, May 1977.

11. Jackson DL: Subdural hematomas. Medical Grand Rounds, 1977.

**Dr Jackson has made multiple presentations to the Johns Hopkins University School of Medicine Geriatric Research Conference from 1996 to the present, as well as many presentations to other regional health care professional conferences on topics including medical ethics and quality of care in geriatric medicine and the ethical and policy implications of reform in the health care system.**

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS
Louise Bailey, Individually and on Behalf of All Similarly Situated Medicare Part B beneficiaries

## DEFENDANTS
Mutual of Omaha Insurance Co., Michael O. Leavitt, Secretary, and Leslie V. Norwalk

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** Salt Lake
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Thomas C. Fox
Reed Smith LLP
1301 K Street NW - Suite 1100, East Tower
Washington, DC 20005
202.414.9200

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
◉ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

○ **A. Antitrust**
☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**
☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)** OR ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions** (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans** (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting & Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☐ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities-Employment**<br>☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment & Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **441 Civil Rights-Voting** (if Voting Rights Act) |

**V. ORIGIN**

◉ **1 Original Proceeding**  ○ **2 Removed from State Court**  ○ **3 Remanded from Appellate Court**  ○ **4 Reinstated or Reopened**  ○ **5 Transferred from another district (specify)**  ○ **6 Multi district Litigation**  ○ **7 Appeal to District Judge from Mag. Judge**

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Action for declaratory, injunctive, and other relief under the Medicare Act, 42 U.S.C. §§ 1395 et seq.; Due Process Clause of the Fifth Amend., US Const.

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS [X] ACTION UNDER F.R.C.P. 23     **DEMAND $** _____   Check YES only if demanded in complaint
**JURY DEMAND:**   YES [X]   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES [X]   NO ☐   If yes, please complete related case form.

**DATE** 12/15/06     **SIGNATURE OF ATTORNEY OF RECORD** *Thomas C. Fox*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.