UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

<table>
<tr><td>

LOUISE BAILEY, 4782 S. Holladay<br>
Blvd. Salt Lake City, Utah<br>
84117, Individually, And On<br>
Behalf of All Other Similarly<br>
Situated Medicare Part B<br>
Beneficiaries<br>
<br>
      Plaintiffs,<br>
<br>
  v.<br>
<br>
MUTUAL OF OMAHA INSURANCE<br>
COMPANY, a Medicare Fiscal<br>
Intermediary, Medicare Division,<br>
P.O. Box 1602, Omaha, NE 68101;<br>
<br>
    and<br>
<br>
MICHAEL O. LEAVITT, SECRETARY,<br>
U.S. DEPARTMENT OF HEALTH AND<br>
HUMAN SERVICES, 200 Independence<br>
Avenue, S.W., Washington, D.C.<br>
20201<br>
<br>
    and<br>
<br>
LESLIE V. NORWALK, ACTING<br>
ADMINISTRATOR, CENTERS FOR<br>
MEDICARE & MEDICAID SERVICES,<br>
7500 Security Boulevard,<br>
Baltimore, MD 21244<br>
<br>
      Defendants.

</td><td>

**JURY REQUESTED**

<br><br><br><br>

Case No. 1:06-cv-2144

</td></tr>
</table>

AMENDED CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by and through their counsel, upon personal knowledge as to their own acts and beliefs, and upon information and belief as to all matters based upon the investigation of counsel, allege as follows:

## I. INTRODUCTION

1.    This is a proposed class action of national significance brought by Plaintiff Louise Bailey, individually, and on behalf of other similarly situated Medicare Part B beneficiaries residing in skilled nursing facilities ("SNFs") (collectively, the "Plaintiffs") against Mutual of Omaha Insurance Company ("Mutual"), which acts as a Medicare fiscal intermediary and adjudicates the Medicare claims of Plaintiff Bailey and the proposed class members; the Secretary ("the Secretary") of the Department of Health and Human Services ("HHS"); and the Acting Administrator ("Acting Administrator") of the Centers for Medicare & Medicaid Services ("CMS," previously the Health Care Financing Administration ("HCFA"), but referred to herein for all periods as CMS) (collectively, the "Defendants"), who are responsible for administration of the Medicare program.

2.    The Plaintiffs sue the Defendants for their participation, and acquiescence in, the enforcement of coverage policies for blood glucose testing of Medicare beneficiaries

that the Defendants knew were in violation of the Medicare statute and applicable regulations, and that were recently declared invalid by operation of law.  These policies have been, and continue to be, imposed to deny coverage for medically necessary tests that protect institutionalized diabetic patients from cardiovascular disease, heart attacks, strokes, developing blindness, lower-extremity infections that can result in the amputation of limbs, and even death.  These same policies are contrary to a number of federal initiatives to combat diabetes and prevent complications of the disease, and create a significant disincentive for physicians and other caregivers to administer blood glucose tests to Medicare beneficiaries, including the Plaintiffs.

3.    Diabetes is a serious, life-threatening, chronic illness for which there is no cure.  Approximately 21 million children and adults in the United States live with the disease, a number which is growing by an estimated eight percent each year.  Approximately 10.3 million Americans over 60 years of age have diabetes, or more than 1 out of every 5 (20.9 percent).  See Centers for Disease Control, National Diabetes Fact Sheet (2005).  Almost 20 percent of nursing home patients have this debilitating disease.  The impact of diabetes is devastating in these individuals, with 90 percent of nursing home residents

with diabetes having evidence of coronary artery disease, stroke, and/or peripheral vascular disease.

4.    Like Plaintiff Bailey, hundreds of thousands of Medicare beneficiaries throughout the United States reside in Medicare-certified SNFs, where they receive care for their disease, including the administration of blood glucose tests.

5.    Notwithstanding the promulgation by CMS of a National Coverage Determination ("NCD") on blood glucose testing and numerous federal initiates to combat the debilitating effects of diabetes, which encourage frequent testing of blood glucose levels for diabetic patients, CMS and its fiscal intermediaries made concerted efforts to deny Medicare coverage of blood glucose tests for SNF residents under the Medicare Part B benefit, which they knew were contrary to law and best medical practices.  With respect to the Plaintiffs, CMS has allowed and supported, Mutual's enforcement of a Local Coverage Determination ("LCD") to deny coverage for blood glucose tests based upon arbitrary and capricious standards of medical necessity, seriously jeopardizing the health and safety of this fragile population of Medicare beneficiaries.

6.    Plaintiff Bailey, as an aggrieved party, exercised her statutory administrative right to challenge the validity of Mutual's LCD on blood glucose testing before the HHS Departmental Appeals Board ("DAB"), wherein she showed that

Mutual's record for the LCD was incomplete and wholly inadequate in terms of clinical and medical best practice evidence to support the denial of coverage, and that the LCD was inconsistent with the findings in the NCD promulgated by CMS. Plaintiff Bailey moved for summary judgment.

7.    Just days before Mutual's response to the summary judgment motion was due, Mutual, with the acquiescence of CMS, withdrew the LCD in order to divest the Administrative Law Judge ("ALJ") of jurisdiction over her claim.

8.    Mutual's withdrawal of the LCD was, in effect, an acknowledgement that the LCD lacked sufficient support from the medical evidence, and as a matter of law, equivalent to the ALJ invalidating the LCD and the policies set forth therein. Accordingly, Mutual's blood glucose testing LCD and the coverage policies stated therein no longer have any legal effect.

9.    After withdrawal of its LCD, Mutual argued to the ALJ that Plaintiff Bailey's claims for blood glucose tests were reviewed based upon a standard of "medical necessity," which has yet to be defined by Mutual, but as discussed herein is the same policy that was introduced by CMS in Program Memoranda and incorporated by Mutual in its LCD. Based upon this standard of "medical necessity," we believe that Mutual will continue to apply the same coverage policies from the LCD during future claim reviews, despite the fact that those policies are now

invalid as a matter of law and have been shown during the DAB appeal to be without any support from the medical literature, medical best practices, clinical guidelines, or other medical evidence.

10.   Neither Mutual nor CMS have stated that any of Mutual's previous denials of coverage to thousands of other Medicare beneficiaries in the proposed class based upon the now invalid LCD will be reopened and reviewed.

11.   In an effort by CMS to circumvent further the legal effect of the ALJ decision in Plaintiff Bailey's DAB appeal, and despite the irrefutable absence of any supporting medical evidence, CMS finalized a new regulation, effective January 1, 2007, that will require physicians to certify the "medical necessity" of each blood glucose test for Medicare Part B beneficiaries to obtain Medicare payment for those tests under the clinical laboratory fee schedule.  As discussed herein, internal CMS documents show that this regulation is the latest effort by CMS to deny coverage for such tests based upon a trumped-up standard of medical necessity.

12.   This CMS requirement is an effort to codify a policy that was internally-developed at the agency without public comment and first disseminated in its Program Memoranda to Medicare intermediaries in late 2000, and that Mutual and other Medicare intermediaries were directed by CMS to add to their

local coverage policies on blood glucose testing to deny
coverage for an otherwise covered Part B test.  Plaintiff Bailey
challenged the same policy in her LCD appeal Complaint, as
Mutual had articulated it in its LCD.

13.  Because those LCD policies have been invalidated as a
result of Mutual's withdrawal of the LCD, Mutual can no longer
enforce those policies as a matter of law.  Moreover, the new
regulation imposes a requirement, like those in the LCD which
are now invalid, that is without any clinical support, conflicts
with other federal initiatives to treat and prevent diabetes, is
contrary to medical best practices, and, upon information and
belief, will be used by Mutual to deny coverage for Plaintiff
Bailey and other members of the class.

14.  Upon information and belief, Mutual will continue,
with the knowledge and acquiescence of CMS, to act in violation
of the Medicare statute and regulations, and the ALJ's Decision
in the LCD appeal, and deny coverage for blood glucose testing
to the Plaintiffs using the same policies and procedures set
forth in the LCD, for which there is no supporting medical
evidence and, as a matter of law, are invalid.

15.  As set forth in the attached Declaration of Dr. David
L. Jackson (Exhibit 1):

- Blood glucose testing is a cornerstone of
  diabetes care for Medicare beneficiaries and is

supported by accepted medical literature and
recognized practice guidelines.

•    Regular blood glucose testing is recognized as
medically necessary to maintain tight control of blood
glucose levels.

•    It is a medical best practice for blood glucose
test services to be provided to Medicare beneficiaries
who need assistance with or cannot administer self-
administer tests.

•    CMS policies on blood glucose testing are
contrary to the weight of accepted medical evidence
and medical best practices.

•    CMS policies on blood glucose testing are
inconsistent with other federal initiatives to treat
and prevent diabetes.

•    CMS policies on blood glucose testing effectively
deny coverage and create a significant disincentive to
caregivers to perform tests that are necessary to
protect institutionalized diabetics from suffering
heart attacks and strokes, developing blindness,
having their limbs amputated, or even death.

## II. JURISDICTION AND VENUE

16.  This is an action for declaratory and injunctive relief, and other relief arising under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq. ("Medicare Act") and the Due Process Clause of the Fifth Amendment to the United States Constitution.  Plaintiffs are statutorily authorized to bring this action by 42 U.S.C. § 1395oo(f) and 42 U.S.C. § 1395ff(f)(3).  Because Plaintiffs' claims raise "federal questions" and duties owed the Plaintiffs by the United States, the jurisdiction of this Court is founded upon 28 U.S.C. § 1331 and 28 U.S.C. § 1361.

17.  Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f)(1) and 28 U.S.C. § 1391(e).

## III. PARTIES

18.  Plaintiff Louise Bailey is 72 years old and resides at the Holladay Healthcare Center, a Medicare SNF.  She has severe diabetes with blindness as a result of her illness.  Plaintiff Bailey's physician has determined that she requires blood glucose testing four times per day, and that this is medically necessary in order to maintain control over her blood glucose levels.  The other Plaintiffs are members of the proposed class, as further defined below.

19.  Defendant, Mutual of Omaha Insurance Company, is a Medicare Fiscal Intermediary, acting as an agent for CMS; and Defendant, Michael Leavitt, the Secretary of HHS, is responsible for administration of the Medicare program, through CMS, for which Defendant Leslie V. Norwalk is the Acting Administrator.

## IV. <u>LEGAL FRAMEWORK</u>

20.  The Medicare program is a federal health insurance program for people 65 years of age and older, certain younger disabled people, and people with kidney failure.  <u>See</u> 42 U.S.C. § 1395 <u>et</u> <u>seq.</u>  The Secretary is responsible for administering the Medicare program and exercises that responsibility through CMS.

21.  CMS in turn contracts with private insurance companies to perform certain audit, administrative, and payment functions with respect to the Medicare program.  <u>See</u> <u>id.</u> § 1395h.  Those organizations are referred to as "fiscal intermediaries" or "intermediaries."  <u>See</u> <u>id.</u>  Mutual is the fiscal intermediary that processes the Plaintiffs' Medicare claims for payment.

### V.   THE DEFENDANTS HAVE ENGAGED IN CONDUCT KNOWN TO BE IN VIOLATION OF THE MEDICARE ACT, REGULATIONS, AND THE NATIONAL COVERAGE DETERMINATION TO DENY COVERAGE FOR BLOOD GLUCOSE TESTING

**A.   Balanced Budget Act of 1997**

22.   In 1997, Congress passed the Balanced Budget Act of 1997, Public Law No. 105-33 ("BBA"), effective July 1, 1998, which _inter alia_ mandated use of a negotiated rulemaking committee to develop national coverage and administrative policies for clinical diagnostic laboratory services payable under Medicare Part B by January 1, 1999.  The BBA required that these national policies be designed to promote program integrity and national uniformity and simplify administrative requirements with respect to clinical diagnostic laboratory services payable under Medicare Part B.  See BBA §§ 4554(b)(1),(2).

23.   Medicare policy did not specifically address blood glucose testing in nursing homes prior to passage of the BBA and the National Coverage Determination which followed the mandated negotiated rulemaking.  Some Medicare fiscal intermediaries had a local coverage policy that recognized blood glucose tests as a Medicare Part B covered service and paid the claims, other fiscal intermediaries denied coverage.  The Conference Report notes:  "Significant variations exist among Carriers in rules governing requirements labs must meet in filing claims for

payments." BBA Conference Report accompanying H.R. 2015, Report 105-217, July 30, 1997, at 795.

24. After the BBA was passed, internal CMS communications from that time to the present concluded that blood glucose testing in a nursing home setting is a covered service under Medicare Part B. Despite this conclusion, these internal agency communications show a series of actions by CMS with Medicare fiscal intermediaries, including Mutual, to develop trumped-up criteria for "medical necessity" to deny coverage and payment for blood glucose tests in violation of the Medicare statute and the National Coverage Determination.

25. Indeed, at the same time CMS was participating in the negotiated rulemaking for the National Coverage Determination – which, even from early drafts and the proposed decision, it knew would support Medicare coverage of blood glucose testing by diabetic patients like Plaintiff Bailey and other Medicare Part B beneficiaries in nursing homes – the agency was working to develop a policy to deny coverage for blood glucose testing under Medicare Part B purely to prevent payment of those claims.

B.   Internal CMS Communications Concluded That Blood
     Glucose Testing Is a Medicare Covered Service Under
     Medicare Part B

26. On January 7, 1999 in response to questions from Medicare fiscal intermediaries about reimbursement for

laboratory tests, such as blood glucose tests performed on

residents in a skilled nursing home setting, Jacqueline Gordon,

a CMS policy specialist on skilled nursing provider

reimbursement procedures, responded as follows:

> Part A and Part B are apples and oranges.  Part A is a
> global benefit, which pays for routine and ancillary
> services.  There is no nursing benefit under Part B.
> Part B can only pay for services where there is a
> specific benefit.  I am trying to find out if there
> are any prohibitions on paying for these services
> under Part B.  If there are no prohibitions and the
> patients are in a certified portion of the nursing
> home and they only have Part B, then we will have to
> pay the provider for the services through the cost
> report.

E-mail of Jacqueline Gordon (Exhibit 2).

27.  The next day, Ms. Gordon sent a second e-mail

indicating that, with regard to blood glucose tests, she had

found "that this is a covered Medicare service under Part B."

E-mail of Jacqueline Gordon (Exhibit 3).

28.  That same month, CMS convened a "Blood Glucose

Monitoring in Nursing Homes Workgroup" which included six

representatives from the CMS Central Office in Baltimore,

Maryland, four CMS regional offices, and six fiscal

intermediaries, but no participants outside the agency or its

contractors.  A meeting was held on January 26, 1999 to discuss

blood glucose testing (monitoring) services of Medicare Part B

SNF residents and how Medicare should pay for this service.  See

Meeting Report of January 26, 1999, at 1 (Exhibit 4).

29.   On January 29, 1999, Ms. Gordon prepared a written report summarizing the discussion.  The report stated that "[b]illing for these services has now been raised as a result of the SNF's being eligible for CLIA waiver for these tests."  Id. ("CLIA" stands for the Clinical Laboratory Improvement Amendments of 1988, which allowed for SNFs to perform certain laboratory tests outside of a clinical laboratory pursuant to a Certificate of Waiver.)  The report stated that for Medicare Part B residents who are in the non-certified portion of the nursing home, payment for blood glucose testing "is made on a fee schedule basis."  Id.

30.   Upon information and belief, this report also documents the first time that CMS articulated a desire and rationale to deny coverage and prevent payment of blood glucose testing claims even though CMS acknowledges that these tests, when performed in nursing facilities, are covered as CLIA waived tests under Medicare Part B and paid under the fee schedule: "For the patients in the non-certified portion [of the nursing home] we should pay based upon the fee schedule and try to limit payment based upon medical necessity criteria."  Id. at 2.  Some of the examples offered by Ms. Gordon for medical necessity criteria included whether the patient is insulin dependent, whether blood glucose testing appears in the patient's plan of

care, and whether the SNF had a CLIA waiver for the time period claims were submitted for blood glucose tests.

31.  Ms. Gordon circulated this report to various CMS division directors including Tom Hoyer, CMS Director of the Chronic Care Policy Group.

32.  Over the next several months, numerous e-mails and meetings took place within the CMS Central Office in an effort to come up with a uniform set of instructions to the intermediaries and providers on blood glucose tests, with the knowledge that CMS was contemporaneously participating in the Negotiated Rulemaking Committee which was developing a National Coverage Determination pertaining to blood glucose testing.

33.  Members of the Central Office exchanged ideas on how Medicare could _avoid_ paying for these blood glucose tests, notwithstanding the conclusion that they are a _covered_ service under Medicare Part B.  Instead of considering the serious health concerns of diabetic Medicare Part B beneficiaries, the clinical evidence supporting frequent blood glucose testing to prevent complications from the disease, medical best practices and standard industry practices, the overriding consideration of CMS was simply to come up with some basis for denying payment of these tests.

34.  One suggestion was to call the whole thing a DME issue and not pay for it.  _See_ J. Harris email dated Jan. 28, 1999

(Exhibit 5).  Another suggestion was to consider the SNF's use of a patient's monitoring device to administer the test as fraud; but perhaps treat the tests as properly billable if the SNF owns the monitor and uses it on all patients.  See G. Bagley email to Regional Offices dated Jan. 28, 1999 (Exhibit 5).

35.  Medical necessity again is raised as a possible basis for denying claims for blood glucose tests, but this time the fabricated rationale is based on the frequency of testing, for which there is no clinical support:  "Since self testing of blood glucose is the standard practice, thrice daily testing by a lab is not standard and would most likely be not medically necessary."  Id.

36.  In an e-mail to Ms. Gordon dated January 29, 1999, Mr. Hoyer wrote:

> **Unfortunately, in the Part B only setting, if it is a covered test and CLIA waivered <u>then we may have no choice but to pay</u>.  I hope someone comes up with a better idea, but...**

See e-mail of T. Hoyer to J. Gordon et al. dated January 29, 1999 (Exhibit 6) (emphasis added).

37.  Mr. Hoyer later asked Ms. Gordon how many Part B claims were being submitted by SNFs for blood glucose tests, presumably to understand the aggregate cost to the Medicare program.  See J. Gordon e-mail to Regional Offices dated March 25, 1999 (Exhibit 7).

38.   One email from a Regional Office to another Regional Office lamented about the lack of information coming from the Central Office on these deliberations and that it has involved so many people in different positions and divisions.  See J. Campbell e-mail to Regional Office dated April 7, 1999 (Exhibit 8).  Mr. Campbell concludes the email by stating that he hopes the delay is a positive sign – not that CMS will develop an appropriate policy based upon clinical evidence and best medical practices – but that CMS will prohibit this test altogether in nursing homes:  "I hope they eliminate this test in a nursing facility setting . . . SNF and NF."  Id.

39.   On March 15, 1999, Ms. Gordon sent a five-page draft issue paper to Mr. Hoyer outlining the various issues and choices being discussed within CMS on this issue through the emails and meetings.  See Issues Paper (Exhibit 9).  The issues paper begins with two opposing options.  The first option, which is the correct one, is that CMS should cover and pay for blood glucose monitoring tests under Part B as a laboratory test that is paid under the laboratory fee schedule.  See id. at 1.  The second option is not to cover or reimburse for these tests under Part B using some policy.  See id.  The rest of the memo discusses related issues that explore options for limiting payment of these tests, by using medical necessity criteria,

special rules for insulin dependent patients, and new payment
methodologies.  See id. at 1-5.

40.  In April 1999, in response to further inquiries about
whether the CMS Central Office had made any decisions regarding
payment for blood glucose testing issues, Ms. Gordon responded
that there was not an agreement in the Central Office regarding
this issue, however, Mr. Hoyer had said that fiscal
intermediaries can pay the claims.  See J. Gordon e-mail to J.
Campbell dated April 20, 1999 (Exhibit 10).  Ms. Gordon also
stated that there is no national coverage policy for this test,
and that intermediaries had discretion over covering and then
paying or not covering and not paying.  See id.  No explanation
was offered for not covering what CMS acknowledged was a Part B
covered service.

41.  On May 11, 1999, in response to further inquiries
about the lack of a uniform policy on blood glucose tests in
SNFs, Mr. Hoyer stated "[w]e're continuing to consider the issue
and if we are able to give additional advice in the future, we
will do so -- with no prejudice to past actions."  See T. Hoyer
e-mail to J. Gordon and J. Campbell dated May 11, 1999 (Exhibit
11).

42.  In June of 1999, Mr. Hoyer circulated a fact sheet
laying out the statutory authorities and relevant facts which
led him to conclude that "our history and our rules seem to

militate in favor of paying for this service under the fee

schedule." See T. Hoyer e-mail dated June 2, 2999 (Exhibit 12).

Also attached was a proposed policy drafted by Ms. Gordon and

Ms. Greenberg to limit coverage of blood glucose tests in SNFs

to diagnostic tests (i.e., a test administered to the patient to

diagnose diabetes) but deny coverage for additional tests

performed during the treatment of the patient's disease to

monitor the patient's condition. See id. Mr. Hoyer knew, even

at that time, that the pending National Coverage Determination

would clearly support payment of blood glucose monitoring

claims, stating:

> The proposed policy would decline to provide coverage.
> But the proposed regulation on laboratory services
> that is now being negotiated by Grand Bagley's shop
> **[the National Coverage Decision] contains criteria
> that seem surely to lead to payment**.

Id. (emphasis added).

C.  **March 10, 2000 Proposed Rule to Establish National Coverage
    and Administrative Policies**

43.   On March 10, 2000, CMS published a proposed rule to

establish National Coverage Determinations for clinical

diagnostic laboratory services payable under Medicare Part B

that were developed by the Negotiated Rulemaking Committee.

44.   The proposed rule includes a National Coverage

Determination captioned "Medicare National Coverage Decision for

Blood Glucose Testing" which established the necessity for

frequent testing of blood glucose values in the management of

patients with diabetes, and stated:

> Frequent home blood glucose testing by diabetic
> patients should be encouraged.  In stable, non-
> hospitalized patients who are unable or unwilling to
> do home monitoring, it may be reasonable and necessary
> to measure quantitative blood glucose up to four times
> annually.
>
> Depending upon the age of the patient, type of
> diabetes, degree of control, complications of
> diabetes, and other co-morbid conditions, more
> frequent testing than four times annually may be
> reasonable and necessary.
>
> In some patients presenting with nonspecific signs,
> symptoms, or diseases not normally associated with
> disturbances in glucose metabolism, a single blood
> glucose test may be medically necessary.  Repeat
> testing may not be indicated unless abnormal results
> are found or unless there is a change in clinical
> condition.  **If repeat testing is performed, a specific
> diagnosis code (e.g., diabetes) should be reported to
> support medical necessity.  However, repeat testing
> may be indicated where results are normal in patients
> with conditions where there is a confirmed continuing
> risk of glucose metabolism abnormality** (e.g.,
> monitoring glucocorticoid therapy).

65 Fed. Reg. 13,128 (March 10, 2000) (emphasis added).

　　　45.  Diabetic patients typically have a "confirmed

continuing risk of glucose metabolism abnormality."  Therefore,

under this National Coverage Determination, repeat blood glucose

testing of diabetic patients, even multiple times a day, is

considered medically necessary testing that is covered by

Medicare.

46. A section that was not negotiated by the Negotiated Rulemaking Committee was added by CMS entitled "Reasons for Denial." Id. This section set forth CMS's interpretation of its self-proclaimed "longstanding policies" for "informational purposes." 65 Fed. Reg. at 13,130. CMS used this opportunity to make some general statements about documentation that would need to be submitted with blood glucose test claims (e.g., the physician's order indicating the frequency of testing) to support "medical necessity" and that tests are "reasonable and necessary." Although the general nature of these statements make them appear to be compatible with the National Coverage Determination, they were designed to lay the groundwork for CMS's continued closed-door efforts to use its own arbitrary definition of "medical necessity" to undermine the application of the National Coverage Determination.

47. Five months later, with the proposed National Coverage Determination in circulation, Mr. Patel sent an e-mail to Mr. Hoyer asking why some contractors were not reimbursing for glucose testing in SNFs, and why there were differences on the definition of an "inpatient" in various SNF manuals. Mr. Hoyer stated:

> The bottom line at this point is that, **after many months of wondering how it can avoid making payment for these claims-and simultaneously avoiding confronting the [sic] issue of current billing and payment conventions-we've reached the point of**

> **deciding we'd fix the future** (with a specific small
> pmt. amt. for the test) **and pay the past.**  The desire
> of [Office of Clinical Standards and Qualifications]
> and [Program Integrity] to avoid paying the past is
> what held us up.
>
> ****
>
> Under consolidated billing when implemented, the
> answer will be that the services are bundled for Part
> A patients (no additional pmt.) and bundled to the SNF
> **under Part B but paid for in that context under the
> clinical lab fee schedule based on a bill from the
> SNF.**
>
> ****
>
> Most of this has been known for as long as Mr. Geiger
> [sic] has been writing to us but **the desire of
> [Program Integrity] and Robert Streimer (OCSQ-
> coverage) has been to find a way to avoid paying at
> all-and hence no action was taken to explain how to
> bill and to clarify the issue with intermediaries.**
>
> ****
>
> On the overall subject of the manuals-they are out of
> date on some aspects and many of the analysts are not
> familiar enough with them to know how to fix them.
> Hence the **constant emergence of inconsistencies.**

<u>See</u> Mr. Hoyer e-mail dated August 11, 2000 (Exhibit 13).  The

overall theme here is that, despite all the confusion among the

intermediaries and internally at CMS and its Regional Offices

over blood glucose tests for Part B SNF residents, Part B claims

for these tests will be covered and paid at the SNF under the

clinical laboratory fee schedule.  But others within the agency

continued to develop ways to deny payment of blood glucose test

claims.

48.    On October 11, 2000, Tzvi Hefter, who was overseeing drafting of a Program Memorandum on blood glucose testing, reported on a conversation with the CMS Office of General Counsel:

> I spoke to [Office of General Counsel] and while it was truly a painful discussion, I came away with the following: We can say in the [Program Memorandum] that "for a part B only stay in a SNF for the blood glucose test 82962 [by glucometer approved by the FDA for home use] where the carrier has determined that the test is reasonable and necessary, the payment in a certified bed is based on reasonable cost and the payment in a non-certified bed is based on the lab fee schedule amount." **This technically allows the carrier to make a determination that for some reason the test is not necessary and therefore not pay at all for the test.** ([I]t does not allow them to determine that it is not in the scope of benefits as a lab test, since they cannot make that determination.

See T. Hefter e-mail to P. Patel dated Oct. 13, 2000 (Exhibit 14).

49.    Thus, the CMS Office of General Counsel warned Mr. Hefter that blood glucose tests administered to Part B SNF residents are a covered laboratory test and that intermediaries cannot determine that such tests are outside the scope of covered benefits.  Although this was "painful" for Mr. Hefter to hear, it didn't deter him from advising Mr. Patel that "technically" Medicare intermediaries and carriers could determine that "for some reason the test is not necessary and therefore not pay at all for the test."  Id.

50.   This statement formed the basis for CMS's introduction, for the first time, of new restrictions on blood glucose testing in SNFs of Part B residents.  Essentially, Mr. Hefter was advocating what others within the agency had privately discussed before – that Medicare intermediaries could use "medical necessity" as a trumped up basis for denying legitimate claims for blood glucose tests that would otherwise be paid for under the clinical laboratory fee schedule.  This would be done even though the statute, regulations, and pending National Coverage Determination all authorized coverage and payment of frequent blood glucose tests for Part B SNF residents, and in direct opposition to the clinical evidence and medical best practices that supported the National Coverage Determination.  The internal documents clearly show that CMS was determined to deny these claims even though it knew all of this.  Two program memoranda were then issued in quick succession to give Medicare intermediaries the "some reason" Mr. Hefter spoke about so that they could deny coverage for blood glucose tests on arbitrary medical necessity criteria.  Id.


D.   CMS Program Memorandum AB-00-99

51.   CMS Program Memorandum AB-00-99 was issued to Medicare intermediaries and carriers on October 24, 2000 with an effective date of November 1, 2000.  Entitled "Glucose

- 24 -

Monitoring Note," this Program Memorandum acknowledged that blood glucose tests for Part B patients in SNFs are covered and payable under clinical laboratory fee schedule, pursuant to the statutory and regulatory authorities, including Section 1862(a)(1)(A) of the Social Security Act and Sections 410.21 and 411.15 of Title 42 of the Code of Federal Regulations.

52.   However, CMS added an entirely new requirement, never before articulated to the public or found in the existing authorities:  "Implicitly, the laboratory result must be reported to the physician promptly so that the physician can use the result and instruct continuation or modification of patient care; this includes the physician's order for another laboratory service."  CMS Program Memorandum AB-00-99 (Oct. 24, 2000). This single sentence would be the linchpin of the agency's continuing strategy to deny coverage for legitimate blood glucose tests of Part B SNF residents.  The memorandum instructs intermediaries and carriers to make coverage determinations under their own local coverage policies because the National Coverage Determination had not been finalized at that time.  CMS advised its contractors not to deny claims on the basis that these tests were routine because:

> Denial of payment for a Part B covered laboratory service cannot be made on the basis that the service is routine care.  Routine care determinations are applicable for Part A nursing home services.

53.   The "prompt reporting" and "separate order" restrictions from AB-00-99 were added to many of the intermediary's local coverage policies, including Mutual's Local Coverage Determination.  When Mutual's Local Coverage Determination was later challenged by Plaintiff Bailey and others, withdrawn and invalidated, CMS quickly promulgated a regulation in 2006 with the same arbitrary restrictions.  See 71 Fed. Reg. 69,624, 69,704-05 and 69,788 (Dec. 1 2006) (to be codified at 42 C.F.R. § 424(f)).  The goal was simple:  because these were clearly covered tests, CMS would make it administratively impracticable for SNFs and physicians to document the medical necessity of these tests as CMS had now defined medical necessity.

E.    CMS Program Memorandum AB-00-108

54.   Less than two months after CMS issued Program Memorandum AB-00-99, CMS issued Program Memorandum AB-00-108 to Medicare intermediaries and carriers.  CMS Program Memorandum AB-00-108 (December 1, 2000; effective January 1, 2001).  Entitled simply "Glucose Monitoring," CMS first states that it has been informed of a "significant increase" in the number of blood glucose test claims submitted to intermediaries and more health care settings, specifically nursing homes and home health agencies.  Id.

55.  CMS acknowledges the standard of practice for frequent testing in saying that "[a]dministration of the service several times a day is common in order to maintain tight control of glucose to prevent heart disease, blindness, and other complications of diabetes."  Id. (emphasis added).

56.  CMS also notes that it is permissible for providers, such as SNFs, to administer these tests to patients using a glucose monitoring device if the provider has at least a CLIA certificate of waiver.

57.  AB-00-108 then restates the new arbitrary restrictions from AB-00-99 concerning prompt reporting of test results to the physician and new physician orders for tests, with some further explanation:

> Nursing and physician duties, include observing, ordering, administering and interpreting the patient's health status are paid predominately under other payment systems, such as the state nursing home payment system or the physician payment system. If home-use glucose monitoring devices are used in the hospital and nursing home settings, a glucose monitoring service must be performed in accordance with laboratory coverage criteria to qualify for separate payment under the Medicare laboratory benefit. As noted above, **for a laboratory service to be reasonable and necessary, it must be ordered by the physician, the ordering physician must use the result in the management of the beneficiary's specific medical problem, and the laboratory result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of patient care.**

Id. at 3.  As stated above, and shown by internal CMS documents, the last sentence was completely fabricated by CMS to deny coverage for legitimate blood glucose tests.

58.  It was, and continues to be, the best medical practice of physicians to write an order for the SNF to administer a series of blood glucose tests to the patient over a defined and limited period of time (e.g., two weeks, one month) and to be notified if test results fall outside of a specified range. Well aware of this standard medical practice, CMS added that "[a] standing order is not usually acceptable documentation for a covered laboratory service." Id. at 2.  Medicare intermediaries and carriers, including Mutual, later adopted this restriction in their local coverage policies and applied it in an absolute way to deny Part B claims for any and all blood glucose tests administered to SNF residents that do not have a separate physician order, based upon the false assumption that the standard medical practice was to write standing orders for such tests.  When these local coverage policies were later challenged by Plaintiff Bailey and others, CMS quickly moved to cover-up what had been exposed with the invalidation of Mutual's LCD and what would likely be the same result for other intermediary LCDs on blood glucose testing by promulgating this requirement in a new regulation.  See 71 Fed. Reg. 69,624,

69,704-05 and 69,788 (Dec. 1 2006) (to be codified at 42 C.F.R.
§ 424(f)).

59. CMS urged its contractors to "review their local
coverage policies for glucose testing in light of the proposed
national coverage policy in order to prepare for the adoption of
a national coverage policy," which should have been a warning
that contradictory coverage restrictions would need to be
removed, as is required by law. Id. Instead, CMS directly
instructed its contractors to "review their local coverage
[policies] to clarify, if necessary" the new restrictions that
CMS has devised regarding "the order and clear use of a
laboratory result prior to a similar laboratory order." Id.

F. **Final National Coverage Determination for Blood Glucose
Testing**

60. Effective November 23, 2001, CMS promulgated the
National Coverage Determination ("NCD") to address Medicare
coverage of blood glucose testing.

61. Specifically, the NCD states that "[f]requent home
blood glucose testing by diabetic patients should be
encouraged," and that "[t]he convenience of the meter or stick
color method . . . has become a standard of care for control of
blood glucose, even in the inpatient setting." 66 Fed.Reg.
58,846 (Nov. 23, 2001).

62.  The NCD also states that "[d]epending upon the age of the patient, type of diabetes, degree of control, complications of diabetes, and other co-morbid conditions, more frequent testing than four times annually may be reasonable and necessary. . . . [R]epeat testing may be indicated where results are normal in patients with conditions where there is a confirmed continuing risk of glucose metabolism abnormality." Id.

63.  Taking into account the health factors of institutionalized diabetics, nowhere in the NCD are there specific limitations on the frequency of testing, and nowhere is there mention of requiring an order for each blood glucose test administered to patient with a "confirmed continuing risk of glucose metabolism abnormality." The NCD simply lists the number of maladies that may require blood glucose testing and reiterates that reasonable and necessary tests will be reimbursed. See id at 58,846, 58,848.

64. An NCD is a determination by CMS as to whether or not a particular service is covered nationally by Medicare. 42 C.F.R. § 405.1060(a)(1). An NCD is legally binding on all Medicare contractors, including carriers and fiscal intermediaries, as well as the DAB and its ALJs, among others. See id. § 405.1060(a)(4).

65.  A NCD takes precedence over decisions made on the local level by Medicare contractors, _i.e._, LCDs, including what were formerly known as Local Medical Review Policies ("LMRPs"), and other non-binding policies.

66.  An LMRP or LCD may not conflict with a National Coverage Determination once the National Coverage Determination is effective.  If a National Coverage Determination conflicts with a previously established LMRP or LCD, the contractor must change its LMRP or LCD to conform to the National Coverage Determination. . . . The LMRP or LCD may not alter the NCD.  66 Fed. Reg. 58,788 (Nov. 23, 2001).

G.  **Mutual's Local Coverage Determination on Blood Glucose Testing**

67.  Mutual published an LCD titled Blood Glucose Testing, contractor's determination number 2001-B, LCD database ID number L19657.  LCD version number 5 was the last published version. Mutual published its LCD on blood glucose testing as a single statement of the policies it would impose on claimants who submit Medicare claims for blood glucose tests.

68.  The LCD record in the administrative proceeding initiated by Plaintiff Bailey shows that Mutual first had a draft of its LCD on blood glucose testing in December 2000.  The record also shows that Mutual finalized and distributed the LCD

to providers on August 6, 2001.  Other documents in the LCD record show that Mutual was aware of the NCD as it was being developed, yet made no effort to revise its LCD to be consistent with the NCD, as is required.  See 66 Fed. Reg. 58,788 (Nov. 23, 2001).

69.  Significantly, after the NCD was published, Mutual was given a clear written warning by the CMS Region VII office that the language Mutual was planning to add to its LCD from CMS Program Memoranda AB-00-99 and AB-00-108 does not appear in the NCD and should not be included in the LCD because it conflicts with the NCD, as health care providers had argued.

> I agree with the providers - I think lifting language from AB-00-108 and AB-00-99 is inappropriate and is in conflict with the NCD.  I believe all items in red should be deleted.  Those PMs [program memoranda] were written 2 yrs ago - pending a NCD.
>
> From what I can tell the LMRP is word for word the same as the NCD (with the exception of the items in red) so I don't see any real need for them to even have one.  If however, they do - it can not go beyond the NCD and some of the red items do.

See S. Pennington email to Mutual and CMS dated Nov. 4, 2002 (Exhibit 15) (emphasis added).

70.  Others who reviewed the draft LCD internally expressed similar concerns about the legitimacy of language in the LCD that does not appear in the NCD and the negative impact the LCD would likely have on patient care by discouraging testing.

> **I do not believe that a physician should be notified
> each and every time a CBG result is taken.** If a
> patient is in a SNF and requires testing QID (4x a
> day) and a sliding scale is in place and the P.O.
> [physician order] states to contact the physician if
> levels are "X" then the facility should contact the
> doctor. **CBG testing is very important** – remember that
> it used to be that a diabetic would qualify for
> catastrophic care in past years (this was considered
> skilled care) and **now if you require calling [the
> physician] each time this will discourage repeat
> testing and/or facilities seeking reimbursement.**

See M. McNall email to C. Richards at Mutual dated July 5, 2001

(Exhibit 16). Mutual chose to ignore these warnings and publish

the LCD anyway with this objectionable language derived from the

two CMS Program Memoranda, knowing full well that its LCD was in

conflict with the NCD.

71. On its face, Mutual's LCD conflicted with the NCD on

blood glucose testing in numerous ways, including: (1) the

LCD's emphasis on the word "routine" to deny coverage of a

series of blood glucose tests for SNF residents -- the NCD does

not preclude regular and frequent blood glucose testing of SNF

residents; (ii) the LCD's requirement that each test result be

reported to the physician promptly -- the NCD does not require

"prompt" notification, which could interfere with frequent blood

glucose testing that is encouraged by the NCD; and (iii) the

LCD's statement that there can be no standing order for blood

glucose testing for such services to be covered -- the NCD

specifically encourages frequent testing of blood glucose levels

for diabetic patients, does not provide any specific limitations to testing, and acknowledges that specific diagnosis codes, such as diabetes, support repeat testing, especially where there is a confirmed continuing risk of glucose metabolism abnormality.

72. Effective October 1, 2005, Mutual issued a notice that it would implement system edits to more readily identify all Medicare Part B claims for blood glucose testing so as to deny coverage for SNF residents.

73. From the date the LCD was first published (August 6, 2001) to the date Mutual put in place system edits (October 1, 2005), and thereafter, Mutual has denied coverage for Medicare Part B claims for blood glucose tests provided to SNF residents on the basis of the policies reflected in its LCD.

74. Therefore, from the original publication of Mutual's LCD on August 6, 2001 to the present, and continuing, on information and belief, into the future, Mutual has taken the position under its LCD that Medicare Part B claims of SNF residents for a series of blood glucose tests are not covered services and payable, even if they meet the medical standards of practice for such tests.

## VI. FACTUAL BACKGROUND OF PLAINTIFF BAILEY'S LCD CHALLENGE

75. The Medicare Act entitles an aggrieved party to challenge an intermediary's policy by direct appeal to the DAB.

42 C.F.R. §§ 426.300, 426.320.  This appeal process is separate
and distinct from an appeal by a beneficiary of a denied
Medicare claim, for which there is a separate claims appeal
process.  See 42 C.F.R. § 426.310(a).  The Medicare Act also
grants federal courts jurisdiction to consider an LCD-related
challenge to the validity of a determination or ruling of the
Secretary without exhausting administrative remedies if there
are no material issues of fact in dispute.  See 42 U.S.C. §
1395ff(f)(3).

76.  On March 28, 2006, Plaintiff Bailey filed a complaint
with the DAB, as an aggrieved party under 42 C.F.R. § 426.400.
Plaintiff Bailey challenged the validity of Mutual's LCD on
blood glucose testing as legal authority for denying Medicare
coverage of her blood glucose tests.  Her complaint included
substantial clinical and medical evidence supporting the
invalidation of the challenged LCD.

77.  By order dated April 19, 2006, the ALJ certified that
her complaint met the acceptability requirements set forth in 42
C.F.R. § 426.410(b)-(d).

78.  On July 18, 2006, Plaintiff Bailey filed the Aggrieved
Party's Statement pursuant to 42 C.F.R. § 426.425(a), showing in
great detail that the LCD record, which had been produced by
Mutual, is incomplete and wholly inadequate to support the

coverage policies enunciated in the LCD when evaluated under the reasonableness standard at 42 C.F.R. § 426.425(a).

79.   On July 18, 2006, Plaintiff Bailey also moved for Summary Judgment on her claims to invalidate Mutual's LCD.

80.   A few days before its response was due, Mutual, on August 11, 2006, upon information and belief with the knowledge and acquiescence of CMS, withdrew the LCD as a scheme to divest the ALJ of jurisdiction over Plaintiff Bailey's substantive challenge of the coverage policies in the LCD.

81.   As part of Mutual's notice to the ALJ that it had retired its LCD on blood glucose testing, Mutual then argued, contrary to the plain language of the LCD, which had been previously disseminated to healthcare providers, that the LCD is not being used to deny claims for blood glucose testing submitted by Plaintiff Bailey; rather, Mutual took the position that the claims for blood glucose testing are denied if they are not medically necessary.

82.   The ALJ declined to render any substantive relief to Plaintiff Bailey and stated in his decision that Mutual's withdrawal of its LCD deprived him of jurisdiction under the regulations to further adjudicate the issues she had raised.

83.   Without an LCD, Plaintiff Bailey and all other Plaintiffs were rendered unable to further utilize the LCD appeal process to challenge the merits of the coverage policies

in the LCD, effectively exhausting their administrative remedies.

## VII. LEGAL EFFECT OF PLAINTIFF BAILEY'S LCD CHALLENGE

### A.   The LCD's Restrictive Coverage Policies Are Now Invalid By Operation Of Law

84.   Pursuant to 42 C.F.R. 426.460(b), Mutual's withdrawal of its blood glucose testing LCD has the same legal effect as an ALJ's decision to invalidate that LCD under the reasonableness standard.   Accordingly, the LCD and the policies incorporated therein – which all affected parties had understood to be Mutual's policy on blood glucose testing coverage – are now invalid as a matter of law, and those policies can no longer be applied to anyone.

85.   In addition, Mutual is required to reopen denied claims of Plaintiff Bailey and adjudicate those claims, and any new claims submitted for blood glucose testing services, without using the invalid policies reflected in the LCD, now that it is withdrawn.   Any and all claims submitted to Mutual by anyone for blood glucose testing services with dates of service on or after August 11, 2006 must be adjudicated without using the invalid policies in the LCD.

86. Mutual confirmed by letter after the Complaint was filed in this action that Plaintiff Bailey's claims for blood glucose tests were re-reviewed, purportedly without application of its LCD, and again denied. <u>See</u> letter from M. Zajicek to J. Healy dated December 19, 2006 with remittance advice attached (Exhibit 17). Not surprisingly, the reason for the denials is that they are not reasonable and necessary (<u>i.e.</u>, lack of medical necessity), in keeping with the policy of the LCD. Accordingly, Mutual continues to enforce its retired LCD, which is a violation of the law and the ALJ's order of dismissal in Plaintiff Bailey's LCD appeal.

87. CMS stated very clearly in the preamble to the rules governing these LCD appeal procedures that it is the policy or policies discussed in the LCD that are invalid when the LCD is retired, not just the document itself:

> Retiring an LCD or withdrawing an NCD would result in the retired/withdrawn *policy* no longer applying in the claims adjudication process for services rendered on or after the date that the *policy* is retired/withdrawn. Moreover, the aggrieved party would be granted individual claim review. Since a claimant would receive the same relief that would have been available had the adjudicator found that the relevant LCD or NCD was not valid, there would be no reason to continue the appeal.

*Medicare Program: Review of National Coverage Determinations and Local Coverage Determinations; Final Rule*, 68 Fed. Reg. 63,692, 63,698 (November 7, 2003) (emphasis added). CMS added that:

> When we retire/withdraw an LCD/NCD *we will not apply those policies for services furnished after the retirement/withdrawal date* and we will reprocess the

aggrieved party's affected claims *without applying the retired/withdrawn policy.*

Id. (emphasis added).

88.    Mutual cannot deny claims for blood glucose testing services on or after August 11, 2006 (i) using any of the restrictive coverage policies discussed in the now-retired and invalid LCD on blood glucose testing, or (ii) based on its policy interpretations discussed in the LCD of other authorities (including CMS Program Memoranda AB-00-99 and AB-00-108, Medicare Claims Processing Manual § 90.1, and 42 C.F.R. § 410.32).

**B.    Mutual's Deliberate Choice Not To Reference The LCD By Name On Claims Denials Is A Mere Technicality That Does Not Allow Mutual To Continue To Enforce The Invalid LCD Policies**

89.    The Medicare statute defines an LCD as "a determination by a fiscal intermediary or carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary—or carrier—wide basis under such parts, in accordance with section 1862(a)(1)(A)."    42 U.S.C. § 1395ff(f)(2)(B).

90.    Simply stated, an LCD is an official statement of the fiscal intermediary's policies on the coverage of specific items or services for Medicare reimbursement.    It applies to claims for the listed items or services whether the fiscal intermediary

proclaims it on every claim determination, or chooses not to mention it on any.  It is binding on claimants until retired or otherwise invalidated.  And once it is no longer valid – as is the case here – the coverage policies enunciated in that LCD can no longer be enforced by the fiscal intermediary.

91.  Mutual's LCD on blood glucose testing is now retired and invalid, and so are all of its policies discussed in that LCD interpreting Medicare authorities (including CMS Program Memoranda AB-00-99 and AB-00-108, Medicare Claims Processing Manual § 90.1, and 42 C.F.R. § 410.32) to establish when Mutual will and will not reimburse claims for blood glucose testing services.

92.  The restrictive coverage policies in Mutual's now-retired and invalid LCD on blood glucose testing can no longer be applied to providers and beneficiaries that Mutual services. The LCD was Mutual's attempt to reflect, in one document, its coverage limitations on blood glucose testing services.  Mutual started with the broadly permissive coverage policy of the NCD on blood glucose testing.  Mutual then added the restrictive coverage policy language from CMS Program Memoranda AB-00-99 and AB-00-108 (*e.g.*, "prompt" notification of test results to the ordering physician, standing orders generally not acceptable, and orders for each test) – all derived from CMS's internal efforts to manufacture some basis for intermediaries and

carriers to deny payment of blood glucose test claims under the
general term "medical necessity."  Mutual finished with its own
unsupported policy interpretations of CMS Program Memoranda AB-
00-99 and AB-00-108 (that "prompt" means before the next test);
the Medicare Claims Processing Manual § 90.1 (which Mutual
interprets to prohibit coverage of blood glucose testing for SNF
residents, as opposed to coverage for beneficiaries in their own
homes); and 42 C.F.R. § 410.32 (which Mutual interprets to
prohibit all standing physician orders for blood glucose
testing).

    93.  Now that the LCD is retired and invalid, all of the
coverage limitations on blood glucose testing services reflected
in the LCD are unenforceable by law, including the trumped-up
medical necessity criteria.  Any other conclusion or result
would be a total perversion of justice for Plaintiff Bailey and
the thousands of other Medicare beneficiaries in the proposed
class whose claims have been or will be denied.


C.   **Mutual Can Obtain No Support From The New CMS Regulation To
     Deny Claims For Blood Glucose Tests**

    94.  Buried in the 2007 Medicare Physician Fee schedule
rulemaking, CMS developed a new provision in the regulation that
will require physicians to certify the medical necessity of each
blood glucose test for Medicare beneficiaries beginning January

1, 2007.  See 71 Fed. Reg. 69,624, 69,704-05 and 69,788 (Dec. 1

2006) (to be codified at 42 C.F.R. § 424(f)).

95.  Upon information and belief, this regulation was

quickly promulgated to circumvent further the consequences of

Plaintiff Bailey's challenge to Mutual's LCD, which is now

invalid.  The regulation adopts the same unfounded and arbitrary

medical necessity criteria for separate physician orders that

was manufactured within CMS during the development of the NCD to

undermine the NCD, introduced in the Program Memoranda, and

written into many of the intermediary LCDs as an artificial

construct with the single purpose of denying coverage for

legitimate blood glucose tests for Part B SNF residents that

would otherwise be payable under the clinical laboratory fee

schedule.

96.  Current clinical evidence, medical literature, and

medical best practices support the medical necessity and

reasonableness of a physician-prescribed protocol of repeat

blood glucose monitoring in diabetic patients.  Requiring

physicians to individually order and certify the medical

necessity of each "finger stick" blood glucose test administered

to a Part B-eligible nursing home resident is inconsistent with

the Medicare statute and regulations, as well as longstanding

CMS policy.

97.  More importantly, CMS provides no clearly articulated rationale in support of its policy, which deviates significantly from the current medical best practices in diabetes management, is contrary to other federal initiatives, and creates significant disincentive on professional care givers to utilize these tests in managing the care of institutionalized diabetic patients.  (See Declaration of Dr. Jackson).

98.  Like the invalid LCD, this new regulation of CMS ignores current medical literature and clinical authorities and is inconsistent with numerous federal initiatives to combat diabetes and prevent complications of the disease.  These federal initiatives recognize the value of having the physician prescribe supplies and document the frequency of self-testing, without requiring physician review before each testing event. Some of the key programs sponsored by the federal government include:

- The Centers for Disease Control and Prevention ("CDC") National Public Health Initiative on Diabetes and Women's Health (see http://www.cdc.gov/diabetes/projects/women.htm);

- The HHS Council on Health Disparities, which sponsors a number of programs designed to improve the health of minorities and underserved populations, including diabetes detection and prevention (see http://raceandhealth.hhs.gov); and

- The National Diabetes Education Program ("NDEP") (see http://www.cdc.gov/diabetes/ndep/index.htm)

When HHS launched NDEP in 2001, a joint federal program run by the National Institutes of Health and the CDC, the Secretary emphasized the importance of informing Medicare beneficiaries that they "can use their benefits to better monitor and manage their diabetes." See "HHS Launches Diabetes Education Program for Older Americans," HHS Press Release (May 3, 2001), reprinted at http://www.hhs.gov/news/press/2001pres/20010503.html.pg1. The NDEP supports routine monitoring of blood sugar levels by diabetics and their health care providers for use in an effective treatment plan for managing their disease.

99.  As a result of the LCD appeal, all new claims for blood glucose tests must be reviewed by Mutual without application of the LCD and its coverage policies.  Under the applicable regulatory scheme, Plaintiff Bailey's previously submitted claims are to be readjudicated by Mutual.  All other Plaintiffs in the proposed class should be afforded the same relief.

100. Plaintiff Bailey alleges that Mutual's review of her denied claims, her future claims, and the claims of the proposed class, will continue to be denied based upon the policies reflected in the invalid LCD, as indicated by the recent denials of her claims upon re-review, which is a clear violation of law.

## VII. **CLASS ACTION ALLEGATIONS**

101. Plaintiff Bailey brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of herself and the Class comprised of:

> All Medicare Part B beneficiaries residing
> in SNFs who require blood glucose testing
> and whose blood glucose test claims have
> been or will be processed by Mutual during
> the Class Period.

102. The Class Period is from August 6, 2001, the effective date of Mutual's LCD regarding blood glucose testing services, now withdrawn, ad infinitum.

103. The Class consists of numerous individuals throughout the United States, making joinder impractical, in satisfaction of Rule 23(a)(1). The disposition of the claims of the Class Members in a single class action will provide substantial benefits to all parties and to the Court.

104. The claims of the representative Plaintiff is typical of the claims of the Class, as required by Rule 23(a)(3), in that the representative Plaintiff, like all the Class, requires blood glucose testing and has had (and reasonably anticipates will have) such claims denied by Mutual based upon the withdrawn LCD.

105. The factual and legal bases of the Defendants' misconduct are common to the Class and represent a common thread

of action in violation of statutory authority, arbitrary and capricious agency action, and other misconduct resulting in injury to Plaintiff and members of the Class.

106. Plaintiff will fairly and adequately represent and protect the interests of the Class, as required by Rule 23(a)(4). Plaintiff has retained counsel with substantial experience handling nationwide class actions. Plaintiff and her counsel are committed to vigorously prosecuting the action on behalf of the Class, and have the financial resources to do so. Neither Plaintiff nor her counsel has any interest adverse to those of the Class.

107. Defendants have acted on grounds generally applicable to Plaintiff and the Class and require Court imposition of uniform relief to ensure compatible standards of conduct toward the Class, thereby making appropriate declaratory and injunctive relief to the Class as a whole within the meaning of Rule 23(b)(2).

## VIII. CAUSES OF ACTION

### COUNT I

### VIOLATION OF THE MEDICARE ACT AND APPLICABLE REGULATIONS

108. Paragraphs 1 through 57 are hereby incorporated by reference as if fully set forth herein.

109. Mutual's LCD was an official statement of its policies on the coverage of blood glucose tests for Medicare

beneficiaries.  The LCD applied to claims submitted by or on behalf of these beneficiaries for the listed items or services whether Mutual chose to indicate that on every claim determination, or chose not to mention it on any.  It is binding on claimants until retired or otherwise invalidated.  And once it is no longer valid - as is the case here - the coverage policies enunciated in that LCD can no longer be enforced by Mutual.

110.  Mutual's withdrawal of its blood glucose testing LCD has the same legal effect as an ALJ decision to invalidate that LCD under the reasonableness standard, pursuant to 42 C.F.R. § 426.460(b).

111.  It is the policy or policies discussed in the LCD that are invalid when the LCD is retired, not just the document itself.

112.  Mutual is prohibited from denying claims for blood glucose testing on the basis of lack of "medical necessity" or not "reasonable and necessary."  Those terms have been rendered meaningless in this context through the efforts of CMS and its Medicare intermediaries, including Mutual, to impose arbitrary and capricious restrictions, without a legal or clinical basis, on coverage and payment of blood glucose tests when they would otherwise be covered and payable under the clinical laboratory fee schedule.

113. Accordingly, the Defendants are acting in violation of the Medicare Act and regulations by continuing to enforce and/or acquiesce in the enforcement of the coverage policies by Mutual that were invalidated when the LCD was withdrawn.

## COUNT II

### VIOLATION OF FIFTH AMENDMENT DUE PROCESS

114. Paragraphs 1 through 62 are hereby incorporated by reference as if fully set forth herein.

115. Mutual's LCD on blood glucose testing, and the coverage policies discussed therein, are now invalid as a matter of law, pursuant to 42 C.F.R. § 426.460(b); 68 Fed. Reg. 63,692, 63,698 (November 7, 2003).

116. Plaintiff Bailey has received notice through the DAB appeal process that the LCD is invalid, and the ALJ ordered that her claims for blood glucose testing services be reviewed without application of the retired/withdrawn LCD, per 42 C.F.R. § 426.420(e)(1).

117. Prior claims and subsequent claims for blood glucose testing now must be adjudicated by Mutual without application of the invalid LCD policies. See id. § 426.460(b)(1)(iv). This is a material fact about the LCD that affects Mutual's review of claims, claimants' submission of new claims, and claimants' decision-making on whether to appeal denied claims.

118. Only Plaintiff Bailey has received notice of this fact.

119. All Class members, and the providers who administer blood glucose testing services to the Class, should be informed of this fact so that they can appropriately submit claims and make informed decisions about whether to exercise their statutory and regulatory rights to challenge claims denied under the LCD policies.

120. Accordingly, it is a continuing violation of Plaintiffs' right to due process under the Fifth Amendment of the United States Constitution that the Defendants have not issued some form of notice to effectively inform the Class, and the providers who administer blood glucose tests to the Class, of the following: (i) Mutual's LCD on blood glucose testing, and the policies stated therein, were declared invalid as a matter of law by the ALJ's order dated September 19, 2006; (ii) Mutual is prohibited from reviewing any new claims for blood glucose testing under the LCD policies; and (iii) beneficiaries, and providers acting on their behalf, have the right to seek reversal of denied claims through the Medicare claims appeal process.

## IX. RELIEF REQUESTED

WHEREFORE, Plaintiffs request:

(1)  A declaration that the restrictive coverage policies in Mutual's LCD are invalid by law as a result of Mutual's withdrawal of the LCD, and can no longer be applied to Plaintiff Bailey and the Class.

(2)  A declaration that the NCD on blood glucose testing is the appropriate standard for Medicare coverage and payment of blood glucose testing claims for Part B beneficiaries in SNFs.

(3)  A declaration that the medical necessity criteria developed by CMS and implemented by Mutual and other Medicare intermediaries for blood glucose tests on Part B beneficiaries in SNFs conflict with the NCD and are otherwise arbitrary and capricious, and contrary to applicable law.

(4)  A declaration that blood glucose testing services provided to Plaintiff Bailey and the Class are medically necessary when supported by a physician order or certification for a prescribed series of blood glucose tests, furnished over a limited period of time specified by the physician, to monitor an individual's blood glucose level.

(5)  An Order directing Mutual to readjudicate previously submitted Medicare Part B claims for blood glucose testing service provided to Plaintiff Bailey and the Class and reprocess

those claims in accordance with declarations (1) through (4)
above.

(6) An Order directing Mutual to adjudicate newly
submitted Medicare Part B claims for blood glucose testing
service provided to Plaintiff Bailey and the Class and process
those claims in accordance with declarations (1) through (4)
above.

(7) An Order creating a review process with a Magistrate
of the Court to confirm that all claims adjudicated and
readjudicated by Mutual pursuant to the three orders above are
consistent with declarations (1) through (4) above.

(8) An Order directing Defendants to issue some form of
Notice to effectively inform Plaintiff Bailey, the Class, and
their SNF providers, of the following: (i) Mutual's LCD on
blood glucose testing, and the policies stated therein, were
declared invalid as a matter of law by the ALJ's order dated
September 19, 2006; (ii) Mutual will reprocess blood glucose
test claims previously submitted in accordance with declarations
(1) through (4) above; (iii) Mutual will process new blood
glucose test claims in accordance with declarations (1) through
(4) above; and (iv) beneficiaries, and providers acting on
their behalf, have the right to seek reversal of denied claims
through the Medicare claims appeal process.

(9)   Legal fees and costs of this suit incurred by

Plaintiffs; and

(10) Such other relief as this Court deems just and

appropriate.

Respectfully submitted,

*Thomas C. Fox*
_____

Counsel:                              Thomas C. Fox
Carol C. Loepere                      D.C. Bar #4473
Antony B. Klapper                     REED SMITH LLP
Jason M. Healy                        1301 K Street, N.W.
Amanda Walker                         Suite 1100 – East Tower
REED SMITH LLP                        Washington, D.C. 20005
1301 K Street, N.W.                   (202) 414-9222
Suite 1100 – East Tower
Washington, D.C. 20005
(202) 414-9200


Dated:   February 9, 2007

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the foregoing Amended Complaint in Case No. 1:06-cv-2144 to be served via first-class mail, postage prepaid this 9th day of February, 2007 to the following:

Leslie V. Norwalk, Acting Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD   21244

Martha K. Zajicek, Esq., First Vice President & Counsel
Mutual of Omaha Insurance Co.
Medicare Division
P.O. Box 1602
Omaha, NE   68101

Michael O. Leavitt, Secretary
United States Department of Health & Human Services
200 Independence Avenue, S.W.
Washington, D.C.   20201

Jeffrey A. Taylor, United States Attorney
United States Attorney's Office for D.C.
555 4th Street, N.W.
Washington, D.C.   20530

Alberto R. Gonzales, Attorney General of the United States
Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C.   20530

Respectfully submitted,

Thomas C. Fox (D.C. Bar #4473)
REED SMITH LLP
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, D.C.   20005
(202) 414-9222
Attorney for Plaintiffs

Dated:  February 9, 2007

# EXHIBIT 1

## DECLARATION OF DAVID L. JACKSON, MD, PhD

I, David L. Jackson, do hereby declare under penalty of perjury, and state as follows:

I have been professionally involved in quality of care in geriatric medicine for the past 20 years, serving in various capacities, including in the past as Director of the State of Ohio Department of Health and as Director of the State of Ohio Department of Mental Retardation and Developmental Disabilities. I have also served on the Board of the Association of State and Territorial Health Officers. I received my Ph.D. with Distinction from Johns Hopkins University in 1966 and my M.D. degree from that institution in 1968. I completed my residency training in Internal Medicine and served as both Resident and Chief Resident in Neurology at Hopkins from 1968 through 1975.

I was a member of the Steering Committee for the National Quality Forum on advising CMS on creating the current public outcomes reporting for the nation's long term care facilities. In the past, I served as the Director of the Division of Critical Care Medicine and Professor of Medicine at Case Western Reserve University in Cleveland, Ohio. I also served as a member of the American Academy of Neurology National Ethics Committee and have written and lectured on the ethical issues in medicine nationally.

I currently hold an appointment as an Adjunct Professor of Medicine at the Johns Hopkins University School of Medicine in the Division of Geriatric Medicine. For the past fifteen years, I have worked both for providers and as an agent of the courts, state governments and the U.S. Department of Health and Human Services (DHHS) in a wide array of quality-related consulting engagements. These engagements relate to quality management and improvement issues in geriatric/long term care and have been conducted in more than 20 states. I have attached my academic curriculum vitae that provides more detail on my background and experience.

Set forth below is my professional opinion on the adverse medical and health care implications of the various policies that have been promulgated by the U.S. Department of Health & Human Services, Centers for Medicare & Medicaid Services, and applied by their Medicare fiscal intermediaries, such as Mutual of Omaha, in the area of blood glucose testing of patients in nursing facilities.

In sum, it is my professional opinion, and I would so testify at any hearing on behalf of the Plaintiff Louise Bailey and the class of Medicare beneficiaries as follows:

I.   THE DIABETES EPIDEMIC AND THE MEDICARE PART B POPULATION: BLOOD GLUCOSE TESTING (BGT) IS A CORNERSTONE OF DIABETES CARE AND SUPPORTED BY ACCEPTED MEDICAL LITERATURE AND RECOGNIZED PRACTICE GUIDELINES

Diabetes Mellitus (DM)/Type II is a disorder of carbohydrate metabolism that leads to abnormalities of fat and protein metabolism. It is the most common endocrinologic disorder and is the most prevalent endocrinologic disorder in individuals over the age of 55 years. According to statistics recently reported by David Eddy, M.D., Ph.D. at the 2001 Health Legacy Partnership Conference, Type II diabetes affects about 16 million people in the United States and it is estimated that approximately 6 million of these individuals have not yet been diagnosed. In addition, 20 million people have impaired glucose tolerance resulting in elevated fasting plasma glucose levels. The incidence of DM will increase over the next three decades as the graying of

America continues.  The impact of this disorder on quality of life and on economic costs is substantial.

Blood glucose testing to monitor glucose levels in the blood, as performed by patients and health care providers, is considered a cornerstone of diabetes care (See Position Statement: Tests of Glycemia in Diabetes, American Diabetes Association, Diabetes Care 25:S97-S99, Supp. 1 (Jan. 2002), pg. S97).  The results of both the individual test results and the patterns of sequential tests over time are used by the treating physician to assess the efficacy of therapy and to guide adjustments in medical nutrition therapy, exercise, and medications to achieve the best possible blood glucose control (See id).

Many clinical authorities advocate the use of sliding scale insulin administration supported by glucose testing for nursing home residents, although prolonged use of sliding scale insulin is not recommended (See Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pg. 26).  This approach uses a base dose of intermediate or long acting insulin, often with a dose of regular (fast acting) insulin, supplemented by regular insulin administered by the nurse based on the patient's blood sugar and the treating physician's orders.  The established best practice is for the physician to set the frequency of the testing and a range of insulin doses based on the blood glucose values of the specific patient.  The specific parameters for very high or very low blood glucose values ("critical results") are also set for the individual patient in the physician's orders for that patient.  Any blood glucose value that is above/below the critical threshold for that patient must be immediately communicated to the treating physician.  The treating physician also reviews the results of multiple glucose tests over time as a batch to evaluate the patterns of response to the insulin therapy.

Blood glucose testing (or monitoring), a measurement of glucose in the blood that can be done at any time on a portable machine, has long been used to assess blood glucose levels for diabetics.  Blood glucose testing is typically performed by placing a drop of blood on a reagent strip, which uses a chemical substance to react to the amount of glucose in the blood.  The portable machine then reads the strip and displays the results as a number on a digital display.  Physicians are notified when glucose values are above or below the specified parameters.  Adjustments are made to the base (and supplemental) dose when the physician deems such a change is necessary.  This treatment protocol is essentially the same whether the patient is being treated at home, as a hospital inpatient, or in a skilled nursing facility ("SNF").  This approach is consistent with the policy established in the National Coverage Decision ("NCD") on blood glucose testing.

This type of glucose testing is particularly important in elderly patients where their age and other co-morbidities have compromised the body's homeostatic ability to maintain a normal and stable body state.  To help elderly diabetics maintain a homeostatic state, the AMDA clinical practice model for management of diabetic patients recommends a blood glucose test be taken on admission, bedside glucose testing be performed several times a day (more frequently if the patient's glucose level is poorly controlled), daily blood glucose review, and physician alert when values fall below or above the recommended range or a range indicated in the physician-ordered protocol of blood glucose monitoring (See id. pgs. 11, 27-28, 39-42).  The American Diabetes Association also recommends blood glucose testing of type 1 diabetics three or more times daily (See Standards of Medical Care in Diabetes, American Diabetes Association, Diabetes Care 2004, Vol. 27, pg. S20; Position Statement: Tests of Glycemia in Diabetes, American Diabetes Association, Diabetes Care 25:S97-S99, Supp. 1 (Jan. 2002), pg. S97).  Such glucose testing should not be confused with screening tests, routine or standing orders.  Regular testing, when prescribed as part of a treatment protocol specifically designed to meet the needs of the individual beneficiary, is medically necessary to avoid certain short and long-term complications of diabetes, and to assess the efficacy of ongoing treatment. Such tight control of

blood glucose in diabetics has been shown in many papers in the peer-reviewed medical literature to improve outcomes and decrease the likelihood of complications that can lead to disability, poor quality of life and death (e.g. vision loss, renal failure, heart attacks, etc.).

The medical literature clearly indicates that day-to-day control of insulin levels reduces the severity of existing consequences of diabetes, and can prevent the onset of new symptoms and complications.  Diabetes is common in the nursing home setting, with over 18 percent of nursing home residents having this disease (See Managing Diabetes in the Long-Term Care Setting:  Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pg. 2).  The literature demonstrates that nursing home patients have a high prevalence of cognitive and physical impairment and need help in daily activities and maintaining recommended dietary and exercise regimens.  The prevalence of these impairments is higher among diabetic nursing home patients than in the nursing home population as a whole, which increases the complexity of diabetes management, and makes it unlikely that these patients can manage their diabetes on their own (See id. pg. 3).  Diabetic nursing home residents are susceptible to hyperglycemia (high levels of blood glucose that can lead to impaired cognition, decreased pain perception, impaired vision, increased the risk of infections and potentially increase risk for falls) and hypoglycemia (low levels of blood glucose, which, untreated, can cause falls or permanent neurological impairment) (See id.  Nursing home residents are frequently unable to perceive or communicate hypoglycemic symptoms (See id.  "Frequent monitoring of blood glucose levels is critical to avoid hypoglycemia and its consequences." Subacute Care for Seniors: Management of Elderly Diabetic Patients In the Subacute Care Setting, A. Lee, MD, Clinics In Geriatric Medicine, 16:4 (Nov. 2000), reprinted at http://home.mdconsult.com, pg. 8).

Treatment guidelines for diabetes published by numerous medical societies establish that glucose monitoring is reasonable and necessary for the treatment of diabetes patients, and leave the frequency of the testing to the medical judgment of the treating physician, based on the patient's individual circumstances (See Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), see especially pgs. 39-41).  Regular blood glucose testing is part of an overall, individualized treatment care plan for diabetes management, along with a meal plan, activity and physical therapy, treatment with oral antidiabetic agents and/or insulin, foot/wound care, and pain management (See id. pg. 16).  Regular monitoring of blood glucose levels helps patients achieve target ranges for blood glucose control; reduce the risk of lower-extremity infections, ulcers, and limb loss; control pain and neuropathic symptoms; and reduce the progression of other diabetic complications (See id. pgs. 16-17).

The insulin needs of patients with diabetes can vary from one patient to another, from day to day, even from hour to hour.  Most nursing home patients have type 2 diabetes but a sizable proportion have combined therapy that includes the administration of insulin for the management of their diabetes .  Regular testing is particularly important for these patients because blood glucose levels frequently vary depending on the time of day, as demonstrated in a study conducted by the National Institute of Diabetes and Digestive and Kidney Diseases and Social, and Scientific Systems, Inc., published in the December 27, 2000, Journal of the American Medical Association (See Diurnal Variation in Fasting Plasma Glucose, JAMA (Dec. 27, 2000), pg. 5; see also Merck Manual of Diagnosis and Therapy § 2, Ch. 13, pgs. 9-10 (discussing the "dawn phenomenon")).

During the past decade, clinical trials have demonstrated the importance of glycemic control, as measured through regular blood glucose testing, to prevent and reduce the complications of diabetes (See The Importance of Tight Glycemic Control, J.E. Gerich, MD, The American Journal of Medicine, 118:9A (September 2005), reprinted at http://home.mdconsult.com, pg. 4).  Several new therapeutic agents have become available to

improve and monitor glycemic control in patients with type 2 diabetes, including less painful and continuous monitoring devices (See id). Although this technology is not widely used at the present time, the optimization of glycemic control by any means has been shown to be cost-effective. See id. Regular blood glucose testing with home use devices has been shown to be less expensive in the long run than the costs of surgery and other treatments for patients who develop complications due to poor glycemic control. However, despite the advances in monitoring devices and therapeutic agents, at least one study suggests that there has not been a corresponding improvement in glycemic control for diabetic patients (See id). The likely explanations for this include "lack of time and resources due to reimbursement considerations, for physicians to treat patients with diabetes," provide needed education, and other factors (See id).

II.    REGULAR BLOOD GLUCOSE TESTING IS RECOGNIZED AS MEDICALLY
       NECESSARY TO MAINTAIN TIGHT CONTROL OF BLOOD GLUCOSE LEVELS

A series of clinical studies have demonstrated that "tight" control of glucose levels leads to significant decreases in the incidence of complications seen over time in many diabetic patients. **It is important to note that the patient population in today's long term care (LTC) facility is substantially older and more medically complex than in the past ("older and sicker").** Today's LTC patient with DM is older and has more co-morbid conditions than the average LTC facility patient with DM a decade ago. According to a study published in the *Journal of Cardiovascular Nursing*, April 1, 2000, titled "Patient Problems and Nurse Interventions During Acute Care and Discharge Planning," the frequency of problems that individuals over the age of 65 experienced averaged 8.6 problems during the acute care stay that required nurse attention and care planning. In this study, 68% of the nursing interventions associated with these problems related to surveillance activities. The most frequently cited surveillance activity was drawing lab specimens. The number of patient problems demonstrated in this study is also consistent with the number of patient problems identified via the Resident Assessment Instrument (RAI) process.

In comments provided to the Centers for Medicare and Medicaid Services (CMS) on the Resident Assessment Protocol (RAP), the American Health Care Association (AHCA) reported that with each Minimum Data Set (MDS) assessment, approximately 6 to 10 RAPs are generated. This constitutes about 50% of the RAI RAPs that can be triggered for care planning. In 6 of the 17 provided RAPs, DM is listed as an "internal risk factor." Among these six are the more commonly triggered RAPs. There is thus a current need for monitoring that is mandated by the RAI process and a growing need for more intense management of blood glucose levels for an increasing number of residents in LTC facilities who have DM.

III.   IT IS A MEDICAL BEST PRACTICE FOR BGT SERVICES TO BE PROVIDED TO
       MEDICARE PART B BENEFICIARIES WHO NEED ASSISTANCE WITH OR
       CANNOT SELF-ADMINISTER TESTS

As noted above, there is ample medical evidence to establish that frequent determination of blood glucose in the diabetic patient, especially those frail elderly patients in SNF's, is associated with fewer complications and better outcomes than patients with less "tight" control of their blood glucose. The goal of this entire debate should be to ensure that care that meets the standard of "best medical practice" is provided to all Medicare beneficiaries and Medicaid-covered individuals in SNFs, while ensuring that there are adequate safeguards in place to avoid any "gaming" of the system. Certainly it is clear that no test should be paid for unless the results are used to help make clinical management decisions for the patient. These goals can all be met without creating the disincentives and counter-productive signals to the professional team caring for these patients that is created by the current CMS rule.

The technology now exists and can be effectively operated by health care providers at LTC facilities and elsewhere to determine blood glucose levels rapidly and accurately using blood obtained from a finger stick and processed by a simple to calibrate glucometer. This technology and approach facilitates feedback of the results of the blood glucose value to facility professional staff, including the treating physician. It can also assist with the identification of trends as early as possible without basing a judgment about the next dose of insulin for that patient on a single, isolated blood glucose value, if the test result may not reflect any real "trend" in the patient's clinical course. For example, at 4 PM one day, a patient may have a moderately elevated blood glucose results that is not in the "critical value" range. Such a single test result could be due to the patient eating some food not on his/her diet earlier that day while on a leave of absence from the SNF with a family member. For the physician to act on that single value, without evaluating the data in the context of other glucose values over time, would not be the best medical practice. Such a patient should not be immediately treated with additional insulin. If the patient were given an increased insulin dose based on that one blood glucose value, and on the ensuing day he/she did not eat the same "off diet" foods at the same time, the patient would be at real risk for the occurrence of serious hypoglycemia.

Hence it truly is important to evaluate any glucose test results that are in a "critical range" in real time. However, any suggestion that every individual blood glucose value not in a critical range must be communicated immediately to the physician seems to me to be in error on one of two fronts. Either it is based on an assumption that unless the physician is notified immediately of the test results, he/she will not be able to use the data in any meaningful way in the management of the patient. This is patently not true. The other possible assumption seems to be that a test results not in a critical range is not of value in the management of the diabetic patient. This also fails to meet any relevant clinical standard of practice. It should also be emphasized that, independent of any test results, if a SNF (or any) patient "just isn't acting normally" in the relevant nurse's judgment, this observation should be communicated to the treating physician in as timely a fashion as a "critical value" test result. These technologies, and solid clinical practice standards, support using both critical values and patterns of non-critical values of blood glucose in making the most timely and highest quality decisions regarding the delivery of treatments that require the glucose value to help determine the next steps (e.g., the precise amount of additional insulin, if any, that should be administered to the individual patient).

I have personally been involved with developing practice protocols for BGT. These protocols are based on medical best practices for BGT. It is my opinion that when BGT services are provided to LCT residents and other Medicare Part B patients in keeping with at least a number of the following parameters, that BGT services are medically necessary.

There are four levels of clinical situations where glucometer/finger stick glucose monitoring in LTC residents is indicated. These situations are based on patient acuity, clinical judgment, patient diet, patient activity levels and standards of practice for clinical management of patients with DM. The four levels of DM patients include:

A.    Level I – Patients with unstable DM (blood glucose values of < 60 mg% or > 350 mg% or with signs and/or symptoms of hypo- or hyper-glycemia). These patients often require finger stick glucose monitoring to be performed at least 3 or more times per day. The physician orders for this level include specific circumstances that will mandate immediate physician notification (e.g. notify physician immediately for glucose levels less than 60 mg% or more than 350 mg%). The specific levels noted for immediate notification under such a "sliding scale" order are clearly dependent on individual patient characteristics and physician judgment.

The physician's order may also call for the administration of differing amounts of additional medications (e.g. insulin for blood glucose levels that are in certain ranges. That is to say, as an example, give no additional insulin for a determination of between 60 and 150mg%,

give 4 units of regular insulin subcutaneous if blood glucose is between 151 and 250 mg% and give 8 units of regular insulin subcutaneous for a determination between 251 and 350mg%). If the glucose level is greater than 350 mg%, the physician in this hypothetical case would be called immediately, according to the instructions in the Sliding Scale orders, and specific orders obtained from the treating physician for how best to respond.

In all these patients, the pattern of all the glucose determinations over time - and not just any of individual data point along the time line - is of critical importance in the management of the patient's DM. The physician must review the pattern of these values over time to determine if the diet, activity level and/or hypoglycemic drug regime is appropriate or ought to be changed (or if the situation is stabilizing and monitoring frequency can be safely decreased). Hence, the physician's order for this category of individual with DM also should reflect that the facility staff shall notify the physician of all the individual determinations at a time interval specified in the physician's order for the individual patient/resident, whether or not any of the levels had previously triggered an immediate notification. For this level of monitoring intensity, the frequency of physician notification and review, in my view, should be every 24 to 48 hours. The more acutely ill (unstable) the patient, the shorter the frequency of notification. The more stable the patient, the less frequent the notification ordered for blood glucose values that fall within the above range.

B.      Level II – Patients with a significant clinical risk for blood glucose instability, as determined by the attending physician, but who are more stable than the patients noted under Level I noted above. These individuals may or may not have any current fluctuation in glucose levels. For this level to be supported, the patient's glucose values could, for example, either be in the range of (>300 mg% but < 359 mg%) or (< 80 mg% but > 60 mg%) **or** the patient would have a specific medical reason for being at risk for blood glucose instability (e.g. acute urinary tract infection, steroid medications, etc.). The patients in this level may have blood glucose monitoring performed between one (1) and three (3) times per day. Again, as described above, the same type of sliding scale order may be written that allows immediate notification for levels that are very low or very elevated. At Level II, the physician would order notification of the pattern of blood glucose values for his/her evaluation in a range of (e.g.) every 2 to every 3 days.

C.      Level III – Patients who are relatively stable, but still exhibit some risk for fluctuations in glucose control (although with less probability and/or lower magnitude of fluctuations). In these individuals, the monitoring frequency would be between one per day to twice per week. In this circumstance, the physician notification of all determinations would be at a frequency between every three 3 to 7 days, depending on the patient's stability and clinical context.

D.      Level IV – Routine glucose monitoring for relatively stable patients with DM: These patients would demonstrate no blood glucose values outside the ranges noted above and would not exhibit any of the specific clinical factors that would generate a risk for such instability. These patients could have monitoring less than 2/week.

**EXAMPLE:** An individual who historically has relatively stable insulin dependent diabetes mellitus (blood glucose values normally in 150 to 180 mg% range). The physician's initial orders were to check blood glucose levels by finger stick once per week. This individual would be at Level IV under the proposed approach.

This individual then develops an acute urinary tract infection (UTI), with fever and an increased risk for glucose fluctuations. The individual would then transition to Level II, after the appropriate new orders are received from the physician. The physician orders that glucose values be measured three (3) times per day for clinical management during this period of increased risk. The order calls for notification of the physician immediately for specific glucose values that are

in specified emergency ranges. The order also requires that the physician be notified of all the glucose values recorded at least every 48 hours. The blood glucose values for this resident over the next two days are in the 200 to 275 mg% range. None are in the "emergency" range, requiring "stat" notification.

This individual then progresses to develop signs and symptoms of hyperglycemia, with a blood glucose value of 375 mg% (in the "emergency range of >350 mg%"). The physician is notified immediately by the staff, in accordance with the orders. A new order is received that calls for additional insulin to be administered immediately. In addition, the glucose values are to be obtained four (4) times per day. Notification of all the values is ordered to be communicated to the physician at least every 24 hours. The individual has filled the criteria for a Level I patient during this time period.

Over the next several days, the blood glucose values begin to improve, although they are still elevated (235 to 275 mg%). The fever has subsided and the individual is on appropriate antibiotics for the infection. The frequency of glucose determinations is reduced by a new order from the physician to three (3) times per day and notification of all results is ordered to be communicated to the physician at least every 2 days (Level III). This status is continued over a four-day period. During the last 72 hours of this period, the blood glucose values are generally in the 180 to 220 mg% range, with none >235 or <150 mg%. The patient appears to be making an uncomplicated recovery from the UTI. The physician then orders the frequency of blood glucose determinations to be reduced to two (2) times per week. (back to Level IV).

This clinical example is presented to demonstrate how this process can accomplish the following:

- Ensure that good medical practice is supported by the overall framework and approach to patient management.

- Ensure that the physician has access to all the information needed to make optimal clinical management decisions in a timely fashion, and

- Ensure that there are easily understood criteria that will clearly distinguish between "routine monitoring" (analogous to the home setting for stable diabetic patients) and measurement of glucose values that are needed and used for real time management of the patient's disease when glucose instability is present or there is a documented increased risk of such instability occurring.

Physicians should be expected to review all blood glucose determinations at intervals that reflect the relevant time frame within which clinical management decisions need to be made.

The framework outlined here for management of diabetic patients in the LTC population of increasingly frail individuals is consistent with accepted clinical practice. It creates a framework and expectation for effective communication between the physician and the facility staff concerning the relevant laboratory data. This approach also creates a series of opportunities for the physician to review the appropriateness of the treatment regime, dietary intake, activity level, clinical management and the frequency of monitoring required for each individual patient.

The use of the clinical "levels" approach to glucose monitoring provides increased opportunity for the physician to review sequentially the on-going appropriateness of the management plan and the level of intensity of monitoring. This approach is consonant with quality clinical management and testing. It can also provide CMS with adequate safeguards against excessive ordering of unnecessary tests or not having the physician appropriately use the data generated by the tests in the management of the patient.

IV.   CMS POLICIES TO DATE ON BGT ARE CONTRARY TO THE WEIGHT OF MEDICAL EVIDENCE AND MEDICAL BEST PRACTICES

CMS has a clear opportunity to place itself at the forefront of combating diabetes in the nursing home population. However, Program Memorandum AB-00-108 and the recent Final Rule on BGT (to be codified at 42 C.F.R. § 424.24(f)) is precisely the type of reimbursement policy that discourages regular blood glucose testing. Rather than encourage the necessary monitoring of blood glucose levels in Part B SNF residents by covering these tests, these policies establish administrative burdens that would effectively deny coverage, creating a disincentive to perform these tests. Moreover, these policies directly contradict best practices and instead call for an unworkable, misguided and impractical approach to treating diabetes. These CMS policies fail to provide the governmental support that is needed to protect institutionalized diabetics from suffering heart attacks and strokes, developing blindness, requiring the amputation of limbs, and experiencing other complications that require costly medical intervention.

A.   Requiring Orders for Each Individual Blood Glucose Test is Not Best Medical Practices

The established best practice is for the physician to set the frequency of the testing and a range for the blood glucose values of the specific patient. Physicians are notified when glucose values go above or below the specified parameters. Adjustments are made to the base (and supplemental) insulin dose(s) when necessary. This treatment protocol is essentially the same whether the patient is being treated at home, as a hospital inpatient, or in a SNF. It is consistent with existing Medicare requirements and the policy of many fiscal intermediaries. As discussed below, there is no rational basis to apply a more restrictive policy to the administration of blood glucose testing to SNF residents than to ambulatory beneficiaries performing self-testing at home, particularly considering that SNF residents are less capable of such tasks – as reflected in the fact that they require 24-hour care in nursing homes that offer skilled nursing care and other services.

Adherence to the current best practices for glucose testing is particularly important in the care of elderly patients whose age and underlying medical problems together have made them more frail and more prone to fluctuations in many test results, such as blood glucose values. To manage elderly diabetics optimally, AMDA recommends frequent blood glucose monitoring (vide supra) These carefully designed clinical practices are clearly "reasonable and necessary" for the ongoing diagnosis and treatment of diabetes in institutionalized beneficiaries.

Clearly, physicians will and should follow the best practice in this area. Thus, compelling SNFs to phone a physician for each patient, sometimes up to three and four times a day, for an order for the next test to be done in a few hours (in order to achieve coverage under the rubric of the Final Rule) is in actuality telling physicians how to practice medicine, and more importantly, telling them how to practice it inappropriately and badly.[1] Accordingly, the Final Rule is contrary to the best practices of medicine, it is not patient-centered, contradicts the plain requirements of the Act, and is a marked departure from the long-standing policy of the agency.

---

[1]    The Social Security Act expressly mandates that federal agencies are not authorized to "exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." Social Security Act § 1801 (codified at 42 U.S.C. § 1395).

B.    A Physician's Treatment Protocol Does Not Constitute a "Standing Order"

CMS has stated in the Final Rule that a physician's "standing order" is not sufficient to order a series of blood glucose testing services.  I am concerned that CMS is improperly interpreting a physician-prescribed protocol of blood glucose monitoring, including sliding scale insulin dosage determination by glucose monitoring, as a "standing order" or as "routine testing."  If these general principles are misunderstood or misapplied, SNFs would be required to obtain a new physician order for each blood glucose test, which in many cases is done two to three times a day.  In short, I believe that any interpretation of physician-prescribed protocols of blood glucose monitoring as "standing orders" is clearly, in my view, in error.

In diabetes management, "standing order prescriptions" are designed to control unplanned conditions.  Conversely, prescriptions for glucose monitoring are individualized, patient-specific and are designed to maintain a as stable a blood glucose status as possible. The difference between these two medical treatment strategies is essentially "medical event management" (as represented by standing orders) versus "medical diagnosis and management" (as represented by glucose monitoring via sliding scale to determine insulin dose).  Unlike "standing orders" which are aimed at attempting to respond to unplanned/acute conditions, glucose monitoring in the sliding scale scenario strives to maintain glucose stability, which is particularly important in minimizing many complications of chronic diabetes. Moreover, a physician's determination that a series of blood glucose tests administered over a limited period time is reasonable and necessary to detect and then both treat and manage the abnormal blood glucose levels seen in diabetic patients, should not be discounted as a "standing order" that, hence, does not qualify for reimbursement of the testing services.

The American Healthways, Inc. (formerly the Diabetes Treatment Centers of America) developed best practice guidelines for the inpatient management of patients with diabetes.  In this model, "standing orders" consist of developing protocols for responding to hypoglycemia, intravenous insulin infusion instructions, perioperative diabetic assessments and insulin pump management.  These standing orders are needed to address situations where abrupt or unplanned conditions precipitate deterioration of metabolic glucose control, resulting in acute complications like diabetic ketoacidosis, hypoglycemia, and other adverse outcomes, and where immediate action by the staff at the bedside under the orders of the treating physician is required clinically. As is evident, there is a significant difference between "standing orders" and a beneficiary-specific blood glucose monitoring and treatment protocol, yet CMS continually fails to recognize such a distinction, and that misunderstanding has persisted with the Final Rule.

Even if CMS considers a blood glucose monitoring protocol to be a "standing order," such an order would continue to reflect a physician's independent judgment that the prescribed tests are "reasonable and necessary" to diagnose and treat diabetes and therefore covered under Medicare Part B.  In its Compliance Program Guidance for Clinical Laboratories, the Office of Inspector General (the "OIG") for HHS clearly states that "standing orders are not prohibited in connection with an extended course of treatment . . . ."  63 Fed. Reg. 45,076, 45,081.  The OIG does not suggest that laboratory testing performed pursuant to a "standing order", including blood glucose testing, is itself not reasonable and necessary.  Rather, the OIG's concern is that, in some cases, a physician's initial determination that testing is medically necessary may not be adequately updated or reviewed.  In the context of blood glucose monitoring in SNFs, it is our experience that physicians who order glucose monitoring in connection with an extended course of treatment for diabetic nursing home beneficiaries are periodically monitoring both the test results over time and the continuing need for the sliding scale management orders.  Thus, a carefully planned protocol for blood glucose testing, reviewed periodically by the treating physician, does not present the potential concerns highlighted by the OIG and, accordingly, would satisfy the "reasonable and necessary" requirements of the Medicare statute and regulations.  A protocol of blood glucose monitoring for a SNF resident may itself be reasonable

and necessary to generate a pattern of results over time, often more valuable in patient management than any single test that is administered pursuant to the prescribed plan of treatment.

    C.    <u>CMS Policies Place Unnecessary Administrative Burdens On Providers And Physicians</u>

The Final Rule requirement that treating physicians specifically certify in real time each individual blood glucose test prescribed for a SNF beneficiary would undoubtedly create unnecessary administrative burdens for both physicians and SNF personnel. Treating diabetes using blood glucose testing in a hospital, SNF, or home, is best managed by trend analysis, not test-to-test adjustments. It is generally of little use to provide individual test results to, and obtain a new order from, the physician after each test, except when the results are outside the "crisis level" parameters set in the existing sliding scale orders by the physician; in such cases, as with any significant change in condition, the physician would, of course, be promptly notified. Under current best practices, it is most useful for the physician to review trends of test results over time in order to determine whether insulin dosage modification is medically necessary (See Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pgs. 28).

Nevertheless, the Final Rule as crafted will impose additional, unreasonable requirements that would not serve to improve the health of Medicare beneficiaries. Instead of adhering to current best practices, the Final Rule would require repeat communications between the SNF and the physician, as many as three or four times per day, for each diabetic SNF resident whose physician has prescribed a protocol of ongoing blood glucose monitoring. As a physician who treats diabetic Medicare SNF residents in his/her clinical practice observes, it "would be impractical and, in my opinion, (medically) unnecessary for me to write a separate order for each blood glucose test to be administered to [my patient], or to be notified of the results of each test".

The Final Rule will also create a tremendous burden on SNFs and their nursing staff and fails to take into consideration the realities of caring for Medicare beneficiaries who suffer from this common and debilitating disease. Most SNF residents have blood glucose testing schedules that follow similar time frames and, thus, the Final Rule will require nurses to call physicians for every diabetic patient at the same time. In other words, even if SNFs reported each individual test result to each diabetic resident's physician – and then waited for the physician to certify the next scheduled test – it is doubtful that this process would further the agency's ostensible goal of increasing physician involvement in diabetes management. Time taken to report individual tests also impedes necessary consultation and input from interdisciplinary care team members that have a critical role in the patient's diabetes management. Moreover, as discussed below, the requirement that each blood glucose test be supported by an individual physician order would impose a significant paperwork burden on providers and fiscal intermediaries. Consequently, the Final Rule will not serve to further the health needs of Part B beneficiaries, but would merely impose additional burdens on those practitioners and SNF personnel currently following best practices in treating diabetes in nursing home residents. CMS should encourage physicians and SNFs to continue using current best practices in treating Medicare Part B beneficiaries, not frustrate such efforts by imposing unnecessary administrative burdens on these providers.

V.    <u>CMS POLICIES TO DATE ON BGT ARE INCONSISTENT WITH OTHER FEDERAL INITIATIVES TO TREAT AND PREVENT DIABETES</u>

Coverage requirements under Medicare Part B for BGT must be supported by current medical literature and clinical authorities. With the Program Memo, and now with the Final Rule, that simply is not the case. Moreover, these coverage policies are inconsistent with numerous federal initiatives to combat diabetes and prevent complications of the disease. A

number of these programs recognize the value of having the physician prescribe supplies and document the frequency of self-testing, without requiring physician review before each testing event. Some of the key programs sponsored by the federal government include:

- The Centers for Disease Control and Prevention ("CDC") National Public Health Initiative on Diabetes and Women's Health (see http://www.cdc.gov/diabetes/projects/women.htm);

- The HHS Council on Health Disparities, which sponsors a number of programs designed to improve the health of minorities and underserved populations, including diabetes detection and prevention (see http://raceandhealth.hhs.gov); and

- The National Diabetes Education Program ("NDEP") (see http://www.cdc.gov/diabetes/ndep/index.htm).

When HHS launched NDEP in 2001, a joint federal program run by the National Institutes of Health and the CDC, the Secretary emphasized the importance of informing Medicare beneficiaries that they "can use their benefits to better monitor and manage their diabetes." See "HHS Launches Diabetes Education Program for Older Americans," HHS Press Release (May 3, 2001), reprinted at http://www.hhs.gov/news/press/2001pres/20010503.html, pg. 1. The NDEP supports routine monitoring of blood sugar levels by diabetics and their health care providers for use in an effective treatment plan for managing their disease. See id. These policies are even more important for diabetic patients residing in nursing homes considering the significant impact that diabetes can have on this vulnerable Medicare population.

Nonetheless, the Final Rule will frustrate the objectives of these vital federal initiatives by imposing additional hurdles to regular blood glucose testing in SNF residents. The Final Rule also runs counter to the recommendations of the American Diabetes Association that, given the importance of blood glucose testing to diabetes care, government and third-party payers "should strive to make the procedure readily accessible and affordable for all patients who require it" (See Position Statement: Tests of Glycemia In Diabetes, American Diabetes Association, Diabetes Care 25:S97-S99, Supp. 1 (Jan. 2002), pg. S97). CMS needs coverage policies that are consistent with the significant efforts that the federal government has undertaken to prevent and combat diabetes.


David L. Jackson, MD. PhD.                    11/30/06

David L. Jackson, MD. PhD.            Date

- 11 -

# Curriculum Vitae of Dr. Lawrence Jackson, M.D., Ph. D.

**DAVID LAWRENCE JACKSON, M.D., Ph.D.**

**President**
Jackson and Associates Inc
410-602-4020
E-mail: drdave999@aol.com

HOME ADDRESS
6817 Old Pimlico Road
Baltimore, Maryland 21209

## EXPERIENCE:

**Dr. Jackson has served in leadership positions in multiple health care organizations, ranging from public health/health policy, academic medicine, information systems-related entrepreneurial ventures focused on enhancing the quality of geriatric health services to the medical ethics of new medical technologies.**

**1987 to 2003, then 2003 to Present:**
**President**, Jackson and Associates (changed to J+A Inc. in 2003), a geriatric health care consulting firm focusing on quality of care issues. Led teams of professionals on scores of engagements working on quality related issues in over 20 states for state government agencies and many LTC provider organizations, as well as an agent of the court. Currently selected as External Quality Monitor for project with Office of Inspector General, DHHS

**1994 – PRESENT:**
**Adjunct Professor of Medicine**, Division of Geriatric Medicine; Department of Medicine, Johns Hopkins University School of Medicine, Baltimore, Maryland (pro bono).

**March 2001 to May 2005:**
**National Medical Director**: HCR-Manor Care: Toledo, Ohio: Focused on corporate strategies for enhancing the involvement of physicians and Medical Directors in LTC and on clinical quality improvement initiatives.

**1997-2000**
**CEO and Chairman**, HealthWare Solutions International, Inc., Developing JAVA-based, web-enabled Long Term Care and Assisted Living Quality Management Information Systems, (Baltimore).

**1998-2000**
Member (founding **Chairman** for 1998-99), Maryland Health Care Foundation (Private-Public sector initiative on health care for the un-insured)
**1989-1997**
**Chairman and CEO**, AssurQual, Inc. (Founder): Long Term Care Quality Management Information Systems,
**1988-1990**
**Senior VP and then President**, APACHE Medical Systems, Inc., ICU Quality Assurance System, Washington, D.C.

**1989-1995**
**Clinical Professor**, Department of Medicine, The Ohio State University, Columbus, Ohio.

**1986**
**Candidate** for U.S. Congress, 15th District, Columbus, Ohio.

**1983-1986**
**Director**, Ohio Department of Health, Columbus, Ohio.

**1985**
**Director**, Ohio Department of Mental Retardation and Developmental Disabilities, Columbus, Ohio.

**1980-1983**
**Director**, Center for the Critically Ill: Chief, Division of Critical Care, Department of Medicine, Case Western Reserve University, University Hospitals of Cleveland, Cleveland, Ohio.

**1975-1981; 1981-1983; 1983--1985**

Assistant, Associate, and then Full Professor of Medicine, Case Western Reserve University School of Medicine, University Hospitals of Cleveland, Cleveland, Ohio.

**1973-1974**
**White House Fellow:** Special Asst. to the Administrator, U.S. Environmental Protection Agency, Washington, D.C.

## EDUCATION:

Johns Hopkins University:  A.B., 1961
Johns Hopkins University:  Ph.D., 1966, Ph.D. with Distinction
Johns Hopkins University School of Medicine:  M.D., 1968

## MILITARY SERVICE:

**1969-1971**
Lieutenant Commander, U.S. Navy Medical Corps. Research:  Respiratory effects of cold helium/oxygen in deep sea diving, Naval Medical Research Institute, Washington, D.C.

## HONOR AND AWARDS:
Member of CMS Technical Expert Panel (TEP) on Impact of Staffing/Workforce on Quality in geriatric care
Member Steering Committee for National Quality Forum/CMS Review of Quality Measures in LTC (2001-02)
Member of multiple national task force groups focusing on LTC quality issues over past 5 years (e.g. AMDA, AHCA, etc.)
Member, White House Task Force Working Group on Health Care Reform; both Quality and Information Systems, (1993)
Board member, Association of State and Territorial Health Officers
Phi Beta Kappa (Junior Year); Alpha Omega Alpha (Johns Hopkins)
Teacher of the Year Award, Department of Medicine, Case Western Reserve University
Delegate, (1980) and Alternate, (1992) Democratic Convention
Recipient, National Institutes of Health Grant (RO-1) for neurophysiological research 1981-1983
Fellow, U.S., Endowment for the Humanities (Bio-Medical Ethics) at Kennedy Center for Biomedical Ethics
Recipient, Ohio Department of Health Centennial Award for contributions to Public Health (1986)
Recipient Annual Award for Contributions to MR/DD in State of Ohio (1985), Ohio Private Residential Association
Member, multiple NIH Grant Review Panels; former Counselor to the Pan American Medical Association

## PROFESSIONAL SOCITIES:

American Health Planning Association (Former Board Member)
American College of Physicians (Fellow)
American Academy of Neurology:  Served on National Ethics Committee and Legislative Affairs Committee.
American Medical Association (former)
Johns Hopkins Medical and Surgical Association
White House Fellows Association
Former member of Society of Critical Care Medicine, serving as Associate Editor of CRITICAL CARE MEDICINE
American Medical Directors Association (Ethics Committee member)

## PRESENTATIONS AND PAPERS:

Many papers, books, chapters, and National/International presentations on topics ranging from geriatric health care and Quality Management/Health care reform to basic neurophysiology, biomedical ethics and public health.

## REFERENCES:  Available upon request

# CURRICULUM VITAE

### DAVID LAWRENCE JACKSON, M.D., Ph.D.

**SUMMARY OF EXPERIENCE:**

**Dr. Jackson has served in leadership positions in multiple health care organizations, ranging from large organizations in crisis to smaller, entrepreneurial entities. He currently has been approved by the US DHSS to serve as the External Quality Monitor for almost 100 LTC sites under the terms of a Corporate Integrity Agreement between the provider organization and the US government. He has achieved national and regional recognition for his contributions in the fields of public health and health policy, bioethical implications of new technologies and the "Edge of Life", scientific research in the neurosciences, and the measurement and management of quality in health care systems.**

| | |
|---|---|
| **ADDRESS:** | **6917 Old Pimlico Road**<br>**Baltimore, Maryland  21209  USA** |
| **BIRTH:** | **October 27, 1939** |
| **MARITAL STATUS:** | **Married to Doty S. Jackson, R.N.**<br>**Two children:** Elizabeth Jackson Westman (born September 28, 1977) and Katherine Minh Jackson (born March 20, 1998) |
| **EDUCATION:** | **B.A., Johns Hopkins University** – 1961<br>**Ph.D. with Distinction, Johns Hopkins University**, Department of Physiology - 1966<br>**M.D., Johns Hopkins University School of Medicine** – 1968 |
| **INTERNSHIP and RESIDENCIES:** | **Intern,** Osler Medical Service, Johns Hopkins Hospital – 1968-1969;<br>**Assistant Resident,** Department of Medicine, Johns Hopkins Hospital – 1971-1972;<br>**Assistant Resident,** Department of Neurology, Johns Hopkins Hospital – 1972-1973;<br>**White House Fellowship,** Special Assistant to Administrator, U.S. Environmental Protection Agency – 1973-1974;<br>**Senior Resident and Chief Resident,** Department of Neurology, Johns Hopkins Hospital – 1974-1976. |

**PROFESSIONAL**

**November 1986 to Present: President, Jackson & Associates Inc;**
Quality of health care delivery and strategic planning consulting engagements for scores of organizations over past fifteen years. Currently serving as Quality Monitor for two LTC organizations for US DHSS Office of Inspector General.

**July 1995 to Present: Adjunct Professor of Medicine, Johns Hopkins University,** Baltimore, MD (Division of Geriatric Medicine)

**May 2005 to Present: Senior Medical Consultant: HCR Manor Care:**
Working on physician communications, clinical Information Systems, new technology evaluation and prescription drug use/formulary development.

**March 2001 to May 2005: National Medical Director: HCR-Manor Care:**
Efforts focused on increasing physician involvement and initiating quality improvement
initiatives across a multi-billion dollar health care organization.

**September 1989 to December 2000: Chairman and Chief Executive Officer,
HealthWare Solutions International, Inc.** Baltimore, MD.
Web-enabled Long Term Care Information Systems

**June 1998 to July 2000: Chairman and Member, Board of Directors, Maryland
Health Care Foundation.** Public-Private sector initiative on health care services for
the uninsured.

**June 1988 to 1994: Clinical Professor of Medicine, the Ohio State University College
of Medicine,** Columbus, OH.

**1983 to 1994: Clinical Professor of Preventive Medicine, the Ohio State University
School of Medicine,** Columbus, OH.

**1983 to 1992: Member, American Academy of Neurology Ethics Committee**

**1982 to 1986: NIH External Merit Review Committee:  Head Trauma Center
Program,** Bethesda, MD

**January 1988 to 1990: Senior V.P. and President (One of Co-Founders), APACHE
Medical Systems, Inc.,** Washington, D.C. (now publicly traded acute care quality
management information technology firm).

**January 1986 to November 1986: Candidate for U.S. Congress**

**September 1985 to November 1985: Interim Director, Ohio Department of Mental
Retardation and Developmental Disabilities.**  Led a team to restore public confidence
in this major department of state government (>3,000 employees and annual budget of
>$300 million) following a series of patient abuse scandals. Advocacy organizations
recognized his contributions to this effort with several service awards after the effort was
completed.

**1983 to January 1986: Director, Ohio Department of Health** (Cabinet Office, State
Government; >1000 employees and budget of $150 million annually). Elected to National
Board of Association of State and Territorial Health Officers by peers. Generally
recognized for building the Ohio Department of Health into one of the best public health
departments in the nation, starting a series of nationally recognized, innovative programs
in (e.g.) early HIV-AIDS education and prevention (in 1983) and the ethical implications
of the distribution of scarce resources (a state-wide program to manage solid organ
transplantation, with the collaboration of University Hospital of Cleveland, the Cleveland
Clinic, Ohio State University Hospitals and the University of Cincinnati Hospital).

**1983 to 1985: Professor of Medicine, Case Western Reserve University,** Cleveland,
OH

**1981 to 1983: Director, Center for the Critically Ill, University Hospitals of Cleveland**, Cleveland, OH. With Dr. Stuart Youngner, was co-founder and first Director of this nationally recognized center for the study of ethics in critical care medicine.

**1980 to 1983: Chairman, American Academy of Neurology Course**, Critical Care Neurology, National Meeting, New Orleans, Los Angeles and Washington, D.C.

**1981 to 1984: Member, Biomedical Research External Review Committee** for Oak Ridge Associated Universities

**1980 to 1983: Chief, Division of Critical Care, Department of Medicine, Case Western Reserve University, University Hospitals of Cleveland**, Cleveland, OH

**1980 to 1983: Associate Professor, Department of Neurology, Case Western Reserve University, University Hospitals of Cleveland**, Cleveland, OH

**1979 to June 1983: Associate Professor, Department of Medicine, Case Western Reserve University, University Hospitals of Cleveland**, Cleveland, OH

**1977 to 1980: Co-Chief, Division of Clinical Pharmacology and Critical Care Medicine, Department of Medicine, Case Western Reserve University**, Cleveland, OH

**April 1983: Director, Critical Care Neurology Symposium**, Center for Critically Ill

**1980: Member NIH Technical Merit Review Panel**, Head Trauma Centers Program

**1976 and 1979: Faculty Member, American Academy of Neurology** National Meeting Review Course

**1975 to 1979: Assistant Professor of Medicine and Neurology, Case Western Reserve University, School of Medicine, University Hospitals of Cleveland**, Cleveland, OH

**1974 to 1981: Consultant to Administrator and Assistant Administrator for Research and Development, Environmental Protection Agency**, Washington, D.C.

**MILITARY SERVICE**

**1969 – 1971: Lieutenant Commander, U.S. Navy Medical Corps:** First-class navy deep-sea diver and conducted research on the respiratory effects of cold helium/oxygen in deep-sea diving

**HONORS AND AWARDS**

**Centennial Award for Contribution to Public Health in Ohio, 1986:** Ohio Department of Health – For Conceiving Statewide Ohio Consortium for Solid Organ Transplantation. One of 12 awardees, including Dr. Albert Sabin and Dr. Henry Heimlich.

**White House Fellow 1983-74;** Special Assistant to the Administrator, Honorable Russell Train

**Teacher of the Year Award, 1977 Dept. of Medicine, University Hospitals of Cleveland**

**Fellow in Bioethics: National Endowment for the Humanities,** Kennedy Institute, Washington, D.C. – 1981;

**Phi Beta Kappa (Junior year) Tufts University,** Medford, MA.

**Alpha Omega Alpha 1968, Johns Hopkins University School of Medicine** Baltimore, MD.

**Undersea Medical Society** (elected member) 1970.

**Counselor to Pan American Medical Association (Environmental Health)** – 1975;

**Meritorious Service Award, Ohio Private Residential Association** – 1986;

**Annual Public Service Award , Ohio Association of Retarded Citizens** – 1986;

**Award for Contributions to head trauma services, Ohio Association of the National Head Injury Foundation** – 1989.

**LICENSURE & BOARD CERTIFICATION:**

Licensed in Ohio
Board Certified – Internal Medicine (Fellow of the American College of Physicians)
Board Eligible – Neurology

**PROFESSIONAL SOCIETIES:**

1976 to Present: **American College of Physicians (FACP)**

2001 to present: American Medical Director Association (AMDA): Member, National Ethics Committee; 2004 through 2006

1986 to 2000: **American Medical Association**

1986 to 1997: **Ohio State Medical Association**

1986 to 1997: **Franklin County and Columbus Academy of Medicine**

1985 to 1999: **American Health Planning Association;** (Board Member and President elect 1985 to 1995)

1981 to 1996: **Society for Health and Human Values**

1978 – 1983: **Cleveland Medical Library Association,**

1976 – 1986: **Society for Critical Care Medicine** (elected)

1976 – 1985: **American Federation for Clinical Research**

1975 – 1983: **Pan American Medical Society**

1975 to Present: **Johns Hopkins Medical and Surgical Association**

1974 to Present: **American Academy of Neurology** (associate)

1974 to Present: **White House Fellows Association**

1971 – 1979: **Undersea Medical Society** (elected)

**COMMITTEE**
**APPOINTMENTS:**

September 2003 to Present: Member, **Johns Hopkins University School of Medicine Admissions Committee**

March 2002 through 2006: Member of **Advisory Board to Lipitz Center for Integrated Health, Johns Hopkins School of Public Health.**

2001-2003: Member, **National Steering Committee for National Quality Forum/ CMS LTC and sub acute care performance measures project**

1998-2000: **Maryland Health Care Foundation: Board member and founding Chairman** (public-private sector health care initiatives for the uninsured in Maryland).

1999-2000: **Task Force on Malpractice Crisis in Long Term Care,** Federation of Insurance and Corporate Counsels national project.

1998: **Chairman, Task force on Medicaid reimbursement for academic medical centers in Maryland**

1988 to 1995: **Member, American Academy of Neurology Legislative Affairs Committee**

1988 to 1995: Member, **Academy of Medicine of Franklin County and Columbus Ethics Committee**

1987 – 1990: Member, **Ohio Sate Medical Association Judicial and Professional Relations Committee**

1986 – 1990: **Reviewer, AIDS impact study proposals,** National Center Health Services Research

1983 to 1996: Member, **American Academy of Neurology Ethics Committee**

1981-1983: **Chairman, Executive Committee, Center for the Critically Ill, University Hospitals of Cleveland**

1981: **Member, Chairman, Department of Anatomy Search Committee: Case Western Reserve University**

1981 – 1985: **Member, Committee on Ethical/Philosophical Curriculum Development, Case Western Reserve Univ. Medical School**

1980: **Member, Chairman, Department of Anesthesiology Search Committee, Case Western Reserve University**

1980 – 1983: **Member, Fellowship Committee,** American Heart Association Northeast Ohio Affiliate

1980 – 1985: **Member, Northeast Ohio Council on Emergency Medical Services**

1980: **Member, American College of Physicians Medical Knowledge Self Assessment Program V:  Neurology Section,** Patient Management Program Section

1979 – 1984: **Extracranial/Intracranial Bypass Multi-Center Study:**  Neurologist for Center 31 (University Hospitals of Cleveland).

1979 – 1985: **Member, Advisory Committee, Department of Medicine, Case Western Reserve University,** Cleveland, OH

1979 – 1980: **Member, House Staff Liaison Committee, Department of Medicine, University Hospitals of Cleveland**

1979 – 1980: **Member, Computer Committee, Case Western Reserve University**

1979: Member, **Delegation of Former White House Fellows,** hosted by the Chinese People's Institute of Foreign Affairs

1978 – 1979: **Member, Resuscitation Committee, University Hospitals of Cleveland** (Former Chairman)

1976 – 1982: **Chairman, University Hospitals of Cleveland  Medical ICU Committee**

## PUBLICATIONS

1. Jackson DL: A Hypothalamic Region Responsive to Localized Injection of Pyrogens. Ph.D. Thesis, Johns Hopkins University, 1967.

2. Jackson DL: A Hypothalamic Region Responsive to Localized Injection of Pyrogens. J Neurophysiol 1967; 30: 586-602.

3. Jackson DL, Tauber, J, Rawlins JSP: Evaluation of NSRDL Heater Pump Performance Characteristics and Reliability. Naval Medical Research Institute Report No. 1, August, 1969.

4. Greenbaum L, Dickson K, Jackson DL, Evans D: Toxicological and Physiological Effects of Bromotrifluoromethane. Toxicol Appl Pharmacol 1972; 21: 1-11.

5. Wands J, Mann R, Jackson DL, Butler T: Fatal Community Acquired Herellia Pneumonia in Chronic Renal Failure. Am Rev Resp Dis 1983; 108: 964-967.

6. Jackson DL, Newill V: The Strengths and Weaknesses of Population Studies in Assessing Environmental Health Effects. International Symposium on Recent Advances in the Assessment of the Health Effects of Environmental Pollution 1984; 1: 161-180.

7. Jackson DL, Dominick D, Samuels S: Working paper on regulatory options, Appendix 9, in Decision Making for Regulating Chemicals in the Environment. Washington, D.C., National Research Council, National Academy of Sciences, 1975.

8. Davies JC III, Fairbanks R, Freeman AM III, et al: Decision Making for Regulating Chemicals in the Environment. A report prepared by the Committee on Principles of Decision Making of Regulations Chemicals in the Environment. Washington, D.C., National Academy of Sciences, 1975.

9. Spivak JL, Jackson DL: Pellagra: An Analysis of 18 Patients and a Review of the Literature. Johns Hopkins Med J 1977; 140: 295-309.

10. Jackson DL, Beraducci J: Accidental Carbon Monoxide Poisoning: A Growing Home Hazard. Medical Times 1978; 106: 26-37

11. Jackson DL, Dole WP: Total Cerebral Ischemia: A New Model System for the Study of Post-Cardiac Arrest Brain Damage. Stroke 1979; 10: 38-43.

12. Youngner S, Jackson DL, Allen ML: Staff Attitudes Towards the Care of the Critically Ill in the Medical ICU. Crit Care Med 1979; 7: 35-43.

13. Jackson DL, Youngner S: Patient Autonomy and Death with Dignity: Some Clinical Caveats. N Eng J Med 1979; 301 (8): 404-408.

14. Jackson DL, Satyamurti S, Davis L, Drachman DB: Isaac's Syndrome with Laryngeal Involvement – An Unusual Presentation of Myokymia. Neurology 1979; 29: 1612-1615.

15. Johnson PL, Drake CL, Fay JA, Jackson DLL, et al: A Report Prepared by the National Academy of Sciences Committees on Priorities in Environmental Research and Development. Washington, D.C., National Academy of Sciences, 1979.

16. Griggs RC, Baxter BW, Brennan RW, Conomy J., et al: Neurology: An Annotated Bibliography of Recent Literature. Ann Int Med 1979; 91: 658-663.

17. Jackson DL, Lin SR: Question of Methodology with Labeled Microspheres (letter). Stroke 1979; 10 (4): 480.

18. Jackson DL: Terror in the ICU (letter). Forum of Medicine 1979; 1: 7.

19. Youngner S, Jackson DL: Death with Dignity (letter). N Engl J Med 1980; 302: 126.

20. Jackson DL, Youngner S: Patient Autonomy and Death with Dignity, Jurimetrics Journal, 20: 348-359, 1980.

21. Jackson DL, Menges H: Accidental Carbon Monoxide Poisoning: A Growing Hazard. J Am Med Assoc 1980; 243: 772-774.

22. Allen M, Youngner S, Jackson DL: Closing the Communication Gap between Physicians and Nurses in the ICU Setting. Heart/Lung 1980; 9: 836-840.

23. Youngner S, Jackson DL, Raddich W: Family Wishes and Patient Autonomy. Hastings Center Report 1980; 10: 21-22.

24. Jackson DL, Dole WP, McGloin J, Rosenblatt JI: Total Cerebral Ischemia: A New Model System for Micro-Circulatory Studies. Stroke 1981; 12: 66-72.

25. Jackson DL, Youngner S: Autonomy and the Need to Preserve Life (invited comments). Hastings Center Report 1982; 12: 44.

26. Dole W, Jackson DL, Rosenblatt JI, Thompson WL: Relative Error and Variability in Blood Flow Measurements with Radiolabeled Microspheres. Am J Physiol 1982; 243 H371-H378

27. Jackson DL, Youngner SJ: Patient Autonomy and Refusal of Life Saving Therapy (invited comments). Hastings Center Report 1982; 12: 44.

28. Rosenblatt JU, Jackson DL, Dole WP, Thompson WL: On Uniform Approximation of Poison Varieties by Normal Ones. J of Statistical Planning and Inference, 1983; 7.

29. Youngner S, Jackson DL, Coulton C, et al: A National Survey of Hospital Ethics Committees. Crit Care Med 1983; 11: 902-905.

30. Jackson DL, Korbin J, Youngner S, et al: Fatal Outcome in Untreated Adolescent Ulcerative Colitis: An Unusual Case of Child Neglect. Crit Care Med 1983; 11: 832-833.

31. Franklin C, Jackson DL: Discharge Decision-making in a Medical ICU: Characteristics of Unexpected Readmissions. Crit Care Med 1983; 11: 51-55.

32. Wolfson SK Jr, Yonas H, Jackson DL, Gur D, Miller DM, Good WF, Boehnke M, Latchaw RE: Experimental and Clinical Experience with Two and Three Dimensional Imaging of Xe-CT Local Cerebral Blood Flow (LCBF). J Cereb Blood Flow Metab 1983; 3 (Suppl): 131.

33. Youngner S, Korbin J, Jackson DL: Ethical and Social Perspectives in Critical Care. Crit Care Med 1983; 11: 834.

34. Wongmonkolrit JJ, McPherson SL, El-Naggar A, et al:  Acute Fulminant Toxoplasma Meningoencephalitis in a Homosexual Man.  Acta Neuropatho (Berl) 1983.

35. Youngner S, Coulton C, Welton R, Juknialis B, Jackson DL:  ICU visiting policies.  Crit Care Med 1984; 12:  7.

36. Coulton C, McClish D, Doremus H, Smookler S, Powell S, Jackson DL:  Implications of DRG's for Intensive Care.  Crit Care Med, March 1984.

37. Koch KA, Jackson DL, Schmiedl M, et al:  Effect of Thiopental Therapy on Cerebral Blood Flow Following Total Cerebral Ischemia.  Crit Care Med 1984; 12:  90-95.

38. Koch KA, Jackson DL, Schmiedl M, Rosenblatt JI:  Total Cerebral Ischemia:  Effect on Alterations in Arterial PCO on Cerebral Micro-circulation.  J Cerebral Blood Flow Metab 1984; 4:  343-349.

39. Youngner SJ, Coulton C, Juknialis BW, Jackson DL:  Patient's Attitudes toward  Hospital Ethics Committees.  Law Medicine & Health Care, 1984; 12 (1):  21-25.

40. Yonas H, Wolfson SK Jr, Gur D, Latchaw RE, Good WF, Leanza R, Jackson DL, Janeta PJ, Reinmuth OM:  Clinical Experience with the Use of Xenon-enhanced CT Blood Flow Mapping in Cerebral Vascular Disease.  Stroke 1984; 15 (3):  443.

41. McClish D, Russo A, Franklin C, Jackson DL, Lewandowski W, Alcover IA:  Profile of Medical ICU and Ward Patients in an Acute Care Hospital.  Crit Care Med 1985; 13:  381-386.

42. Youngner S, Allen M, Bartlett E, Cascorbi H, Hau T, Jackson DL, Mahowalk M, Martin B, Youngner S:  Psychosocial and Ethical Implications of Organ Retrieval.  N Eng J Med 1985 (August 1); 313:  321-324.

43. Henning R, McClish D, Daly B, Nearman H, Franklin C, Jackson DL:  Clinical characteristics and resource utilization of ICU patients:  Implications for organization of intensive care.  Crit Care Med 1987; 15:  3.

## BOOKS, CHAPTERS, REVIEWS, EDITORIALS, ETC.

1. Jackson DL, Buckley J (eds): Proceedings of Symposium of Exposure Assessment. Washington, DC, Environmental Protection Agency. 1979.

2. Jackson DL, Griggs R, Baxter B, et al: Neurology in Kay CG (ed): Medical Knowledge, Self Assessment Program V. Philadelphia, American College of Physicians, 1980, pp 329-351.

3. Jackson DL: Selected topics in critical care neurology, in Shoemaker WC, Thompson WL (eds): Critical Care Medicine (Vol 1). Fullerton, CA, Society of Critical Care Medicine, 1980, I (M): 1-47.

4. Davis LE, Jackson DL, Gothe B: Neurological Infections and Respiratory Dysfunction, in Weiner WJ (ed): Respiratory Dysfunction in Neurological Disease. Mt. Kisco, NY, Futura Publishing Co., 1980, pp 41-70.

5. Spivak J, Jackson DL: Pellagra: An Analysis of 18 patients and a review of the literature, in Carpenter KJ (ed): Benchmark Papers in Biochemistry: Pellagra. Stroudsburg, PA, Hutchinson Ross Publishing Co, 1981, pp 345-359.

6. Jackson DL, Youngner SJ: Patient autonomy and "death with dignity" in Abrams N, Buckner MD (eds): Medical Ethics: A Clinical Textbook for the Health Care Professions. Cambridge, MA, The MIT Press, 1982.

7. Youngner SJ, Jackson DL, Coulton C, et al: A national survey of hospital ethics committees, in the Deciding to Forgo Life-Sustaining Treatment, A Report of the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research. Washington, DC, U.S. Government Printing Office, 1983, pp 443-457.

8. Jackson DL: Critical Care Neurology in Shoemaker WC, Thompson WH (eds): Critical Care Medicine, 1984.

9. Jackson DL: Ethical decisions in the Intensive Care Unit, in Back N, Brewer GJ, Eijsvoogel VP, et al (eds): Progress in Clinical and Biological Research. Vol 139: Difficult Decisions in Medical Ethics: The Fourth Volume in a Series on Ethics, Humanism, and Medicine. New York, Alan R. Liss, Inc., 1983, pp 125-135.

10. Jackson DL, LaManna JF: Neurologic implications of cardiopulmonary resuscitation in Henning RJ, Jackson DL (eds): Critical Care Neurology and Neurosurgery. New York, Praeger Publishing, 1984, in press.

11. Youngner SJ, Coulton C, Juknialis BW, Jackson DL: Institutional Ethics Committees and Health Care Decision Making: Part II Review of Existing Institutional Ethics Committees and Comparison with Prognosis and Research Committees, Chapter 6. Edited by Cranford RE and Doudera AE. Published in cooperation with the American Society of Law and Medicine, Health Administration Press, Ann Arbor, MI, 1984.

12. Annas GJ, Etley Er, Jackson DL: The Introduction of Major Organ Transplantation on the State Level: Ethical and Practical Considerations in the Development of Public Policy.

13. Youngner SJ, Bartlett ET, Human Death and High Technology: The Failure of the Whole Brain Formulations. Henning RJ and Jackson DL (eds): Critical Care Neurology and Neurosurgery.

14. Coulton C, McClish D, Doremus H, Powell S, Smookler, Jackson DL: Implications of DRG Payment for Medical Intensive Care. Medical Care August 1985, Vol 23, No 8, pp 977-985.

**NOTE**: Dr. Jackson has written multiple op-ed and editorial articles focusing on the use of information technologies in geriatric health care and quality management strategies in long term care (in publications such as <u>Contemporary Long Term Care</u>, <u>McKnights</u>, <u>Provider</u>, etc.)

## ABSTRACTS

1.  Thompson WL, Gurley HT, Lutz BA, Jackson DL, et al: Inefficacy of gluccorticoids in shock (Double-blind study).

2.  Jackson DL, Dole WP: A minimally invasive model system for total cerebral ischemia. Fed Proc 1977; 36: 582.

3.  Dole WP, Jackson DL, Thompson WL: Sources of error in microsphere methodology. Fred Proc 1977; 36: 580.

4.  Dole WP, Jackson DL, Rosenblatt JI, Thompson WL: An Approach to reducing sources of error in microsphere methodology. Clin Resch 1977; 25: 332A.

5.  Youngner S, Allen M, Jackson DL: Comparison of nurse/physician attitudes on decision making in a medical intensive care unit. Clin Resch 1977; 25: 332A.

6.  Jackson DL, Spivak JL: Pellagra: An often neglected complication of malnutrition in urban society. Clin Resch 1977; 25: 393A.

7.  Jackson DL, Dole WP, Rosenblatt JI, Thompson WL: Radioactive microspheres: An analysis of sources of error and their use in the study of microcirculatory abnormalities following total cerebral ischemia, in Proc Fifth Pharmacol Toxicol Symposium, National Institutes of General Medical Sciences, 1977, p 58.

8.  Dole WP, Jackson DL: Brain damage after cardiac resuscitation: Failure of cerebral reperfusion. Clin Resch 1978; 26: 3A.

9.  Koch KA, Jackson DL, Rosenblatt J, et al: Total cerebral ischemia (TCI): Natural History of regional brain blood flow. Fed Proc 1978; 37: 228A

10. Koch K, Jackson DL, Thompson WL, Schmiedl M: Total cerebral ischemia (TCI): Therapy with hydoxyethyl starch and dopamine. Clin Resch 1978; 26: 29A.

11. Jackson DL, Satyamurti S, Davis LE, Drachman DB: Isaac's syndrome: Vocal cord myokymia as a source of symptoms, IV International Congress of Neuromuscular Diseases. Montreal, September 17-21, 1978.

12. Youngner S, Jackson DL: Patient autonomy and the right to die: some clinical caveats. Crit Care Med 1979; 7: 131A.

13. Jackson DL, Koch KA, Schmiedl M, et al: Total cerebral ischemia; Regional cerebral blood flow following thiopental therapy. Crit Care Med 1979; 7: 145.

14. Koch KA, Schmiedl M, Jackson DL, et al: Total cerebral ischemia: Sensitivity of the globally damaged brain to arterial PCO2 variations. Fed Proc 1979; 38: 368.

15. Jackson DL, Dole WP, Rosenblatt JI, et al: Redistribution of systemic organ blood flow following global ischemia. Fed Proc 1979; 38: 368.

16. Koch K, Jackson DL, Rosenblatt JI, et al: Total cerebral ischemia: The effect of vasodilator therapy on post-ischemic brain damage. Clin Resch 1979; 27: 235A.

17. Jackson DL, McGloin J, Dole WP: Total cerebral ischemia: A new model system for micro-circulatory studies. Eur Crit Care 1978.

18. Youngner S, Jackson DL:  Survey of house office and teaching faculty attitudes towards patient autonomy in an academic medical intensive care unit.  Crit Care Med 1980; 8:  260A.

19. Franklin C, Jackson DL, Koch K:  Retrospective analysis of MICU readmissions.  Crit Care Med 1981; 9:  263.

20. Nemoto E, Jackson DL, Willi J, Koch K:  Impaired reperfusion:  Effect of barbiturate therapy after total cerebral ischemia in monkeys.  Crit Care Med 1981; 9:  183.

21. Jackson DL, Dole WP, Friday K, et al:  Effect of indomethacin on coronary reactive hyperemia following ischemia: Mechanism for ventricular fibrillation during increased left ventricular afterload.  Clin Resch 1981; 30:  574A.

22. Jackson DL, Friday K, Wilson JH, Rosenblatt JI:  Calcium ionophore antagonists and the impaired reperfusion phenomenon following total cerebral ischemia (TCI).  Crit Care Med 1981; 10:  206.

23. Jackson DL, Smith M, Wilson NJ:  1-benzyl imidazole inhibition of thromboxane synthesis:  Effect on impaired cerebral perfusion following total cerebral ischemia.  Clin Resch 1982; 30:  409A.

24. Youngner S, Jackson DL, Coulton C, et al:  Formation of hospital ethics committees by large (>400 bed) hospitals in the continental United States (1981).  Clin Resch 1982; 30:  309A.

25. Allen MA, Daly B, Jackson DL, et al:  Allocation of nursing resources in critical care.  Crit Care Med 1982; 10:  213.

26. Wolfson SK, Yonas H, Jackson DL, et al:  Experimental and clinical experience with two and three dimensional imaging of Xenon-CT local cerebral blood flow (LCBF).  Cerebral Blood Flow Metab (Suppl) 1983.

27. Youngner SJ, Jackson DL, Coulton C, et al:  Ethics Committees:  The patient's perspective.  Clin Resch 1983; 31261A.

28. Youngner SJ, Jackson DL, Coulton C, et al:  Regional survey of intensive care unit visiting policies.  Crit Care Med 1983; 11:  238A.

29. Coulton C, McClish D, Doremus H, Smookler S, Powell S, Jackson DL:  Implications of DRG's for intensive care. Crit Care Med 1984; 12:  332.

30. Romeo SA, McCracken KA, Crumrine RC, Jackson DL, LaManna JC:  Capillary mean transit time, regional cerebral blood flow and regional cerebral blood volume after recovery from total cerebral ischemia in dogs.  The Physiologist 1984; 27:  265.

31. Wolfson SK Jr, Gur D, Yonas H, Jackson DL, Good WF, Latchaw RE, Kennedy WH, Cook EE, Good BD: Proceedings of the devices and technology branch contractor's meeting proceedings, Washington, DC, NIH Pub. 1984; 84:  1659 p 89.

32. Coulton C, McClish DK, Doremus H, Smookler S, Powell S, Jackson DL:  Implications of DRG's for Intensive Care Units.  Crit Care Med 1984; 12.

33. Powell S, Jackson DL, McClish D:  Diagnostic organ system evaluation (Dose) and intensive care unit (ICU) patient classification system:  Potential for use in prospective payment.  Clin Resch 1983; 31:  2.

## PRESENTATIONS

1. Rawlins JSP, Jackson DL, Tauber J: Diver heating: problems and progress. Third International Symposium on Underwater Medicine, LaSpezia, Italy, June 1980.

2. Jackson DL, Rawlins JSP, Tauber J: Respiratory heat loss in hyperbaric atmospheres. Third International Meeting on Hyperbaric and Underwater Physiology, Marseilles, France, June, 1970.

3. Hoke B, Flynn B, Jackson DL, Alexander: Effect of breathing cold helium at 1000 feet sea water pressure. Fourth International Symposium on Underwater Medicine, Freeport, Bahamas, August, 1982.

4. Jackson DL, Newill V: The strengths and weaknesses of population studies in assessing environmental health effects. Presented at Plenary Session, First International Symposium on Recent Advances in the Assessment of the Health Effects of Environmental Pollution. Sponsored by the World Health Organization and US Environmental Protection Agency and the Commission of the European Communities, Paris, France, June 1974.

5. Jackson DL: Neurology in the Intensive Care Unit, American Academy of Neurology Course Presentation, Toronto, April 1976.

6. Jackson DL: Critical Care Neurology. Presented at Ohio State Medical Association, Cincinnati, Ohio, May 1976.

7. Jackson DL, Dole WP: A Minimally Invasive Model System for Total Cerebral Ischemia. Presented at the Federation of American Societies for Experimental Biology, Chicago, April 1977.

8. Dole WP, Jackson DL, Thompson WL: Source of error in microsphere methodology. Presented at the Federation of American Societies for Experimental Biology, Chicago, April 1977.

9. Jackson DL, Rosenblatt JI: Seminar on use of radiolabelled microspheres in blood flow studies: Practical analytical considerations. Wright Patterson Air Force Research Laboratory/University of Dayton Physiology Department, Dayton, Ohio, July 1977.

10. Jackson DL, McGloin J, Dole WP: Total Cerebral Ischemia: A new model system for micro-circulatory studies. Presented at the Proceedings of the second World Congress on Intensive Care, Paris, France, September 1977.

11. Jackson DL, Dole WP, Rosenblatt JI, Thompson WL: Radioactive microspheres: An analysis of sources of error and their use in the study of micro-circulatory abnormalities following total cerebral ischemia. Presented at the Fifth Pharmacology Toxicology Symposium. National Institutes of General Medical Sciences, Washington, DC, November 1977.

12. Jackson DL: New concepts in pathophysiology and treatment of total cerebral ischemia. Neurology Grand Rounds, University of New Mexico School of Medicine, January 1978.

13. Jackson DL: Satyamurti S, David L. Drachman D: Isaac's syndrome: Vocal cord myokymia as a source of symptoms. IV International Congress on Neuromuscular Diseases, Montreal, Quebec, Canada, September 1978.

14. Dole WP, Jackson DL: Brain damage after cardiac resuscitation: Failure of cerebral reperfusion. American Federation for Clinical Research, 1978.

15. Koch KA, Jackson DL, Rosenblatt J, Dole W, Thompson WL: Total cerebral ischemia (TCI): Natural history of regional brain blood flow. FASEB National Meeting, Atlantic City, N.J., April 1978.

16. Koch KA, Jackson DL, Thompson WL, Schmiedl M: Total cerebral ischemia (TCI): Therapy with hydroxyethyl starch and dopamine. American Federation for Clinical Research 1978.

17. Jackson DL: Acute metabolic encephalopathies. American Academy of Neurology, April 1979.

18. Jackson DL: Neurology in the ICU. American Academy of Neurology, 1979.

19. Koch KA, Schmiedl, M, Jackson DL, Rosenblatt JI, Thompson WL: Total cerebral ischemia: Sensitivity of the globally damaged brain to arterial PC02 variations. FASEB Spring Meeting, Dallas, Texas, April 2, 1979.

20. Jackson DL, Dole WP, Rosenblatt JI, Koch KA, Thompson WL: Redistribution of systemic organ blood flow following global ischemia. FASEB Spring Meeting, Dallas, Texas, April 2, 1979.

21. Koch KA, Jackson DL, Rosenblatt JI, Schmiedl M, Thompson WL: Total Cerebral Ischemia: The effect of vasodilator therapy on post-ischemic brain damage. American Federation for Clinical Research, Washington, DC, May 7, 1979.

22. Youngner S, Jackson DL: Patient autonomy and the right to die: Some clinical caveats. Eighth Annual Symposium of the Society of Critical Care Medicine, San Francisco, May 27-30, 1979.

23. Jackson DL, Koch KA, Schmiedl M, Thompson WL, Rosenblatt JI: Total Cerebral Ischemia: Regional cerebral blood flow following thiopental therapy. Eighth Annual Symposium of the Society of Critical Care Medicine, San Francisco, May 27-30, 1979.

24. Jackson DL, Buckley J: Co-Chairmen: Workshop on Exposure Assessment. Environmental Protection Agency, Baltimore, MD, January 1979.

25. Jackson DL: Acute metabolic encephalopathies: course presentation. American Academy of Neurology, Chicago, May 1979.

26. Jackson DL: Neurological complications of cardiac arrest. Cardiology Grand Rounds, Massachusetts General Hospital, Boston, MA, May 1979.

27. Jackson DL: Pathophysiology and management of acute thermal stress. American Academy of Neurology, 1980.

28. Jackson DL: Frontiers in treatment of global cerebral ischemia. Invited lecture, Neurology Grand Rounds, University of Texas, San Antonio, January 1980.

29. Jackson DL: Pathophysiology and therapy of acute thermal stress. Course lecture, American Academy of Neurology National Meetings, New Orleans, April 1980.

30. Youngner S, Jackson DL: Survey of house officer and teaching faculty attitudes towards patient autonomy in an academic medical intensive care unit. Society of Critical Care Medicine National Meeting, San Antonio, TX, May 1980.

31. Jackson DL: Critical Care Neurology: Breakfast luncheon and workshop sessions (2), at Society of Critical Care Medicine Meeting, San Antonio, TX, May 1980.

32. Jackson DL: Pathophysiology of CNS damage following cardiac arrest. American Heart Association NE Ohio Affiliate, Research meeting, May 1980.

33. Jackson DL: Global Cerebral Ischemia, Neurology Grand Rounds, Invited Lecture, Wayne State University School of Medicine, Detroit, Michigan, July 1980.

34. Jackson DL: Nemoto: Effect on thiopental therapy on impaired reperfusion phenomenon in monkeys after total cerebral ischemia. Society of Critical Care Medicine Meeting, Washington, DC, May 1981.

35. Franklin C, Jackson DL: Discharge and decision making in intensive care. Society of Critical Care Medicine Meeting, Washington, DC, May 1981.

36. Jackson DL: Patient autonomy and professional responsibility. National Endowment of Humanities Seminar on Medical Ethics, Kennedy Institute, Washington, DC, June 1981.

37. Jackson DL: The ICU and the emergency room. Trauma Symposium, Department of Surgery, Case Western Reserve University, Cleveland, Ohio, June 1981.

38. Jackson DL: Cerebral resuscitation. Tri State Critical Care Society, November 1981.

39. Jackson DL: Ethical implications of acute brain damage. Tri State Critical Care Society, November 1981.

40. Jackson DL: Update on cerebral resuscitation. Critical Care Neurology, April 1981.

41. Jackson DL, Friday K, Wilson NJ, Rosenblatt JI: Calcium ionosphere antagonists and the impaired reperfusion phenomenon following total cerebral ischemia (TCI). Society of Critical Care Medicine Meeting, St. Louis, June 1982.

42. Jackson DL, Smith M, Wilson NJ: 1-benzyl imidazole inhibition of thromboxane synthesis: Effect on impairing cerebral perfusion following total cerebral ischemia. AFCE meeting, Washington, DC, April 1982.

43. Allen MA, Daly B, Jackson DL, et al: Allocation of nursing resources in critical care. Society of Critical Care Medicine Meeting, St. Louis, June 1982.

44. Jackson DL: Intensive Care: Challenges in a large referral community hospital. Youngstown, Ohio, March 1982.

45. Jackson DL: Ethical considerations when a patient refuses life saving treatment. University of Michigan Annual Ethics Symposium, March 1982.

46. Jackson DL: Patient autonomy and professional responsibility. St. Francis Society, International Symposium on Medical Ethics, Washington, DC, March 1982.

47. Jackson DL: Ethical dilemmas in critical care medicine. Women's Health Day, Cleveland, Ohio, April 1982.

48. Jackson DL: New methodologies for measurement of cerebral blood flow. Neurosurgery Grand Rounds, University Hospitals of Cleveland, September 1982.

49. Jackson DL: Patient autonomy: A clinician's perspective. Symposium on Ethical Dilemmas at the End of Life, Cleveland, Ohio, October 1982.

50. Jackson DL: Pathophysiology and therapy of global cerebral ischemia. Critical Care Medicine Research Conference, Johns Hopkins Hospital, Baltimore, Maryland, October 1982.

51. Jackson DL:  Ethical controversies in intensive care units.  Symposium on Medical Ethics Michigan State University, Saginaw, Michigan, November 1982.

52. Latchaw RE, Yonas H, Wolfson SK, Jackson DL, et al:  Experimental and clinical experience with two- and three-dimensional imaging of Xe-CT local cerebral blood flow (LCBF).  The American Society of Neuroradiology Annual Meeting, San Francisco, California, June 4-8 1983.

53. Coulton C, McClish D, Doremus H, Smookler S, Powell S, Jackson DL:  Implications of DRG's for intensive care.  Society of Critical Care Medicine Annual Meeting, San Francisco, California, June 1984.

54. Romeo SA, McCracken KA, Crumrine RC, Jackson DL, LaManna JC:  Capillary mean transit time, regional cerebral blood flow, and regional cerebral blood volume after recovery from total cerebral ischemia in dogs.  35th Annual Fall Meeting of the American Physiology Society, Lexington, Kentucky, August 1984

55. Yonas H, Wolfson SK Jr, Jackson DL, Gur D, Miller DN, Good WF, Boehnke M, Latchaw RE:  Solid construction of blood flow mapping.  Scientific Exhibit presented at the Cushing Meeting in Neurological Surgery, Washington, DC, May 1983.

56. Yonas H, Wolfson SK Jr, Jackson DL, Gur D, Miller DN, Good WF, Boehnke M, Latchaw RE.  Experimental and clinical experience with Xe-CT local blood flow mapping.  Scientific Exhibit presented at the Cushing Meeting in Neurological Surgery, Washington, DC, May 1983.

57. Jackson DL:  Ethical and Social Dimensions of Critical Care Neurology.  American Academy of Neurology, 1984.

58. Bouxsein P, Getson J, Jackson DL, Kudrle R (Panelists).  Working Paper 5 Medicare – Medicare at Age 20:  Its Past, Present and Future by TR Marmor.

59. Henning R, McClish DK, Daly B, Nearman H, Franklin C, Jackson DL:  Clinical and Demographic Characteristics of SICU and MICU Patients.  Presented at this Annual Meeting of the Society of Critical Care Medicine, Chicago, Illinois, May 1985.

60. Jackson DL:  Assuring Quality in Long Term Care.  Nebraska Health Care Association, April 1992.

61. Jackson DL:  End-of-Life Issues.  1992 AOPHA Spring Retreat, Panel Discussion.  Cuyahoga Fall, Ohio, May 1992.

**Note: Dr. Jackson has delivered scores of presentations at national and regional Professional Quality of Health Care and Long Term Care/Assisted Living conferences during the past 10+ years. These include presentations at the American Medical Directors Association (2003, 2004 and 2005), the annual meeting of Covenant Dove senior services organization (2003 to Present), the HCR Manor Care Annual Leadership Conference (2002, 2003, 2004 and 2005), the American Health Care Association (2002), the American Association of Homes and Services for the Aging (2000), Federation of Insurance and Corporate Counsels' National Task Force on the Crisis in Long Term Care Malpractice Seminar (2000), the Business Week Healthcare CIO Summit at Phoenix, AZ (1999), the E-healthcare conference in Chicago (1999), and at the Risk Management Conference sponsored by the American Health Care Association in Chicago (November 1998).  Topics for these presentations have included health care reform, medical ethics, quality of care challenges in both critical care and geriatric settings and the inter-connections amongst government, academic medicine and the private sector.**

## CONTINUING MEDICAL EDUCATION PRESENTATIONS

1. Jackson DL: Subclavian steal. Medical Grand Rounds, 1975.

2. Jackson DL: Acute therapy of seizure disorder and stroke. Therapeutics Conference, 1976.

3. Jackson DL: COMA-Differential diagnosis and neurological examination of comatose patient. Therapeutics Conference, 1976.

4. Jackson DL: Management of drug overdose and poisoning. Therapeutics Conference, 1976.

5. Jackson DL: Management of transient ischemic attacks. Medicine 1976, Department of Medicine, May 1976.

6. Jackson DL, Beraducci AL: Carbon Monoxide Poisoning. Medical Grand Rounds, 1977.

7. Jackson DL: COMA-Differential diagnosis and neurologic examination of the comatose patient. Therapeutics Conference 1977.

8. Jackson DL: Apoplexy through the ages: from Hippocrates to the CAT scan. Medical Grand Rounds, 1977.

9. Jackson DL: Cardiac arrest and its neurological complications. Medicine, May 1977.

10. Jackson DL: Approach to the comatose patient. Medicine, 1977, Department of Medicine, May 1977.

11. Jackson DL: Subdural hematomas. Medical Grand Rounds, 1977.

**Dr Jackson has made multiple presentations to the Johns Hopkins University School of Medicine Geriatric Research Conference from 1996 to the present, as well as many presentations to other regional health care professional conferences on topics including medical ethics and quality of care in geriatric medicine and the ethical and policy implications of reform in the health care system.**

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Louise Bailey, Individually and on Behalf of All Similarly Situated Medicare Part B beneficiaries | Mutual of Omaha Insurance Co., Michael O. Leavitt, Secretary, and Leslie V. Norwalk |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF (EXCEPT IN U.S. PLAINTIFF CASES) | Salt Lake | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT (IN U.S. PLAINTIFF CASES ONLY) |
|---|---|---|
| | | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Thomas C. Fox<br>Reed Smith LLP<br>1301 K Street NW - Suite 1100, East Tower<br>Washington, DC 20005<br>202.414.9200 | |

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ◉ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ **A.** *Antitrust* | ○ **B.** *Personal Injury/ Malpractice* | ○ **C.** *Administrative Agency Review* | ○ **D.** *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ◉ **E.** *General Civil (Other)* | **OR** | ○ **F.** *Pro Se General Civil* |
|---|---|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

<table>
<tr><td>

○ **G. Habeas Corpus/ 2255**

☐ 530 Habeas Corpus-General
☐ 510 Motion/Vacate Sentence

</td><td>

○ **H. Employment Discrimination**

☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)

*(If pro se, select this deck)*

</td><td>

○ **I. FOIA/PRIVACY ACT**

☐ 895 Freedom of Information Act
☐ 890 Other Statutory Actions (if Privacy Act)

*(If pro se, select this deck)*

</td><td>

○ **J. Student Loan**

☐ 152 Recovery of Defaulted Student Loans (excluding veterans)

</td></tr>
</table>

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI.  CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Action for declaratory, injunctive, and other relief under the Medicare Act, 42 U.S.C. §§ 1395 et seq.; Due Process Clause of the Fifth Amend., US Const.

**VII. REQUESTED IN COMPLAINT**   ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $** [ _____ ] Check YES only if demanded in complaint   **JURY DEMAND:** YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☒ NO ☐   If yes, please complete related case form.

DATE  12/15/06     SIGNATURE OF ATTORNEY OF RECORD   *Thomas C. Fox*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.       COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.      CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.      CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

CLERK'S OFFICE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CO-932
Rev. 4/96

## NOTICE OF DESIGNATION OF RELATED CIVIL CASES PENDING
IN THIS OR ANY OTHER UNITED STATES COURT

Civil Action No. _____
(To be supplied by the Clerk)

**NOTICE TO PARTIES:**

Pursuant to Rule 405(b)(2), you are required to prepare and submit this form at the time of filing any civil action which is related to any pending cases or which involves the same parties and relates to the same subject matter of any dismissed related cases. This form must be prepared in sufficient quantity to provide one copy for the Clerk's records, one copy for the Judge to whom the cases is assigned and one copy for each defendant, so that you must prepare 3 copies for a one defendant case, 4 copies for a two defendant case, etc.

**NOTICE TO DEFENDANT:**

Rule 405(b)(2) of this Court requires that you serve upon the plaintiff and file with your first responsive pleading or motion any objection you have to the related case designation.

**NOTICE TO ALL COUNSEL**

Rule 405(b)(3) of this Court requires that as soon as an attorney for a party becomes aware of the existence of a related case or cases, such attorney shall immediately notify, in writing, the Judges on whose calendars the cases appear and shall serve such notice on counsel for all other parties.

_____

The plaintiff, defendant or counsel must complete the following:

I.    RELATIONSHIP OF NEW CASE TO PENDING RELATED CASE(S).

A new case is deemed related to a case pending in this or another U.S. Court if the new case: [Check appropriate box(e's) below.]

| | | |
|---|---|---|
| ☐ | (a) | relates to common property |
| ☐ | (b) | involves common issues of fact |
| ☐ | (c) | grows out of the same event or transaction |
| ☐ | (d) | involves the validity or infringement of the same patent |
| ☐ | (e) | is filed by the same pro se litigant |

2.    RELATIONSHIP OF NEW CASE TO DISMISSED RELATED CASE(ES)

A new case is deemed related to a case dismissed, with or without prejudice, in this or any other U.S. Court, if the new case involves the <u>same</u> parties and <u>same</u> subject matter.

Check box if new case is related to a dismissed case:  ☒

3.    NAME THE UNITED STATES COURT IN WHICH THE RELATED CASE IS FILED (IF OTHER THAN THIS COURT):

**Department of Health and Human Services Departmental Appeals Board, Civil Remedies Division**

4.    CAPTION AND CASE NUMBER OF RELATED CASE(E'S).  IF MORE ROOM IS NEED PLEASE USE OTHER SIDE.

**Louise Bailey**                               v.    **Mutual of Omaha Insurance Company**         C.A. No.  **C-06-349**

**12/15/06**                        *Thomas C. Fox*
DATE                               Signature of Plaintiff /Defendant (or counsel)

# EXHIBIT 2

From:        Jacqueline Gordon
To:          CHICAGO.CHI1(JCampbell)
Date:        Thu, Jan 7, 1999 10:37 AM
Subject:     Blood Glucose Tests -Reply

I'll be available on Friday.  Is it 2:00 p.m. my time.  I'm still trying to find out if there is any Part B coverage issues.- Also, Part A and Part B are apples and oranges.  Part A is a global benefit which pays for routine and ancillary services.  There is no nursing benefit under Part B.  Part B can only pay for services where there is a specific benefit.  I'm trying to find out if there is any prohibitions on paying for these services under Part B.  If there are no prohibitions and the patients are in a certified portion of the nursing home and they only have Part B, then we will have to pay the provider for the services through the cost report.

Campbell
DEPOSITION
EXHIBIT
2

# EXHIBIT 3

From: Jacqueline Gordon
To: CHICAGO.CHI1(JCampbell)
Date: Fri, Jan 8, 1999  8:43 AM
Subject: Phone number -Reply

For today I'll just listen in on the call.  After the call I'll let my supervisors know about the issue and they can decide who needs to be involved in Central Office.  If you truly believe that some other payer either private, Medicaid or other has made payment for the services, you will be facing Medicare secondary payer issues.  In that case Medicare will in many cases be the primary payer and you will still need to follow all Part B Medicare rules and get money back from the other payers when Medicare is primary.  That could be really messy.  I have found that this is a covered Medicare service under Part B.  But, in some cases it is covered as a test under Clinical lab test, in some cases it can be covered under diabetic benefit, if covered as a home monitor then it is considered as DME, we would need to check if it is DME then it can't be covered because it is a nursing home.



DEPOSITION
EXHIBIT
9

# EXHIBIT 4

Deposition
Exh. No. 3    Date 3/13/02
Lori Mackenzie    Salomon Reporting

Blood Glucose Monitoring In Nursing Homes Workgroup
Meeting Report from January 26, 1999

Central Office: Jackie Gordon, Laurie Feinberg, Pat Williams, Anita Greenberg, Sharon Hippler, and Joyce Eng
Regional Offices: Seattle, Denver, Chicago, Philadelphia
Intermediaries: Administar, Maryland Blue Cross, Medicare Part A Washington, Veritus, Blue Cross and Blue Shield of Minnesota, UGS

## BACKGROUND

We have learned that there is a consultant, Jim Giger, Systematic Management Systems, going around the country telling SNFs that they may bill for the CLIA waived blood glucose monitoring test for Part B patients who have run out of Part A . Some SNFs would like to bill for claims as far back as 1992. These patients are in either the certified or non-certified portion of the nursing home. Under Mr. Giger's agreement with the SNFs, he will receive 40 percent of the SNF's recovered reimbursement for the tests. Billing for these services has now been raised as a result of the SNF's being eligible for CLIA waiver for these tests.

Instructions in Section 541 of the Skilled Nursing Facility Manual and other manuals state that for patients in a Part A stay, payment prior to SNF PPS is made through the cost report. The Part A patient is not an area of concern. The instructions state that for a patient that has run out of Part A (payment will be made under Part B) and the patient is in the certified portion of the nursing home, payment is made through the cost report. For the Part B patient who is in the non-certified portion of the nursing home, payment is made on a fee schedule basis.

## DISCUSSION

At this time only the four Regions identified above and their associated intermediaries have contacted Central Office asking for guidance. But, Mr. Giger and possibly another consultant have probably approached other regions. Maryland Blue Cross said that IHS has been submitting claims since October 1997. Manor Care and Genesis were other provider chains mentioned. For the other intermediaries it has been more recent.

During the meeting the intermediaries indicated that some of them have paid for the claims both through the cost report and on a fee schedule basis. The billing code for the Part B patient in a certified stay is 22x and for the non-certified 23x. Some intermediaries indicated that they were holding back making payment or denying payment pending decisions made by the regions and Central Office. Seattle indicated that they are holding back making decisions on 9,000 claims. The amount of claims at issue both paid and unpaid is in the tens of thousands. Some intermediaries claimed that for a given patient claims were $600 a month (3 tests a day for a month with a fee schedule payment of $5.00).

There was discussion regarding how we should pay for this service. Was this a lab test or was this DME? Some participants felt that we should consider it a lab test for both the Part B patients in

the certified and non-certified portions of the nursing home. For the patients in the non-certified portion we should pay based on the fee schedule and try to limit payment based on medical necessity criteria. Examples of denying for medical necessity would be: testing patient more than necessary especially if the patient is not insulin dependent; was this in the plan of care, and did the SNF have a CLIA waiver for the time period of the claims. One issue raised was when could the SNF actually start billing for this CLIA waived test. We thought it was not until 1994. Some participants also felt we should pay for the Part B patients in the certified portion off of the cost report. Some intermediaries had made payment for the tests throught the cost report but had placed these Part B costs in the routine cost center. Central Office did not think this was appropriate because we only make a routine and ancillary decision for Part A services. Some participants thought that we should not treat it as a lab test just because of the CLIA rules. They felt that we should just pay for the equipment and supplies which are the test strips and glucometer. These items are DME. There is a fee schedule for these DME supplies and equipment. However, for the most part, the Part B patient would not be considered to be residing in the home. Accordingly there would be no payment made for this if we classified the services as DME because there is no Part B coverage for DME in the SNF.

It was also reported that some SNFs are moving patients when Part A is exhausted to the non-certified portion of the SNF to get fee schedule payment.

## ISSUES

o     This is a nationwide issue.

o     Is this a lab test or DME? If we do not consider this a lab test, are we treating this lab test differently than the other CLIA waived lab tests? Is the nature of this test different and should be treated differently because it is a home monitor test. Therefore, we should not be paying for nursing services associated with the monitor.

o     When could the SNFs start billing for CLIA waived tests.

o     Mr. Giger is telling SNFs that they can request payment back to 1992 because the intermediaries gave them incorrect information by not informing them that they could bill for these services. There may be resubmission of claims issues. Also, if we decide not to pay, then we will have over payment issues for the intermediaries who have paid.

o     What is the proper cost reporting treatment of these services. We do not believe these costs should be in routine.

o     Medical necessity issues including issues raised above. How many claims get pulled for record request? One intermediary said 100%.

o     Special rules for insulin dependent patients.

o     It was mentioned that the Florida Shared System was making payment for these services.

Is it being paid for properly?

o        Beneficiaries may be liable for high Part B copayments.

o        Are there Medicare secondary payor issues if Medicaid has paid for these services as routine services?

o        Is there a fraud and abuse issue if the SNFs are moving the patients to the non-certified portion to get the fee schedule payment?

# EXHIBIT 5

From:        Grant Bagley
To:          BALT2.CO2(JGordon2, TGustafson, THoyer), BALT3.CO3...
Date:        1/28/99 3:18pm
Subject:     Blood Glucose Monitoring In Nursing Homes -Reply -Reply

I think it depends on whats going on.  If the SNF staff is using the patients glucose monitor to test and then billing as a lab test, sounds like fraud.  If the SNF is using the SNF's monitor to test everyone then it would be ok to bill as a lab test but the question would be whether or not the test is medically necessary.  Since self testing of blood glucose is the standard practice, thrice daily testing by a lab is not standard and would most likely be not medically necessary.  The question would arise as to why the glucose monitor (DME) was not supplied by the SNF.

>>> Jean Harris 01/28/99 03:33pm >>>
My reaction is to call it DME and say we won't pay for it.  However, it looks as though so far you've been talking to people who are familiar with FI issues, policies and processes.  It may be well to get some DME experience from some ROs and perhaps even some DMERCs.

CC:          BALT2.CO2(AGreenberg, JEng, LFeinberg, LWilson, SH...

Hoyer                    Deposition
Exh. No. 4        Date 3-15-02
Oneeka Hill      Salomon Reporting

# EXHIBIT 6

From:        Thomas Hoyer
To:          BALT2.CO2(GBagley, JGordon2, TGustafson), BALT3.CO...
Date:        1/29/99 10:06am
Subject:     Blood Glucose Monitoring In Nursing Homes -Reply -Reply

Unfortunately, in the Part B only setting, if it is a covered test and CLIA waivered then we may have no choice but to pay.  I hope someone comes up with a better idea, but . . . .

>>> Jean Harris 01/28/99 03:33pm >>>
My reaction is to call it DME and say we won't pay for it.  However, it looks as though so far you've been talking to people who are familiar with FI issues, policies and processes.  It may be well to get some DME experience from some ROs and perhaps even some DMERCs.

CC:          BALT2.CO2(AGreenberg, JEng, LFeinberg, LWilson, SH...

---

Hoyer _____ Deposition
Exh. No. __1__ Date 3·15·02·
Oneeka Hill   Salomon Reporting

# EXHIBIT 7

From:       Jacqueline Gordon
To:          CHICAGO.CHI1.JCampbell, DALLAS.DAL1.JSigmund, SAN
FRANCISCO.SFO1.MGeideman
Date:       Thu, Mar 25, 1999  9:41 AM
Subject:   Blood Glucose  Monitoring

Tom Hoyer had asked me to try to get some estimate of the magnitude of claims for these services that
were being billed by SNFs for patients who had run out of Part A or never were on Part A (Part B billings).
I had been in contact with John Campbell and Jimmy Sigmund.   I had seen Margaret's name on an old
E-Mail so I thought I might ask Margaret if she has some information on this.  Please give me your
feedback.  Thank you.

# EXHIBIT 8

From:          John Campbell
To:            DENVER.DEN1(RStrub)
Date:          Wed, Apr 7, 1999  7:36 AM
Subject:       Blood Glucose Monitoring in SNF -Reply

Here's what I know about the current status on this issue:

As you can see, CO has kept us on the dark about what is going on right now.  I check every so often with CO, but this seems to be on a slow moving track as it touches little bits and pieces of many positions and divisions.  Too many sign-offs probably for anything quick.  The delay, I hope, is positive as there would not be this need for discussion if we were just going to continue what is already written.  I hope they eliminate this test in a nursing facility setting...SNF and NF.

# EXHIBIT 9

From:       Jacqueline Gordon
To:         THoyer
Date:       3/15/99 2:58pm
Subject:    Blood Glucose Monitoring Issues Paper

Tom, here is a draft issues paper.  Let me know any suggestions
you have.  I believe I covered all of the issues that have been
discussed through the E-Mails and the meetings.  I'm not sure if
this is the format you wanted.

Hoyer            Deposition
Exh. No. 5    Date 3·11·02
Oneeka Hill    Salomon Reporting

Issues Paper

SUBJECT:   Coverage, Payment and Billing For Blood Glucose Monitoring Tests Provided to
Skilled Nursing Facilities (SNF) Patients Who Have Run Out of Part A and Are Eligible
For Payment For Services Under Part B. These Patients May Be in Either the Certified or
Non-Certified Portions of the SNF

Issues

1)      Should HCFA cover and pay the SNFs for the blood glucose monitoring test?

Option 1:      HCFA will cover and pay for blood glucose monitoring test. HCFA bases
decision on: HCFA pays under Part B for laboratory tests furnished to
beneficiaries not in a Part A covered stay in a SNF; the blood glucose monitoring
test is determined to be a laboratory test and the blood glucose monitoring test is
on the lab fee schedule.

Option 2:      Do not cover or reimburse based on a Part B coverage or other policy in
regulations or statute which supports the following statements. We have
determined that just because the blood glucose monitoring test was assigned a
code as a CLIA waived test does not mean that these tests are payable under
Medicare. Home glucose monitoring is a self performed service and as such we
expect that the nursing home will assist or perform this self care as a part their
basic service. It does not represent a billable lab test nor is it a skilled service.

Recommendation:

2)      There are other policy directives that may set precedents which will conflict with not
covering or paying. Blood glucose monitoring of diabetics is a politically charged issue.
There are many diabetes advocates in Congress. There is a recent provision in the BBA to
add a Medicare benefit for home blood glucose monitoring and diabetes education. There
is a CPT code in the laboratory fee schedule for use of home monitoring of blood glucose
by a machine that is approved for home use. There is a Program Memorandum that states
that this CPT code for use of home monitoring of blood glucose is separately billable
under Medicare when performed in a physician's office.

Option 1:      Do not cover and pay based on regulatory or statutory basis even though
there are other precedents.

Option 2:      Do not cover and pay even if there is no regulatory or statutory policy
basis and even though there are other precedents.

Option 3:      Cover and pay because there are other precedents.

Recommendation:

3)    HCFA decides to cover and pay. Can we still limit coverage or payment?

Option 1:    Limit the exposure period for back billing by the statutory limitation on filing Part B claims which Jackie Sheridan cited as being limited to 27 months.

Option 2:    Limit exposure by using the "no legal obligation to pay" exclusion in the law if the nursing homes have not made separate billings for this service to the beneficiaries. If this is true we may be able to argue that since the beneficiary was not obligated to pay, Medicare payment is excluded .( Jackie  Sheridan also made this suggestion.)

Option 3:    Cover based on special rules for insulin dependent patients.

Option 4:    Other medical necessity review issues that could limit coverage. Determine percentage of claims that get pulled for review.

Recommendation: _____  _____

4)    HCFA decides to cover and pay. What instructions doesHCFA give to the intermediaries?

Option 1:    Follow instructions in Section 541 of the Skilled Nursing Facility Manual provides instructions for payment of laboratory services in a SNF. The instructions provide that for Part B patients residing in the certified portion of the nursing home, payment is based on reasonable cost and is paid by the intermediary through the Medicare cost report. Place the costs in the laboratory cost center of the Medicare cost report. On the other hand, for Part B patients residing in the non-certified portion of the nursing home, payment for certain laboratory services are made by the intermediary based on the lab fee schedule.

Option 2:    New payment methodology.

Recommendation:

5)    HCFA decides to cover and pay. This is a nationwide issue with intermediaries throughout the country either paying or not paying for the services. Many have held back in making payments and if we decide to pay may have to pay interest. Many intermediaries have paid for the services but applied Part A policies to these Part B services.

Option 1:    Issue clarifying instructions on how the intermediaries should cover and pay for the services. If we decide to cover and reimburse, instructions will include payment of interest if applicable. These instructions will also discuss requirements for payment of old claims for CLIA waived tests. Intermediaries will  correct any

errors they may have made in making payments. Intermediaries will pay according to clarifying instructions.

Option 2:    Same as Option 1, except we will not cover or pay retrospectively.   Pay on a prospective basis. Intermediaries who previously paid for services will collect overpayments.

Option 3:    Issue clarifying instructions which discuss not covering or paying for services.  Intermediaries will collect overpayments if they paid for services.

Recommendation:

6)    If we cover and pay  what is the proper laboratory fee schedule payment?

~~Option 1:    Use code 82962 which many have cited as being the proper code for payment.~~

Option 2:    Use another code.

Recommendation

7)    If we cover and pay  what is the proper billing codes for the certified and non-certified Part B patients?  For services furnished on or after July 1, 1998, both  Part B patient in the certified and the non-certified portions of the SNF are paid on basis of the laboratory fee schedule.

Option 1:    Billing code 22x for the certified Part B patients.  Billing code 23x for the non-certified Part B patients.

Option 2:    Other billing codes.

Recommendation:

8)    Consultants are continuing to  go around the country telling SNFs that they may bill for the CLIA waived blood glucose monitoring test for Part B patients who have run out of Part A . Some SNFs would like to bill for claims as far back as 1992.  These patients are in either the certified or non-certified portion of the mursing home. If we decide that we will pay for these services, when could the SNFs start billing for CLIA waived tests. Will all providers need to prove that they had a CLIA waiver.

Option 1: .    SNFs can bill for services as far back as September 1, 1992, based on instructions from HCFA.  These instructions stated that under CLIA provisions, effective September 1, 1992 you musthave a CLIA certificate in order to legally perform laboratory testing.  Therefore, in order to claim payment for prior services, the SNF must have had a CLIA certificate for the corresponding billing

date.

Option 2:    Permit the providers payment even if they did not have CLIA certificate for the corresponding billing date.

Option 3:    Do not permit payment for old CLIA waived tests.

Recommendation:    _____

9)    How has the Florida Shared System been making payment for these services?

Option 1:    They have not been making payments in accordance with the clarifying memorandum that we will issue. Therefore, we will ask to correct errors. Florida Shared System will make payments based on the clarifying instructions.

Option 2:    Florida Shared System will not correct errors of past payments but, for current claims will make payments based on clarifying instructions.

Option 3:    Florida Shared System had made payments based on our clarifying instructions and will continue to do so.

Recommendation:    _____

13)    Beneficiaries may be liable for high Part B copayments if we determine that we will cover and pay for these services.

Option 1:    We cover and pay for services so beneficiaries will be liable for Part B copayments.

Option 2:    We do not cover and pay for services so beneficiaries will not be liable for Part B copayments.

Option 3:    We do cover and pay for services but we do not require beneficiaries to pay Part B copayments.

Recommendation:    _____

14)    Are these fraud and abuse issues? SNFs are moving patients to the non-certified portion of the SNF to get the fee schedule payment rather than the SNF PPS payment. If we do not cover and pay for these services and we find that certified nursing homes are not performing appropriate monitoring .

Option 1:    We determine that these SNF practices are appropriate and we cannot control

through certification.

Option 2:    Refer to State Agency for investigation for providing inadequate care.

Recommendation:

# EXHIBIT 10

with Part A exhausted and in certified beds (bill type 22x) are to be paid on a reasonable cost basis, per claim, with adjustments possible at cost report settlement time.

The part which most recently concerned me was the deductible/coinsurance issue. I finally confirmed that deductible/coinsurance does apply to these claims. But I don't like it!

At cost report settlement time, there is every likelihood that money will be due back the program on the blood glucose tests. I doubt the benes will get at that time the benefit of any related reduction in his/her coinsurance, which was based on the submitted charges (vs. allowed amount).

Thanks for your help and interest in this. Premera BC will be releasing a revised bulletin to its SNFs and processing the 22x claims via APASS as currently set up.

I do believe, however, that there remain policy questions/concerns within CO & the ROs on the SNF lab test billing issue--esp this one.

Regards.

cc/FYI: CRobl, JGordon, JCAMPBELL----Hi. I'd prefer you not send cc an FI on this. Thanks.


4.  **From:**    John Campbell
    **To:**      BALT1.CO1(ARinggold), SEATTLE.SEA1(AHardy)
    **Date:**    4/16/99 2:28pm
    **Subject:** No cc intended - REPLY

I certainly won't send a "cc" of this material until I get something from the CO folks who are working on this. I don't like the release of 22X bills by one systems maintainer/set of FIs when others are holding these bills until a definitive policy statement is released. We really don't see where inpatient institutional patients should have to pay coinsurance at all for a test incorporated into routine nursing. I think this sends a mixed message to the SNF and hospital providers depending on the Region. Oh well.

NB to CO: We're still waiting. Is a decision near? Where's it at?


5.  **From:**    Jacqueline Gordon
    **To:**      CHICAGO.CHI1(JCAMPBELL)
    **Date:**    4/20/99 8:57am
    **Subject:** No cc intended - REPLY -Reply

Several months ago we had a telephone conference with several regions and intermediaries. At that point, we thought that we would have an easy answer to what the policy is. However, since we have not had agreement in HCFA Central Office on this, Tom Hoyer had said that FIs can pay the bills. However, according to Jackie Sheridan, there is no national coverage policy for this. Therefore, intermediaries and carriers have discretion over covering or not covering and then paying.

# EXHIBIT 11

From:      Thomas Hoyer
To:        BALT2.CO2(JGordon2), CHICAGO.CHI1(JCampbell)
Date:      5/11/99 12:10pm
Subject:   What gives? -Reply

The story is that we didn't find an "easy" answer to the issue and so we did not ask people to hold claims pending the development of a national policy. We're continuing to consider the issue and if we are able to give additional advice in the future, we will do so -- with no prejudice to past actions.

>>> John Campbell 05/11/99 11:47am >>>
I just got a call from a Emily Kyle of Systematic management Systems, Inc in Arizona regarding our favorite blood glucose monitoring tests in a SNF issue. She is affiliated with Mr. Jim Geiger who is the consultant that is going around the country telling SNFs to bill for this.

Emily stated that she talked with you two last Friday and was told that a decision on this issue was still pending. She was led to believe that the discussion was alive and well and that no actions or decisions should be made pending such decision. However, I previously had received this e-mail note on April 20:

"Several months ago we had a telephone conference with several regions and intermediaries. At that point, we thought that we would have an easy answer to what the policy is. However, since we have not had agreement in HCFA Central Office on this, Tom Hoyer had said that FIs can pay the bills. However, according to Jackie Sheridan there is no national coverage policy for this. Therefore, intermediaries and carriers have discretion over covering or not covering and then paying."

That message, to me, said that there is no policy and there will be no policy and that FIs and carriers are free to use their Medical Director's discretion on coverage and payment. Accordingly, I advised the FIs that were holding huge (as in thousands) numbers of claims to either pay, deny or reject. Now that Minnesota has begun to do that, this consultant is going ballistic. Minnesota is rejecting the claims as not billable in an institutional setting.

Just what is the story? Is something, in fact, going to be decided on a national level, or is it up to each FI and carrier to decide? Please let us know. Thank you.

CC:        CHICAGO.CHI1(DPerteet),

Hoyer
Deposition
Exh. No. 6    Date 3-15-02
Oneeka Hill    Salomon Reporting

# EXHIBIT 12

From:        Thomas Hoyer
To:          BALT3.CO3.RStreimer, TGustafson, HCFA.HHS_Gateway....
Date:        6/2/99 2:19pm
Subject:     Blood Glucose Monitoring -- Non-Medicare SNF and NF
Stays

This is a conundrum that needs some work to solve.   I have
attached two items.  First is a fact sheet which lays out the
statutory authorities and other relevant facts related to the
issue.   Second is a proposed policy drafted by a group of people
including Jackie Gordon and Anita Greenberg

On the one hand, it appears to me that our history and our rules
seem to militate in favor of paying for this service under the
fee schedule (especially after BBA SNF bundling is implemented,
since this requires fee schedule payments).

On the other hand, it seems preposterous to pay piecemeal for
tests so frequently done in institutional settings with equipment
designed for use in the home by the patient him or herself.

The proposed policy would decline to provide coverage.  But the
proposed regulation on laboratory services that is now being
negotiated by Grand Bagley's shop contains criteria that seem
surely to lead to payment (see Jackie Sheridan's draft in the
Fact Sheet).

Right now contractors are denying tests on the basis of medical
necessity in some cases, in other cases insisting on cost billing
by the SNFs and making other sorts of local medical revew
decisions.

Robert and Tom and Leila -- could I have your reactions to this
stuff?  I'll undertake to convene a meeting once i get the
responses and see where we seem to need to go.

Thanks.

CC:        JGordon2, AGreenberg, JSheridan, JFlaherty

Gordon          Deposition
Exh. No. 13   Date 3/13/02
Lori Mackenzie   Salomon Reporting

FACT SHEET FOR BLOOD GLUCOSE MONITORING TEST IN SNFS FOR PART B PATIENTS

1)   The blood glucose monitoring test is a Clinical Laboratory Improvement Act (CLIA) waived test. Therefore, providers may perform and receive payment for these waived tests if they applied and paid for a CLIA waiver certificate even though they are not registered as a clinical laboratory.

2)   There is a CPT code and a price in the laboratory fee schedule for blood glucose monitoring. The CPT code in the laboratory fee schedule for blood glucose monitoring- "Glucose, monitoring device(s) cleared by the FDA specifically for home use". The national limitation amount for the code 82962 on the 1999 fee schedule is $4.37, though individual states may have lower amounts.

3)   Circumstances for billing (present). Coverage.

We do not have a national coverage policy for blood glucose monitoring in SNFs. Therefore, HCFA recommends for Part B services that will be paid under the fee schedule, local medical review policy should determine if services are reasonable and necessary and payment is warranted for this test under the Medicare Part B fee schedule.

For Part B services to be paid through the cost report, we do not have a national coverage policy for blood glucose monitoring in SNFs. Therefore, HCFA recommends that it is up to each intermediary to make individual determinations regarding coverage and payment.

4)   Provisions of the Balanced Budget Act of 1997 regarding skilled nursing facility prospective payment system provides changes under consolidated billing for provision of and payment of these Part B services.

   A)   Pre-PPS-Both Part A and Part B blood glucose monitoring services would be paid through the cost report. Part A services were treated as routine services and included in the per diem. Part B service provided to patients in the certified portion of the nursing home were paid on a reasonable cost basis and included in the laboratory cost center. The exception is for Part B patients in a non-certified portion of the nursing home, their services would be paid by the intermediary based on the fee schedule.

   B)   Post-PPS-Blood glucose monitoring tests provided to patients in a Part A stay are included in the SNF PPS per diem payment. Until we have consolidated billing for Part B patients, the instructions described above for Part B payment would continue. When Consolidated Billing for Part B services is implemented, along with requiring the SNF to bill for the

services, both Part B services in the certified and non-certified portion of the SNF will be paid by the intermediary on a fee schedule basis.

5)    Filing Limits

Regulations at 42 CFR 424.44 Time Limits for FilingClaims provide Basic Limits. Except as provided in the reasons for extension, the claims must be mailed or delivered to the intermediary or carrier, as appropriate-1) on or before December 31 of the second of the following year for services that were furnished during the first 9 months of a calendar year; and 2) on or before December 31 of the second following year for services that were furnished during the last 3 months of the calendar year.

b)    Extension of filing time because of error or misinterpretation.  (1) The time for filing a claim will be extended if failure to meet the deadline in the above was caused by error or misrepresentation of an employee, intermediary, carrier, or agent of the Department that was performing Medicare functions and acting within the scope of its authority.  (2) The time will be extended through the last day of the 6th calendar month following the month in which the error or misrepresentation is corrected.

(Tom, this would be a good way of cutting down on the old claims.  However, the consultant is already prepared to say that the intermediaries told the providers that they could not file claims.  We could argue that there was no national coverage policy and therefore it was intermediary discretion)

6)    Coinsurance

If we determine that we are going to permit the SNFs to bill us for these services and we will cover and pay for the services,  Medicare will only pay for 80 percent. Will the beneficiary be responsible for the other 20 percent as a coinsurance payment for the old claims?  Based on the following response to 7) it would appear that for the old claims there would be no coinsurance because we may not cover if the beneficiary was never billed.  For the new claims, if the provider bills the beneficiary for the services then there would be a coinsurance.

7)    Obligation to Pay

There is no coverage of services if the beneficiary has no obligation to pay, i.e., the beneficiary has not been billed for these services.  Section 1862(a) of the Social Security Act, Exclusions From Coverage and Medicare Secondary Payer,  states, Notwithstanding, any other provision of this title, no payment may be made under

Part A or part B for any expenses incurred for items or services- for which the individual furnished such items or services has no legal obligation to pay, and which no other person (by such reason of such individual's membership in a prepayment plan or otherwise) has a legal obligation to provide or pay for, except in the case of Federally qualified health center services; ru

ISSUES

1)    Coverage Rule-At this point the coverage rule gives us a lot of latitude because there is no national coverage policy and it is up to the intermediaries to make their own determinations.  However, HCFA is currently working on developing a policy.  I would recommend that we not withdrawal the current policy. Intermediaries should apply own local policies and in the future use the new rule.

The following is a small portion of the proposed rule sent to me by Jackie Sheridan.

DOCUMENTATION REQUIREMENTS:

RECOMMENDED MEDICARE NATIONAL COVERAGE POLICY FOR BLOOD GLUCOSE TESTING

POLICY NUMBER:

DESCRIPTION:

This policy is intended to apply to blood samples used to determine glucose levels.

Blood glucose determination may be done using whole blood, serum or plasma.  It may be sampled by capillary puncture, as in the fingerstick method, or by vein puncture or arterial sampling.  The method for assay may be by color comparison of an indicator stick, by meter assay of whole blood or a filtrate of whole blood, using a device approved for home monitoring, or by using a laboratory assay system using serum or plasma. The convenience of the meter or stick color method allows a patient to have access to blood glucose values in less than a minute or so and has become a standard of care for control of blood glucose, even in the inpatient setting.

HCPCS CODES (Alpha numeric, CPT © AMA):

| Code: | Descriptor: |
|---|---|
| 82947 | Glucose; quantitative |

82948          Glucose; blood, reagent strip
82962          Glucose, blood by glucose monitoring device(s) cleared
by the FDA specifically for          home use.

## INDICATIONS:

Blood glucose values are often necessary for the management of
patients with diabetes mellitus, where hyperglycemia and hypoglycemia
are often present.  They are also critical in the determination of control of
blood glucose levels in the patient with impaired fasting glucose (FPG
110-125 mg/dL), the patient with insulin resistance syndrome and/or
carbohydrate intolerance (excessive rise in glucose following ingestion of
glucose or glucose sources of food), in the patient with a hypoglycemia
disorder such as nesidioblastosis or insulinoma, and in patients with a
catabolic or malnutrition state.  In addition to those conditions already
listed, patients with tuberculosis, unexplained chronic or recurrent
infections, alcoholism, coronary artery disease (especially in women),
unexplained skin conditions (including pruritis, local skin infections,
ulceration and gangrene without an established cause) should be
evaluated.  Many medical conditions may be a consequence of a
sustained elevated or depressed glucose level.  These include comas,
seizures or epilepsy, confusion, hunger, abnormal weight loss or gain,
and loss of sensation.  Evaluation of glucose may also be indicated in
patients on medications known to affect carbohydrate metabolism.

## LIMITATIONS:

Frequent home blood glucose testing by diabetic patients should be
encouraged.  In stable, non-hospitalized patients who are unable or
unwilling to do home monitoring, it may be reasonable and necessary to
measure quantitative blood glucose up to four times annually.

Depending upon the age of the patient, type of diabetes, degree of
control, complications of diabetes, and other co-morbid conditions, more
frequent testing than four times annually may be reasonable and
necessary.

In some patients presenting with nonspecific signs, symptoms, or
diseases not normally associated with disturbances in glucose
metabolism, a single blood glucose test may be appropriate.  Repeat
testing may not be indicated unless abnormal results are found or unless
there is a change in clinical condition.  If repeat testing is performed, a
specific diagnosis code (e.g., diabetes) should be reported to support
medical necessity.  However, repeat testing may be indicated where
results are normal in patients with conditions where there is a confirmed

testing performed will result in denial of claims.

Tests that require an FDA approval or clearance will be denied as not reasonable and necessary if FDA approval or clearance has not been obtained, except for those having a Category B Investigational Device Exemption (IDE).  Coverage of Category B IDE devices is left to contractor discretion.   (See Federal Register, volume 60, number 181, BPD-841-FC, addendum.)


DOCUMENTATION REQUIREMENTS:

The ordering physician must include evidence in the patient's clinical record that an evaluation of history and physical preceded the ordering of glucose testing and that manifestations of abnormal glucose levels were present to warrant the testing.

2)  The new rule would also include new price codes.

Blood Glucose Testing

Section 1833(h) of the Social Security Act requires the application of fee schedules to the payment for clinical diagnostic laboratory tests under Part B of the Medicare program. Clinical diagnostic laboratory tests performed by a participating nursing facility for its outpatients, nonpatients, or patients who are eligible for Part B benefits only, are paid under the clinical diagnostic laboratory fee schedule in order to reimburse the facility for rendering laboratory services to Medicare patients.

In addition, Clinical Laboratory Improvement Amendments (CLIA) waived test for Medicare purposes must meet the requirements of sectin 1862(a)(1)(A) of the Social Security Act which is the cornerstone of medical necessity requirements. This section prohibits payment for any item or service that is not reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member. Diagnostic tests (unless specifically otherwise provided for by law), are covered only when they are required because of a specific patient complaint, symptom, or diagnosis.

Descriptions of the performance of blood glucose testing in the nursing facility indicate that the testing is not always performed for diagnostic purposes. The testing is performed for the diagnosis and monitoring of the diabetic patient. The nursing facility may have one test strip monitor for which the nurses test all patients (or a monitor per nurses station, or a monitor per floor), and it is used for multiple patients at the bedside throughout the patients' stays. The glucose test is often not performed for diagnosis, rather for monitoring or maintenance without separate laboratory services.

Regardless of the test instrument or code submitted for payment, the clinical laboratory fee schedule does not support payment for non-diagnostic glucose testing. A description of the CPT code 82962, the most common code for this service in the nursing facility, describes the method when whole blood is obtained (usually by finger stick device) and assayed by glucose oxidase, hexokinase, or electrochemical methods and spectrophotometry using a small portable device designed for home blood glucose monitoring use.

Establishment of an alpha-numeric HCPCS code does not imply that there is coverage or payment by Medicare under Medicare law or regulations. These are general generic categories of products that are used by different payers for different reasons including claims processing and the various insurers have established coverage and payment policies to cover or not cover or to pay or not pay that do apply to the code. Codes may also be established for non-payment of services. In this case for Medicare purposes we believe that a CLIA waived test must be for diagnostic purposes as required under 1862(a)(1)(A).

Medicare will cover a CLIA waived blood glucose test for diagnostic purposes. However, once the diagnosis has been made Medicare will no longer cover this test for the Medicare beneficiary and claims should not be submitted for payment. We would support denial of claims of this sort of practice by nursing facilities and we recommend that contractor newsletters notify providers.

# EXHIBIT 13

From:       Thomas Hoyer
To:         TGustafson@BALT5.CO5, , PPatel@BALT5.CO5,
Date:       Fri, Aug 11, 2000 9:45 am
Subject:    HHA billing for Lab Claims -Reply -Reply

Answers, as best I can put them together, below.   The bottom line at this point is that, after many months of wondering how it can avoid making payment for these claims -- and simultaneously avoiding confronting the issue of current billing and payment conventions -- we've reached the point of deciding we'd fix the future (with a specific small pmt. amt. for the test) and pay the past.   The desire of OCSQ and PIG to avoid paying for the past is what held us up.   I'm sorry that P2 is holding the bag here.  I'd be glad to discuss this ad nauseum if you want.

>>> Parashar Patel 08/10 6:22 pm >>>
Tom H.,

Thanks for the talking points.....they will be useful in the response that CCP sends to Geiger, et al.  There are 3 issues that need follow-up.

1.  What/why are some contractors not reimbursing for glucose monitoring in SNFs.

When the issue came up, the contractors were doing differing things and were told by PIG to keep on doing what they had been doing.   In fact, in my view, the fact that we have delayed implementing consolidated billing for SNFs means that SNFs could be billing these services several ways for their Part B only patients:  (!) billing costs on the SNF bills -- this is a longstanding ability of providers which the manuals describe (although you might check with Jim Menas to see if the Clinical Lab Fee Schedule has primacy here as the sole payment methodology -- in which case Jim should have been fixing the manual to say that), (2) billing the charges as a supplier -- longstanding provider payment rules say that whether a provider bills these as costs or whether they can be provided on a charge basis (by someone else or by the SNF, if it has a supplier number) is governed by local practice as determined by the intermediary, or (3) a supplier provides and bills the services.

Under consolidated billing when implemented, the answer will be that the services are bundled for Part A patients (no additional pmt.) and bundled to the SNF under Part B but paid for in that context under the clinical lab fee schedule based on a bill from the SNF.

2.  What is the definition of inpatient w/ respect to SNF stays; before the Pt A benefit runs out and after it runs out.  There are some differences in various SNF manuals.  And why do we pay for lab tests for non-PPS stays on a cost basis for some beds but fee schedule for others?  Under SNF PPS, the person who is in an SNF is an inpatient, period.  However, because we didn't yet implement consolidated billing, the non-Part A patient is still fair game for the array of billing solutions described above.

3.  Why can't home health agencies bill for these lab claims.   This is the question that the talking points answer.  Providers can bill as suppliers for covered part B services.  As such, an HHA can submit a bill for such services.  Unfortunately, there is a standard systems edit that refuses to recognize a separate bill from an HHA for a lab service because someone sometime in the past decided that such bills would never be covered (a wrong decision).  Actually billing for lab tests is so limited, apparently, that no one noticed the systems glitch until Geiger made the complaint.  We currently have a bill type that an HHA can use so the only thing is for the systems change to be made.

As to why P2 should do this -- because in the end this whole hoo-rah is about how Medicare gets billed for lab tests when they are paid for under part B.  that's a P2 policy responsibility and the job of telling Chet's gang what needs to be done to implement the coverage and payment rules goes to the component that is responsible for the benefit.

Most of this has been known for as long as Mr. Geiger has been writing to us but the desire of PIG and Robert Streimer (OCSQ -- coverage) has been to find a way to avoid paying at all -- and hence no action was taken to explain how to bill and to clarify the issue with the intermediaries.

On the overall subject of the manuals -- they are out of date on some aspects and many of the analysts are not familiar enough with them to know how to fix them.  Hence the constant emergence of inconsistencies.

I didn't think that P2 would be responsible for making systems changes so that home health agencies can·submit the bills.....I thought this (as well as item #2 and maybe even #1) would be in CCP's.  We should discuss which Group should handle this.

>>> Thomas Hoyer 08/10 3:50 pm >>>
<WP Attachment Enclosed>

Hoyer _____ Deposition

Exh. No. _12_   Date 3·15-0

O·HH11

Lori Mackenzie      Salomon Reporting

# EXHIBIT 14

From:       Tzvi Hefter
To:         PPatel
Date:       Fri, Oct 13, 2000  2:46 pm
Subject:    Blood Glucose!

I spoke to Mike Meister and while it was truly a painful discussion, I came away with the following:  We can say in the PM that "for a Part B only stay in  a SNF for the blood glucose test 82962 where the carrier has determined that the test is reasonable and necessary, the payment in a certified bed is based on reasonable cost and the payment in a non-certified bed is based on the lab fee schedule amount."  This technically allows the carrier to make a determination that for some reason the test is not necessary and therefore not pay at all for the test.  (it does not allow them to determine that it is not in the scope of benefits as a lab test, since they cannot make that  determination. (He did allow that in the future HCFA may want to pursue looking into redefining the scope of benefits as to what is considered a lab test and exclude those tests that are now approved for home use!)  Tzvi

Hefter                    Deposition
Exh. No. 2        Date 3/14/02
Lori Mackenzie       Salomon Reporting

# EXHIBIT 15



*Blood Glucose*

*12/6/02 at RO meeting → next week to do*

"Susan Jesse"
<SJesse@cms.hhs.go
v>

11/04/2002 12:51 PM

To: "Jacquelyn Stanard" <JStanard@cms.hhs.gov>,
Carol.Richards@mutualofomaha.com
cc: "Darcy Jakopchek" <DJakopchek@cms.hhs.gov>, "Kathleen De Hart"
<KDeHart@cms.hhs.gov>, "Kathryn Nichols"
<KNichols@cms.hhs.gov>, "Rebecca Dillender"
<RDillender@cms.hhs.gov>
Subject: Fwd: Blood Glucose Testing NCD

I agree with the providers - I think lifting language from AB-00-108 and
AB-00-99 is inappropriate and is in conflict with the NCD. I believe all
items in red should be deleted. Those PMs were written 2 yrs ago - pending a
NCD.
From what I can tell the LMRP is word for word the same as the NCD (with the
exception of the items in red) so I don't see any real need for them to even
have one. If however, they do - it can not go beyond the NCD and some of the
red items do. Also they need to list AB-02-030 and AB-02-110 in the section
that addresses CMS policies.
I am forwarding all of this information to Becky Dillenger (our lab expert) to
see what her opinion of the situation is.

Susan Jesse Pennington
Nurse Consultant
Region VII  - Kansas City
Division of Health Plans and Providers

e-mail:  SJesse@CMS.HHS.GOV
phone: (816) 426-5783 ext.3420

----- Message from Carol.Richards@mutualofomaha.com on Mon, 28 Oct 2002 11:17:51 -0600 -----

To: KDehart@cms.hhs.gov, KNichols@cms.hhs.gov,
JStanard@cms.hhs.gov

Subject Blood Glucose Testing NCD
:

I have been reviewing Mutual's policies for Lab services and comparing them
to the NCD's that will be final and effective on November 25, 2002. I have
made corrections, additions, and deletions, to codes only, so there is no
conflicting information in all but one policy. The only policy that has
any addition information is the blood glucose testing. I am going to
resend this policy to you for review. The language that appears in RED is
the language from PM AB-00-99 and AB-00-108. There has been some
controversy and some providers indicate that the language from the PM's are
in conflict with the NCD. I do not feel there is any conflict, we address
the frequency, which, when CMS is silent regarding this, the contractor has
the discretion to add. I know  from he Baltimore meeting that Administar
had updated their policy, which is more limiting than ours, and had both
their RO and the CO review for conflicting information. There were no
recommendations from either of these offices for change to the language of
Administars policy.

I will include the langue of the other policy,  I would like to have you
consider this language as I would like to add this to the existing policy
ONLY IF it would not have to be sent out for a 45 day comment period. This
langue says essentially what Mutual's policy says, only much more clearly.
If this would require the 45 day comment period I will leave the existing
language that has already been out for comment.

Here are sections of the LMRP I would like to add to Mutual's:

Clinical examples-Medicare does not provide separate payment in a Skilled Nursing Facility (SNF) seting for
1.Periodic blood gulcose monitoring in a diabetic such as is routinely performed in the patient 's own home 2. Periodic blood glucose monitoring in a diabetic residing in a nursing home for custodial care(not in a SF covered stay) who receives routine care provided by the nursing home staff, including periodic blood glucose monitoring services.
Medicare may provide sparate payment for - 1. blood glusoce monitoring services ordered by a physician.  The physician must be promptly notified of the results in order to provide active medical care to treat the patient.  2.  blood glucose monitoring services for a diabetic who develops complications that may requrie changes in the patient's diabetic management.  The physician would order the blood glucose monitoring service, be promptly notified of the results, and provide active treatment (such as a medication adjustment) based upon those results.

If home- use glucose monitoring devices are used in thenursing home settings, a glucos monitoring servie must be performed in accordance with laboratoyr coverage criteria to qualify for separate payment under the Medicar laboratory beneftr......for a laboratory service to be reasonabel and necessay:
    it must be ordered by the physician
    the ordering physician must use the result in the management of the beneficiary's specific medical problem; and
    the laborator result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or a modification of patient care.

I am attaching our blood glucose testing policy.

Thanks(See attached file: Blood  Glucose Testing.doc)

Blood  Glucose Testing.dc Susan Jesse.vcf

# EXHIBIT 16

**Carol Richards**

07/06/2001 06:33 AM

To: Mcmcnall@aol.com
cc:
cc: Carol.richards@mutualofomaha.com
Subject: Re: CBG's

The instructions that are in the local medical review policy for blood glucose testing are taken from a program memorandum from HCFA. Having several years of SNF experience myself I do not think that the physician should be notified each and every time a ROUTINE blood sugar is performed (as in your example of a QID accucheck and a sliding scale order) As a general rule Medicare does not provide coverage for routine testing, there are a few exceptions, blood glucose testing is not one of them. HCFA, nor Mutual of Omaha, does not intend to restrict the performance of blood glucose testing, but without an indication that there is an unstable condition, and documentation that the physician is aware of the condition and some type of medical management is considered this would not meet the laboratoy guidelines, nor does it show that the accucheck is anything other that routine. This should not discourage repeat testing, that would be a standard of care issue. It would not seem reasonable to not perform accuchecks based on reimbursement for a service. If there is documentation to support physician involvement and intervention, and an unstable condition the billing of accuchecks would be considered for coverage.

As you are aware diabetic care is not longer considered a skilled service in a SNF unless there is an indication of an unstable condition and physician involvement in the medical management (order changes).

I appreciate your comments regarding this LMRP. Please call or e-mail again if you have any other comments or suggestions.
Mcmcnall@aol.com



**Mcmcnall@aol.com**

07/05/2001 03:27 PM

To: Carol.richards@mutualofomaha.com
cc:
Subject: CBG's

Carol,
I do not believe that a physician should be notified each and every time a CBG result is taken. If a patient is in a SNF and requires testing QID (4x a day) and a sliding scale is in place and the P.O. states to contact the physician if levels are "X" then the facility should contact the doctor. CBG testing is very important - remember it used to be that a diabetic would qualify for catastrophic care in past years (this was considered skilled care) and now if you require calling each time this will discourage repeat testing and/or facilities seeking reimbursement.

Mike McNall

# EXHIBIT 17





MUTUAL *of* OMAHA INSURANCE COMPANY
Medicare Division
P.O. Box 1602 • Omaha, NE 68101
mutualmedicare.com
A CMS Contracted Intermediary

Martha K. Zajicek
1st Vice President & Counsel
*t* 402 351 2421   *f* 402 351 2000
martha.zajicek@mutualofomaha.com

December 19, 2006

Mr. Jason M. Healy, Esq.
Reed Smith LLP
1301 K Street, N.W.
Washington, D.C. 2005-3317

     RE:    *In re* CMS LCD COMPLAINT: Blood Glucose Testing (LCD Database ID No.
           L19657) Contractor: Mutual of Omaha Insurance Company (Fiscal Intermediary).
           Region VII, Midwest Consortium
           Code No. C-06-349
           Decision No. CR1509

Dear Mr. Healy:

I am writing to inform you that in accordance with the decision of Administrative Law Judge Keith
W. Sickendick in the above-referenced case, your client's individual claim review has been
performed by Mutual of Omaha Insurance Company, as a fiscal intermediary under contract with
the Department of Health & Human Services, Centers for Medicare & Medicaid Services. Such
review was performed without the application of the Blood Glucose Testing LCD L19657 which
was withdrawn effective August 11, 2006.

The review affirmed the denial of the claim. Upon completion of reprocessing of the claim,
notification of the decision will be forwarded to the beneficiary.

Very truly yours,

Martha K. Zajicek
First Vice President & Counsel
Law Operation

cc:   Elaine Knapp, ARNP, CMS Seattle RO
     Janet Kyle
     Ellen Evans, MD

JAN-10-2007 WED 12:52 PM KINDRED COORP          FAX NO. 502 596 4186          P. 01



### Kindred Healthcare
### 680 South Fourth Avenue
### Louisville, KY 40202

## FAX COVER SHEET

**DATE:**     1/10/07

**# PAGES**
**FAXED:**     7

**TO:**     Cindy Passa

**FAX #:**     801-272-0622

**FROM:**     Cassey Weckman, Medicare Claims Coordinator

**FAX #:**     502-596-4230

**PHONE #:**     502-596-6274

**RE:**     The Attached

☐ Urgent     ☒ For Review     ☐ Please Comment     ☐ Please Reply

### **Confidentiality Notice**

The information contained in this facsimile transmission is intended only for the use of the individual or entity to whom it is addressed. It may contain privileged, confidential or protected health information.

If you received it in error, you are on notice of its status. Please notify us immediately by telephone and return all pages to the address shown above. Please do not copy it or use it for any purposes, or disclose its contents to any other person. To do so could violate state and Federal privacy laws. Thank you for your cooperation. Please contact the sender if you need assistance.

FROM :HOLLADAY 00 HEALTHCARE        FAX NO. :801 272 0622        Jan. 10 2007 03:07PM  P4/9

JAN-10-2007 WED 12:53 PM KINDRED COORP             FAX NO. 502 596 4186              P. 02


```
MAP1711        M E D I C A R E   A   O N L I N E   S Y S T E M        CLAIM PAGE 01
SC                        UB92 CLAIM INQUIRY                           SV:
 HIC 529382826A      TOB 22I   S/LOC P B9997     OSCAR 465109          UB-FORM
NPI 0000000000 TRANS HOSP PROV                   PROCESS NEW HIC
PAT.CNTL#: 1230119              TAX#/SUB: 870425864       TAXO.CD:
 STMT DATES FROM 100105  TO 103105  DAYS COV        N-C      CO    LTR
 LAST BAILEY                    FIRST LOUISE          MI      DOB 11131933
 ADDR 1 4782 S HOLLADAY BLVD         2 HOLLADAY UT
     3                              4
     5                              6
 ZIP 841175444 SEX F MS   ADMIT DATE 070604 HR    TYPE 3 SRC 1 D HM      STAT 30
   COND CODES 01 64 02    03    04    05    06    07    08    09    10
  OCC CDS/DATE 01 11 070804 02 35 070804 03 44 070804 04          05
          06              07              08          09          10
   SPAN CODES/DATES 01               02               03
 04                05               06               07
 08                09               10               FAC.ZIP
   DCN 20530801717002         04
       V A L U E   C O D E S   -   A M O U N T S  -   A N S I   MSP APP IND
 01 A2        41.76 PR 2  02 50       61.00      03 51       39.00
 04 76        89.00       05                     06
 07                       08                     09
 37205                                                    <== REASON CODES
       PRESS PF3-EXIT  PF5-SCROLL BKWD  PF6-SCROLL FWD  PF8-NEXT
```

FROM :HOLLADAY 00 HEALTHCARE          FAX NO. :801 272 0622          Jan. 10 2007 03:07PM P5/9

JAN-10-2007 WED 12:53 PM KINDRED COORP          FAX NO. 502 596 4188          P. 03

```
MAP171D          M E D I C A R E   A   O N L I N E   S Y S T E M    CLAIM PAGE 02
SC                              UB92 CLAIM INQUIRY
DCN 20635400270008        04  HIC 529382826A      RECEIPT DATE 122006   TOB 221
STATUS P  LOCATION B9997       TRAN DT 122206      STMT COV DT 100105    TO 103105
PROVIDER ID 465109            BENE NAME BAILEY, LOUISE
NONPAY CD    GENER HARDCPY       MR INCLD IN COMP         CL MR IND
TPE-TO-TPE   USER ACT CODE N     WAIV IND    MR REV URC   DEMAND
REJ CD       MR HOSP RED         RCN IND     MR HOSP-RO   ORIG UAC N
MED REV RSNS  50200
OCE MED REV RSNS
    1    HCPC/MOD IN    SERV                        -----REASON-CODES------
 REV  HCPC MODIFIERS    DATE  COV-UNT  COV-CHRG   ADR
0300 82962            100105                        FMR 50200
ORIG                   ORIG REV        MR Y         ODC 55616
OCE OVR 3 CWF OVR   NCD OVR    NCD DOC    NCD RESP 0 NCD# 190.20   OLUAC N
         NON        NON    DENIAL OVER ST/LC  MED  -------------ANSI-----------
LUAC  COV-UNT   COV-CHRG  REAS  CODE OVER    TEC  ADJ  GRP ------REMARKS------
 N       2       6.54 55616                  S   50   CO


TOTAL     2       6.54      LINE ITEM REASON CODES
37205                                              <== REASON CODES
     PRESS PF2-1712  PF3-EXIT  PF5-UP  PF6 DOWN  FF7-PREV  PF8-NEXT  PF10-LEFT
```

JAN-10-2007 WED 12:54 PM KINDRED COORP        FAX NO. 502 596 4186        P. 04

```
MAP1881       M E D I C A R E   A   O N L I N E   S Y S T E M      OP: CNA75104
SC                        REASON CODES INQUIRY                       DT: 100505
PLAN REAS  NARR   EFF      MSN      EFF       TERM     EMC      HC/PRO  PP   CC
IND  CODE  TYPE  DATE      REAS    DATE       DATE   ST/LOC   ST/LOC  LOC  IND
1    55616  E   063003    15.4    063003    010156 D        D
TPTP A     B    NPCD A     B      HD CPY A 8  B 8  NB ADR 1   CAL DY      C/L L
----------------------------------NARRATIVE------------------------------------
GLUCOSE MONITORING NOT REASONABLE/NECESSARY-PROV.LIABLE




            PROCESS COMPLETED  ---   NO MORE DATA THIS TYPE
PRESS PF3-EXIT  PF6-SCROLL FWD  PF8-NEXT
```

Case 1:06-cv-02144-RCL    Document 8-3    Filed 02/09/2007    Page 35 of 37
FROM :HOLLADAY 00  HEALTHCARE    FAX NO. :801 272 0622    Jan. 10 2007 03:07PM P7/9

JAN-10-2007 WED 12:54 PM KINDRED COORP            FAX NO. 502 596 4188            P. 05

```
MAP1712         M E D I C A R E  A  O N L I N E  S Y S T E M    CLAIM PAGE 02
SC                      UB92 CLAIM INQUIRY                       REV CD PAGE 01

  HIC 529382826A     TOB 22I   S/LOC P B9997   PROVIDER 465109

                                   TOT    COV
  CL   REV  HCPC MODIFS      RATE UNIT    UNIT  TOT CHARGE NCOV CHARGE SERV DT
   1  0300  82962           3.270 00002               6.54        6.54 100105
   2  0300  82962           3.270 00002               6.54        6.54 100205
   3  0300  82962           3.270 00002               6.54        6.54 100305
   4  0300  82962           3.270 00002               6.54        6.54 100405
   5  0300  82962           3.270 00002               6.54        6.54 100505
   6  0300  82962           3.270 00002               6.54        6.54 100605
   7  0300  82962           3.270 00002               6.54        6.54 100705
   8  0300  82962           3.270 00002               6.54        6.54 100805
   9  0300  82962           3.270 00002               6.54        6.54 100905
  10  0300  82962           3.270 00002               6.54        6.54 101005
  11  0300  82962           3.270 00002               6.54        6.54 101105
  12  0300  82962           3.270 00002               6.54        6.54 101205
  13  0300  82962           3.270 00002               6.54        6.54 101305
  14  0300  82962           3.270 00002               6.54        6.54 101405

  37205                                              <== REASON CODES
         PRESS PF2-171D   PF3-EXIT   PF5-UP   PF6 DOWN   PF7-PREV   PF8-NEXT   PF11-RIGHT
```

JAN-10-2007 WED 12:55 PM KINDRED CORP              FAX NO. 502 596 4186              P. 06

```
MAP1712          M E D I C A R E   A   O N L I N E   S Y S T E M     CLAIM PAGE 02
SC                         UB92 CLAIM INQUIRY                        REV CD PAGE 02

HIC 529382826A    TOB 22I   S/LOC P B9997   PROVIDER 465109

                                TOT   COV
CL  REV  HCPC MODIFS      RATE  UNIT  UNIT  TOT CHARGE NCOV CHARGE SERV DT
15  0300 82962           3.270 00002             6.54        6.54 101505
16  0300 82962           3.270 00001             3.27        3.27 101605
17  0300 82962           3.270 00002             6.54        6.54 101705
18  0300 82962           3.270 00002             6.54        6.54 101805
19  0300 82962           3.270 00002             6.54        6.54 101905
20  0300 82962           3.270 00002             6.54        6.54 102005
21  0300 82962           3.270 00002             6.54        6.54 102105
22  0300 82962           3.270 00002             6.54        6.54 102205
23  0300 82962           3.270 00002             6.54        6.54 102305
24  0300 82962           3.270 00002             6.54        6.54 102405
25  0300 82962           3.270 00001             3.27        3.27 102505
26  0300 82962           3.270 00002             6.54        6.54 102605
27  0300 82962           3.270 00002             6.54        6.54 102705
28  0300 82962           3.270 00002             6.54        6.54 102805

37205                                              <== REASON CODES
     PRESS PF2-171D  PF3-EXIT  PF5-UP  PF6 DOWN  PF7-PREV  PF8-NEXT  PF11-RIGHT
```

FROM :HOLLADAY 00  HEALTHCARE          FAX NO. :801 272 0622          Jan. 10 2007 03:08PM  P9/9

JAN-10-2007 WED 12:55 PM KINDRED COORP          FAX NO. 502 598 4186          P. 07

```
MAP1712        M E D I C A R E   A   O N L I N E   S Y S T E M    CLAIM PAGE 02
SC                           UB92 CLAIM INQUIRY                REV CD PAGE 03

HIC 529382826A     TOB 221  S/LOC P B9997  PROVIDER 465109

                             TOT    COV
CL  REV  HCPC MODIFS      RATE UNIT   UNIT  TOT CHARGE NCOV CHARGE SERV DT
29 0300 82962            3.270 00002              6.54        6.54 102905
30 0300 82962            3.270 00002              6.54        6.54 103005
31 0300 82962            3.270 00002              6.54        6.54 103105
32 0420 97001 GP        73.420 00001 00001      73.42             102005
33 0430 97003 GO        78.300 00001 00001      78.30             101905
34 0430 97530 GO        28.560 00002 00002      57.12             101905
35 0001                                        405.04      196.20


37205                                              <== REASON CODES
       PRESS PF2-171D  PF3-EXIT  PF5-UP  PF6 DOWN  PF7-PREV  PF8-NEXT  PF11-RIGHT
```