IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LOUISE BAILEY,                          )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )     Case No. 1:06-cv-2144
                                        )     Judge Royce C. Lamberth
MUTUAL OF OMAHA INSURANCE               )
COMPANY, MICHAEL O. LEAVITT,            )
and LESLIE V. NORWALK,                  )
                                        )
          Defendants.                   )
_____)

## DEFENDANTS' ADDITIONAL ATTACHMENTS IN SUPPORT OF THEIR MOTION TO DISMISS

                                   Respectfully submitted

OF COUNSEL:
DANIEL MERON                       PETER D. KEISLER
General Counsel                    Assistant Attorney General

KATHLEEN H. MCGUAN                 JEFFREY A. TAYLOR
Associate General Counsel          United States Attorney

MARK D. POLSTON                    SHEILA M. LIEBER
Deputy Associate                   PETER ROBBINS
General Counsel for Litigation     United States
                                   Department of Justice
WILLIAM A. CONNELLY                20 Massachusetts Avenue, N.W., Room 7142
Attorney                           Washington, D.C.  20530
Department of Health               Tel:  (202) 514-3953
and Human Services                 Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LOUISE BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-cv-2144 |
| | ) | Judge Royce C. Lamberth |
| MUTUAL OF OMAHA INSURANCE | ) | |
| COMPANY, MICHAEL O. LEAVITT, | ) | |
| and LESLIE V. NORWALK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' EXHIBIT C**







# Medicare Coverage Database

mcd feedback | coverage home | help | basket

 Search     Indexes     Reports     Download

**View LCD**

**LCD for Blood Glucose Testing (L19657)**

Jump to Section...



**Please note: This is a Retired LCD.**

**Please note: If you are printing this document and it is truncated on the right margin, please try printing landscape.**

### Contractor Information



**Contractor Name** back to top

Mutual of Omaha Insurance Company

**Contractor Number** back to top

52280

**Contractor Type** back to top

FI

### LCD Information



## LCD ID Number <sup>back to top</sup>

L19657

## LCD Title <sup>back to top</sup>

Blood Glucose Testing

## Contractor's Determination Number <sup>back to top</sup>

2001-B

## AMA CPT / ADA CDT Copyright Statement <sup>back to top</sup>

CPT codes, descriptions and other data only are copyright 2006 American Medical
Association (or such other date of publication of CPT). All Rights Reserved. Applicable
FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes,
nomenclature, descriptors and other data contained therein) is copyright by the American
Dental Association. © 2002, 2004 American Dental Association. All rights reserved.
Applicable FARS/DFARS apply.

## CMS National Coverage Policy <sup>back to top</sup>

Title XVIII of the Social Security Act, section 1862(a)(7).This section excludes routine
physical examinations.

· Title XVIII of the Social Security Act, section 1862(a)(1)(A). This section allows coverage
and payment for only those services that are considered to be medically reasonable and
necessary.

· Title XVIII of the Social Security Act, section 1833 (e). This section prohibits Medicare
payment for any claim which lacks the necessary information to process the claim.

· 42 CFR 410.32 diagnostic tests must be ordered by the physician who is treating the
beneficiary for a specific medical problem and uses the results in the management of the
medical problem.

· 42 CFR 411.15 diagnostic testing in connection with a specific symptom or complaint.

· Program Memorandum AB-00-99, October 24, 2000.

· Program Memorandum AB-00-108, December 1, 2000.

· 42 CFR Part 410; Medicare Program; Negotiated Rulemaking; Coverage and Administrative
Policies for Clinical Laboratory Services; Final Rule, November 23, 2001.

CMS Publication 100-4, Chapter 7, Section 90.1 - Glucose Monitoring (rev. 1, 10-01-03).

## Primary Geographic Jurisdiction back to top

Alaska
Alabama
Arizona
California - Entire State
Colorado
Connecticut
Delaware
Florida
Georgia
Hawaii
Iowa
Idaho
Illinois
Indiana
Kansas
Kentucky
Louisiana
Massachusetts
Maryland
Maine
Michigan
Minnesota
Missouri - Entire State
Mississippi
Montana
North Carolina
North Dakota
Nebraska
New Hampshire
New Jersey
New Mexico
Nevada
Ohio
Oklahoma
Oregon
Pennsylvania
Rhode Island
South Carolina
South Dakota
Tennessee
Texas
Utah
Virginia
Vermont
Washington
Wisconsin
West Virginia
Wyoming

## Secondary Geographic Jurisdiction back to top

**Oversight Region** <u>back to top</u>

Region VII


**Original Determination Effective Date** <u>back to top</u>

For services performed on or after 09/04/2001


**Original Determination Ending Date** <u>back to top</u>

08/11/2006


**Revision Effective Date** <u>back to top</u>

For services performed on or after 09/21/2005


**Revision Ending Date** <u>back to top</u>

08/11/2006


**Indications and Limitations of Coverage and/or Medical Necessity** <u>back to top</u>

Blood glucose values are often necessary for the management of patients with diabetes mellitus, where hyperglycemia and hypoglycemia are often present. They are also critical in the determination of control of blood
glucose levels in the patient with impaired fasting glucose (FPG 110-125 mg/dL), the patient with insulin resistance syndrome and/or carbohydrate intolerance (excessive rise in glucose following ingestion of glucose or glucose sources of food), in the patient with a hypoglycemia disorder such as nesidioblastosis or insulinoma, and in patients with a catabolic or malnutrition state. In addition to those conditions already listed, glucose testing may be medically necessary in patients with tuberculosis, unexplained chronic or recurrent infections, alcoholism, coronary artery disease (especially in women), or unexplained skin conditions (including pruritis, local skin infections, ulceration and gangrene without an established cause). Many medical conditions may be a consequence of a sustained elevated or depressed glucose level. These include comas, seizures or epilepsy, confusion, abnormal hunger, abnormal weight loss
or gain, and loss of sensation. Evaluation of glucose may also be indicated in patients on medications known to affect carbohydrate metabolism.

Frequent home blood glucose testing by diabetic patients should be encouraged. In stable, non-hospitalized patients who are unable or unwilling to do home monitoring, it may be reasonable and necessary to measure quantitative blood glucose up to four times annually.

Depending upon the age of the patient, type of diabetes, degree of control, complications of diabetes, and other comorbid conditions, more frequent testing than four times annually may be reasonable and necessary.

In some patients presenting with nonspecific signs, symptoms, or diseases not normally

associated with disturbances in glucose metabolism, a single blood glucose test may be medically necessary. Repeat testing may not be
indicated unless abnormal results are found or unless there is a change in clinical condition. If repeat testing is performed, a specific diagnosis code (e.g., diabetes) should be reported to support medical necessity. However, repeat testing may be indicated where results are normal in patients with conditions where there is a confirmed continuing risk of glucose metabolism abnormality (e.g., monitoring glucocorticoid therapy).

If a physician separately orders the performance of a glucose monitoring service for a patient who can not self-administer, clinical staff generally will administer a glucose monitoring service along with their other duties.

For laboratory services to be reasonable and necessary, it must not only be ordered by the physician but the ordering physician must also use the result in the management of the beneficiary's specific medical problem.

**Implicitly, the laboratory result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of patient care: this includes the physician's order for another laboratory service.**

Compliance program guidance for laboratory services sets forth conditions under which a physician's order for a repeat laboratory service can qualify as an order for another covered laboratory service. A standing order is not usually acceptable documentation for a covered laboratory service.

Glucose monitoring of laboratory services must be performed in accordance with laboratory service coverage criteria including the order an clear use of a laboratory result prior to a similar subsequent laboratory order to benefit.

Medicare Part B may pay for a glucose monitoring device and related disposable supplies under its duable medical equipment benefit if the equipment is used in the home or in an institution that is used as a home. A hospital or SNF is not considered a home under this benefit (§ 1861(h) of the Act, 42 CFR 410.38).

Routine glucose monitoring of diabetics is never covered in a SNF, whether the beneficiary is in a covered Part A stay or not. Glucose monitoring may only be covered when it meets all the conditions of a covered laboratory service, including use by the physician in modifying the patient's treatment.

## Coverage Topic <u>back to top</u>

Lab Services

## Coding Information



**Bill Type Codes:** <u>back to top</u>

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

| | |
|---|---|
| 12x | Hospital-inpatient or home health visits (Part B only) |
| 13x | Hospital-outpatient (HHA-A also) (under OPPS 13X must be used for ASC claims submitted for OPPS payment -- eff. 7/00) |
| 14x | Non-Patient Laboratory Specimens |
| 18x | Hospital-swing beds |
| 21x | SNF-inpatient (including Part A) |
| 22x | SNF-inpatient or home health visits (Part B only) |
| 23x | SNF-outpatient (HHA-A also) |
| 71x | Clinic-rural health |
| 72x | Clinic-hospital based or independent renal dialysis facility |
| 74x | Clinic-ORF only (eff 4/97); ORF and CMHC (10/91 - 3/97) |
| 75x | Clinic-CORF |

**Revenue Codes:** back to top
**Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.**

| | |
|---|---|
| 0300 | Laboratory-general classification |
| 0310 | Laboratory pathological-general classification |

## CPT/HCPCS Codes back to top

| | |
|---|---|
| 82947 | GLUCOSE; QUANTITATIVE, BLOOD (EXCEPT REAGENT STRIP) |
| 82948 | GLUCOSE; BLOOD, REAGENT STRIP |
| 82962 | GLUCOSE, BLOOD BY GLUCOSE MONITORING DEVICE(S) CLEARED BY THE FDA SPECIFICALLY FOR HOME USE |

## ICD-9 Codes that Support Medical Necessity back to top

**Listing of HCPCS codes contained in this instruction does not assure coverage of service. Current coverage criteria still apply. It is not enough to link the procedure to a correct, payable ICD-9-CM diagnosis code. The diagnosis or clinical suspicion must be present for the procedure to be paid.**

| | |
|---|---|
| 011.00 - 011.96 | TUBERCULOSIS OF LUNG INFILTRATIVE CONFIRMATION UNSPECIFIED - UNSPECIFIED PULMONARY TUBERCULOSIS TUBERCLE BACILLI NOT FOUND BY BACTERIOLOGICAL OR HISTOLOGICAL EXAMINATION BUT TUBERCULOSIS CONFIRMED BY OTHER METHODS (INOCULATION OF ANIMALS) |
| 038.0 - 038.9 | STREPTOCOCCAL SEPTICEMIA - UNSPECIFIED SEPTICEMIA |
| 112.1 | CANDIDIASIS OF VULVA AND VAGINA |
| 112.3 | CANDIDIASIS OF SKIN AND NAILS |
| 118 | OPPORTUNISTIC MYCOSES |
| 150.8 | MALIGNANT NEOPLASM OF OTHER SPECIFIED PART OF ESOPHAGUS |
| 157.4 | MALIGNANT NEOPLASM OF ISLETS OF LANGERHANS |
| 158.0 | MALIGNANT NEOPLASM OF RETROPERITONEUM |
| 211.7 | BENIGN NEOPLASM OF ISLETS OF LANGERHANS |
| 242.00 - 242.91 | TOXIC DIFFUSE GOITER WITHOUT THYROTOXIC CRISIS OR STORM - THYROTOXICOSIS WITHOUT GOITER OR OTHER CAUSE WITH THYROTOXIC CRISIS OR STORM |
| 250.00 - 250.93 | DIABETES MELLITUS WITHOUT MENTION OF COMPLICATION, TYPE II OR UNSPECIFIED TYPE, NOT STATED AS UNCONTROLLED - DIABETES WITH UNSPECIFIED COMPLICATION, TYPE I [JUVENILE TYPE], UNCONTROLLED |
| 251.0 - 251.9 | HYPOGLYCEMIC COMA - UNSPECIFIED DISORDER OF PANCREATIC INTERNAL SECRETION |
| 253.0 - 253.9 | ACROMEGALY AND GIGANTISM - UNSPECIFIED DISORDER OF THE PITUITARY GLAND AND ITS HYPOTHALAMIC CONTROL |
| 255.0 | CUSHING'S SYNDROME |
| 263.0 - 263.9 | MALNUTRITION OF MODERATE DEGREE - UNSPECIFIED PROTEIN-CALORIE MALNUTRITION |
| 271.0 - 271.9 | GLYCOGENOSIS - UNSPECIFIED DISORDER OF CARBOHYDRATE TRANSPORT AND METABOLISM |
| 272.0 - 272.4 | PURE HYPERCHOLESTEROLEMIA - OTHER AND UNSPECIFIED HYPERLIPIDEMIA |
| 275.0 | DISORDERS OF IRON METABOLISM |
| 276.0 - 276.9 | HYPEROSMOLALITY AND/OR HYPERNATREMIA - ELECTROLYTE AND FLUID DISORDERS NOT ELSEWHERE CLASSIFIED |
| 278.3 | HYPERCAROTINEMIA |
| 293.0 | DELIRIUM DUE TO CONDITIONS CLASSIFIED ELSEWHERE |
| 294.9 | UNSPECIFIED PERSISTENT MENTAL DISORDERS DUE TO CONDITIONS |

|  |  |
|---|---|
|  | CLASSIFIED ELSEWHERE |
| 298.9 | UNSPECIFIED PSYCHOSIS |
| 300.9 | UNSPECIFIED NONPSYCHOTIC MENTAL DISORDER |
| 310.1 | PERSONALITY CHANGE DUE TO CONDITIONS CLASSIFIED ELSEWHERE |
| 337.9 | UNSPECIFIED DISORDER OF AUTONOMIC NERVOUS SYSTEM |
| 345.10 - 345.11 | GENERALIZED CONVULSIVE EPILEPSY WITHOUT INTRACTABLE EPILEPSY - GENERALIZED CONVULSIVE EPILEPSY WITH INTRACTABLE EPILEPSY |
| 355.9 | MONONEURITIS OF UNSPECIFIED SITE |
| 356.9 | UNSPECIFIED IDIOPATHIC PERIPHERAL NEUROPATHY |
| 357.9 | UNSPECIFIED INFLAMMATORY AND TOXIC NEUROPATHIES |
| 362.10 | BACKGROUND RETINOPATHY UNSPECIFIED |
| 362.18 | RETINAL VASCULITIS |
| 362.29 | OTHER NONDIABETIC PROLIFERATIVE RETINOPATHY |
| 362.50 - 362.57 | MACULAR DEGENERATION (SENILE) OF RETINA UNSPECIFIED - DRUSEN (DEGENERATIVE) OF RETINA |
| 362.60 - 362.66 | PERIPHERAL RETINAL DEGENERATION UNSPECIFIED - SECONDARY VITREORETINAL DEGENERATIONS |
| 362.81 - 362.89 | RETINAL HEMORRHAGE - OTHER RETINAL DISORDERS |
| 365.04 | OCULAR HYPERTENSION |
| 365.32 | CORTICOSTEROID-INDUCED GLAUCOMA RESIDUAL STAGE |
| 366.00 - 366.09 | NONSENILE CATARACT UNSPECIFIED - OTHER AND COMBINED FORMS OF NONSENILE CATARACT |
| 366.10 - 366.19 | SENILE CATARACT UNSPECIFIED - OTHER AND COMBINED FORMS OF SENILE CATARACT |
| 367.1 | MYOPIA |
| 368.8 | OTHER SPECIFIED VISUAL DISTURBANCES |
| 373.00 | BLEPHARITIS UNSPECIFIED |
| 377.24 | PSEUDOPAPILLEDEMA |
| 377.9 | UNSPECIFIED DISORDER OF OPTIC NERVE AND VISUAL PATHWAYS |
| 378.50 - 378.55 | PARALYTIC STRABISMUS UNSPECIFIED - EXTERNAL OPHTHALMOPLEGIA |
| 379.45 | ARGYLL ROBERTSON PUPIL ATYPICAL |
| 410.00 - 410.92 | ACUTE MYOCARDIAL INFARCTION OF ANTEROLATERAL WALL EPISODE OF CARE UNSPECIFIED - ACUTE MYOCARDIAL INFARCTION OF UNSPECIFIED SITE SUBSEQUENT EPISODE OF CARE |
| 414.00 - 414.19 | CORONARY ATHEROSCLEROSIS OF UNSPECIFIED TYPE OF VESSEL |

|  | NATIVE OR GRAFT - OTHER ANEURYSM OF HEART |
|---|---|
| 425.9 | SECONDARY CARDIOMYOPATHY UNSPECIFIED |
| 440.23 | ATHEROSCLEROSIS OF NATIVE ARTERIES OF THE EXTREMITIES WITH ULCERATION |
| 440.24 | ATHEROSCLEROSIS OF NATIVE ARTERIES OF THE EXTREMITIES WITH GANGRENE |
| 440.9 | GENERALIZED AND UNSPECIFIED ATHEROSCLEROSIS |
| 458.0 | ORTHOSTATIC HYPOTENSION |
| 462 | ACUTE PHARYNGITIS |
| 466.0 | ACUTE BRONCHITIS |
| 480.0 - 486 | PNEUMONIA DUE TO ADENOVIRUS - PNEUMONIA ORGANISM UNSPECIFIED |
| 490 | BRONCHITIS NOT SPECIFIED AS ACUTE OR CHRONIC |
| 491.0 - 491.9 | SIMPLE CHRONIC BRONCHITIS - UNSPECIFIED CHRONIC BRONCHITIS |
| 527.7 | DISTURBANCE OF SALIVARY SECRETION |
| 528.0 | STOMATITIS |
| 535.50 - 535.51 | UNSPECIFIED GASTRITIS AND GASTRODUODENITIS (WITHOUT HEMORRHAGE) - UNSPECIFIED GASTRITIS AND GASTRODUODENITIS WITH HEMORRHAGE |
| 536.8 | DYSPEPSIA AND OTHER SPECIFIED DISORDERS OF FUNCTION OF STOMACH |
| 571.8 | OTHER CHRONIC NONALCOHOLIC LIVER DISEASE |
| 572.0 - 572.8 | ABSCESS OF LIVER - OTHER SEQUELAE OF CHRONIC LIVER DISEASE |
| 574.50 - 574.51 | CALCULUS OF BILE DUCT WITHOUT CHOLECYSTITIS WITHOUT OBSTRUCTION - CALCULUS OF BILE DUCT WITHOUT CHOLECYSTITIS WITH OBSTRUCTION |
| 575.0 - 575.12 | ACUTE CHOLECYSTITIS - ACUTE AND CHRONIC CHOLECYSTITIS |
| 576.1 | CHOLANGITIS |
| 577.0 | ACUTE PANCREATITIS |
| 577.1 | CHRONIC PANCREATITIS |
| 577.8 | OTHER SPECIFIED DISEASES OF PANCREAS |
| 590.00 - 590.9 | CHRONIC PYELONEPHRITIS WITHOUT LESION OF RENAL MEDULLARY NECROSIS - INFECTION OF KIDNEY UNSPECIFIED |
| 595.9 | CYSTITIS UNSPECIFIED |
| 596.4 | ATONY OF BLADDER |
| 596.53 | PARALYSIS OF BLADDER |
| 599.0 | URINARY TRACT INFECTION SITE NOT SPECIFIED |

| 607.84 | IMPOTENCE OF ORGANIC ORIGIN |
| 608.89 | OTHER SPECIFIED DISORDERS OF MALE GENITAL ORGANS |
| 616.10 | VAGINITIS AND VULVOVAGINITIS UNSPECIFIED |
| 626.0 | ABSENCE OF MENSTRUATION |
| 626.4 | IRREGULAR MENSTRUAL CYCLE |
| 628.9 | INFERTILITY FEMALE OF UNSPECIFIED ORIGIN |
| 648.03 | ANTEPARTUM DIABETES MELLITUS |
| 648.04 | POSTPARTUM DIABETES MELLITUS |
| 648.80 | ABNORMAL GLUCOSE TOLERANCE OF MOTHER COMPLICATING PREGNANCY CHILDBIRTH OR THE PUERPERIUM UNSPECIFIED AS TO EPISODE OF CARE |
| 648.83 | ABNORMAL GLUCOSE TOLERANCE OF MOTHER ANTEPARTUM |
| 648.84 | ABNORMAL GLUCOSE TOLERANCE OF MOTHER POSTPARTUM |
| 656.60 - 656.63 | EXCESSIVE FETAL GROWTH AFFECTING MANAGEMENT OF MOTHER UNSPECIFIED AS TO EPISODE OF CARE - EXCESSIVE FETAL GROWTH AFFECTING MANAGEMENT OF MOTHER ANTEPARTUM |
| 657.00 - 657.03 | POLYHYDRAMNIOS UNSPECIFIED AS TO EPISODE OF CARE - POLYHYDRAMNIOS ANTEPARTUM COMPLICATION |
| 680.0 | CARBUNCLE AND FURUNCLE OF FACE |
| 686.00 - 686.9 | PYODERMA UNSPECIFIED - UNSPECIFIED LOCAL INFECTION OF SKIN AND SUBCUTANEOUS TISSUE |
| 698.0 - 698.1 | PRURITUS ANI - PRURITUS OF GENITAL ORGANS |
| 704.1 | HIRSUTISM |
| 705.0 | ANHIDROSIS |
| 707.00 - 707.9 | DECUBITUS ULCER, UNSPECIFIED SITE - CHRONIC ULCER OF UNSPECIFIED SITE |
| 709.3 | DEGENERATIVE SKIN DISORDERS |
| 729.1 | MYALGIA AND MYOSITIS UNSPECIFIED |
| 730.07 | ACUTE OSTEOMYELITIS INVOLVING ANKLE AND FOOT |
| 730.17 | CHRONIC OSTEOMYELITIS INVOLVING ANKLE AND FOOT |
| 730.27 | UNSPECIFIED OSTEOMYELITIS INVOLVING ANKLE AND FOOT |
| 780.01 | COMA |
| 780.02 | TRANSIENT ALTERATION OF AWARENESS |
| 780.09 | ALTERATION OF CONSCIOUSNESS OTHER |
| 780.2 | SYNCOPE AND COLLAPSE |
| 780.31 | FEBRILE CONVULSIONS |

| | |
|---|---|
| 780.39 | OTHER CONVULSIONS |
| 780.4 | DIZZINESS AND GIDDINESS |
| 780.71 - 780.79 | CHRONIC FATIGUE SYNDROME - OTHER MALAISE AND FATIGUE |
| 780.8 | GENERALIZED HYPERHIDROSIS |
| 782.0 | DISTURBANCE OF SKIN SENSATION |
| 783.1 | ABNORMAL WEIGHT GAIN |
| 783.5 | POLYDIPSIA |
| 783.6 | POLYPHAGIA |
| 785.0 | TACHYCARDIA UNSPECIFIED |
| 785.4 | GANGRENE |
| 786.01 | HYPERVENTILATION |
| 786.09 | RESPIRATORY ABNORMALITY OTHER |
| 786.50 | UNSPECIFIED CHEST PAIN |
| 787.6 | INCONTINENCE OF FECES |
| 787.91 | DIARRHEA |
| 788.41 - 788.43 | URINARY FREQUENCY - NOCTURIA |
| 789.1 | HEPATOMEGALY |
| 790.21 - 790.29 | IMPAIRED FASTING GLUCOSE - OTHER ABNORMAL GLUCOSE |
| 790.6 | OTHER ABNORMAL BLOOD CHEMISTRY |
| 791.0 | PROTEINURIA |
| 791.5 | GLYCOSURIA |
| 796.1 | ABNORMAL REFLEX |
| 799.4 | CACHEXIA |
| V23.0 - V23.9 | SUPERVISION OF HIGH-RISK PREGNANCY WITH HISTORY OF INFERTILITY - SUPERVISION OF UNSPECIFIED HIGH-RISK PREGNANCY |
| V58.69 | LONG-TERM (CURRENT) USE OF OTHER MEDICATIONS |
| V67.2 | FOLLOW-UP EXAMINATION FOLLOWING CHEMOTHERAPY |
| V67.51 | FOLLOW-UP EXAMINATION FOLLOWING COMPLETED TREATMENT WITH HIGH-RISK MEDICATION NOT ELSEWHERE CLASSIFIED |

## Diagnoses that Support Medical Necessity back to top

## ICD-9 Codes that DO NOT Support Medical Necessity back to top

| | |
|---|---|
| 798.0 - 798.9 | SUDDEN INFANT DEATH SYNDROME - UNATTENDED DEATH |
| V15.85 | PERSONAL HISTORY OF EXPOSURE TO POTENTIALLY HAZARDOUS BODY FLUIDS |
| V16.1 | FAMILY HISTORY OF MALIGNANT NEOPLASM OF TRACHEA BRONCHUS AND LUNG |
| V16.2 | FAMILY HISTORY OF MALIGNANT NEOPLASM OF OTHER RESPIRATORY AND INTRATHORACIC ORGANS |
| V16.6 | FAMILY HISTORY OF LEUKEMIA |
| V16.7 | FAMILY HISTORY OF OTHER LYMPHATIC AND HEMATOPOIETIC NEOPLASMS |
| V16.8 | FAMILY HISTORY OF OTHER SPECIFIED MALIGNANT NEOPLASM |
| V16.9 | FAMILY HISTORY OF UNSPECIFIED MALIGNANT NEOPLASM |
| V17.0 - V17.89 | FAMILY HISTORY OF PSYCHIATRIC CONDITION - FAMILY HISTORY, OTHER MUSCULOSKELETAL DISEASES |
| V18.0 - V18.8 | FAMILY HISTORY OF DIABETES MELLITUS - FAMILY HISTORY OF INFECTIOUS AND PARASITIC DISEASES |
| V19.0 - V19.8 | FAMILY HISTORY OF BLINDNESS OR VISUAL LOSS - FAMILY HISTORY OF OTHER CONDITION |
| V20.0 - V20.2 | HEALTH SUPERVISION OF FOUNDLING - ROUTINE INFANT OR CHILD HEALTH CHECK |
| V28.0 - V28.9 | ANTENATAL SCREENING FOR CHROMOSOMAL ANOMALIES BY AMNIOCENTESIS - UNSPECIFIED ANTENATAL SCREENING |
| V50.0 - V50.9 | ELECTIVE HAIR TRANSPLANT FOR PURPOSES OTHER THAN REMEDYING HEALTH STATES - UNSPECIFIED ELECTIVE SURGERY FOR PURPOSES OTHER THAN REMEDYING HEALTH STATES |
| V53.2 | FITTING AND ADJUSTMENT OF HEARING AID |
| V60.0 - V60.9 | LACK OF HOUSING - UNSPECIFIED HOUSING OR ECONOMIC CIRCUMSTANCE |
| V62.0 | UNEMPLOYMENT |
| V62.1 | ADVERSE EFFECTS OF WORK ENVIRONMENT |
| V65.0 | HEALTHY PERSON ACCOMPANYING SICK PERSON |
| V68.0 - V68.9 | ISSUE OF MEDICAL CERTIFICATES - ENCOUNTERS FOR UNSPECIFIED ADMINISTRATIVE PURPOSE |
| V70.0 - V70.9 | ROUTINE GENERAL MEDICAL EXAMINATION AT A HEALTH CARE FACILITY - UNSPECIFIED GENERAL MEDICAL EXAMINATION |
| V73.0 - V73.99 | SCREENING EXAMINATION FOR POLIOMYELITIS - SCREENING EXAMINATION FOR UNSPECIFIED VIRAL DISEASE |
| V74.0 - V74.9 | SCREENING EXAMINATION FOR CHOLERA - SCREENING EXAMINATION FOR UNSPECIFIED BACTERIAL AND SPIROCHETAL DISEASES |

| V75.0 - V75.9 | SCREENING EXAMINATION FOR RICKETTSIAL DISEASES - SCREENING EXAMINATION FOR UNSPECIFIED INFECTIOUS DISEASE |
| V76.0 | SPECIAL SCREENING FOR MALIGNANT NEOPLASMS OF THE RESPIRATORY ORGANS |
| V76.3 | SCREENING FOR MALIGNANT NEOPLASMS OF THE BLADDER |
| V76.42 - V76.9 | SCREENING FOR MALIGNANT NEOPLASMS OF THE ORAL CAVITY - SCREENING FOR UNSPECIFIED MALIGNANT NEOPLASMS |
| V78.0 - V78.9 | SCREENING FOR IRON DEFICIENCY ANEMIA - SCREENING FOR UNSPECIFIED DISORDER OF BLOOD AND BLOOD-FORMING ORGANS |
| V79.0 - V79.9 | SCREENING FOR DEPRESSION - SCREENING FOR UNSPECIFIED MENTAL DISORDER AND DEVELOPMENTAL HANDICAP |
| V80.0 - V80.3 | SCREENING FOR NEUROLOGICAL CONDITIONS - SCREENING FOR EAR DISEASES |
| V81.0 - V81.6 | SCREENING FOR ISCHEMIC HEART DISEASE - SCREENING FOR OTHER AND UNSPECIFIED GENITOURINARY CONDITIONS |
| V82.0 - V82.9 | SCREENING FOR SKIN CONDITIONS - SCREENING FOR UNSPECIFIED CONDITION |

## ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation back to top

## Diagnoses that DO NOT Support Medical Necessity back to top

## General Information



## Documentation Requirements back to top

Lab results

Medication Administration Record

Documentation to support the physician was notified prior to subsequent testing and the medical intervention of the physician

## Appendices back to top

## Utilization Guidelines back to top

A standing order for a covered laboratory service without evidence of signs or symptoms of hyperglycemia or hypoglycemia would not be considered reasonable and necessary and would not be considered for separate payment.

Lack of documentation of prompt notification of the physician (prompt notification would be the anticipation that the physician would be notified prior to the next blood glucose monitoring with the possible adjustment of medication) would not be considered reasonable and
necessary and would not be considered for separate payment.

Routine monitoring per accucheck of blood sugars done daily, weekly or intermittently without signs or symptoms and/or without physician notification would not be considered reasonable or necessary and would
not be considered for separate payment.

· Tests for screening purposes that are performed in the absence of signs, symptoms, complaints, or personal history of disease or injury are not covered except as explicitly authorized by statute. These include exams
required by insurance companies, business establishments, government agencies, or other third parties.

· Tests that are not reasonable and necessary for the diagnosis or treatment of an illness or injury are not covered according to the statute.
· Failure to provide documentation of the medical necessity of tests may result in denial of claims.

Such documentation may include notes documenting relevant signs, symptoms or abnormal findings that substantiate the medical necessity for ordering the tests.

In addition, failure to provide independent verification that the test was ordered by the treating physician (or qualified non-physician practitioner) through documentation in the physician's office may result in
denial.

A claim for a test for which there is a national coverage or local medical review policy will be denied as not reasonable and necessary if it is submitted without an ICD-9-CM code or narrative diagnosis listed as covered
in the policy unless other medical documentation justifying the necessity is submitted with the claim.

· If a national or local policy identifies a frequency expectation, a claim for a test that exceeds that expectation may be denied as not reasonable and necessary, unless it is submitted with documentation
justifying increased frequency.

· Tests that are not ordered by a treating physician or other qualified treating non-physician practitioner acting within the scope of their license and in compliance with Medicare requirements will be denied as not reasonable and necessary.

· Failure of the laboratory performing the test to have the appropriate Clinical Laboratory

Improvement Act of 1988 (CLIA) certificate for the testing performed will result in denial of claims.

Glucose monitoring laboratory service must be performed in accordance with laboratory service coverage criteria including the order and clear use of a laboratory result prior to a similar subsequent laboratory order to qualify for separate payment under the Medicare laboratory benefit.
(PM AB-00-108).

Compliance program guidelines for laboratory services sets forth conditions under which a physician's order for a repeat laboratory service can qualify as an order for another covered laboratory service. A standing order is not usually acceptable for a covered laboratory service.(PM AB-00-108).

If home -use glucose monitoring devices are used in the nursing home settings, a glucose monitoring service must be performed in accordance with laboratory coverage criteria to qualify for separate payment under the Medicare laboratory benefit. For a laboratory service to be reasonable and necessary, it must be ordered by the physician, the ordering physician must use the result in the management of the beneficiary's specific medical problem, and the laboratory result must be reported to the physician PROMPTLY in order for the physician to use the result and instruct continuation or modification of the patient care. (PM AB-00-
108).

## Sources of Information and Basis for Decision back to top

This policy has been adopted from the Medicare National Coverage Decisions for Blood Glucose Testing. This policy was developed through the Medical Coverage Negotiated Rule making process. The sources of information used in
developing this policy can be found on the HCFA web site,
and are listed below;

· 2000 CPT Physicians' Current Procedural Terminology, American Medical Association

· AACE Guidelines for the Management of Diabetes Mellitus, Endocrine Practice (1995) 1:149-157.

Bower, Bruce F. And Robert E. Moore, Endocrine Function and Carbohydrates.

· Clinical Laboratory Medicine, Kenneth D. McClatchy, editor. Baltimore/Williams & Wilkins, 1994. p 321-323.

· Report of the Expert Committee on the Diagnosis and Classification of Diabetes Mellitus, Diabetes Care, Volume 20, Number 7, July 1997, pages 1183 et seq.

· Roberts, H. J., Difficult Diagnoses. W. B. Saunders Co., pp 69-70.

## Advisory Committee Meeting Notes back to top

## Start Date of Comment Period back to top

## End Date of Comment Period back to top

## Start Date of Notice Period back to top

## Revision History Number back to top

9/21/2005 Addition of ICD-9 codes 158.0, 362.10. 790.21 to 790.29 and 783.6 which were left off with conversion from LMRP to LCD.

11/25/02 Addition of CFR Final Rule information, Addition to covered codes of 362.0 and 780.31.

2001-B 7/1/03 Deletion of range 730.07-730.27 and substitution of 730.07, 730.17, 730.27 as instructed in Transmittal AB-03-084, June 6, 2003.

## Revision History Explanation back to top

Mutual of Omaha, Medicare Division is retiring LCD L19657 Blood Glucose Testing effective August 11, 2006. LCD L19657 is retired based on subsequent issuance of an NCD by CMS on the same subject matter (NCD for Blood Glucose Testing 190.20). This retirement will have no effect on the manner in which Mutual of Omaha currently processes medical reviews or conducts appeals on blood glucose monitoring. Mutual of Omaha will continue to apply the medical necessity guidelines found in the Program Integrity Manual, Chapter 13, Section 13.5.1 when it reviews claims for blood glucose monitoring. The CMS NCD remains in effect and provides instructions for the documentation of active management by the physician that is required for diagnostic testing of blood glucose.

09/04/2005 - This policy was updated by the ICD-9 2005-2006 Annual Update.

7/2/2006 - The description for Bill code 14 was changed

## Last Reviewed On Date back to top

08/10/2006

## Related Documents back to top

This LCD has no Related Documents.

## LCD Attachments back to top

There are no attachments for this LCD.

## Other Versions <u>back to top</u>



Updated on 07/02/2006 with effective dates 09/21/2005 - N/A

Updated on 10/06/2005 with effective dates 09/21/2005 - N/A

Updated on 09/21/2005 with effective dates 09/21/2005 - N/A

Updated on 09/19/2005 with effective dates 09/04/2001 - N/A

## Read the **LCD Disclaimer**

---

**Note:** To view PDFs, please download and install <u>Adobe Acrobat Reader</u>.

🧺 <u>Add to basket</u>  |  ✉ **<u>Email this to a friend</u>**  |  📄 <u>New Search</u>

www4

---

<u>Web Policies & Important Links</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LOUISE BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-cv-2144 |
| | ) | Judge Royce C. Lamberth |
| MUTUAL OF OMAHA INSURANCE | ) | |
| COMPANY, MICHAEL O. LEAVITT, | ) | |
| and LESLIE V. NORWALK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' EXHIBIT D**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LOUISE BAILEY, Individually and on Behalf of All) Other Similarly Situated Medicare Part B Beneficiaries, ) ) | |
| Plaintiffs, ) | DATE: February 1, 2007 |
| v. ) | Case No. 1:06CV02144 |
| MUTUAL OF OMAHA INSURANCE COMPANY, ) ) | |
| and ) | |
| MICHAEL O. LEAVITT, SECRETARY, ) United States Department of Health and Human Services, ) | |
| and ) | |
| LESLIE V. NORWALK, ACTING ) ADMINISTRATOR, CENTERS FOR MEDICARE ) & MEDICAID SERVICES, ) Defendants. ) | |

ADMINISTRATIVE RECORD BEFORE THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD

**INDEX**

List of Materials in the Record

| Item Number | Document Description | Page Number |
|---|---|---|

**PART I**

DECISIONS

1.    September 19, 2006 decision of the Departmental Appeals Board       1 - 2
      Civil Remedies Administrative Law Judge Keith W. Sickendick,
      Decision No. CR1509.

-2-

## PART II

### CIVIL REMEDIES DIVISION RECORD

2.     March 28, 2006:  Aggrieved Party's appeal of local coverage determination (LCD), beneficiary's complaint.     3 - 19

3.     April 7, 2006:  Acknowledgment of Receipt.     20 - 21

4.     April 19, 2006:  Acknowledgment of Receipt of Acceptable Complaint; Order to File LCD Record; and Briefing Schedule on the Aggrieved Party's Motion for Summary Judgment.     22 - 28

5.     May 2, 2006:  Aggrieved Party's Beneficiary's Complaint, Aggrieved Party's Motion to Seal, and Certificate of Service, with attachments marked as A. Ex. 1 through A. Ex. 27.     29 - 323

6.     June 5, 2006:  Aggrieved Party's facsimile of a letter from Mutual of Omaha Insurance Company dated May 31, 2006.     324 - 325

7.     June 14, 2006:  a letter from Mutual of Omaha Insurance Company with attachments of LCD record for Blood Glucose Testing.     326 - 613

8.     June 15, 2006:  Aggrieved Party's Motion for Extension of Time to File Statement and Motion for Summary Judgment, and Certificate of Service.     614 - 619

9.     June 15, 2006:  Aggrieved Party's letter to counsel for Mutual of Omaha Insurance Company regarding Aggrieved Party's May 2, 2006 filing.     620 - 621

10.     June 28, 2006:  Administrative Law Judge (ALJ) Keith W. Sickendick's Order Extending Schedule for Filing.     622 - 623

11.     July 18, 2006:  Aggrieved Party's Statement and Motion for Summary Judgment, and Certificate of Service, with attachments marked as A. Ex. 1 through A. Ex. 6     624 - 701

12.     August 11, 2006:  Contractor's Response to Beneficiary's Complaint, with attachments marked as CMS Ex. 1 and CMS Ex. 2 with Certificate of Service     702 - 713

-3-

13.    August 11, 2006:  Contractor's letter regarding retirement of LCD of
       the Aggrieved Party with Certificate of Service. Response to          714 - 715
       Aggrieved Party's Motion for Summary Judgment with Certificate of
       Service.

14.    August 11, 2006:  Response to Aggrieved Party's Motion for
       Summary Judgment with Certificate of Service.                         716 - 717

15.    September 1, 2006:  Aggrieved Party's Motion for Leave to File
       Reply to Mutual of Omaha Insurance Company's Response to              718 - 733
       Beneficiary's Complaint, Aggrieved Party's Reply to Mutual of
       Omaha Insurance Company's Response to Beneficiary's Complaint,
       with an attachment marked as A. Ex. 1, and Certificate of Service.

16.    September 19, 2006 transmittal letter of CRD Decision CR1509 by
       ALJ Sickendick with an attachment of Contractor's letter dated        734 - 736
       August 11, 2006 regarding retirement of LCD of the Aggrieved Party.
       The decision is listed above in "Part I" of this index.

UNITED STATES OF AMERICA

DEPARTMENT OF HEALTH AND HUMAN SERVICES

*C E R T I F I C A T I O N   O F   T R U E   C O P Y*

Pursuant to the provisions of 42 U.S.C. 3505 and the

authority vested in me by delegation from the Secretary (see

attached memo), I hereby certify that the annexed is a true copy of

the document on file in the Department of Health and Human

Services.

IN WITNESS WHEREOF, I have hereunto set my hand

and caused the seal of the Department of Health and Human

Services to be affixed, on this_____/ st_____day of

_____February_____2007.

Judith A. Ballard
Deputy Chair
Departmental Appeals Board

Department of Health and Human Services

# DEPARTMENTAL APPEALS BOARD

Civil Remedies Division

|  |  |
|---|---|
| *In re* CMS LCD Complaint: | ) |
|  | ) |
|  | )  Date: September 19, 2006 |
| Blood Glucose Testing | ) |
| (LCD Database ID No. L19657) | )  Docket No. C-06-349 |
|  | ) |
| Contractor: Mutual of Omaha Insurance | )  Decision No. CR1509 |
| Company (Fiscal Intermediary). | ) |
|  | ) |
| Region VII, Midwest Consortium | ) |
|  | ) |

## DECISION

The complaint is dismissed pursuant to 42 C.F.R. § 426.444(b)(6).

## I. Background

On March 28, 2006, Louise Bailey (the complainant) requested through counsel that the local coverage determination (LCD) titled "Blood Glucose Testing," LCD Database I.D. No. L19657, issued by the Medicare Fiscal Intermediary, Mutual of Omaha Insurance Company, be reviewed. The complainant also requested that summary judgment be rendered in her favor on the issues raised by her complaint. The case was assigned to me for further proceedings on April 7, 2006.

Mutual of Omaha advised me by letter dated August 11, 2006, attached, that the challenged LCD has been retired effective August 11, 2006.

1

2

## II. Discussion

Pursuant to 42 C.F.R. § 426.444(b)(6), an administrative law judge (ALJ) must dismiss a LCD complaint concerning LCD provisions if the contractor notifies the ALJ that the LCD provisions are no longer in effect. Pursuant to 42 C.F.R. § 426.420(a) a contractor may retire an LCD subject to my jurisdiction at anytime before I issue a decision. The regulation provides that retirement of an LCD under review has the same effect as a decision finding the LCD invalid under the reasonableness standard as described under 42 C.F.R. § 426.260(b), *i.e.*, an aggrieved party's denied claim is to be newly adjudicated by the contractor without application of the retired LCD. The regulations provide that if I receive notice that an LCD was retired before I issue a decision, I must dismiss the complaint and inform the aggrieved party that individual claim review will be done by the contractor without application of the retired LCD. 42 C.F.R. § 426.420(e)(1). The regulations grant me no discretion as to what must be done when an LCD is retired as it has been in this case. The fact that a contractor invalidates, withdraws, retires, or otherwise renders the offending LCD provisions ineffective, effectively deprives me of jurisdiction to continue. *See* 42 C.F.R. § 426.405(d)(4).

## III. Conclusion

Accordingly, the complaint must be dismissed. The aggrieved party is advised in accordance with 42 C.F.R. § 426.420(e)(1), that in accordance with 42 C.F.R. § 426.260(b)(1) the contractor is required to comply with the requirements of that provision with regard to claim readjudication.


Keith W. Sickendick
Administrative Law Judge

C-06-349

**Reed**Smith

**Jason M. Healy**
Direct Phone: 202.414.9245
Email: jhealy@reedsmith.com

Reed Smith LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C. 20005-3373
202.414.9200
Fax 202.414.9299

March 28, 2006

<u>VIA OVERNIGHT MAIL</u>

Departmental Appeals Board
Civil Remedies Division, Mail Stop 6132
Cohen Building, Room G-644
330 Independence Avenue, S.W.
Washington, D.C. 20201



LHS

Re:   **APPEAL OF LOCAL COVERAGE DETERMINATION**
      Contractor Name:  Mutual of Omaha Insurance Company
      LCD Title:  Blood Glucose Testing
      Contractor's Determination Number:  2001-B
      LCD Version Number:  5

Dear Sir or Madam:

On behalf of Louise Bailey, a Medicare Part B beneficiary, we submit the enclosed Complaint to challenge the above-referenced local coverage determination on blood glucose testing. For the reasons discussed therein, the provisions of the local coverage determination identified in this Complaint are invalid as a matter of law because they conflict with the national coverage determination for blood glucose testing.

If you have any questions about the enclosed or require any additional information, please do not hesitate to contact us.

Sincerely,

*Jason M. Healy*

Jason M. Healy

Enclosure

cc:    Louise Bailey

3

LONDON ◆ NEW YORK ◆ LOS ANGELES ◆ SAN FRANCISCO ◆ WASHINGTON, D.C. ◆ PHILADELPHIA ◆ PITTSBURGH ◆ OAKLAND

PRINCETON ◆ FALLS CHURCH ◆ WILMINGTON ◆ NEWARK ◆ MIDLANDS, U.K. ◆ CENTURY CITY ◆ RICHMOND ◆ LEESBURG

r e e d s m i t h . c o m

DCLIB-454717.2-JMHEALY 3/28/06 3:01 PM

C-06-349

# UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES
## DEPARTMENTAL APPEALS BOARD
## CIVIL REMEDIES DIVISION

RECEIVED

MAR 2 2 2005

LMS

In Re LCD Complaint of Louise Bailey:    )
        )
Contractor Name:  Mutual of Omaha Insurance Co.    )    DAB Docket No. _____
LCD Title:  Blood Glucose Testing    )
Contractor's Determination Number:  2001-B    )
LCD Version Number:  5    )
        )

## BENEFICIARY'S COMPLAINT

1.      On behalf of Louise Bailey, a Medicare Part B beneficiary (the "Beneficiary"), we submit this Complaint to formally challenge the provisions of the local coverage determination ("LCD") on blood glucose testing referenced above.  See Exhibit 1.  The fiscal intermediary, Mutual of Omaha Insurance Company (the "Intermediary"), has documented its intent to deny coverage, based upon the LCD, for blood glucose testing services the Beneficiary received, and continues to receive, while a resident of a skilled nursing facility ("SNF").  See Exhibit 2.

2.      For the reasons discussed herein, the Beneficiary asserts that the provisions of the LCD the Intermediary relies upon to deny blood glucose testing services are invalid as a matter of law because they conflict with the National Coverage Decision for Blood Glucose Testing (the "NCD").  See Exhibit 3.  The administrative law judge ("ALJ") should invalidate these provisions of the Intermediary's LCD.

3.      Ms. Bailey is 72 years old and resides at the Holladay Healthcare Center, a Medicare SNF.  Ms. Bailey has severe diabetes with blindness as a result of her illness.  Ms. Bailey previously tested her blood glucose levels herself when she lived at home.  When her health declined, Ms. Bailey was admitted to the SNF, where she needs a nurse to test her blood glucose levels and administer her insulin.  Ms. Bailey's physician has determined that she requires blood glucose testing four times per day, and that this is necessary in order to maintain control over Ms. Bailey's blood glucose levels.  See Exhibit 8, Statement By C. Steven Fehlauer, M.D.  This frequency of testing allows her physician and nurses to better manage her disease.  This is important because Ms. Bailey has a propensity to develop hypoglycemia without her knowing it is happening.  See id.  The lack of continuing coverage for these services seriously jeopardizes the Beneficiary's health and her continuing care.

4

4.    The NCD is a determination by the Department of Health & Human Services ("HHS"), Centers for Medicare & Medicaid Services ("CMS") that does not preclude and, in fact, supports blood glucose testing within a SNF setting.  A NCD is binding on all Medicare fiscal intermediaries ("FIs") as well as the Departmental Appeals Board ("DAB") and its ALJs, among others.

5.    Because the LCD conflicts with the NCD and, as set forth below, there are no material facts in dispute, we request that the ALJ invalidate the LCD on a summary judgment basis, pursuant to 42 C.F.R. § 426.405(c)(18).  We request that the ALJ treat this Complaint as a motion for such a decision.

6.    This Complaint presents an issue of national significance that cannot, and should not, be relegated to individual beneficiary claims appeals.  Of those United States citizens over the age of sixty, approximately 8.6 million, or 18.3%, have diabetes.  See Exhibit 19, U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Diabetes Fact Sheet (2003), pg. 5.  Like Ms. Bailey, hundreds of thousands of Medicare beneficiaries throughout the United States have been or will be denied coverage for essential blood glucose testing simply because they live in a SNF and do not have the ability to live in a home environment on their own or with a family member.  The Intermediary's LCD penalizes Medicare Beneficiaries for obtaining the necessary supervision and care that a Medicare-certified SNF can provide.  As a result, the Intermediary's LCD, and similar LCDs promulgated by other FIs, seriously jeopardize the health and safety of this fragile population of Medicare beneficiaries.  We ask that the ALJ reverse this trend before the Intermediary's improper coverage policy causes these beneficiaries to suffer from additional medical complications or die.

7.    Pursuant to 42 C.F.R. § 426.400, we provide the following information in support of this complaint.

## TIMELINESS

8.    This complaint is timely because, pursuant to 42 C.F.R. § 426.400(b)(1), it is being filed within 6 months of the physician orders for treatment attached at Exhibit 4.  The Beneficiary has already received these blood glucose testing services because it would have been clinically, if not ethically, inappropriate to withhold treatment from the Beneficiary while the Complaint was being prepared and this appeal pursued.  None of the claims for blood glucose testing services for the Beneficiary with dates of service on or after October 1, 2005 have been reimbursed by the Intermediary.  See Exhibit 5.  The Intermediary has issued Additional Development Requests ("ADRs") related to these claims, see Exhibit 2, and the Beneficiary's health care providers have responded to these ADRs with additional documentation and statements challenging the legal validity of the LCD upon which we fully expect these claims will be denied, see Exhibit 6.

## BENEFICIARY INFORMATION                                                      5

9.    The following is information about the Beneficiary:

a.  Name: Louise Bailey

b.  Mailing address:  4782 S. Holladay Blvd.
    Salt Lake City, Utah 84117

c.  State of residence:  Utah

d.  Telephone number:  (801) 272-0622

e.  Health Insurance Claim Number (if applicable):  ███████████

f.  E-mail address (if applicable):  none

## REPRESENTATIVE INFORMATION

10.  The following is information about the Beneficiary's Representative in this appeal:

a.  Name: REED SMITH, LLP
    Thomas C. Fox, Esq.
    Jason M. Healy, Esq.
    Attorneys for the Beneficiary

b.  Mailing address:  Jason M. Healy
    Reed Smith LLP
    1301 K Street, N.W.
    Suite 1100 – East Tower
    Washington, D.C. 20005-3373

c.  Telephone number:  (202) 414-9222
    (202) 414-9245

d.  Fax number:  (202) 414-9299

e.  E-mail address:  tfox@reedsmith.com
    jhealy@reedsmith.com

11.  Copy of written authorization to represent the Beneficiary:  The Beneficiary's Appointment of Representative letter is attached at Exhibit 7.

## TREATING PHYSICIAN WRITTEN STATEMENT

12.  Attached at Exhibit 4 is a copy of the written orders signed by the Beneficiary's treating physician for blood glucose testing services.  The physician's order constitutes a written statement from the treating physician that the Beneficiary needs the services that are the subject of the LCD.  In addition, the Beneficiary's physician has prepared a written statement in support of this appeal.  See Exhibit 8, Statement By C. Steven Fehlauer, M.D.

6

LCD INFORMATION

13.    The following is information about the LCD in dispute:

a.    Name of Contractor using the LCD:  Mutual of Omaha Insurance
       Company

b.    Title of LCD being challenged:  Blood Glucose Testing, Determination
       Number 2001-B, Version Number 5

c.    Specific provision(s) of the LCD that, on their face, conflict with the NCD
       and adversely affect the aggrieved party:

       (i)  "Repeat testing may not be indicated unless abnormal results are found
       or unless there is a change in clinical condition."

       (ii)  "For laboratory services to be reasonable and necessary, it must not
       only be ordered by the physician but the ordering physician must also use
       the result in the management of the beneficiary's specific medical
       problem.

       **Implicitly, the laboratory result must be reported to the physician
       promptly in order for the physician to use the result and instruct
       continuation or modification of patient care: this includes the
       physician's order for another laboratory service.**

       Compliance program guidance for laboratory services sets forth conditions
       under which a physician's order for a repeat laboratory service can qualify
       as an order for another covered laboratory service. A standing order is not
       usually acceptable documentation for a covered laboratory service.

       Glucose monitoring of laboratory services must be performed in
       accordance with laboratory service coverage criteria including the order an
       clear use of a laboratory result prior to a similar subsequent laboratory
       order to benefit.

       Medicare Part B may pay for a glucose monitoring device and related
       disposable supplies under its durable medical equipment benefit if the
       equipment is used in the home or in an institution that is used as a home.
       A hospital or SNF is not considered a home under this benefit (§ 1861(h)
       of the Act, 42 CFR 410.38).

       Routine glucose monitoring of diabetics is never covered in a SNF,
       whether the beneficiary is in a covered Part A stay or not. Glucose
       monitoring may only be covered when it meets all the conditions of a
       covered laboratory service, including use by the physician in modifying
       the patient's treatment."

7

(iii) "Documentation to support the physician was notified prior to subsequent testing and the medical intervention of the physician."

(iv) "A standing order for a covered laboratory service without evidence of signs or symptoms of hyperglycemia or hypoglycemia would not be considered reasonable and necessary and would not be considered for separate payment.

Lack of documentation of prompt notification of the physician (prompt notification would be the anticipation that the physician would be notified prior to the next blood glucose monitoring with the possible adjustment of medication) would not be considered reasonable and necessary and would not be considered for separate payment.

Routine monitoring per accucheck of blood sugars done daily, weekly or intermittently without signs or symptoms and/or without physician notification would not be considered reasonable or necessary and would not be considered for separate payment."

(v) "If a national or local policy identifies a frequency expectation, a claim for a test that exceeds that expectation may be denied as not reasonable and necessary, unless it is submitted with documentation justifying increased frequency."

(vi) "Glucose monitoring laboratory service must be performed in accordance with laboratory service coverage criteria including the order and clear use of a laboratory result prior to a similar subsequent laboratory order to qualify for separate payment under the Medicare laboratory benefit. (PM AB-00-108).

Compliance program guidelines for laboratory services sets forth conditions under which a physician's order for a repeat laboratory service can qualify as an order for another covered laboratory service. A standing order is not usually acceptable for a covered laboratory service. (PM AB-00-108).

If home-use glucose monitoring devices are used in the nursing home settings, a glucose monitoring service must be performed in accordance with laboratory coverage criteria to qualify for separate payment under the Medicare laboratory benefit. For a laboratory service to be reasonable and necessary, it must be ordered by the physician, the ordering physician must use the result in the management of the beneficiary's specific medical problem, and the laboratory result must be reported to the physician PROMPTLY in order for the physician to use the result and instruct continuation or modification of the patient care.(PM AB-00-108)."

8

<u>AGGRIEVED PARTY STATEMENT, OF WHICH THERE ARE</u>
<u>NO MATERIAL FACTS IN DISPUTE</u>

14.    The Beneficiary needs the blood glucose testing services that are the subject of the LCD, as evidenced by the written order signed by the Beneficiary's treating physician for those services. <u>See</u> <u>Exhibit</u> 4. We fully expect that the Intermediary will deny the claims that have been submitted for these services, based upon ADRs from the Intermediary. The provisions of the LCD quoted above are invalid as a matter of law because they conflict with the NCD. Moreover, coverage for the Beneficiary's blood glucose tests is supported by the Medicare statute, the Medicare regulations, and a Program Memorandum published by CMS. The frequency that the Beneficiary's blood glucose test results are reported to her physician is not incompatible with additional language in the Program Memorandum concerning prompt reporting of test results.

15.    <u>The Medicare Statute and Regulations Support Coverage of The Beneficiary's</u> <u>Blood Glucose Tests</u>. The Beneficiary's blood glucose tests meet the requirements in the Social Security Act (the "Act") and the Medicare regulations. The Act is the foremost authority for Medicare Part B coverage for blood glucose testing. The applicable section of the Act is the general requirement that the service be "reasonable and necessary for the diagnosis or treatment of illness or injury." <u>Exhibit</u> 9, 42 U.S.C. § 1395y(a)(1)(A). Under this requirement, blood glucose testing is reasonable and necessary for the diagnosis or treatment of diabetes.

16.    In recognition of the fact that Congress provided for Medicare Part B coverage of blood glucose testing services, the Medicare regulations further describe the circumstances under which blood glucose testing is reasonable and necessary. The regulations define blood glucose testing with a device approved for home use as a "diagnostic laboratory test." <u>Exhibit</u> 10, 42 C.F.R. § 493.15. For Medicare beneficiaries residing in a SNF, coverage exists for diagnostic laboratory tests if they are "ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." <u>Exhibit</u> 11, <u>Id.</u> § 410.32(a). Thus, the <u>only</u> requirement in the Medicare regulations for blood glucose testing to be reasonable and necessary is an order by the treating physician for such testing. Nothing in the Medicare regulations imposes any additional requirements.

17.    <u>The NCD Supports Coverage of The Beneficiary's Blood Glucose Tests</u>. Effective November 23, 2001, CMS promulgated the NCD to address Medicare coverage of blood glucose testing. The NCD specifically encourages frequent testing of blood glucose levels for diabetic patients and acknowledges that it may be reasonable and necessary to measure quantitative blood glucose in stable, non-hospitalized patients who are unable or unwilling to do so. The NCD does not provide any specific limitations to testing. In plain language, the NCD acknowledges that specific diagnosis codes, such as diabetes, support repeat testing, especially where there is a confirmed continuing risk of glucose metabolism abnormality. Significantly, the NCD has seen both revision and expansion since its effective date of November 23, 2001, but the position both covering and supporting blood glucose testing with a home-use device has not changed.

9

18.     The NCD notes that using a device approved for home testing has become a standard of care for control of blood glucose, even in the inpatient setting. Importantly, the NCD does not expressly require that treating physicians receive the results of blood glucose tests with the frequency now required by the Intermediary. Nor does the NCD suggest that frequent testing is unreasonable or lacks medical necessity for beneficiaries diagnosed with diabetes. Rather, the NCD merely limits coverage for beneficiaries with "nonspecific signs, symptoms, or diseases not normally associated with disturbances in glucose metabolism" (i.e., patients without a diagnosis of diabetes) to a single test unless the results are abnormal or there is a change in clinical condition. According to the NCD, specific diagnosis codes such as diabetes support repeat testing, especially where there is a "confirmed continuing risk of glucose metabolism abnormality." Diabetes is a disease that is not only "associated with" disturbances in glucose metabolism, but is defined as "a syndrome characterized by hyperglycemia [abnormally high blood glucose] resulting from absolute or relative impairment in insulin secretion and/or insulin action." Exhibit 20, The Merck Manual of Diagnosis and Therapy § 2, Ch. 13, pg. 1. Beneficiaries with a diagnosis of diabetes who reside in SNFs almost always have such a continuing risk. Therefore, the NCD supports coverage of claims for regular blood glucose testing of beneficiaries with a diagnosis of diabetes, including Ms. Bailey.

19.     Specifically, the NCD states that "[f]requent home blood glucose testing by diabetic patients should be encouraged," and that "[t]he convenience of the meter or stick color method . . . has become a standard of care for control of blood glucose, even in the inpatient setting." Exhibit 3, 66 Fed. Reg. 58846 (Nov. 23, 2001). The NCD also states that "[d]epending upon the age of the patient, type of diabetes, degree of control, complications of diabetes, and other co-morbid conditions, more frequent testing than four times annually may be reasonable and necessary. . . . [R]epeat testing may be indicated where results are normal in patients with conditions where there is a confirmed continuing risk of glucose metabolism abnormality." Id. Taking into account the health factors of the Beneficiary, nowhere in the NCD are there specific limitations on the frequency of testing, and nowhere is there mention of "prompt" notification. The NCD simply lists the number of maladies that may require blood glucose testing and reiterates that reasonable and necessary tests will be reimbursed. See id. at 58846, 58848.

20.     A NCD is a determination by CMS as to whether or not a particular service is covered nationally by Medicare. See Exhibit 12, 42 C.F.R. § 405.1060(a)(1). A NCD is binding on all Medicare contractors, including carriers and fiscal intermediaries, as well as the DAB and its ALJs, among others. See id. § 405.1060(a)(4).

21.     A NCD takes precedence over decisions made on the local level by Medicare contractors, i.e., LCDs, including what were formerly known as Local Medical Review Policies ("LMRPs"), and other non-binding policies. "An LMRP may not conflict with a national coverage decision once the national coverage decision is effective. If a national coverage decision conflicts with a previously established LMRP, the contractor must change its LMRP to conform to the national coverage decision. . . . The LMRP may not alter the national coverage decision." Exhibit 13, 66 Fed. Reg. 58,788 (Nov. 23, 2001) (emphasis added).

22.     For this reason, if a LCD conflicts with a NCD, the Medicare contractor must follow the NCD.

10

23.    The Beneficiary's blood glucose testing services meet the NCD criteria in that they are performed on a diabetic beneficiary who has a continued risk of glucose metabolism abnormality. The NCD clearly states that such testing should be encouraged. Thus, limiting blood glucose services to the Beneficiary when she requires daily insulin shots defies the language of the NCD and good medical practice. The Beneficiary's blood glucose testing services also meet the reasonable and necessary criteria. They are ordered by the treating physician, furnished by qualified personnel, in an appropriate setting, and furnished in accordance with accepted standards of medical practice for the treatment of diabetes. All of the tests are performed at a frequency determined by the Beneficiary's treating physician to meet her specific medical needs.

24.    The Program Memorandum Supports Coverage of The Beneficiary's Blood Glucose Tests. In December 2000, CMS issued a Program Memorandum that specifically recognizes "administration of the [blood glucose testing] service several times a day is common in order to maintain tight control of glucose to prevent heart disease, blindness, and other complications of diabetes." Exhibit 14, CMS Program Memorandum AB-00-108 (Dec. 1, 2000). This language supports coverage of the Beneficiary's claims for blood glucose testing.

25.    Despite this statement, the Program Memorandum attempts to change longstanding Medicare policy, going well beyond the statute, the regulations, and the NCD to state that glucose testing laboratory services will not quality for separate payment under Medicare unless the laboratory result is promptly reported to the physician to use the result to continue or modify patient care. The Program Memorandum cites no direct authority for this proposition and simply claims it is "implicit" in Medicare's requirements that services be reasonable and necessary to be covered. The Program Memorandum does not further define the term "prompt."

26.    Although we do not believe the NCD supports a prompt reporting requirement, the frequency that the Beneficiary's blood glucose test results are reported to her physician is not incompatible with the language in the Program Memorandum concerning prompt reporting of test results. The standard medical practice, where blood glucose test results are reported to the physician on a regular basis (but not immediately) constitutes prompt reporting. However, we also note that ALJs are not bound by CMS program memoranda and manual instructions. See Exhibit 12, 42 C.F.R. § 405.1062(a).

27.    The Intermediary's recent interpretation of its LCD requires that blood glucose test results be reported to the treating physician before the performance of the next blood glucose test. This interpretation further restricts coverage of blood glucose tests for diabetic patients who require regular testing. Because this interpretation has no basis in the statute, the regulations, the NCD, standard medical practice, or, we would argue, even the Program Memorandum, it should be invalidated.

28.    The LCD. The Intermediary's LCD on blood glucose testing, now in its fifth version, had an original effective date of September 4, 2001. The current version of the LCD applies to services performed on or after September 21, 2005.

11

29.    The LCD Conflicts With the NCD and Must Be Invalidated. The LCD issued by Mutual conflicts with the NCD on blood glucose testing. Therefore, the NCD, not the LCD, dictates which blood glucose testing services will be reimbursed. The NCD trumps the LCD and is controlling.

30.    On or about September 2005, the Intermediary posted a newsletter on its web site (the "Intermediary's Newsletter") stating that, as of October 1, 2005, the Intermediary would subject all claims submitted for blood glucose testing services to medical review and/or system edits. See Exhibit 15.

31.    In spite of the NCD and the force of law that it carries, the Intermediary now maintains the position that routine blood glucose testing in a SNF is a non-covered service, based on its LCD.

32.    As a result of this decision, none of the claims for blood glucose testing services for the Beneficiary with dates of service on or after October 1, 2005 will be reimbursed by Mutual.

33.    The ALJ should invalidate the Intermediary's LCD as a matter of law because the language quoted above conflicts with the NCD in numerous ways. First, the LCD's emphasis on the word "routine" has the effect of denying coverage of regular blood glucose testing of SNF residents. The LCD also states that routine blood glucose testing services are never covered in a SNF because a SNF is not a home; however, the LCD says that blood glucose testing in a SNF is a covered laboratory service that qualifies for separate payment under the Medicare laboratory benefit. The NCD does not preclude regular blood glucose testing of SNF residents. As an undisputed fact, glucose testing may be covered when it meets all the conditions of a covered laboratory service. Therefore, characterizing blood glucose testing as "routine" cannot foreclose coverage under Part B in a SNF setting. Even the Program Memorandum acknowledges that "[d]enial of payment for a Part B covered laboratory service cannot be made on the basis that the service is routine care." Exhibit 14, pg. 3. "Under Medicare, routine care determinations are applicable only for Part A nursing home services." Id.

34.    Second, the LCD states that "routine" blood glucose testing is not reasonable and necessary. According to the LCD, for a laboratory service to be reasonable and necessary, it must be ordered by the physician, the ordering physician must use the result in the management of the beneficiary's specific medical problem, and the laboratory result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of the patient care. This statement is substantially the same as the Program Memorandum. See id. However, as discussed above, the plain language of the Social Security Act, the Medicare regulations, and the NCD do not require "prompt" notification. The NCD sets the Medicare national coverage criteria for blood glucose testing, and it does not require "prompt" notification of laboratory results to the physician. The absence in the NCD of the restrictive notification language, together with the NCD's language encouraging frequent testing and recognizing it as the standard of care, invalidates any "prompt" notification requirement in the LCD.

12

35.    Third, the LCD states that there can be no standing order for blood glucose testing for such services to be covered. On its face, that restriction contradicts the language in the LCD itself and in the NCD that specifically encourages frequent testing of blood glucose levels for diabetic patients and acknowledges that it may be reasonable and necessary to measure quantitative blood glucose in stable, non-hospitalized patients who are unable or unwilling to do so. The NCD does not provide any specific limitations to testing. To the contrary, the NCD acknowledges that specific diagnosis codes, such as diabetes, supports repeat testing, especially where there is a confirmed continuing risk of glucose metabolism abnormality. Therefore, a clear and unambiguous reading of the NCD supports the use of physician orders for repeat blood glucose testing; it does not suggest that the physician must sign a separate order for each test.

36.    The Intermediary's Recent Interpretation of its LCD is Arbitrary and Capricious. In addition, the Intermediary's recent interpretation of its LCD is arbitrary and capricious and amounts to substantive changes to its coverage policy that did not undergo a notice and comment period. The Intermediary's Newsletter states that, as of October 1, 2005, all blood glucose testing claims for SNF residents will be subject to medical review and/or system edits. See Exhibit 15. This is an abrupt change in the Intermediary's coverage policy that will have a devastating impact on thousands of Medicare Part B beneficiaries who reside in SNFs. The effect of this policy will be to deny claims for such beneficiaries that were previously allowed under the same LCD, with language that has remained substantially the same through five different versions, over the course of four and a half years (the first version of this LCD was effective on September 4, 2001).

37.    Based upon the Intermediary's history of allowing such claims under this LCD, it was reasonable for the Beneficiary to rely upon the Intermediary's long-standing interpretation of its own LCD when she submitted her claims for blood glucose testing services. Because the Beneficiary's blood glucose tests were covered and paid previously by the Intermediary, she had every reason to assume that blood glucose tests would continue to be covered and paid under the same LCD. The ALJ should find that the Intermediary's new interpretation of this LCD constitutes substantive and material changes to this local coverage policy that are invalid for not going through the notice and comment process required by Medicare Program Integrity Manual (CMS Pub. 100-08) § 13.7.2. See Exhibit 16. It is inequitable for the Intermediary to discontinue payment for the same services under the same LCD based upon the Beneficiary's reliance.

38.    The LCD Is Contrary to Good Medical Practice and Not Supported by the Medical Literature. Blood glucose testing to monitor glucose levels in the blood, as performed by patients and health care providers, is considered a cornerstone of diabetes care. See Exhibit 25, Position Statement: Tests of Glycemia In Diabetes, American Diabetes Association, Diabetes Care 25:S97-S99, Supp. 1 (Jan. 2002), pg. S97. The results of these tests are used to assess the efficacy of therapy and to guide adjustments in medical nutrition therapy, exercise, and medications to achieve the best possible blood glucose control. See id.

39.    Clinical authorities support the use of sliding scale insulin administration supported by glucose testing for nursing home residents, but prolonged use of sliding scale insulin is not recommended. See Exhibit 21, Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pg. 26.

13

- 10 -

This approach uses a base dose of intermediate or long acting insulin, and regular insulin, supplemented by regular insulin administered by the nurse based on the patient's blood sugar and the treating physician's orders. The established best practice is for the physician to set the frequency of the testing and a range for the blood glucose values of the specific patient. Blood glucose testing (or monitoring), a measurement of glucose in the blood that can be done at any time on a portable machine, has long been used to assess blood glucose levels for diabetics. Blood glucose testing is typically performed by placing a drop of blood on a reagent strip, which uses a chemical substance to react to the amount of glucose in the blood. The portable machine then reads the strip and displays the results as a number on a digital display. Physicians are notified when glucose values go above or below the specified parameters. Adjustments are made to the base (and supplemental) dose when necessary. This treatment protocol is essentially the same whether the patient is being treated at home, as a hospital inpatient, or in a SNF, and is consistent with existing Medicare requirements and the prior Intermediary policy.

40.     This type of glucose testing is particularly important in elderly patients where their age has compromised the body's ability to maintain stability/uniformity on its own. To help elderly diabetics maintain a homeostatic state, the clinical practice model of the AMDA recommends a blood glucose test on admission, bedside glucose testing several times a day (more frequently if the patient's glucose level is poorly controlled), daily blood glucose review, and physician alert when values fall below or above the recommended range or a range indicated in the physician's order. See Exhibit 21, Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pgs. 11, 27-28, 39-42. The American Diabetes Association also recommends blood glucose testing of type 1 diabetics three or more times daily. See Exhibit 23, Standards of Medical Care in Diabetes, American Diabetes Association, Diabetes Care 2004, Vol. 27, pg. S20; Exhibit 25, Position Statement: Tests of Glycemia In Diabetes, American Diabetes Association, Diabetes Care 25:S97-S99, Supp. 1 (Jan. 2002), pg. S97. Such glucose testing should not be confused with screening tests, routine or standing orders. This testing is medically necessary to avoid certain short and long term complications of diabetes, and to assess the efficacy of ongoing treatment.

41.     The medical literature clearly indicates that day-to-day control of insulin levels reduces the severity of existing consequences of diabetes, and can prevent the onset of new symptoms and complications. Diabetes is common in the nursing home setting, with over 18 percent of nursing home residents with this disease. See Exhibit 21, Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pg. 2. The literature demonstrates that nursing home patients have a high prevalence of cognitive and physical impairment and need help in daily activities. The prevalence of these impairments is higher among diabetic nursing home patients than in the nursing home population as a whole, which increases the complexity of diabetes management, and makes it unlikely that these patients can manage their diabetes on their own. See id., pg. 3. Diabetic nursing home residents are susceptible to hyperglycemia (a condition that impairs cognition, decreases pain thresholds, impairs vision, and may increase the risk for falls) and hypoglycemia (which, untreated, can cause falls or permanent neurological impairment). See id. Nursing home residents are frequently unable to perceive or communicate hypoglycemic symptoms. See id. "Frequent monitoring of blood glucose levels is critical to avoid hypoglycemia and its consequences." See Exhibit 26, Subacute Care for Seniors: Management

14

of Elderly Diabetic Patients In the Subacute Care Setting, A. Lee, MD, Clinics In Geriatric Medicine, 16:4 (Nov. 2000), reprinted at http://home.mdconsult.com, pg. 8.

42.    Treatment guidelines for diabetes published by numerous medical societies establish that glucose testing is reasonable and necessary for the treatment of diabetes patients, and leave the frequency of the testing to the medical judgment of the treating physician, based on the patient's individual circumstances. See Exhibit 21, Managing Diabetes in the Long-Term Care Setting:  Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), see especially pgs. 39-41.  Regular blood glucose testing is part of an overall, individualized treatment care plan for diabetes management, along with a meal plan, activity and physical therapy, treatment with oral antidiabetic agents and/or insulin, foot/wound care, and pain management.  See Exhibit 21, Managing Diabetes in the Long-Term Care Setting:  Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pg. 16.  Regular monitoring of blood glucose levels helps achieve target ranges for blood glucose control; reduce the risk of lower-extremity infections, ulcers, and limb loss; control pain and neuropathic symptoms; and reduce the progression of other diabetic complications. See id., pgs. 16-17.

43.    The insulin needs of patients with diabetes can vary from one patient to another, from day to day, even from hour to hour.  Most nursing home patients have type 2 diabetes but a sizable proportion have combined therapy with insulin orders for treatment.  Regular testing is particularly important because blood glucose levels frequently vary depending on the time of day, as demonstrated in a study conducted by the National Institute of Diabetes and Digestive and Kidney Diseases and Social, and Scientific Systems, Inc., published in the December 27, 2000, Journal of the American Medical Association.  See Exhibit 22, Diurnal Variation in Fasting Plasma Glucose, JAMA (Dec. 27, 2000), pg. 5; see also Exhibit 20, The Merck Manual of Diagnosis and Therapy § 2, Ch. 13, pgs. 9-10 (discussing the "dawn phenomenon").

44.    During the past decade, clinical trials have demonstrated the importance of glycemic control, as measured through regular blood glucose testing, to prevent and reduce the complications of diabetes.  See Exhibit 24, The Importance of Tight Glycemic Control, J.E. Gerich, MD, The American Journal of Medicine, 118:9A (September 2005), reprinted at http://home.mdconsult.com, pg. 4.  Several new therapeutic agents have become available to improve and monitor glycemic control in patients with type 2 diabetes, including less painful and continuous monitoring devices.  See id.  Significantly, the optimization of glycemic control has been shown to be cost-effective.  See id.  Regular blood glucose testing with a monitoring device is less expensive in the long run than the costs of surgery and other treatments for patients who develop complications due to poor glycemic control.  However, despite the advances in monitoring devices and therapeutic agents, at least one study suggests that there has not been a corresponding improvement in glycemic control for diabetic patients.  See id.  The likely explanations for this include "lack of time and resources due to reimbursement considerations, for physicians to treat patients with diabetes" and other factors.  Id.  The Intermediary's recent interpretation of its LCD is precisely the type of reimbursement policy that discourages regular blood glucose testing.  Rather than encourage the necessary monitoring of blood glucose levels in Part B SNF residents by covering these tests, the LCD denies coverage, creating a disincentive to perform these tests.  As a result, there is an increased likelihood that the Part B beneficiaries who suffer from this debilitating disease will develop blindness, require the amputation of limbs, and experience other complications that require costly medical intervention.

15

- 12 -

45.     The Intermediary's LCD not only ignores current medical literature and clinical authorities, it is inconsistent with numerous federal initiatives to combat diabetes and prevent complications of the disease. A number of these programs recognize the value of having the physician prescribe supplies and document the frequency of self-testing, without requiring physician review before each testing event. When HHS launched the National Diabetes Education Program ("NDEP") in 2001, a joint federal program run by the National Institutes of Health and the Centers for Disease Control and Prevention, the Secretary emphasized the importance of informing Medicare beneficiaries that they "can use their benefits to better monitor and manage their diabetes." Exhibit 27, "HHS Launches Diabetes Education Program for Older Americans," HHS Press Release (May 3, 2001), reprinted at http://www.hhs.gov/news/press/2001pres/20010503.html, pg. 1. The NDEP supports routine self-monitoring of blood sugar levels by diabetics and their health care providers for use in an effective treatment plan for managing their disease. See id. The Intermediary's LCD also runs counter to the recommendations of the American Diabetes Association that, given the importance of blood glucose testing to diabetes care, government and third-party payers "should strive to make the procedure readily accessible and affordable for all patients who require it." Exhibit 25, Position Statement: Tests of Glycemia In Diabetes, American Diabetes Association, Diabetes Care 25:S97-S99, Supp. 1 (Jan. 2002), pg. S97.

46.     The LCD Creates Unnecessary Administrative Burdens On Providers And Physicians. Treating diabetes using blood glucose testing in a hospital, SNF, or home, is best managed by trend analysis, not test-to-test adjustments. It is generally pointless to provide individual test results to the physician, except when test results are outside the parameters set by the physician, in which case the physician will be notified immediately. The physician needs to see trends of test results in order to determine whether dosage modification is medically necessary. See Exhibit 21, Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pgs. 28. This is certainly true with regard to this Beneficiary. Her physician states that:

> It would be impractical and, in my opinion, unnecessary for me to write a separate order for each blood glucose test to be administered to Ms. Bailey, or to be notified of the results of each test. It is my professional opinion, in keeping with standard medical practice, to review Ms. Bailey's blood glucose test results on a bi-monthly basis and make appropriate adjustment to her plan of care.

Exhibit 8, pg. 2, Statement By C. Steven Fehlauer, M.D.

47.     Moreover, the LCD's prompt notification language creates a tremendous burden on SNFs and their nursing staff and fails to take into consideration the realities of caring for Medicare beneficiaries who suffer from this debilitating disease. Most SNF residents have blood glucose testing schedules that follow similar time frames and, thus, will require nurses to call physicians for every diabetic patient at the same time. Further, even if SNF staff were to contact the physician after each test, there is no assurance the physician would promptly respond to the call or, in fact, use the individual test result in care planning. Based upon the written statement by the Beneficiary's physician, it is unlikely that he would do so. See Exhibit 8, pg. 2, Statement By C. Steven Fehlauer, M.D. In other words, even if SNFs reported each individual blood glucose test result to each diabetic resident's physician, it is doubtful that this process would

meet the Intermediary's purported goal of increasing physician involvement in diabetes management. One can only conclude that the Intermediary is now interpreting the prompt notification language in its LCD to impose an unworkable requirement upon SNF care givers, in a deliberate effort to deny legitimate claims for blood glucose tests.

## CLINICAL AND SCIENTIFIC EVIDENCE

48.    The following clinical and scientific evidence is enclosed as additional support for the Beneficiary's appeal:

a.    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Diabetes Fact Sheet (2003).  See Exhibit 19.

b.    The Merck Manual of Diagnosis and Therapy § 2, Ch. 13.  See Exhibit 20.

c.    Managing Diabetes in the Long-Term Care Setting:  Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002).  See Exhibit 21.

d.    Diurnal Variation in Fasting Plasma Glucose, JAMA (Dec. 27, 2000).  See Exhibit 22.

e.    Standards of Medical Care in Diabetes, American Diabetes Association, Diabetes Care, Vol. 27: S15-S35 (2004).  See Exhibit 23.

f.    The Importance of Tight Glycemic Control, J.E. Gerich, MD, The American Journal of Medicine, 118:9A (Sept. 2005), reprinted at http://home.mdconsult.com. See Exhibit 24.

g.    Position Statement: Tests of Glycemia In Diabetes, American Diabetes Association, Diabetes Care 25:S97-S99, Supp. 1 (Jan. 2002).  See Exhibit 25.

h.    Subacute Care for Seniors: Management of Elderly Diabetic Patients In the Subacute Care Setting, A. Lee, MD, Clinics In Geriatric Medicine, 16:4 (Nov. 2000), reprinted at http://home.mdconsult.com.  See Exhibit 26.

i.    "HHS Launches Diabetes Education Program for Older Americans," HHS Press Release (May 3, 2001), reprinted at http://www.hhs.gov/news/press/2001pres/20010503.html.  See Exhibit 27.

17

TWO RECENT ALJ DECISIONS IN CLAIMS APPEALS REVERSED DENIALS BASED
UPON SIMILAR LCDs, AND THESE DECISIONS HAVE NOT BEEN APPEALED BY THE
FI, NOR HAS THE SECRETARY SOUGHT TO INTERVENE

49.    Two ALJs recently accepted arguments similar to the ones asserted by the
Beneficiary in recent claims appeals based upon similar LCDs for blood glucose testing.  See
Exhibit 17, Extendicare Health Services v. AdminaStar Federal, Docket Number 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
(Aug. 12, 2004) ("Extendicare I"); Exhibit 18, Extendicare Health Services v. AdminaStar
Federal, Docket Number 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 (Aug. 24, 2004) ("Extendicare II").[1]  We submit that these
decisions are persuasive authority in this appeal.

50.    Both cases dealt with an LMRP released by AdminaStar that was similar to
Mutual's LMRP in that it stated that Medicare would only cover medically reasonable and
necessary blood glucose testing services when a physician is "promptly notified of the test results
so that he/she may provide active treatment . . . .  Multiple blood glucose monitoring services,
without prompt physician notification, are not covered . . . ."  See Extendicare II, at 3.  In arguing
for Part B coverage of blood glucose tests, Extendicare, in both cases, appealed from
determinations that reimbursement was not warranted because the medical records did not reflect
that the physician was notified after each test or that the physician used each test result to order a
new test.  In neither case did AdminaStar seek appeal of the ALJs' determinations, nor did the
Secretary seek to intervene.

51.    In finding for Extendicare, one ALJ stated, "If a service cannot be denied because
it is routine,[2] it stands to reason that the services may be covered despite the fact that it is routine.
In fact, the purpose of routine, frequent blood glucose testing is to assure that tight control is
maintained, and this is precisely the kind of testing which is encouraged and allowed under the
[NCD]."  Extendicare II, at 7.  The other ALJ determined that blood glucose testing is not a
"routine" procedure because it requires skilled care, and that "prompt" notification was not
defined in the LMRP.  Further, the ALJ concluded that "With such lack of specificity, it makes
every sense for the doctor to be able to monitor blood sugar after a series of blood tests over a
period of a week or so, in order to assess any fluctuations. . . . Expecting a physician to check
every day on the results and make changes based on each report in isolation is neither cost-
effective nor warranted for good health."  Extendicare I, at 2.

52.    We are not aware of any appeal which CMS filed with respect to these decisions
with the Medicare Appeals Council of the DAB, which it had the right to do, or any other
communication issued by CMS expressing disagreement with the factual findings and legal
conclusions of the ALJ.

---

[1] We are aware of one ALJ decision in a claims appeal (appeal number 1-7174101) that reached
a different outcome.

[2] The ALJ discussed the reference to "routine" in the context of the Hearing Officer's denial of
reimbursement for blood glucose testing since such testing was "routine."  The ALJ quoted CMS
Program Memorandum AB-00-108, which states "Denial of payment for a Part B covered
laboratory service cannot be made on the basis that the service is routine care.  Under Medicare,
routine care determinations are applicable only for Part A nursing home services."  Extendicare
II, at 7.

18

- 15 -

53.     The Beneficiary's position is similar to the position of Extendicare endorsed by the ALJs. The blood glucose testing services cannot be dismissed as "routine" and, further, they meet the criteria of reasonable and medically necessary. As the ALJs stated, nothing in the NCD or regulations requires notifying the physician of each and every test result, nor is such notification necessary for effective management of the illness. Indeed, the Beneficiary's blood glucose testing services are necessary and are even encouraged by CMS.

## RELIEF REQUESTED

54.     The ALJ has the authority pursuant to 42 C.F.R. § 426.405(c)(18) to invalidate the LCD on a summary judgment basis because there are no material facts in dispute and the LCD conflicts with the NCD. We request that the ALJ treat this Complaint as a motion for such a decision.

55.     Alternatively, we believe that the information and evidence provided herein prove that the quoted provisions of the LCD should be invalidated. Those LCD provisions are contrary to the NCD, the statute, the regulations, the medical literature, good clinical practices, and the documented medical needs of this Beneficiary.

Respectfully submitted,

*Jason M. Healy*

Thomas C. Fox, Esq.
Jason M. Healy, Esq.
REED SMITH LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C. 20005-3317
(202) 414-9200

Attorneys for the Beneficiary

March 28, 2006

19

- 16 -



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

Departmental Appeals Board
MS 6132
Civil Remedies Division
330 Independence Avenue, SW
Cohen Building, Room G-644
Washington, D.C. 20201

April 7, 2006

Jason M. Healy, Esq.
Reed Smith LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C. 20005-3373

CMS LCD Challenge Staff
Mail Stop C3-02-16
7500 Security Boulevard
Baltimore, Maryland 21244-1850

        and

Mutual of Omaha Insurance Company
Medicare Area
P.O. Box 1602
Omaha, Nebraska 68101

        Subject:        *In re* CMS LCD COMPLAINT: Local Medical Review Policy
                        (LMRP) Title Blood Glucose Testing.
                        CRD Docket No. C-06-349

### ACKNOWLEDGMENT OF RECEIPT

The Civil Remedies Division (CRD), of the United States Department of Health and
Human Services, received your correspondence dated March 28, 2006. This letter
acknowledges receipt of your "Complaint for Review of Local Coverage Determination."
The title of the Local Coverage Determinations (LCD) involved is: Blood Glucose
Testing. The name of the Medicare carrier is: Mutual of Omaha Insurance Company.
The carrier represents CMS (Centers for Medicare & Medicaid Services) unless otherwise
directed. 42 C.F.R. § 426.415. Provider involved: Steve Fehlauer, M.D.

LCDs are policies issued by the fiscal intermediaries or carriers of CMS, DHHS, as
defined in section 1869(f) of the Social Security Act. On November 7, 2003, CMS issued

2

final regulations which were published in the *Federal Register* at 68 Fed. Reg. 63691-63731 (codified at 42 C.F.R. Part 426) pertaining to appeals of these determinations.

I have docketed the case as styled above, No. C-06-349, and I have assigned it to Administrative Law Judge Keith W. Sickendick for the hearing and related proceedings. Please refer to this docket number in all correspondence and submissions to CRD.

The staff attorney working with Judge Sickendick is Anthony J. Smith. Mr. Smith's telephone number is (202) 565-0161, his E-mail address is tony.smith@hhs.gov, and his fax number is (202) 565-0226. **Please do not fax documents in excess of 10 pages**. Judge Sickendick will not discuss any aspect of the case with a party unless there has been notice and opportunity for all parties to participate. Judge Sickendick will issue further instructions for the development of this case. **Judge Sickendick's office will be in contact with the parties shortly to schedule proceedings in this matter.**

Sincerely yours,

Marion T. Silva
Chief Administrative Law Judge
Departmental Appeals Board

21

DEPARTMENT OF HEALTH AND HUMAN SERVICES

## DEPARTMENTAL APPEALS BOARD

CIVIL REMEDIES DIVISION

|  |  |
|---|---|
| *In re* CMS LCD Complaint: | ) |
|  | ) Date:  **APR 1 9 2006** |
| Blood Glucose Testing | ) |
| (LCD Database ID No. L19657) | ) Docket No. C-06-349 |
|  | ) |
| Contractor: Mutual of Omaha Insurance | ) |
| Company (Fiscal Intermediary). | ) |
|  | ) |
| Region VII, Midwest Consortium | ) |
|  | ) |

## ACKNOWLEDGMENT OF RECEIPT OF ACCEPTABLE COMPLAINT; ORDER TO FILE LCD RECORD; AND BRIEFING SCHEDULE ON THE AGGRIEVED PARTY'S MOTION FOR SUMMARY JUDGMENT

## I.    PROCEDURAL HISTORY

On March 28, 2006, Louise Bailey (the aggrieved party) requested through counsel that the local coverage determination (LCD) titled "Blood Glucose Testing," LCD Database I.D. No. L19657, issued by the Medicare Fiscal Intermediary, Mutual of Omaha Insurance Company, be reviewed. The aggrieved party also requested that summary judgment be rendered in her favor on the issues raised by her complaint. The case was assigned to me for further proceedings on April 7, 2006.

On November 7, 2003, the Centers for Medicare & Medicaid Services (CMS) published regulations governing review of LCDs. The regulations are codified at 42 C.F.R. Part 426.

2

## II.    ACKNOWLEDGMENT OF RECEIPT OF ACCEPTABLE COMPLAINT

I have evaluated the complaint as required by 42 C.F.R. § 426.410(b), (c), & (d) and find that it is acceptable. The aggrieved party is directed to serve copies of the complaint and supporting documents upon the contractor and CMS at the addresses specified at the end of this order **within 15 days of this order** and to file with my office a certificate of service certifying that service was accomplished. The aggrieved party filed 27 exhibits with her complaint. Prior to service upon the contractor and CMS, the aggrieved party will ensure that her exhibits are marked in accordance with the instructions at paragraph IV.D.2 of this order. A copy of the properly marked exhibits will also be filed with my office with the certificate reflecting service upon the contractor and CMS.

Pursuant to 42 C.F.R. § 426.403, once an acceptable complaint is filed, the aggrieved party may submit additional new evidence without withdrawing the complaint until the record is closed. Pursuant to 42 C.F.R. § 426.417, the contractor may review any new evidence submitted and comment upon whether it is significant pursuant to 42 C.F.R. § 426.340. Accordingly, any new evidence submitted must be served upon all parties to this proceeding and counsel must provide an appropriate certificate of service.

## III.    ORDER TO FILE LCD RECORD; AGGRIEVED PARTY'S STATEMENT; AND SCHEDULE FOR BRIEFING ON THE MOTION FOR SUMMARY JUDGMENT

**Not more than 30 days from the date of this Order**, the contractor or CMS will serve upon the aggrieved party the LCD record as defined by 42 C.F.R. § 426.418.

**Not more than 30 days from the date of this Order**, the contractor or CMS will serve upon my office the LCD record as defined by 42 C.F.R. § 426.419.

**Not more than 60 days from the date of this Order**, the aggrieveD party will file her statement as authorized by 42 C.F.R. § 426.425(a). At that time, the aggrieved party may renew and/or supplement her motion for summary judgment.

**Not more than 90 days from the date of this Order**, the contractor will file its response as authorized by 42 C.F.R. § 426.425(b). The contractor and/or CMS will also file a response to the aggrieved party's motion for summary judgment.

3

After receiving the LCD record and briefs of the parties', I will conduct the review specified by 42 C.F.R. § 426.425. Upon completion of my review, I will issue a decision or issue further orders for discovery and the preparation of this case for hearing.

# IV. PROCEDURAL INSTRUCTIONS

## A. Requests for Extension.

An extension of the deadlines established by this Order will not be granted except upon a showing of good cause, which for purposes of this order, will be such cause as is beyond the control of the moving party. 42 C.F.R. § 426.410(d).

## B. Service of Pleadings and Documents.

All documents which are required to be filed with the Civil Remedies Division (CRD) of the Departmental Appeals Board pursuant to this Order, will be served upon opposing counsel, if the opposing party is represented or upon the unrepresented party, including notices, motions, exchanges, stipulations and reports. A document submitted for filing will not be accepted for filing if it does not have attached a certificate of service wherein counsel or the unrepresented party certifies on penalty of perjury that a copy has been served upon the opposing party or counsel and indicating the date and the manner of service. Service may be by first class mail, courier, express mail delivery service, or by personal service through delivery to counsel for the party or to the unrepresented party or their office, home, or last known address. Service by mail is complete upon mailing. Service by courier or express mail delivery service or similar service is complete upon delivery to the service. Personal service is complete upon receipt by the party served or delivery to the place of business or home. Service by electronic means including email and facsimile transmissions is only effective if the parties agree to such service in writing. Electronic service is complete upon transmission unless the sending party learns that there was no electronic receipt by the party to be served. Electronic service is also not effective unless the document transmitted bears a facsimile signature. Electronic transmission of courtesy copies is not discouraged. **CRD does not accept documents for filing by facsimile, email, or courier unless specifically authorized by me.** The address for filing documents and all correspondence with the CRD related to this case is:

4

**DEPARTMENT OF HEALTH & HUMAN SERVICES**
**DEPARTMENTAL APPEALS BOARD, MS 6132**
**CIVIL REMEDIES DIVISION**
**330 INDEPENDENCE AVENUE, SW**
**COHEN BUILDING, ROOM G-644**
**WASHINGTON, DC 20201**

C. Signatures Required.

No document will be accepted for filing unless it is signed by counsel or the unrepresented party. Service of an unsigned document is not effective.

D. Format of Pleadings and Marking of Exhibits.

1. Pleadings. Any motion, brief, response, reply, notice or other request to me should be in a proper format similar to the format of this Order. The style of the document must identify the aggrieved party or parties and provide the other information that appears in the style of this document. The title of the document must clearly indicate the purpose of the document, e.g. "Motion" is inadequate but "Motion To File The LCD Record" is adequate. Documents in letter format may be used when filing of the document is not required e.g. for transmitting pleadings, requesting procedural guidance from the Attorney Advisor or Paralegal assigned to assist me, coordination with the opposing party and for similar purposes. Pleadings will be on 8.5" x 11" white paper with 1" margins, single or double spaced, and printed in a clear font of no less than 12 point. No electronic media will be accepted for filing. A certificate of service must be attached to every pleading submitted for filing.

2. Exhibits. Each proposed exhibit must be:

1.    Identified with the docket number of the case;

2.    Marked with an abbreviated designation for the party offering the proposed exhibit ("A" for Aggrieved Party, "CMS" for CMS and/or the Contractor) followed by the abbreviation "Ex." for "exhibit;" and

5

3.    Designated with a separate, unique, and whole identifying number
(e.g., "1"). Use of letters, a combination of numbers and letters, or
decimal points cannot be used.

All identifying markings must be placed on the proposed exhibit itself and not on a
tab separator or a divider. The identifying markings should be placed as near as
possible to the lower, right-hand corner of the document and must not obscure any
relevant part of the proposed exhibit.

Proposed exhibits that contain more than one page should be attached securely
without obscuring any relevant part of the exhibit. Each page of a proposed
exhibit must be numbered so that the page can be located easily when the
document is being discussed in a brief, at a hearing, or in the decision. An
example of how these designations should look is:

Docket No. C-02-100
A. Ex. 1
Page 1 of 6

Proposed exhibits that are not prepared according to these instructions will not be
accepted. Documents and photographs will generally be accepted as proposed
exhibits, but electronic media including audio or video tapes or discs including
computer and CD disks will not be received. Parties who wish to offer the
contents of tapes or disks as evidence, must do so in the form of a transcript.
Leave to file must be requested for exhibits that exceed 8.5" x 11," and if leave is
granted, the exhibit must be folded flat and submitted in a envelope of
approximately 8.5" x 11" with the exhibit number on both the exhibit and the
envelope. Large demonstrative items used at hearing will not be received in
evidence unless the offering party has the ability to substitute a photograph that
accurately depicts the object. Exhibits that are not documents or photographs may
be offered and admitted, but photographs of the item will be substituted in the
record and the offering party has the burden of providing adequate photographs.
Documents or photographs of less than 8.5" x 11" should be securely attached to
an 8.5" x 11" sheet of paper.

If the parties wish for me to consider the contents of learned articles or parts of
publications they must submit copies properly marked as exhibits. It is not
necessary to submit as exhibits copies of applicable statutes or regulations.

6

E. Sealing the Record.

Documents submitted to the CRD become part of the public record of proceedings in this case and are subject to public disclosure under the Freedom of Information Act and/or other federal statutes. The parties are cautioned that they are responsible for ensuring that any privacy interest, proprietary interest, or privileged materials must be appropriately marked and filed with a motion to seal the documents. The record of this proceeding may be sealed but only to the minimum extent necessary to protect the perceived proprietary or privacy interest. The parties are reminded that any order to seal the record that I issue may have no effect if the case is appealed to the Federal courts.

F. Number of Copies.

Unless otherwise specified only one copy of a document will be served upon the opposing party. **A record copy of each pleading or document required to be filed and two additional copies will be filed with CRD and no pleading will be treated as filed until the proper number of copies are submitted.** Counsel or the unrepresented party must certify in the certificate of service for a pleading that the required copies have been served.

G. Computing Time Periods.

In computing any period of time under this Order, do not count the day this Order was issued; or if the running of a period is triggered by an act, event, or default, then the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period will be included, unless it is a Saturday, a Sunday, or a legal holiday. When the period of time allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation. "Legal holiday" includes: New Year's Day, Birthday of Martin Luther King, Jr., Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, Christmas Day, and any other day appointed as a holiday by the President or the Congress of the United States. If any pleading required or permitted under this Order is served by USPS mail, the pleading is presumed to have been received by the addressee five days after the date on the certificate of service, unless it is shown that the pleading was received earlier or later. All time periods computed under this Order are from the date of this Order rather than the date this Order is received, unless otherwise specified.

27

7

H. Ex Parte Communications Prohibited.

Ex parte communications are prohibited however, procedural questions may be addressed
to Tony Smith at 202-565-0161 or Tony.Smith@hhs.gov.

**IT IS SO ORDERED.**

Keith W. Sickendick
Administrative Law Judge

Addresses:

Thomas C. Fox, Esq.
Jason M. Healy, Esq.
Reed Smith LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, DC 2005-3317

      and

CMS LCD Challenge Staff
Mail Stop C3-02-16
7500 Security Blvd.
Baltimore, MD 21244-1850

      and

Mutual of Omaha Insurance Company
Medicare Area
P.O. Box 1602
Omaha, NE 68101

# Reed Smith



**Jason M. Healy**
Direct Phone: 202.414.9245
Email: jhealy@reedsmith.com

<div align="right">

Reed Smith LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C. 20005-3373
202.414.9200
Fax 202.414.9299

</div>

May 2, 2006

## VIA OVERNIGHT MAIL

Department of Health & Human Services
Departmental Appeals Board, MS 6132
Civil Remedies Division
330 Independence Avenue, SW
Cohen Building, Room G-644
Washington, D.C. 20201

Re:  *In re* CMS LCD COMPLAINT
Blood Glucose Testing (LCD Database ID No. L19657)
Contractor:  Mutual of Omaha Insurance Company (Fiscal Intermediary)
Region VII, Midwest Consortium
Docket No. C-06-349

Dear Sir or Madam:

Pursuant to ALJ Keith W. Sickendick's Order dated April 19, 2006, please find three copies of the following items enclosed:

(1)    Beneficiary's Complaint with exhibits numbered and pages marked for confidential patient information;

(2)    Aggrieved Party's Motion to Seal; and

(3)    Certificate of Service certifying that service was accomplished upon the contractor (Mutual of Omaha) and CMS.

If you have any questions about these enclosures, please contact me at (202) 414-9245.

Sincerely,

*Jason M. Healy*

Jason M. Healy

29

LONDON ♦ NEW YORK ♦ LOS ANGELES ♦ SAN FRANCISCO ♦ WASHINGTON, D.C. ♦ PHILADELPHIA ♦ PITTSBURGH ♦ OAKLAND

PRINCETON ♦ FALLS CHURCH ♦ WILMINGTON ♦ NEWARK ♦ MIDLANDS, U.K. ♦ CENTURY CITY ♦ RICHMOND ♦ LEESBURG

reedsmith.com

DCLIB-467725.1-JMHEALY 5/2/06 2:19 PM

Departmental Appeals Board
May 2, 2006
Page 2

**ReedSmith**

Encls.

cc:    Mutual of Omaha Insurance Company
        Medicare Area
        P.O. Box 1602
        Omaha, NE 68101

        CMS LCD Challenge Staff
        Mail Stop C3-02-16
        7500 Security Blvd.
        Baltimore, MD 21244-1850

CONFIDENTIAL:
Patient Information

# UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES
## DEPARTMENTAL APPEALS BOARD
### CIVIL REMEDIES DIVISION

|  |  |
|---|---|
| In Re LCD Complaint of Louise Bailey: ) | |
| ) | |
| Contractor Name: Mutual of Omaha Insurance Co. ) | DAB Docket No. _____ |
| LCD Title: Blood Glucose Testing ) | |
| Contractor's Determination Number: 2001-B ) | |
| LCD Version Number: 5 ) | |

## BENEFICIARY'S COMPLAINT

1.      On behalf of Louise Bailey, a Medicare Part B beneficiary (the "Beneficiary"), we submit this Complaint to formally challenge the provisions of the local coverage determination ("LCD") on blood glucose testing referenced above. See Exhibit 1. The fiscal intermediary, Mutual of Omaha Insurance Company (the "Intermediary"), has documented its intent to deny coverage, based upon the LCD, for blood glucose testing services the Beneficiary received, and continues to receive, while a resident of a skilled nursing facility ("SNF"). See Exhibit 2.

2.      For the reasons discussed herein, the Beneficiary asserts that the provisions of the LCD the Intermediary relies upon to deny blood glucose testing services are invalid as a matter of law because they conflict with the National Coverage Decision for Blood Glucose Testing (the "NCD"). See Exhibit 3. The administrative law judge ("ALJ") should invalidate these provisions of the Intermediary's LCD.

3.      Ms. Bailey is 72 years old and resides at the Holladay Healthcare Center, a Medicare SNF. Ms. Bailey has severe diabetes with blindness as a result of her illness. Ms. Bailey previously tested her blood glucose levels herself when she lived at home. When her health declined, Ms. Bailey was admitted to the SNF, where she needs a nurse to test her blood glucose levels and administer her insulin. Ms. Bailey's physician has determined that she requires blood glucose testing four times per day, and that this is necessary in order to maintain control over Ms. Bailey's blood glucose levels. See Exhibit 8, Statement By C. Steven Fehlauer, M.D. This frequency of testing allows her physician and nurses to better manage her disease. This is important because Ms. Bailey has a propensity to develop hypoglycemia without her knowing it is happening. See id. The lack of continuing coverage for these services seriously jeopardizes the Beneficiary's health and her continuing care.

CONFIDENTIAL:
Patient Information

4.    The NCD is a determination by the Department of Health & Human Services ("HHS"), Centers for Medicare & Medicaid Services ("CMS") that does not preclude and, in fact, supports blood glucose testing within a SNF setting. A NCD is binding on all Medicare fiscal intermediaries ("FIs") as well as the Departmental Appeals Board ("DAB") and its ALJs, among others.

5.    Because the LCD conflicts with the NCD and, as set forth below, there are no material facts in dispute, we request that the ALJ invalidate the LCD on a summary judgment basis, pursuant to 42 C.F.R. § 426.405(c)(18). We request that the ALJ treat this Complaint as a motion for such a decision.

6.    This Complaint presents an issue of national significance that cannot, and should not, be relegated to individual beneficiary claims appeals. Of those United States citizens over the age of sixty, approximately 8.6 million, or 18.3%, have diabetes. See Exhibit 19, U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Diabetes Fact Sheet (2003), pg. 5. Like Ms. Bailey, hundreds of thousands of Medicare beneficiaries throughout the United States have been or will be denied coverage for essential blood glucose testing simply because they live in a SNF and do not have the ability to live in a home environment on their own or with a family member. The Intermediary's LCD penalizes Medicare Beneficiaries for obtaining the necessary supervision and care that a Medicare-certified SNF can provide. As a result, the Intermediary's LCD, and similar LCDs promulgated by other FIs, seriously jeopardize the health and safety of this fragile population of Medicare beneficiaries. We ask that the ALJ reverse this trend before the Intermediary's improper coverage policy causes these beneficiaries to suffer from additional medical complications or die.

7.    Pursuant to 42 C.F.R. § 426.400, we provide the following information in support of this complaint.

## TIMELINESS

8.    This complaint is timely because, pursuant to 42 C.F.R. § 426.400(b)(1), it is being filed within 6 months of the physician orders for treatment attached at Exhibit 4. The Beneficiary has already received these blood glucose testing services because it would have been clinically, if not ethically, inappropriate to withhold treatment from the Beneficiary while the Complaint was being prepared and this appeal pursued. None of the claims for blood glucose testing services for the Beneficiary with dates of service on or after October 1, 2005 have been reimbursed by the Intermediary. See Exhibit 5. The Intermediary has issued Additional Development Requests ("ADRs") related to these claims, see Exhibit 2, and the Beneficiary's health care providers have responded to these ADRs with additional documentation and statements challenging the legal validity of the LCD upon which we fully expect these claims will be denied, see Exhibit 6.

## BENEFICIARY INFORMATION

9.    The following is information about the Beneficiary:                    32

CONFIDENTIAL:
Patient Information

a.    Name:  Louise Bailey

b.    Mailing address:        4782 S. Holladay Blvd.
                             Salt Lake City, Utah 84117

c.    State of residence:  Utah

d.    Telephone number:  (801) 272-0622

e.    Health Insurance Claim Number (if applicable): █████████

f.    E-mail address (if applicable):  none

## REPRESENTATIVE INFORMATION

10.    The following is information about the Beneficiary's Representative in this appeal:

    a.    Name: REED SMITH, LLP
           Thomas C. Fox, Esq.
           Jason M. Healy, Esq.
           Attorneys for the Beneficiary

    b.    Mailing address: Jason M. Healy
                    Reed Smith LLP
                    1301 K Street, N.W.
                    Suite 1100 – East Tower
                    Washington, D.C. 20005-3373

    c.    Telephone number:  (202) 414-9222
                            (202) 414-9245

    d.    Fax number:  (202) 414-9299

    e.    E-mail address:  tfox@reedsmith.com
                        jhealy@reedsmith.com

11.    Copy of written authorization to represent the Beneficiary: The Beneficiary's Appointment of Representative letter is attached at Exhibit 7.

## TREATING PHYSICIAN WRITTEN STATEMENT

12.    Attached at Exhibit 4 is a copy of the written orders signed by the Beneficiary's treating physician for blood glucose testing services. The physician's order constitutes a written statement from the treating physician that the Beneficiary needs the services that are the subject of the LCD. In addition, the Beneficiary's physician has prepared a written statement in support of this appeal. See Exhibit 8, Statement By C. Steven Fehlauer, M.D.

33

CONFIDENTIAL:
Patient Information

(iii) "Documentation to support the physician was notified prior to subsequent testing and the medical intervention of the physician."

(iv) "A standing order for a covered laboratory service without evidence of signs or symptoms of hyperglycemia or hypoglycemia would not be considered reasonable and necessary and would not be considered for separate payment.

Lack of documentation of prompt notification of the physician (prompt notification would be the anticipation that the physician would be notified prior to the next blood glucose monitoring with the possible adjustment of medication) would not be considered reasonable and necessary and would not be considered for separate payment.

Routine monitoring per accucheck of blood sugars done daily, weekly or intermittently without signs or symptoms and/or without physician notification would not be considered reasonable or necessary and would not be considered for separate payment."

(v) "If a national or local policy identifies a frequency expectation, a claim for a test that exceeds that expectation may be denied as not reasonable and necessary, unless it is submitted with documentation justifying increased frequency."

(vi) "Glucose monitoring laboratory service must be performed in accordance with laboratory service coverage criteria including the order and clear use of a laboratory result prior to a similar subsequent laboratory order to qualify for separate payment under the Medicare laboratory benefit. (PM AB-00-108).

Compliance program guidelines for laboratory services sets forth conditions under which a physician's order for a repeat laboratory service can qualify as an order for another covered laboratory service. A standing order is not usually acceptable for a covered laboratory service. (PM AB-00-108).

If home-use glucose monitoring devices are used in the nursing home settings, a glucose monitoring service must be performed in accordance with laboratory coverage criteria to qualify for separate payment under the Medicare laboratory benefit. For a laboratory service to be reasonable and necessary, it must be ordered by the physician, the ordering physician must use the result in the management of the beneficiary's specific medical problem, and the laboratory result must be reported to the physician PROMPTLY in order for the physician to use the result and instruct continuation or modification of the patient care.(PM AB-00-108)."

35

CONFIDENTIAL:
Patient Information

## LCD INFORMATION

13.   The following is information about the LCD in dispute:

    a.   Name of Contractor using the LCD:  Mutual of Omaha Insurance Company

    b.   Title of LCD being challenged:  Blood Glucose Testing, Determination Number 2001-B, Version Number 5

    c.   Specific provision(s) of the LCD that, on their face, conflict with the NCD and adversely affect the aggrieved party:

        (i) "Repeat testing may not be indicated unless abnormal results are found or unless there is a change in clinical condition."

        (ii) "For laboratory services to be reasonable and necessary, it must not only be ordered by the physician but the ordering physician must also use the result in the management of the beneficiary's specific medical problem.

        **Implicitly, the laboratory result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of patient care: this includes the physician's order for another laboratory service.**

        Compliance program guidance for laboratory services sets forth conditions under which a physician's order for a repeat laboratory service can qualify as an order for another covered laboratory service. A standing order is not usually acceptable documentation for a covered laboratory service.

        Glucose monitoring of laboratory services must be performed in accordance with laboratory service coverage criteria including the order an clear use of a laboratory result prior to a similar subsequent laboratory order to benefit.

        Medicare Part B may pay for a glucose monitoring device and related disposable supplies under its durable medical equipment benefit if the equipment is used in the home or in an institution that is used as a home. A hospital or SNF is not considered a home under this benefit (§ 1861(h) of the Act, 42 CFR 410.38).

        Routine glucose monitoring of diabetics is never covered in a SNF, whether the beneficiary is in a covered Part A stay or not. Glucose monitoring may only be covered when it meets all the conditions of a covered laboratory service, including use by the physician in modifying the patient's treatment."

34

CONFIDENTIAL:
Patient Information

AGGRIEVED PARTY STATEMENT, OF WHICH THERE ARE
NO MATERIAL FACTS IN DISPUTE

14.    The Beneficiary needs the blood glucose testing services that are the subject of
the LCD, as evidenced by the written order signed by the Beneficiary's treating physician for
those services. See Exhibit 4. We fully expect that the Intermediary will deny the claims that
have been submitted for these services, based upon ADRs from the Intermediary. The provisions
of the LCD quoted above are invalid as a matter of law because they conflict with the NCD.
Moreover, coverage for the Beneficiary's blood glucose tests is supported by the Medicare
statute, the Medicare regulations, and a Program Memorandum published by CMS. The
frequency that the Beneficiary's blood glucose test results are reported to her physician is not
incompatible with additional language in the Program Memorandum concerning prompt
reporting of test results.

15.    The Medicare Statute and Regulations Support Coverage of The Beneficiary's
Blood Glucose Tests. The Beneficiary's blood glucose tests meet the requirements in the Social
Security Act (the "Act") and the Medicare regulations. The Act is the foremost authority for
Medicare Part B coverage for blood glucose testing. The applicable section of the Act is the
general requirement that the service be "reasonable and necessary for the diagnosis or treatment
of illness or injury." Exhibit 9, 42 U.S.C. § 1395y(a)(1)(A). Under this requirement, blood
glucose testing is reasonable and necessary for the diagnosis or treatment of diabetes.

16.    In recognition of the fact that Congress provided for Medicare Part B coverage of
blood glucose testing services, the Medicare regulations further describe the circumstances under
which blood glucose testing is reasonable and necessary. The regulations define blood glucose
testing with a device approved for home use as a "diagnostic laboratory test." Exhibit 10, 42
C.F.R. § 493.15. For Medicare beneficiaries residing in a SNF, coverage exists for diagnostic
laboratory tests if they are "ordered by the physician who is treating the beneficiary, that is, the
physician who furnishes a consultation or treats a beneficiary for a specific medical problem and
who uses the results in the management of the beneficiary's specific medical problem." Exhibit
11, Id. § 410.32(a). Thus, the only requirement in the Medicare regulations for blood glucose
testing to be reasonable and necessary is an order by the treating physician for such testing.
Nothing in the Medicare regulations imposes any additional requirements.

17.    The NCD Supports Coverage of The Beneficiary's Blood Glucose Tests.
Effective November 23, 2001, CMS promulgated the NCD to address Medicare coverage of
blood glucose testing. The NCD specifically encourages frequent testing of blood glucose levels
for diabetic patients and acknowledges that it may be reasonable and necessary to measure
quantitative blood glucose in stable, non-hospitalized patients who are unable or unwilling to do
so. The NCD does not provide any specific limitations to testing. In plain language, the NCD
acknowledges that specific diagnosis codes, such as diabetes, support repeat testing, especially
where there is a confirmed continuing risk of glucose metabolism abnormality. Significantly, the
NCD has seen both revision and expansion since its effective date of November 23, 2001, but the
position both covering and supporting blood glucose testing with a home-use device has not
changed.

36

CONFIDENTIAL:
Patient Information

18.    The NCD notes that using a device approved for home testing has become a standard of care for control of blood glucose, even in the inpatient setting. Importantly, the NCD does not expressly require that treating physicians receive the results of blood glucose tests with the frequency now required by the Intermediary. Nor does the NCD suggest that frequent testing is unreasonable or lacks medical necessity for beneficiaries diagnosed with diabetes. Rather, the NCD merely limits coverage for beneficiaries with "nonspecific signs, symptoms, or diseases not normally associated with disturbances in glucose metabolism" (i.e., patients without a diagnosis of diabetes) to a single test unless the results are abnormal or there is a change in clinical condition. According to the NCD, specific diagnosis codes such as diabetes support repeat testing, especially where there is a "confirmed continuing risk of glucose metabolism abnormality." Diabetes is a disease that is not only "associated with" disturbances in glucose metabolism, but is defined as "a syndrome characterized by hyperglycemia [abnormally high blood glucose] resulting from absolute or relative impairment in insulin secretion and/or insulin action." Exhibit 20, The Merck Manual of Diagnosis and Therapy § 2, Ch. 13, pg. 1. Beneficiaries with a diagnosis of diabetes who reside in SNFs almost always have such a continuing risk. Therefore, the NCD supports coverage of claims for regular blood glucose testing of beneficiaries with a diagnosis of diabetes, including Ms. Bailey.

19.    Specifically, the NCD states that "[f]requent home blood glucose testing by diabetic patients should be encouraged," and that "[t]he convenience of the meter or stick color method . . . has become a standard of care for control of blood glucose, even in the inpatient setting." Exhibit 3, 66 Fed. Reg. 58846 (Nov. 23, 2001). The NCD also states that "[d]epending upon the age of the patient, type of diabetes, degree of control, complications of diabetes, and other co-morbid conditions, more frequent testing than four times annually may be reasonable and necessary. . . . [R]epeat testing may be indicated where results are normal in patients with conditions where there is a confirmed continuing risk of glucose metabolism abnormality." Id. Taking into account the health factors of the Beneficiary, nowhere in the NCD are there specific limitations on the frequency of testing, and nowhere is there mention of "prompt" notification. The NCD simply lists the number of maladies that may require blood glucose testing and reiterates that reasonable and necessary tests will be reimbursed. See id. at 58846, 58848.

20.    A NCD is a determination by CMS as to whether or not a particular service is covered nationally by Medicare. See Exhibit 12, 42 C.F.R. § 405.1060(a)(1). A NCD is binding on all Medicare contractors, including carriers and fiscal intermediaries, as well as the DAB and its ALJs, among others. See id. § 405.1060(a)(4).

21.    A NCD takes precedence over decisions made on the local level by Medicare contractors, i.e., LCDs, including what were formerly known as Local Medical Review Policies ("LMRPs"), and other non-binding policies. "An LMRP may not conflict with a national coverage decision once the national coverage decision is effective. If a national coverage decision conflicts with a previously established LMRP, the contractor must change its LMRP to conform to the national coverage decision. . . . The LMRP may not alter the national coverage decision." Exhibit 13, 66 Fed. Reg. 58,788 (Nov. 23, 2001) (emphasis added).

22.    For this reason, if a LCD conflicts with a NCD, the Medicare contractor must follow the NCD.

37

CONFIDENTIAL:
Patient Information

23.    The Beneficiary's blood glucose testing services meet the NCD criteria in that they are performed on a diabetic beneficiary who has a continued risk of glucose metabolism abnormality. The NCD clearly states that such testing should be encouraged. Thus, limiting blood glucose services to the Beneficiary when she requires daily insulin shots defies the language of the NCD and good medical practice. The Beneficiary's blood glucose testing services also meet the reasonable and necessary criteria. They are ordered by the treating physician, furnished by qualified personnel, in an appropriate setting, and furnished in accordance with accepted standards of medical practice for the treatment of diabetes. All of the tests are performed at a frequency determined by the Beneficiary's treating physician to meet her specific medical needs.

24.    The Program Memorandum Supports Coverage of The Beneficiary's Blood Glucose Tests. In December 2000, CMS issued a Program Memorandum that specifically recognizes "administration of the [blood glucose testing] service several times a day is common in order to maintain tight control of glucose to prevent heart disease, blindness, and other complications of diabetes." Exhibit 14, CMS Program Memorandum AB-00-108 (Dec. 1, 2000). This language supports coverage of the Beneficiary's claims for blood glucose testing.

25.    Despite this statement, the Program Memorandum attempts to change longstanding Medicare policy, going well beyond the statute, the regulations, and the NCD to state that glucose testing laboratory services will not qualify for separate payment under Medicare unless the laboratory result is promptly reported to the physician to use the result to continue or modify patient care. The Program Memorandum cites no direct authority for this proposition and simply claims it is "implicit" in Medicare's requirements that services be reasonable and necessary to be covered. The Program Memorandum does not further define the term "prompt."

26.    Although we do not believe the NCD supports a prompt reporting requirement, the frequency that the Beneficiary's blood glucose test results are reported to her physician is not incompatible with the language in the Program Memorandum concerning prompt reporting of test results. The standard medical practice, where blood glucose test results are reported to the physician on a regular basis (but not immediately) constitutes prompt reporting. However, we also note that ALJs are not bound by CMS program memoranda and manual instructions. See Exhibit 12, 42 C.F.R. § 405.1062(a).

27.    The Intermediary's recent interpretation of its LCD requires that blood glucose test results be reported to the treating physician before the performance of the next blood glucose test. This interpretation further restricts coverage of blood glucose tests for diabetic patients who require regular testing. Because this interpretation has no basis in the statute, the regulations, the NCD, standard medical practice, or, we would argue, even the Program Memorandum, it should be invalidated.

28.    The LCD. The Intermediary's LCD on blood glucose testing, now in its fifth version, had an original effective date of September 4, 2001. The current version of the LCD applies to services performed on or after September 21, 2005.

38

- 8 -

CONFIDENTIAL:
Patient Information

29.    The LCD Conflicts With the NCD and Must Be Invalidated.  The LCD issued by Mutual conflicts with the NCD on blood glucose testing.  Therefore, the NCD, not the LCD, dictates which blood glucose testing services will be reimbursed.  The NCD trumps the LCD and is controlling.

30.    On or about September 2005, the Intermediary posted a newsletter on its web site (the "Intermediary's Newsletter") stating that, as of October 1, 2005, the Intermediary would subject all claims submitted for blood glucose testing services to medical review and/or system edits.  See Exhibit 15.

31.    In spite of the NCD and the force of law that it carries, the Intermediary now maintains the position that routine blood glucose testing in a SNF is a non-covered service, based on its LCD.

32.    As a result of this decision, none of the claims for blood glucose testing services for the Beneficiary with dates of service on or after October 1, 2005 will be reimbursed by Mutual.

33.    The ALJ should invalidate the Intermediary's LCD as a matter of law because the language quoted above conflicts with the NCD in numerous ways.  First, the LCD's emphasis on the word "routine" has the effect of denying coverage of regular blood glucose testing of SNF residents.  The LCD also states that routine blood glucose testing services are never covered in a SNF because a SNF is not a home; however, the LCD says that blood glucose testing in a SNF is a covered laboratory service that qualifies for separate payment under the Medicare laboratory benefit.  The NCD does not preclude regular blood glucose testing of SNF residents.  As an undisputed fact, glucose testing may be covered when it meets all the conditions of a covered laboratory service.  Therefore, characterizing blood glucose testing as "routine" cannot foreclose coverage under Part B in a SNF setting.  Even the Program Memorandum acknowledges that "[d]enial of payment for a Part B covered laboratory service cannot be made on the basis that the service is routine care."  Exhibit 14, pg. 3.  "Under Medicare, routine care determinations are applicable only for Part A nursing home services."  Id.

34.    Second, the LCD states that "routine" blood glucose testing is not reasonable and necessary.  According to the LCD, for a laboratory service to be reasonable and necessary, it must be ordered by the physician, the ordering physician must use the result in the management of the beneficiary's specific medical problem, and the laboratory result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of the patient care.  This statement is substantially the same as the Program Memorandum.  See id.  However, as discussed above, the plain language of the Social Security Act, the Medicare regulations, and the NCD do not require "prompt" notification.  The NCD sets the Medicare national coverage criteria for blood glucose testing, and it does not require "prompt" notification of laboratory results to the physician.  The absence in the NCD of the restrictive notification language, together with the NCD's language encouraging frequent testing and recognizing it as the standard of care, invalidates any "prompt" notification requirement in the LCD.

39

35.    Third, the LCD states that there can be no standing order for blood glucose testing for such services to be covered. On its face, that restriction contradicts the language in the LCD itself and in the NCD that specifically encourages frequent testing of blood glucose levels for diabetic patients and acknowledges that it may be reasonable and necessary to measure quantitative blood glucose in stable, non-hospitalized patients who are unable or unwilling to do so. The NCD does not provide any specific limitations to testing. To the contrary, the NCD acknowledges that specific diagnosis codes, such as diabetes, supports repeat testing, especially where there is a confirmed continuing risk of glucose metabolism abnormality. Therefore, a clear and unambiguous reading of the NCD supports the use of physician orders for repeat blood glucose testing; it does not suggest that the physician must sign a separate order for each test.

36.    The Intermediary's Recent Interpretation of its LCD is Arbitrary and Capricious. In addition, the Intermediary's recent interpretation of its LCD is arbitrary and capricious and amounts to substantive changes to its coverage policy that did not undergo a notice and comment period. The Intermediary's Newsletter states that, as of October 1, 2005, all blood glucose testing claims for SNF residents will be subject to medical review and/or system edits. See Exhibit 15. This is an abrupt change in the Intermediary's coverage policy that will have a devastating impact on thousands of Medicare Part B beneficiaries who reside in SNFs. The effect of this policy will be to deny claims for such beneficiaries that were previously allowed under the same LCD, with language that has remained substantially the same through five different versions, over the course of four and a half years (the first version of this LCD was effective on September 4, 2001).

37.    Based upon the Intermediary's history of allowing such claims under this LCD, it was reasonable for the Beneficiary to rely upon the Intermediary's long-standing interpretation of its own LCD when she submitted her claims for blood glucose testing services. Because the Beneficiary's blood glucose tests were covered and paid previously by the Intermediary, she had every reason to assume that blood glucose tests would continue to be covered and paid under the same LCD. The ALJ should find that the Intermediary's new interpretation of this LCD constitutes substantive and material changes to this local coverage policy that are invalid for not going through the notice and comment process required by Medicare Program Integrity Manual (CMS Pub. 100-08) § 13.7.2. See Exhibit 16. It is inequitable for the Intermediary to discontinue payment for the same services under the same LCD based upon the Beneficiary's reliance.

38.    The LCD Is Contrary to Good Medical Practice and Not Supported by the Medical Literature. Blood glucose testing to monitor glucose levels in the blood, as performed by patients and health care providers, is considered a cornerstone of diabetes care. See Exhibit 25, Position Statement: Tests of Glycemia In Diabetes, American Diabetes Association, Diabetes Care 25:S97-S99, Supp. 1 (Jan. 2002), pg. S97. The results of these tests are used to assess the efficacy of therapy and to guide adjustments in medical nutrition therapy, exercise, and medications to achieve the best possible blood glucose control. See id.

39.    Clinical authorities support the use of sliding scale insulin administration supported by glucose testing for nursing home residents, but prolonged use of sliding scale insulin is not recommended. See Exhibit 21, Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pg. 26.

40

CONFIDENTIAL:
Patient Information

This approach uses a base dose of intermediate or long acting insulin, and regular insulin, supplemented by regular insulin administered by the nurse based on the patient's blood sugar and the treating physician's orders. The established best practice is for the physician to set the frequency of the testing and a range for the blood glucose values of the specific patient. Blood glucose testing (or monitoring), a measurement of glucose in the blood that can be done at any time on a portable machine, has long been used to assess blood glucose levels for diabetics. Blood glucose testing is typically performed by placing a drop of blood on a reagent strip, which uses a chemical substance to react to the amount of glucose in the blood. The portable machine then reads the strip and displays the results as a number on a digital display. Physicians are notified when glucose values go above or below the specified parameters. Adjustments are made to the base (and supplemental) dose when necessary. This treatment protocol is essentially the same whether the patient is being treated at home, as a hospital inpatient, or in a SNF, and is consistent with existing Medicare requirements and the prior Intermediary policy.

40.    This type of glucose testing is particularly important in elderly patients where their age has compromised the body's ability to maintain stability/uniformity on its own. To help elderly diabetics maintain a homeostatic state, the clinical practice model of the AMDA recommends a blood glucose test on admission, bedside glucose testing <u>several times a day</u> (more frequently if the patient's glucose level is poorly controlled), daily blood glucose review, and physician alert when values fall below or above the recommended range or a range indicated in the physician's order. <u>See</u> <u>Exhibit</u> 21, Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pgs. 11, 27-28, 39-42. The American Diabetes Association also recommends blood glucose testing of type 1 diabetics three or more times daily. <u>See</u> <u>Exhibit</u> 23, Standards of Medical Care in Diabetes, American Diabetes Association, Diabetes Care 2004, Vol. 27, pg. S20; <u>Exhibit</u> 25, Position Statement: Tests of Glycemia In Diabetes, American Diabetes Association, Diabetes Care 25:S97-S99, Supp. 1 (Jan. 2002), pg. S97. Such glucose testing should <u>not</u> be confused with screening tests, routine or standing orders. This testing is medically necessary to avoid certain short and long term complications of diabetes, and to assess the efficacy of ongoing treatment.

41.    The medical literature clearly indicates that day-to-day control of insulin levels reduces the severity of existing consequences of diabetes, and can prevent the onset of new symptoms and complications. Diabetes is common in the nursing home setting, with over 18 percent of nursing home residents with this disease. <u>See</u> <u>Exhibit</u> 21, Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pg. 2. The literature demonstrates that nursing home patients have a high prevalence of cognitive and physical impairment and need help in daily activities. The prevalence of these impairments is higher among diabetic nursing home patients than in the nursing home population as a whole, which increases the complexity of diabetes management, and makes it unlikely that these patients can manage their diabetes on their own. <u>See</u> <u>id.</u>, pg. 3. Diabetic nursing home residents are susceptible to hyperglycemia (a condition that impairs cognition, decreases pain thresholds, impairs vision, and may increase the risk for falls) and hypoglycemia (which, untreated, can cause falls or permanent neurological impairment). <u>See</u> <u>id.</u> Nursing home residents are frequently unable to perceive or communicate hypoglycemic symptoms. <u>See</u> <u>id.</u> "Frequent monitoring of blood glucose levels is critical to avoid hypoglycemia and its consequences." <u>See</u> <u>Exhibit</u> 26, Subacute Care for Seniors: Management

41

CONFIDENTIAL:
Patient Information

of Elderly Diabetic Patients In the Subacute Care Setting, A. Lee, MD, Clinics In Geriatric Medicine, 16:4 (Nov. 2000), reprinted at http://home.mdconsult.com, pg. 8.

42.     Treatment guidelines for diabetes published by numerous medical societies establish that glucose testing is reasonable and necessary for the treatment of diabetes patients, and leave the frequency of the testing to the medical judgment of the treating physician, based on the patient's individual circumstances. See Exhibit 21, Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), see especially pgs. 39-41. Regular blood glucose testing is part of an overall, individualized treatment care plan for diabetes management, along with a meal plan, activity and physical therapy, treatment with oral antidiabetic agents and/or insulin, foot/wound care, and pain management. See Exhibit 21, Managing Diabetes in the Long-Term Care Setting:  Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pg. 16. Regular monitoring of blood glucose levels helps achieve target ranges for blood glucose control; reduce the risk of lower-extremity infections, ulcers, and limb loss; control pain and neuropathic symptoms; and reduce the progression of other diabetic complications. See id., pgs. 16-17.

43.     The insulin needs of patients with diabetes can vary from one patient to another, from day to day, even from hour to hour. Most nursing home patients have type 2 diabetes but a sizable proportion have combined therapy with insulin orders for treatment. Regular testing is particularly important because blood glucose levels frequently vary depending on the time of day, as demonstrated in a study conducted by the National Institute of Diabetes and Digestive and Kidney Diseases and Social, and Scientific Systems, Inc., published in the December 27, 2000, Journal of the American Medical Association. See Exhibit 22, Diurnal Variation in Fasting Plasma Glucose, JAMA (Dec. 27, 2000), pg. 5; see also Exhibit 20, The Merck Manual of Diagnosis and Therapy § 2, Ch. 13, pgs. 9-10 (discussing the "dawn phenomenon").

44.     During the past decade, clinical trials have demonstrated the importance of glycemic control, as measured through regular blood glucose testing, to prevent and reduce the complications of diabetes. See Exhibit 24, The Importance of Tight Glycemic Control, J.E. Gerich, MD, The American Journal of Medicine, 118:9A (September 2005), reprinted at http://home.mdconsult.com, pg. 4. Several new therapeutic agents have become available to improve and monitor glycemic control in patients with type 2 diabetes, including less painful and continuous monitoring devices. See id. Significantly, the optimization of glycemic control has been shown to be cost-effective. See id. Regular blood glucose testing with a monitoring device is less expensive in the long run than the costs of surgery and other treatments for patients who develop complications due to poor glycemic control. However, despite the advances in monitoring devices and therapeutic agents, at least one study suggests that there has not been a corresponding improvement in glycemic control for diabetic patients. See id. The likely explanations for this include "lack of time and resources due to reimbursement considerations, for physicians to treat patients with diabetes" and other factors. Id. The Intermediary's recent interpretation of its LCD is precisely the type of reimbursement policy that discourages regular blood glucose testing. Rather than encourage the necessary monitoring of blood glucose levels in Part B SNF residents by covering these tests, the LCD denies coverage, creating a disincentive to perform these tests. As a result, there is an increased likelihood that the Part B beneficiaries who suffer from this debilitating disease will develop blindness, require the amputation of limbs, and experience other complications that require costly medical intervention.

42

CONFIDENTIAL:
Patient Information

45.    The Intermediary's LCD not only ignores current medical literature and clinical authorities, it is inconsistent with numerous federal initiatives to combat diabetes and prevent complications of the disease. A number of these programs recognize the value of having the physician prescribe supplies and document the frequency of self-testing, without requiring physician review before each testing event. When HHS launched the National Diabetes Education Program ("NDEP") in 2001, a joint federal program run by the National Institutes of Health and the Centers for Disease Control and Prevention, the Secretary emphasized the importance of informing Medicare beneficiaries that they "can use their benefits to better monitor and manage their diabetes." Exhibit 27, "HHS Launches Diabetes Education Program for Older Americans," HHS Press Release (May 3, 2001), reprinted at http://www.hhs.gov/news/press/2001pres/20010503.html, pg. 1. The NDEP supports routine self-monitoring of blood sugar levels by diabetics and their health care providers for use in an effective treatment plan for managing their disease. See id. The Intermediary's LCD also runs counter to the recommendations of the American Diabetes Association that, given the importance of blood glucose testing to diabetes care, government and third-party payers "should strive to make the procedure readily accessible and affordable for all patients who require it." Exhibit 25, Position Statement: Tests of Glycemia In Diabetes, American Diabetes Association, Diabetes Care 25:S97-S99, Supp. 1 (Jan. 2002), pg. S97.

46.    The LCD Creates Unnecessary Administrative Burdens On Providers And Physicians. Treating diabetes using blood glucose testing in a hospital, SNF, or home, is best managed by trend analysis, not test-to-test adjustments. It is generally pointless to provide individual test results to the physician, except when test results are outside the parameters set by the physician, in which case the physician will be notified immediately. The physician needs to see trends of test results in order to determine whether dosage modification is medically necessary. See Exhibit 21, Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002), pgs. 28. This is certainly true with regard to this Beneficiary. Her physician states that:

> It would be impractical and, in my opinion, unnecessary for me to write a separate order for each blood glucose test to be administered to Ms. Bailey, or to be notified of the results of each test. It is my professional opinion, in keeping with standard medical practice, to review Ms. Bailey's blood glucose test results on a bi-monthly basis and make appropriate adjustment to her plan of care.

Exhibit 8, pg. 2, Statement By C. Steven Fehlauer, M.D.

47.    Moreover, the LCD's prompt notification language creates a tremendous burden on SNFs and their nursing staff and fails to take into consideration the realities of caring for Medicare beneficiaries who suffer from this debilitating disease. Most SNF residents have blood glucose testing schedules that follow similar time frames and, thus, will require nurses to call physicians for every diabetic patient at the same time. Further, even if SNF staff were to contact the physician after each test, there is no assurance the physician would promptly respond to the call or, in fact, use the individual test result in care planning. Based upon the written statement by the Beneficiary's physician, it is unlikely that he would do so. See Exhibit 8, pg. 2, Statement By C. Steven Fehlauer, M.D. In other words, even if SNFs reported each individual blood glucose test result to each diabetic resident's physician, it is doubtful that this process would

CONFIDENTIAL:
Patient Information

meet the Intermediary's purported goal of increasing physician involvement in diabetes management. One can only conclude that the Intermediary is now interpreting the prompt notification language in its LCD to impose an unworkable requirement upon SNF care givers, in a deliberate effort to deny legitimate claims for blood glucose tests.

## CLINICAL AND SCIENTIFIC EVIDENCE

48.    The following clinical and scientific evidence is enclosed as additional support for the Beneficiary's appeal:

a.    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Diabetes Fact Sheet (2003). See Exhibit 19.

b.    The Merck Manual of Diagnosis and Therapy § 2, Ch. 13. See Exhibit 20.

c.    Managing Diabetes in the Long-Term Care Setting: Clinical Practice Guideline, American Medical Directors Association (AMDA) (2002). See Exhibit 21.

d.    Diurnal Variation in Fasting Plasma Glucose, JAMA (Dec. 27, 2000). See Exhibit 22.

e.    Standards of Medical Care in Diabetes, American Diabetes Association, Diabetes Care, Vol. 27: S15-S35 (2004). See Exhibit 23.

f.    The Importance of Tight Glycemic Control, J.E. Gerich, MD, The American Journal of Medicine, 118:9A (Sept. 2005), reprinted at http://home.mdconsult.com. See Exhibit 24.

g.    Position Statement: Tests of Glycemia In Diabetes, American Diabetes Association, Diabetes Care 25:S97-S99, Supp. 1 (Jan. 2002). See Exhibit 25.

h.    Subacute Care for Seniors: Management of Elderly Diabetic Patients In the Subacute Care Setting, A. Lee, MD, Clinics In Geriatric Medicine, 16:4 (Nov. 2000), reprinted at http://home.mdconsult.com. See Exhibit 26.

i.    "HHS Launches Diabetes Education Program for Older Americans," HHS Press Release (May 3, 2001), reprinted at http://www.hhs.gov/news/press/2001pres/20010503.html. See Exhibit 27.

44

CONFIDENTIAL:
Patient Information

TWO RECENT ALJ DECISIONS IN CLAIMS APPEALS REVERSED DENIALS BASED
UPON SIMILAR LCDs, AND THESE DECISIONS HAVE NOT BEEN APPEALED BY THE
FI, NOR HAS THE SECRETARY SOUGHT TO INTERVENE

49.    Two ALJs recently accepted arguments similar to the ones asserted by the
Beneficiary in recent claims appeals based upon similar LCDs for blood glucose testing. See
Exhibit 17, Extendicare Health Services v. AdminaStar Federal, Docket Number 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
(Aug. 12, 2004) ("Extendicare I"); Exhibit 18, Extendicare Health Services v. AdminaStar
Federal, Docket Number 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 (Aug. 24, 2004) ("Extendicare II").[1]  We submit that these
decisions are persuasive authority in this appeal.

50.    Both cases dealt with an LMRP released by AdminaStar that was similar to
Mutual's LMRP in that it stated that Medicare would only cover medically reasonable and
necessary blood glucose testing services when a physician is "promptly notified of the test results
so  that he/she may provide active treatment . . . .  Multiple blood glucose monitoring services,
without prompt physician notification, are not covered . . . ." See Extendicare II, at 3.  In arguing
for Part B coverage of blood glucose tests, Extendicare, in both cases, appealed from
determinations that reimbursement was not warranted because the medical records did not reflect
that the physician was notified after each test or that the physician used each test result to order a
new test.  In neither case did AdminaStar seek appeal of the ALJs' determinations, nor did the
Secretary seek to intervene.

51.    In finding for Extendicare, one ALJ stated, "If a service cannot be denied because
it is routine,[2] it stands to reason that the services may be covered despite the fact that it is routine.
In fact, the purpose of routine, frequent blood glucose testing is to assure that tight control is
maintained, and this is precisely the kind of testing which is encouraged and allowed under the
[NCD]." Extendicare II, at 7.  The other ALJ determined that blood glucose testing is not a
"routine" procedure because it requires skilled care, and that "prompt" notification was not
defined in the LMRP.  Further, the ALJ concluded that "With such lack of specificity, it makes
every sense for the doctor to be able to monitor blood sugar after a series of blood tests over a
period of a week or so, in order to assess any fluctuations. . . . Expecting a physician to check
every day on the results and make changes based on each report in isolation is neither cost-
effective nor warranted for good health." Extendicare I, at 2.

52.    We are not aware of any appeal which CMS filed with respect to these decisions
with the Medicare Appeals Council of the DAB, which it had the right to do, or any other
communication issued by CMS expressing disagreement with the factual findings and legal
conclusions of the ALJ.

_____

[1] We are aware of one ALJ decision in a claims appeal (appeal number 1-7174101) that reached
a different outcome.
[2] The ALJ discussed the reference to "routine" in the context of the Hearing Officer's denial of
reimbursement for blood glucose testing since such testing was "routine."  The ALJ quoted CMS
Program Memorandum AB-00-108, which states "Denial of payment for a Part B covered
laboratory service cannot be made on the basis that the service is routine care.  Under Medicare,
routine care determinations are applicable only for Part A nursing home services." Extendicare
II, at 7.

45

CONFIDENTIAL:
Patient Information

53.    The Beneficiary's position is similar to the position of Extendicare endorsed by the ALJs. The blood glucose testing services cannot be dismissed as "routine" and, further, they meet the criteria of reasonable and medically necessary. As the ALJs stated, nothing in the NCD or regulations requires notifying the physician of each and every test result, nor is such notification necessary for effective management of the illness. Indeed, the Beneficiary's blood glucose testing services are necessary and are even encouraged by CMS.

## RELIEF REQUESTED

54.    The ALJ has the authority pursuant to 42 C.F.R. § 426.405(c)(18) to invalidate the LCD on a summary judgment basis because there are no material facts in dispute and the LCD conflicts with the NCD. We request that the ALJ treat this Complaint as a motion for such a decision.

55.    Alternatively, we believe that the information and evidence provided herein prove that the quoted provisions of the LCD should be invalidated. Those LCD provisions are contrary to the NCD, the statute, the regulations, the medical literature, good clinical practices, and the documented medical needs of this Beneficiary.

Respectfully submitted,

Thomas C. Fox, Esq.
Jason M. Healy, Esq.
REED SMITH LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C. 20005-3317
(202) 414-9200

Attorneys for the Beneficiary

March 28, 2006

46

- 16 -

DEPARTMENT OF HEALTH AND HUMAN SERVICES

**DEPARTMENTAL APPEALS BOARD**

CIVIL REMEDIES DIVISION



| | |
|---|---|
| *In Re* LCD Complaint: | )<br>)<br>) |
| Blood Glucose Testing<br>(LCD Database ID No. L19657) | )<br>)        Docket No. C-06-349<br>) |
| Contractor: Mutual of Omaha Insurance<br>Company (Fiscal Intermediary) | )<br>)<br>) |
| Region VII, Midwest Consortium | )<br>) |

### AGGRIEVED PARTY'S MOTION TO SEAL

The Aggrieved Party in this appeal requests that the ALJ order to be sealed the pages of the Beneficiary's Complaint and the exhibits thereto that are marked "CONFIDENTIAL: Patient Information." These documents include identifying patient health information that is protected from public disclosure pursuant to 5 U.S.C. § 552(b)(6) and 45 C.F.R. § 5.67.

Respectfully submitted,

Thomas C. Fox, Esq.
Jason M. Healy, Esq.
REED SMITH LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C. 20005-3317
(202) 414-9200

Attorneys for the Aggrieved Party

May 2, 2006

47

## CERTIFICATE OF SERVICE

I hereby certify that on this second day of May, 2006, the enclosed (1) Beneficiary's Complaint with exhibits numbered and pages marked for confidential patient information, and (2) Aggrieved Party's Motion to Seal, were served via Certified Mail to:

>Mutual of Omaha Insurance Company
>Medicare Area
>P.O. Box 1602
>Omaha, NE 68101

and

>CMS LCD Challenge Staff
>Mail Stop C3-02-16
>7500 Security Blvd.
>Baltimore, MD 21244-1850

Jason M. Healy, Esq.

48

# Blood Glucose Testing

## Mutual of Omaha Insurance Company

| Contractor Information | |
|---|---|
| **Contractor Name** | Mutual of Omaha Insurance Company |
| **Contractor Number** | 52280 |
| **Contractor Type** | FI |
| **LCD Information** | |
| **LCD Database ID Number** | L19657 |
| **LCD Version Number** | 5 |
| **LCD Title** | Blood Glucose Testing |
| **Contractor's Determination Number** | 2001-B |
| **AMA CPT / ADA CDT Copyright Statement** | CPT codes, descriptions and other data only are copyright 2005 American Medical Association (or such other date of publication of CPT). All Rights Reserved. Applicable FARS/DFARS Clauses Apply. Current Dental Terminology, (CDT) (including procedure codes, nomenclature, descriptors and other data contained therein) is copyright by the American Dental Association. © 2002, 2004 American Dental Association. All rights reserved. Applicable FARS/DFARS apply. |
| **CMS National Coverage Policy** | Title XVIII of the Social Security Act, section 1862(a)(7).This section excludes routine physical examinations.<br><br>· Title XVIII of the Social Security Act, section 1862(a)(1)(A). This section allows coverage and payment for only those services that are considered to be medically reasonable and necessary.<br><br>· Title XVIII of the Social Security Act, section 1833 (e). This section prohibits Medicare payment for any claim which lacks the necessary information to process the claim.<br><br>· 42 CFR 410.32 diagnostic tests must be ordered by the physician who is treating the beneficiary for a specific medical problem and uses the results in the management of the medical problem.<br><br>· 42 CFR 411.15 diagnostic testing in connection with a specific symptom or complaint.<br><br>· Program Memorandum AB-00-99, October 24, 2000.<br><br>· Program Memorandum AB-00-108, December 1, 2000.<br><br>· 42 CFR Part 410; Medicare Program; Negotiated Rulemaking; Coverage and Administrative Policies for Clinical Laboratory Services; Final Rule, November |

49

23, 2001.

CMS Publication 100-4, Chapter 7, Section 90.1 - Glucose Monitoring (rev. 1, 10-01-03).

| Primary Geographic Jurisdiction | |
|---|---|
| | AK |
| | AL |
| | AZ |
| | CA |
| | CO |
| | CT |
| | DE |
| | FL |
| | GA |
| | HI |
| | IA |
| | ID |
| | IL |
| | IN |
| | KS |
| | KY |
| | LA |
| | MA |
| | MD |
| | ME |
| | MI |
| | MN |
| | MO |
| | MS |
| | MT |
| | NC |
| | ND |
| | NE |
| | NH |
| | NJ |
| | NM |
| | NV |
| | OH |
| | OK |
| | OR |
| | PA |
| | RI |
| | SC |
| | SD |
| | TN |
| | TX |
| | UT |
| | VA |
| | VT |
| | WA |
| | WI |
| | WV |
| | WY |
| Secondary | |

50

| Geographic Jurisdiction | |
|---|---|
| Oversight Region | Region VII |
| CMS Consortium | Midwest |
| Original Determination Effective Date | For services performed on or after 09/04/2001 |
| Original Determination Ending Date | |
| Revision Effective Date | For services performed on or after 09/21/2005 |
| Revision Ending Date | |
| Indications and Limitations of Coverage and/or Medical Necessity | Blood glucose values are often necessary for the management of patients with diabetes mellitus, where hyperglycemia and hypoglycemia are often present. They are also critical in the determination of control of blood glucose levels in the patient with impaired fasting glucose (FPG 110-125 mg/dL), the patient with insulin resistance syndrome and/or carbohydrate intolerance (excessive rise in glucose following ingestion of glucose or glucose sources of food), in the patient with a hypoglycemia disorder such as nesidioblastosis or insulinoma, and in patients with a catabolic or malnutrition state. In addition to those conditions already listed, glucose testing may be medically necessary in patients with tuberculosis, unexplained chronic or recurrent infections, alcoholism, coronary artery disease (especially in women), or unexplained skin conditions (including pruritis, local skin infections, ulceration and gangrene without an established cause). Many medical conditions may be a consequence of a sustained elevated or depressed glucose level. These include comas, seizures or epilepsy, confusion, abnormal hunger, abnormal weight loss or gain, and loss of sensation. Evaluation of glucose may also be indicated in patients on medications known to affect carbohydrate metabolism.<br><br>Frequent home blood glucose testing by diabetic patients should be encouraged. In stable, non-hospitalized patients who are unable or unwilling to do home monitoring, it may be reasonable and necessary to measure quantitative blood glucose up to four times annually.<br><br>Depending upon the age of the patient, type of diabetes, degree of control, complications of diabetes, and other comorbid conditions, more frequent testing than four times annually may be reasonable and necessary.<br><br>In some patients presenting with nonspecific signs, symptoms, or diseases not normally associated with disturbances in glucose metabolism, a single blood glucose test may be medically necessary. Repeat testing may not be indicated unless abnormal results are found or unless there is a change in clinical condition. If repeat testing is performed, a specific diagnosis code (e.g., diabetes) should be reported to support medical necessity. However, repeat testing may be indicated where results are normal in patients with conditions where there is a confirmed continuing risk of glucose metabolism abnormality (e.g., monitoring glucocorticoid therapy).<br><br>If a physician separately orders the performance of a glucose monitoring |

service for a patient who can not self-administer, clinical staff generally will administer a glucose monitoring service along with their other duties.

For laboratory services to be reasonable and necessary, it must not only be ordered by the physician but the ordering physician must also use the result in the management of the beneficiary's specific medical problem.

**Implicitly, the laboratory result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of patient care: this includes the physician's order for another laboratory service.**

Compliance program guidance for laboratory services sets forth conditions under which a physician's order for a repeat laboratory service can qualify as an order for another covered laboratory service. A standing order is not usually acceptable documentation for a covered laboratory service.

Glucose monitoring of laboratory services must be performed in accordance with laboratory service coverage criteria including the order an clear use of a laboratory result prior to a similar subsequent laboratory order to benefit.

Medicare Part B may pay for a glucose monitoring device and related disposable supplies under its duable medical equipment benefit if the equipment is used in the home or in an institution that is used as a home. A hospital or SNF is not considered a home under this benefit (§ 1861(h) of the Act, 42 CFR 410.38).

Routine glucose monitoring of diabetics is never covered in a SNF, whether the beneficiary is in a covered Part A stay or not. Glucose monitoring may only be covered when it meets all the conditions of a covered laboratory service, including use by the physician in modifying the patient's treatment.

| Coverage Topic | Lab Services |
|---|---|

## Coding Information

| Bill Type Codes | | |
|---|---|---|
| | 12x | Hospital-inpatient or home health visits (Part B only) |
| | 13x | Hospital-outpatient (HHA-A also) (under OPPS 13X must be used for ASC claims submitted for OPPS payment -- eff. 7/00) |
| | 14x | Hospital-other (Part B) |
| | 18x | Hospital-swing beds |
| | 21x | SNF-inpatient (including Part A) |
| | 22x | SNF-inpatient or home health visits (Part B only) |
| | 23x | SNF-outpatient (HHA-A also) |
| | 71x | Clinic-rural health |
| | 72x | Clinic-hospital based or independent renal dialysis facility |
| | 74x | Clinic-ORF only (eff 4/97); ORF and CMHC (10/91 - 3/97) |
| | 75x | Clinic-CORF |

52

| Revenue Codes | 0300 | Laboratory-general classification |
| | 0310 | Laboratory pathological-general classification |
| **CPT/HCPCS Codes** | | |
| | 82947 | GLUCOSE; QUANTITATIVE, BLOOD (EXCEPT REAGENT STRIP) |
| | 82948 | GLUCOSE; BLOOD, REAGENT STRIP |
| | 82962 | GLUCOSE, BLOOD BY GLUCOSE MONITORING DEVICE(S) CLEARED BY THE FDA SPECIFICALLY FOR HOME USE |
| **Does the CPT 30% Coding Rule Apply?** | No | |
| **ICD-9 Codes that Support Medical Necessity** | Listing of HCPCS codes contained in this instruction does not assure coverage of service. Current coverage criteria still apply. It is not enough to link the procedure to a correct, payable ICD-9-CM diagnosis code. The diagnosis or clinical suspicion must be present for the procedure to be paid. | |
| | 011.00 - 011.96 | |
| | 038.0 - 038.9 | |
| | 112.1 | CANDIDIASIS OF VULVA AND VAGINA |
| | 112.3 | CANDIDIASIS OF SKIN AND NAILS |
| | 118 | OPPORTUNISTIC MYCOSES |
| | 150.8 | MALIGNANT NEOPLASM OF OTHER SPECIFIED PART OF ESOPHAGUS |
| | 157.4 | MALIGNANT NEOPLASM OF ISLETS OF LANGERHANS |
| | 158.0 | MALIGNANT NEOPLASM OF RETROPERITONEUM |
| | 211.7 | BENIGN NEOPLASM OF ISLETS OF LANGERHANS |
| | 242.00 - 242.91 | |
| | 250.00 - 250.93 | |
| | 251.0 - 251.9 | |
| | 253.0 - 253.9 | |
| | 255.0 | CUSHING'S SYNDROME |
| | 263.0 - | |

53

| | |
|---|---|
| 263.9 | |
| 271.0 - 271.9 | |
| 272.0 - 272.4 | |
| 275.0 | DISORDERS OF IRON METABOLISM |
| 276.0 - 276.9 | |
| 278.3 | HYPERCAROTINEMIA |
| 293.0 | DELIRIUM DUE TO CONDITIONS CLASSIFIED ELSEWHERE |
| 294.9 | UNSPECIFIED PERSISTENT MENTAL DISORDERS DUE TO CONDITIONS CLASSIFIED ELSEWHERE |
| 298.9 | UNSPECIFIED PSYCHOSIS |
| 300.9 | UNSPECIFIED NONPSYCHOTIC MENTAL DISORDER |
| 310.1 | PERSONALITY CHANGE DUE TO CONDITIONS CLASSIFIED ELSEWHERE |
| 337.9 | UNSPECIFIED DISORDER OF AUTONOMIC NERVOUS SYSTEM |
| 345.10 - 345.11 | |
| 355.9 | MONONEURITIS OF UNSPECIFIED SITE |
| 356.9 | UNSPECIFIED IDIOPATHIC PERIPHERAL NEUROPATHY |
| 357.9 | UNSPECIFIED INFLAMMATORY AND TOXIC NEUROPATHIES |
| 362.10 | BACKGROUND RETINOPATHY UNSPECIFIED |
| 362.18 | RETINAL VASCULITIS |
| 362.29 | OTHER NONDIABETIC PROLIFERATIVE RETINOPATHY |
| 362.50 - 362.57 | |
| 362.60 - 362.66 | |
| 362.81 - 362.89 | |
| 365.04 | OCULAR HYPERTENSION |
| 365.32 | CORTICOSTEROID-INDUCED GLAUCOMA RESIDUAL STAGE |
| 366.00 - 366.09 | |
| 366.10 - 366.19 | |

54

| 367.1 | MYOPIA |
| 368.8 | OTHER SPECIFIED VISUAL DISTURBANCES |
| 373.00 | BLEPHARITIS UNSPECIFIED |
| 377.24 | PSEUDOPAPILLEDEMA |
| 377.9 | UNSPECIFIED DISORDER OF OPTIC NERVE AND VISUAL PATHWAYS |
| 378.50 - 378.55 | |
| 379.45 | ARGYLL ROBERTSON PUPIL ATYPICAL |
| 410.00 - 410.92 | |
| 414.00 - 414.19 | |
| 425.9 | SECONDARY CARDIOMYOPATHY UNSPECIFIED |
| 440.23 | ATHEROSCLEROSIS OF NATIVE ARTERIES OF THE EXTREMITIES WITH ULCERATION |
| 440.24 | ATHEROSCLEROSIS OF NATIVE ARTERIES OF THE EXTREMITIES WITH GANGRENE |
| 440.9 | GENERALIZED AND UNSPECIFIED ATHEROSCLEROSIS |
| 458.0 | ORTHOSTATIC HYPOTENSION |
| 462 | ACUTE PHARYNGITIS |
| 466.0 | ACUTE BRONCHITIS |
| 480.0 - 486 | |
| 490 | BRONCHITIS NOT SPECIFIED AS ACUTE OR CHRONIC |
| 491.0 - 491.9 | |
| 527.7 | DISTURBANCE OF SALIVARY SECRETION |
| 528.0 | STOMATITIS |
| 535.50 - 535.51 | |
| 536.8 | DYSPEPSIA AND OTHER SPECIFIED DISORDERS OF FUNCTION OF STOMACH |
| 571.8 | OTHER CHRONIC NONALCOHOLIC LIVER DISEASE |
| 572.0 - 572.8 | |
| 574.50 - 574.51 | |
| 575.0 - | |

55

| | |
|---|---|
| 575.12 | |
| 576.1 | CHOLANGITIS |
| 577.0 | ACUTE PANCREATITIS |
| 577.1 | CHRONIC PANCREATITIS |
| 577.8 | OTHER SPECIFIED DISEASES OF PANCREAS |
| 590.00 - 590.9 | |
| 595.9 | CYSTITIS UNSPECIFIED |
| 596.4 | ATONY OF BLADDER |
| 596.53 | PARALYSIS OF BLADDER |
| 599.0 | URINARY TRACT INFECTION SITE NOT SPECIFIED |
| 607.84 | IMPOTENCE OF ORGANIC ORIGIN |
| 608.89 | OTHER SPECIFIED DISORDERS OF MALE GENITAL ORGANS |
| 616.10 | VAGINITIS AND VULVOVAGINITIS UNSPECIFIED |
| 626.0 | ABSENCE OF MENSTRUATION |
| 626.4 | IRREGULAR MENSTRUAL CYCLE |
| 628.9 | INFERTILITY FEMALE OF UNSPECIFIED ORIGIN |
| 648.03 | ANTEPARTUM DIABETES MELLITUS |
| 648.04 | POSTPARTUM DIABETES MELLITUS |
| 648.80 | ABNORMAL GLUCOSE TOLERANCE OF MOTHER COMPLICATING PREGNANCY CHILDBIRTH OR THE PUERPERIUM UNSPECIFIED AS TO EPISODE OF CARE |
| 648.83 | ABNORMAL GLUCOSE TOLERANCE OF MOTHER ANTEPARTUM |
| 648.84 | ABNORMAL GLUCOSE TOLERANCE OF MOTHER POSTPARTUM |
| 656.60 - 656.63 | |
| 657.00 - 657.03 | |
| 680.0 | CARBUNCLE AND FURUNCLE OF FACE |
| 686.00 - 686.9 | |
| 698.0 - 698.1 | |
| 704.1 | HIRSUTISM |

56

| 705.0 | ANHIDROSIS |
| 707.00 - 707.9 | |
| 709.3 | DEGENERATIVE SKIN DISORDERS |
| 729.1 | MYALGIA AND MYOSITIS UNSPECIFIED |
| 730.07 | ACUTE OSTEOMYELITIS INVOLVING ANKLE AND FOOT |
| 730.17 | CHRONIC OSTEOMYELITIS INVOLVING ANKLE AND FOOT |
| 730.27 | UNSPECIFIED OSTEOMYELITIS INVOLVING ANKLE AND FOOT |
| 780.01 | COMA |
| 780.02 | TRANSIENT ALTERATION OF AWARENESS |
| 780.09 | ALTERATION OF CONSCIOUSNESS OTHER |
| 780.2 | SYNCOPE AND COLLAPSE |
| 780.31 | FEBRILE CONVULSIONS |
| 780.39 | OTHER CONVULSIONS |
| 780.4 | DIZZINESS AND GIDDINESS |
| 780.71 - 780.79 | |
| 780.8 | GENERALIZED HYPERHIDROSIS |
| 782.0 | DISTURBANCE OF SKIN SENSATION |
| 783.1 | ABNORMAL WEIGHT GAIN |
| 783.5 | POLYDIPSIA |
| 783.6 | POLYPHAGIA |
| 785.0 | TACHYCARDIA UNSPECIFIED |
| 785.4 | GANGRENE |
| 786.01 | HYPERVENTILATION |
| 786.09 | RESPIRATORY ABNORMALITY OTHER |
| 786.50 | UNSPECIFIED CHEST PAIN |
| 787.6 | INCONTINENCE OF FECES |
| 787.91 | DIARRHEA |
| 788.41 - 788.43 | |
| 789.1 | HEPATOMEGALY |
| 790.21 - 790.29 | |

57

| | | |
|---|---|---|
| | V60.0 - V60.9 | |
| | V62.0 | UNEMPLOYMENT |
| | V62.1 | ADVERSE EFFECTS OF WORK ENVIRONMENT |
| | V65.0 | HEALTHY PERSON ACCOMPANYING SICK PERSON |
| | V68.0 - V68.9 | |
| | V70.0 - V70.9 | |
| | V73.0 - V73.99 | |
| | V74.0 - V74.9 | |
| | V75.0 - V75.9 | |
| | V76.0 | SPECIAL SCREENING FOR MALIGNANT NEOPLASMS OF THE RESPIRATORY ORGANS |
| | V76.3 | SCREENING FOR MALIGNANT NEOPLASMS OF THE BLADDER |
| | V76.42 - V76.9 | |
| | V78.0 - V78.9 | |
| | V79.0 - V79.9 | |
| | V80.0 - V80.3 | |
| | V81.0 - V81.6 | |
| | V82.0 - V82.9 | |
| **Non-Medical Necessity ICD-9 Codes Asterisk Explanation** | | |
| **Diagnoses that DO NOT Support Medical Necessity** | | |
| **General Information** | | |
| **Documentation Requirements** | Lab results<br><br>Medication Administration Record<br><br>Documentation to support the physician was notified prior to subsequent testing and the medical intervention of the physician | |
| **Appendices** | | |
| **Utilization Guidelines** | A standing order for a covered laboratory service without evidence of signs or symptoms of hyperglycemia or hypoglycemia would not be considered reasonable and necessary and would not be considered for separate payment. | |

59

Lack of documentation of prompt notification of the physician (prompt notification would be the anticipation that the physician would be notified prior to the next blood glucose monitoring with the possible adjustment of medication) would not be considered reasonable and necessary and would not be considered for separate payment.

Routine monitoring per accucheck of blood sugars done daily, weekly or intermittently without signs or symptoms and/or without physician notification would not be considered reasonable or necessary and would not be considered for separate payment.

· Tests for screening purposes that are performed in the absence of signs, symptoms, complaints, or personal history of disease or injury are not covered except as explicitly authorized by statute. These include exams required by insurance companies, business establishments, government agencies, or other third parties.

· Tests that are not reasonable and necessary for the diagnosis or treatment of an illness or injury are not covered according to the statute.
· Failure to provide documentation of the medical necessity of tests may result in denial of claims.

Such documentation may include notes documenting relevant signs, symptoms or abnormal findings that substantiate the medical necessity for ordering the tests.

In addition, failure to provide independent verification that the test was ordered by the treating physician (or qualified non-physician practitioner) through documentation in the physician's office may result in denial.

A claim for a test for which there is a national coverage or local medical review policy will be denied as not reasonable and necessary if it is submitted without an ICD-9-CM code or narrative diagnosis listed as covered in the policy unless other medical documentation justifying the necessity is submitted with the claim.

· If a national or local policy identifies a frequency expectation, a claim for a test that exceeds that expectation may be denied as not reasonable and necessary, unless it is submitted with documentation justifying increased frequency.

· Tests that are not ordered by a treating physician or other qualified treating non-physician practitioner acting within the scope of their license and in compliance with Medicare requirements will be denied as not reasonable and necessary.

· Failure of the laboratory performing the test to have the appropriate Clinical Laboratory Improvement Act of 1988 (CLIA) certificate for the testing performed will result in denial of claims.

Glucose monitoring laboratory service must be performed in accordance with laboratory service coverage criteria including the order and clear use of a laboratory result prior to a similar subsequent laboratory order to qualify for      60

| | |
|---|---|
| | separate payment under the Medicare laboratory benefit. (PM AB-00-108).<br><br>Compliance program guidelines for laboratory services sets forth conditions under which a physician's order for a repeat laboratory service can qualify as an order for another covered laboratory service. A standing order is not usually acceptable for a covered laboratory service.(PM AB-00-108).<br><br>If home -use glucose monitoring devices are used in the nursing home settings, a glucose monitoring service must be performed in accordance with laboratory coverage criteria to qualify for separate payment under the Medicare laboratory benefit. For a laboratory service to be reasonable and necessary, it must be ordered by the physician, the ordering physician must use the result in the management of the beneficiary's specific medical problem, and the laboratory result must be reported to the physician PROMPTLY in order for the physician to use the result and instruct continuation or modification of the patient care.(PM AB-00-108). |
| **Sources of Information and Basis for Decision** | This policy has been adopted from the Medicare National Coverage Decisions for Blood Glucose Testing. This policy was developed through the Medical Coverage Negotiated Rule making process. The sources of information used in developing this policy can be found on the HCFA web site, and are listed below;<br><br>· 2000 CPT Physicians' Current Procedural Terminology, American Medical Association<br><br>· AACE Guidelines for the Management of Diabetes Mellitus, Endocrine Practice (1995)1:149-157.<br><br>Bower, Bruce F. And Robert E. Moore, Endocrine Function and Carbohydrates.<br><br>· Clinical Laboratory Medicine, Kenneth D. McClatchy, editor. Baltimore/Williams & Wilkins, 1994. p 321-323.<br><br>· Report of the Expert Committee on the Diagnosis and Classification of Diabetes Mellitus, Diabetes Care, Volume 20, Number 7, July 1997, pages 1183 et seq.<br><br>· Roberts, H. J., Difficult Diagnoses. W. B. Saunders Co., pp 69-70. |
| **Advisory Committee Meeting Notes** | |
| **Start Date of Comment Period** | |
| **End Date of Comment Period** | |
| **Start Date of Notice Period** | 61 |
| **Revision History Number** | 9/21/2005 Addition of ICD-9 codes 158.0, 362.10. 790.21 to 790.29 and 783.6 which were left off with conversion from LMRP to LCD. |

| | |
|---|---|
| | 11/25/02 Addition of CFR Final Rule information, Addition to covered codes of 362.0 and 780.31.<br><br>2001-B 7/1/03 Deletion of range 730.07-730.27 and substitution of 730.07, 730.17, 730.27 as instructed in Transmittal AB-03-084, June 6, 2003. |
| **Revision History Explanation** | 09/04/2005 - This policy was updated by the ICD-9 2005-2006 Annual Update. |
| **Last Reviewed on Date** | 09/21/2005 |
| **Notes** | 09/04/2005 - This policy was updated by the ICD-9 2005-2006 Annual Update. |
| **Does this LCD contain a "Least Costly Alternative" provision?** | No |
| **Related Documents** | This LCD has no Related Documents. |
| **LCD Attachments** | There are no attachments for this LCD |
| **Approved?** | Yes |
| **Saved By** | Carol Richards |
| **Saved On** | 10/06/2005 09:33:26 |
| **Other Versions** | Version 4 - Updated on 09/21/2005 16:11:53, by Carol Richards, with effective dates 09/21/2005 - N/A (Approved).<br>Version 3 - Updated on 09/19/2005 14:44:53, by Carol Richards, with effective dates 09/04/2001 - N/A (Approved).<br>Version 2 - Updated on 09/04/2005 14:41:17, by Admin User, with effective dates 09/04/2001 - N/A.<br>Version 1 - Updated on 02/10/2005 15:38:38, by Carol Richards, with effective dates 09/04/2001 - N/A. |



This website is an official service of the Centers for Medicare & Medicaid Services.

Docket No. C-06-349
A. Ex. 1
Page 14 of 14

https://coverage.cms.fu.com/lcd/view_lcd_popup.asp?which=view&contractor_num...    12/21/2005

CONFIDENTIAL:
Patient Information



MEDICARE
Part A Intermediary

CENTERS for MEDICARE & MEDICAID SERVICES

REPORT: 001        MEDICARE PART A - 52280      PROVIDER NUMBER: 465109
DATE: 12/07/05    ADDITIONAL DEVELOPMENT REQUEST  TYPE REQUEST: MEDICAL
                                                  BILL TYPE: 223


HOLLADAY HEALTHCARE CENTER
4782 S HOLLADAY BLVD
HOLLADAY            UT 84117


WE HAVE REVIEWED YOUR CLAIM RECORDS AND FOUND THAT ADDITIONAL DEVELOPMENT
WILL BE NECESSARY BEFORE PROCESSING CAN BE FINALIZED.  TO ASSIST YOU IN
PROVIDING THE REQUIRED INFORMATION, WE HAVE ASSIGNED REASON CODES TO THE
AFFECTED CLAIM RECORD (SEE BELOW) FOR YOUR REVIEW.  PLEASE REFER TO THE
ACCOMPANYING LIST FOR EXPLANATION OF THE ASSIGNED CODE, AND ENTER THE
REQUIRED INFORMATION IN THE SPACE PROVIDED BELOW EACH CLAIM RECORD AND
RETURN WITHIN 30 DAYS TO THE:          OMB CONTROL# 0938-0969


                    MEDICAL REVIEW DEPARTMENT
                    MUTUAL OF OMAHA MEDICARE
                    PO BOX 1602
                    OMAHA            NE    68101


| MEDICAL REC NO. DCN | PATIENT NAME/ HIC NUMBER | | FROM/TO DATES | OPR-MED ANALYST | TOTAL CHARGES |
|---|---|---|---|---|---|
| 020530 | BAILEY | LOUISE | 110105 | M699 | 261.60 |
| 20534002602402 | | | 113005 | | |

REASONS:  50200

                        50200
PLEASE SUBMIT THE FOLLOWING INFORMATION TO SUPPORT BLOOD GLUCOSE SERVICES
- PHYSICIAN ORDER(S) TO INCLUDE BLOOD GLUCOSE TESTING.
- DOCUMENTATION FOR THE MEDICAL NECESSITY FOR EACH TEST BILLED, THIS MAY
  INCLUDE NURSE'S NOTES AND OR PHYSICIAN PROGRESS NOTES.
- RESULTS OF EACH BLOOD GLUCOSE/ACCUCHECK TEST BILLED.
- DOCUMENTATION OF PHYSICIAN NOTIFICATION OF EACH TEST RESULT NOTING THE USE
  OF THE RESULTS TO MODIFY TREATMENT.
- DETAILED ITEMIZATION OF CHARGES BILLED.
- HISTORY AND PHYSICAL SUPPORTING THE DIAGNOSIS OF DIABETES


                                                            63

Docket No. C-06-349
A. Ex. 2
Page 1 of 2

CONFIDENTIAL:
Patient Information



**CENTERS for MEDICARE & MEDICAID SERVICES**

MEDICARE
Part A Intermediary

REPORT: 001          MEDICARE PART A - 52280      PROVIDER NUMBER: 465109
DATE:  1/09/06    ADDITIONAL DEVELOPMENT REQUEST   TYPE REQUEST: MEDICAL
                                                   BILL TYPE: 223


HOLLADAY HEALTHCARE CENTER
4782 S HOLLADAY BLVD
HOLLADAY             UT 84117



WE HAVE REVIEWED YOUR CLAIM RECORDS AND FOUND THAT ADDITIONAL DEVELOPMENT
WILL BE NECESSARY BEFORE PROCESSING CAN BE FINALIZED.  TO ASSIST YOU IN
PROVIDING THE REQUIRED INFORMATION, WE HAVE ASSIGNED REASON CODES TO THE
AFFECTED CLAIM RECORD (SEE BELOW) FOR YOUR REVIEW.  PLEASE REFER TO THE
ACCOMPANYING LIST FOR EXPLANATION OF THE ASSIGNED CODE, AND ENTER THE
REQUIRED INFORMATION IN THE SPACE PROVIDED BELOW EACH CLAIM RECORD AND
RETURN WITHIN 30 DAYS TO THE:
                                         OMB CONTROL# 0938-0969


                    MEDICAL REVIEW DEPARTMENT
                    MUTUAL OF OMAHA MEDICARE
                    PO BOX 1602
                    OMAHA           NE    68101


| MEDICAL REC NO. DCN | PATIENT NAME/ HIC NUMBER | | FROM/TO DATES | OPR-MED ANALYST | TOTAL CHARGES |
|---|---|---|---|---|---|
| 020530 20600602557902 | BAILEY ██████ | LOUISE | 120105 123105 | M699 | 287.76 |

REASONS:  50200

                         50200
PLEASE SUBMIT THE FOLLOWING INFORMATION TO SUPPORT BLOOD GLUCOSE SERVICES
- PHYSICIAN ORDER(S) TO INCLUDE BLOOD GLUCOSE TESTING.
- DOCUMENTATION FOR THE MEDICAL NECESSITY FOR EACH TEST BILLED, THIS MAY
  INCLUDE NURSE'S NOTES AND OR PHYSICIAN PROGRESS NOTES.
- RESULTS OF EACH BLOOD GLUCOSE/ACCUCHECK TEST BILLED.
- DOCUMENTATION OF PHYSICIAN NOTIFICATION OF EACH TEST RESULT NOTING THE USE
  OF THE RESULTS TO MODIFY TREATMENT.
- DETAILED ITEMIZATION OF CHARGES BILLED.
- HISTORY AND PHYSICAL SUPPORTING THE DIAGNOSIS OF DIABETES

Docket No. C-06-349
A. Ex. 2
Page 2 of 2

**58846**    **Federal Register** / Vol. 66, No. 226 / Friday, November 23, 2001 / Rules and Regulations

has not been coded to the full number of digits required for that code. (From Coding Clinic for ICD–9–CM, Fourth Quarter, 1995, page 44.)

4. Diagnoses documented as "probable," "suspected," "questionable," "rule-out," or "working diagnosis" should not be coded as though they exist. Rather, code the condition(s) to the highest degree of certainty for that encounter/visit, such as signs, symptoms, abnormal test results, exposure to communicable disease or other reasons for the visit. (From Coding Clinic for ICD–9–CM, Fourth Quarter 1995, page 45.)

5. When a non-specific ICD–9 code is submitted, the underlying sign, symptom, or condition must be related to the indications for the test above.

6. When the indication for the test is long-term administration of glucocorticosteroids, use ICD–9–CM code V58.69.

*Medicare National Coverage Decision for Blood Glucose Testing*

*Description*

This policy is intended to apply to blood samples used to determine glucose levels.

Blood glucose determination may be done using whole blood, serum or plasma. It may be sampled by capillary puncture, as in the fingerstick method, or by vein puncture or arterial sampling. The method for assay may be by color comparison of an indicator stick, by meter assay of whole blood or a filtrate of whole blood, using a device approved for home monitoring, or by using a laboratory assay system using serum or plasma. The convenience of the meter or stick color method allows a patient to have access to blood glucose values in less than a minute or so and has become a standard of care for control of blood glucose, even in the inpatient setting.

### HCPCS Codes (Alpha numeric, CPT–AMA)

| Code | Descriptor |
| --- | --- |
| 82947 | Glucose; quantitative, blood (except reagent strip) |
| 82948 | Glucose; blood, reagent strip |
| 82962 | Glucose, blood by glucose monitoring device(s) cleared by the FDA specifically for home use. |

*Indications*

Blood glucose values are often necessary for the management of patients with diabetes mellitus, where hyperglycemia and hypoglycemia are often present. They are also critical in the determination of control of blood glucose levels in the patient with impaired fasting glucose (FPG 110–125 mg/dL), the patient with insulin resistance syndrome and/or carbohydrate intolerance (excessive rise in glucose following ingestion of glucose or glucose sources of food), in the patient with a hypoglycemia disorder such as nesidioblastosis or insulinoma, and in patients with a catabolic or malnutrition state. In addition to those conditions already listed, glucose testing may be medically necessary in patients with tuberculosis, unexplained chronic or recurrent infections, alcoholism, coronary artery disease (especially in women), or unexplained skin conditions (including pruritis, local skin infections, ulceration and gangrene without an established cause). Many medical conditions may be a consequence of a sustained elevated or depressed glucose level. These include comas, seizures or epilepsy, confusion, abnormal hunger, abnormal weight loss or gain, and loss of sensation. Evaluation of glucose may also be indicated in patients on medications known to affect carbohydrate metabolism.

*Limitations*

Frequent home blood glucose testing by diabetic patients should be encouraged. In stable, non-hospitalized patients who are unable or unwilling to do home monitoring, it may be reasonable and necessary to measure quantitative blood glucose up to four times annually.

Depending upon the age of the patient, type of diabetes, degree of control, complications of diabetes, and other co-morbid conditions, more frequent testing than four times annually may be reasonable and necessary.

In some patients presenting with nonspecific signs, symptoms, or diseases not normally associated with disturbances in glucose metabolism, a single blood glucose test may be medically necessary. Repeat testing may not be indicated unless abnormal results are found or unless there is a change in clinical condition. If repeat testing is performed, a specific diagnosis code (e.g., diabetes) should be reported to support medical necessity. However, repeat testing may be indicated where results are normal in patients with conditions where there is a confirmed continuing risk of glucose metabolism abnormality (e.g., monitoring glucocorticoid therapy).

### ICD–9–CM Codes Covered by Medicare Program

| Code | Description |
| --- | --- |
| 011.00–011.96 | Tuberculosis |
| 038.0–038.9 | Septicemia |
| 112.1 | Recurrent vaginal candidiasis |
| 112.3 | Interdigital candidiasis |
| 118 | Opportunistic mycoses |
| 157.4 | Malignant neoplasm of Islets of Langerhans |
| 158.0 | Malignant neoplasm of retroperitoneum |
| 211.7 | Benign neoplasm of Islets of Langerhans |
| 242.00–242.91 | Thyrotoxicosis |
| 250.00–250.93 | Diabetes mellitus |
| 251.0–251.9 | Disorders of pancreatic internal secretion |
| 253.0–253.9 | Disorders of the pituitary gland |
| 255.0 | Cushing syndrome |

65

Federal Register / Vol. 66, No. 226 / Friday, November 23, 2001 / Rules and Regulations     58847

| Code | Description |
|---|---|
| 263.0–263.9 | Malnutrition |
| 271.0–271.9 | Disorders of carbohydrate transport and metabolism |
| 272.0–272–4 | Disorders of lipoid metabolism |
| 275.0 | Hemochromotosis |
| 276.0–276.9 | Disorders of fluid, electrolyte and acid-base balance |
| 278.3 | Hypercarotinemia |
| 293.0 | Acute delirium |
| 294.9 | Unspecified organic brain syndrome |
| 298.9 | Unspecified psychosis |
| 300.9 | Unspecified neurotic disorder |
| 310.1 | Organic personality syndrome |
| 337.9 | Autonomic nervous system neuropathy |
| 345.10–345.11 | Generalized convulsive epilepsy |
| 348.3 | Encephalopathy, unspecified |
| 355.9 | Neuropathy, not otherwise specified |
| 356.9 | Unspecified hereditary and idiopathic peripheral neuropathy |
| 357.9 | Unspecified inflammatory and toxic neuropathy |
| 362.10 | Background retinopathy |
| 362.18 | Retinal vasculitis |
| 362.29 | Nondiabetic proliferative retinopathy |
| 362.50–362.57 | Degeneration of macular posterior pole |
| 362.60–362.66 | Peripheral retinal degeneration |
| 362.81–362.89 | Other retinal disorders |
| 362.0 | Unspecified retinal disorders |
| 365.04 | Borderline glaucoma, ocular hypertension |
| 365.32 | Corticosteriod-induced glaucoma residual |
| 366.00–366.09 | Presenile cataract |
| 366.10–366.19 | Senile cataract |
| 367.1 | Acute myopia |
| 368.8 | Other specified visual disturbance |
| 373.00 | Blepharitis |
| 377.24 | Pseudopapilledema |
| 377.9 | Autonomic nervous system neuropathy |
| 378.50–378.55 | Paralytic strabismus |
| 379.45 | Argyll-Robertson pupils |
| 410.00–410.92 | Acute myocardial infarctions |
| 414.00–414.19 | Coronary atherosclerosis and aneurysm of heart |
| 425.9 | Secondary cardiomyopathy, unspecified |
| 440.23 | Arteriosclerosis of extremities with ulceration |
| 440.24 | Arteriosclerosis of extremities with gangrene |
| 440.9 | Arteriosclerosis, not otherwise specified |
| 458.0 | Postural hypotension |
| 462 | Acute pharyngitis |
| 466.0 | Acute bronchitis |
| 480.0–486 | Pneumonia |
| 490 | Recurrent bronchitis, not specified as acute or chronic |
| 491.0–491.9 | Chronic bronchitis |
| 527.7 | Disturbance of salivory secretion (drymouth) |
| 528.0 | Stomatitis |
| 535.50–535.51 | Gastritis |
| 536.8 | Dyspepsia |
| 571.8 | Other chronic nonalcoholic liver disease |
| 572.0–572.8 | Liver abscess and sequelae of chronic liver disease |
| 574.50–574.51 | Choledocholitiasis |
| 575.0–575.12 | Cholecystitis |
| 576.1 | Cholangitis |
| 577.0 | Acute pancreatitis |
| 577.1 | Chronic pancreatitis |
| 577.8 | Pancreatic multiple calculi |
| 590.00–590.9 | Infections of the kidney |
| 595.9 | Recurrent cystitis |
| 596.4 | Bladder atony |
| 596.53 | Bladder paresis |
| 599.0 | Urinary tract infection, recurrent |
| 607.84 | Impotence of organic origin |
| 608.89 | Other disorders male genital organs |
| 616.10 | Vulvovaginitis |
| 626.0 | Amenorrhea |
| 626.4 | Irregular menses |
| 628.9 | Infertility—female |
| 648.00 | Diabetes mellitus complicating pregnancy, Childbirth or the puerperium, unspecified as to episode of care or not applicable |
| 648.03 | Diabetes mellitus complicating pregnancy, Childbirth or the puerperium, antipartum condition or complication |

66

**58848**    **Federal Register** / Vol. 66, No. 226 / Friday, November 23, 2001 / Rules and Regulations

| Code | Description |
| --- | --- |
| 648.04 | Diabetes mellitus complicating pregnancy, Childbirth or the puerperium, postpartum condition or complication |
| 648.80 | Abnormal glucose tolerance complicating pregnancy, childbirth or the puerperium, unspecified as to episode of care or not applicable |
| 648.83 | Abnormal glucose tolerance complicating pregnancy, childbirth or the puerperium, antipartum condition or complication |
| 648.84 | Abnormal glucose tolerance complicating pregnancy, childbirth or the puerperium, postpartum condition or complication |
| 656.60–656.63 | Fetal problems affecting management of mother—large for-date of fetus |
| 657.00–657.03 | Polyhydramnios |
| 680.0–680.9 | Carbuncle and furuncle |
| 686.00–686.9 | Infections of skin and subcutaneous tissue |
| 698.0 | Pruritis ani |
| 698.1 | Pruritis of genital organs |
| 704.1 | Hirsutism |
| 705.0 | Anhidrosis |
| 707.0–707.9 | Chronic ulcer of skin |
| 709.3 | Degenerative skin disorders |
| 729.1 | Myalgia |
| 730.07–730.27 | Osteomyelitis of tarsal bones |
| 780.01 | Coma |
| 780.02 | Transient alteration of awareness |
| 780.09 | Alteration of consciousness, other |
| 780.2 | Syncope and collapse |
| 780.31 | Febrile convulsions |
| 780.39 | Seizures, not otherwise specified |
| 780.4 | Dizziness and giddiness |
| 780.71–780.79 | Malaise and fatigue |
| 780.8 | Hyperhidrosis |
| 781.0 | Abnormal involuntary movements |
| 782.0 | Loss of vibratory sensation |
| 783.1 | Abnormal weight gain |
| 783.2 | Abnormal loss of weight |
| 783.5 | Polydipsia |
| 783.6 | Polyphagia |
| 785.0 | Tachycardia |
| 785.4 | Gangrene |
| 786.01 | Hyperventilation |
| 786.09 | Dyspnea, |
| 786.50 | Chest pain, unspecified |
| 787.6 | Fecal incontinence |
| 787.91 | Diarrhea |
| 788.41–788.43 | Frequency of urination and polyuria |
| 789.1 | Hepatomegaly |
| 790.2 | Abnormal glucose tolerance test |
| 790.6 | Other abnormal blood chemistry (hyperglycemia) |
| 791.0 | Proteinuria |
| 791.5 | Glycosuria |
| 796.1 | Abnormal reflex |
| 799.4 | Cachexia |
| V23.0–.9 | Supervision of high risk pregnancy |
| V67.2 | Follow-up examination, following chemotherapy |
| V67.51 | Follow up examination with high-risk medication not elsewhere classified |
| V58.69 | Long term current use of other medication |

*Reasons for Denial:*

Note: This section was not negotiated by the Negotiated Rulemaking Committee. This section includes HCFA's interpretation of its longstanding policies and is included for informational purposes.

• Tests for screening purposes that are performed in the absence of signs, symptoms, complaints, or personal history of disease or injury are not covered except as explicitly authorized by statute. These include exams required by insurance companies, business establishments, government agencies, or other third parties.

• Tests that are not reasonable and necessary for the diagnosis or treatment of an illness or injury are not covered according to the statute.

• Failure to provide documentation of the medical necessity of tests may result in denial of claims. Such documentation may include notes documenting relevant signs, symptoms or abnormal findings that substantiate the medical necessity for ordering the tests. In addition, failure to provide independent verification that the test was ordered by the treating physician (or qualified nonphysician practitioner) through documentation in the physician's office may result in denial.

• A claim for a test for which there is a national coverage or local medical review policy will be denied as not reasonable and necessary if it is submitted without an ICD–9–CM code or narrative diagnosis listed as covered in the policy unless other medical documentation justifying the necessity is submitted with the claim.

• If a national or local policy identifies a frequency expectation, a

Federal Register / Vol. 66, No. 226 / Friday, November 23, 2001 / Rules and Regulations    58849

claim for a test that exceeds that expectation may be denied as not reasonable and necessary, unless it is submitted with documentation justifying increased frequency.
• Tests that are not ordered by a treating physician or other qualified treating nonphysician practitioner acting within the scope of their license and in compliance with Medicare requirements will be denied as not reasonable and necessary.
• Failure of the laboratory performing the test to have the appropriate Clinical Laboratory Improvement Amendment of 1988 (CLIA) certificate for the testing performed will result in denial of claims.

## ICD–9–CM Codes Denied

| Code | Description |
|------|-------------|
| 798.0–798.9 | Sudden death, cause unknown |
| V15.85 | Exposure to potentially hazardous body fluids |
| V16.1 | Family history of malignant neoplasm, trachea, bronchus, and lung |
| V16.2 | Family history of malignant neoplasm, other respiratory and intrathoracic organs |
| V16.4 | Family history of malignant neoplasm, genital organs |
| V16.5 | Family history of malignant neoplasm, urinary organs |
| V16.6 | Family history of malignant neoplasm, leukemia |
| V16.7 | Family history of malignant neoplasm, other lymphatic and hematopoietic neoplasms |
| V16.8 | Family history of malignant neoplasm, other specified malignant neoplasm |
| V16.9 | Family history of malignant neoplasm, unspecified malignant neoplasm |
| V17.0–V17.8 | Family history of certain chronic disabling diseases |
| V18.0–V18.8 | Family history of certain other specific conditions |
| V19.0–V19.8 | Family history of other conditions |
| V20.0–V20.2 | Health supervision of infant or child |
| V28.0–V28.9 | Antenatal screenings |
| V50.0–V50.9 | Elective surgery for purposes other than remedying health states |
| V53.2 | Fitting and adjustment of hearing aid |
| V60.0–V60.9 | Housing, household, and economic circumstances |
| V62.0 | Unemployment |
| V62.1 | Adverse effects of work environment |
| V65.0 | Healthy persons accompanying sick persons |
| V65.1 | Persons consulting on behalf of another person |
| V68.0–V68.9 | Encounters for administrative purposes |
| V70.0–V70.9 | General medical examinations |
| V73.0–V73.99 | Special screening examinations for viral and chlamydia diseases |
| V74.0–V74.9 | Special screening examinations for bacterial and spirochetal diseases |
| V75.0–V75.9 | Special screening examination for other infectious diseases |
| V76.0 | Special screening for malignant neoplasms, respiratory organs |
| V76.3 | Special screening for malignant neoplasms, bladder |
| V76.42–V76.9 | Special screening for malignant neoplasms, (sites other than breast, cervix, and rectum) |
| V77.0–V77.9 | Special screening for endocrine, nutrition, metabolic, and immunity disorders |
| V78.0–V78.9 | Special screening for disorders of blood and blood-forming organs |
| V79.0–V79.9 | Special screening for mental disorders |
| V80.0–V80.3 | Special screening for neurological, eye, and ear diseases |
| V81.0–V81.6 | Special screening for cardiovascular, respiratory, and genitourinary diseases |
| V82.0–V82.9 | Special screening for other conditions |

### ICD–9–CM Codes That Do Not Support Medical Necessity

Any ICD–9–CM code not listed in either of the ICD–9–CM sections above.

### Sources of Information

AACE Guidelines for the Management of Diabetes Mellitus, Endocrine Practice (1995)1:149–157.

Bower, Bruce F. and Robert E. Moore, Endocrine Function and Carbohydrates.

Clinical Laboratory Medicine, Kenneth D. McClatchy, editor. Baltimore/Williams & Wilkins, 1994. pp 321–323.

Report of the Expert Committee on the Diagnosis and Classification of Diabetes Mellitus, Diabetes Care, Volume 20, Number 7, July 1997, pages 1183 *et seq.*

Roberts, H.J., Difficult Diagnoses. W. B. Saunders Co., pp 69–70.

### Coding Guidelines

1. Any claim for a test listed in "HCPCS CODES" above must be submitted with an ICD–9–CM diagnosis code or comparable narrative. Codes that describe symptoms and signs, as opposed to diagnoses, should be provided for reporting purposes when a diagnosis has not been established by the physician. (Based on Coding Clinic for ICD–9–CM, Fourth Quarter 1995, page 43.)

2. Screening is the testing for disease or disease precursors so that early detection and treatment can be provided for those who test positive for the disease. Screening tests are performed when no specific sign, symptom, or diagnosis is present and the patient has not been exposed to a disease. The testing of a person to rule out or to confirm a suspected diagnosis because the patient has a sign or symptom is a diagnostic test, not a screening. In these cases, the sign or symptom should be used to explain the reason for the test. When the reason for performing a test is because the patient has had contact with, or exposure to, a communicable disease, the appropriate code from category V01, Contact with or exposure to communicable diseases, should be assigned, not a screening code, but the test may still be considered screening and not covered by Medicare. For screening tests, the appropriate ICD–9–CM screening code from categories V28 or V73–V82 (or comparable narrative) should be used. (From Coding Clinic for ICD–9–CM, Fourth Quarter 1996, pages 50 and 52)

3. A three-digit code is to be used only if it is not further subdivided.

Where fourth-digit and/or fifth-digit subclassifications are provided, they must be assigned. A code is invalid if it has not been coded to the full number of digits required for that code. (From Coding Clinic for ICD–9–CM. Fourth Quarter, 1995, page 44).

4. Diagnoses documented as "probable," "suspected,' questionable," "rule-out," or "working diagnosis" should not be coded as though they exist. Rather, code the condition(s) to the highest degree of certainty for that encounter/visit, such as signs, symptoms, abnormal test results, exposure to communicable disease or other reasons for the visit. (From Coding Clinic for ICD–9–CM, Fourth Quarter 1995, page 45).

5. When a non-specific ICD–9 code is submitted, the underlying sign, symptom, or condition must be related to the indications for the test above.

6. A diagnostic statement of impaired glucose tolerance must be evaluated in the context of the documentation in the medical record in order to assign the most accurate ICD–9–CM code. An abnormally elevated fasting blood glucose level in the absence of the diagnosis of diabetes is classified to Code 790.6—other abnormal blood chemistry. If the provider bases the diagnostic statement of impaired glucose tolerance" on an abnormal glucose tolerance test, the condition is classified to 790.2—normal glucose tolerance test. Both conditions are considered indications for ordering glycated hemoglobin or glycated protein testing in the absence of the diagnosis of diabetes mellitus.

7. When a patient is under treatment for a condition for which the tests in this policy are applicable, the ICD–9–CM code that best describes the condition is most frequently listed as the reason for the test.

8. When laboratory testing is done solely to monitor response to medication, the most accurate ICD–9–CM code to describe the reason for the test would be V58.69—long term use of medication.

9. Periodic follow-up for encounters for laboratory testing for a patient with a prior history of a disease, who is no longer under treatment for the condition, would be coded with an appropriate code from the V67 category—follow-up examination.

10. According to ICD–9–CM coding conventions, codes that appear in italics in the Alphabetic and/or Tabular columns of ICD–9–CM are considered manifestation codes that require the underlying condition to be coded and sequenced ahead of the manifestation. For example, the diagnostic statement, "thyrotoxic exophthalmos (376.21)," which appears in italics in the tabular listing, requires that the thyroid disorder (242.0–242.9) is coded and sequenced ahead of thyrotoxic exophthalmos. Therefore, a diagnostic statement that is listed as a manifestation in ICD–9–CM must be expanded to include the underlying disease in order to accurately code the condition.

### Documentation Requirements

The ordering physician must include evidence in the patient's clinical record that an evaluation of history and physical preceded the ordering of glucose testing and that manifestations of abnormal glucose levels were present to warrant the testing.

### Medicare National Coverage Decision for Glycated Hemoglobin/glycated Protein

### Description

The management of diabetes mellitus requires regular determinations of blood glucose levels. Glycated hemoglobin/ protein levels are used to assess long-term glucose control in diabetes. Alternative names for these tests include glycated or glycosylated hemoglobin or Hgb, hemoglobin glycated or glycosylated protein, and fructosamine.

Glycated hemoglobin (equivalent to hemoglobin A1) refers to total glycosylated hemoglobin present in erythrocytes, usually determined by affinity or ion-exchange chromatographic methodology. Hemoglobin A1c refers to the major component of hemoglobin A1, usually determined by ion-exchange affinity chromatography, immunoassay or agar gel electrophoresis.

Fructosamine or glycated protein refers to glycosylated protein present in a serum or plasma sample. Glycated protein refers to measurement of the component of the specific protein that is glycated usually by colorimetric method or affinity chromatography.

Glycated hemoglobin in whole blood assesses glycemic control over a period of 4–8 weeks and appears to be the more appropriate test for monitoring a patient who is capable of maintaining long-term, stable control. Measurement may be medically necessary every 3 months to determine whether a patient's metabolic control has been on average within the target range. More frequent assessments, every 1–2 months, may be appropriate in the patient whose diabetes regimen has been altered to improve control or in whom evidence is present that intercurrent events may have altered a previously satisfactory level of control (for example, post-major surgery or as a result of glucocorticoid therapy). Glycated protein in serum/ plasma assesses glycemic control over a period of 1–2 weeks. It may be reasonable and necessary to monitor glycated protein monthly in pregnant diabetic women. Glycated hemoglobin/ protein test results may be low, indicating significant, persistent hypoglycemia, in nesidioblastosis or insulinoma, conditions which are accompanied by inappropriate hyperinsulinemia. A below normal test value is helpful in establishing the patient's hypoglycemic state in those conditions.

### HCPCS Codes (alpha numeric, CPT © AMA)

| Code | Descriptor |
| --- | --- |
| 82985 | Glycated protein |
| 83036 | Hemoglobin; glycated |

### Indications

Glycated hemoglobin/protein testing is widely accepted as medically necessary for the management and control of diabetes. It is also valuable to assess hyperglycemia, a history of hyperglycemia or dangerous hypoglycemia. Glycated protein testing may be used in place of glycated hemoglobin in the management of diabetic patients, and is particularly useful in patients who have abnormalities of erythrocytes such as hemolytic anemia or hemoglobinopathies.

### Limitations

It is not considered reasonable and necessary to perform glycated hemoglobin tests more often than every

69

# PHYSICIAN'S ORDERS

| D/C DATE | ORDER DATE | Cd | ORDER TEXT | FREQUENCY |
|---|---|---|---|---|
| | | | GENERIC EQUIVALENTS MAY BE USED UNLESS OTHER- WISE NOTED. | |
| | 7/6/2004 | DT | 3 : THERAPEUTIC DIET: 1800 CAL ADA | |
| | 7-6-04 | | Resident is DNR | |
| | 7/6/2004 | MF | 8 : MAY HAVE ANNUAL FLU VACCINE  MAY HAVE ANNUAL PPD TEST | |
| | 7/6/2004 | TI | 13 : LANTUS INSULIN 10 UNITS SQ Q AM / DM | QAM S |
| | 7/6/2004 | SS | 21 : GLUCOSCAN BID / DM  ***SEE DIABETIC RECORD*** | SO |
| | 7/8/2004 | MR | 22 : SENNA S 1 TAB PO Q DAY / CONSTIPATION | QD |
| | 7/6/2004 | MR | 18 : LIPITOR 40 MG PO Q HS / HYPERCHOLESTROLEMIA | QHS |
| | 7/6/2004 | MR | 20 : CALCIUM 500 MG PO TID / OSTEOPOROSIS | TID |
| | 7/6/2004 | ME | 11 : LEXAPRO 10 MG PO Q DAY / SIT. DEPRESSION R/T HEALTH PROBLEMS.  ***SEE A/D BLUE MED SHEET*** | SO |
| | 7/6/2004 | MR | 17 : REGLAN 10 MG PO Q AC&HS / GERD | AC & HS |
| | 7/6/2004 | MR | 14 : PREVACID 30 MG PO BID / GERD | BID |
| | 7/6/2004 | MR | 15 : LASIX 20 MG PO Q DAY / HTN | QD |
| | 7/6/2004 | MR | 16 : PLAVIX 75 MG PO Q DAY / HYPERCHOLESTROLEMIA | QD |
| | 7/6/2004 | MR | 19 : COZAAR 50 MG PO Q DAY / HTN | QD |
| | 7/8/2004 | TR | 24 : SHOES OR SLIPPERS ON FEET WHEN LEAVING ROOM TO PROTECT THEM | IO1 |

| Charting From | Thru | Facility Name | | LAST PHYS. EXAM |
|---|---|---|---|---|
| 8/1/2004 | 8/31/2004 | Holladay Healthcare Center | | |
| PHYSICIAN NAME | | | ALT. PHYS. NAME | ALT. PHYS. PHONE |
| FEHLAUER, DR. STEVE | | (801)321-5060 | FEHLAUER, DR. STEVE | (801)321-5060 |
| Diagnosis | | | Nursing Alert | |
| Diabetes mellitus; Hypertension; Osteoporosis; OSTEOPOROSIS NOS; BRIEF RESSIVE REACT; DMI WO CMP NT ST UNCNTRL; ESOPHAGEAL UX; BOTH S BLIND-WHO DEF | | | BLIND; Do not resuscitate; Pain less than daily; Some/all natural teeth lost, does not have or does not use dentures (or partial plates) | |

Docket No. C-06-349
A. Ex. 4
Page 1 of 4

| | ALLERGIES | |
|---|---|---|
| DEMEROL | | |
| | 70 | |

| PATIENT NAME | | PATIENT NO. | STA | ROOM/BED | PAG |
|---|---|---|---|---|---|
| BAILEY, LOUISE | | 20530 | 1 | 0102A | 1 |

# PHYSICIAN'S ORDERS

| D/C DATE | ORDER DATE | Cd | ORDER TEXT | FREQUENCY |
|---|---|---|---|---|
| | 7/6/2004 | TR | 9 : OFFER HS SNACK DOCUMENT % TAKEN OR R=REFUSED | NS1 |
| | 7/6/2004 | TV | 5 : VITAL SIGNS Q DAY (SEE VS & WT REPORT/YELLOW) | SO |
| | 7/6/2004 | WA | 4 : WEIGHTS WEEKLY (SEE WT HX REPORT/DIETARY) LAST WT: | SO |
| | 7/6/2004 | AG | 6 : MAY GO OUT ON PASS WITH MEDS AND RESPONSIBLE PERSON | |
| | 7/6/2004 | AS | 2 : MAY PARTICIPATE IN SOCIAL ACTIVITIES AS TOLERATED | |
| | 7/6/2004 | OA | 7 : PODIATRIST CARE AS ORDERED | PRN |
| | 7/7/2004 | RP | 1 : REHAB POTENTIAL: POOR | |

I HAVE REVIEWED & APPROVED THE PATIENT CARE PLAN

I HAVE REVIEWED & APPROVED THE ACTIVITY PLAN. IT ISN'T IN CONFLICT WITH MED. PLAN OF CARE

CONTINUE THE ABOVE ORDERS FOR 30 DAYS/SNF OR 60 DAYS/ICF UNLESS OTHERWISE SPECIFIED.

I CERTIFY THAT THIS PATIENT REQUIRES SKILLED / INTERMEDIATE NURSING HOME CARE.

REHAB/RESTORATIVE NURSING PER NURSING JUDGEMENT

NURSES REVIEW BY: _Fosler, RN_  DATE: _8-1-04_

M.D. SIGNATURE: _____  DATE: _____

Docket No. C-06-349
A. Ex. 4
Page 2 of 4

| Charting From | Thru | Facility Name | | LAST PHYS. EXAM |
|---|---|---|---|---|
| 8/1/2004 | 8/31/2004 | Holladay Healthcare Center | | |

| PHYSICIAN NAME | | ALT. PHYS. NAME | ALT. PHYS. PHONE |
|---|---|---|---|
| FEHLAUER, DR. STEVE | (801)321-5060 | FEHLAUER, DR. STEVE | (801)321-5060 |

| Diagnosis | Nursing Alert |
|---|---|
| Diabetes mellitus; Hypertension; Osteoporosis; OSTEOPOROSIS NOS; BRIEF DEPRESSIVE REACT; DMI WO CMP NT ST UNCNTRL; ESOPHAGEAL BOTH ___IND-WHO DEF | BLIND; Do not resuscitate; Pain less than daily; Some/all natural teeth lost, does not have or does not use dentures (or partial plates) |

| ALLERGIES | |
|---|---|
| DEMEROL | |

71

| PATIENT NAME | PATIENT NO. | STA | ROOM/BED | PAG |
|---|---|---|---|---|
| BAILEY, LOUISE | 20530 | 1 | 0102A | 2 |

CONFIDENTIAL:
Patient Information

# ADMISSION ORDERS

| SECTION A: MEDICATION/TREATMENT | SECTION D: NEW ADMISSION ORDERS (Complete this section once part 4 is detached |
|---|---|
| Lexapro 10mg po QD ✓ | Admit to: _Holladay Healthcare_ |
| Diagnosis: _depression_ | Rehab potential: ☐ Good ☐ Fair ☒ Poor ☐ None |
| Darvocet N 100 po QID prn pain | Comment: ___ |
| Diagnosis: _osteoporosis_ | CPR Status: ☐ Yes ☒ No CPR    Resident representative aware? ☒ Yes ☐ No |
| Lantus insulin 10units SQ QAM | Advance directives issued? ☒ Yes ☐ No    Copy attached? ☐ Yes ☐ No |
| Diagnosis: _DM_ | Diet Order: _1800 cal ADA_ |
| Prevacid 30mg po BID. ✓ | Texture: ☒ Regular ☐ Ground meat ☐ Pureed ☐ As tolerated ☐ Other ___ |
| Diagnosis: _GERD_ | ☐ May have regular diet - Special occasions |
| Lasix 20mg po QD. | ☐ Supplements: ___ |

**Therapy Evaluation Orders:**

Weight bearing ability: ☐ Full ☐ Partial ☐ None  Mobility Status: ___

PT _yes_ x per week   OT ___ x per week   ST ___ x per week

| SECTION A (cont.) | ADDITIONAL ORDERS | YES |
|---|---|---|
| Diagnosis: _HTN_ | Restraints – If yes, type/frequency/reason | |
| Plavix 75mg po QD. ✓ | | |
| | Side rails – If yes, type/frequency/reason | |
| Diagnosis: _hypercholesterolemia_ | | |
| Reglan 10mg po QAC et Q HS. | Podiatry care PRN | ✓ |
| | Dental care PRN | ✓ |
| Diagnosis: _GERD_ | Ophthalmology care PRN | ✓ |
| Lipitor 40mg po Q HS. ✓ | Audiological care PRN | ✓ |
| | May participate in:  Overall activity plan | ✓ |
| | Volunteer program | |
| Diagnosis: _hypercholesterolemia_ | May have occasional alcoholic beverage | |
| Cozaar 50mg po QD. ✓ | May go on pass with meds | ✓ |
| | PPD per facility policy | ✓ |
| Diagnosis: _HTN_ | Chest X-ray | ✓ |
| Calcium 500mg po TID | Pneumococcal vaccine | |
| | Annual flu shot | ✓ |
| Diagnosis: _osteoporosis_ | Laboratory per facility policy | ✓ |
| ~~Glucose~~ BID | | |
| Diagnosis: ~~DM~~ | Vital signs per facility policy | ✓ |
| Nurse's signature | Weight per facility policy | ✓ |
| _Godale, LPN / W. Hanson LPN_ | Discharge Plans: ___ | |
| Date _7_ / _6_ / _04_ | Admission date _7_ / _6_ / _04_   Date Of Birth ___ |

| I have reviewed this resident's plan of care and am in agreement with it. | SECTION B: DIAGNOSES (not listed in Section A) | SECTION C: ALLERGIES | ☐ Generic equivalents not be used |
|---|---|---|---|
| Physician's signature | | _Demerol_ | |
| Date _7_ / _13_ / _04_ | | | 72 |

WHITE–To Physician for Signature    YELLOW–Temporary Chart Copy    PINK–Pharmacy Copy    GREEN–Medication Adm. Reco

| NAME–Last | First | Middle | Attending Physician | Record No. | Room/Bed |
|---|---|---|---|---|---|
| _Bailey_ | _Louise_ | | _Fehlauer_ | | _102A_ |

CFS 5-2/4P  © 1992 Briggs Corporation, Des Moines, IA 50306 (800) 247-2343
PRINTED IN U.S.A.

ADMISSION ORD

Docket No. C-06-349
A. Ex. 4

CONFIDENTIAL:
Patient Information



PHYSICIAN'S TELEPHONE ORDERS AUDIT

ORIGINAL COPY - Physician Please Sign and Return

Docket No. C-06-349
A. Ex. 4
Page 4 of 4

DBA HOLLADAY HEALTH CARE CENT
4782 SO. HOLLADAY BLVD.
SALT LAKE CITY UT 84117

| 2 | | 3 PATIENT CONTROL NO. |
|---|---|---|
| | | 020530 |

| 5 FED. TAX NO. | 6 STATEMENT COVERS PERIOD FROM / THROUGH | 7 COV D. | 8 N-C D. | 9 C-I D. | 10 L-R D. | 11 |
|---|---|---|---|---|---|---|
| | 100105  103105 | 0 | 0 | 0 | 0 | |

12 PATIENT NAME
BAILEY, LOUISE

13 PATIENT ADDRESS

| 14 | DATE | 15 SEX | 16 MS | 17 DATE | 18 HR | 19 TYPE | 20 SRC | 21 D HR | 22 STAT | 23 MEDICAL RECORD NO. | 24 | CONDITION CODES 25 26 27 28 29 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | F | U | 07062004 | 12 | 3 | 1 | 30 | 020530 | | | |

| 32 OCCURRENCE CODE / DATE | 33 OCCURRENCE CODE / DATE | 34 OCCURRENCE CODE / DATE | 35 OCCURRENCE CODE / DATE | 36 OCCURRENCE SPAN CODE FROM THROUGH | 37 |
|---|---|---|---|---|---|
| 11  07082004 | 44  07082004 | 35  07082004 | | | A B |

**CONFIDENTIAL:**
**Patient Information**

Medicaid

| 39 CODE | VALUE CODES AMOUNT | 40 CODE | VALUE CODES AMOUNT | 41 CODE | VALUE CODES AMOUNT |
|---|---|---|---|---|---|
| a 51 | 3900 | 50 | 6100 | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATES | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 |
|---|---|---|---|---|---|---|---|
| 300 | LAB | 82962 | 10012005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10022005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10032005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10042005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10052005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10062005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10072005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10082005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10092005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10102005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10112005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10122005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10132005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10142005 | 2 | 654 | | |
| | LAB | 82962 | 10152005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10162005 | 1 | 327 | | |
| 300 | LAB | 82962 | 10172005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10182005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10192005 | 2 | 654 | | |
| 430 | OCCUPATION THER | 97003/GO | 10192005 | 1 | 7830 | | |
| 430 | OCCUPATION THER | 97530/GO | 10192005 | 2 | 5712 | | |
| 300 | LAB | 82962 | 10202005 | 2 | 654 | | |
| 420 | PHYSICAL THERP | 97001/GP | 10202005 | 1 | 7342 | | |

| 50 PAYER | 51 PROVIDER NO. | 52 REL INFO | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 |
|---|---|---|---|---|---|---|
| MEDICARE | 465109 | Y | Y | | | |
| AARPUHC | 522085558004 | Y | Y | | | |

57

**DUE FROM PATIENT** ▶

| 58 INSURED'S NAME | 59 P REL | 60 CERT. - SSN - HIC. - ID NO. | 61 GROUP NAME | 62 INSURANCE GROUP NO. |
|---|---|---|---|---|
| BAILEY, LOUISE | 01 | | | |
| BAILEY, LOUISE | 01 | | | |

| 63 TREATMENT AUTHORIZATION CODES | 64 ESC | 65 EMPLOYER NAME | 66 EMPLOYER LOCATION |
|---|---|---|---|
| | | | |

| 67 PRIN. DIAG. CD. | 68 CODE | 69 CODE | 70 CODE | OTHER DIAG. CODES 71 CODE 72 CODE 73 CODE | 74 CODE | 75 CODE | 76 ADM. DIAG. CD. | 77 E-CODE | 78 |
|---|---|---|---|---|---|---|---|---|---|
| 73300 | 25010 | 53081 | 4019 | 2720 | | | 73300 | | |

| 79 P.C. | 80 PRINCIPAL PROCEDURE CODE / DATE | 81 OTHER PROCEDURE CODE / DATE | OTHER PROCEDURE CODE / DATE | 82 ATTENDING PHYS. ID |
|---|---|---|---|---|
| | | | | E69796 FEHLAUER  C. |
| | OTHER PROCEDURE CODE / DATE | OTHER PROCEDURE CODE / DATE | OTHER PROCEDURE CODE / DATE | 83 OTHER PHYS. ID |

| 84 REMARKS | | OTHER PHYS. ID |
|---|---|---|
| (801)277-7002 | | 74 |

Docket No. C-06-349
A. Ex. 5
Page 1 of 6

85 PROVIDER REPRESENTATIVE
X

86 DATE

UB-92 HCFA-1450

OCR/ORIGINAL

I CERTIFY THE CERTIFICATIONS ON THE REVERSE APPLY TO THIS BILL AND ARE MADE A PART HEREOF

| | | 2 | | | | | 3 PATIENT CONTROL NO. |
|---|---|---|---|---|---|---|---|
| | | | | | | | 020530 |

DEA HOLLADAY HEALTH CARE CENT
4782 SO. HOLLADAY BLVD.
SALT LAKE CITY UT 84117

| 5 FED. TAX NO. | 6 STATEMENT COVERS PERIOD FROM 100105 THROUGH 103105 | 7 COV D. 0 | 8 N-C D. 0 | 9 C-I D. 0 | 10 L-R D. 0 | 11 |

12 PATIENT NAME
B    Y, LOUISE

13 PATIENT ADDRESS

**CONFIDENTIAL:**
**Patient Information**

| 14 BIRTHDATE | 15 SEX F | 16 MS U | ADMISSION 17 DATE 07062004 | 18 HR 12 | 19 TYPE 3 | 20 SRC 1 | 21 D HR | 22 STAT 30 | 23 MEDICAL RECORD NO. 020530 | | 24 | CONDITION 26 27 28 29 30 |

| 32 CODE | OCCURRENCE DATE | 33 CODE | OCCURRENCE DATE | 34 CODE | OCCURRENCE DATE | 35 CODE | OCCURRENCE DATE | 36 CODE | OCCURRENCE SPAN FROM THROUGH | 37 A B C |
|---|---|---|---|---|---|---|---|---|---|---|
| 11 | 07082004 | 44 | 07082004 | 35 | 07082004 | | | | | |

| | | 39 CODE | VALUE CODES AMOUNT | 40 CODE | VALUE CODES AMOUNT | 41 CODE | VALUE CODES AMOUNT |
|---|---|---|---|---|---|---|---|
| | a | 51 | 3900 | 50 | 6100 | | |
| | b | | | | | | |
| | c | | | | | | |
| | d | | | | | | |

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATES | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 |
|---|---|---|---|---|---|---|---|
| 300 | LAB | 82962 | 10212005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10222005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10232005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10242005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10252005 | 1 | 327 | | |
| 300 | LAB | 82962 | 10262005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10272005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10282005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10292005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10302005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10312005 | 2 | 654 | | |
| 001 | TOTAL CHARGE | | | | 40504 | | |

| 50 PAYER | 51 PROVIDER NO. | 52 REL INFO | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 58 |
|---|---|---|---|---|---|---|
| MEDICARE | 465109 | Y | Y | | | |
| AARPUHC | 522085558004 | Y | Y | | | |

57

**► DUE FROM PATIENT ►**

| 58 INSURED'S NAME | 59 P.REL | 60 CERT. - SSN - HIC. - ID NO. | 61 GROUP NAME | 62 INSURANCE GROUP NO. |
|---|---|---|---|---|
| BAILEY, LOUISE | 01 | | | |
| BAILEY, LOUISE | 01 | | | |

| 63 TREATMENT AUTHORIZATION CODES | 64 ESC | 65 EMPLOYER NAME | 66 EMPLOYER LOCATION |
|---|---|---|---|
| | | | |

| 67 PRIN. DIAG. CD. | 68 CODE | 69 CODE | 70 CODE | OTHER DIAG. CODES 71 CODE | 72 CODE | 73 CODE | 74 CODE | 75 CODE | 76 ADM. DIAG. CD. | 77 E-CODE | 78 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 73300 | 25010 | 53081 | 4019 | 2720 | | | | | 73300 | | |

| 79 P.C. | 80 PRINCIPAL PROCEDURE CODE DATE | 81 OTHER PROCEDURE CODE DATE | OTHER PROCEDURE CODE DATE | 82 ATTENDING PHYS. ID |
|---|---|---|---|---|
| | | | | E69796 FEHLAUER    C. |

| OTHER PROCEDURE CODE DATE | OTHER PROCEDURE CODE DATE | OTHER PROCEDURE CODE DATE | 83 OTHER PHYS. ID |
|---|---|---|---|
| | | | |

| 84 REMARKS | OTHER PHYS. ID |
|---|---|
| (801)277-7002 | 75 |

**Docket No. C-06-349**
**A. Ex. 5**
**Page 2 of 6**

| 85 PROVIDER REPRESENTATIVE | 86 DATE |
|---|---|
| X | |

APPROVED OMB NO.

DEA HOLLADAY HEALTH CARE CENTER
4782 SO. HOLLADAY BLVD.
SALT LAKE CITY UT 84117

| 3 PATIENT CONTROL NO. | 020530 |

| 5 FED. TAX NO. | 6 STATEMENT COVERS PERIOD | | 7 COV D. | 8 N-C D. | 9 C-I D. | 10 L-R D. | 11 |
| --- | FROM | THROUGH | | | | | |
| 870425864 | 110105 | 113005 | 0 | 0 | 0 | 0 | |

12 PT. NAME
BA..Y, LOUISE    13 PATIENT ADDRESS

| 14 | 15 SEX | 16 MS | ADMISSION | | | | 21 D. HR | 22 STAT | 23 MEDICAL RECORD NO. |
| | 17 DATE | 18 HR | 19 TYPE | 20 SRC | | | | |
| | F | U | 07062004 | 12 | 3 | 1 | | 30 | 020530 |

CONDITION CODES

CONFIDENTIAL:
Patient Information

AARP/UHC
P.O. BOX 740819
Atlanta, GA 30374

| | VALUE CODES | | | VALUE CODES | | | VALUE CODES |
| | CODE | AMOUNT | | CODE | AMOUNT | | CODE | AMOUNT |
| a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATES | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 300 | LAB | 82962 | 11012005 | 2 | 654 | | |
| 300 | LAB | 82962 | 11022005 | 2 | 654 | | |
| 300 | LAB | 82962 | 11032005 | 2 | 654 | | |
| 300 | LAB | 82962 | 11042005 | 2 | 654 | | |
| 300 | LAB | 82962 | 11052005 | 2 | 654 | | |
| 300 | LAB | 82962 | 11062005 | 2 | 654 | | |
| 300 | LAB | 82962 | 11072005 | 2 | 654 | | |
| 300 | LAB | 82962 | 11082005 | 2 | 654 | | |
| 300 | LAB | 82962 | 11092005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11102005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11112005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11122005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11132005 | 3 | 981 | | |
| | LAB | 82962 | 11142005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11152005 | 3 | 981 | | |
| 0 | LAB | 82962 | 11162005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11172005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11182005 | 2 | 654 | | |
| 300 | LAB | 82962 | 11192005 | 2 | 654 | | |
| 300 | LAB | 82962 | 11202005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11212005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11222005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11232005 | 3 | 981 | | |

| 50 PAYER | 51 PROVIDER NO. | 52 REL | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 |
| --- | --- | --- | --- | --- | --- | --- |
| MEDICARE | 465109 | Y | Y | | | |
| AARPUHC | 522085558004 | Y | Y | | | |

57    DUE FROM PATIENT

| 58 INSURED'S NAME | 59 P.REL | 60 CERT. - SSN - HIC. - ID NO. | 61 GROUP NAME | 62 INSURANCE GROUP NO. |
| --- | --- | --- | --- | --- |
| BAILEY, LOUISE | 01 | | | |
| BAILEY, LOUISE | 01 | | | |

| 63 TREATMENT AUTHORIZATION CODES | 64 ESC | 65 EMPLOYER NAME | 66 EMPLOYER LOCATION |

| 67 PRIN. DIAG. CD. | 68 CODE | OTHER DIAG. CODES | | | | | 76 ADM. CD. | 77 E-CODE | 78 |
| 73300 | 25010 | 53081 | | | | | 73300 | | |

| 79 P. | PRINCIPAL PROCEDURE | | 81 | OTHER PROCEDURE | | OTHER PROCEDURE | | 82 ATTENDING PHYS. ID |
| | CODE | DATE | | CODE | DATE | CODE | DATE | E69796 FEHLAUER    C. S |
| | OTHER PROCEDURE | | | OTHER PROCEDURE | | OTHER PROCEDURE | | 83 OTHER PHYS. ID |
| | CODE | DATE | | CODE | DATE | CODE | DATE | |

| 84 REMARKS | (801) 277-7002 | | 85 OTHER PHYS. ID | 76 |

| 85 PROVIDER REPRESENTATIVE | 86 DATE |

DBA HOLLADAY HEALTH CARE CENTER
4782 SO. HOLLADAY BLVD.
SALT LAKE CITY UT 84117

| 3 PATIENT CONTROL NO. |
|---|
| 020530 |

5 FED. TAX NO.

6 STATEMENT COVERS PERIOD
FROM 110105 THROUGH 113005

7 COV D. 0 | 8 NC D. 0 | 9 C-I D. 0 | 10 L-R D. 0 | 11

12 PATIENT NAME  EY, LOUISE

13 PATIENT ADDRESS

14   15 SEX F   16 MS U   17 ADMISSION DATE 07062004   18 HR 12   19 TYPE 3   20 SRC 1   21 D HR 30   22 STAT   23 MEDICAL RECORD NO. 020530

CONDITION CODES

**CONFIDENTIAL:**
**Patient Information**

AARP/UHC
P.O. BOX 740819
Atlanta, GA 30374

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATES | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 |
|---|---|---|---|---|---|---|---|
| 300 | LAB | 82962 | 11242005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11252005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11262005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11272005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11282005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11292005 | 3 | 981 | | |
| 300 | LAB | 82962 | 11302005 | 3 | 981 | | |
| 001 | TOTAL CHARGE | | | | 26160 | | |

| 50 PAYER | 51 PROVIDER NO. | 52 REL INFO | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 |
|---|---|---|---|---|---|---|
| MEDICARE | 465109 | Y | Y | | | |
| AARPUHC | 522085558004 | Y | Y | | | |

**DUE FROM PATIENT ▶**

| 58 INSURED'S NAME | 59 P.REL | 60 CERT - SSN - HIC - ID NO. | 61 GROUP NAME | 62 INSURANCE GROUP NO. |
|---|---|---|---|---|
| BAILEY, LOUISE | 01 | | | |
| BAILEY, LOUISE | 01 | | | |

63 TREATMENT AUTHORIZATION CODES | 64 ESC | 65 EMPLOYER NAME | 66 EMPLOYER LOCATION

| 67 PRIN. DIAG. CD. | 68 CODE | OTHER DIAG. CODES | 76 ADM. DIAG. CD. | 77 E-CODE | 78 |
|---|---|---|---|---|---|
| 73300 | 25010 | 53081 | 73300 | | |

| 80 P.C. | PRINCIPAL PROCEDURE CODE / DATE | OTHER PROCEDURE CODE / DATE | 82 ATTENDING PHYS. ID |
|---|---|---|---|
| | | | E69796 FEHLAUER   C.   S |

83 OTHER PHYS. ID

84 REMARKS  (801) 277-7002

86 OTHER PHYS. ID   77

85 PROVIDER REPRESENTATIVE   86 DATE

Docket No. C-06-349
A. Ex. 5
Page 4 of 6

APPROVED OMB. NO.

DBA HOLLADAY HEALTH CARE CENTER
4782 SO. HOLLADAY. BLVD.
SALT LAKE CITY UT 84117

| 3 PATIENT CONTROL NO. |
| 020530 |

| 5 FED. TAX NO. | 6 STATEMENT COVERS PERIOD FROM | THROUGH | 7 COV D. | 8 NC D. | 9 C-I D. | 10 L-R D. | 11 |
| | 120105 | 123105 | 0 | 0 | 0 | 0 | |

12 NAME
BAILEY, LOUISE                     13 PATIENT ADDRESS

| 14 ATE | 15 SEX | 16 MS | ADMISSION 17 DATE | 18 HR | 19 TYPE | 20 SRC | 21 D HR | 22 STAT | 23 MEDICAL RECORD NO. | CONDITION CODES 24 25 26 27 28 29 30 31 |
| | F | U | 07062004 | 12 | 3 | 1 | | 30 | 020530 | |

| 32 OCCURRENCE CODE DATE | 33 OCCURRENCE CODE DATE | 34 OCCURRENCE CODE DATE | 35 OCCURRENCE CODE DATE | 36 OCCURRENCE SPAN CODE FROM THROUGH | 37 A B C |

**CONFIDENTIAL:**
**Patient Information**

Medicaid

| 39 VALUE CODES CODE AMOUNT | 40 VALUE CODES CODE AMOUNT | 41 VALUE CODES CODE AMOUNT |
| a | | |
| b | | |
| c | | |
| d | | |

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATES | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 |
| 300 | LAB | 82962 | 12242005 | 3 | 981 | | |
| 300 | LAB | 82962 | 12252005 | 3 | 981 | | |
| 300 | LAB | 82962 | 12262005 | 2 | 654 | | |
| 300 | LAB | 82962 | 12272005 | 3 | 981 | | |
| 300 | LAB | 82962 | 12282005 | 3 | 981 | | |
| 300 | LAB | 82962 | 12292005 | 3 | 981 | | |
| 300 | LAB | 82962 | 12302005 | 3 | 981 | | |
| 300 | LAB | 82962 | 12312005 | 3 | 981 | | |
| 001 | TOTAL CHARGE | | | | 28776 | | |

| 0 PAYER | 51 PROVIDER NO. | 52 REL INFO | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 |
| MEDICARE | 465109 | Y | Y | | | |
| MEDICAID | Mentally | Y | Y | | | |

57

DUE FROM PATIENT ►

| 8 INSURED'S NAME | 59 P.REL | 60 CERT. - SSN - HIC. - ID NO. | 61 GROUP NAME | 62 INSURANCE GROUP NO. |
| BAILEY, LOUISE | 01 | | | |
| BAILEY, LOUISE | 01 | | | |

| 3 TREATMENT AUTHORIZATION CODES | 64 ESC | 65 EMPLOYER NAME | 66 EMPLOYER LOCATION |
| | | | |

| 7 PRIN. DIAG. CD. | 68 CODE | 69 CODE | 70 CODE | OTHER DIAG. CODES 71 CODE | 72 CODE | 73 CODE | 74 CODE | 75 CODE | 76 ADM. DIAG. CD. | 77 E-CODE | 78 |
| 73360 | 25010 | 53081 | | | | | | | 73300 | | |

| P.C. | PRINCIPAL PROCEDURE CODE DATE | 81 | OTHER PROCEDURE CODE DATE | OTHER PROCEDURE CODE DATE | 82 ATTENDING PHYS. ID |
| | | | | | E69796 PEHLAUER    C.    S |

| OTHER PROCEDURE CODE DATE | OTHER PROCEDURE CODE DATE | OTHER PROCEDURE CODE DATE | 83 OTHER PHYS. ID |

| REMARKS | (801)277-7002 | OTHER PHYS. ID | 78 |



# Holladay Healthcare Center

A Kindred Community

<div align="right">

**CONFIDENTIAL:**
**Patient Information**

</div>

December 12, 2005

Medicare Medical Review Unit
Mutual of Omaha Insurance Company
Medicare Area - Medical Reviews
P. O. Box 1602
Omaha, NE 68101

Re:  Request for Blood Glucose Testing Documentation/Information
Provider Name/Number: _Holladay Healthcare Ctr  465109_
Beneficiary Name: _Louise, Ruth_
HICN: _▮▮▮▮▮▮▮▮▮_
Dates of Services: _10-01-05  to  10-31-05_

To Whom It May Concern:

We are in receipt of your request for information dated _11-7-05_ . Pursuant to your
request, the following documents are enclosed for your review.

|  | No. of Pages |
|---|---|
| Physician Order(s) for blood glucose testing (BGT) | [ 1 ] |
| Documentation of medical necessity for BGT | [ ) ] |
| Documentation of BGT results | [ 3 ] |
| Documentation of any physician notification of BGT results and any resulting physician orders |  |
| National BGT Coverage Decision | [ 7 ] |
| Letter to Mutual of Omaha, dated April 22, 2005, with attachment | [ 4 ] |
|  | [ 11 ] |
| Total number of pages submitted for review | [ 31 ] |

Should you have any questions, please contact the undersigned at [phone number].

_____ BOm
Name/Credentials

cc:  Facility Executive Director
     Regional Director of Utilization
     Claim Tracking File

---

For Mutual of Omaha Medicare's use only:
Received _____ Analyzed _____     Region_____ Clerk #_____
Reason Code(s)_____     MR HCPCS Code(s)_____
MR Decision_____
_____
_____     MR Rev Code_____
_____     MR All_____
Medically reviewed by_____     Date_____
Overridden by_____     Date_____

4782 South Holladay Boulevard     Salt Lake City, Utah 84117
801 277.7002     801.272.0622 Fax

**Attention Medicare Medical Review Unit**

<div align="right">

CONFIDENTIAL:
Patient Information

</div>

**For Provider Use:**

Provider Number  _46-5109_

HIC Number  ██████████  DCN _____

Dates of Service  _10-01-05_  to  _10-31-05_

**Please indicate if:**

PT Notes Attached  _✓_    ST Notes Attached _____  OT Notes Attached  _✓_ ✗

SNF MDS Attached _____  Demand MDS Attached _____

Itemized bill for Supply/Pharmacy _____

Ambulance _____  Cardiac Rehab _____  Cataract surgery _____

Chest X-Rays _____  CT Scan _____  EPO _____  HBO _____  Labs _____

MRI _____  MRA _____  Observation _____  PSYCH _____

Questionable Covered Procedure _____

Other (Specify) _____

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

**For Mutual of Omaha Medicare's use only:**

Received _____  Analyzed _____  Region _____  Clerk # _____

Reason Code(s) _____          **MR Indicators:**

_____    _____          MR HCPCS Code(s) _____

MR Decision _____          _____

_____          _____

_____          MR Rev Code _____

_____          MR All _____

_____

Medically reviewed by _____          Date _____

Overridden by _____          Date _____

Docket No. C-06-349
A. Ex. 6
Page 7 of 24

**58846**    Federal Register / Vol. 66, No. 226 / Friday, November 23, 2001 / Rules and Regulations

has not been coded to the full number of digits required for that code. (From Coding Clinic for ICD–9–CM, Fourth Quarter, 1995, page 44.)

4. Diagnoses documented as "probable," "suspected," "questionable," "rule-out," or "working diagnosis" should not be coded as though they exist. Rather, code the condition(s) to the highest degree of certainty for that encounter/visit, such as signs, symptoms, abnormal test results, exposure to communicable disease or other reasons for the visit. (From Coding Clinic for ICD–9–CM, Fourth Quarter 1995, page 45.)

5. When a non-specific ICD–9 code is submitted, the underlying sign, symptom, or condition must be related to the indications for the test above.

6. When the indication for the test is long-term administration of glucocorticosteroids, use ICD–9–CM code V58.69.

*Medicare National Coverage Decision for Blood Glucose Testing*

*Description*

This policy is intended to apply to blood samples used to determine glucose levels.

Blood glucose determination may be done using whole blood, serum or plasma. It may be sampled by capillary puncture, as in the fingerstick method, or by vein puncture or arterial sampling. The method for assay may be by color comparison of an indicator stick, by meter assay of whole blood or a filtrate of whole blood, using a device approved for home monitoring, or by using a laboratory assay system using serum or plasma. The convenience of the meter or stick color method allows a patient to have access to blood glucose values in less than a minute or so and has become a standard of care for control of blood glucose, even in the inpatient setting.

*HCPCS Codes (Alpha numeric, CPT–AMA)*

| Code | Descriptor |
|---|---|
| 82947 | Glucose; quantitative, blood (except reagent strip) |
| 82948 | Glucose; blood, reagent strip |
| 82962 | Glucose, blood by glucose monitoring device(s) cleared by the FDA specifically for home use. |

*Indications*

Blood glucose values are often necessary for the management of patients with diabetes mellitus, where hyperglycemia and hypoglycemia are often present. They are also critical in the determination of control of blood glucose levels in the patient with impaired fasting glucose (FPG 110–125 mg/dL), the patient with insulin resistance syndrome and/or carbohydrate intolerance (excessive rise in glucose following ingestion of glucose or glucose sources of food), in the patient with a hypoglycemic disorder such as nesidioblastosis or insulinoma, and in patients with a catabolic or malnutrition state. In addition to those conditions already listed, glucose testing may be medically necessary in patients with tuberculosis, unexplained chronic or recurrent infections, alcoholism, coronary artery disease (especially in women), or unexplained skin conditions (including pruritis, local skin infections, ulceration and gangrene without an established cause). Many medical conditions may be a consequence of a sustained elevated or depressed glucose level. These include comas, seizures or epilepsy, confusion, abnormal hunger, abnormal weight loss or gain, and loss of sensation. Evaluation of glucose may also be indicated in patients on medications known to affect carbohydrate metabolism.

*Limitations*

Frequent home blood glucose testing by diabetic patients should be encouraged. In stable, non-hospitalized patients who are unable or unwilling to do home monitoring, it may be reasonable and necessary to measure quantitative blood glucose up to four times annually.

Depending upon the age of the patient, type of diabetes, degree of control, complications of diabetes, and other co-morbid conditions, more frequent testing than four times annually may be reasonable and necessary.

In some patients presenting with nonspecific signs, symptoms, or diseases not normally associated with disturbances in glucose metabolism, a single blood glucose test may be medically necessary. Repeat testing may not be indicated unless abnormal results are found or unless there is a change in clinical condition. If repeat testing is performed, a specific diagnosis code (e.g., diabetes) should be reported to support medical necessity. However, repeat testing may be indicated where results are normal in patients with conditions where there is a confirmed continuing risk of glucose metabolism abnormality (e.g., monitoring glucocorticoid therapy).

*ICD–9–CM Codes Covered by Medicare Program*

| Code | Description |
|---|---|
| 011.00–011.96 | Tuberculosis |
| 038.0–038.9 | Septicemia |
| 112.1 | Recurrent vaginal candidiasis |
| 112.3 | Interdigital candidiasis |
| 118 | Opportunistic mycoses |
| 157.4 | Malignant neoplasm of islets of Langerhans |
| 158.0 | Malignant neoplasm of retroperitoneum |
| 211.7 | Benign neoplasm of islets of Langerhans |
| 242.00–242.91 | Thyrotoxicosis |
| 250.00–250.93 | Diabetes mellitus |
| 251.0–251.9 | Disorders of pancreatic internal secretion |
| 253.0–253.9 | Disorders of the pituitary gland |
| 255.0 | Cushing syndrome |

82

Federal Register / Vol. 66, No. 226 / Friday, November 23, 2001 / Rules and Regulations    58847

| Code | Description |
|------|-------------|
| 263.0–263.9 | Malnutrition |
| 271.0–271.9 | Disorders of carbohydrate transport and metabolism |
| 272.0–272–4 | Disorders of lipoid metabolism |
| 275.0 | Hemochromotosis |
| 276.0–276.9 | Disorders of fluid, electrolyte and acid-base balance |
| 278.3 | Hypercarotinemia |
| 293.0 | Acute delirium |
| 294.9 | Unspecified organic brain syndrome |
| 298.9 | Unspecified psychosis |
| 300.9 | Unspecified neurotic disorder |
| 310.1 | Organic personality syndrome |
| 337.9 | Autonomic nervous system neuropathy |
| 345.10–345.11 | Generalized convulsive epilepsy |
| 348.3 | Encephalopathy, unspecified |
| 355.9 | Neuropathy, not otherwise specified |
| 356.9 | Unspecified hereditary and idiopathic peripheral neuropathy |
| 357.9 | Unspecified inflammatory and toxic neuropathy |
| 362.10 | Background retinopathy |
| 362.18 | Retinal vasculitis |
| 362.29 | Nondiabetic proliferative retinopathy |
| 362.50–362.57 | Degeneration of macular posterior pole |
| 362.60–362.66 | Peripheral retinal degeneration |
| 362.81–362.89 | Other retinal disorders |
| 362.0 | Unspecified retinal disorders |
| 365.04 | Borderline glaucoma, ocular hypertension |
| 365.32 | Corticosteriod-induced glaucoma residual |
| 366.00–366.09 | Presenile cataract |
| 366.10–366.19 | Senile cataract |
| 367.1 | Acute myopia |
| 368.8 | Other specified visual disturbance |
| 373.00 | Blepharitis |
| 377.24 | Pseudopapilledema |
| 377.9 | Autonomic nervous system neuropathy |
| 378.50–378.55 | Paralytic strabismus |
| 379.45 | Argyll-Robertson pupils |
| 410.00–410.92 | Acute myocardial infarctions |
| 414.00–414.19 | Coronary atherosclerosis and aneurysm of heart |
| 425.9 | Secondary cardiomyopathy, unspecified |
| 440.23 | Arteriosclerosis of extremities with ulceration |
| 440.24 | Arteriosclerosis of extremities with gangrene |
| 440.9 | Arteriosclerosis, not otherwise specified |
| 458.0 | Postural hypotension |
| 462 | Acute pharyngitis |
| 466.0 | Acute bronchitis |
| 480.0–486 | Pneumonia |
| 490 | Recurrent bronchitis, not specified as acute or chronic |
| 491.0–491.9 | Chronic bronchitis |
| 527.7 | Disturbance of salivory secretion (drymouth) |
| 528.0 | Stomatitis |
| 535.50–535.51 | Gastritis |
| 536.8 | Dyspepsia |
| 571.8 | Other chronic nonalcoholic liver disease |
| 572.0–572.8 | Liver abscess and sequelae of chronic liver disease |
| 574.50–574.51 | Choledocholitiasis |
| 575.0–575.12 | Cholecystitis |
| 576.1 | Cholangitis |
| 577.0 | Acute pancreatitis |
| 577.1 | Chronic pancreatitis |
| 577.8 | Pancreatic multiple calculi |
| 590.00–590.9 | Infections of the kidney |
| 595.9 | Recurrent cystitis |
| 596.4 | Bladder atony |
| 596.53 | Bladder paresis |
| 599.0 | Urinary tract infection, recurrent |
| 607.84 | Impotence of organic origin |
| 608.89 | Other disorders male genital organs |
| 616.10 | Vulvovaginitis |
| 626.0 | Amenorrhea |
| 626.4 | Irregular menses |
| 628.9 | Infertility—female |
| 648.00 | Diabetes mellitus complicating pregnancy, Childbirth or the puerperium, unspecified as to episode of care or not applicable |
| 648.03 | Diabetes mellitus complicating pregnancy, Childbirth or the puerperium, antipartum condition or complication |

**58848**    Federal Register / Vol. 66, No. 226 / Friday, November 23, 2001 / Rules and Regulations

| Code | Description |
|------|-------------|
| 648.04 | Diabetes mellitus complicating pregnancy, Childbirth or the puerperium, postpartum condition or complication |
| 648.80 | Abnormal glucose tolerance complicating pregnancy, childbirth or the puerperium, unspecified as to episode of care or not applicable |
| 648.83 | Abnormal glucose tolerance complicating pregnancy, childbirth or the puerperium, antipartum condition or complication |
| 648.84 | Abnormal glucose tolerance complicating pregnancy, childbirth or the puerperium, postpartum condition or complication |
| 656.60–656.63 | Fetal problems affecting management of mother—large for-date of fetus |
| 657.00–657.03 | Polyhydramnios |
| 680.0–680.9 | Carbuncle and furuncle |
| 686.00–686.9 | Infections of skin and subcutaneous tissue |
| 698.0 | Pruritis ani |
| 698.1 | Pruritis of genital organs |
| 704.1 | Hirsutism |
| 705.0 | Anhidrosis |
| 707.0–707.9 | Chronic ulcer of skin |
| 709.3 | Degenerative skin disorders |
| 729.1 | Myalgia |
| 730.07–730.27 | Osteomyelitis of tarsal bones |
| 780.01 | Coma |
| 780.02 | Transient alteration of awareness |
| 780.09 | Alteration of consciousness, other |
| 780.2 | Syncope and collapse |
| 780.31 | Febrile convulsions |
| 780.39 | Seizures, not otherwise specified |
| 780.4 | Dizziness and giddiness |
| 780.71–780.79 | Malaise and fatigue |
| 780.8 | Hyperhidrosis |
| 781.0 | Abnormal involuntary movements |
| 782.0 | Loss of vibratory sensation |
| 783.1 | Abnormal weight gain |
| 783.2 | Abnormal loss of weight |
| 783.5 | Polydipsia |
| 783.6 | Polyphagia |
| 785.0 | Tachycardia |
| 785.4 | Gangrene |
| 786.01 | Hyperventilation |
| 786.09 | Dyspnea, |
| 786.50 | Chest pain, unspecified |
| 787.6 | Fecal incontinence |
| 787.91 | Diarrhea |
| 788.41–788.43 | Frequency of urination and polyuria |
| 789.1 | Hepatomegaly |
| 790.2 | Abnormal glucose tolerance test |
| 790.6 | Other abnormal blood chemistry (hyperglycemia) |
| 791.0 | Proteinuria |
| 791.5 | Glycosuria |
| 796.1 | Abnormal reflex |
| 799.4 | Cachexia |
| V23.0–.9 | Supervision of high risk pregnancy |
| V67.2 | Follow-up examination, following chemotherapy |
| V67.51 | Follow up examination with high-risk medication not elsewhere classified |
| V58.69 | Long term current use of other medication |

*Reasons for Denial:*

Note: This section was not negotiated by the Negotiated Rulemaking Committee. This section includes HCFA's interpretation of its longstanding policies and is included for informational purposes.

• Tests for screening purposes that are performed in the absence of signs, symptoms, complaints, or personal history of disease or injury are not covered except as explicitly authorized by statute. These include exams required by insurance companies, business establishments, government agencies, or other third parties.

• Tests that are not reasonable and necessary for the diagnosis or treatment of an illness or injury are not covered according to the statute.

• Failure to provide documentation of the medical necessity of tests may result in denial of claims. Such documentation may include notes documenting relevant signs, symptoms or abnormal findings that substantiate the medical necessity for ordering the tests. In addition, failure to provide independent verification that the test was ordered by the treating physician (or qualified nonphysician practitioner) through documentation in the physician's office may result in denial.

• A claim for a test for which there is a national coverage or local medical review policy will be denied as not reasonable and necessary if it is submitted without an ICD–9–CM code or narrative diagnosis listed as covered in the policy unless other medical documentation justifying the necessity is submitted with the claim.

• If a national or local policy identifies a frequency expectation, a

84

claim for a test that exceeds that expectation may be denied as not reasonable and necessary, unless it is submitted with documentation justifying increased frequency.
• Tests that are not ordered by a treating physician or other qualified

treating nonphysician practitioner acting within the scope of their license and in compliance with Medicare requirements will be denied as not reasonable and necessary.
• Failure of the laboratory performing the test to have the appropriate Clinical

Laboratory Improvement Amendment of 1988 (CLIA) certificate for the testing performed will result in denial of claims.

### ICD–9–CM Codes Denied

| Code | Description |
| --- | --- |
| 798.0–798.9 | Sudden death, cause unknown |
| V15.85 | Exposure to potentially hazardous body fluids |
| V16.1 | Family history of malignant neoplasm, trachea, bronchus, and lung |
| V16.2 | Family history of malignant neoplasm, other respiratory and intrathoracic organs |
| V16.4 | Family history of malignant neoplasm, genital organs |
| V16.5 | Family history of malignant neoplasm, urinary organs |
| V16.6 | Family history of malignant neoplasm, leukemia |
| V16.7 | Family history of malignant neoplasm, other lymphatic and hematopoietic neoplasms |
| V16.8 | Family history of malignant neoplasm, other specified malignant neoplasm |
| V16.9 | Family history of malignant neoplasm, unspecified malignant neoplasm |
| V17.0–V17.8 | Family history of certain chronic disabling diseases |
| V18.0–V18.8 | Family history of certain other specific conditions |
| V19.0–V19.8 | Family history of other conditions |
| V20.0–V20.2 | Health supervision of infant or child |
| V28.0–V28.9 | Antenatal screenings |
| V50.0–V50.9 | Elective surgery for purposes other than remedying health states |
| V53.2 | Fitting and adjustment of hearing aid |
| V60.0–V60.9 | Housing, household, and economic circumstances |
| V62.0 | Unemployment |
| V62.1 | Adverse effects of work environment |
| V65.0 | Healthy persons accompanying sick persons |
| V65.1 | Persons consulting on behalf of another person |
| V68.0–V68.9 | Encounters for administrative purposes |
| V70.0–V70.9 | General medical examinations |
| V73.0–V73.99 | Special screening examinations for viral and chlamydia diseases |
| V74.0–V74.9 | Special screening examinations for bacterial and spirochetal diseases |
| V75.0–V75.9 | Special screening examination for other infectious diseases |
| V76.0 | Special screening for malignant neoplasms, respiratory organs |
| V76.3 | Special screening for malignant neoplasms, bladder |
| V76.42–V76.9 | Special screening for malignant neoplasms, (sites other than breast, cervix, and rectum) |
| V77.0–V77.9 | Special screening for endocrine, nutrition, metabolic, and immunity disorders |
| V78.0–V78.9 | Special screening for disorders of blood and blood-forming organs |
| V79.0–V.79.9 | Special screening for mental disorders |
| V80.0–V80.3 | Special screening for neurological, eye, and ear diseases |
| V81.0–V81.6 | Special screening for cardiovascular, respiratory, and genitourinary diseases |
| V82.0–V82.9 | Special screening for other conditions |

*ICD–9–CM Codes That Do Not Support Medical Necessity*

Any ICD–9–CM code not listed in either of the ICD–9–CM sections above.

*Sources of Information*

AACE Guidelines for the Management of Diabetes Mellitus, Endocrine Practice (1995)1:149–157.

Bower, Bruce F. and Robert E. Moore, Endocrine Function and Carbohydrates.

Clinical Laboratory Medicine, Kenneth D. McClatchy, editor. Baltimore/Williams & Wilkins, 1994. pp 321–323.

Report of the Expert Committee on the Diagnosis and Classification of Diabetes Mellitus, Diabetes Care, Volume 20, Number 7, July 1997, pages 1183 *et seq.*

Roberts, H.J., Difficult Diagnoses. W. B. Saunders Co., pp 69–70.

*Coding Guidelines*

1. Any claim for a test listed in "HCPCS CODES" above must be submitted with an ICD–9–CM diagnosis code or comparable narrative. Codes that describe symptoms and signs, as opposed to diagnoses, should be provided for reporting purposes when a diagnosis has not been established by the physician. (Based on Coding Clinic for ICD–9–CM, Fourth Quarter 1995, page 43.)

2. Screening is the testing for disease or disease precursors so that early detection and treatment can be provided for those who test positive for the disease. Screening tests are performed when no specific sign, symptom, or diagnosis is present and the patient has not been exposed to a disease. The testing of a person to rule out or to

confirm a suspected diagnosis because the patient has a sign and/or symptom is a diagnostic test, not a screening. In these cases, the sign or symptom should be used to explain the reason for the test. When the reason for performing a test is because the patient has had contact with, or exposure to, a communicable disease, the appropriate code from category V01, Contact with or exposure to communicable diseases, should be assigned, not a screening code, but the test may still be considered screening and not covered by Medicare. For screening tests, the appropriate ICD–9–CM screening code from categories V28 or V73–V82 (or comparable narrative) should be used. (From Coding Clinic for ICD–9–CM, Fourth Quarter 1996, pages 50 and 52)

3. A three-digit code is to be used only if it is not further subdivided.

85

# ReedSmith

Thomas C. Fox
Direct Phone: (202) 414-9222
Email: tfox@reedsmith.com

<div align="right">

Reed Smith LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C. 20005-3373
202.414.9200
Fax 202.414.9299

</div>

April 22, 2005

<u>VIA FEDERAL EXPRESS</u>

Marna Bogan, R.N.
Senior Nurse Coordinator
Medicare Medical Review
Mutual of Omaha
P.O. Box 1602
Omaha, NE 68101

Re:    <u>Blood Glucose Testing</u>

Dear Ms. Bogan:

This law firm represents Kindred Healthcare, Inc. and its subsidiary Medicare provider entities ("Kindred"). We understand that you have been speaking with Mr. Dennis Hansen of Kindred's Health Services Division (nursing homes) about a blood glucose testing and billing issue under Medicare Part B. As Mr. Hansen recently mentioned to you, Kindred has asked us to update its legal position with respect to this issue. We have done so below and would ask that you share this letter with appropriate senior management at Mutual for review and response to us.

<u>Kindred's October 2001 Letter</u>

By way of background, enclosed is an October 29, 2001 letter that Kindred (f/k/a Vencor, Inc.) sent to Mark Pilley, M.D., Medical Director, Medicare, at Mutual of Omaha ("Mutual").

Please note that in our October 2001 letter, we expressed the view that Mutual's August 6, 2001 LMRP on blood glucose monitoring was not enforceable in light of then-current Medicare laws and regulations, and the fact that the final national coverage decision ("NCD") had not been released by the Centers for Medicare and Medicaid ("CMS"). In our letter we maintained that Mutual's LMRP is contrary to good medical practice and that it creates unnecessary administrative burdens on providers and physicians. We also asserted that the proposed regulations (what would become the NCD) had not been finalized and the LMRP could not be used to circumvent the rulemaking process. Last, we asserted that the LMRP was implemented in contravention of existing laws and regulations.

Marna Bogan, R.N.
April 22, 2005
Page 2

ReedSmith

Approximately 3-1/2 years have passed since we sent this letter, and there has been no formal response from Mutual. In the interim, however, several legal developments have occurred which support Kindred's original position and warrant this updated position paper.

<div align="center">

**Final National Coverage Decision**
**Effective November 23, 2002**

</div>

## The Final NCD is Controlling

The controlling NCD, effective November 23, 2002, states that "[f]requent home blood glucose testing by diabetic patients should be encouraged," and that "[t]he convenience of the meter or stick color method . . . has become a standard of care for control of blood glucose, even in the inpatient setting." 66 Fed. Reg. 58846 (Nov. 23, 2001). The NCD also states that "[d]epending upon the age of the patient, type of diabetes, degree of control, complications of diabetes, and other co-morbid conditions, more frequent testing than four times annually may be reasonable and necessary. . . . [R]epeat testing may be indicated where results are normal in patients with conditions where there is a confirmed continuing risk of glucose metabolism abnormality." Id. Taking into account the health factors of the beneficiary, nowhere in the NCD are specific limitations on the frequency of testing, and nowhere is the mention of "prompt" notification. The NCD simply lists the number of maladies that may require blood glucose testing and reiterates that the reasonable and necessary tests will be reimbursed. See id. at 58846, 58848.

The NCD, not the LMRP, dictates which blood glucose monitoring services will be reimbursed. A NCD is binding on all Medicare carrier and fiscal intermediaries, the Medicare Appeals Council and administrative law judges ("ALJs"). 42 C.F.R. § 405.732(a)(4). Further, "[a]n LMRP may not conflict with a national coverage decision once the national coverage decision is effective. If a national coverage decision conflicts with a previously established LMRP, the contractor must change its LMRP to conform to the national coverage decision." 66 Fed. Reg. 58788 (Nov. 23, 2001) (emphasis added). Thus, the NCD trumps the LMRP and is controlling.

Kindred's blood glucose monitoring services meet the NCD criteria in that they are performed on diabetic beneficiaries who have a continued risk of glucose metabolism abnormality. As aforementioned, the NCD clearly states that such testing should be encouraged. Thus, limiting blood glucose services to patients who require daily insulin shots defies the language of the NCD and good medical practice.

Kindred's blood glucose monitoring services also meet the reasonable and necessary criteria. They are ordered by the treating physician, furnished by qualified personnel, in an appropriate setting, and furnished in accordance with accepted standards of medical practice for the treatment of diabetes. All of the tests are performed at a frequency determined by the treating physician to meet each beneficiary's needs.

Docket No. C-06-349
A. Ex. 6
Page 8 of 74

Marna Bogan, R.N.
April 22, 2005
Page 3

ReedSmith

## American Health Care Association
### Medical Director Meetings

The American Health Care Association, a trade association to which Kindred belongs, participated through a number of medical directors of its member facilities in a series of meetings over at least several years with representatives of the Centers for Medicare and Medicaid Services ("CMS"), during which the blood glucose testing and billing matter was discussed along with the clinical issues and benefits of the monitoring services provided by Kindred and others. To our knowledge, no revisions, modifications, or other communications were issued by CMS with respect to the NCD.

## Extendicare Health Services, Inc.
### Administrative Law Judge Decisions

## Recent Extendicare Decisions Agree That Blood Glucose Monitoring Is Medicare Reimbursable

Two ALJs recently accepted arguments similar to the ones asserted by Kindred in recent coverage decisions. See Extendicare Health Services v. AdminaStar Federal, Docket Number 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 (Aug. 12, 2004) ("Extendicare I."); Extendicare Health Services v. AdminaStar Federal, Docket Number 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 (Aug. 24, 2004) ("Extendicare II"). Both cases dealt with an LMRP released by AdminaStar that was similar to Mutual's LMRP in that it stated that Medicare would only cover medically reasonable and necessary blood glucose monitoring services when a physician is "promptly notified of the test results so that he/she may provide active treatment . . . . Multiple blood glucose monitoring services, without prompt physician notification, are not covered . . . ." See Extendicare II, at 3. In arguing for Part B coverage of blood glucose tests, Extendicare, in both cases, appealed from determinations that reimbursement was not warranted because the medical records did not reflect that the physician was notified after each test or that the physician used each test result to order a new test. In neither case did AdminaStar seek appeal of the ALJs' determinations, nor did the Secretary seek to intervene.

In finding for Extendicare, one ALJ stated, "If a service cannot be denied because it is routine,[1] it stands to reason that the services may be covered despite the fact that it is routine. In fact, the purpose of routine, frequent blood glucose monitoring is to assure that tight control is maintained, and this is precisely the kind of testing which is encouraged and allowed under the [NCD]." Extendicare II, at 7. The other ALJ determined that blood glucose monitoring is not a "routine" procedure because it requires skilled care, and that "prompt" notification was not defined in the LMRP. Further, the ALJ concluded that "With such lack of specificity, it makes every sense for the doctor to be able to monitor blood sugar after a series of blood tests over a period of a week or so, in order to assess any fluctuations. . . .

---

[1] The ALJ discussed the reference to "routine" in the context of the Hearing Officer's denial of reimbursement for blood glucose testing since such testing was "routine." The ALJ quoted CMS Program Memorandum AB-00-108, which states "Denial of payment for a Part B covered laboratory service cannot be made on the basis that the service is routine care. Under Medicare, routine care determinations are applicable only for Part A nursing home services." Extendicare II, at 7.

Marna Bogan, R.N.
April 22, 2005
Page 4

ReedSmith

Expecting a physician to check every day on the results and make changes based on each report in isolation is neither cost-effective nor warranted for good health." Extendicare I, at 2.

We are not aware of any appeal which CMS filed with respect to these decisions with the Medicare Appeals Council of the Department Appeals Board, Department of Health and Human Services, which it had the right to do, or any other communication issued by CMS expressing disagreement with the factual findings and legal conclusions of the Administrative Law Judge.

Kindred's position is similar to the positions of Extendicare endorsed by the ALJs. The blood glucose monitoring services cannot be dismissed as "routine" and, further, they meet the criteria of reasonable and necessary. As the ALJs stated, nothing in the NCD or regulations requires notifying the physician of each and every test result, nor is such notification necessary for effective management of the illness. Kindred, like Extendicare, is simply seeking reimbursement under the Medicare Part B rules for blood glucose monitoring services that are considered necessary and are even encouraged by CMS.

<u>Conclusion</u>

It is the position of Kindred that its blood glucose testing and billing fully meet, and will continue to meet, the coverage criteria set forth in the law. Similarly, Mutual's payment of these claims was in accordance with those criteria.

Accordingly, Kindred maintains that any denials of these claims, retrospectively or prospectively, would be contrary to the law; further, it intends to follow the current Medicare laws and regulations and continue to bill for these services.

Very truly yours,

Thomas C. Fox

Thomas C. Fox

Enclosures
cc:　Dennis J. Hansen, Kindred Healthcare
　　　　Senior VP of Operational Reimbursement
　　　Mark Pilley, M.D., Mutual of Omaha
　　　　Medical Director Medicare
　　　David Pearce, Esq., Kindred Healthcare

89

DBA HOLLADAY HEALTH CARE CENT
4782 SO. HOLLADAY BLVD.
SALT LAKE CITY UT 84117

FED. TAX NO. ████

| 6 STATEMENT COVERS PERIOD | | 7 | 8 N-D. | 9 C4 D. | 10 L-R D. | 11 |
|---|---|---|---|---|---|---|
| FROM 100105 | THROUGH 103105 | | 0 | 0 | 0 | |

020530

**CONFIDENTIAL:**
**Patient Information**

12 P.ATIENT NAME
BAILEY, LOUISE

13 PATIENT ADDRESS ████

| 14 Bi | E | 15 SEX 16 MS | 17 DATE | ADMISSION 18 HR | 19 TYPE | 20 SRC | 21 D HR | 22 STAT | 23 MEDICAL RECORD NO. | | 24 | 25 | 26 | CONDITION 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | F  U | 07062004 | 12 | 3 | 1 | 30 | 020530 | | | | | | | | |

| 32 OCCURRENCE CODE DATE | 33 OCCURRENCE CODE DATE | 34 OCCURRENCE CODE DATE | 35 OCCURRENCE CODE DATE | 36 OCCURRENCE SPAN CODE FROM THROUGH | 37 |
|---|---|---|---|---|---|
| 11 07082004 | 44 07082004 | 35 07082004 | | | A B C |

AARP/UHC
P.O. BOX 740819
Atlanta, GA 30374

| 38 | 39 VALUE CODES CODE AMOUNT | 40 VALUE CODES CODE AMOUNT | 41 VALUE CODES CODE AMOUNT |
|---|---|---|---|
| a | 51 3900 | 50 6100 | |
| b | | | |
| c | | | |
| d | | | |

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATES | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 |
|---|---|---|---|---|---|---|---|
| 300 | LAB | 82962 | 10012005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10022005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10032005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10042005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10052005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10062005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10072005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10082005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10092005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10102005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10112005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10122005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10132005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10142005 | 2 | 654 | | |
| | LAB | 82962 | 10152005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10162005 | 1 | 327 | | |
| 300 | LAB | 82962 | 10172005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10182005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10192005 | 2 | 654 | | |
| 430 | OCCUPATION THER | 97003/GO | 10192005 | 1 | 7830 | | |
| 430 | OCCUPATION THER | 97530/GO | 10192005 | 2 | 5712 | | |
| 300 | LAB | 82962 | 10202005 | 2 | 654 | | |
| 420 | PHYSICAL THERP | 97001/GP | 10202005 | 1 | 7342 | | |

| 0 PAYER | 51 PROVIDER NO. | 52 REL 53 ASG INFO BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 |
|---|---|---|---|---|---|
| MEDICARE | 465109 | Y  Y | | | |
| AARPUHC | 522085558004 | Y  Y | | | |

7

**DUE FROM PATIENT ▶**

| 8 INSURED'S NAME | 58 P.REL | 59 CERT. · SSN · HIC · ID NO. | 61 GROUP NAME | 62 INSURANCE GROUP NO. |
|---|---|---|---|---|
| BAILEY, LOUISE | 01 | | | |
| BAILEY, LOUISE | 01 | ████ | | |

| 3 TREATMENT AUTHORIZATION CODES | 84 ESC 65 EMPLOYER NAME | 66 EMPLOYER LOCATION |
|---|---|---|
| | | |

| PRIN. DIAG. CD. | 68 CODE | 70 CODE | OTHER DIAG. CODES 71 CODE | 72 CODE | 73 CODE | 74 CODE | 76 ADM. DIAG. CD. | 77 E-CODE | 78 |
|---|---|---|---|---|---|---|---|---|---|
| 73300 | 25010 | 53081 | 4019 | 2720 | | | 73300 | | |

| I.P.C. | 80 PRINCIPAL PROCEDURE CODE DATE | 81 OTHER PROCEDURE CODE DATE | OTHER PROCEDURE CODE DATE | 82 ATTENDING PHYS. ID |
|---|---|---|---|---|
| | | | | E69796 FEHLAUER  C. |
| | OTHER PROCEDURE CODE DATE | OTHER PROCEDURE CODE DATE | OTHER PROCEDURE CODE DATE | 83 OTHER PHYS. ID |

| REMARKS | OTHER PHYS. ID | |
|---|---|---|
| (801)277-7002 | | 90 |

**Docket No. C-06-349**
**A. Ex. 6**
**Page 11 of 74**

85 PROVIDER REPRESENTATIVE
X

DBA HOLLADAY HEALTH CARE CENT
4782 SO. HOLLADAY BLVD.
SALT LAKE CITY UT 84117

020530

| FED. TAX NO. | 5 STATEMENT COVERS PERIOD FROM | THROUGH | 7 COV D. | 8 NC D | 9 C/I D | 10 L-R D | 11 |
| | 100105 | 103105 | 0 | 0 | 0 | 6 | |

12 PATIENT NAME
BAILEY, LOUISE

13 PATIENT ADDRESS

**CONFIDENTIAL:**
**Patient Information**

| 14 B | 15 SEX | 16 MS | ADMISSION 17 DATE | 18 HR | 19 TYPE | 20 SRC | 21 D HR | 22 STAT | 23 MEDICAL RECORD NO. | | CONDITION CODES | |
| | F | U | 07062004 | 12 | 3 | 1 | 30 | 020530 | | | |

| 32 OCCURRENCE CODE | DATE | 33 OCCURRENCE CODE | DATE | 34 OCCURRENCE DATE | 35 OCCURRENCE DATE | 36 OCCURRENCE SPAN CODE | FROM | THROUGH | 37 |
| 11 | 07082004 | 44 | 07082004 | 35 07082004 | | | | | A B C |

| 39 VALUE CODES CODE | AMOUNT | 40 VALUE CODES | | 41 VALUE CODES | AMOUNT |
| a 51 | 3900 | 50 | 6100 | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATES | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 |
| 300 | LAB | 82962 | 10212005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10222005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10232005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10242005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10252005 | 1 | 327 | | |
| 300 | LAB | 82962 | 10262005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10272005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10282005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10292005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10302005 | 2 | 654 | | |
| 300 | LAB | 82962 | 10312005 | 2 | 654 | | |
| 001 | TOTAL CHARGE | | | | 40504 | | |

| 50 PAYER | 51 PROVIDER NO. | 52 REL INFO | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 |
| MEDICARE | 465109 | Y | Y | | | |
| AARPUHC | 522085558004 | Y | Y | | | |

**DUE FROM PATIENT** ▶

| 58 INSURED'S NAME | 59 P.REL | 60 CERT · SSN · HIC · ID NO. | 61 GROUP NAME | 62 INSURANCE GROUP NO. |
| BAILEY, LOUISE | 01 | | | |
| BAILEY, LOUISE | 01 | | | |

| 63 TREATMENT AUTHORIZATION CODES | 64 ESC | 65 EMPLOYER NAME | 66 EMPLOYER LOCATION |
| | | | |

| P.RIN. DIAG. CD. | 68 CODE | 69 CODE | 70 CODE | OTHER DIAG. CODES 71 CODE | 72 CODE | 73 CODE | 74 CODE | 75 | 76 ADM. DIAG. CD. | 77 E-CODE | 78 |
| 73300 | 25010 | 53081 | 4019 | 2720 | | | | | 73300 | | |

| P.C. | 80 PRINCIPAL PROCEDURE CODE | DATE | 81 OTHER PROCEDURE CODE | DATE | OTHER PROCEDURE CODE | DATE | 82 ATTENDING PHYS. ID |
| | | | | | | | E69796 FEHLAUER    C. |
| | OTHER PROCEDURE CODE | DATE | OTHER PROCEDURE CODE | DATE | OTHER PROCEDURE CODE | DATE | 83 OTHER PHYS. ID |

| REMARKS | | 84 OTHER PHYS. ID |
| (801) 277-7002 | **Docket No. C-06-349** | 91 |
| | **A. Ex. 6** | |
| | **Page 12 of 74** | 85 PROVIDER REPRESENTATIVE   86 DATE |
| | | X |

**CONFIDENTIAL:**
**Patient Information**

RECORDING FROM: 1/1/05 THRU: 1/31/05

PATIENT NAME: Ymmie Bailey

DOCTOR: ______

DATE OF S/S INSULIN ORDER: 7/6/04

FREQUENCY OF USE: BID

MONTH OF THIS RECORD: Oct

SLIDING SCALE ORDER:

_____ - _____ U _____ INSULIN

_____ - _____ U _____ INSULIN

_____ - _____ U _____ INSULIN

_____ - _____ U _____ INSULIN

| DATE | BREAKFAST (0630) TEST | INS. | SITE | INIT. | DINNER (1730) TEST | INS. | SITE | INIT. |
|---|---|---|---|---|---|---|---|---|
| 1 | 109 | — | — | [illegible] | 177 | — | — | [illegible] |
| 2 | 113 | — | — | [illegible] | 164 | — | — | [illegible] |
| 3 | 109 | — | — | [illegible] | 174 | — | — | [illegible] |
| 4 | 133 | — | — | [illegible] | 224 | — | — | [illegible] |
| 5 | 126 | — | — | [illegible] | 247 | — | — | DB |
| 6 | 188 | — | — | [illegible] | 273 | — | — | [illegible] |
| 7 | 216 | — | — | WP | 146 | — | — | [illegible] |
| 8 | 126 | — | — | [illegible] | 136 | — | — | WP |
| 9 | 117 | — | — | [illegible] | 128 | — | — | [illegible] |
| 10 | 127 | — | — | [illegible] | 244 | — | — | [illegible] |
| 11 | 99 | — | — | DB | 211 | — | — | [illegible] |
| 12 | 118 | — | — | DB | 188 | — | — | DB |
| 13 | 138 | — | — | DB | 203 | — | — | DB |
| 14 | 99 | — | — | [illegible] | 178 | — | — | [illegible] |
| 15 | 125 | — | — | [illegible] | 114 | — | — | WP |
| 16 | 110 | — | — | [illegible] | | — | — | [illegible] |
| 17 | 114 | — | — | DB | | | | |
| 18 | 136 | — | — | DB | 117 | — | — | DB |
| 19 | 164 | — | — | DB | 159 | — | — | DB |
| 20 | 145 | — | — | [illegible] | 163 | — | — | DB |
| 21 | 114 | — | — | [illegible] | 240 | — | — | [illegible] |
| 22 | 119 | — | — | [illegible] | 117 | — | — | [illegible] |
| 23 | 150 | Ø | N/A | [illegible] | 144 | — | — | WP |
| 24 | 89 | — | — | [illegible] | 226 | Ø | N/A | [illegible] |
| 25 | 103 | — | — | DB | 169 | — | — | [illegible] |
| 26 | 119 | — | — | [illegible] | 144 | — | — | [illegible] |
| 27 | 90 | — | — | [illegible] | 98 | — | — | [illegible] |
| 28 | 113 | — | — | [illegible] | 157 | — | — | [illegible] |
| 29 | 93 | — | — | [illegible] | 143 | — | — | [illegible] |
| 30 | 108 | — | — | [illegible] | 149 | — | — | [illegible] |
| 31 | 91 | — | — | [illegible] | 213 | — | — | DB |

LUNCH (TEST / INS. / SITE / INIT.): c/o Nausea/Vomiting

BEDTIME (TEST / INS. / SITE / INIT.): Had b-day cake for lunch

92

# Medication Record

**CONFIDENTIAL:**
Patient Information



| Order Date | Medication / Diagnosis |
|---|---|
| Order Date: 08/22/2005 | GLUCOSCAN BID / DM ***SEE DIABETIC RECORD*** |
| Order Date: 07/06/2004 | [redacted] UNITS SQ QAM / DM |
| Order Date: 04/27/2005 | PLAVIX 75 MG PO Q DAY / VENOUS THROMBOSIS |
| Order Date: 04/14/2005 | COZAAR 25 MG PO Q DAY / HTN |
| Order Date: 02/08/2005 | PREVACID 30 MG PO Q PM / GERD |
| Order Date: 06/16/2005 | LIPITOR 20 MG PO Q PM / HYPERCHOLESTROLEMIA |
| Order Date: 08/19/2004 | COLACE 200 MG PO BID / CONSTIPATION |
| Order Date: 08/19/2004 | SENNA 1 TAB PO ON MON, WED AND FRI ROUTINE / CONSTIPATION |

CHARTING FROM 10/1/2005 THRU 10/31/2005

INSTRUCTIONS (SEE REVERSE SIDE)

DEMEROL

Diabetes mellitus; Hypertension; Osteoporosis; VENOUS THROMBOSIS NEC; ADJUSTMNT DIS W DEPRESSN; DMI WO CMP NT ST UNCNTRL; ESOPHAGEAL REFLUX; BOTH EYES BLIND-WHO DEF

BLIND; Do not resuscitate; Pain less than daily. Some/all natural teeth lost, does not have or does not use dentures (or partial plates).

PHYSICIAN: FEHLAUER, DR STEVE
BAILEY, LV
TELEPHONE NO (801)408-5060
20530

ALT PHYS: FEHLAUER, DR STEVE
ALT TELEPHONE (801)408-5060

Holladay Healthcare Center

CONFIDENTIAL:
Patient Information

# Medication Record

94

Docket No. C-05-149
Page 6 of A. V.

**Order Date: 02/15/2005**
REMERON 15 MG PO Q HS / DEPRESSION RJT
MEDICAL ILLNESS, TEARFUL
**SEE A/D BLUE MED SHEET***

**Order Date: 11/19/2004**
TYLENOL 650 MG PO Q 4 HRS PRN / PAIN

**Order Date: 05/23/2005**
MAALOX 30 CC PO QID PRN / HEART BURN

**Order Date: 03/24/2005**
PREP H SUPPOSITORY 1 PR BID PRN /

Influenza vaccine 0.5 ml IM annually as prophylaxis for influenza.
Education/Consultation provided.
Administered: _____
DATE _____ SITE _____ INITIALS _____
Not Administered:
Check if Contraindicated ___ and document in resident progress notes
the reason (s) contraindicated.
Check if Refused ___ and document in resident progress notes to whom
education on the vaccine was provided and the reason (s) for the refusal.
DATE _____ INITIALS _____

**INSTRUCTIONS**
(SEE REVERSE SIDE)

Diabetes mellitus; Hypertension; Osteoporosis; VENOUS
THROMBOSIS NEC; ADJUSTMNT DIS W DEPRESSN; DMI WO CMP NT ST
UNCNTRL; ESOPHAGEAL REFLUX; BOTH EYES BLIND-WHO DEF

PHYSICIAN  FEHLAUER, DR. STEVE
BAILEY, I

TELEPHONE NO  (901)408-5060

20530

**CHARTING FROM**  11/1/2005  **THRU**  10/31/2005

DEMEROL

**COMPLETE EXPIRES CHECKED BY**

**ALLERGIES**

ROOM/BED  0134C

ALT PHYS  FEHLAUER, DR. STEVE

Holliday Healthcare Center

**NURSES ALERT**
BLIND: Do not resuscitate.
Pain less than daily. Some all
natural teeth lost, does not
have or does not use dentures
(or partial plates)

ALT TELEPHONE  (901)408-5060

PAGE  2

Hour columns: Sa 01, Su 02, Mo 03, Tu 04, We 05, Th 06, Fr 07, Sa 08, Su 09, Mo 10, Tu 11, We 12, Th 13, Fr 14, Sa 15, Su 16, Mo 17, Tu 18, We 19, Th 20, Fr 21, Sa 22, Su 23, Mo 24, Tu 25, We 26, Th 27, Fr 28, Sa 29, Su 30, Mo 31



**CONFIDENTIAL:**
**Patient Information**

PATIENT NAME: Lorraine Bailey

DOCTOR: Falauer

DATE OF S/S INSULIN ORDER: 7/16/04

FREQUENCY OF USE: BID

MONTH OF THIS RECORD: November

THRU: 11/30/05

SLIDING SCALE ORDER:

**Medication Record**

CONFIDENTIAL:
Patient Information

Order Date: 10/20/2005
LANTUS INSULIN 27 UNITS SQ AT HS PM

Order Date: 07/06/2004
GLUCOSCAN BID / DM
"SEE DIABETIC RECORD"...

Order Date: 04/27/2005
PLAVIX 75 MG PO Q DAY / VENOUS THROMBOSIS

Order Date: 04/14/2005
COZAAR 25 MG PO Q DAY / HTN

Order Date: 02/08/2005
PREVACID 30 MG PO Q PM / GERD

Order Date: 08/16/2005
LIPITOR 20 MG PO Q PM / HYPERCHOLESTEROLEMIA

Order Date: 08/19/2004
COLACE 200 MG PO BID / CONSTIPATION

Order Date: 08/19/2004
SENNA 1 TAB PO ON MON, WED AND FRI ROUTINE /
CONSTIPATION

INSTRUCTIONS
(SEE REVERSE SIDE)

PHYSICIAN
FEHLAUER, DR. STEVE
BAILEY, L.

DIAGNOSIS
Diabetes mellitus; Hypertension; Osteoporosis, VENOUS
THROMBOSIS NEC; ADJUSTMNT DIS W DEPRESSN; DMI WO CMP NT ST
UNCNTRL; ESOPHAGEAL REFLUX; BOTH EYES BLIND-WHO DEF

CHARTING FROM: 11/1/2005    THRU: 11/30/2005

ALT PHYS    FEHLAUER, DR. STEVE

TELEPHONE NO. (801)408-5060    FACILITY Holladay Healthcare Center

ALLERGIES: DEMEROL

COMPLETE ENTRIES CHECKED BY:    NURSE'S INITIALS

BLIND: Do not resuscitate;
Pain less than daily; Some/all
natural teeth lost, does not
have or does not use dentures
(or partial plates)

CONFIDENTIAL:
Patient Information

## PHYSICIAN'S PROGRESS NOTES

| DATE | TIME | NOTES MUST BE SIGNED BY PHYSICIAN |
|------|------|-----------------------------------|

7-8-04   Admission H & P

[CC:] Constipation often + requested softner

[HPI:] This is an admission H+P for a 72 yr old ♀ who was adm. from home + c̄ self-care deficits 2° D.M. / effects Husb. has assisted her, along c̄ H.H. CNA for last 4 yrs but now c̄ caregiver fatigue + ø assist. from family.

No med. records avail. p̄ several attempts for H.H.C staff + husb. to acquire medical + surg. dx acquired from this very pleasant + cognitively intact lady.   Medicaid pending.

[P.MHX:]

• ~~IDDM to IDDM (4-5 yrs + first dx. p̄ onset of blindness)~~

• ~~neuropathy of bil. ft. 2° DM~~

• gastroparesis 2° D.M. (dx. hosp. stay 12/03)

• Hx T.I.A. c̄ temp. loss of speech

• HTN, prim.        ∘ depression, situational

• osteoporosis prev. – ø bone density

• hiatal hernia c̄ GERD

• GLFs x2 c̄ (2 + 4 yrs ago c̄ fx.)

• Blindness 2° DM 4-5 yrs.                 97

(Ⓛ)  [PSHX:]  • Ⓛ hip pinning (4 yrs. ago) 2° GLF
        • Ⓡ shoulder fx. + rep 2° GLF 2 yrs.
        • TAH remote.  • hyster. 20 yrs ago  • multi...

NAME—Last   First   Middle   Attending Physician   Record No.   Room/Bed
Bailey, Louise        Fehlauer        Pope, APRN

CFS 9-1HH  © 1992 Briggs Corporation, Des Moines, IA 50306  (800) 247-2343  PRINTED IN U.S.A.

Docket No. C-06-349        PHYSICIAN'S PROGRESS NOTES

CONFIDENTIAL:
Patient Information

## PHYSICIAN'S PROGRESS NOTES

| DATE | TIME | NOTES MUST BE SIGNED BY PHYSICIAN |
|------|------|-----------------------------------|

7-8-04

[Current Meds:]
- lexapro 10 mg qd
- prevacid 30 mg bed
- lasix 20 qd
- reglan 10 mg qt.
  c̄ AC
- calcium 500 tid

[Allergies:]
- Lantus insulin 10 U
  c̄ AM
- plavix 75 qd.
- lipitor 40 c̄ HS
- cozaar 50 qd.
- Darvocet N 100 qid

[Fam Hx:] Father = ↓ age 75 c̄ MI; AODM
Mother = ↓ age 85 - ? ⊕ kidney, lung or liver dis.

[Soc Hx:] Married, 3 children = 2 dau.
out-of-state & son in SLC. Retired.
Occup = sales/office worker/ business owner
⊖ tobacco or ETOH.

[ROS:] ⊕ constipation; ⊕ numbness of lft;
otherwise N.S.

[ADLs:] Cont. B&B; requires assist. c̄ feeding;
mod. assist. c̄ bathing, dressing & hygiene.
Propels self in w/c & ambs.

[S:] See HPI. Denies CP, N/V, joint pain.

[O:] VS = 134/88  71-18          Wt. = 5'5"  116 lbs.
Gen. = Sitting in w/c. Alert & oriented X3
& very pleasant & coop. HEENT = Normocephalic.
P ± & ⊖ react to light - does ⊖ see light of
opthmascope. Bil. TM visible & intact. Skin tag
Lt. ear auricle. Own teeth ↑ & ↓ but poor
hygiene. Nares dry. Neck = ⊖ JVD or adenopathy
— Pope, APRN

Docket No. C-06-349
A. Ex. 6
Page 19 of 74

| NAME-Last | First | Middle | Attending Physician | Record No. | Room/Bed |
|-----------|-------|--------|---------------------|-----------|----------|
| Bailey | Louise | | Tellman | | 98 |

CONFIDENTIAL:
Patient Information

# PHYSICIAN'S PROGRESS NOTES

| DATE | TIME | NOTES MUST BE SIGNED BY PHYSICIAN |
|------|------|-----------------------------------|
| 7-8-04 | | Hrt. = <u>RRR</u>, s̄ murmur; $S_1 S_2$. Lungs = CTA, s̄ wheezing. Abdom. = sl. rounded, soft & N.T. c̄ hypoactive BTs ×4 quads. Skin = intact. Extrem. = ↓ ROM R̄ shoulder, to abduction; otherwise WNLs. Fair strength ×4. Toenails longer than recommended s̄ cyanosis or sores. |
| | | <u>A/P:</u> ① Constipation 2° DM, ↓ mobility. Add senna S q̄d + T as needed. |
| | | ② AODM / IDDM c̄ neuropathy, retinopathy, blindness, gastroparesis. On lantus & accept. glucoscans last 2 d. Cont. to monitor. s̄ chg in meds. Cont. ↑ P care. |
| | | ③ HTN = WNLs. s̄ Δ in meds. |
| | | ④ Depression, situational, 2° mult. health problems. Cont. lexapro. |
| | | ⑤ Health maint. = declines offer of mammo, but agrees to dental. SW to assist c̄ medicaid dentist loc. |
| | | ⑥ Osteoporosis prev. = cont. cal. add vit. |
| | | ⑦ A.D. = s̄ CPR. |
| | | ⑧ Labs = consider hgb. $A_1c$, CMP, $B_{12}$, TSH, $T_4$ if s̄ done @ prim. MD clinic last Fri. Nsg. to call for labs. |
| | | 99 |
| | | Pope, APRN |

| NAME—Last | First | Middle | Attending Physician | Record No. | Room/Bed |
|-----------|-------|--------|--------------------|-----------|---------|
| Bailey | Louise | | Tehlauer | | ONP |

# PHYSICIAN'S ORDERS

| D/C DATE | ORDER DATE | Cd | ORDER TEXT | FREQUENCY |
|---|---|---|---|---|
| | | | GENERIC EQUIVALENTS MAY BE USED UNLESS OTHER- WISE NOTED. | **CONFIDENTIAL:** Patient Information |
| | 7/6/2004 | DT | 3 : THERAPEUTIC DIET: 1800 CAL ADA | |
| | 7-6-04 | | *Resident is DNR.* | |
| | 7/6/2004 | MF | 8 : MAY HAVE ANNUAL FLU VACCINE MAY HAVE ANNUAL PPD TEST | |
| | 7/6/2004 | TI | 13 : LANTUS INSULIN 10 UNITS SQ Q AM / DM | QAM S |
| | 7/6/2004 | GS | 21 : GLUCOSCAN BID / DM ***SEE DIABETIC RECORD*** | SO |
| | 7/8/2004 | MR | 22 : SENNA S 1 TAB PO Q DAY / CONSTIPATION | QD |
| | 7/6/2004 | MR | 18 : LIPITOR 40 MG PO Q HS / HYPERCHOLESTROLEMIA | QHS |
| | 7/6/2004 | MR | 20 : CALCIUM 500 MG PO TID / OSTEOPOROSIS | TID |
| | 7/6/2004 | ME | 11 : LEXAPRO 10 MG PO Q DAY / SIT. DEPRESSION R/T HEALTH PROBLEMS. ***SEE A/D BLUE MED SHEET*** | SO |
| | 7/6/2004 | MR | 17 : REGLAN 10 MG PO Q AC&HS / GERD | AC & HS |
| | 7/6/2004 | MR | 14 : PREVACID 30 MG PO BID / GERD | BID |
| | 7/6/2004 | MR | 15 : LASIX 20 MG PO Q DAY / HTN | QD |
| | 7/6/2004 | MR | 16 : PLAVIX 75 MG PO Q DAY / HYPERCHOLESTROLEMIA | QD |
| | 7/6/2004 | MR | 19 : COZAAR 50 MG PO Q DAY / HTN | QD |
| | 7/8/2004 | TR | 24 : SHOES OR SLIPPERS ON FEET WHEN LEAVING ROOM TO PROTECT THEM | IO1 |

| Charting From | Thru | Facility Name | LAST PHYS. EXAM |
|---|---|---|---|
| 8/1/2004 | 8/31/2004 | Holladay Healthcare Center | |

| PHYSICIAN NAME | | ALT. PHYS. NAME | ALT. PHYS. PHONE |
|---|---|---|---|
| FEHLAUER, DR. STEVE | (801)321-5060 | FEHLAUER, DR. STEVE | (801)321-5060 |

| Diagnosis | Nursing Alert |
|---|---|
| Diabetes mellitus; Hypertension; Osteoporosis; OSTEOPOROSIS NOS; BRIEF DE____SIVE REACT; DMI WO CMP NT ST UNCNTRL; ESOPHAGEAL __; BOTH __S BLIND-WHO DEF | BLIND; Do not resuscitate; Pain less than daily; Some/all natural teeth lost, does not have or does not use dentures (or partial plates) |

Docket No. C-06-349
A. Ex. 6
Page 21 of 74

| ALLERGIES |
|---|
| DEMEROL |

100

| PATIENT NAME | PATIENT NO. | STA | ROOM/BED | PAG |
|---|---|---|---|---|
| BAILEY, LOUISE | | | | |

# PHYSICIAN'S ORDERS

CONFIDENTIAL:
Patient Information

| D/C DATE | ORDER DATE | Cd | ORDER TEXT | FREQUENCY |
|---|---|---|---|---|
| | 7/6/2004 | TR | 9 : OFFER HS SNACK<br>DOCUMENT % TAKEN OR R=REFUSED | NS1 |
| | 7/6/2004 | TV | 5 : VITAL SIGNS Q DAY<br>(SEE VS & WT REPORT/YELLOW) | SO |
| | 7/6/2004 | WA | 4 : WEIGHTS WEEKLY<br>(SEE WT HX REPORT/DIETARY)<br>LAST WT: | SO |
| | 7/6/2004 | AG | 6 : MAY GO OUT ON PASS WITH MEDS AND<br>RESPONSIBLE PERSON | |
| | 7/6/2004 | AS | 2 : MAY PARTICIPATE IN SOCIAL ACTIVITIES AS<br>TOLERATED | |
| | 7/6/2004 | OA | 7 : PODIATRIST CARE AS ORDERED | PRN |
| | 7/7/2004 | RP | 1 : REHAB POTENTIAL: POOR | |

I HAVE REVIEWED & APPROVED THE PATIENT
CARE PLAN

I HAVE REVIEWED & APPROVED THE ACTIVITY
PLAN. IT ISN'T IN CONFLICT WITH MED. PLAN
OF CARE

CONTINUE THE ABOVE ORDERS FOR 30 DAYS/SNF
OR 60 DAYS/ICF UNLESS OTHERWISE
SPECIFIED.

I CERTIFY THAT THIS PATIENT REQUIRES
SKILLED / INTERMEDIATE NURSING HOME CARE.

REHAB/RESTORATIVE NURSING PER NURSING
JUDGEMENT

NURSES REVIEW BY: _Gosler, VN_ DATE: _8-1-04_

M.D. SIGNATURE: _____ DATE: _____

Docket No. C-06-349
A. Ex. 6
Page 22 of 74

| Charting From | Thru | Facility Name | | LAST PHYS. EXAM |
|---|---|---|---|---|
| 8/1/2004 | 8/31/2004 | Holladay Healthcare Center | | |

| PHYSICIAN NAME | | ALT. PHYS. NAME | ALT. PHYS. PHONE |
|---|---|---|---|
| FEHLAUER, DR. STEVE | (801)321-5060 | FEHLAUER, DR. STEVE | (801)321-5060 |

| Diagnosis | Nursing Alert |
|---|---|
| Diabetes mellitus; Hypertension; Osteoporosis; OSTEOPOROSIS NOS; BRIEF<br>DEF `SIVE REACT; DMI WO CMP NT ST UNCNTRL; ESOPHAGEAL<br>BOTH<br>S BLIND-WHO DEF | BLIND; Do not resuscitate; Pain less than daily; Some/all natural teeth<br>lost, does not have or does not use dentures (or partial plates) |

| | ALLERGIES |
|---|---|
| | DEMEROL |

101

| PATIENT NAME | PATIENT NO. | STA | ROOM/BED | PAGE |
|---|---|---|---|---|
| BAILEY, LOUISE | | | | |

CONFIDENTIAL:
Patient Information

# ADMISSION ORDERS

| SECTION A: MEDICATION/TREATMENT | SECTION D: NEW ADMISSION ORDERS (Complete this section once part 4 is detach) |
|---|---|
| Lexapro 10mg po QD | Admit to: _Holladay Healthcare_ |
| | Rehab potential: ☐ Good ☐ Fair ☒ Poor ☐ None |
| Diagnosis: _depression_ | Comment: _____ |
| Darvocet N 100 po QID | CPR Status: ☐ Yes ☒ No CPR    Resident representative aware? ☒ Yes ☐ No |
| prn pain | Advance directives issued? ☐ Yes ☐ No    Copy attached? ☐ Yes ☐ No |
| Diagnosis: _osteoporosis_ | Diet Order: _1800 cal ADA_ |
| Lantus insulin 10units | Texture: ☒ Regular ☐ Ground meat ☐ Pureed ☐ As tolerated ☐ Other ___ |
| SQ Q AM | ☐ May have regular diet - Special occasions |
| Diagnosis: _DM_ | ☐ Supplements: _____ |
| Prevacid 30mg po BID. | **Therapy Evaluation Orders:** |
| | Weight bearing ability: ☐ Full ☐ Partial ☐ None  Mobility Status: ___ |
| Diagnosis: _GERD_ | PT _yes_ x per week   OT _____ x per week   ST _____ x per week |

| Lasix 20mg po QD. | ADDITIONAL ORDERS | YES |
|---|---|---|
| | Restraints – If yes, type/frequency/reason | |
| Diagnosis: _HTN_ | | |
| Plavix 75mg po QD. | Side rails – If yes, type/frequency/reason | |
| | | |
| Diagnosis: _hypercholesterolemia_ | Podiatry care PRN | ✓ |
| Reglan 10mg po QAC et | Dental care PRN | ✓ |
| Q HS. | Ophthalmology care PRN | ✓ |
| Diagnosis: _GERD_ | Audiological care PRN | ✓ |
| Lipitor 40mg po Q HS. | May participate in:  Overall activity plan | ✓ |
| | Volunteer program | |
| Diagnosis: _hypercholesterolemia_ | May have occasional alcoholic beverage | |
| Cozaar 50mg po QD. | May go on pass with meds | |
| | PPD per facility policy | ✓ |
| Diagnosis: _HTN_ | Chest X-ray | |
| Calcium 500mg po | Pneumococcal vaccine | |
| TID | Annual flu shot | |
| Diagnosis: _osteoporosis_ | Laboratory per facility policy | ✓ |
| ~~Gluco Scan BID~~ | | |
| Diag: _DM_ | Vital signs per facility policy | ✓ |
| Nurse's signature | Weight per facility policy | ✓ |
| _Bailey, LPN W. Anderson rn_ | Discharge Plans: _____ |
| Date _7_/_6_/_04_ | Admission date _7_/_6_/_04_    Date Of Birth ▓▓▓▓ |

| I have reviewed this resident's plan of care and am in agreement with it. | SECTION B: DIAGNOSES (not listed in Section A) | SECTION C: ALLERGIES | ☐ Generic equivalents not be used |
|---|---|---|---|
| Physician's signature | | _Demerol_ | |
| Date _7_/_13_/_04_ | | | |
| | | | 102 |

| NAME–Last | First | Middle | Attending Physician | Record No. | Room/Bed |
|---|---|---|---|---|---|
| Bailey, | Louise | | Fehlauer | | 102A |

CFS 5-2/4P  © 1992 Briggs Corporation, Des Moines, IA 50306  (800) 247-2343
PRINTED IN U.S.A.

ADMISSION ORDE[R]

Docket No. C-06-349

CONFIDENTIAL:
Patient Information

Docket No. C-06-349
A. Ex. 6
Page 24 of 74

CONFIDENTIAL:
Patient Information

## NURSE'S NOTES

| DATE/ TIME | PROB. NO. | NOTES MUST BE SIGNED WITH NAME AND TITLE |
|---|---|---|
| 10/20/05 10:50 | | Orders received to Δ Lantus to 25 units SQ q Am. ___ M. Allen rn |
| 10/27/05 | | Pt. seen by podiatrist, no new orders ___ Hauler |
| 11-5-05 | | N.O. Benadryl 25mg Caps 2 po QHS prn sleep per pt. request ___ Devon |
| 11/8/05 | | Louise attended care plan mtg'ing today & doing well. pleased w/ new room & situation. We are working on getting her a new wheelchair, which pleases her. Her daughter-in-law present as well. She is pleased w/ care & Louise's new room. ___ W. Hanson rn |
| 11-8-05 13cro | | T.O. Please check BS @ 2000 Q day. Put in MAR and on BS sheet. ___ Dawn |
| 11-10-05 | | Orders noted: 1) Tylenol 500mg ⅱ po QHS 2) If/when res voids @ Noc, ✓ BG et Sat. Notify MD if abnormal, X 1 week. 3) Prevacid @ HS (+time Δ). — (A. Manzo) RN |
| 11-19-05 | | weekly done today ___ |
| 11/28/05 1600 | | Resident c/o cough & hoarse voice. Requesting cough med. orders received et noted from Dr. Fehlauer. Called to pharm. Res to stay in rm until viral symptoms gone. — ___ rn |
| 11/29/05 1430 | | N.O. cepacol throat lozenges prn sore throat; give 1 betwn ea meal x 7 day. 1 per meal supplement & soft foods while having sore throat. this is already being done. — ___ rn |

| NAME—Last | First | Middle | Attending Physician | Record No. | Room/Bed |
|---|---|---|---|---|---|
| Bailey | Louise | | Dr. Fehlauer | | 104 |

CFS 6-32HH © 1992 Briggs, Des Moines, IA 50306  PRINTED IN U.S.A. (R500)

DON'T BREAK THE LAW — MAKE THE CALL  (Save 13¢)  1-800-247-2343  www.BriggsCorp.com

NURSE'S NOTES
□ Continued on Reverse

**CONFIDENTIAL:**
**Patient Information**

Discipline:   OT

Treatment Dx: 799.3          Treatment Dx Onset Date:          Start of Care (Eval Date): 10/19/2005 Admission Setting: Inpatient

Patient : Bailey, Louise

Payer : Medicare B

Treatment Dx Onset Date: 10/3/2005

1. Identify Procedure(s) prescribed.
2. If treatment is not rendered, indicate appropriate session code. Utilize rehab progress note for supportive documentation necessary for Daily Services Record.
3. Record progress summaries on Rehab Progress Note.
4. Signed electronic DAR, maintained in Rehab Debt., is the supporting document confirming services were provided by the specific therapist.

Session Code:
P=Procedure/medical appointment
M=Medical Hold
C=Schedule Conflict
D=Discontinued/Discharged
R=Refused
S=Sick/Illness
W=Withheld (see progress record)

| Therapist | Procedure | DAY of Month | | | | | | | | | | | | | | | | | | | 19 | 20 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mayer, Jamie Lynn, OTR | 97003 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 97530 | | | | | | | | | | | | | | | | | | | | 30 | | | | | | | | | | | |
| Evaluation Time | | | | | | | | | | | | | | | | | | | | | 30 | | | | | | | | | | | |
| Individual Time | | | | | | | | | | | | | | | | | | | | | 30 | | | | | | | | | | | |
| Total Time | | | | | | | | | | | | | | | | | | | | | 30 | | | | | | | | | | | |

Docket No. C-06-349
A. Ex. 6
Page 26 of 74

## Occupational Therapy Evaluation

Facility Name: **HHC**   Room Number: **134C**

Patient Name: **Louise Bailey**   State: **UT**   Soc. Sec. #: ▮▮▮   DOB: ▮▮▮   Age: **71**

Gender: ☐ M  ☒ F  Med ID #: ▮▮▮   Facility Admit Date: **7-6-04**   Admit Setting: ☒ Inpatient Skilled  ☐ LTC  ☐ Outpatient (non-resident)

Admit Dx: **DM II**   ICD-9 #: **250**  Onset Date: _____   Dates of Prior Hosp.: _____ to: _____

Payor: **MCB**   Policy #: ▮▮▮   Payor Effective Date: _____

Rehab (Incident) Start Date: **10/05**  Primary Rehab Dx: **debility** ☐ same as Admit Dx   ICD-9 #: **799.3**  Onset Date: _____

Prior Living Setting: ☒ LTC  ☐ ACLF/B&C  ☐ Private Residence

Eval Date: **10/19/05**  Ordering MD: **Fehlauer**   Tx Dx: **debility**   ICD-9 #: **799.3**  Onset Date: _____

Prior Level of Function: **min Ⓐ c̄ ADL's**

Treatment Precautions (circle all that apply): Aspiration   Diabetic   Diet Restrictions _____   NPO   Cardiac _____   No Code   Full Code

Respiratory **-θ-**   HTN   Isolation   Wound/Skin   Fall Risk   Behavior   Confusion   Hearing/Visual Impaired _____

Restraints **-θ-**   Total Hip   Wt Bearing Status: Non / Toe Touch / Partial / Full / _____ # or _____ %   No Treatment Precautions

Adaptive Equipment: _____

Therapy History: _____

Clinical Evaluation Summary (i.e., PMHx, Prior living arrangement, ROM, Tone, MMT, Gross/Fine Coordination, Pain, Sensation, Activity tolerance, Cognition, Perception):

Pt. referred to OT services p̄ quarterly IDT screen to address a possible fx'l decline. Pt. has a PMH significant for GERD, HTN, DM, depression & Ⓑ blindness. On eval, Pt, CNA staff & restorative aide were interviewed to determine pts level of fx'l Ⓘ. Pt. reports ⊕ significant Δ in ADL task dependence & overall ↓ improvement c̄ stren for fx'l tasks. CNA & restorative report ⊕ Δ in ADL status. Pt. will evaluate for 6m to address gait & x-fer status. OT to cont. quarterly screen to dete nl

☐ See Special Assessment Sheet

Current level of general ADL status: _____

**Treatment Plan: Skilled Occupational Therapy to Treat**

☐ QD  ☐ BID  ☐ TID (check one)

x / week for _____ Weeks

Treatment may include:

☐ Self Care / Home Management Training / Adapt. Equip.

☐ Therapeutic Exercises

☐ Therapeutic Activities

☐ Neuro-Muscular Re-education

☐ Orthotics Fitting & Training

☐ Cognitive / Perceptual Retraining

☐ Compensatory Instruction

☐ Home Visit as needed

☐ Patient / Family / Staff Instruction

☐

☐

☐

☐

*eval only*

Other Comments: _____

**Justification for Skilled Services** (Include why therapy is needed and why the knowledge & the skills of a therapist are required):

Short-Term Goals to be achieved by: ___/___/___

*eval only*

Long-Term Goals to be achieved by: ___/___/___

Patient Goals for Therapy: _____

Potential for achieving goals and benefit from skilled services: ☐ Excellent  ☐ Good  ☐ Fair   due to: _____

Patient/Caregiver participated in establishing Plan of Care: ☐ Yes  ☐ No  ☐ Unable due to: _____

Signature of therapist/professional establishing plan / treatment including professional designation: **Mayer, MOTR/L**   Date: **10-19-05**

Certify the need for these services furnished under this plan of treatment and while under my care from _____ through _____.

NOTE: Federal law mandates that the physician personally date his/her signature.

Physician Signature: **C Fehlauer**   Date: _____

Kindred Healthcare - 3/2002          Occupational Therapy Evaluation

Docket No. C-06-349
A. Ex. 6

Holladay Healthcare Center

A Kindred Community

December 12, 2005

Medicare Medical Review Unit
Mutual of Omaha Insurance Company
Medicare Area - Medical Reviews
P. O. Box 1602
Omaha, NE 68101

Re:  *Request for Blood Glucose Testing Documentation/Information*
     Provider Name/Number:  *Halladay Health care Ctr*
     Beneficiary Name:  *Bo, B,   Jos,l*
     HICN:  ████████████
     Dates of Services:  *11-1-05  to  11-30-05*

To Whom It May Concern:

We are in receipt of your request for information dated  *12-7-05* . Pursuant to your
request, the following documents are enclosed for your review.

| | No. of Pages |
|---|---|
| Physician Order(s) for blood glucose testing (BGT) | [      ] |
| Documentation of medical necessity for BGT | [      ] |
| Documentation of BGT results | [      ] |
| Documentation of any physician notification of BGT results and any resulting physician orders | [      ] |
| National BGT Coverage Decision | [   4   ] |
| Letter to Mutual of Omaha, dated April 22, 2005, with attachment | [  11   ] |
| Total number of pages submitted for review | [  28   ] |

Should you have any questions, please contact the undersigned at [phone number].  *801-277-7002*

*Cindy Pason Boon*
Name, Credentials

cc:  Facility Executive Director
     Regional Director of Utilization
     Claim Tracking File

---

For Mutual of Omaha Medicare's use only:
Received _____  Analyzed _____
Reason Code(s)_____         Region_____  Clerk #_____
MR Decision_____          MR HCPCS Code(s)_____
_____           _____
_____           MR Rev Code_____
_____           MR All_____

Medically reviewed by_____           Date_____
Overridden by_____           Date_____

*782 South Holladay Boulevard    Salt Lake City, Utah 84117*
*801.277.7002    801.272.0622 Fax*

Docket No. C-06-349
A. Ex. 6
Page 28 of 74

# Attention Medicare Medical Review Unit

**CONFIDENTIAL:**
**Patient Information**

**For Provider Use:**

Provider Number ___465109_____

HIC Number [REDACTED] _____ DCN_____

Dates of Service ___11-1-05_____ to ___11-30-05_____

**Please indicate if:**

PT Notes Attached _____    ST Notes Attached _____  OT Notes Attached _____

SNF MDS Attached _____    Demand MDS Attached _____

Itemized bill for Supply/Pharmacy __✗___

Ambulance _____  Cardiac Rehab _____  Cataract surgery _____

Chest X-Rays _____  CT Scan _____  EPO_____  HBO_____  Labs_____

MRI _____  MRA _____  Observation _____  PSYCH _____

Questionable Covered Procedure _____

Other (Specify) _____

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

**For Mutual of Omaha Medicare's use only:**

Received _____  Analyzed _____  Region_____  Clerk # _____

Reason Code(s) _____                    **MR Indicators:**

_____    _____                    MR HCPCS Code(s) _____

MR Decision_____        _____

_____        _____

_____        MR Rev Code  _____

_____        MR All _____

_____

Medically reviewed by _____  Date _____

Overridden by _____  Date _____

58846    Federal Register / Vol. 66, No. 226 / Friday, November 23, 2001 / Rules and Regulations

has not been coded to the full number of digits required for that code. (From Coding Clinic for ICD–9–CM. Fourth Quarter, 1995, page 44.)

4. Diagnoses documented as "probable," "suspected," "questionable," "rule-out," or "working diagnosis" should not be coded as though they exist. Rather, code the condition(s) to the highest degree of certainty for that encounter/visit, such as signs, symptoms, abnormal test results, exposure to communicable disease or other reasons for the visit. (From Coding Clinic for ICD–9–CM, Fourth Quarter 1995, page 45.)

5. When a non-specific ICD–9 code is submitted, the underlying sign, symptom, or condition must be related to the indications for the test above.

6. When the indication for the test is long-term administration of glucocorticosteroids, use ICD–9–CM code V58.69.

### Medicare National Coverage Decision for Blood Glucose Testing

#### Description

This policy is intended to apply to blood samples used to determine glucose levels.

Blood glucose determination may be done using whole blood, serum or plasma. It may be sampled by capillary puncture, as in the fingerstick method, or by vein puncture or arterial sampling. The method for assay may be by color comparison of an indicator stick, by meter assay of whole blood or a filtrate of whole blood, using a device approved for home monitoring, or by using a laboratory essay system using serum or plasma. The convenience of the meter or stick color method allows a patient to have access to blood glucose values in less than a minute or so and has become a standard of care for control of blood glucose, even in the inpatient setting.

HCPCS Codes (Alpha numeric, CPT–AMA)

| Code | Descriptor |
|---|---|
| 82947 | Glucose; quantitative, blood (except reagent strip) |
| 82948 | Glucose; blood, reagent strip |
| 82962 | Glucose, blood by glucose monitoring device(s) cleared by the FDA specifically for home use. |

#### Indications

Blood glucose values are often necessary for the management of patients with diabetes mellitus, where hyperglycemia and hypoglycemia are often present. They are also critical in the determination of control of blood glucose levels in the patient with impaired fasting glucose (FPG 110–125 mg/dL), the patient with insulin resistance syndrome and/or carbohydrate intolerance (excessive rise in glucose following ingestion of glucose or glucose sources of food), in the patient with a hypoglycemia disorder such as nesidioblastosis or insulinoma, and in patients with a catabolic or malnutrition state. In addition to those conditions already listed, glucose testing may be medically necessary in patients with tuberculosis, unexplained chronic or recurrent infections, alcoholism, coronary artery disease (especially in women), or unexplained skin conditions (including pruritus, local skin infections, ulceration and gangrene without an established cause). Many medical conditions may be a consequence of a sustained elevated or depressed glucose level. These include comas, seizures or epilepsy, confusion, abnormal hunger, abnormal weight loss or gain, and loss of sensation. Evaluation of glucose may also be indicated in patients on medications known to affect carbohydrate metabolism.

#### Limitations

Frequent home blood glucose testing by diabetic patients should be encouraged. In stable, non-hospitalized patients who are unable or unwilling to do home monitoring, it may be reasonable and necessary to measure quantitative blood glucose up to four times annually.

Depending upon the age of the patient, type of diabetes, degree of control, complications of diabetes, and other co-morbid conditions, more frequent testing than four times annually may be reasonable and necessary.

In some patients presenting with nonspecific signs, symptoms, or diseases not normally associated with disturbances in glucose metabolism, a single blood glucose test may be medically necessary. Repeat testing may not be indicated unless abnormal results are found or unless there is a change in clinical condition. If repeat testing is performed, a specific diagnosis code (e.g., diabetes) should be reported to support medical necessity. However, repeat testing may be indicated where results are normal in patients with conditions where there is a confirmed continuing risk of glucose metabolism abnormality (e.g., monitoring glucocorticoid therapy).

ICD–9–CM Codes Covered by Medicare Program

| Code | Description |
|---|---|
| 011.00–011.96 | Tuberculosis |
| 038.0–038.9 | Septicemia |
| 112.1 | Recurrent vaginal candidiasis |
| 112.3 | Interdigital candidiasis |
| 118 | Opportunistic mycoses |
| 157.4 | Malignant neoplasm of Islets of Langerhans |
| 158.0 | Malignant neoplasm of retroperitoneum |
| 211.7 | Benign neoplasm of Islets of Langerhans |
| 242.00–242.91 | Thyrotoxicosis |
| 250.00–250.93 | Diabetes mellitus |
| 251.0–251.9 | Disorders of pancreatic internal secretion |
| 253.0–253.9 | Disorders of the pituitary gland |
| 255.0 | Cushing syndrome |

109

Federal Register / Vol. 66, No. 226 / Friday, November 23, 2001 / Rules and Regulations    58847

| Code | Description |
|------|-------------|
| 263.0–263.9 | Malnutrition |
| 271.0–271.9 | Disorders of carbohydrate transport and metabolism |
| 272.0–272–4 | Disorders of lipoid metabolism |
| 275.0 | Hemochromotosis |
| 276.0–276.9 | Disorders of fluid, electrolyte and acid-base balance |
| 278.3 | Hypercarotinemia |
| 293.0 | Acute delirium |
| 294.9 | Unspecified organic brain syndrome |
| 298.9 | Unspecified psychosis |
| 300.9 | Unspecified neurotic disorder |
| 310.1 | Organic personality syndrome |
| 337.9 | Autonomic nervous system neuropathy |
| 345.10–345.11 | Generalized convulsive epilepsy |
| 348.3 | Encephalopathy, unspecified |
| 355.9 | Neuropathy, not otherwise specified |
| 356.9 | Unspecified hereditary and idiopathic peripheral neuropathy |
| 357.9 | Unspecified inflammatory and toxic neuropathy |
| 362.10 | Background retinopathy |
| 362.18 | Retinal vasculitis |
| 362.29 | Nondiabetic proliferative retinopathy |
| 362.50–362.57 | Degeneration of macular posterior pole |
| 362.60–362.66 | Peripherial retinal degeneration |
| 362.81–362.89 | Other retinal disorders |
| 362.0 | Unspecified retinal disorders |
| 365.04 | Borderline glaucoma, ocular hypertension |
| 365.32 | Corticosteriod-induced glaucoma residual |
| 366.00–366.09 | Presenile cataract |
| 366.10–366.19 | Senile cataract |
| 367.1 | Acute myopia |
| 368.8 | Other specified visual disturbance |
| 373.00 | Blepharitis |
| 377.24 | Pseudopapilledema |
| 377.9 | Autonomic nervous system neuropathy |
| 378.50–378.55 | Paralytic strabismus |
| 379.45 | Argyll-Robertson pupils |
| 410.00–410.92 | Acute myocardial infarctions |
| 414.00–414.19 | Coronary atherosclerosis and aneurysm of heart |
| 425.9 | Secondary cardiomyopathy, unspecified |
| 440.23 | Arteriosclerosis of extremities with ulceration |
| 440.24 | Arteriosclerosis of extremities with gangrene |
| 440.9 | Arteriosclerosis, not otherwise specified |
| 458.0 | Postural hypotension |
| 462 | Acute pharyngitis |
| 466.0 | Acute bronchitis |
| 480.0–486 | Pneumonia |
| 490 | Recurrent bronchitis, not specified as acute or chronic |
| 491.0–491.9 | Chronic bronchitis |
| 527.7 | Disturbance of salivory secretion (drymouth) |
| 528.0 | Stomatitis |
| 535.50–535.51 | Gastritis |
| 536.8 | Dyspepsia |
| 571.8 | Other chronic nonalcoholic liver disease |
| 572.0–572.8 | Liver abscess and sequelae of chronic liver disease |
| 574.50–574.51 | Choledocholitiasis |
| 575.0–575.12 | Cholecystitis |
| 576.1 | Cholangitis |
| 577.0 | Acute pancreatitis |
| 577.1 | Chronic pancreatitis |
| 577.8 | Pancreatic multiple calculi |
| 590.00–590.9 | Infections of the kidney |
| 595.9 | Recurrent cystitis |
| 596.4 | Bladder atony |
| 596.53 | Bladder paresis |
| 599.0 | Urinary tract infection, recurrent |
| 607.84 | Impotence of organic origin |
| 608.89 | Other disorders male genital organs |
| 616.10 | Vulvovaginitis |
| 626.0 | Amenorrhea |
| 626.4 | Irregular menses |
| 628.9 | Infertility—female |
| 648.00 | Diabetes mellitus complicating pregnancy, Childbirth or the puerperium, unspecified as to episode of care or not applicable |
| 648.03 | Diabetes mellitus complicating pregnancy, Childbirth or the puerperium, antepartum condition or complication |

110

58848    Federal Register / Vol. 66, No. 226 / Friday, November 23, 2001 / Rules and Regulations

| Code | Description |
|---|---|
| 648.04 | Diabetes mellitus complicating pregnancy, Childbirth or the puerperium, postpartum condition or complication |
| 648.80 | Abnormal glucose tolerance complicating pregnancy, childbirth or the puerperium, unspecified as to episode of care or not applicable |
| 648.83 | Abnormal glucose tolerance complicating pregnancy, childbirth or the puerperium, antepartum condition or complication |
| 648.84 | Abnormal glucose tolerance complicating pregnancy, childbirth or the puerperium, postpartum condition or complication |
| 656.60–656.63 | Fetal problems affecting management of mother—large for-date of fetus |
| 657.00–657.03 | Polyhydramnios |
| 680.0–680.9 | Carbuncle and furuncle |
| 686.00–686.9 | Infections of skin and subcutaneous tissue |
| 698.0 | Pruritis ani |
| 698.1 | Pruritis of genital organs |
| 704.1 | Hirsutism |
| 705.0 | Anhidrosis |
| 707.0–707.9 | Chronic ulcer of skin |
| 709.3 | Degenerative skin disorders |
| 729.1 | Myalgia |
| 730.07–730.27 | Osteomyelitis of tarsal bones |
| 780.01 | Coma |
| 780.02 | Transient alteration of awareness |
| 780.09 | Alteration of consciousness, other |
| 780.2 | Syncope and collapse |
| 780.31 | Febrile convulsions |
| 780.39 | Seizures, not otherwise specified |
| 780.4 | Dizziness and giddiness |
| 780.71–780.79 | Malaise and fatigue |
| 780.8 | Hyperhidrosis |
| 781.0 | Abnormal involuntary movements |
| 782.0 | Loss of vibratory sensation |
| 783.1 | Abnormal weight gain |
| 783.2 | Abnormal loss of weight |
| 783.5 | Polydipsia |
| 783.6 | Polyphagia |
| 785.0 | Tachycardia |
| 785.4 | Gangrene |
| 786.01 | Hyperventilation |
| 786.09 | Dyspnea, |
| 786.50 | Chest pain, unspecified |
| 787.6 | Fecal incontinence |
| 787.91 | Diarrhea |
| 788.41–788.43 | Frequency of urination and polyuria |
| 789.1 | Hepatomegaly |
| 790.2 | Abnormal glucose tolerance test |
| 790.6 | Other abnormal blood chemistry (hyperglycemia) |
| 791.0 | Proteinuria |
| 791.5 | Glycosuria |
| 796.1 | Abnormal reflex |
| 799.4 | Cachexia |
| V23.0–.9 | Supervision of high risk pregnancy |
| V67.2 | Follow-up examination, following chemotherapy |
| V67.51 | Follow up examination with high-risk medication not elsewhere classified |
| V58.69 | Long term current use of other medication |

*Reasons for Denial:*

Note: This section was not negotiated by the Negotiated Rulemaking Committee. This section includes HCFA's interpretation of its longstanding policies and is included for informational purposes.

• Tests for screening purposes that are performed in the absence of signs, symptoms, complaints, or personal history of disease or injury are not covered except as explicitly authorized by statute. These include exams required by insurance companies, business establishments, government agencies, or other third parties.

• Tests that are not reasonable and necessary for the diagnosis or treatment of an illness or injury are not covered according to the statute.

• Failure to provide documentation of the medical necessity of tests may result in denial of claims. Such documentation may include notes documenting relevant signs, symptoms or abnormal findings that substantiate the medical necessity for ordering the tests. In addition, failure to provide independent verification that the test was ordered by the treating physician (or qualified nonphysician practitioner) through documentation in the physician's office may result in denial.

• A claim for a test for which there is a national coverage or local medical review policy will be denied as not reasonable and necessary if it is submitted without an ICD–9–CM code or narrative diagnosis listed as covered in the policy unless other medical documentation justifying the necessity is submitted with the claim.

• If a national or local policy identifies a frequency expectation, a

111

Federal Register / Vol. 66, No. 226 / Friday, November 23, 2001 / Rules and Regulations    58849

claim for a test that exceeds that expectation may be denied as not reasonable and necessary, unless it is submitted with documentation justifying increased frequency.

• Tests that are not ordered by a treating physician or other qualified treating nonphysician practitioner acting within the scope of their license and in compliance with Medicare requirements will be denied as not reasonable and necessary.

• Failure of the laboratory performing the test to have the appropriate Clinical Laboratory Improvement Amendment of 1988 (CLIA) certificate for the testing performed will result in denial of claims.

### ICD–9–CM Codes Denied

| Code | Description |
|---|---|
| 798.0–798.9 | Sudden death, cause unknown |
| V15.85 | Exposure to potentially hazardous body fluids |
| V16.1 | Family history of malignant neoplasm, trachea, bronchus, and lung |
| V16.2 | Family history of malignant neoplasm, other respiratory and intrathoracic organs |
| V16.4 | Family history of malignant neoplasm, genital organs |
| V16.5 | Family history of malignant neoplasm, urinary organs |
| V16.6 | Family history of malignant neoplasm, leukemia |
| V16.7 | Family history of malignant neoplasm, other lymphatic and hematopoietic neoplasms |
| V16.8 | Family history of malignant neoplasm, other specified malignant neoplasm |
| V16.9 | Family history of malignant neoplasm, unspecified malignant neoplasm |
| V17.0–V17.8 | Family history of certain chronic disabling diseases |
| V18.0–V18.8 | Family history of certain other specific conditions |
| V19.0–V19.8 | Family history of other conditions |
| V20.0–V20.2 | Health supervision of infant or child |
| V28.0–V28.9 | Antenatal screenings |
| V50.0–V50.9 | Elective surgery for purposes other than remedying health states |
| V53.2 | Fitting and adjustment of hearing aid |
| V60.0–V60.9 | Housing, household, and economic circumstances |
| V62.0 | Unemployment |
| V62.1 | Adverse effects of work environment |
| V65.0 | Healthy persons accompanying sick persons |
| V65.1 | Persons consulting on behalf of another person |
| V68.0–V68.9 | Encounters for administrative purposes |
| V70.0–V70.9 | General medical examinations |
| V73.0–V73.99 | Special screening examinations for viral and chlamydia diseases |
| V74.0–V74.9 | Special screening examinations for bacterial and spirochetal diseases |
| V75.0–V75.9 | Special screening examination for other infectious diseases |
| V76.0 | Special screening for malignant neoplasms, respiratory organs |
| V76.3 | Special screening for malignant neoplasms, bladder |
| V76.42–V76.9 | Special screening for malignant neoplasms, (sites other than breast, cervix, and rectum) |
| V77.0–V77.9 | Special screening for endocrine, nutrition, metabolic, and immunity disorders |
| V78.0–V78.9 | Special screening for disorders of blood and blood-forming organs |
| V79.0–V.79.9 | Special screening for mental disorders |
| V80.0–V80.3 | Special screening for neurological, eye, and ear diseases |
| V81.0–V81.6 | Special screening for cardiovascular, respiratory, and genitourinary diseases |
| V82.0–V82.9 | Special screening for other conditions |

### ICD–9–CM Codes That Do Not Support Medical Necessity

Any ICD–9–CM code not listed in either of the ICD–9–CM sections above.

#### Sources of Information

AACE Guidelines for the Management of Diabetes Mellitus, Endocrine Practice (1995)1:149–157.

Bower, Bruce F. and Robert E. Moore, Endocrine Function and Carbohydrates.

Clinical Laboratory Medicine, Kenneth D. McClatchy, editor. Baltimore/Williams & Wilkins, 1994. pp 321–323.

Report of the Expert Committee on the Diagnosis and Classification of Diabetes Mellitus, Diabetes Care, Volume 20, Number 7, July 1997, pages 1183 et seq.

Roberts, H.J., Difficult Diagnoses. W. B. Saunders Co., pp 69–70.

#### Coding Guidelines

1. Any claim for a test listed in "HCPCS CODES" above must be submitted with an ICD–9–CM diagnosis code or comparable narrative. Codes that describe symptoms and signs, as opposed to diagnoses, should be provided for reporting purposes when a diagnosis has not been established by the physician. (Based on Coding Clinic for ICD–9–CM, Fourth Quarter 1995, page 43.)

2. Screening is the testing for disease or disease precursors so that early detection and treatment can be provided for those who test positive for the disease. Screening tests are performed when no specific sign, symptom, or diagnosis is present and the patient has not been exposed to a disease. The testing of a person to rule out or to confirm a suspected diagnosis because the patient has a sign and/or symptom is a diagnostic test, not a screening. In these cases, the sign or symptom should be used to explain the reason for the test. When the reason for performing a test is because the patient has had contact with, or exposure to, a communicable disease, the appropriate code from category V01, Contact with or exposure to communicable diseases, should be assigned, not a screening code, but the test may still be considered screening and not covered by Medicare. For screening tests, the appropriate ICD–9–CM screening code from categories V28 or V73–V82 (or comparable narrative) should be used. (From Coding Clinic for ICD–9–CM, Fourth Quarter 1996, pages 50 and 52)

3. A three-digit code is to be used only if it is not further subdivided.

# ReedSmith

**Thomas C. Fox**
Direct Phone: (202) 414-9222
Email: tfox@reedsmith.com

Reed Smith LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C. 20005-3373
202.414.9200
Fax 202.414.9299

April 22, 2005

VIA FEDERAL EXPRESS

Marna Bogan, R.N.
Senior Nurse Coordinator
Medicare Medical Review
Mutual of Omaha
P.O. Box 1602
Omaha, NE  68101

Re:   Blood Glucose Testing

Dear Ms. Bogan:

This law firm represents Kindred Healthcare, Inc. and its subsidiary Medicare provider entities ("Kindred").  We understand that you have been speaking with Mr. Dennis Hansen of Kindred's Health Services Division (nursing homes) about   a blood glucose testing and billing issue under Medicare Part B.  As Mr. Hansen recently mentioned to you, Kindred has asked us to update its legal position with respect to this issue.  We have done so below and would ask that you share this letter with appropriate senior management at Mutual for review and response to us.

## Kindred's October 2001 Letter

By way of background, enclosed is an October 29, 2001 letter that Kindred (f/k/a Vencor, Inc.) sent to Mark Pilley, M.D., Medical Director, Medicare, at Mutual of Omaha ("Mutual").

Please note that in our October 2001 letter, we expressed the view that Mutual's August 6, 2001 LMRP on blood glucose monitoring was not enforceable in light of then-current Medicare laws and regulations, and the fact that the final national coverage decision ("NCD") had not been released by the Centers for Medicare and Medicaid ("CMS").  In our letter we maintained that Mutual's LMRP is contrary to good medical practice and that it creates unnecessary administrative burdens on providers and physicians.  We also asserted that the proposed regulations (what would become the NCD) had not been finalized and the LMRP could not be used to circumvent the rulemaking process.  Last, we asserted that the LMRP was implemented in contravention of existing laws and regulations.

LONDON ♦ NEW YORK ♦ LOS ANGELES ♦ SAN FRANCISCO ♦ WASHINGTON, D.C. ♦ PHILADELPHIA ♦ PITTSBURGH ♦ OAKLAND
PRINCETON ♦ FALLS CHURCH ♦ WILMINGTON ♦ NEWARK ♦ MIDLANDS, U.K. ♦ CENTURY CITY ♦ RICHMOND ♦ LEESBURG

reedsmith.com

Docket No. C-06-349

113

Mama Bogan, R.N.
April 22, 2005
Page 2

ReedSmith

Approximately 3-1/2 years have passed since we sent this letter, and there has been no formal response from Mutual. In the interim, however, several legal developments have occurred which support Kindred's original position and warrant this updated position paper.

### Final National Coverage Decision
### Effective November 23, 2002

#### The Final NCD is Controlling

The controlling NCD, effective November 23, 2002, states that "[f]requent home blood glucose testing by diabetic patients should be encouraged," and that "[t]he convenience of the meter or stick color method . . . has become a standard of care for control of blood glucose, even in the inpatient setting." 66 Fed. Reg. 58846 (Nov. 23, 2001). The NCD also states that "[d]epending upon the age of the patient, type of diabetes, degree of control, complications of diabetes, and other co-morbid conditions, more frequent testing than four times annually may be reasonable and necessary. . . . [R]epeat testing may be indicated where results are normal in patients with conditions where there is a confirmed continuing risk of glucose metabolism abnormality." Id. Taking into account the health factors of the beneficiary, nowhere in the NCD are specific limitations on the frequency of testing, and nowhere is the mention of "prompt" notification. The NCD simply lists the number of maladies that may require blood glucose testing and reiterates that the reasonable and necessary tests will be reimbursed. See id. at 58846, 58848.

The NCD, not the LMRP, dictates which blood glucose monitoring services will be reimbursed. A NCD is binding on all Medicare carrier and fiscal intermediaries, the Medicare Appeals Council and administrative law judges ("ALJs"). 42 C.F.R. § 405.732(a)(4). Further, "[a]n LMRP may not conflict with a national coverage decision once the national coverage decision is effective. If a national coverage decision conflicts with a previously established LMRP, the contractor must change its LMRP to conform to the national coverage decision." 66 Fed. Reg. 58788 (Nov. 23, 2001) (emphasis added). Thus, the NCD trumps the LMRP and is controlling.

Kindred's blood glucose monitoring services meet the NCD criteria in that they are performed on diabetic beneficiaries who have a continued risk of glucose metabolism abnormality. As aforementioned, the NCD clearly states that such testing should be encouraged. Thus, limiting blood glucose services to patients who require daily insulin shots defies the language of the NCD and good medical practice.

Kindred's blood glucose monitoring services also meet the reasonable and necessary criteria. They are ordered by the treating physician, furnished by qualified personnel, in an appropriate setting, and furnished in accordance with accepted standards of medical practice for the treatment of diabetes. All of the tests are performed at a frequency determined by the treating physician to meet each beneficiary's needs.

114

### American Health Care Association
#### Medical Director Meetings

The American Health Care Association, a trade association to which Kindred belongs, participated through a number of medical directors of its member facilities in a series of meetings over at least several years with representatives of the Centers for Medicare and Medicaid Services ("CMS"), during which the blood glucose testing and billing matter was discussed along with the clinical issues and benefits of the monitoring services provided by Kindred and others. To our knowledge, no revisions, modifications, or other communications were issued by CMS with respect to the NCD.

### Extendicare Health Services, Inc.
#### Administrative Law Judge Decisions

#### Recent Extendicare Decisions Agree That Blood Glucose Monitoring Is Medicare Reimbursable

Two ALJs recently accepted arguments similar to the ones asserted by Kindred in recent coverage decisions. See Extendicare Health Services v. AdminaStar Federal, Docket Number 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 (Aug. 12, 2004) ("Extendicare I."); Extendicare Health Services v. AdminaStar Federal, Docket Number 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 (Aug. 24, 2004) ("Extendicare II"). Both cases dealt with an LMRP released by AdminaStar that was similar to Mutual's LMRP in that it stated that Medicare would only cover medically reasonable and necessary blood glucose monitoring services when a physician is "promptly notified of the test results so that he/she may provide active treatment . . . . Multiple blood glucose monitoring services, without prompt physician notification, are not covered . . . ." See Extendicare II, at 3. In arguing for Part B coverage of blood glucose tests, Extendicare, in both cases, appealed from determinations that reimbursement was not warranted because the medical records did not reflect that the physician was notified after each test or that the physician used each test result to order a new test. In neither case did AdminaStar seek appeal of the ALJs' determinations, nor did the Secretary seek to intervene.

In finding for Extendicare, one ALJ stated, "If a service cannot be denied because it is routine,[1] it stands to reason that the services may be covered despite the fact that it is routine. In fact, the purpose of routine, frequent blood glucose monitoring is to assure that tight control is maintained, and this is precisely the kind of testing which is encouraged and allowed under the [NCD]." Extendicare II, at 7. The other ALJ determined that blood glucose monitoring is not a "routine" procedure because it requires skilled care, and that "prompt" notification was not defined in the LMRP. Further, the ALJ concluded that "With such lack of specificity, it makes every sense for the doctor to be able to monitor blood sugar after a series of blood tests over a period of a week or so, in order to assess any fluctuations. . . .

---

[1] The ALJ discussed the reference to "routine" in the context of the Hearing Officer's denial of reimbursement for blood glucose testing since such testing was "routine." The ALJ quoted CMS Program Memorandum AB-00-108, which states "Denial of payment for a Part B covered laboratory service cannot be made on the basis that the service is routine care. Under Medicare, routine care determinations are applicable only for Part A nursing home services." Extendicare II, at 7.

Marna Bogan, R.N.
April 22, 2005
Page 4

ReedSmith

Expecting a physician to check every day on the results and make changes based on each report in isolation is neither cost-effective nor warranted for good health." Extendicare I, at 2.

We are not aware of any appeal which CMS filed with respect to these decisions with the Medicare Appeals Council of the Department Appeals Board, Department of Health and Human Services, which it had the right to do, or any other communication issued by CMS expressing disagreement with the factual findings and legal conclusions of the Administrative Law Judge.

Kindred's position is similar to the positions of Extendicare endorsed by the ALJs. The blood glucose monitoring services cannot be dismissed as "routine" and, further, they meet the criteria of reasonable and necessary. As the ALJs stated, nothing in the NCD or regulations requires notifying the physician of each and every test result, nor is such notification necessary for effective management of the illness. Kindred, like Extendicare, is simply seeking reimbursement under the Medicare Part B rules for blood glucose monitoring services that are considered necessary and are even encouraged by CMS.

<u>Conclusion</u>

It is the position of Kindred that its blood glucose testing and billing fully meet, and will continue to meet, the coverage criteria set forth in the law. Similarly, Mutual's payment of these claims was in accordance with those criteria.

Accordingly, Kindred maintains that any denials of these claims, retrospectively or prospectively, would be contrary to the law; further, it intends to follow the current Medicare laws and regulations and continue to bill for these services.

Very truly yours,

Thomas C Fox

Thomas C. Fox

Enclosures
cc:    Dennis J. Hansen, Kindred Healthcare
          Senior VP of Operational Reimbursement
       Mark Pilley, M.D., Mutual of Omaha
          Medical Director Medicare
       David Pearce, Esq., Kindred Healthcare

**CONFIDENTIAL:**
**Patient Information**

**CMS/**
CENTERS for MEDICARE & MEDICAID SERVICES

**MEDICARE**
Part A Intermediary

REPORT: 001            MEDICARE PART A - 52280        PROVIDER NUMBER: 465109
DATE: 12/07/05        ADDITIONAL DEVELOPMENT REQUEST   TYPE REQUEST: MEDICAL
                                                        BILL TYPE: 223

HOLLADAY HEALTHCARE CENTER
4782 S HOLLADAY BLVD
HOLLADAY            UT 84117

WE HAVE REVIEWED YOUR CLAIM RECORDS AND FOUND THAT ADDITIONAL DEVELOPMENT
WILL BE NECESSARY BEFORE PROCESSING CAN BE FINALIZED. TO ASSIST YOU IN
PROVIDING THE REQUIRED INFORMATION, WE HAVE ASSIGNED REASON CODES TO THE
AFFECTED CLAIM RECORD (SEE BELOW) FOR YOUR REVIEW. PLEASE REFER TO THE
ACCOMPANYING LIST FOR EXPLANATION OF THE ASSIGNED CODE, AND ENTER THE
REQUIRED INFORMATION IN THE SPACE PROVIDED BELOW EACH CLAIM RECORD AND
RETURN WITHIN 30 DAYS TO THE:                OMB CONTROL# 0938-0969

                    MEDICAL REVIEW DEPARTMENT
                    MUTUAL OF OMAHA MEDICARE
                    PO BOX 1602
                    OMAHA            NE    68101

| MEDICAL REC NO. DCN | PATIENT NAME/ HIC NUMBER | | FROM/TO DATES | OPR-MED ANALYST | TOTAL CHARGES |
|---|---|---|---|---|---|
| 020530 20534002602402 | BAILEY | LOUISE | 110105 113005 | M699 | 261.60 |

REASONS: 50200

                        50200
PLEASE SUBMIT THE FOLLOWING INFORMATION TO SUPPORT BLOOD GLUCOSE SERVICES
- PHYSICIAN ORDER(S) TO INCLUDE BLOOD GLUCOSE TESTING.
- DOCUMENTATION FOR THE MEDICAL NECESSITY FOR EACH TEST BILLED, THIS MAY
  INCLUDE NURSE'S NOTES AND OR PHYSICIAN PROGRESS NOTES.
- RESULTS OF EACH BLOOD GLUCOSE/ACCUCHECK TEST BILLED.
- DOCUMENTATION OF PHYSICIAN NOTIFICATION OF EACH TEST RESULT NOTING THE USE
  OF THE RESULTS TO MODIFY TREATMENT.
- DETAILED ITEMIZATION OF CHARGES BILLED.
- HISTORY AND PHYSICAL SUPPORTING THE DIAGNOSIS OF DIABETES

117

**MUTUAL of OMAHA INSURANCE COMPANY** ▪ MEDICARE AREA ▪ P.O. BOX 1602 ▪ OMAHA, NE 68101



DBA HOLLADAY ~~CARE CENTER~~
4782 SO. HOLLADAY BLVD.
SALT LAKE CITY UT 84117

| 12 PATIENT NAME | | |
| --- | --- | --- |
| BAILEY, LOUISE | | |

**CONFIDENTIAL:**
**Patient Information**

| 14 BIRTHDATE | 15 SEX | 16 MS | 17 ADMISSION DATE | 18 HR | 19 TYPE | 20 SRC | 21 D HR | 22 STAT | 23 MEDICAL RECORD NO. |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | F | U | 07062004 | 12 | 3 | 1 | | 30 | 020530 |

AARP/UHC
P.O. BOX 740819
Atlanta, GA 30374

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATES | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES |
| --- | --- | --- | --- | --- | --- | --- |
| 300 | LAB | 82962 | 11012005 | 2 | 654 | |
| 300 | LAB | 82962 | 11022005 | 2 | 654 | |
| 300 | LAB | 82962 | 11032005 | 2 | 654 | |
| 300 | LAB | 82962 | 11042005 | 2 | 654 | |
| 300 | LAB | 82962 | 11052005 | 2 | 654 | |
| 300 | LAB | 82962 | 11062005 | 2 | 654 | |
| 300 | LAB | 82962 | 11072005 | 2 | 654 | |
| 300 | LAB | 82962 | 11082005 | 2 | 654 | |
| 300 | LAB | 82962 | 11092005 | 3 | 981 | |
| 300 | LAB | 82962 | 11102005 | 3 | 981 | |
| 300 | LAB | 82962 | 11112005 | 3 | 981 | |
| 300 | LAB | 82962 | 11122005 | 3 | 981 | |
| 300 | LAB | 82962 | 11132005 | 3 | 981 | |
| 300 | LAB | 82962 | 11142005 | 3 | 981 | |
| 300 | LAB | 82962 | 11152005 | 3 | 981 | |
| | LAB | 82962 | 11162005 | 3 | 981 | |
| 300 | LAB | 82962 | 11172005 | 3 | 981 | |
| 300 | LAB | 82962 | 11182005 | 2 | 654 | |
| 300 | LAB | 82962 | 11192005 | 2 | 654 | |
| 300 | LAB | 82962 | 11202005 | 3 | 981 | |
| 300 | LAB | 82962 | 11212005 | 3 | 981 | |
| 300 | LAB | 82962 | 11222005 | 3 | 981 | |
| 300 | LAB | 82962 | 11232005 | 3 | 981 | |

| PAYER | 51 PROVIDER NO. | 52 REL INFO | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 |
| --- | --- | --- | --- | --- | --- | --- |
| MEDICARE | 465109 | Y | Y | | | |
| AARP/UHC | 522088558004 | Y | Y | | | |

**DUE FROM PATIENT ▶**

| INSURED'S NAME | 59 P.REL | 60 CERT - SSN - HIC - ID NO. | 61 GROUP NAME | 62 INSURANCE GROUP NO. |
| --- | --- | --- | --- | --- |
| BAILEY, LOUISE | 01 | | | |
| BAILEY, LOUISE | 01 | | | |

| TREATMENT AUTHORIZATION CODES | 64 ESC | 65 EMPLOYER NAME | 66 EMPLOYER LOCATION |
| --- | --- | --- | --- |
| | | | |

| RIN. DIAG. CD. | 68 DIAG. | OTHER DIAG. CODES | | | | | | 76 ADM. DIAG. CD. | 77 E-CODE |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 73300 | 25010 | 53081 | | | | | | 73300 | |

| 80 PRINCIPAL PROCEDURE | 81 | OTHER PROCEDURE | OTHER PROCEDURE | 82 ATTENDING PHYS. ID |
| --- | --- | --- | --- | --- |
| CODE DATE | | CODE DATE | CODE DATE | E69796 FEHLAUER C. |

| OTHER PROCEDURE | OTHER PROCEDURE | OTHER PROCEDURE | 83 OTHER PHYS. ID |
| --- | --- | --- | --- |
| CODE DATE | CODE DATE | CODE DATE | |

REMARKS    (801) 277-7002

| 84 OTHER PHYS. ID | |
| --- | --- |
| | 118 |

| 85 PROVIDER REPRESENTATIVE | 86 DATE |
| --- | --- |
| X | |

2 HCFA-1450      OCR/ORIGINAL      **Docket No. C-06-349**      I CERTIFY THE CERTIFICATIONS ON THE REVERSE APPLY TO THIS BILL AND ARE MADE A PART H

DBA HOLLADAY HEALTH CARE CENTER
4782 SO. HOLLADAY BLVD.
SALT LAKE CITY UT 84117

020530

5 FED. TAX NO.

6 STATEMENT COVERS PERIOD
FROM 110105  THROUGH 113005

V.D. 0   8 N-C-D. 0   9 C-I-D. 0   10 L-P-D. 0   11

12 PATIENT NAME
BAILEY, LOUISE

13 PATIENT ADDRESS

**CONFIDENTIAL:**
Patient Information

14 DATE   15 SEX F   16 MS U   ADMISSION 17 DATE 07062004  18 HR 12  19 TYPE 3  20 SRC 1   21 D HR   22 STAT 30   23 MEDICAL RECORD NO. 020530

32 OCCURRENCE CODE/DATE   33 OCCURRENCE   34 OCCURRENCE   35 OCCURRENCE   36 OCCURRENCE SPAN FROM/THROUGH   A B C

AARP/UHC
P.O. BOX 740819
Atlanta, GA 30374

39 VALUE CODES CODE/AMOUNT   a b c d   40 VALUE CODES   41 VALUE CODES

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATES | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES |
|---|---|---|---|---|---|---|
| 300 | LAB | 82962 | 11242005 | 3 | 981 | |
| 300 | LAB | 82962 | 11252005 | 3 | 981 | |
| 300 | LAB | 82962 | 11262005 | 3 | 981 | |
| 300 | LAB | 82962 | 11272005 | 3 | 981 | |
| 300 | LAB | 82962 | 11282005 | 3 | 981 | |
| 300 | LAB | 82962 | 11292005 | 3 | 981 | |
| 300 | LAB | 82962 | 11302005 | 3 | 981 | |
| 001 | TOTAL CHARGE | | | | 26160 | |

| PAYER | 51 PROVIDER NO. | 52 REL INFO | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 |
|---|---|---|---|---|---|---|
| MEDICARE | 465109 | Y | Y | | | |
| AARPUHC | 52005558004 | Y | Y | | | |

**DUE FROM PATIENT ▶**

INSURED'S NAME
BAILEY, LOUISE
BAILEY, LOUISE

59 P.REL 01  01   60 CERT. - SSN - HIC. - ID NO.   61 GROUP NAME   62 INSURANCE GROUP NO.

TREATMENT AUTHORIZATION CODES   64 ESC   65 EMPLOYER NAME   66 EMPLOYER LOCATION

PRIN. DIAG. CD. 73300   66 CODE 25010   67 CODE 53081   OTHER DIAG. CODES   76 ADM. DIAG. CD. 73300   77 E-CODE

80 PRINCIPAL PROCEDURE CODE/DATE   81 OTHER PROCEDURE   OTHER PROCEDURE   82 ATTENDING PHYS. ID
E69796 FEHLAUER   C   S

OTHER PROCEDURE   OTHER PROCEDURE   OTHER PROCEDURE   83 OTHER PHYS. ID

REMARKS   (801)277-7002

Docket No. C-06-349
A. Ex. 6
Page 40 of 74

OTHER PHYS. ID   119

85 PROVIDER REPRESENTATIVE
X   86 DATE

2 HCFA-1450   OCR/ORIGINAL   I CERTIFY THE CERTIFICATIONS ON THE REVERSE APPLY TO THIS BILL AND ARE MADE A PART HE

CONFIDENTIAL:
Patient Information

## PHYSICIAN'S PROGRESS NOTES

**NOTES MUST BE SIGNED BY PHYSICIAN**

| DATE | TIME | |
|------|------|---|
| 7-8-04 | | Admission H & P |

CC: Constipation often & requested softner

HPI: This is an admission H+P for a 72 yr old ♀ who was adm. from home + c̄ self-care deficits 2° D.M. / effects Husb. has assisted her, along c̄ H.H. CNA for last 4 yrs but now c̄ caregiver fatigue + to assist. from family.

No med. records avail. p̄ several attem for H.H.C. staff & husb. to acquire. Medica + surg. dx acquired from this very pleasant + cognitively intact lady.

P.M.HX: Medicaid spending.

~~IDDM DM (45 yrs & first dx. p̄ onset of blindness)~~

neuropathy of bil. ft. 2° DM.
- gastroparesis 2° D.M. (dx. hosp. stay 12/03,
- Hx. T.I.A. c̄ temp. loss of speech
- HTN, prim.        depression, situat
- osteoporosis prev. - ↓ bone density
- hiatal hernia c̄ GERD
- GLFs X2 & (2 + 4 yrs ago c̄ fx)
- Blindness 2° DM · 45 yrs

PSHX: (L) hip pinning (4 yrs. ago) 2° GLF
(R) shoulder fx + rep 2° GLF 2 yrs
- TTA, remote.    · hyster. 20 yrs. ago. · mult

NAME-Last: Bailey   First: Louise   Middle:

Attending Physician: Fehlauer

Pope, APR

CONFIDENTIAL:
Patient Information

## PHYSICIAN'S PROGRESS NOTES

| DATE | TIME | NOTES MUST BE SIGNED BY PHYSICIAN |
|------|------|------------------------------------|

-8-04  [Current meds:]                    [Allergies:]

• lexapro 10 mg qd          • Lantus insulin 10 U
- prevacid 30 mg bid           ƈ AM
• lasix 20 qd               • plavix 75 qd.
- reglan 10 mg q̶d.          ° lipitor 40 ƈ HS
    ƈ AC                    ° cozaar 50 qd
° calcium 500 tid           • Darvocet N 100 qid

[Fam Hx:] Father = ↓ age 75 ƈ MI; AODM
    Mother = ↓ age 85 - ?  ⊖ kidney, lung, or liver dis.

[Soc Hx:] Married, 3 children = 2 dau.
out-of-state & son in SLC. Retired
occup = sales/office worker/ business owner
⊖ tobacco or ETOH.

[ROS:] ⊕ constipation; ⊕ numbness of Lt ft;
otherwise N.S.

[ADLs:] Cont. B&B, requires assist. ƈ feeding,
mod. assist. ƈ bathing, dress. & hygiene.
Propels self in w/c & ambs.

[S:] See HPI.  Denies CP, N/V, joint pain

[O:] VS = 134/88  71-18          Wt. = 5'5"  116 lbs

Gen. = Sitting in w/c. Alert & oriented ×3
& very pleasant & coop. HEENT = normocephalic
P + & ⊕ react to light - does ⊖ see light of
optmascope. Bil. TM visible & intact. Skin ƈ
Ⓛ ear auricle. Own teeth 7 +↓ but poor
hygiene. Nares dry. Neck = ⊖ JVD or adenopathy
                                    — Pope APRN

CONFIDENTIAL:
Patient Information

## PHYSICIAN'S PROGRESS NOTES

| DATE | TIME | NOTES MUST BE SIGNED BY PHYSICIAN |
|------|------|-----------------------------------|

7-8-04    Hrt. = (R R R) s̄ murmur; $S_1 S_2$. Lungs = CT̄
s̄ wheezing. Abdom. = sl. rounded, soft,
N.T. c̄ hypoactive BTs x4 quads. Skin =
intact. Exem. = ↓ ROM ® shoulder, to
abduction; otherwise WNLs. Fair strength x4.
Toenails longer than recommended. s̄
cyanosis or sores.

A/P: ① Constipation 2° DM, ↓ mobility.
Add senna S qd & T as needed.

② AODM/IDDM c̄ neuropathy, retinopathy,
blindness, gastroparesis. On lantus &
accept. glucoscans last 2 d. Cont. to
monitor. s̄ chg in meds. Cont. to care

③ HTN = WNLs  s̄ Δ in meds.

④ Depression, situational, 2° mult.
health problems. Cont. lexapro.

⑤ Health maint. = declines offer of
mammo, but agrees to dental. SW to
assist c̄ medicaid dentist loc.

⑥ Osteoporosis prev. = cont. cal. add
vit.

⑦ A.D = s̄ C.P.R.

⑧ Labs = consider hgb. $A_1 c$, CMP, $B_{12}$,
TSH, T4 if s̄ done @ prim. MD clinic
last Fri. Nsg to call for labs.

⑨                                      Pope, APRN

NAME-Last    Bailey    First    Louise    Middle    Attending Physician    Tehlauer    Record No.    Room/Bed    SNF

CFS9-1HH © 1992 Briggs, Des Moines, IA 50306  PRINTED IN U.S.A. (R500)
DON'T BREAK THE LAW    Save    1-800-247-2343
MAKE THE CALL    13¢    www.BriggsCorp.com

Docket No. C-06-349
A. Ex. 6

PHYSICIAN'S PROGRESS NOTE
122
Continued on Reverse

# PHYSICIAN'S ORDERS

| D/C DATE | ORDER DATE | Cd | ORDER TEXT | FREQUENCY |
|---|---|---|---|---|
| | | | GENERIC EQUIVALENTS MAY BE USED UNLESS OTHER- WISE NOTED. | **CONFIDENTIAL:** Patient Information |
| | 7/6/2004 | DT | 3 : THERAPEUTIC DIET: 1800 CAL ADA | |
| | 7-6-04 | | *Resident is DNR.* | |
| | 7/6/2004 | MF | 8 : MAY HAVE ANNUAL FLU VACCINE MAY HAVE ANNUAL PPD TEST | |
| | 7/6/2004 | TI | 13 : LANTUS INSULIN 10 UNITS SQ Q AM / DM | QAM S |
| | 7/6/2004 | ~~MR~~ | 21 : GLUCOSCAN BID / DM ***SEE DIABETIC RECORD*** | SO |
| | 7/8/2004 | MR | 22 : SENNA S 1 TAB PO Q DAY / CONSTIPATION | QD |
| | 7/6/2004 | MR | 18 : LIPITOR 40 MG PO Q HS / HYPERCHOLESTROLEMIA | QHS |
| | 7/6/2004 | MR | 20 : CALCIUM 500 MG PO TID / OSTEOPOROSIS | TID |
| | 7/6/2004 | ME | 11 : LEXAPRO 10 MG PO Q DAY / SIT. DEPRESSION R/T HEALTH PROBLEMS. ***SEE A/D BLUE MED SHEET*** | SO |
| | 7/6/2004 | MR | 17 : REGLAN 10 MG PO Q AC&HS / GERD | AC & HS |
| | 7/6/2004 | MR | 14 : PREVACID 30 MG PO BID / GERD | BID |
| | 7/6/2004 | MR | 15 : LASIX 20 MG PO Q DAY / HTN | QD |
| | 7/6/2004 | MR | 16 : PLAVIX 75 MG PO Q DAY / HYPERCHOLESTROLEMIA | QD |
| | 7/6/2004 | MR | 19 : COZAAR 50 MG PO Q DAY / HTN | QD |
| | 7/8/2004 | TR | 24 : SHOES OR SLIPPERS ON FEET WHEN LEAVING ROOM TO PROTECT THEM | IO1 |

| Charting From | Thru | Facility Name | | LAST PHYS. EXAM |
|---|---|---|---|---|
| 8/1/2004 | 8/31/2004 | Holladay Healthcare Center | | |

| PHYSICIAN NAME | | ALT. PHYS. NAME | ALT. PHYS. PHONE |
|---|---|---|---|
| HLAUER, DR. STEVE | (801)321-5060 | FEHLAUER, DR. STEVE | (801)321-5060 |

| Diagnosis | Nursing Alert |
|---|---|
| abetes mellitus; Hypertension; Osteoporosis; OSTEOPOROSIS NOS; BRIEF EPRESSIVE REACT; DMI WO CMP NT ST UNCNTRL; ESOPHAGEAL FL  BOTH  .S  ND-WHO DEF | BLIND; Do not resuscitate; Pain less than daily; Some/all natural teeth lost, does not have or does not use dentures (or partial plates) |

Docket No. C-06-349
A. Ex. 6
Page 44 of 74

| ALLERGIES |
|---|
| DEMEROL |

123

| PATIENT NAME | PATIENT NO. | STA | ROOM/BED | PA |
|---|---|---|---|---|
| ILEY, LOUISE | 20530 | 1 | 0102A | |

# PHYSICIAN'S ORDERS

| D/C DATE | ORDER DATE | Cd | ORDER TEXT | FREQUENCY |
|----------|-----------|-----|-----------|-----------|
| | 7/6/2004 | TR | 9 : OFFER HS SNACK<br>DOCUMENT % TAKEN OR R=REFUSED | NS1 |
| | 7/6/2004 | TV | 5 : VITAL SIGNS Q DAY<br>(SEE VS & WT REPORT/YELLOW) | SO |
| | 7/6/2004 | WA | 4 : WEIGHTS WEEKLY<br>(SEE WT HX REPORT/DIETARY)<br>LAST WT: | SO |
| | 7/6/2004 | AG | 6 : MAY GO OUT ON PASS WITH MEDS AND<br>RESPONSIBLE PERSON | |
| | 7/6/2004 | AS | 2 : MAY PARTICIPATE IN SOCIAL ACTIVITIES AS<br>TOLERATED | |
| | 7/6/2004 | OA | 7 : PODIATRIST CARE AS ORDERED | PRN |
| | 7/7/2004 | RP | 1 : REHAB POTENTIAL: POOR | |

I HAVE REVIEWED & APPROVED THE PATIENT
CARE PLAN

I HAVE REVIEWED & APPROVED THE ACTIVITY
PLAN. IT ISN'T IN CONFLICT WITH MED. PLAN
OF CARE

CONTINUE THE ABOVE ORDERS FOR 30 DAYS/SNF
OR 60 DAYS/ICF UNLESS OTHERWISE
SPECIFIED.

I CERTIFY THAT THIS PATIENT REQUIRES
SKILLED / INTERMEDIATE NURSING HOME CARE.

REHAB/RESTORATIVE NURSING PER NURSING
JUDGEMENT

NURSES REVIEW BY: _Gosler, LPN_  DATE: _8-1-04_

M.D. SIGNATURE: _____  DATE: _____

CONFIDENTIAL:
Patient Information

Docket No. C-06-349
A. Ex. 6
Page 45 of 74

| Charting From | Thru | Facility Name | | LAST PHYS. EXAM |
|---------------|------|---------------|---|----------------|
| 8/1/2004 | 8/31/2004 | Holladay Healthcare Center | | |

| PHYSICIAN NAME | | ALT. PHYS. NAME | ALT. PHYS. PHONE |
|----------------|---|-----------------|------------------|
| LAUER, DR. STEVE | (801)321-5060 | FEHLAUER, DR. STEVE | (801)321-5060 |

| Diagnosis | Nursing Alert |
|-----------|---------------|
| Detes mellitus; Hypertension; Osteoporosis; OSTEOPOROSIS NOS; BRIEF 'RESSIVE REACT; DMI WO CMP NT ST UNCNTRL; ESOPHAGEAL 'LU' OTH S' -WHO DEF | BLIND; Do not resuscitate; Pain less than daily; Some/all natural teeth lost, does not have or does not use dentures (or partial plates) |

| ALLERGIES |
|-----------|
| DEMEROL |

124

| PATIENT NAME | PATIENT NO. | STA | ROOM/BED | PAC |
|--------------|-------------|-----|----------|-----|
| EY, LOUISE | 20530 | 1 | 0102A | |

CONFIDENTIAL:
Patient Information

# ADMISSION ORDERS

| SECTION A: MEDICATION/TREATMENT | SECTION D: NEW ADMISSION ORDERS (Complete this section once part 4 is diets |
|---|---|
| Lexapro 10mg po QD ✓ | Admit to: _Holladay Healthcare_ |
| Diagnosis: depression | Rehab potential: ☐ Good ☐ Fair ☒ Poor ☐ None |
| Darvocet N 100 po QID | Comment: _____ |
| prn pain | CPR Status: ☐ Yes ☒ No CPR    Resident representative aware? ☒ Yes ☐ No |
| Diagnosis: osteoporosis | Advance directives issued? ☒ Yes ☐ No   Copy attached? ☐ Yes ☐ No |
| Lantus insulin 10units | Diet Order: _1800 cal ADA_ |
| SQ Q AM | Texture: ☒ Regular ☐ Ground meat ☐ Pureed ☐ As tolerated ☐ Other ___ |
| Diagnosis: DM | ☐ May have regular diet - Special occasions |
| Prevacid 30mg po BiD. ✓ | ☐ Supplements: ___ |
| Diagnosis: GERD | **Therapy Evaluation Orders:** |
| Lasix 20mg po QD. | Weight bearing ability: ☐ Full ☐ Partial ☐ None  Mobility Status: ___ |
| Diagnosis: HTN | PT _yes_ x per week OT ___ x per week ST ___ x per week |
| Plavix 75mg po QD. ✓ | ADDITIONAL ORDERS |
| Diagnosis: hypercholesterolemia | Restraints – If yes, type/frequency/reason |
| Reglan 10mg po QAC et | Side rails – If yes, type/frequency/reason |
| Q HS. | Podiatry care PRN |
| Diagnosis: GERD | Dental care PRN |
| Lipitor 40mg po Q HS. | Ophthalmology care PRN |
| Diagnosis: hypercholesterolemia | Audiological care PRN |
| Cozaar 50mg po QD. ✓ | May participate in:  Overall activity plan |
| Diagnosis: HTN | Volunteer program |
| Calcium 500mg po | May have occasional alcoholic beverage |
| TID ✓ | May go on pass with meds |
| Diagnosis: osteoporosis | PPD per facility policy |
| ~~Glucoscan BID~~ | Chest X-ray |
| | Pneumococcal vaccine |
| Diag. DM | Annual flu shot |
| | Laboratory per facility policy |
| Nurse's signature | |
| ~~Bailey~~ LPN /W. _____ un | |
| Date _7 / 6 / 04_ | Vital signs per facility policy |
| | Weight per facility policy |
| I have reviewed this resident's plan of care and am in agreement with it. | Discharge Plans: ___ |
| Physician's signature | |
| _____ | **Admission date** _7 / 6 / 04_      Date Of Birth ▮▮▮ |
| Date _7 / 13 / 04_ | SECTION B: DIAGNOSES (not listed in Section A) | SECTION C: ALLERGIES  Demerol | ☐ Generic equivalents not be use |

125

| NAME–Last | First | Middle | Attending Physician | Record No. | Room/Bed |
|---|---|---|---|---|---|
| Bailey | Louise | | Fehlauer | | 102A |

CFS 5-2/4P   © 1992 Briggs Corporation, Des Moines, IA 50306 (800) 247-2343
P1108            PRINTED IN U.S.A.

ADMISSION ORD

CONFIDENTIAL:
Patient Information



PHYSICIAN'S TELEPHONE ORDERS AUDIT

Name of Facility: HHC

Family Name: Bailey    First Name: Louise

Admission Number:

Address:

Room No.

Attending Physician: F A Taylor

Date Ordered: 1/18/05    Time Ordered:

Orders: Please check B S x2 2000
0 day

Signature of Physician: M C 3/05

Signature of Nurse:

Med/Tx Sheet
Nurses Notes

On MD Order Sheet
Pharmacy

Date & Time    Pt. Care Plan

Initials    Initials    Date    Communicated    Signed

ORIGINAL COPY - Physician Please Sign and Return

Form 1394/4 © BRIGGS, Des Moines, IA 50306 (800) 247-2343    www.Briggscorp.com    PRINTED IN U.S.A.

Docket No. C-06-349
A. Ex. 6

CONFIDENTIAL:
Patient Information

## NURSE'S NOTES

| DATE/TIME | PROB. NO. | NOTES MUST BE SIGNED WITH NAME AND TITLE |
|---|---|---|
| 10/20/05 10:50 | | Order received to Δ Lantus to 25 units SQ q 4m. —W. Alen |
| 10/27/05 | | Pt. seen by podiatrist, no new orders. —Haufen |
| 11-5-05 | | N.O. Benadryl 25mg Caps 2 po q HS prn sleep per pt. request —Rein |
| 11/8/05 | | Louise attended care plan mtging today & doing we pleased w/ new room & situation. We are working on getting her a new wheelchair, which please her. Her daughter-in-law present as well. She is pleased w/ care & Louise's new room. —W. Hanson con |
| 11-8-05 13cro | | T.O. Please check Bs @ 2000 Q day, Put in MAR and on BS sheet —Daren |
| 11-10-05 | | Orders noted: 1) Tylenol 500 mg ii po QHS 2) If/when res wakes @ noc, √ BG et stat. Notify MD if abnormal, X 1 week. 3) Prevacid @ HS (+time Δ). — Umanzoe RN |
| 11-14-05 | | weekly done today —N. Ford |
| 11/28/05 16:00 | | Resident C/o cough & hoarse voice. Requesting cough med. Order received et noted from Dr. Johnson. Called to pharm. Res to stay in Rm until viral symptoms gone —Rein |
| 11/29/05 1430 | | N.O. Cepacol (throat lozenges) prn sore throat; Give 1 between ea meal x 7 day. Offer Ensure supplement & soft foods while having sore throat. This as already being done —Rein |

NAME—Last: Bailey    First: Louise    Middle:    Attending Physician: Dr. Fehrauer    Record No.:    Room/Bed:

CFS 6-32HH  © 1992 Briggs, Des Moines, IA 50306  PRINTED IN U.S.A. (R500)

DON'T BREAK THE LAW — MAKE THE CALL    Save 13¢    1-800-247-2343  www.BriggsCorp.com    *savings on buying vs copying

NURSE'S NOTE
□ Continued on Reverse



128

CONFIDENTIAL:

# Medication Record

Order Date: 10/20/2005
LANTUS INSULIN...

Order Date: 07/06/2004
GLUCOSCAN BID / DM
***SEE DIABETIC RECORD***

Order Date: 04/27/2005
PLAVIX 75 MG PO Q DAY / VENOUS THROMBOSIS

Order Date: 04/14/2005
COZAAR 25 MG PO Q DAY / HTN

Order Date: 02/08/2005
PREVACID 30 MG PO Q DAY / GERD

Order Date: 06/16/2005
LIPITOR 20 MG PO Q PM / HYPERCHOLESTROLEMIA

Order Date: 08/19/2004
COLACE 200 MG PO BID / CONSTIPATION

Order Date: 08/19/2004
SENNA 1 TAB PO ON MON, WED AND FRI ROUTINE / CONSTIPATION

INSTRUCTIONS
(SEE REVERSE SIDE)

Diabetes mellitus; Hypertension, Osteoporosis; VENOUS THROMBOSIS NEC; ADJUSTMNT DIS W DEPRESSN; DMII W/O CMP NT ST UNCNTRL; ESOPHAGEAL REFLUX; BOTH EYES BLIND-WHO DEF

PHYSICIAN  FEHLAUER, DR. STEVE
BAILEY, LUISE

TELEPHONE NO  (801)408-5060

21530

DEMEROL

CHARTING FROM  11/11/2005  THRU  11/30/2005

COMPLETE ENTRIES CHECKED BY:

ALT PHYS  FEHLAUER, DR. STEVE

ALT TELEPHONE  (801)408-5060

0134C  Holladay Healthcare Center

BLIND; Do not resuscitate;
Pain less than daily; Some/all
natural teeth lost, does not
have or does not use dentures
(or partial plates)

129

# Holladay Healthcare Center

A Kindred Community

CONFIDENTIAL
Patient Information

December 12, 2005

Medicare Medical Review Unit
Mutual of Omaha Insurance Company
Medicare Area - Medical Reviews
P. O. Box 1602
Omaha, NE 68101

Re:  *Request for Blood Glucose Testing Documentation/Information*
Provider Name/Number:  *Holladay Health Care Ctr*
Beneficiary Name:  *Bailey, Tou...*
HICN: ▓▓▓▓▓▓▓▓▓▓
Dates of Services:  *12-1-05 to 12-31-05*

To Whom It May Concern:

We are in receipt of your request for information dated *1-9-06* . Pursuant to your
request, the following documents are enclosed for your review.

|                                                                                  | No. of Pages |      |
|----------------------------------------------------------------------------------|:------------:|:----:|
| Physician Order(s) for blood glucose testing (BGT)                               | [            | ]    |
| Documentation of medical necessity for BGT                                       | [            | ]    |
| Documentation of BGT results                                                     | [            | ]    |
| Documentation of any physician notification of BGT results and any resulting physician orders | |    |
| National BGT Coverage Decision                                                   | [            | ]    |
| Letter to Mutual of Omaha, dated April 22, 2005, with attachment                 | [ 4          | ]    |
|                                                                                  | [ 11         | ]    |
| Total number of pages submitted for review                                       | [ 29         | ]    |

Should you have any questions, please contact the undersigned at [phone number]. *801-277-7002*

*Cindy Pearson* Boom
Name/Credentials

cc:  Facility Executive Director
Regional Director of Utilization
Claim Tracking File

For Mutual of Omaha Medicare's use only:
Received _____  Analyzed _____
Reason Code(s)_____   Region_____   Clerk #_____
MR Decision_____   MR HCPCS Code(s)_____

_____
_____   MR Rev Code_____
_____   MR All_____

Medically reviewed by_____   Date_____
Overridden by_____   Date_____

4782 South Holladay Boulevard    Salt Lake City, Utah 84117
801 277 7002    801 272 0622 fax

130

CONFIDENTIAL:
Patient Information

## Attention Medicare Medical Review Unit

**For Provider Use:**

Provider Number ___*465109*_____

HIC Number ___███████████___ DCN_____

Dates of Service ___*12-01-05*_____ to ___*12-31-05*_____

**Please indicate if:**

PT Notes Attached _____   ST Notes Attached _____   OT Notes Attached _____

SNF MDS Attached _____   Demand MDS Attached _____

Itemized bill for Supply/Pharmacy _____

Ambulance _____   Cardiac Rehab _____   Cataract surgery _____

Chest X-Rays _____   CT Scan _____   EPO_____   HBO_____   Labs_____

MRI _____   MRA _____   Observation _____   PSYCH _____

Questionable Covered Procedure _____

Other (Specify) _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**For Mutual of Omaha Medicare's use only:**

Received _____   Analyzed _____   Region_____   Clerk # _____

Reason Code(s) _____

**MR Indicators:**

_____   _____

MR HCPCS Code(s) _____

MR Decision_____

_____   _____

_____   MR Rev Code _____

_____   MR All _____

_____

Medically reviewed by _____   Date _____

Overridden by _____   Date _____

131

**58846    Federal Register / Vol. 66, No. 226 / Friday, November 23, 2001 / Rules and Regulations**

has not been coded to the full number of digits required for that code. (From Coding Clinic for ICD–9–CM. Fourth Quarter, 1995, page 44.)

4. Diagnoses documented as "probable," "suspected," "questionable," "rule-out," or "working diagnosis" should not be coded as though they exist. Rather, code the condition(s) to the highest degree of certainty for that encounter/visit, such as signs, symptoms, abnormal test results, exposure to communicable disease or other reasons for the visit. (From Coding Clinic for ICD–9–CM, Fourth Quarter 1995, page 45.)

5. When a non-specific ICD–9 code is submitted, the underlying sign, symptom, or condition must be related to the indications for the test above.

6. When the indication for the test is long-term administration of glucocorticosteroids, use ICD–9–CM code V58.69.

*Medicare National Coverage Decision for Blood Glucose Testing*

*Description*

This policy is intended to apply to blood samples used to determine glucose levels.

Blood glucose determination may be done using whole blood, serum or plasma. It may be sampled by capillary puncture, as in the fingerstick method or by vein puncture or arterial sampling. The method for assay may be by color comparison of an indicator stick, by meter assay of whole blood or a filtrate of whole blood, using a device approved for home monitoring, or by using a laboratory assay system using serum or plasma. The convenience of the meter stick color method allows a patient to have access to blood glucose values in less than a minute or so and has become a standard of care for control of blood glucose, even in the inpatient setting.

*HCPCS Codes (Alpha numeric, CPT–AMA)*

| Code | Descriptor |
| --- | --- |
| 82947 | Glucose; quantitative, blood (except reagent strip) |
| 82948 | Glucose; blood, reagent strip |
| 82962 | Glucose, blood by glucose monitoring device(s) cleared by the FDA specifically for home use. |

*Indications*

Blood glucose values are often necessary for the management of patients with diabetes mellitus, where hyperglycemia and hypoglycemia are often present. They are also critical in the determination of control of blood glucose levels in the patient with impaired fasting glucose (FPG 110–125 mg/dL), the patient with insulin resistance syndrome and/or carbohydrate intolerance (excessive rise in glucose following ingestion of glucose or glucose sources of food), in the patient with a hypoglycemia disorder such as nesidioblastosis or insulinoma, and in patients with a catabolic or malnutrition state. In addition to those conditions already listed, glucose testing may be medically necessary in patients with tuberculosis, unexplained chronic or recurrent infections, alcoholism, coronary artery disease (especially in women), or unexplained skin conditions (including pruritis, local skin infections, ulceration and gangrene without an established cause). Many medical conditions may be a consequence of a sustained elevated or depressed glucose level. These include comas, seizures or epilepsy, confusion, abnormal hunger, abnormal weight loss or gain, and loss of sensation. Evaluation of glucose may also be indicated in patients on medications known to affect carbohydrate metabolism.

*Limitations*

Frequent home blood glucose testing by diabetic patients should be encouraged. In stable, non-hospitalized patients who are unable or unwilling to do home monitoring, it may be reasonable and necessary to measure quantitative blood glucose up to four times annually.

Depending upon the age of the patient, type of diabetes, degree of control, complications of diabetes, and other co-morbid conditions, more frequent testing than four times annually may be reasonable and necessary.

In some patients presenting with nonspecific signs, symptoms, or diseases not normally associated with disturbances in glucose metabolism, a single blood glucose test may be medically necessary. Repeat testing may not be indicated unless abnormal results are found or unless there is a change in clinical condition. If repeat testing is performed, a specific diagnosis code (e.g., diabetes) should be reported to support medical necessity. However, repeat testing may be indicated where results are normal in patients with conditions where there is a confirmed continuing risk of glucose metabolism abnormality (e.g., monitoring glucocorticoid therapy).

*ICD–9–CM Codes Covered by Medicare Program*

| Code | Description |
| --- | --- |
| 011.00–011.96 | Tuberculosis |
| 038.0–038.9 | Septicemia |
| 112.1 | Recurrent vaginal candidiasis |
| 112.3 | Interdigital candidiasis |
| 118 | Opportunistic mycoses |
| 157.4 | Malignant neoplasm of islets of Langerhans |
| 158.0 | Malignant neoplasm of retroperitoneum |
| 211.7 | Benign neoplasm of islets of Langerhans |
| 242.0–242.91 | Thyrotoxicosis |
| 250.00–250.93 | Diabetes mellitus |
| 251.0–251.9 | Disorders of pancreatic internal secretion |
| 253.0–253.9 | Disorders of the pituitary gland |
| 255.0 | Cushing syndrome |

Federal Register / Vol. 66, No. 226 / Friday, November 23, 2001 / Rules and Regulations    588

| Code | Description |
|---|---|
| 263.0–263.9 | Malnutrition |
| 271.0–271.9 | Disorders of carbohydrate transport and metabolism |
| 272.0–272–4 | Disorders of lipoid metabolism |
| 275.0 | Hemochromotosis |
| 276.0–276.9 | Disorders of fluid, electrolyte and acid-base balance |
| 278.3 | Hypercarotinemia |
| 293.0 | Acute delirium |
| 294.9 | Unspecified organic brain syndrome |
| 298.9 | Unspecified psychosis |
| 300.9 | Unspecified neurotic disorder |
| 310.1 | Organic personality syndrome |
| 337.9 | Autonomic nervous system neuropathy |
| 345.10–345.11 | Generalized convulsive epilepsy |
| 348.3 | Encephalopathy, unspecified |
| 355.9 | Neuropathy, not otherwise specified |
| 356.9 | Unspecified hereditary and idiopathic peripheral neuropathy |
| 357.9 | Unspecified inflammatory and toxic neuropathy |
| 362.10 | Background retinopathy |
| 362.18 | Retinal vasculitis |
| 362.29 | Nondiabetic proliferative retinopathy |
| 362.50–362.57 | Degeneration of macular posterior pole |
| 362.60–362.66 | Peripheral retinal degeneration |
| 362.81–362.89 | Other retinal disorders |
| 362.0 | Unspecified retinal disorders |
| 365.04 | Borderline glaucoma, ocular hypertension |
| 365.32 | Corticosteriod-induced glaucoma residual |
| 366.00–366.09 | Presenile cataract |
| 366.10–366.19 | Senile cataract |
| 367.1 | Acute myopia |
| 368.8 | Other specified visual disturbance |
| 373.00 | Blepharitis |
| 377.24 | Pseudopapilledema |
| 377.9 | Autonomic nervous system neuropathy |
| 378.50–378.55 | Paralytic strabismus |
| 379.45 | Argyll-Robertson pupils |
| 410.00–410.92 | Acute myocardial infarctions |
| 414.00–414.19 | Coronary atherosclerosis and aneurysm of heart |
| 425.9 | Secondary cardiomyopathy, unspecified |
| 440.23 | Arteriosclerosis of extremities with ulceration |
| 440.24 | Arteriosclerosis of extremities with gangrene |
| 440.9 | Arteriosclerosis, not otherwise specified |
| 458.0 | Postural hypotension |
| 462 | Acute pharyngitis |
| 466.0 | Acute bronchitis |
| 480.0–486 | Pneumonia |
| 490 | Recurrent bronchitis, not specified as acute or chronic |
| 491.0–491.9 | Chronic bronchitis |
| 527.7 | Disturbance of salivary secretion (drymouth) |
| 528.0 | Stomatitis |
| 535.50–535.51 | Gastritis |
| 536.8 | Dyspepsia |
| 571.8 | Other chronic nonalcoholic liver disease |
| 572.0–572.8 | Liver abscess and sequelae of chronic liver disease |
| 574.50–574.51 | Choledocholitiasis |
| 575.0–575.12 | Cholecystitis |
| 576.1 | Cholangitis |
| 577.0 | Acute pancreatitis |
| 577.1 | Chronic pancreatitis |
| 577.8 | Pancreatic multiple calculi |
| 590.00–590.9 | Infections of the kidney |
| 595.9 | Recurrent cystitis |
| 596.4 | Bladder atony |
| 596.53 | Bladder paresis |
| 599.0 | Urinary tract infection, recurrent |
| 607.84 | Impotence of organic origin |
| 608.89 | Other disorders male genital organs |
| 616.10 | Vulvovaginitis |
| 626.0 | Amenorrhea |
| 626.4 | Irregular menses |
| 628.9 | Infertility—female |
| 648.00 | Diabetes mellitus complicating pregnancy. Childbirth or the puerperium, unspecified as to episode of care or not applicable |
| 648.03 | Diabetes mellitus complicating pregnancy, Childbirth or the puerperium, antipartum condition or complication |

133

58848    Federal Register / Vol. 66, No. 226 / Friday, November 23, 2001 / Rules and Regulations

| Code | Description |
|---|---|
| 648.04 | Diabetes mellitus complicating pregnancy, childbirth or the puerperium, postpartum condition or complication |
| 648.80 | Abnormal glucose tolerance complicating pregnancy, childbirth or the puerperium, unspecified as to episode of care or not applicable |
| 648.83 | Abnormal glucose tolerance complicating pregnancy, childbirth or the puerperium, antipartum condition or complication |
| 648.84 | Abnormal glucose tolerance complicating pregnancy, childbirth or the puerperium, postpartum condition or complication |
| 656.60—656.63 | Fetal problems affecting management of mother—large for-date of fetus |
| 657.00—657.03 | Polyhydramnios |
| 680.0—680.9 | Carbuncle and furuncle |
| 686.00—686.9 | Infections of skin and subcutaneous tissue |
| 698.0 | Pruritis ani |
| 698.1 | Pruritis of genital organs |
| 704.1 | Hirsutism |
| 705.0 | Anhidrosis |
| 707.0—707.9 | Chronic ulcer of skin |
| 709.3 | Degenerative skin disorders |
| 729.1 | Myalgia |
| 730.07—730.27 | Osteomyelitis of tarsal bones |
| 780.01 | Coma |
| 780.02 | Transient alteration of awareness |
| 780.09 | Alteration of consciousness, other |
| 780.2 | Syncope and collapse |
| 780.31 | Febrile convulsions |
| 780.39 | Seizures, not otherwise specified |
| 780.4 | Dizziness and giddiness |
| 780.71—780.79 | Malaise and fatigue |
| 780.8 | Hyperhidrosis |
| 781.0 | Abnormal involuntary movements |
| 782.0 | Loss of vibratory sensation |
| 783.1 | Abnormal weight gain |
| 783.2 | Abnormal loss of weight |
| 783.5 | Polydipsia |
| 783.6 | Polyphagia |
| 785.0 | Tachycardia |
| 785.4 | Gangrene |
| 786.01 | Hyperventilation |
| 786.09 | Dyspnea |
| 786.50 | Chest pain, unspecified |
| 787.6 | Fecal incontinence |
| 787.91 | Diarrhea |
| 788.41—788.43 | Frequency of urination and polyuria |
| 789.1 | Hepatomegaly |
| 790.2 | Abnormal glucose tolerance test |
| 790.6 | Other abnormal blood chemistry (hyperglycemia) |
| 791.0 | Proteinuria |
| 791.5 | Glycosuria |
| 796.1 | Abnormal reflex |
| 799.4 | Cachexia |
| V23.0—.9 | Supervision of high risk pregnancy |
| V67.2 | Follow-up examination, following chemotherapy |
| V67.51 | Follow up examination with high-risk medication not elsewhere classified |
| V58.69 | Long term current use of other medication |

**Reasons for Denial:**

Note: This section was not negotiated by the Negotiated Rulemaking Committee. This section includes HCFA's interpretation of its longstanding policies and is included for informational purposes.

• Tests for screening purposes that are performed in the absence of signs, symptoms, complaints, or personal history of disease or injury are not covered except as explicitly authorized by statute. These include exams required by insurance companies, business establishments, government agencies, or other third parties.

• Tests that are not reasonable and necessary for the diagnosis or treatment of an illness or injury are not covered according to the statute.

• Failure to provide documentation of the medical necessity of tests may result in denial of claims. Such documentation may include notes documenting relevant signs, symptoms or abnormal findings that substantiate the medical necessity for ordering the tests. In addition, failure to provide independent verification that the test was ordered by the treating physician (or qualified nonphysician practitioner) through documentation in the physician's office may result in denial.

• A claim for a test for which there is a national coverage or local medical review policy will be denied as not reasonable and necessary if it is submitted without an ICD–9–CM code or narrative diagnosis listed as covered in the policy unless other medical documentation justifying the necessity is submitted with the claim.

• If a national or local policy identifies a frequency expectation, a

claim for a test that exceeds that expectation may be denied as not reasonable and necessary, unless it is submitted with documentation justifying increased frequency.
• Tests that are not ordered by a treating physician or other qualified

treating nonphysician practitioner acting within the scope of their license and in compliance with Medicare requirements will be denied as not reasonable and necessary.
• Failure of the laboratory performing the test to have the appropriate Clinical

Laboratory Improvement Amendment 1988 (CLIA) certificate for the testing performed will result in denial of claims.

### ICD–9–CM Codes Denied

| Code | Description |
|------|-------------|
| 798.0–798.9 | Sudden death, cause unknown |
| V15.85 | Exposure to potentially hazardous body fluids |
| V16.1 | Family history of malignant neoplasm, trachea, bronchus, and lung |
| V16.2 | Family history of malignant neoplasm, other respiratory and intrathoracic organs |
| V16.4 | Family history of malignant neoplasm, genital organs |
| V16.5 | Family history of malignant neoplasm, urinary organs |
| V16.6 | Family history of malignant neoplasm, leukemia |
| V16.7 | Family history of malignant neoplasm, other lymphatic and hematopoietic neoplasms |
| V16.8 | Family history of malignant neoplasm, other specified malignant neoplasm |
| V16.9 | Family history of malignant neoplasm, unspecified malignant neoplasm |
| V17.0–V17.8 | Family history of certain chronic disabling diseases |
| V18.0–V18.8 | Family history of certain other specific diseases |
| V19.0–V19.8 | Family history of other conditions |
| V20.0–V20.2 | Health supervision of infant or child |
| V28.0–V28.9 | Antenatal screenings |
| V50.0–V50.9 | Elective surgery for purposes other than remedying health states |
| V53.2 | Fitting and adjustment of hearing aid |
| V60.0–V60.9 | Housing, household, and economic circumstances |
| V62.0 | Unemployment |
| V62.1 | Adverse effects of work environment |
| V65.0 | Healthy persons accompanying sick persons |
| V65.1 | Persons consulting on behalf of another person |
| V68.0–V68.9 | Encounters for administrative purposes |
| V70.0–V70.9 | General medical examinations |
| V73.0–V73.99 | Special screening examinations for viral and chlamydia diseases |
| V74.0–V74.9 | Special screening examinations for bacterial and spirochetal diseases |
| V75.0–V75.9 | Special screening examination for other infectious diseases |
| V76.0 | Special screening for malignant neoplasms, respiratory organs |
| V76.3 | Special screening for malignant neoplasms, bladder |
| V76.42–V76.9 | Special screening for malignant neoplasms, (sites other than breast, cervix, and rectum) |
| V77.0–V77.9 | Special screening for endocrine, nutrition, metabolic, and immunity disorders |
| V78.0–V78.9 | Special screening for disorders of blood and blood-forming organs |
| V79.0–V.79.9 | Special screening for mental disorders |
| V80.0–V80.3 | Special screening for neurological, eye, and ear diseases |
| V81.0–V81.6 | Special screening for cardiovascular, respiratory, and genitourinary diseases |
| V82.0–V82.9 | Special screening for other conditions |

### ICD–9–CM Codes That Do Not Support Medical Necessity

Any ICD–9–CM code not listed in either of the ICD–9–CM sections above.

### Sources of Information

AACE Guidelines for the Management of Diabetes Mellitus. Endocrine Practice (1995)1:149–157.

Bower, Bruce F. and Robert E. Moore. Endocrine Function and Carbohydrates.

Clinical Laboratory Medicine. Kenneth D. McClatchy, editor. Baltimore/Williams & Wilkins, 1994. pp 321–323.

Report of the Expert Committee on the Diagnosis and Classification of Diabetes Mellitus, Diabetes Care, Volume 20, Number 7, July 1997, pages 1183 et seq.

Roberts, H.J., Difficult Diagnoses. W. B. Saunders Co., pp 69–70.

### Coding Guidelines

1. Any claim for a test listed in "HCPCS CODES" above must be submitted with an ICD–9–CM diagnosis code or comparable narrative. Codes that describe symptoms and signs, as opposed to diagnoses, should be provided for reporting purposes when a diagnosis has not been established by the physician. (Based on Coding Clinic for ICD–9–CM, Fourth Quarter 1995, page 43.)

2. Screening is the testing for disease or disease precursors so that early detection and treatment can be provided for those who test positive for the disease. Screening tests are performed when no specific sign, symptom, or diagnosis is present and the patient has not been exposed to a disease. The testing of

confirm a suspected diagnosis because the patient has a sign and/or symptom is a diagnostic test, not a screening. In these cases, the sign or symptom should be used to explain the reason for the test. When the reason for performing a test is because the patient has had contact with, or exposure to, a communicable disease, the appropriate code from category V01, Contact with or exposure to communicable diseases, should be assigned, not a screening code, but the test may still be considered screening and not covered by Medicare. For screening tests, the appropriate ICD–9–CM screening code from categories V28 or V73–V82 (or comparable narrative) should be used. (From Coding Clinic for ICD–9–CM, Fourth Quarter 1996, pages 50 and 52.)

3. A three-digit code is to be used

# ReedSmith

**Thomas C. Fox**
Direct Phone: (202) 414-9222
Email: tfox@reedsmith.com

Reed Smith
1301 K Street, N
Suite 1100 - East To
Washington, D.C. 20005-3
202.414.9
Fax 202.414.9

April 22, 2005

<u>VIA FEDERAL EXPRESS</u>

Marna Bogan, R.N.
Senior Nurse Coordinator
Medicare Medical Review
Mutual of Omaha
P.O. Box 1602
Omaha, NE 68101

      Re:   <u>Blood Glucose Testing</u>

Dear Ms. Bogan:

This law firm represents Kindred Healthcare, Inc. and its subsidiary Medicare provider entities ("Kindred"). We understand that you have been speaking with Mr. Dennis Hansen of Kindred's Health Services Division (nursing homes) about a blood glucose testing and billing issue under Medicare Part B. As Mr. Hansen recently mentioned to you, Kindred has asked us to update its legal position with respect to this issue. We have done so below and would ask that you share this letter with appropriate senior management at Mutual for review and response to us.

### Kindred's October 2001 Letter

By way of background, enclosed is an October 29, 2001 letter that Kindred (f/k/a Vencor, Inc.) sent to Mark Pilley, M.D., Medical Director, Medicare, at Mutual of Omaha ("Mutual").

Please note that in our October 2001 letter, we expressed the view that Mutual's August 6, 2001 LMRP on blood glucose monitoring was not enforceable in light of then-current Medicare laws and regulations, and the fact that the final national coverage decision ("NCD") had not been released by the Centers for Medicare and Medicaid ("CMS"). In our letter we maintained that Mutual's LMRP is contrary to good medical practice and that it creates unnecessary administrative burdens on providers and physicians. We also asserted that the proposed regulations (what would become the NCD) had not been finalized and the LMRP could not be used to circumvent the rulemaking process. Last, we asserted that the LMRP was implemented in contravention of existing laws and regulations.

LONDON • NEW YORK •

Marna Bogan, R.N.
April 22, 2005
Page 2

ReedSmith

Approximately 3-1/2 years have passed since we sent this letter, and there has been no formal response from Mutual. In the interim, however, several legal developments have occurred which support Kindred's original position and warrant this updated position paper.

<div align="center">

Final National Coverage Decision
Effective November 23, 2002

</div>

### The Final NCD is Controlling

The controlling NCD, effective November 23, 2002, states that "[f]requent home blood glucose testing by diabetic patients should be encouraged," and that "[t]he convenience of the meter or stick color method . . . has become a standard of care for control of blood glucose, even in the inpatient setting." 66 Fed. Reg. 58846 (Nov. 23, 2001). The NCD also states that "[d]epending upon the age of the patient, type of diabetes, degree of control, complications of diabetes, and other co-morbid conditions, more frequent testing than four times annually may be reasonable and necessary. . . . [R]epeat testing may be indicated where results are normal in patients with conditions where there is a confirmed continuing risk of glucose metabolism abnormality." Id. Taking into account the health factors of the beneficiary, nowhere in the NCD are specific limitations on the frequency of testing, and nowhere is the mention of "prompt" notification. The NCD simply lists the number of maladies that may require blood glucose testing and reiterates that the reasonable and necessary tests will be reimbursed. See id. at 58846, 58848.

The NCD, not the LMRP, dictates which blood glucose monitoring services will be reimbursed. A NCD is binding on all Medicare carrier and fiscal intermediaries, the Medicare Appeals Council and administrative law judges ("ALJs"). 42 C.F.R. § 405.732(a)(4). Further, "[a]n LMRP may not conflict with a national coverage decision once the national coverage decision is effective. If a national coverage decision conflicts with a previously established LMRP, the contractor must change its LMRP to conform to the national coverage decision." 66 Fed. Reg. 58788 (Nov. 23, 2001) (emphasis added). Thus, the NCD trumps the LMRP and is controlling.

Kindred's blood glucose monitoring services meet the NCD criteria in that they are performed on diabetic beneficiaries who have a continued risk of glucose metabolism abnormality. As aforementioned, the NCD clearly states that such testing should be encouraged. Thus, limiting blood glucose services to patients who require daily insulin shots defies the language of the NCD and good medical practice.

Kindred's blood glucose monitoring services also meet the reasonable and necessary criteria. They are ordered by the treating physician, furnished by qualified personnel, in an appropriate setting, and furnished in accordance with accepted standards of medical practice for the treatment of diabetes. All of the tests are performed at a frequency determined by the treating physician to meet each beneficiary's needs.

137

Marna Bogan, R.N.
April 22, 2005
Page 3

ReedSm

### American Health Care Association
#### Medical Director Meetings

The American Health Care Association, a trade association to which Kindred belongs, participated through a number of medical directors of its member facilities in a series of meetings ove at least several years with representatives of the Centers for Medicare and Medicaid Services ("CMS" during which the blood glucose testing and billing matter was discussed along with the clinical issues and benefits of the monitoring services provided by Kindred and others. To our knowledge, no revisions, modifications, or other communications were issued by CMS with respect to the NCD.

### Extendicare Health Services, Inc.
#### Administrative Law Judge Decisions

#### Recent Extendicare Decisions Agree That Blood Glucose Monitoring Is Medicare Reimbursab

Two ALJs recently accepted arguments similar to the ones asserted by Kindred in recent coverage decisions. See Extendicare Health Services v. AdminaStar Federal, Docket Number 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 (Aug. 12, 2004) ("Extendicare I."); Extendicare Health Services v. AdminaStar Federal, Docket Number 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 (Aug. 24, 2004) ("Extendicare II"). Both cases dealt with an LMRP released by AdminaStar that was similar to Mutual's LMRP in that it stated that Medicare would only cover medically reasonable and necessary blood glucose monitoring services when a physician is "promptly notified of the test results so that he/she may provide active treatment . . . . Multiple blood glucose monitoring services, without prompt physician notification, are not covered . . . ." See Extendicare II, a 3. In arguing for Part B coverage of blood glucose tests, Extendicare, in both cases, appealed from determinations that reimbursement was not warranted because the medical records did not reflect that the physician was notified after each test or that the physician used each test result to order a new test. In neither case did AdminaStar seek appeal of the ALJs' determinations, nor did the Secretary seek to intervene.

In finding for Extendicare, one ALJ stated, "If a service cannot be denied because it is routine, 1 it stands to reason that the services may be covered despite the fact that it is routine. In fact, the purpose of routine, frequent blood glucose monitoring is to assure that tight control is maintained, and this is precisely the kind of testing which is encouraged and allowed under the [NCD]." Extendicare II, at 7. The other ALJ determined that blood glucose monitoring is not a "routine" procedure because it requires skilled care, and that "prompt" notification was not defined in the LMRP. Further, the ALJ concluded that "With such lack of specificity, it makes every sense for the doctor to be able to monitor blood sugar after a series of blood tests over a period of a week or so, in order to assess any fluctuations. . . .

---

1 The ALJ discussed the reference to "routine" in the context of the Hearing Officer's denial of reimbursement for blood glucose testing since such testing was "routine." The ALJ quoted CMS Program Memorandum AB-00-108, which states "Denial of payment for a Part B covered laboratory service cannot be made on the basis that the service is routine care. Under Medicare, routine care determinations are applicable only for Part A nursing home

Marna Bogan, R.N.
April 22, 2005
Page 4

ReedSm

Expecting a physician to check every day on the results and make changes based on each report in isolation is neither cost-effective nor warranted for good health." Extendicare I, at 2.

We are not aware of any appeal which CMS filed with respect to these decisions with the Medicare Appeals Council of the Department Appeals Board, Department of Health and Human Services, which it had the right to do, or any other communication issued by CMS expressing disagreement with the factual findings and legal conclusions of the Administrative Law Judge.

Kindred's position is similar to the positions of Extendicare endorsed by the ALJs. The blood glucose monitoring services cannot be dismissed as "routine" and, further, they meet the criteria of reasonable and necessary. As the ALJs stated, nothing in the NCD or regulations requires notifying tl physician of each and every test result, nor is such notification necessary for effective management of the illness. Kindred, like Extendicare, is simply seeking reimbursement under the Medicare Part B ru for blood glucose monitoring services that are considered necessary and are even encouraged by CMS

Conclusion

It is the position of Kindred that its blood glucose testing and billing fully meet, and will continue to meet, the coverage criteria set forth in the law. Similarly, Mutual's payment of these clain was in accordance with those criteria.

Accordingly, Kindred maintains that any denials of these claims, retrospectively or prospectively, would be contrary to the law; further, it intends to follow the current Medicare laws and regulations and continue to bill for these services.

Very truly yours,

Thomas C Fox

Thomas C. Fox

Enclosures
cc:    Dennis J. Hansen, Kindred Healthcare
         Senior VP of Operational Reimbursement
       Mark Pilley, M.D., Mutual of Omaha
         Medical Director Medicare
       David Pearce, Esq., Kindred Healthcare

139



**CONFIDENTIAL:**
Patient Information

**MEDICARE**
Part A intermediary

REPORT: 001                    MEDICARE PART A - 52280      PROVIDER NUMBER: 465109
DATE:  1/09/06       ADDITIONAL DEVELOPMENT REQUEST   TYPE REQUEST: MEDICAL
                                                     BILL TYPE: 223


HOLLADAY HEALTHCARE CENTER
4782 S HOLLADAY BLVD
HOLLADAY            UT 84117



WE HAVE REVIEWED YOUR CLAIM RECORDS AND FOUND THAT ADDITIONAL DEVELOPMENT
WILL BE NECESSARY BEFORE PROCESSING CAN BE FINALIZED.  TO ASSIST YOU IN
PROVIDING THE REQUIRED INFORMATION, WE HAVE ASSIGNED REASON CODES TO THE
AFFECTED CLAIM RECORD (SEE BELOW) FOR YOUR REVIEW.  PLEASE REFER TO THE
ACCOMPANYING LIST FOR EXPLANATION OF THE ASSIGNED CODE, AND ENTER THE
REQUIRED INFORMATION IN THE SPACE PROVIDED BELOW EACH CLAIM RECORD AND
RETURN WITHIN 30 DAYS TO THE:
                                          OMB CONTROL# 0938-0969


                    MEDICAL REVIEW DEPARTMENT
                    MUTUAL OF OMAHA MEDICARE
                    PO BOX 1602
                    OMAHA          NE   68101


| MEDICAL REC NO. DCN | PATIENT NAME/ HIC NUMBER | | FROM/TO DATES | OPR-MED ANALYST | TOTAL CHARGES |
|---|---|---|---|---|---|
| 020530 20600602557902 | BAILEY | LOUISE | 120105 123105 | M699 | 287.76 |

REASONS:  50200

                        50200
PLEASE SUBMIT THE FOLLOWING INFORMATION TO SUPPORT BLOOD GLUCOSE SERVICES
- PHYSICIAN ORDER(S) TO INCLUDE BLOOD GLUCOSE TESTING.
- DOCUMENTATION FOR THE MEDICAL NECESSITY FOR EACH TEST BILLED, THIS MAY
  INCLUDE NURSE'S NOTES AND OR PHYSICIAN PROGRESS NOTES.
- RESULTS OF EACH BLOOD GLUCOSE/ACCUCHECK TEST BILLED.
- DOCUMENTATION OF PHYSICIAN NOTIFICATION OF EACH TEST RESULT NOTING THE USE
  OF THE RESULTS TO MODIFY TREATMENT.
- DETAILED ITEMIZATION OF CHARGES BILLED.
- HISTORY AND PHYSICAL SUPPORTING THE DIAGNOSIS OF DIABETES

140



DBA HOLLADAY HEALTH CARE CENTER
4782 SO. HOLLADAY BLVD.
SALT LAKE CITY UT 84117

5 PATIENT CONTROL NO. 020530

4 STATEMENT COVERS PERIOD FROM 120105 THROUGH 123105

7 COV D. 0 · 8 N-C D. 0 · 9 C-I D. 0 · 10 L-R D. 11

12 NAME
BAILEY, LOUISE

13 PATIENT ADDRESS

CONFIDENTIAL
Patient Information

14 BIRTHDATE   15 SEX F   16 MS U   17-18 ADMISSION DATE 07062004  HR 12  TYPE 3  SRC 1   21 D HR   22 STAT 30   23 MEDICAL RECORD NO. 020530

Medicaid

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATES | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES |
|---|---|---|---|---|---|---|
| 300 | LAB | 82962 | 12012005 | 3 | 981 | |
| 300 | LAB | 82962 | 12022005 | 3 | 981 | |
| 300 | LAB | 82962 | 12032005 | 3 | 981 | |
| 300 | LAB | 82962 | 12042005 | 3 | 981 | |
| 300 | LAB | 82962 | 12052005 | 3 | 981 | |
| 300 | LAB | 82962 | 12062005 | 3 | 981 | |
| 300 | LAB | 82962 | 12072005 | 3 | 981 | |
| 300 | LAB | 82962 | 12082005 | 3 | 981 | |
| 300 | LAB | 82962 | 12092005 | 3 | 981 | |
| 300 | LAB | 82962 | 12102005 | 3 | 981 | |
| 300 | LAB | 82962 | 12112005 | 3 | 981 | |
| 300 | LAB | 82962 | 12122005 | 3 | 981 | |
| 300 | LAB | 82962 | 12132005 | 1 | 327 | |
| 300 | LAB | 82962 | 12142005 | 3 | 981 | |
| 300 | LAB | 82962 | 12152005 | 3 | 981 | |
| 300 | LAB | 82962 | 12162005 | 3 | 981 | |
| 300 | LAB | 82962 | 12172005 | 3 | 981 | |
| 300 | LAB | 82962 | 12182005 | 2 | 654 | |
| 300 | LAB | 82962 | 12192005 | 3 | 981 | |
| 300 | LAB | 82962 | 12202005 | 2 | 654 | |
| 300 | LAB | 82962 | 12212005 | 3 | 981 | |
| 300 | LAB | 82962 | 12222005 | 3 | 981 | |
| 300 | LAB | 82962 | 12232005 | 3 | 981 | |

| PAYER | 51 PROVIDER NO. | 52 REL INFO | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 |
|---|---|---|---|---|---|---|
| MEDICARE | 465109 | Y | Y | | | |
| MEDICAID | | Mentally | Y | Y | | |

DUE FROM PATIENT ▶

| INSURED'S NAME | 59 P.REL | 60 CERT. - SSN - HIC - ID NO. | 61 GROUP NAME | 62 INSURANCE GROUP NO. |
|---|---|---|---|---|
| BAILEY, LOUISE | 01 | | | |
| BAILEY, LOUISE | 01 | | | |

TREATMENT AUTHORIZATION CODES   64 ESC   65 EMPLOYER NAME   66 EMPLOYER LOCATION

PRIN. DIAG. CD. 33   66 CODE 25010   53083   OTHER DIAG. CODES   74 CODE   76 ADM. DIAG. CD. 73300   77 E-CODE

80 PRINCIPAL PROCEDURE CODE / DATE   81 OTHER PROCEDURE   OTHER PROCEDURE   82 ATTENDING PHYS. ID   E69796 PERLAUER   C   S

OTHER PROCEDURE   OTHER PROCEDURE   OTHER PROCEDURE   83 OTHER PHYS. ID

REMARKS  (801)277-7002

OTHER PHYS. ID

141



DBA HOLLADAY HEALTH CARE CENTER
4782 SO. HOLLADAY BLVD.
LAKE CITY UT 84117

3 PATIENT CONTROL NO.
020530

5 FED. TAX NO.    6 STATEMENT COVERS PERIOD    7 COV D.    8 N-C D.    9 C-I D.    10 L-R D.    11
FROM 120105    THROUGH 123105    0    0    0

12 PATIENT NAME
BAILEY, LOUISE

13 PATIENT ADDRESS

CONFIDENTIA
Patient Informati

14 BIRTHDATE    15 SEX 16 MS    17-20 ADMISSION    21 D HR 22 STAT    23 MEDICAL RECORD NO.    COND.
    F  U    07062004  12  3  1    30    020530

Medicaid    VALUE CODES    VALUE CODES    VALUE COD

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATES | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES |
|---|---|---|---|---|---|---|
| 300 | LAB | 82962 | 12242005 | 3 | 981 | |
| 300 | LAB | 82962 | 12252005 | 3 | 981 | |
| 300 | LAB | 82962 | 12262005 | 2 | 654 | |
| 300 | LAB | 82962 | 12272005 | 3 | 981 | |
| 300 | LAB | 82962 | 12282005 | 3 | 981 | |
| 300 | LAB | 82962 | 12292005 | 3 | 981 | |
| 300 | LAB | 82962 | 12302005 | 3 | 981 | |
| 300 | LAB | 82962 | 12312005 | 3 | 981 | |
| 001 | TOTAL CHARGE | | | | 28776 | |

50 PAYER    51 PROVIDER NO.    52 REL 53 ASG    54 PRIOR PAYMENTS    55 EST. AMOUNT DUE    56
MEDICARE        465109    Y  Y
MEDICAID        Mentally  Y  Y

DUE FROM PATIENT ▶

INSURED'S NAME    59 P.REL    60 CERT - SSN - HIC - ID NO.    61 GROUP NAME    62 INSURANCE GROUP NO.
BAILEY, LOUISE    01
BAILEY, LOUISE    01

TREATMENT AUTHORIZATION CODES    64 ESC 65 EMPLOYER NAME    66 EMPLOYER LOCATION

RIN  D. CD.    66 CODE    OTHER DIAG. CODES    76 ADM. DIAG. CD. 77 E-CODE
3    25010    53081    73300

PRINCIPAL PROCEDURE    OTHER PROCEDURE    82 ATTENDING PHYS. ID
CODE    DATE    CODE    DATE    BC9796 FEHLAUER

OTHER PROCEDURE    OTHER PROCEDURE    OTHER PROCEDURE    83 OTHER PHYS. ID
CODE    DATE    CODE    DATE    CODE    DATE

REMARKS (801)277-7002    OTHER PHYS. ID

Docket No. C-06-14?

142

CONFIDENTIAL:
Patient Information

## PHYSICIAN'S PROGRESS NOTES

| DATE | TIME | NOTES MUST BE SIGNED BY PHYSICIAN |
|------|------|-----------------------------------|
| 7-8-04 | | Admission H & P |

CC.) Constipation often & requested softner

HPI.) This is an admission H+P for a 72 yr old ♀ who was adm. from home ē self-care deficits 2° D.M. / effects Husb. has assisted her, along ē H.H. C.N. for last 4 yrs but now ē caregiver fatigue + ø assist. from family.

No med. records avail. p̄ several atten for HHC staff & husb. to acquire. Medical & surg. dx acquired from this very pleasant & cognitively intact lady

P.MHX.)                    Medicaid pending.

~~IDDM / DM (45 yrs & first dx. p̄ onset (blindness)~~

~~neuropathy of bil. ft. 2° DM.~~
- gastroparesis 2° D.M. (dx. hosp. stay 12/03,
- Hx T.I.A. ē temp. loss of speech
- HTN, prim,                 ° depression, situat.
- osteoporosis prev. — ø bone density
- hiatal hernia ē GERD
- GI Fs x2 ū (2 + 4 yrs ago ē fx)
- Blindness 2° DM 4-5 yrs.

PSHX) · Ⓛ hip pinning (4 yrs. ago) 2° GI F
        · Ⓡ shoulder fx. + rep 2° GI F 2 yrs.
- TAH remote.         · hyster. 20 yrs. ago.  · mult

143

NAME–Last                First          Middle     Attending Physician

CONFIDENTIAL:
Patient Information

# PHYSICIAN'S PROGRESS NOTES

| DATE | TIME | NOTES MUST BE SIGNED BY PHYSICIAN |
|------|------|-----------------------------------|

7-8-04

[Current Meds:]                          [Allergies:]
- lexapro 10 mg qd                       - Lantus insulin 10 U
- prevacid 30 mg bid                       p̄ AM
- lasix 20 qd                            - Plavix 75 qd
- reglan 10 mg qd.                       - lipitor 40 p̄ HS
  p̄ AC                                   - cozaar 50 qd
- calcium 500 tid                        - Darvocet N 100 qid

[Fam Hx:] Father = ↓ age 75 c̄ MI; AODM
          Mother = ↓ age 85 - ? ⊕ kidney, lung or liver dis.

[Soc Hx:] Married, 3 children = 2 dau.
out-of-state & son in SLC. Retired
occup = sales/office worker/ business owner
⊖ tobacco or ETOH.

[ROS:] ⊕ constipation; ⊕ numbness of rt ft,
otherwise N.S.

[ADLs:] Cont. B&B; requires assist. c̄ feeding,
mod assist. c̄ bathing, dressing & hygiene.
Propels self in w/c & ambs.

[S:] See HPI. Denies CP, N/V, joint pain

[O:] VS = 134/88  T 1-18        Wt. = 5'5"
                                        116 lbs.
Gen. = Sitting in w/c. Alert & oriented x3
& very pleasant & coop. HEENT = Normocephalic
P ↓ & ⊖ react to light - does ⊖ see light of
optmascope. Bil. TM visible & intact. Skin tag
L ear auricle. Own teeth ↑ & ↓ but poor
hygiene. Nares dry. Neck = ⊖ JVD or adenopathy.
——— Pope APRN

Docket No. C-06-349
A. Ex. 6

CONFIDENTIAL
Patient Informatio

# PHYSICIAN'S PROGRESS NOTES

| DATE | TIME | NOTES MUST BE SIGNED BY PHYSICIAN |
|------|------|-----------------------------------|
| 7-8-04 | | Pt. = RRR ō murmur; S₁S₂. Lungs = C? ō wheezing. Abdom. = sl. rounded, soft, N.T. c̄ hyperactive BTs ×4 quads. Spin. = intact. Extrem. = ↓ ROM ® shoulder, to abduction; otherwise WNLs. Fair strength x Toenails longer than recommended + cyanosis or sores. |

A/P: ① Constipation 2° DM, ↓ mobility. Add senna-S qd + ↑ as needed.

② AODM/IDDM c̄ neuropathy, retinopathy, blindness, gastroparesis. On lantus + accept. glucoscans last 2 d. Cont. to monitor. + chg. in meds. Cont. to care.

③ HTN = WNLs   + Δ in meds.

④ Depression, situational, 2° mult. health problems. Cont. lexapro.

⑤ Health maint. = declines offer of mammo, but agrees to dental. SW to assist c̄ medicaid dentist, loc.

⑥ Osteoporosis prev. = cont. cal. add vit.

⑦ A.D = Ø C.P.R.

⑧ Labs = consider hgb. A₁c, CMP, B₁₂, TSH, T₄ if to done @ prim. MD clinic last Fri. Nsg. to call for labs.

Pope, APRN

# PHYSICIAN'S ORDERS

CONFIDENTIAL
Patient Information

| '''C DATE | ORDER DATE | Cd | ORDER TEXT | FREQUENC |
|---|---|---|---|---|
| | | | GENERIC EQUIVALENTS MAY BE USED UNLESS OTHER- WISE NOTED. | |
| | 7/6/2004 | DT | 3 : THERAPEUTIC DIET: 1800 CAL ADA | |
| | 7-6-04 | | *Resident is DNR* | |
| | 7/6/2004 | MF | 8 : MAY HAVE ANNUAL FLU VACCINE  MAY HAVE ANNUAL PPD TEST | |
| | 7/6/2004 | TI | 13 : LANTUS INSULIN 10 UNITS SQ Q AM / DM | QAM S |
| | 7/6/2004 | GL | 21 : GLUCOSCAN BID / DM  ***SEE DIABETIC RECORD*** | SO |
| | 7/8/2004 | MR | 22 : SENNA S 1 TAB PO Q DAY / CONSTIPATION | QD |
| | 7/6/2004 | MR | 18 : LIPITOR 40 MG PO Q HS / HYPERCHOLESTROLEMIA | QHS |
| | 7/6/2004 | MR | 20 : CALCIUM 500 MG PO TID / OSTEOPOROSIS | TID |
| | 7/6/2004 | ME | 11 : LEXAPRO 10 MG PO Q DAY / SIT. DEPRESSION R/T HEALTH PROBLEMS.  ***SEE A/D BLUE MED SHEET*** | SO |
| | 7/6/2004 | MR | 17 : REGLAN 10 MG PO Q AC&HS / GERD | AC & HS |
| | 7/6/2004 | MR | 14 : PREVACID 30 MG PO BID / GERD | BID |
| | 7/6/2004 | MR | 15 : LASIX 20 MG PO Q DAY / HTN | QD |
| | 7/6/2004 | MR | 16 : PLAVIX 75 MG PO Q DAY / HYPERCHOLESTROLEMIA | QD |
| | 7/6/2004 | MR | 19 : COZAAR 50 MG PO Q DAY / HTN | QD |
| | 7/8/2004 | TR | 24 : SHOES OR SLIPPERS ON FEET WHEN LEAVING ROOM TO PROTECT THEM | IO1 |

| Charting From | Thru | Facility Name | LAST PHYS. EXAM |
|---|---|---|---|
| 8/1/2004 | 8/31/2004 | Holladay Healthcare Center | |

| PHYSICIAN NAME | | ALT. PHYS. NAME | ALT. PHYS. PHONE |
|---|---|---|---|
| HLA '. DR. STEVE | (801)321-5060 | FEHLAUER, DR. STEVE | (801)321-5060 |

Diagnosis

betes mellitus; Hypertension; Osteoporosis; OSTEOPOROSIS NOS; BRIEF
PRESSIVE REACT; DMI WO CMP NT ST UNCNTRL; ESOPHAGEAL
'LUX; BOTH
.S BLIND-WHO DEF

Nursing Alert

BLIND; Do not resuscitate; Pain less than daily; Some/all natural teeth
lost, does not have or does not use dentures (or partial plates)

Docket No. C-06-349
A. Ex. 6

ALLERGIES

DEMEROL

446

CONFIDENTIAL
Patient Informatio

# PHYSICIAN'S ORDERS

| D/C DATE | ORDER DATE | Cd | ORDER TEXT | FREQUENC |
|---|---|---|---|---|
| | 7/6/2004 | TR | 9 : OFFER HS SNACK<br>DOCUMENT % TAKEN OR R=REFUSED | NS1 |
| | 7/6/2004 | TV | 5 : VITAL SIGNS Q DAY<br>(SEE VS & WT REPORT/YELLOW) | SO |
| | 7/6/2004 | WA | 4 : WEIGHTS WEEKLY<br>(SEE WT HX REPORT/DIETARY)<br>LAST WT: | SO |
| | 7/6/2004 | AG | 6 : MAY GO OUT ON PASS WITH MEDS AND<br>RESPONSIBLE PERSON | |
| | 7/6/2004 | AS | 2 : MAY PARTICIPATE IN SOCIAL ACTIVITIES AS<br>TOLERATED | |
| | 7/6/2004 | OA | 7 : PODIATRIST CARE AS ORDERED | PRN |
| | 7/7/2004 | RP | 1 : REHAB POTENTIAL: POOR | |

I HAVE REVIEWED & APPROVED THE PATIENT
CARE PLAN

I HAVE REVIEWED & APPROVED THE ACTIVITY
PLAN. IT ISN'T IN CONFLICT WITH MED. PLAN
OF CARE

CONTINUE THE ABOVE ORDERS FOR 30 DAYS/SNF
OR 60 DAYS/ICF UNLESS OTHERWISE
SPECIFIED.

I CERTIFY THAT THIS PATIENT REQUIRES
SKILLED / INTERMEDIATE NURSING HOME CARE.

REHAB/RESTORATIVE NURSING PER NURSING
JUDGEMENT

NURSES REVIEW BY: _Bosler, VN_ DATE: _8-1-04_

M.D. SIGNATURE: _____ DATE: _____

Docket No. C-06-349
A. Ex. 6
Page 68 of 74

| Charting From | Thru | Facility Name | LAST PHYS. EXAM |
|---|---|---|---|
| 8/1/2004 | 8/31/2004 | Holladay Healthcare Center | |

| PHYSICIAN NAME | ALT. PHYS. NAME | ALT. PHYS. PHONE |
|---|---|---|
| HLAUER, DR. STEVE (801)321-5060 | FEHLAUER, DR. STEVE (801)321-5060 | |

| Diagnosis | Nursing Alert |
|---|---|
| betes mellitus; Hypertension; Osteoporosis; OSTEOPOROSIS NOS; BRIEF PRESSIVE REACT; DMI WO CMP NT ST UNCNTRL; ESOPHAGEAL FLUX; BOTH LS BLIND-WHO DEF | BLIND; Do not resuscitate; Pain less than daily; Some/all natural teeth lost, does not have or does not use dentures (or partial plates) |

ALLERGIES

DEMEROL

CONFIDENTIAL:
Patient Information

# ADMISSION ORDERS

| SECTION A: MEDICATION/TREATMENT | SECTION D: NEW ADMISSION ORDERS (Complete this section once part 4 is de |
|---|---|
| Lexapro 10mg po QD | Admit to: Holladay Healthcare |
| | Rehab potential: ☐ Good ☐ Fair ☒ Poor ☐ None |
| Diagnosis: depression | Comment: _____ |
| Darvocet N 100 po QID prn pain | CPR Status: ☐ Yes ☒ No CPR    Resident representative aware? ☒ Yes ☐ No |
| | Advance directives issued? ☒ Yes ☐ No    Copy attached? ☐ Yes ☐ No |
| Diagnosis: osteoporosis | Diet Order: 1800 cal ADA |
| Lantus insulin 10units SQ Q AM | Texture: ☒ Regular ☐ Ground meat ☐ Pureed ☐ As tolerated ☐ Other __ |
| | ☐ May have regular diet - Special occasions |
| Diagnosis: DM | ☐ Supplements: _____ |
| Prevacid 30mg po BID. | **Therapy Evaluation Orders:** |
| | Weight bearing ability: ☐ Full ☐ Partial ☐ None  Mobility Status: ___ |
| Diagnosis: GERD | PT __yes__ x per week  OT ___ x per week  ST ___ x per week |
| Lasix 20mg po QD. | ADDITIONAL ORDERS |
| | Restraints – If yes, type/frequency/reason |
| Diagnosis: HTN | |
| Plavix 75mg po QD. | Side rails – If yes, type/frequency/reason |
| | |
| Diagnosis: hypercholesterolemia | Podiatry care PRN |
| reglan 10mg po QAC et Q HS. | Dental care PRN |
| | Ophthalmology care PRN |
| | Audiological care PRN |
| Diagnosis: GERD | May participate in:  Overall activity plan |
| Lipitor 40mg po Q HS. | Volunteer program |
| | May have occasional alcoholic beverage |
| | May go on pass with meds |
| Diagnosis: hypercholesterolemia | PPD per facility policy |
| Cozaar 50mg po QD. | Chest X-ray |
| | Pneumococcal vaccine |
| Diagnosis: HTN | Annual flu shot |
| Calcium 500mg po TID | Laboratory per facility policy |
| | |
| Diagnosis: osteoporosis | |
| ~~Glucuxxx xxxx BID~~ | Vital signs per facility policy |
| ~~Diagnosis DM~~ | |
| Nurse's signature | Weight per facility policy |
| Baxley, RN / W. Hanson RN | Discharge Plans: _____ |
| Date 7 / 6 / 04 | Admission date 7 / 6 / 04    Date Of Birth ___ |

| I have reviewed this resident's plan of care and am in agreement with it. | SECTION B: DIAGNOSES (not listed in Section A) | SECTION C: ALLERGIES | ☐ Generic |
|---|---|---|---|
| Physician's signature | | Demerol | equivalent |
| | | | not be use |
| Date 7 / 13 / 04 | | | |
| | | | 148 |

| NAME–Last | First | Middle | Attending Physician | Record No. | Room/Bed |
|---|---|---|---|---|---|
| Bailey, Louise | | | Fehlauer | | |

CONFIDENTIAL:
Patient Information

PHYSICIAN'S TELEPHONE ORDERS AUDIT

Name of Facility: HHC

Family Name: Billups    First Name: Louise    Address:

Admission Number:    Room No.:    Attending Physician: Fahrner

Date Ordered: 1/8/05    Time Ordered:    Date Discontinued:

please check BS Q day x 2000

Signature of Nurse Releasing: [signature]

Signature of Physician: [signature] 1/08/05

| | Initials | | Initials | Date |
|---|---|---|---|---|
| On MD Order Sheet | | Date & Time | | Communicated |
| Pharmacy | | Pt. Care Plan | | Signed |
| Med/Tx Sheet | | | | |
| Nurses Notes | | | | |

ORIGINAL COPY - Physician Please Sign and Return

Form 139414 © BRIGGS, Des Moines, IA 50306 (800) 247-2343. PRINTED IN U.S.A.    www.BriggsCorp.com

149

CONFIDENTIAL:
Patient Information

## NURSE'S NOTES

| DATE/TIME | PROB. NO. | NOTES MUST BE SIGNED WITH NAME AND TITLE |
|---|---|---|
| 10/20/05 1050 | | Order received to △ lantus to 25 units SQ ō 4m. —VVAlicin |
| 10/27/05 | | Pt seen by podiatrist, no new orders. —Uaufei |
| 11-5-05 | | N.O. Benadryl 25mg Caps 2 po QHS prn sleep per pt request —Penn |
| 11/8/05 | | Louise attended care plan mtg'ing today ∨ doing w pleased w/ new room & situation. We are working on getting her a new wheelchair, which pleases her. Her daughter-in-law present as well. She is pleased w/ care & Louise's new room. —W Henson cin |
| 11-8-05 1300 | | T.O. Please check BS @ 2000 Q day. Put in MAR and on BS sheet. —Sⁿ Jasmu |
| 11-10-05 | | Orders noted: 1) Tylenol 500 mg TT po QHS 2) If/when res wakes @ noc, √ BG et Sat. Notify MD if abnormal, X 1 week. 3) Prevacid @ tHs (+ time △). — KMansfield Rn |
| 11-19-05 | | weekly done today —R Penn RN |
| 11/28/05 1600 | | Resident C/o cough & hoarse voice. Requesting cough med. Orders received et noted from Dr. Johnson Called to pharm. Res to stay in Rm until viral symptoms gone — Penn |
| 11/29/05 1430 | | N.O. Cepacol throat lozenges prn sore throat; gives 1 before ea meal x 7 day. Offer throat supplement & soft foods while having sore throat this is already being done — Penn |

CONFIDENTIAL:
Patient Information



CONFIDENTIAL:
Patient Information

# Medication Record

Order Date: 11/29/2005
NOURISHMENTS: OFFER MEAL SUPPLEMENT AND SO
FOODS WHILE HAVING SORE THROAT.
Discontinue Date: 12/05/2005

Order Date: 10/20/2005

Order Date: 07/06/2004
GLUCOSCAN BID / DM
***SEE DIABETIC RECORD***

Order Date: 11/08/2005
PLEASE CHECK BS @ 2000 Q HS / DM
***SEE DIABETIC RECORD***

Order Date: 04/27/2005
PLAVIX 75 MG PO Q DAY / VENOUS THROMBOSIS

Order Date: 04/14/2005
COZAAR 25 MG PO Q DAY / HTN

Order Date: 02/08/2005
PREVACID 30 MG PO Q HS / GERD

Order Date: 06/16/2005
LIPITOR 20 MG PO Q PM / HYPERCHOLESTEROLEMIA

INSTRUCTIONS
(SEE REVERSE SIDE)

Diabetes mellitus; Hypertension; Osteoporosis; VENOUS
THROMBOSIS NEC; ADJUSTMNT DIS W DEPRESSN; DMI WO CMP NT ST
UNCNTRL; ESOPHAGEAL REFLUX; BOTH EYES BLIND-WHO DEF

PHYSICIAN    FEHLAUER, DR. STEVE

BAILEY, LOUISE

CHARTING FROM: 12/17/2005    THRU    12/31/2005

DEMEROL

BLIND. Do not resuscitate.
Pain less than daily. Some/all
natural teeth lost, does not
have or does not use dentures
(or partial plates).

TELEPHONE NO.    (001)408-5060    21/530

NURSE STAT    0110B    Holliday Healthcare Center

ALT PHYS    FEHLAUER, DR. STEVE

15:

CONFIDENTIAL
Patient Information

# Medication Record

Order Date: 11/29/2005
CEPACOL THROAT LOZENGES PRN (GIVE 1 TAB
BEFORE EACH MEAL X 7 DAYS) / SORE THROAT
Discontinue Date: 12/05/2005

Order Date: 03/24/2005
PREP H SUPPOSITORY 1 PR BID PRN /

1/4 if available / reasonwards

cops

Ambien 5mg po @ HS prN
m-w-f only.
12/6/05

Antihis Coractin 23 Units SQ
@ AM

INSTRUCTIONS
(SEE REVERSE SIDE)

Diabetes mellitus; Hypertension; Osteoporosis; VENOUS
THROMBOSIS NEC; ADJUSTMNT DIS W DEPRESSN; DMI WO CMP NT ST
UNCNTRL; ESOPHAGEAL REFLUX; BOTH EYES BLIND-WHO DEF

PHYSICIAN  FEHLAUER, DR STEVE
BAILEY, LOUISE

TELEPHONE NO.
(801) 408-5060

CHARTING FROM: 12/17/2005    THRU 12/31/2005

DEMEROL

ALT. PHYS  FEHLAUER, DR STEVE

ALT. TELEPHONE
(801) 408-5060

Holladay Healthcare Center

2/0530    0110B    1

NURSES ALERT:
BLIND; Do not resuscitate;
Pain less than daily; Some
natural teeth lost, does not
have or does not use denture
(or partial plates)

153

**CONFIDENTIAL:**
**Patient Information**

# ReedSmith

**Thomas C. Fox**
Direct Phone: 202.414.9222
Email: tfox@reedsmith.com

Reed Smith LLP
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, D.C. 20005-3373
202.414.9200
Fax 202.414.9299

March 2, 2006

BY HAND

Louise Bailey
Holladay Healthcare Center
4782 South Holladay Blvd.
Salt Lake City, Utah 84117

Re:   Appeal Of Local Coverage Determination
      Contractor Name:  Mutual of Omaha Insurance Company
      LCD Title:  Blood Glucose Testing
      Contractor's Determination Number:  2001-B
      LCD Version Number:  5

APPOINTMENT OF REPRESENTATIVE

Dear Ms. Bailey:

   This letter will confirm that you have appointed Reed Smith, LLP and its attorneys Thomas
C. Fox and Jason M. Healy to represent you in the above-referenced appeal. All correspondence and
filings in this appeal should be sent to Jason M. Healy at Reed Smith LLP.

   We greatly appreciate the opportunity to represent you in this matter.

Sincerely,

Thomas C. Fox

Thomas C. Fox

AGREED:

Louise Bailey

LONDON ♦ NEW YORK ♦ LOS ANGELES ♦ SAN FRANCISCO ♦ WASHINGTON, D.C. ♦ PHILADELPHIA ♦ PITTSBURGH ♦ OAKLAND ♦ PRINCETON
FALLS CHURCH ♦ WILMINGTON ♦ NEWARK ♦ MIDLANDS, U.K. ♦ CENTURY CITY ♦ RICHMOND ♦ HARRISBURG ♦ LEESBURG ♦ WESTLAKE VILLAGE

reedsmith.com

CONFIDENTIAL:
Patient Information

STATEMENT BY C. STEVEN FEHLAUER, M.D.

I am providing this statement in support of a local coverage determination ("LCD")

appeal by one of my patients, Louise Bailey, who is a Medicare Part B beneficiary residing at the

Holladay Healthcare Center, 4782 South Holladay Blvd., Salt Lake City, Utah 84117. I

understand that Ms. Bailey is challenging the Medicare fiscal intermediary's coverage denials of

her claims for blood glucose testing services under its LCD titled "Blood Glucose Testing." For

the reasons discussed below, it is my professional opinion that Ms. Bailey requires frequent

blood glucose testing and that claims submitted for these services should be covered by Medicare

Part B.

Ms. Bailey has severe diabetes with blindness as a result of her illness. She cannot self

test or administer her insulin without the assistance or her nurses. While her glucose control is

generally adequate, it is not under "good" control. Managing her disease is difficult because of

her propensity to develop hypoglycemia without her knowing it is happening. She also has

neuropathy and gastroparesis from diabetes and likely has autonomic neuropathy as well.

The records regarding Ms. Bailey's care at Holladay Healthcare Center show that the

blood glucose tests were performed, the results recorded, appropriate actions by the nurses are

documented, and the physician (myself) is reviewing the information and changing the treatment

plan based on the results. Due to Ms. Bailey's condition, she currently requires blood glucose

testing 4 times per day. This is necessary in order to maintain control over Ms. Bailey's blood

glucose levels. My recent orders for Ms. Bailey's blood glucose testing reflect this frequency of

testing due to her condition. These orders could not be characterized as "standing orders," in my

opinion, because they are tailored to her current medical condition. I review the results of this

155

CONFIDENTIAL:
Patient Information

testing on at least an every 60-day basis.  It would be impractical and, in my opinion,

unnecessary for me to write a separate order for each blood glucose test to be administered to

Ms. Bailey, or to be notified of the results of each test.  It is my professional opinion, in keeping

with standard medical practice, to review Ms. Bailey's blood glucose test results on a bi-monthly

basis and make appropriate adjustments to her plan of care.

By my signature, I swear and attest that the foregoing is true and correct.

Date:  3/9/06

C. STEVEN FEHLAUER, M.D.

WAIS Document Retrieval

From the U.S. Code Online via GPO Access
[wais.access.gpo.gov]
[Laws in effect as of January 24, 2002]
[Document not affected by Public Laws enacted between
  January 24, 2002 and December 19, 2002]
[CITE: 42USC1395y]


TITLE 42--THE PUBLIC HEALTH AND WELFARE

CHAPTER 7--SOCIAL SECURITY

SUBCHAPTER XVIII--HEALTH INSURANCE FOR AGED AND DISABLED

Part D--Miscellaneous Provisions

Sec. **1395y**. Exclusions from coverage and medicare as secondary
        payer


(a) Items or services specifically excluded

    Notwithstanding any other provision of this subchapter, no payment
may be made under part A or part B of this subchapter for any expenses
incurred for items or services--
        (1)(A) which, except for items and services described in a
    succeeding subparagraph, are not reasonable and necessary for the
    diagnosis or treatment of illness or injury or to improve the
    functioning of a malformed body member,
        (B) in the case of items and services described in section
    1395x(s)(10) of this title, which are not reasonable and necessary
    for the prevention of illness,
        (C) in the case of hospice care, which are not reasonable and
    necessary for the palliation or management of terminal illness,
        (D) in the case of clinical care items and services provided
    with the concurrence of the Secretary and with respect to research
    and experimentation conducted by, or under contract with, the
    Medicare Payment Advisory Commission or the Secretary, which are not
    reasonable and necessary to carry out the purposes of section
    1395ww(e)(6) of this title,\1\
--------------------------------------------------------------------
    \1\ See References in Text note below.
--------------------------------------------------------------------
        (E) in the case of research conducted pursuant to section 1320b-
    12 of this title, which is not reasonable and necessary to carry out
    the purposes of that section,
        (F) in the case of screening mammography, which is performed
    more frequently than is covered under section 1395m(c)(2) of this
    title or which is not conducted by a facility described in section
    1395m(c)(1)(B) of this title, in the case of screening pap smear and
    screening pelvic exam, which is performed more frequently than is
    provided under section 1395x(nn) of this title, and, in the case of
    screening for glaucoma, which is performed more frequently than is
    provided under section 1395x(uu) of this title,
        (G) in the case of prostate cancer screening tests (as defined
    in section 1395x(oo) of this title), which are performed more
    frequently than is covered under such section,
        (H) in the case of colorectal cancer screening tests, which are
    performed more frequently than is covered under section 1395m(d) of
    this title, and
        (I) the frequency and duration of home health services which are
    in excess of normative guidelines that the Secretary shall establish
    by regulation;

**Centers for Medicare & Medicaid Services, HHS**    **§ 493.15**

### § 493.3  Applicability.

(a) *Basic rule.* Except as specified in paragraph (b) of this section, a laboratory will be cited as out of compliance with section 353 of the Public Health Service Act unless it—

(1) Has a current, unrevoked or unsuspended certificate of waiver, registration certificate, certificate of compliance, certificate for PPM procedures, or certificate of accreditation issued by HHS applicable to the category of examinations or procedures performed by the laboratory; or

(2) Is CLIA-exempt.

(b) *Exception.* These rules do not apply to components or functions of—

(1) Any facility or component of a facility that only performs testing for forensic purposes;

(2) Research laboratories that test human specimens but do not report patient specific results for the diagnosis, prevention or treatment of any disease or impairment of, or the assessment of the health of individual patients; or

(3) Laboratories certified by the Substance Abuse and Mental Health Services Administration (SAMHSA), in which drug testing is performed which meets SAMHSA guidelines and regulations. However, all other testing conducted by a SAMHSA-certified laboratory is subject to this rule.

(c) *Federal laboratories.* Laboratories under the jurisdiction of an agency of the Federal Government are subject to the rules of this part, except that the Secretary may modify the application of such requirements as appropriate.

[57 FR 7139, Feb. 28, 1992, as amended at 58 FR 5221, Jan. 19, 1993; 60 FR 20043, Apr. 24, 1995; 68 FR 3702, Jan. 24, 2003]

### § 493.5  Categories of tests by complexity.

(a) Laboratory tests are categorized as one of the following:

(1) Waived tests.

(2) Tests of moderate complexity, including the subcategory of PPM procedures.

(3) Tests of high complexity.

(b) A laboratory may perform only waived tests, only tests of moderate complexity, only PPM procedures, only tests of high complexity or any combination of these tests.

(c) Each laboratory must be either CLIA-exempt or possess one of the following CLIA certificates, as defined in § 493.2:

(1) Certificate of registration or registration certificate.

(2) Certificate of waiver.

(3) Certificate for PPM procedures.

(4) Certificate of compliance.

(5) Certificate of accreditation.

[60 FR 20043, Apr. 24, 1995]

### § 493.15  Laboratories performing waived tests.

(a) *Requirement.* Tests for certificate of waiver must meet the descriptive criteria specified in paragraph (b) of this section.

(b) *Criteria.* Test systems are simple laboratory examinations and procedures which—

(1) Are cleared by FDA for home use;

(2) Employ methodologies that are so simple and accurate as to render the likelihood of erroneous results negligible; or

(3) Pose no reasonable risk of harm to the patient if the test is performed incorrectly.

(c) *Certificate of waiver tests.* A laboratory may qualify for a certificate of waiver under section 353 of the PHS Act if it restricts the tests that it performs to one or more of the following tests or examinations (or additional tests added to this list as provided under paragraph (d) of this section) and no others:

(1) Dipstick or Tablet Reagent Urinalysis (non-automated) for the following:

(i) Bilirubin;

(ii) Glucose;

(iii) Hemoglobin;

(iv) Ketone;

(v) Leukocytes;

(vi) Nitrite;

(vii) pH;

(viii) Protein;

(ix) Specific gravity; and

(x) Urobilinogen.

(2) Fecal occult blood;

(3) Ovulation tests—visual color comparison tests for human luteinizing hormone;

(4) Urine pregnancy tests—visual color comparison tests;

(5) Erythrocyte sedimentation rate—non-automated;

977

(6) Hemoglobin—copper sulfate—non-automated;

(7) Blood glucose by glucose monitoring devices cleared by the FDA specifically for home use;

(8) Spun microhematocrit; and

(9) Hemoglobin by single analyte instruments with self-contained or component features to perform specimen/reagent interaction, providing direct measurement and readout.

(d) *Revisions to criteria for test categorization and the list of waived tests.* HHS will determine whether a laboratory test meets the criteria listed under paragraph (b) of this section for a waived test. Revisions to the list of waived tests approved by HHS will be published in the FEDERAL REGISTER in a notice with opportunity for comment.

(e) Laboratories eligible for a certificate of waiver must—

(1) Follow manufacturers' instructions for performing the test; and

(2) Meet the requirements in subpart B, Certificate of Waiver, of this part.

[57 FR 7139, Feb. 28, 1992, as amended at 58 FR 5221, Jan. 19, 1993]

### § 493.17  Test categorization.

(a) *Categorization by criteria.* Notices will be published in the FEDERAL REGISTER which list each specific test system, assay, and examination categorized by complexity. Using the seven criteria specified in this paragraph for categorizing tests of moderate or high complexity, each specific laboratory test system, assay, and examination will be graded for level of complexity by assigning scores of 1, 2, or 3 within each criteria. The score of "1" indicates the lowest level of complexity, and the score of "3" indicates the highest level. These scores will be totaled. Test systems, assays or examinations receiving scores of 12 or less will be categorized as moderate complexity, while those receiving scores above 12 will be categorized as high complexity.

NOTE: A score of "2" will be assigned to a criteria heading when the characteristics for a particular test are intermediate between the descriptions listed for scores of "1" and "3."

(1) *Knowledge.*

(i) *Score 1.* (A) Minimal scientific and technical knowledge is required to perform the test; and

(B) Knowledge required to perform the test may be obtained through on-the-job instruction.

(ii) *Score 3.* Specialized scientific and technical knowledge is essential to perform preanalytic, analytic or postanalytic phases of the testing.

(2) *Training and experience.*

(i) *Score 1.* (A) Minimal training is required for preanalytic, analytic and postanalytic phases of the testing process; and

(B) Limited experience is required to perform the test.

(ii) *Score 3.* (A) Specialized training is essential to perform the preanalytic, analytic or postanalytic testing process; or

(B) Substantial experience may be necessary for analytic test performance.

(3) *Reagents and materials preparation.*

(i) *Score 1.* (A) Reagents and materials are generally stable and reliable; and

(B) Reagents and materials are pre-packaged, or premeasured, or require no special handling, precautions or storage conditions.

(ii) *Score 3.* (A) Reagents and materials may be labile and may require special handling to assure reliability; or

(B) Reagents and materials preparation may include manual steps such as gravimetric or volumetric measurements.

(4) *Characteristics of operational steps.* (i) *Score 1.* Operational steps are either automatically executed (such as pipetting, temperature monitoring, or timing of steps), or are easily controlled.

(ii) *Score 3.* Operational steps in the testing process require close monitoring or control, and may require special specimen preparation, precise temperature control or timing of procedural steps, accurate pipetting, or extensive calculations.

(5) *Calibration, quality control, and proficiency testing materials.* (i) *Score 1.* (A) Calibration materials are stable and readily available;

(B) Quality control materials are stable and readily available; and

mass measurement does not meet the conditions for coverage in paragraphs (b) or (d) of this section, or the standards on frequency of coverage in paragraph (c) of this section, it is excluded from Medicare coverage as not "reasonable" and "necessary" under section 1862(a)(1)(A) of the Act and §411.15(k) of this chapter.

[63 FR 34327, June 24, 1998]

### §410.32  Diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests: Conditions.

(a) *Ordering diagnostic tests.* All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary (see §411.15(k)(1) of this chapter).

(1) *Chiropractic exception.* A physician may order an x-ray to be used by a chiropractor to demonstrate the subluxation of the spine that is the basis for a beneficiary to receive manual manipulation treatments even though the physician does not treat the beneficiary.

(2) *Mammography exception.* A physician who meets the qualification requirements for an interpreting physician under section 354 of the Public Health Service Act as provided in §410.34(a)(7) may order a diagnostic mammogram based on the findings of a screening mammogram even though the physician does not treat the beneficiary.

(3) *Application to nonphysician practitioners.* Nonphysician practitioners (that is, clinical nurse specialists, clinical psychologists, clinical social workers, nurse-midwives, nurse practitioners, and physician assistants) who furnish services that would be physician services if furnished by a physician, and who are operating within the scope of their authority under State law and within the scope of their Medicare statutory benefit, may be treated the same as physicians treating beneficiaries for the purpose of this paragraph.

(b) *Diagnostic x-ray and other diagnostic tests*—(1) *Basic rule.* Except as indicated in paragraph (b)(2) of this section, all diagnostic x-ray and other diagnostic tests covered under section 1861(s)(3) of the Act and payable under the physician fee schedule must be furnished under the appropriate level of supervision by a physician as defined in section 1861(r) of the Act. Services furnished without the required level of supervision are not reasonable and necessary (see §411.15(k)(1) of this chapter).

(2) *Exceptions.* The following diagnostic tests payable under the physician fee schedule are excluded from the basic rule set forth in paragraph (b)(1) of this section:

(i) Diagnostic mammography procedures, which are regulated by the Food and Drug Administration.

(ii) Diagnostic tests personally furnished by a qualified audiologist as defined in section 1861(ll)(3) of the Act.

(iii) Diagnostic psychological testing services when—

(A) Personally furnished by a clinical psychologist or an independently practicing psychologist as defined in program instructions; or

(B) Furnished under the general supervision of a physician or a clinical psychologist.

(iv) Diagnostic tests (as established through program instructions) personally performed by a physical therapist who is certified by the American Board of Physical Therapy Specialties as a qualified electrophysiologic clinical specialist and permitted to provide the service under State law.

(v) Diagnostic tests performed by a nurse practitioner or clinical nurse specialist authorized to perform the tests under applicable State laws.

(vi) Pathology and laboratory procedures listed in the 80000 series of the Current Procedural Terminology published by the American Medical Association.

(3) *Levels of supervision.* Except where otherwise indicated, all diagnostic x-ray and other diagnostic tests subject to this provision and payable under the physician fee schedule must be furnished under at least a general level of

328

160

**Centers for Medicare & Medicaid Services, HHS**  §410.32

physician supervision as defined in paragraph (b)(3)(i) of this section. In addition, some of these tests also require either direct or personal supervision as defined in paragraphs (b)(3)(ii) or (b)(3)(iii) of this section, respectively. (However, diagnostic tests performed by a physician assistant (PA) that the PA is legally authorized to perform under State law require only a general level of physician supervision.) When direct or personal supervision is required, physician supervision at the specified level is required throughout the performance of the test.

(i) *General supervision* means the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required during the performance of the procedure. Under general supervision, the training of the nonphysician personnel who actually perform the diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the physician.

(ii) *Direct supervision* in the office setting means the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed.

(iii) *Personal supervision* means a physician must be in attendance in the room during the performance of the procedure.

(c) *Portable x-ray services.* Portable x-ray services furnished in a place of residence used as the patient's home are covered if the following conditions are met:

(1) These services are furnished under the general supervision of a physician, as defined in paragraph (b)(3)(i) of this section.

(2) The supplier of these services meets the requirements set forth in part 486, subpart C of this chapter, concerning conditions for coverage for portable x-ray services.

(3) The procedures are limited to—

(i) Skeletal films involving the extremities, pelvis, vertebral column, or skull;

(ii) Chest or abdominal films that do not involve the use of contrast media; and

(iii) Diagnostic mammograms if the approved portable x-ray supplier, as defined in subpart C of part 486 of this chapter, meets the certification requirements of section 354 of the Public Health Service Act, as implemented by 21 CFR part 900, subpart B.

(d) *Diagnostic laboratory tests.* (1) *Who may furnish services.* Medicare Part B pays for covered diagnostic laboratory tests that are furnished by any of the following:

(i) A participating hospital or participating RPCH.

(ii) A nonparticipating hospital that meets the requirements for emergency outpatient services specified in subpart G of part 424 of this chapter and the laboratory requirements specified in part 493 of this chapter.

(iii) The office of the patient's attending or consulting physician if that physician is a doctor of medicine, osteopathy, podiatric medicine, dental surgery, or dental medicine.

(iv) An RHC.

(v) A laboratory, if it meets the applicable requirements for laboratories of part 493 of this chapter, including the laboratory of a nonparticipating hospital that does not meet the requirements for emergency outpatient services in subpart G of part 424 of this chapter.

(vi) An FQHC.

(vii) An SNF to its resident under §411.15(p) of this chapter, either directly (in accordance with §483.75(k)(1)(i) of this chapter) or under an arrangement (as defined in §409.3 of this chapter) with another entity described in this paragraph.

(2) *Documentation and recordkeeping requirements.*

(i) *Ordering the service.* The physician or (qualified nonphysician practitioner, as defined in paragraph (a)(3) of this section), who orders the service must maintain documentation of medical necessity in the beneficiary's medical record.

(ii) *Submitting the claim.* The entity submitting the claim must maintain the following documentation:

329

161

(2) Neither the party that requested the hearing nor the party's representative appears at the time and place set for the hearing, if—

(i) The party was notified before the time set for the hearing that the request for hearing might be dismissed without further notice for failure to appear;

(ii) The party did not appear at the time and place of hearing and does not contact the ALJ hearing office within 10 days and provide good cause for not appearing; or

(iii) The ALJ sends a notice to the party asking why the party did not appear; and the party does not respond to the ALJ's notice within 10 days or does not provide good cause for the failure to appear.

(iv) In determining whether good cause exists under this paragraph (a)(2), the ALJ considers any physical, mental, educational, or linguistic limitations (including any lack of facility with the English language), that the party may have.

(3) The person or entity requesting a hearing has no right to it under § 405.1002.

(4) The party did not request a hearing within the stated time period and the ALJ has not found good cause for extending the deadline, as provided in § 405.1014(c).

(5) The beneficiary whose claim is being appealed died while the request for hearing is pending and all of the following criteria apply:

(i) The request for hearing was filed by the beneficiary or the beneficiary's representative, and the beneficiary's surviving spouse or estate has no remaining financial interest in the case. In deciding this issue, the ALJ considers if the surviving spouse or estate remains liable for the services that were denied or a Medicare contractor held the beneficiary liable for subsequent similar services under the limitation of liability provisions based on the denial of the services at issue.

(ii) No other individuals or entities that have a financial interest in the case wish to pursue an appeal under § 405.1002.

(iii) No other individual or entity filed a valid and timely request for an ALJ hearing in accordance to § 405.1014.

(6) The ALJ dismisses a hearing request entirely or refuses to consider any one or more of the issues because a QIC, an ALJ or the MAC has made a previous determination or decision under this subpart about the appellant's rights on the same facts and on the same issue(s) or claim(s), and this previous determination or decision has become final by either administrative or judicial action.

(7) The appellant abandons the request for hearing. An ALJ may conclude that an appellant has abandoned a request for hearing when the ALJ hearing office attempts to schedule a hearing and is unable to contact the appellant after making reasonable efforts to do so.

(b) *Notice of dismissal.* The ALJ mails a written notice of the dismissal of the hearing request to all parties at their last known address. The notice states that there is a right to request that the MAC vacate the dismissal action.

[70 FR 11472, Mar. 8, 2005, as amended at 70 FR 37704, June 30, 2005]

### § 405.1054  Effect of dismissal of a request for a hearing before an ALJ.

The dismissal of a request for a hearing is binding, unless it is vacated by the MAC under § 405.1108(b).

APPLICABILITY OF MEDICARE COVERAGE POLICIES

### § 405.1060  Applicability of national coverage determinations (NCDs).

(a) *General rule.* (1) An NCD is a determination by the Secretary of whether a particular item or service is covered nationally under Medicare.

(2) An NCD does not include a determination of what code, if any, is assigned to a particular item or service covered under Medicare or a determination of the amount of payment made for a particular item or service.

(3) NCDs are made under section 1862(a)(1) of the Act as well as under other applicable provisions of the Act.

(4) An NCD is binding on fiscal intermediaries, carriers, QIOs, QICs, ALJs, and the MAC.

(b) *Review by an ALJ.* (1) An ALJ may not disregard, set aside, or otherwise review an NCD.

**Centers for Medicare & Medicaid Services, HHS**                                   **§ 405.1102**

(2) An ALJ may review the facts of a particular case to determine whether an NCD applies to a specific claim for benefits and, if so, whether the NCD was applied correctly to the claim.

(c) *Review by the MAC.* (1) The MAC may not disregard, set aside, or otherwise review an NCD for purposes of a section 1869 claim appeal, except that the DAB may review NCDs as provided under part 426 of this title.

(2) The MAC may review the facts of a particular case to determine whether an NCD applies to a specific claim for benefits and, if so, whether the NCD was applied correctly to the claim.

[70 FR 11472, Mar. 8, 2005, as amended at 70 FR 37704, June 30, 2005]

### § 405.1062 Applicability of local coverage determinations and other policies not binding on the ALJ and MAC.

(a) ALJs and the MAC are not bound by LCDs, LMRPs, or CMS program guidance, such as program memoranda and manual instructions, but will give substantial deference to these policies if they are applicable to a particular case.

(b) If an ALJ or MAC declines to follow a policy in a particular case, the ALJ or MAC decision must explain the reasons why the policy was not followed. An ALJ or MAC decision to disregard such policy applies only to the specific claim being considered and does not have precedential effect.

(c) An ALJ or MAC may not set aside or review the validity of an LMRP or LCD for purposes of a claim appeal. An ALJ or the DAB may review or set aside an LCD (or any part of an LMRP that constitutes an LCD) in accordance with part 426 of this title.

### § 405.1063 Applicability of CMS Rulings.

CMS Rulings are published under the authority of the Administrator, CMS. Consistent with § 401.108 of this chapter, rulings are binding on all CMS components, on all HHS components that adjudicate matters under the jurisdiction of CMS, and on the Social Security Administration to the extent that components of the Social Security Administration adjudicate matters under the jurisdiction of CMS.

### § 405.1064 ALJ decisions involving statistical samples.

When an appeal from the QIC involves an overpayment issue and the QIC used a statistical sample in reaching its reconsideration, the ALJ must base his or her decision on a review of the entire statistical sample used by the QIC.

MEDICARE APPEALS COUNCIL REVIEW

### § 405.1100 Medicare Appeals Council review: General.

(a) The appellant or any other party to the hearing may request that the MAC review an ALJ's decision or dismissal.

(b) Under circumstances set forth in § 405.1104 and 405.1108, the appellant may request that a case be escalated to the MAC for a decision even if the ALJ has not issued a decision or dismissal in his or her case.

(c) When the MAC reviews an ALJ's decision, it undertakes a de novo review. The MAC issues a final action or remands a case to the ALJ within 90 days of receipt of the appellant's request for review, unless the 90-day period is extended as provided in this subpart.

(d) When deciding an appeal that was escalated from the ALJ level to the MAC, the MAC will issue a final action or remand the case to the ALJ within 180 days of receipt of the appellant's request for escalation, unless the 180-day period is extended as provided in this subpart.

### § 405.1102 Request for MAC review when ALJ issues decision or dismissal.

(a)(1) A party to the ALJ hearing may request a MAC review if the party files a written request for a MAC review within 60 days after receipt of the ALJ's decision or dismissal.

(2) For purposes of this section, the date of receipt of the ALJ's decision or dismissal is presumed to be 5 days after the date of the notice of the decision or dismissal, unless there is evidence to the contrary.

(3) The request is considered as filed on the date it is received by the entity specified in the notice of the ALJ's action.

179

58788    Federal Register / Vol. 66, No. 226 / Friday, November 23, 2001 / Rules and Regulations

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Centers for Medicare & Medicaid Services

### 42 CFR Part 410

[CMS–3250–F]

RIN 0938–AL03

**Medicare Program; Negotiated Rulemaking: Coverage and Administrative Policies for Clinical Diagnostic Laboratory Services**

**AGENCY:** Center for Medicare & Medicaid Services, (CMS) HHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule establishes national coverage and administrative policies for clinical diagnostic laboratory services payable under Medicare Part B to promote Medicare program integrity and national uniformity, and simplify administrative requirements for clinical diagnostic laboratory services. This rule addresses public comments received on the proposed rule that was published March 10, 2000. A Negotiated Rulemaking Committee (the Committee) developed the policies as directed by section 4554(b)(1) of the Balanced Budget Act of 1997 (the BBA).

**DATES:** Effective November 25, 2002, except for sections 410.28(f), 410.32(d) redesignations, (d)(1) heading, (d)(4) and (e), which are effective February 21, 2002. See the effective date section of the preamble for a discussion of the effective dates for provisions that were discussed in the preamble but not codified in the rule.

**FOR FURTHER INFORMATION CONTACT:** Jackie Sheridan, (410) 786–4635 (for issues related to coverage policies). Brigid Davison, (410) 786–8794 (for issues related to documentation requirements). Dan Layne, (410) 786–3320 (for issues related to claims processing).

**SUPPLEMENTARY INFORMATION:** The sections contained within this document have been constructed according to the framework outlined in the table of contents that follows. We summarized pertinent material from our proposed rule that was published on March 10, 2000 (65 FR 13082) followed by public comments and our responses.

Table of Contents

I. Background
  A. Current Statutory Authority and Medicare Policies
  B. Recent Legislation
II. Provisions of the March 10, 2000 Proposed Rule
III. Comments and Responses
IV. Summary of Changes Based on the March 10, 2000 Proposed Rule
V. Collection of Information Requirements
VI. Regulatory Impact Analysis

## I. Background

### A. Current Statutory Authority and Medicare Policies

Section 1833 and 1861 of the Social Security Act (the Act) provides for payment of, among other things, clinical diagnostic laboratory services under Medicare Part B. Tests must be ordered either by a physician, as described in § 410.32(a), or by a qualified nonphysician practitioner, as described in § 410.32(a)(3). Tests may be furnished by any of the entities listed in § 410.32(d)(1). A laboratory furnishing tests on human specimens must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988 (CLIA) (Public Law 100–578), as set forth in 42 CFR part 493. Part 493 applies to laboratories seeking payment under the Medicare and Medicaid programs.

Section 1862(a)(1)(A) of the Act, to which there are certain explicit statutory exceptions, provides that no Medicare payment may be made for expenses incurred for items or services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. Moreover, section 1862(a)(7) of the Act excludes coverage "where such expenses are for routine physical checkups, eye examinations for the purpose of prescribing, fitting, or changing eyeglasses, procedures performed (during the course of any eye examination) to determine the refractive state of the eyes, hearing aids or examination therefore, or immunizations (except as otherwise allowed under section 1861(s)(10) and paragraph (1)(B) or under paragraph (1)(F).

Under the above statutory authority, we have issued national coverage decisions and policies in a variety of documents, such as Centers for Medicare & Medicaid Services manual instructions, **Federal Register** notices, and Centers for Medicare & Medicaid Services Rulings. We have issued approximately 20 national coverage decisions pertaining to clinical diagnostic laboratory services in the Medicare Coverage Issues Manual (CMS Pub. 6). Medicare program manuals are posted on the Internet at *http://www.cms.gov/pubforms/progman.htm*. Program transmittals and program memoranda are posted at *http://www.cms.gov/pubforms/transmit/transmit.htm*.

Under section 1842(a) of the Act, we contract with organizations to perform bill processing and benefit payment functions for Medicare Part B (Supplementary Medical Insurance). These Medicare contractors, who process Part B claims from noninstitutional entities, are called carriers. Under section 1816(a) of the Act, we contract with fiscal intermediaries to perform claims processing and benefit payment functions for Medicare Part (Hospital Insurance). Fiscal intermediaries also process claims payable from the Medicare Part B trust fund that are submitted by providers that participate in Medicare Part A, such as hospitals and skilled nursing facilities. We use the term "contractor(s)" to mean carriers and fiscal intermediaries.

Medicare contractors review and adjudicate claims for services to ensure that Medicare payments are made only for services that are covered under Medicare Part A or Part B. In the absence of a specific national coverage decision, coverage decisions are made at the discretion of the local contractors. Frequently, local contractors publish local medical review policies (LMRPs) to provide guidance to the public and medical community that they service.

Contractors develop these local medical review policies by considering medical literature, the advice of local medical societies and medical consultants, and public comments. Our instructions regarding the development of local medical review policies appear in section 2.3 of the Program Integrity Manual (CMS Pub. 83).

These LMRPs explain when an item or service will (or will not) be considered "reasonable and necessary" and thus eligible (or ineligible) for coverage under the Medicare statute. If a contractor develops an LMRP, its LMRP applies only within the area it serves. While another contractor may come to a similar decision, we do not require it to do so. An LMRP may not conflict with a national coverage decision once the national coverage decision is effective. If a national coverage decision conflicts with a previously established LMRP, the contractor must change its LMRP to conform to the national coverage decision. A contractor may, however, make an LMRP that supplements a national coverage decision where the national coverage decision is silent on an issue. The LMRP may not alter the national coverage decision.

# Program Memorandum
# Intermediaries/Carriers

Department of Health and Human
Services (DHHS)
**HEALTH CARE FINANCING
ADMINISTRATION (HCFA)**

**Transmittal  AB-00-108**

**Date:  DECEMBER 1 , 2000**

**CHANGE REQUEST 1362**

**SUBJECT:    Glucose Monitoring**

This Program Memorandum (PM) reviews Medicare coverage and payment policy for glucose monitoring for a patient whose stay is not covered by Medicare Part A but who is eligible for services under Medicare Part B.  During the past year, program integrity efforts have identified a significant increase in the number of claims submitted to intermediaries for glucose monitoring using a home-use device.  We also have received inquiries from contractors, providers, and beneficiaries reporting encouragement of home-use glucose monitoring devices for more patients, more often and in more health care settings, specifically nursing homes and home health agencies, than in the past so that a review of the service is warranted. This PM incorporates and supplements material previously issued in a prior PM, AB-00-99, CR 1407, "Glucose Monitoring Note."  It provides instructions on payment that supplement AB-00-109, CR 1377, "2001 Clinical Laboratory Fee Schedule."

Glucose monitoring measures blood sugar levels for the purpose of managing insulin therapy (shots, medication, and diet). The service often involves the use of an inexpensive hand-held device to evaluate a small sample of the patient's blood acquired through a finger stick.  The device measures blood glucose values immediately on a digital display so as to permit self-administration in the home.  If a physician separately orders the performance of a glucose monitoring service for a patient who can not self-administer, clinical staff generally will administer a glucose monitoring service along with their other duties.[1]  Administration of the service several times a day is common in order to maintain tight control of glucose to prevent heart disease, blindness, and other complications of diabetes. This device is on the list of instruments that can be administered by providers registered under the Clinical Laboratory Improvement Amendments of 1988 (CLIA), including providers registered with only a certificate of waiver.[2]

**HCFA-Pub. 60AB**

---

[1]   Medicare Part B may pay for a glucose monitoring device and related disposable supplies under its durable medical equipment benefit if the equipment is used in the home or in an institution that is used as a home.  A hospital or SNF is not considered a home under this benefit. §1861(h) of the Social Security Act. §42 Code of Federal Regulations (CFR) 410.38.

[2]   Section 353 of the Public Health Service Act codified at §42 CFR 493.  The most recent PM identifying CLIA-waived instruments under CLIA is PM AB-00-61, dated July 2000.

The Current Procedural Terminology (CPT) code that most often describes the service is 82962 *Glucose, blood by glucose monitoring device(s) cleared by the FDA (Food and Drug Administration) specifically for home use.*[3] Section 1862(a)(1)(A) of the Social Security Act requires the service to be reasonable and necessary for diagnosis and treatment in order to be covered by Medicare. Sections 42 CFR 410.32 and 411.15 specify that for a laboratory service to be reasonable and necessary, it must not only be ordered by the physician but the ordering physician must also use the result in the management of the beneficiary's specific medical problem. Implicitly, the laboratory result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of patient care; this includes the physician's order for another laboratory service. Compliance program guidance for laboratory services sets forth conditions under which a physician's order for a repeat laboratory service can qualify as an order for another covered laboratory service. A standing order is not usually acceptable documentation for a covered laboratory service. A national coverage policy on blood glucose monitoring has not been finalized. Carriers and intermediaries have been responsible for making coverage determinations and many have developed a local coverage policy to assist with payment determinations. However, during the past two years, experts involved in the clinical laboratory negotiated rulemaking process determined that blood glucose laboratory testing warrants a national coverage policy. These experts reached a consensus on a proposed national coverage policy, which was described in the March 10, 2000 *Federal Register*, volume 65, number 48, pages 13127-13131. This document can be obtained at the web site http://www.access.gpo.gov Intermediaries and carriers can refer to coverage policy developments at the web site http://www.hcfa.gov/quality/docs/labsd-d.htm Contractors should review their local coverage policy for glucose testing in light of the proposed national coverage policy in order to prepare for the adoption of a national coverage policy. Also, contractors should review their local coverage policy to clarify, if necessary, that a glucose monitoring laboratory service must be performed in accordance with laboratory service coverage criteria including the order and clear use of a laboratory result prior to a similar subsequent laboratory order to qualify for separate payment under the Medicare laboratory benefit.

If a glucose monitoring service is administered for a patient who is hospitalized and eligible for Medicare Part B but who is not in a Part A covered hospital stay, a Form HCFA-1450 is submitted to the intermediary using type of bill (TOB) 12x and revenue code 30x and is paid under the clinical laboratory fee schedule.[4] If a patient is eligible for Part B, but is not in a Part A covered nursing home stay, §541 of the Skilled Nursing Facility (SNF) Manual explains that a laboratory service is separately payable either on a reasonable cost basis (if the patient is in a certified bed) or under the clinical laboratory fee schedule (if the patient is in a non-certified bed). If a Part B only patient resides in a nursing home certified bed, a Uniform Bill-92 (UB92) using TOB 22x and revenue code 30x is submitted to the intermediary. The laboratory cost center of the cost report must reflect the corresponding glucose monitoring costs and charges even when the provider is registered for laboratory testing with only a certificate of waiver from CLIA. The beneficiary is liable for the deductible and coinsurance. If a Part B only patient resides in a non-certified bed, payment is made under the clinical laboratory fee schedule. Until further instructions regarding Part B only patient are implemented, a UB92 is submitted using TOB

---

[3] CPT code 82962 represents a method when whole blood is obtained (usually by finger stick device) and assayed by glucose oxidase, hexaokinase, or electrochemical methods and spectrophotometry using a small portable device designed for home blood glucose monitoring use. The device(s) are now also used in physician offices, nursing homes, hospitals, and during home health visits. CPT code 82947-QW describes instruments that measure quantitative glucose levels but are not cleared by the FDA for home glucose monitoring. Development of hand-held device(s) using a noninvasive biosensor or other micromethod for more rapid glucose monitoring is underway; however, to date these devices are not categorized by FDA as CLIA-waived tests. The term *continuous glucose monitoring* does not refer to CLIA-waived test but to a procedure that implants needle probes into the patient and provides measurements to a computer screen. This lengthy procedure, reviewing and interpreting the measurements is performed by a physician or appropriately licensed practitioner similar to a 24-hour electrocardiographic monitoring and payment is made under the physician fee schedule.

[4] Medicare Intermediary Manual, §§3604 and 3628.

3

23x and revenue code 30x to the intermediary when the SNF provides a laboratory service either directly or under arrangement with an outside laboratory. The beneficiary is not liable for a deductible or coinsurance. Nursing and physician duties, include observing, ordering, administering and interpreting the patient's health status are paid predominately under other payment systems, such as the state nursing home payment system or the physician payment system. If home-use glucose monitoring devices are used in the hospital and nursing home settings, a glucose monitoring service must be performed in accordance with laboratory coverage criteria to qualify for separate payment under the Medicare laboratory benefit. As noted above, for a laboratory service to be reasonable and necessary, it must be ordered by the physician, the ordering physician must use the result in the management of the beneficiary's specific medical problem, and the laboratory result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of patient care. When a glucose monitoring service meets the criteria to be a covered laboratory service for a Part B only patient, regardless of whether the nursing home patient resides in a certified or non-certified bed, payment must be made. Denial of payment for a Part B covered laboratory service cannot be made on the basis that the service is routine care. Under Medicare, routine care determinations are applicable only for Part A nursing home services.

A covered home health service requires a home health employee to supervise, assist, record, and report on the patient's daily/weekly functional and medical activities. For some patients, their daily/weekly activities include glucose monitoring, often self administered or administered with the help of a care giver who is not an employee of or affiliated with the home health provider. If the patient maintains a home-use glucose monitoring device, a home health employee's supervision and assistance of a glucose monitoring service is encompassed in the payment for the home health service. However, if a physician separately orders the employee to administer a glucose monitoring service for a Part B only patient who does not administer daily/weekly glucose monitoring and does not maintain a glucose monitoring device, the glucose monitoring service is not encompassed in the home health benefit. [5] If a home health agency receives a supplier number, a Form HCFA-1500 may be submitted to the carrier in accordance with physician and supplier billing instructions for filing Part B claims at MCM 3001.[6] Corresponding laboratory costs and charges must be reported on the cost report even when the home health agency is registered for CLIA testing with only a certificate of waiver. Sections 42 CFR 410.32 and 411.15 apply equally to a laboratory service in the home health setting. Therefore, if a home health employee carries and assists with the use of a home-use glucose monitoring device during a home health visit, a glucose monitoring service must be performed in accordance with laboratory coverage criteria to qualify for separate payment under the Medicare laboratory benefit. The blood glucose monitoring service must not only be ordered by the physician but the ordering physician must also receive and use the order's result in the management of a specific medical problem. The laboratory result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of patient care. Compliance program guidance for laboratory services sets forth the conditions under which a physician's order for a repeat laboratory service can qualify as an order for another covered laboratory service. Program integrity efforts should review for medical necessity a claim for a glucose monitoring laboratory service received at the same time as a claim for glucose test strips indicating the patient is maintaining a home-use device for self monitoring.

At certain times a physician may also order a separate quantitative blood glucose test to enhance a physician evaluation and management service for the patient. A specimen collection of venous blood may be sent to an independent laboratory for testing and the laboratory reports the result to the provider and the ordering physician. This is a separate laboratory service billed with a different code than a home-use glucose monitoring service and is also paid under the laboratory fee schedule. Instructions regarding the clinical diagnostic laboratory fee schedule are at §3628 of the Medicare Intermediary Manual and §5114 of the Medicare Carriers Manual.

---

[5] §1861(m) of the Act governs the extent of Medicare home health services that may be provided to eligible beneficiaries by or under arrangements made by a participating home health agency (HHA).

[6] Home Health Manual, §465.

4

As stated above, the CPT code that most often describes the glucose monitoring service using a laboratory testing device designed for home use is 82962 *Glucose, blood by glucose monitoring device(s) cleared by the FDA specifically for home use.* This CPT code has been included in the clinical laboratory fee schedule since January 1, 1993. The payment amount established for this CPT code was mapped from a previously existing code representing a quantitative glucose test using a device that is not cleared by the FDA for home use. Since that time, the payment amount has been subject to the prescribed updates for the clinical laboratory fee schedule.[7] During the past year, we have reviewed the test and have determined that administering a glucose monitoring service with a home-use device is substantially different than a quantitative glucose test and therefore our earlier mapping of the CPT code 82962 for a device approved for home use to a quantitative blood glucose test was erroneous.

In order to allow Medicare to base the laboratory fee schedule payment amount for CPT code 82962 code on the best available data nationwide, carriers must gap-fill CPT code 82962 for the year 2001. To establish an appropriate gap-fill amount for 2001, carriers should receive assistance from their corresponding intermediaries to consider the cost and the charge for the service as it is administered for Part B patients in a variety of settings such as hospitals, home health agencies, nursing homes, and physician offices. Gap-filling should consider, as appropriate, the costs of professional and clerical labor, device amortization, supplies, and overhead for this service. While these costs can be difficult to distinguish from other nursing and clinical services provided to the patient, the gap-fill amount must be established to carefully reflect only the Medicare laboratory service. Carriers should also evaluate any information that may be submitted to the carrier by other interested parties in establishing the gap-fill amount. In accordance with instructions for laboratory gap-fill codes in PM AB-00-109, CR 1377, "2001 Clinical Laboratory Fee Schedule," the gap-fill amount is established by the carrier on a flow basis as claims are received for the code. For CPT code 82962, the local fee amount field and the National Limitation Amount field are zero-filled in the year 2001 clinical laboratory fee schedule date file that was issued to carriers on November 1, 2000, and to intermediaries on November 21, 2000. Carriers should establish a gap-fill amount not later than March 31, 2001, communicate the amount to the corresponding intermediary as necessary, and report the amount to their Regional Office by May 4, 2001. The gap-fill amounts establish the local laboratory fee schedule amounts for CPT code 82962 and will be used to develop the year 2002 national limitation amount for this code.

**NOTE:** Claims for dates of service prior to the effective date of this PM should be processed in accordance with local medical review policy in effect on the date of service. Medicare Intermediary Manual §3600.2 explains that a claim must be filed on or before December 31 of the calendar year following the year in which the service was furnished. Do not search for previously adjudicated claims, however, timely filed claims may be adjusted if brought to your attention.

*The effective date for this PM is January 1, 2001.*

*The implementation date for this PM is January 1, 2001.*

**These instructions should be implemented within your current operating budget.**

**For questions regarding this document, contact Anita Greenberg on (410) 786-4601.**

**This PM may be discarded after December 31, 2001.**

---

[7] §1833(h) of the Act; Medicare Carriers Manual, §5114.1C.

Blood Glucose Monitoring

 

# MUTUAL MEDICARE

FAQ | CMS Resources | About Us | Contact Us | Feedback | Sitemap

 Search

**E-Mail List Sign-Up**    HIGLAS    LCD    Newsletters
Fee Schedules    Tour of Web Site

Appeals
Claims
Provider Education
EDI
Direct Data Entry
Audit and Reimbursement
Medicare Secondary Payer
Medical Review
CERT

Home >> News >> Blood Glucose Monitoring

Blood Glucose Monitoring

**Attention Nursing Home Administrator, Director of Nursing and Staff:**

Data analysis by Mutual of Omaha-Medicare continues to show a high incidence of billing for Blood Glucose Monitoring, HCPCS 82962 (Glucose, Blood, by Glucose Monitoring Device) in Skilled Nursing Facilities (SNF's). Further analysis also indicates inappropriate billing for HCPCS 82948 (Blood Glucose Reagent Strips). These findings are specific to Bill Types 22x (Skilled Nursing-Medicare Part B) and 23x (Skilled Nursing-Outpatient).

Beginning October 1, 2005, claims submitted to Mutual of Omaha-Medicare for Blood Glucose Monitoring will be subject to medical review and/or systems edits.

Mutual of Omaha – Medicare continues to maintain the position that Blood Glucose Monitoring in a SNF is a non-covered service. Per the Centers for Medicare & Medicaid Services (CMS) online manual system, Claims Processing Manual, Pub 100-4, Chapter 7, §90.1, "Routine glucose monitoring of diabetics is never covered in a SNF, whether the beneficiary is in a covered Part A stay or not. Glucose monitoring may only be covered when it meets all the conditions of a covered laboratory service, including use by the physician in modifying the patient's treatment." Also, the above mentioned section notes that "Medicare Part B may pay for a glucose monitoring device and related disposable supplies under its durable medical equipment benefit if the equipment is used in the home or in an institution that is used as a home. A hospital or SNF is not considered a home under this benefit (§1861(h) of the Act, 42 CFR 410.38)."

If you receive an additional documentation request (ADR), for Blood Glucose Monitoring services, it is extremely important that you submit all documentation to support the medical necessity for the services billed, which includes, but is not limited to:

- Physician order(s) for blood glucose monitoring
- Documentation of the medical necessity for each test billed - this may include nurse's notes and or physician progress notes
- Results of each blood glucose /Accucheck result billed
- Documentation of physician notification of each result and the corresponding medical management
- Detailed itemization of charges billed
- History and Physical supporting the diagnosis of diabetes
- Documentation to support all services provided incidental to or as part of your protocol for the blood glucose services

Place a copy of the Medicare Medical Review Cover Sheet on top of each set of documentation to submit, and mail it to:

Mutual of Omaha Insurance Company
Medicare Area
P.O. Box 1602
Omaha, NE 68101

The Medicare Medical Review Cover Sheet can be located at www.mutualmedicare.com on the Medical Review web page.

If you disagree with the initial determination, your first level of appeal (redetermination) can be requested after denial is shown on the Remittance Advice.

Your appeal request should include any additional medical documentation that was not originally submitted with the initial medical review. If all evidence is not submitted with the initial appeal request, that evidence will be noted in the redetermination notice as required documentation for the second level of appeal (reconsideration). Any evidence indicated in this notice must be submitted to the QIC. It should accompany the request for reconsideration. All evidence, including evidence that is not indicated in this notice, must be presented before the reconsideration is issued. If all evidence is not submitted, you will not be able to submit any new evidence in subsequent appeals unless you can demonstrate good cause for not presenting the evidence to the QIC.

For additional information refer to the educational article published in our March 15, 2005 Newsletter entitled "Blood Glucose Monitoring in Skilled Nursing Facilities (SNF)" which can be found on our web site at www.mutualmedicare.com.

Bill Brock, RN, BS- Medical Review Manager

If you have any questions, please contact:

Mary Sue Gardner, RN/BSN
Mutual of Omaha-Medicare
Senior Medical Review Nurse
(402) 351-5207

or

Traci Wilwerding, RN
Mutual of Omaha-Medicare
Senior Medical Review Nurse
(402) 351-4232

Back to Top

Home | Appeals | LCD | Claims | Provider Education | EDI | Direct Data Entry | Audit and Reimbursement | HIPAA | MSP | Medical Review | CERT

Blood Glucose Monitoring

A few words about your privacy and security. What you can do to help control Medicare fraud and abuse.

© 2005 Mutual of Omaha Insurance Company. All rights reserved.

Docket No. C-06-349
A. Ex. 15
Page 3 of 3



**SOCIAL SECURITY ADMINISTRATION**

Refer To: 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

Office of Hearings and Appeals
17th Floor
One Skyline Tower
Falls Church, VA 22041

Date:    AUG 1 2 2004

Extendicare Health Services
Attn: Shyann Dentice
11 West Michigan Street
Milwaukee, WI 53203

## NOTICE OF DECISION – FULLY FAVORABLE

Enclosed is the Administrative Law Judge's decision on your claim.  Please read this notice and the decision carefully.

### This Decision is Fully Favorable To You

Your Medicare contractor will process the decision and send you a letter about your benefits. If you do not hear anything about this decision for 60 days, contact your Medicare contractor or local Social Security office.

### The Medicare Appeals Council May Review the Decision on Its Own Motion

The Medicare Appeals Council may decide to review the Administrative Law Judge's decision on its own motion within 60 days from the date shown above.  Review at the Medicare Appeals Council's initiative could make the decision less favorable or unfavorable to you.

### If You Disagree With the Decision

If you do not agree with the Administrative Law Judge's decision, you may file an appeal with the Medicare Appeals Council of the Department Appeals Board, DHHS.

### How to File an Appeal

To file an appeal, you must request the Medicare Appeals Council to review the decision in writing.  You may use our Request for Review form (HA-520) or write a letter.  You may file a request at any local Social Security office or mail it to Department of Health and Human Services, Office of the Secretary, Departmental Appeals Board, MS 6127, Medicare Appeals Council, 330 Independence Ave., S.W., Cohen Building, Room G-644, Washington, DC 20201.  Please include the Health Insurance Claim Number (HICN) (and Medicare Part B Docket Number, if applicable) shown above on any appeal you file, and a copy of the decision.

Extendicare Health Services  (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)

Page 2 of 3

## Time to File an Appeal

If you wish to appeal the decision, you must file your request for review **within 60 days** from the date you receive this notice. The Medicare Appeals Council will assume that you received the notice within five days after the date shown above unless you show you received it later. If you file a request for review after the 60-day period, the Medicare Appeals Council will dismiss the request unless you show you had a good reason for not filing it on time.

## Time to Submit Any Additional Evidence

If you have any evidence you wish the Medicare Appeals Council to consider, you should submit it with your request for review.

## Medicare Appeals Council Action On Your Appeal

The Medicare Appeals Council may deny or grant your request for review. The Medicare Appeals Council will review the hearing decision only if one of the bases for review listed in regulation 20 CFR § 404.970 is present.

Your request for review places the entire record of your case before the Medicare Appeals Council. If the Medicare Appeals Council decides to review your case, it will review the parts of the decision with which you disagree and the parts with which you agree. The Medicare Appeals Council may make any part of the decision fully favorable, partially favorable or unfavorable to you.

The Medicare Appeals Council will send you a notice explaining its action. If the Medicare Appeals Council finds no reason to change the decision, the notice will explain why and tell you about your right to file a civil action in Federal district court. If the Medicare Appeals Council issues a fully favorable decision, the notice will enclose the decision. If the Medicare Appeals Council decides to limit the issues in your case, the notice will identify those issues and provide you an opportunity to comment. If the Medicare Appeals Council sends your case back to an Administrative Law Judge, the notice will enclose a remand order that explains why the case is being returned and what actions the Administrative Law Judge will take on your claim.

## If No Appeal and No Review on the Medicare Appeal Council's Own Motion

The Medicare Appeals Council may decide to review the decision on its own motion within 60 days of the date of this notice. If the Medicare Appeals Council does not review the decision on its own motion and you do not appeal the decision within the time permitted, you will lose your right to ask a Federal court to review the decision. This decision will become a final decision that cannot be revised, at your request or our initiative, except in certain circumstances.

Extendicare Health Services   (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)

## Your Right To Representation In An Appeal

You may appoint an attorney or other qualified person to represent you in any appeal you may file with the Medicare Appeals Council.  Your local Social Security office has a list of groups that can help you find an attorney.

You may ask the provider or supplier who provided Medicare services to you to be your representative.  Providers and suppliers of Medicare services may not charge a fee for representing you.  Providers and suppliers must waive any right to payment from you with respect to the services or items involved in your appeal before serving as your representative.

## Disclosure and Privacy Act Notice

Any identifying information (including the name, address, Health Insurance Claim Number (HICN) or any other personal identifiers) relating to the named beneficiary(ies) in this decision is protected from disclosure to anyone other than the appellant or the named beneficiary(ies) by the Social Security Act and the Privacy Act.  Disclosure of such identifying information without the express written consent of the named beneficiary(ies) is a violation of section 1106(a) of the Social Security Act, punishable by a $1,000 fine and/or one year imprisonment.

## Do You Have Any Questions

If you have any questions, you may call, write or visit any Social Security office.  If you visit an office, please bring this notice and decision with you.

Kenneth E. Stewart
Administrative Law Judge

Enclosure

176

## SOCIAL SECURITY ADMINISTRATION
### Office of Hearings and Appeals

### DECISION

**IN THE CASE OF**                                    **CLAIM FOR**


Extendicare Health Services, Inc.                    Supplementary Medical Insurance Benefits
(Appellant)                                          (Part B)


_____                      _____
(Beneficiary)                                        (HICN)


Mutual of Omaha                                      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
(Medicare Contractor)                                (Docket Number)


### PROCEDUAL HISTORY

This case is before the Administrative Law Judge upon a timely request for hearing filed by the appellant following prior determinations made by the carrier on a claim for benefits under the Part B provisions of Title XVIII of the Social Security Act. As the findings are fully favorable, an on-the-record decision is justified without a hearing.

### ISSUES

The general issue is whether payment may be made under the Part B provisions of Title XVIII of the Social Security Act for diagnostic laboratory tests.

### APPLICABLE LAW

Section 1832 of Part B of Title XVIII of the Social Security Act authorizes payment for "medical and other health services."

42 CFR § 410.10 Medical and other health services: Included services.
   Subject to the conditions and limitations specified in this subpart, "medical and other health services" includes the following services:
(e) Diagnostic laboratory and X-ray tests (including diagnostic mammography that meets the conditions for coverage specified in § 410.34(b) of this subpart) and other diagnostic tests.

177

Extendicare Health Services, Inc.   (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)                     Page 2 of 4

42 CFR § 410.32 Diagnostic X-ray tests, diagnostic laboratory tests, and other diagnostic tests: Conditions.

(b) Diagnostic x-ray and other diagnostic tests. (1) Basic rule. Except as indicated in paragraph (b)(2) of this section, all diagnostic x-ray and other diagnostic tests covered under section 1861(s)(3) of the Act and payable under the physician fee schedule must be furnished under the appropriate level of supervision by a physician as defined in section 1861(r) of the Act. Services furnished without the required level of supervision are not reasonable and necessary.

## RATIONALE

The appellant submitted a claim for laboratory services consisting of blood glucose tests for the treatment of diabetes mellitus provided the beneficiary from August 4 to 19, 2003, specifically, procedure code 82962 (glucose, blood by glucose monitoring device). The carrier denied in part because some tests had not been performed. The provider therefore did not appeal for reimbursement on those dates. The Medicare Hearing Officer determined that the laboratory services did not meet the Medicare guidelines for payment since the medical record did not include documentation of actual blood glucose monitoring results, physician notification, or physician use of the blood glucose results to instruct continuation or modification of patient care for the treatment of diabetes mellitus. She did approve payment for August 12, when the beneficiary's diet was modified to a low carbohydrate version, presumably on the basis of the readings. She held, however, that the other days did not display any signs of physician evaluation or change in the regimen on the basis of the blood studies, which she thus termed "routine" and uncovered. She determined that "prompt" notification of the doctor had not been followed (Exhibit 6). The amount in controversy is $196.20, which has been above the minimum since October 1, 2002, or prior to the current dates of service at issue.

The supplier's representative pointed out that the carrier's requirement for a change in treatment based on blood sugar readings, and her designation of the remaining tests as "routine," were not a correct interpretation of the law. Her point is well-taken. (A) The question of whether a procedure is "routine" only applies to nursing home therapy that could be performed by unskilled personnel, and is not applicable in tests such as these. PM AB-00-108. (B) More significantly, she is correct that "prompt" notification is not defined in PM-AB-00-108, even if this interpretation carried the force of law and regulations. (The DMERC B with those indications is only a regional interpretation of the Medicare program). With such lack of specificity, it makes every sense for the doctor to be able to monitor blood sugar after a <u>series</u> of blood tests over a period of a week or so, in order to assess any fluctuations. (The more indicative hemoglobin AC1 was instigated with the understanding that a single result is not as indicative as a person's blood glucose over a period of time, taking into account activity, illness, sleep and feeding changes). <u>Expecting a physician to check every day on the results and make changes based on each report in isolation is neither cost-effective nor warranted for good health.</u> A mere week prior to the dietary change is a reasonable period of time for such monitoring, giving Dr. Mahmoud Doumet a chance to see whether the insulin dose sliding scale amounts, and the prior nutritional program, were working. It is clear that he did not base his alterations solely on that one day of blood sugar levels. Hence, the days up to the covered August 12 date are also allowed for coverage

Extendicare Health Services, Inc.   (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)                    Page 3 of 4

(C) Finally, the fact that there were no further medicine or nutritional adjustments AFTER the change in the diet is not critical.   As counsel noted, "continuation" of the program is sufficient if it is working.  CMS Pub-100.8; NCD- 40-9; LCD L13276.  Otherwise, modification of a successful regimen would become the criteria for reimbursement, even if such change were detrimental to the patient, a most unsatisfactory result.

When the appellant requested a hearing before an Administrative Law Judge, the carrier requested progress notes from the treating physician.  The notes show that the beneficiary had follow up visits for type II diabetes mellitus on September 26 and October 22, 2001, at which time the treating physician considered the laboratory results (Exhibit 8, page 11).  The evidence also includes physician orders dated September 27, 2001 (Exhibit 8, page 8).

Based upon this evidence of record, the Administrative Law Judge finds that the treating physician considered the test results in the course of treatment.  Therefore, the blood glucose tests are covered as diagnostic laboratory tests furnished under the appropriate level of supervision by a physician.

## FINDINGS

After careful consideration of the entire record, the Administrative Law Judge makes the following findings:

1.  The appellant submitted a claim for laboratory services consisting of blood glucose tests for the treatment of diabetes mellitus provided the beneficiary from August 4 through 19, 2003, specifically, procedure code 82962 (glucose, blood by glucose monitoring device).

2.  The amount in controversy is $196.20.

3.  The blood glucose tests are covered as diagnostic laboratory tests furnished under the appropriate level of supervision by a physician.

## DECISION

It is the decision of the Administrative Law Judge that the blood glucose tests are covered under the Part B provisions of Title XVIII of the Social Security Act as diagnostic laboratory tests furnished under the appropriate level of supervision by a physician.

Docket No. C-06-340

Extendicare Health Services, Inc.   (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)

Page 4 of 4

Kenneth E. Stewart
Administrative Law Judge-in-Charge
Division of Medicare

AUG 1 2 2004

_____
Date

**SOCIAL SECURITY ADMINISTRATION**

Refer To: 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

Office of Hearings and Appeals
310 W Wisconsin Ave., Ste 300W
Milwaukee, WI 53203-9930

Date: August 24, 2004

EXTENDICARE HEALTH SERVICES
111 WEST MICHIGAN STREET
MILWAUKEE, WI 53203


RECEIVED SEP 0 1 2004

## NOTICE OF DECISION – FULLY FAVORABLE

Enclosed is the Administrative Law Judge's decision on your claim. Please read this notice and the decision carefully.

### This Decision is Fully Favorable To You

Your Medicare contractor will process the decision and send you a letter about your benefits. If you do not hear anything about this decision for 60 days, contact your Medicare contractor or local Social Security office.

### The Medicare Appeals Council May Review the Decision on Its Own Motion

The Medicare Appeals Council may decide to review the Administrative Law Judge's decision on its own motion within 60 days from the date shown above. Review at the Medicare Appeals Council's initiative could make the decision less favorable or unfavorable to you.

### If You Disagree With the Decision

If you do not agree with the Administrative Law Judge's decision, you may file an appeal with the Medicare Appeals Council of the Department Appeals Board, DHHS.

### How to File an Appeal

To file an appeal, you must request the Medicare Appeals Council to review the decision in writing. You may use our Request for Review form (HA-520) or write a letter. You may file a request at any local Social Security office or mail it to Department of Health and Human Services, Office of the Secretary, Departmental Appeals Board, MS 6127, Medicare Appeals Council, 330 Independence Ave., S.W., Cohen Building, Room G-644, Washington, DC 20201. Please include the Health Insurance Claim Number (HICN) (and Medicare Part B Docket Number, if applicable) shown above on any appeal you file, and a copy of the decision.

See Next Page

EXTENDICARE HEALTH SERVICES  (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)                Page 2 of 3

## Time to File an Appeal

If you wish to appeal the decision, you must file your request for review **within 60 days** from the date you receive this notice.  The Medicare Appeals Council will assume that you received the notice within five days after the date shown above unless you show you received it later.  If you file a request for review after the 60-day period, the Medicare Appeals Council will dismiss the request unless you show you had a good reason for not filing it on time.

## Time to Submit Any Additional Evidence

If you have any evidence you wish the Medicare Appeals Council to consider, you should submit it with your request for review.

## Medicare Appeals Council Action On Your Appeal

The Medicare Appeals Council may deny or grant your request for review.  The Medicare Appeals Council will review the hearing decision only if one of the bases for review listed in regulation 20 CFR § 404.970 is present.

Your request for review places the entire record of your case before the Medicare Appeals Council.  If the Medicare Appeals Council decides to review your case, it will review the parts of the decision with which you disagree and the parts with which you agree.  The Medicare Appeals Council may make any part of the decision fully favorable, partially favorable or unfavorable to you.

The Medicare Appeals Council will send you a notice explaining its action.  If the Medicare Appeals Council finds no reason to change the decision, the notice will explain why and tell you about your right to file a civil action in Federal district court.  If the Medicare Appeals Council issues a fully favorable decision, the notice will enclose the decision.  If the Medicare Appeals Council decides to limit the issues in your case, the notice will identify those issues and provide you an opportunity to comment.  If the Medicare Appeals Council sends your case back to an Administrative Law Judge, the notice will enclose a remand order that explains why the case is being returned and what actions the Administrative Law Judge will take on your claim.

## If No Appeal and No Review on the Medicare Appeal Council's Own Motion

The Medicare Appeals Council may decide to review the decision on its own motion within 60 days of the date of this notice.  If the Medicare Appeals Council does not review the decision on its own motion and you do not appeal the decision within the time permitted, you will lose your right to ask a Federal court to review the decision.  This decision will become a final decision that cannot be revised, at your request or our initiative, except in certain circumstances.

See Next Page

EXTENDICARE HEALTH SERVICES  (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)

## Your Right To Representation In An Appeal

You may appoint an attorney or other qualified person to represent you in any appeal you may file with the Medicare Appeals Council.  Your local Social Security office has a list of groups that can help you find an attorney.

You may ask the provider or supplier who provided Medicare services to you to be your representative.  Providers and suppliers of Medicare services may not charge a fee for representing you.  Providers and suppliers must waive any right to payment from you with respect to the services or items involved in your appeal before serving as your representative.

## Disclosure and Privacy Act Notice

Any identifying information (including the name, address, Health Insurance Claim Number (HICN) or any other personal identifiers) relating to the named beneficiary(ies) in this decision is protected from disclosure to anyone other than the appellant or the named beneficiary(ies) by the Social Security Act and the Privacy Act.  Disclosure of such identifying information without the express written consent of the named beneficiary(ies) is a violation of section 1106(a) of the Social Security Act, punishable by a $1,000 fine and/or one year imprisonment.

## Do You Have Any Questions

If you have any questions, you may call, write or visit any Social Security office.  If you visit an office, please bring this notice and decision with you.  The telephone number of the local office that serves your area is  .  Its address is RM 1703, 5107 Leesburg Pike, Falls Church  VA  22041.

Stephen J. Ahlgren
Administrative Law Judge

Enclosure

# SOCIAL SECURITY ADMINISTRATION
## Office of Hearings and Appeals

## DECISION

IN THE CASE OF                              CLAIM FOR


EXTENDICARE HEALTH                          Supplementary Medical Insurance Benefits
SERVICES                                    (Part B)
(Appellant)


Multiple                                    Multiple
(Beneficiary)                               (HICN)


AdminaStar Federal                          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
(Carrier/Intermediary/PRO/M+CO)             (Docket Number)

## BACKGROUND

This case involves approximately 170 separate beneficiaries and multiple dates of service provided at multiple locations. It appears that each of these cases was adjudicated separately by carrier hearing officers. However, a review of a sample number of these cases indicates they all involve the same service, blood glucose testing, procedure code 82962, and all were denied for the same reason. The hearing officers found that these were routine services and that there was insufficient evidence to show that the tests were used in the active treatment of the patients. Specifically, the hearing officers ruled that the provider did not comply with the local medical review policy requirement that the physician be notified promptly of the results of blood glucose testing prior to performing any additional tests. Because there was no evidence that the physician was "promptly" notified of test results, the hearing officers concluded that the tests were not used in the active treatment of the patient and were therefore not reasonable and necessary.

One case was randomly selected from the Docket and was designated as the master file. The other files with dates of service are listed in the Appendix.

On July 27, 2004, the undersigned conducted a telephone pre-hearing conference with Ms. Jane Dunne, Corporate Council for Extendicare Health Services. She stipulated as follows:

1.    The facts of these cases are essentially the same, are not in dispute, and include the following:

EXTENDICARE HEALTH SERVICES   (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)                    Page 2 of 8

a.   All of the patients were nursing home residents, not covered under Part A of Medicare, but all were eligible under Part B;

b.   All of the patients had some form of diabetes or other medical condition warranting blood glucose testing, although the type of insulin and frequency of administration might vary from patient to patient;

c.   In all cases the blood glucose testing was billed under procedure code 82962;

d.   In all cases the testing was ordered by a physician;

e.   In all cases the physician visited the patient at least monthly, reviewed the medical record, and either renewed or modified treatment orders;

f.   The carrier is correct in finding that the provider did not notify the physician of test results each time a test was taken, or before the next test was taken.

2.   The issue to be resolved is an issue of law and not of fact, i.e., is the carrier's local medical review policy, as it applies to the individual beneficiaries in this case, unduly restrictive and contrary to the Act, the governing regulations, and/or Medicare's National Coverage Decision?

3.   The provider has already submitted a brief which sets forth its arguments (Exhibit C7), and subject to paragraph 4 below, requests that a decision be issued on the record. The provider stipulates that an evidentiary hearing is not necessary in this case and further states that an oral argument is not required.

4.   Ms. Dunne advised that there was a national coverage determination governing glucose monitoring which appeared in the Federal Register dated November 23, 2001, Vol 66, No. 266, @ page 58846. She contended that the carrier's local medical review policy, upon which the denials were based, was contrary to the national coverage determination. Ms. Dunne advised that she would mail a copy of the national coverage determination to this office by July 29, 2004, following which the record could be closed and she would await my decision.[1]

## ISSUE

The general issue before the undersigned is whether the multiple glucose monitoring procedures at issue in this case and billed to the carrier under procedure code 82962 were reasonable and

---

[1] By letter dated July 29, 2004 (Exhibit 5) Ms. Dunne submitted the following documents: NDC for Blood Glucose Testing (Exhibit 4); PM AB-00-99 dated October 24, 2000 (Exhibit 3); Section 60-11 of the Coverage Issue Manual (Exhibit 2); and a copy of the Federal Register dated November 23, 2001 (Exhibit 1).

EXTENDICARE HEALTH SERVICES  (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)

necessary and covered by Medicare, and if not, whether the provider is liable for the non-covered services.

The specific issue in this case is whether the carrier's local medical review policy requirement that the provider notify the physician of the results of each blood glucose test prior to the next test is contrary to law.

## DISCUSSION

Both the Carrier and the Appellant/Provider have submitted copies of the national coverage determination relevant to blood glucose monitoring (NCD 40-9) (Exhibits 4 and C13). The NCD recognizes that blood glucose testing is necessary for patients with diabetes and certain other medical conditions.  The NCD specifically provides that testing "using a device approved for home monitoring, or by using a laboratory assay system using serum or plasma" is covered. However, it is clear that the coverage determination encourages use of devices for home monitoring.  The NCD states:

> The convenience of the meter or stick color method allows a patient to have access to blood glucose values in less than a minute or so and has become a standard of care for control of blood glucose, even in the inpatient setting.

The NCD does not place any specific limitations on the frequency of testing using home monitoring devices. The document states simply that "frequent home blood glucose testing by diabetic patients should be encouraged." The document provides that the proper code for submission of claims for such testing is procedure code 82962 - defined as "Glucose, blood by Glucose monitoring devices(s)_ cleared by the FDA specifically for home use."

The Appellant submitted a copy of the Federal Register/Vol.66, dated Friday, Nov. 23, 2001, showing that the aforesaid NCD was effective as of that date (Exhibit 1).

Prior to the announcement of the National Coverage Determination, the Medicare contract carrier, Administer Federal, had in effect a Local Medical Review Policy (LMRP) LAB-1-0007 governing coverage of blood glucose monitoring services. The policy had apparently been revised twice prior to September 1, 2002. A copy of the third revision to that policy is contained in the record (Exhibit C11), effective September 1, 2002, and it appears that this LMRP serves as the basis for the Carrier's denial of the services at issue.  In that revised policy, and in the absence of any specific limitation on the coverage of claims submitted under code 82962, the Carrier placed the following limitation on payment:

> Medicare program reimbursement for blood glucose monitoring services requires that the service be medically reasonable and necessary.  For blood glucose determinations made with a home-use glucose monitoring device, Medicare will cover medically reasonable and necessary blood glucose monitoring services when the service is ordered by a physician to monitor a diabetic condition, with the physician promptly notified of the test results so that he/she may provide active treatment of the diabetic condition. Multiple blood glucose monitoring services, without prompt physician notification, are not

<u>covered as a diagnostic laboratory test.</u> *For purposes of this policy prompt physician notification means prior to the next blood glucose test.*(Emphasis added)

The policy was again revised as of November 25, 2002, but the above relevant section of the LMRP was not changed (Exhibit C12).

In all of the decisions in these cases, the Hearing Officer cites the aforesaid section of the LMRP, finding that the provider did not promptly notify the physician of test results following each test, that therefore there was no evidence the physician used the test results in the treatment of the beneficiary, and further, did not issue orders for subsequent tests. The Hearing Officer cited CMS Program Memorandum (PM) AB-00-108 as well as the LMRP in support of his/her decision, and noted finally that "routine" blood glucose services are not covered by Medicare, and that standing orders for tests are not considered to be valid.☐ ☐ ☐

The HCFA Program Memorandum AB-00-108 (Exhibit C10), cited by the Hearing Officer was issued December 1, 2000, and it appears that the Carrier's LMRP, LAB-I-000 was largely based on this PM. The PM notes that glucose monitoring (using a home-use device) done "several times a day is common in order to maintain tight control of glucose to prevent heart disease, blindness, and other complications of diabetes." However, the PM also notes that pursuant to the regulations at 42 CFR 410.32 and 411.15, to be reasonable and necessary, a laboratory service must not only be ordered by a physician, but the physician must also use the result in the management of the beneficiary's specific medical problem. The PM then states:

> "Implicitly, the laboratory result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of patient care; this includes the physician's order for another laboratory service."

The PM goes on to note that a standing order is not usually acceptable documentation for a covered laboratory service. Given the almost identical language contained in both the PM and the LMRP, it is clear that the LMRP was simply a restatement of HCFA policy which was in effect as of December 1, 2000. It is also noted that at the time HCFA's policy was announced in December 2000, the national coverage determination had not been issued, and, in fact, the NCD would not be issued for almost another year.

Extendicare stipulates that in the cases at issue, the physician was not notified of test results after each test, or prior to the next test. In many of the cases at issue, the tests were done several times daily over the course of months. Indeed, as noted above, PM AB-00-108 advises that testing several times a day was common in order to maintain tight control of glucose. Nevertheless, it is clear that at least prior to the National Coverage Decision, it was the policy of both HCFA (now CMS) and the carrier, that Medicare would not pay for this service absent evidence that the results were promptly furnished to the physician after each test, and that based on those results, the physician ordered a new test.

Extendicare argues that neither the Act, nor the regulations, nor the National Coverage Determination require "prompt" notification of the physician as defined by the carrier. It is certainly true that there is nothing explicit in any of these authorities which would support the

EXTENDICARE HEALTH SERVICES   (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)                    Page 5 of 8

carrier's requirements. Section 1862(a) of the Act simply requires that the services be reasonable and necessary. The regulations cited by the hearing officer, 42 CFR sections 410.32 and 411.15 require that in addition to being reasonable and necessary, the services must be ordered by the physician, must be used in the management of the patient's condition, and must not be otherwise excluded by the Act.

The record indicates that all of the glucose monitoring services at issue were ordered by the physician, but were done so by a monthly order, for example twice daily for one month unless otherwise ordered, but a specific order was not given for each test. The record also supports a conclusion that the results of the glucose monitoring tests were used by the physician in the management of the patient's care.  In these cases the test results were in the chart reviewed by the physician on his monthly visit to the nursing home. In all of the cases at issue, the physician renews the order for monitoring and generally instructs on increasing or decreasing insulin depending on daily test results.

The Appellant/Provider further notes that CMS Publication 100-8, Chapter 13, Section 5.1C provides in pertinent part that a service shall be considered reasonable and necessary in terms of frequency and duration when it is furnished in accordance with accepted standards of medical practice, and meets but does not exceed the patient's need.

In this case the carrier has **not** found that the frequency of testing ordered by the physician was excessive, or that the testing was not in accordance with accepted standards of medical practice. In fact, the National Coverage Determination issued in November 2001 recognizes that the frequent monitoring of blood glucose, using home use devices, "has become a standard of care ... even in the inpatient setting", and is to be "encouraged".

Finally, the National Coverage Determination does not contain the specific notification requirements imposed by the carrier in its LMRP and contained in HCFA policy prior to the publication of the NCD. The fact that HCFA's prior policy is not contained in the NCD is significant.  Clearly the framers of the NCD could have incorporated the existing Medicare policy into their NCD had they chosen to do so.  The absence, in the NCD, of the restrictive language contained in HCFA's prior policy, together with the NCD's language encouraging frequent testing and recognizing it as the standard of care, strongly suggests that the framers of the NCD intended to expand Medicare coverage of glucose monitoring using home-use devices, even for residents of Nursing Homes not eligible for coverage under Part A of Medicare.

## CONCLUSION

Having carefully considered the hearing officer's decision(s) and supporting authority, the undersigned Administrative Law Judge concludes that those decisions were erroneous as a matter of law, for reason that the Local Medical Review Policy upon which the decisions were based, LMRP LAB-I-0007 as revised, is in direct conflict with, and is superceded by, the National Coverage Determination (NCD 40-9 and 60-11 in the Coverage Issues Manual).

Pursuant to 42 CFR 405.732(a), NCD's are issued by CMS either granting, limiting or excluding Medicare coverage for a specific medical service, procedure or device.  An NCD is binding on

EXTENDICARE HEALTH SERVICES  (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)                    Page 6 of 8

all Medicare carriers and fiscal intermediaries. The regulation further provides that an ALJ may not disregard, set aside or otherwise review an NCD, but may review the facts of a particular case to determine whether an NCD applies to a specific claim for benefits, and if so, whether the NCD has been applied correctly to the claim.

There can be no question as to the applicability of the NCD in this case. It deals directly with the services at issue, and was published in the Federal Register, and in the Coverage Issues Manual, prior to the dates of service at issue in this case.

The language in LMRP LAB-I-007 requiring prompt physician notification of testing results prior to a second test, is based upon a HCFA policy statement, AB-60, issued in December 2000, almost a year prior to the adoption of the NCD. Even though the NCD recognizes frequent blood glucose testing as the standard of care, the LMRP, revised effective September 1, 2002, does not incorporate any of the language of the NCD, nor does it appear in any other way to reflect the sentiment of the new National Coverage Determination. The LMRP enforced by the carrier in this case was exactly the same policy that was in effect prior to the effective date of the National Coverage Determination. The LMRP was not changed to conform to the new statement of national policy.

As CMS pointed out in the comments section of the November 23, 2001 Federal Register, page 58799:

> Once these national coverage decisions become effective, contractors will need to use these policies as they are published. LMRP's may not conflict with the 23 national coverage policies outlined. If a LMRP conflicts with a national coverage decision, the contractor is required to change it so it complies with the national coverage decision. Where a national coverage decision is silent on an issue, such as frequency guidance, a contractor may develop an LMRP that supplements the national coverage decision. However, the LMRP may not conflict with the national coverage decision.

In this case there is no evidence that the carrier, Administer Federal, developed a new LMRP following publication of the National Coverage Determination, although it clearly could have done so. The issue of frequency is not specifically addressed by the NCD other than to say that frequent monitoring of blood glucose should be encouraged.

The effect of the old LMRP can hardly be said to encourage frequent blood glucose testing, and in fact renders the new NCD meaningless. If, as the evidence shows, the standard of care in many cases requires the monitoring of blood sugar two or three times daily in order to maintain tight control, the nursing home would be obligated to contact the physician two or three times daily, even when no change in treatment was warranted. As a practical matter, physicians dealing with the medical problems of patients in immediate need will undoubtedly resent being contacted unless there appears to be a need for a new order. Nursing home personnel, already hard pressed, will find it impossible to contact physicians two or three times daily only to report no recommendations for change in treatment. The LMRP will in fact discourage the frequent monitoring of blood glucose, contrary to both the national coverage policy and to the standards of medical practice.

EXTENDICARE HEALTH SERVICES  (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)                Page 7 of 8

The hearing officer was correct in categorizing these blood glucose checks as "routine". The Officer was incorrect, however, in ruling that routine blood glucose monitoring is not covered by Part B of Medicare. The CMS policy, AB-00-108 specifically provides that:

> "Denial of payment for a Part B covered laboratory service cannot be made on the basis that the service is routine care. Under Medicare, routine care determinations are applicable only for Part A nursing home services."

If a service cannot be denied because it is routine, it stands to reason that the service may be covered despite the fact that it is routine. In fact, the purpose of routine, frequent blood glucose monitoring is to assure that tight control is maintained, and this is precisely the kind of testing which is encouraged and allowed under the national coverage determination.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the facts and law in this case, the undersigned Administrative Law Judge makes the following findings:

1. The beneficiaries named in the Appendix to this decision received blood glucose monitoring from the appellant/provider, utilizing a device approved by the FDA for home use.

2. All of the named beneficiaries were nursing home residents, not covered under Part A of Medicare at the time of the services at issue, but all were eligible under Part B.

3. All of the named beneficiaries had diabetes or other medical conditions warranting frequent blood glucose monitoring.

4. In all cases, the services at issue were ordered by a physician and were used by the physician in the management of the specific beneficiary's condition.

5. In all cases, the claims for service were billed under procedure code 82962.

6. In all cases the hearing officer denied coverage of the submitted claims, finding that the services provided were routine, were provided under standing orders, and that the results of the blood glucose tests were not promptly reported to the physician prior to the conduct of the next blood glucose test, contrary to Local Medical Review Policy (LMRP) LAB-I-0007 as revised.

7. The appellant/provider stipulates that it did not comply with the "prompt" reporting requirements set forth in the above Local Medical Review Policy.

8. The "prompt" reporting requirements set forth in LMRP LAB-I-0007 as revised were based upon, and are a restatement of, HCFA policy AB-00-108, dated December 1, 2000.

EXTENDICARE HEALTH SERVICES   (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)                Page 8 of 8

9. CMS published a National Coverage Determination (40-9), (60-11 in the Coverage Issues Manual), on November 23, 2001, which encourages frequent blood glucose monitoring and recognizes such as the standard of care.

10. The Carrier revised LMRP LAB-I-0007 effective September 1, 2002, and again on November 25, 2002, but in those revisions did not change the "prompt" reporting requirements existing prior to the National Coverage Policy.

11. The Carrier's revised LMRP does not incorporate or recognize either the language or the intent of the National Coverage Policy in that it does not encourage frequent blood glucose monitoring, nor does it recognize such frequent blood glucose monitoring as the standard of medical care.

12. The Carrier's revised LMRP effectively **discourages** frequent blood glucose monitoring by severely restricting the conditions under which procedure code 82962 will be covered by Medicare, contrary to the expressed intent of the National Coverage Policy to **encourage** frequent blood glucose monitoring.

13. The practical effect of the Carrier's LMRP is to deny coverage of procedure code 82962.

14. The Carrier's LMRP, as it was applied to the beneficiaries named in the Appendix to this decision, is directly contrary to, and is superceded by, the National Coverage Decision (NCD 40-9)(60-11 in the Coverage Issues Manual).

15. Pursuant to the aforesaid National Coverage Decision, the frequent blood glucose monitoring services at issue in this case were reasonable and necessary, were provided in accord with the standard of medical care, and are covered under Medicare Part B.

## DECISION

It is the decision of the undersigned Administrative Law Judge, that for the reasons set forth above, the blood glucose monitoring services at issue, provided to the multiple beneficiaries named in the Appendix to this decision, were reasonable and necessary and covered under Part B of Medicare.

Stephen J. Ahlgren
Administrative Law Judge

_____ AUG 2 4 2004 _____
Date

191





# National Diabetes Fact Sheet
## United States, 2003

## General Information

### What is diabetes?

Diabetes mellitus is a group of diseases characterized by high levels of blood glucose resulting from defects in insulin production, insulin action, or both. Diabetes can be associated with serious complications and premature death, but people with diabetes can take steps to control the disease and lower the risk of complications.

### Types of diabetes

**Type 1** diabetes was previously called insulin-dependent diabetes mellitus (IDDM) or juvenile-onset diabetes. Type 1 diabetes develops when the body's immune system destroys pancreatic beta cells, the only cells in the body that make the hormone insulin that regulates blood glucose. This form of diabetes usually strikes children and young adults, although disease onset can occur at any age. Type 1 diabetes may account for 5% to 10% of all diagnosed cases of diabetes. Risk factors for type 1 diabetes may include autoimmune, genetic, and environmental factors.

**Type 2** diabetes was previously called non-insulin-dependent diabetes mellitus (NIDDM) or adult-onset diabetes. Type 2 diabetes may account for about 90% to 95% of all diagnosed cases of diabetes. It usually begins as insulin resistance, a disorder in which the cells do not use insulin properly. As the need for insulin rises, the pancreas gradually loses its ability to produce insulin. Type 2 diabetes is associated with older age, obesity, family history of diabetes, history of gestational diabetes, impaired glucose metabolism, physical inactivity, and race/ethnicity. African Americans, Hispanic/Latino Americans, American Indians, and some Asian Americans and Native Hawaiians or Other Pacific Islanders are at particularly high risk for type 2 diabetes. Type 2 diabetes is increasingly being diagnosed in children and adolescents.

**Gestational diabetes** is a form of glucose intolerance that is diagnosed in some women during pregnancy. Gestational diabetes occurs more frequently among African Americans, Hispanic/Latino Americans, and American Indians. It is also more common among obese women and women with a family history of diabetes. During pregnancy, gestational diabetes requires treatment to normalize maternal blood glucose levels to avoid complications in the infant. After pregnancy, 5% to 10% of women with gestational diabetes are found to have type 2 diabetes. Women who have had gestational diabetes have a 20% to 50% chance of developing diabetes in the next 5-10 years.

**Other specific types** of diabetes result from specific genetic conditions (such as maturity-onset diabetes of youth), surgery, drugs, malnutrition, infections, and other illnesses. Such types of diabetes may account for 1% to 5% of all diagnosed cases of diabetes.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
Centers for Disease Control and Prevention
SAFER • HEALTHIER • PEOPLE

Docket No. C-06-349
A. Ex. 19

## Treating diabetes

* To survive, people with type 1 diabetes must have insulin delivered by injections or a pump.
* Many people with type 2 diabetes can control their blood glucose by following a careful diet and exercise program, losing excess weight, and taking oral medication.
* Many people with diabetes also need to take medications to control their cholesterol and blood pressure.
* Diabetes self-management education is an integral component of medical care.
* Among adults with diagnosed diabetes, 12% take both insulin and oral medications, 19% take insulin only, 53% take oral medications only, and 15% do not take either insulin or oral medications.

## Prediabetes: Impaired glucose tolerance and impaired fasting glucose

* Prediabetes is a term used to distinguish people who are at increased risk of developing diabetes. People with prediabetes have impaired fasting glucose (IFG) or impaired glucose tolerance (IGT). Some people may have both IFG and IGT.
* IFG is a condition in which the fasting blood sugar level is elevated (100 to 125 milligrams per deciliter or mg/dL) after an overnight fast but is not high enough to be classified as diabetes.
* IGT is a condition in which the blood sugar level is elevated (140 to 199 mg/dL after a 2-hour oral glucose tolerance test), but is not high enough to be classified as diabetes.
* In a cross-section of U.S. adults 40-74 years who were tested from 1988 to 1994, 33.8% had IFG, 15.4% had IGT, and 40.1% had prediabetes (IGT or IFG or both). Were these percentages applied to the 2000 U.S. population, about 35 million adults aged 40-74 would have IFG, 16 million would have IGT, and 41 million would have prediabetes.
* Progression to diabetes among those with prediabetes is not inevitable. Studies suggest that weight loss and increased physical activity among people with prediabetes prevent or delay diabetes and may return blood glucose levels to normal.
* People with prediabetes are already at increased risk for other adverse health outcomes such as heart disease and stroke.

## Prevention or delay of diabetes

Research studies have found that lifestyle changes can prevent or delay the onset of type 2 diabetes among high-risk adults. These studies included people with IGT and other high-risk characteristics for developing diabetes. Lifestyle interventions included diet and moderate-intensity physical activity (such as walking for 2 1/2 hours each week). In the Diabetes Prevention Program, a large prevention study of people at high risk for diabetes, the development of diabetes was reduced 58% over 3 years.

Studies have also shown that medications have been successful in preventing diabetes in some population groups. In the Diabetes Prevention Program, people treated with the drug metformin reduced their risk of developing diabetes by 31% over 3 years. Treatment with metformin was most effective among younger, heavier people (those 25-40 years of age who were 50 to 80 pounds overweight) and less effective among older people and people who were not as overweight. Similarly, in the STOP-NIDDM Trial, treatment of people with IGT with the drug acarbose reduced the risk of developing diabetes by 25% over 3 years. Other medication studies are ongoing. In addition to preventing progression from IGT to diabetes, both lifestyle changes and medication have also been shown to increase the probability of reverting from IGT to normal glucose tolerance.

There are no known methods to prevent type 1 diabetes. Several clinical trials are currently in progress or being planned.

## Prevention of diabetes complications

Diabetes can affect many parts of the body and can lead to serious complications such as blindness, kidney damage, and lower-limb amputations. Working together, people with diabetes and their health care providers can reduce the occurrence of these and other diabetes complications by controlling the levels of blood glucose, blood pressure, and blood lipids and by receiving other preventive care practices in a timely manner.

## Glucose control

- Research studies in the United States and abroad have found that improved glycemic control benefits people with either type 1 or type 2 diabetes. In general, for every 1% reduction in results of A1C blood tests (e.g., from 8.0% to 7.0%), the risk of developing microvascular diabetic complications (eye, kidney, and nerve disease) is reduced by 40%.

## Blood pressure control

- Blood pressure control can reduce cardiovascular disease (heart disease and stroke) by approximately 33% to 50% and can reduce microvascular disease (eye, kidney, and nerve disease) by approximately 33%.
- In general, for every 10 millimeters of mercury (mm Hg) reduction in systolic blood pressure, the risk for any complication related to diabetes is reduced by 12%.

## Control of blood lipids

- Improved control of cholesterol or blood lipids (for example, HDL, LDL, and triglycerides) can reduce cardiovascular complications by 20% to 50%.

## Preventive care practices for eyes, kidneys, and feet

- Detecting and treating diabetic eye disease with laser therapy can reduce the development of severe vision loss by an estimated 50% to 60%.
- Comprehensive foot care programs can reduce amputation rates by 45% to 85%.
- Detecting and treating early diabetic kidney disease by lowering blood pressure can reduce the decline in kidney function by 30% to 70%. Treatment with ACE inhibitors and angiotensin receptor blockers (ARBs) are more effective in reducing the decline in kidney function than other blood pressure lowering drugs.

Docket No. C-06-349





## National Estimates on Diabetes

### Methods

The data in this fact sheet were derived from various surveys of the Centers for Disease Control and Prevention (CDC)—the National Health Interview Survey (NHIS), the National Health and Nutrition Examination Surveys (NHANES III and NHANES 1999-2000), the National Hospital Discharge Survey, and surveys conducted through the Behavioral Risk Factor Surveillance System (BRFSS). Other data sources include CDC's National Vital Statistics System, the outpatient database of the Indian Health Service (IHS), the U.S. Renal Data System of the National Institutes of Health (NIH), and published studies. Many of the estimates were calculated from these data sources by CDC and NIH staff.

Estimates of the total number of people with diabetes and the prevalence of diabetes (both diagnosed and undiagnosed) per 100 population are model-based estimates calculated from NHIS data, NHANES data, and population estimates. Age-race-sex-specific diabetes prevalence estimates from the 1999-2001 NHIS and the 2002 outpatient database of the IHS were applied to 2002 census estimates to calculate the number of diagnosed cases of diabetes. The number of persons with undiagnosed diabetes was calculated by applying age-specific estimates from NHANES 1999-2000 to 2002 census estimates. Total prevalence was calculated based on the number of people with both diagnosed and undiagnosed diabetes.

The summary estimates reported in this fact sheet have some variability due to the limits of the measurements and the estimation procedures. However, it is the consensus opinion of the participating organizations that they are the best current estimates of the burden of diabetes. More detail on the data sources, references, and methods are available at http://www.cdc.gov/diabetes/pubs/factsheet.htm.

> **Total prevalence of diabetes in the United States, all ages, 2002**
>
> Total: 18.2 million people — 6.3% of the population — have diabetes.
> Diagnosed: 13.0 million people
> Undiagnosed: 5.2 million people

### Prevalence of diagnosed diabetes among people under 20 years of age, United States, 2002

About 206,000 people under 20 years of age have diabetes. This represents 0.25% of all people in this age group. Approximately one in every 400 to 500 children and adolescents has type 1 diabetes. Although type 2 diabetes is a problem among youth, nationally representative data to monitor diabetes trends among youth are not available. Clinic-based reports and regional studies indicate that type 2 diabetes is becoming more common among children and adolescents, particularly in American Indians, African Americans, and Hispanic/Latinos.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
Centers for Disease Control and Prevention
**SAFER • HEALTHIER • PEOPLE**

195

Docket No. C-06-349
A. Ex. 19

> **Total prevalence of diabetes among people aged 20 years or older, United States, 2002**
> Age 20 years or older: 18.0 million; 8.7% of all people in this age group have diabetes.
> Age 60 years or older: 8.6 million; 18.3% of all people in this age group have diabetes.
> Men: 8.7 million; 8.7% of all men aged 20 years or older have diabetes.
> Women: 9.3 million; 8.7% of all women aged 20 years or older have diabetes.



Total prevalence of diabetes in people aged 20 years or older, by age group—United States, 2002

Source: 1999–2001 National Health Interview Survey and 1999-2000 National Health and Nutrition Examination Survey estimates projected to year 2002



Age-adjusted total prevalence of diabetes in people aged 20 years or older, by race/ethnicity—United States, 2002

Source: 1999–2001 National Health Interview Survey and 1999-2000 National Health and Nutrition Examination Survey estimates projected to year 2002. 2002 outpatient database of the Indian Health Service.

## Total prevalence of diabetes by race/ethnicity among people aged 20 years or older, United States, 2002

**Non-Hispanic whites:** 12.5 million; 8.4% of all non-Hispanic whites aged twenty years or older have diabetes.

**Non-Hispanic blacks:** 2.7 million; 11.4% of all non-Hispanic blacks aged twenty years or older have diabetes. On average, non-Hispanic blacks are 1.6 times as likely to have diabetes than non-Hispanic whites of similar age.

**Hispanic/Latino Americans:** 2.0 million; 8.2% of all Hispanic/Latino Americans aged twenty years or older have diabetes. On average, Hispanic/Latino Americans are 1.5 times more likely to have diabetes than non-Hispanic whites of similar age. Mexican Americans, the largest Hispanic/Latino subgroup, are over twice as likely to have diabetes as non-Hispanic whites of similar age. Similarly, residents of Puerto Rico are 1.8 times more likely to have diagnosed diabetes than U.S. non-Hispanic whites. Sufficient data are not available to derive more specific current estimates for other Hispanic/Latino groups.

**American Indians and Alaska Natives who receive care from the Indian Health Service (IHS):** 110,814; 14.9% of American Indians and Alaska Natives aged 20 years or older and receiving care from IHS have diabetes. At the regional level, diabetes is least common among Alaska Natives (8.2%) and most common among American Indians in the southeastern United States (27.8%) and southern Arizona (27.8%). On average, American Indians and Alaska Natives are 2.3 times as likely to have diabetes as non-Hispanic whites of similar age.

Docket No. C-06-349

**Asian Americans and Native Hawaiian or other Pacific Islanders:** In 2002, Native Hawaiians and Japanese and Filipino residents of Hawaii aged twenty years or older were approximately 2 times as likely to have diagnosed diabetes as white residents of Hawaii of similar age. Prevalence data for diabetes among other Pacific Islanders or Asian Americans are limited, but some groups within these populations are at increased risk for diabetes.

## Incidence of diabetes, United States, 2002

New cases diagnosed per year: 1.3 million people aged 20 years or older.



Number of new cases of diagnosed diabetes in people aged 20 years or older, by age group— United States, 2002

Source: 1999–2001 National Health Interview Survey estimates projected to year 2002

## Deaths among people with diabetes, United States, 2000

- Diabetes was the sixth leading cause of death listed on U.S. death certificates in 2000. This ranking is based on the 69,301 death certificates in which diabetes was listed as the underlying cause of death. Altogether, diabetes contributed to 213,062 deaths.
- Diabetes is likely to be underreported as a cause of death. Studies have found that only about 35% to 40% of decedents with diabetes have diabetes listed anywhere on the death certificate and only about 10% to 15% have it listed as the underlying cause of death.
- Overall, the risk for death among people with diabetes is about 2 times that of people without diabetes.

## Complications of diabetes in the United States

**Heart disease and stroke**

- Heart disease is the leading cause of diabetes-related deaths. Adults with diabetes have heart disease death rates about 2 to 4 times higher than adults without diabetes.
- The risk for stroke is 2 to 4 times higher among people with diabetes.
- About 65% of deaths among people with diabetes are due to heart disease and stroke.

**High blood pressure**

- About 73% of adults with diabetes have blood pressure greater than or equal to 130/80 mm Hg or use prescription medications for hypertension.

**Blindness**

- Diabetes is the leading cause of new cases of blindness among adults aged 20-74 years.
- Diabetic retinopathy causes 12,000 to 24,000 new cases of blindness each year.

Docket No. C-06-349
A. Ex. 19

## Kidney disease

- Diabetes is the leading cause of end-stage renal disease, accounting for 44 percent of new cases.
- In 2001, 42,813 people with diabetes began treatment for end-stage renal disease.
- In 2001, a total of 142,963 people with end-stage renal disease due to diabetes were living on chronic dialysis or with a kidney transplant.

## Nervous system disease

- About 60% to 70% of people with diabetes have mild to severe forms of nervous system damage. The results of such damage include impaired sensation or pain in the feet or hands, slowed digestion of food in the stomach, carpal tunnel syndrome, and other nerve problems.
- Severe forms of diabetic nerve disease are a major contributing cause of lower-extremity amputations.

## Amputations

- More than 60% of nontraumatic lower-limb amputations occur among people with diabetes.
- In 2000-2001, about 82,000 nontraumatic lower-limb amputations were performed annually among people with diabetes.

## Dental disease

- Periodontal (gum) disease is more common among people with diabetes. Among young adults, those with diabetes have about twice the risk of those without diabetes.
- Almost one-third of people with diabetes have severe periodontal diseases with loss of attachment of the gums to the teeth measuring 5 millimeters or more.

## Complications of pregnancy

- Poorly controlled diabetes before conception and during the first trimester of pregnancy can cause major birth defects in 5% to 10% of pregnancies and spontaneous abortions in 15% to 20% of pregnancies.
- Poorly controlled diabetes during the second and third trimesters of pregnancy can result in excessively large babies, posing a risk to the mother and the child.

## Other complications

- Uncontrolled diabetes often leads to biochemical imbalances that can cause acute life-threatening events, such as diabetic ketoacidosis and hyperosmolar (nonketotic) coma.
- People with diabetes are more susceptible to many other illnesses and, once they acquire these illnesses, often have worse prognoses. For example, they are more likely to die with pneumonia or influenza than people who do not have diabetes.

---

### Cost of diabetes in the United States, 2002

Total (direct and indirect): $132 billion
Direct medical costs: $92 billion
Indirect costs: $40 billion (disability, work loss, premature mortality)

---

*These data are based on a study conducted by the Lewin Group, Inc. for the American Diabetes Association and are 2002 estimates of both the direct costs (cost of medical care and services) and indirect costs (costs of short-term and permanent disability and of premature death) attributable to diabetes. This study uses a specific cost-of-disease methodology to estimate the health care costs that are due to diabetes.*

198





## Acknowledgments

The following organizations collaborated in compiling the information for this fact sheet:

- American Association of Diabetes Educators
  http://www.aadenet.org
- American Diabetes Association
  http://www.diabetes.org
- Centers for Disease Control and Prevention
  http://www.cdc.gov/diabetes
  http://www.cdc.gov/nchs
- Centers for Medicare and Medicaid Services
  http://cms.hhs.gov
- Department of Veterans Affairs
  http://www.va.gov/health/diabetes
- Health Resources and Services Administration
  http://www.hrsa.gov
- Indian Health Service
  http://www.ihs.gov
- Juvenile Diabetes Research Foundation International
  http://www.jdrf.org
  National Diabetes Education Program, a joint program of NIH and CDC
  http://www.ndep.nih.gov
  http://www.cdc.gov/team-ndep
  http://www.cdc.gov/diabetes
- National Institute of Diabetes and Digestive and Kidney Diseases of the National Institutes of Health
  http://www.niddk.nih.gov
- U.S. Department of Health and Human Services, Office of Minority Health
  http://www.omhrc.gov

## Note

This publication is not subject to copyright restrictions; please duplicate and distribute copies as desired.

## Citation

Centers for Disease Control and Prevention. National diabetes fact sheet: general information and national estimates on diabetes in the United States, 2003. Rev ed. Atlanta, GA: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, 2004.

CDC Division of Diabetes Translation Public Inquiries/Publications
**Phone toll free:** 1-877-CDC-DIAB (877-232-3422)
**Fax:** 1-301-562-1050
**Internet:** www.cdc.gov/diabetes
**E-mail:** diabetes@cdc.gov
**Mail:** P.O. Box 8728, Silver Spring, MD 20910

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
Centers for Disease Control and Prevention
SAFER • HEALTHIER • PEOPLE

199

Docket No. C-06-349
A. Ex. 19
Page 8 of 8

MERCK Where patients come first

Patients & Caregivers | Healthcare Professi

HOME | ABOUT MERCK | PRODUCTS | NEWSROOM | INVESTOR INFORMATION | CAREERS | RESEARCH | LICENSING | THE M

This Publication Is Searchable   [                    ]   **SEARCH**

# Diabetes Mellitus

*A syndrome characterized by hyperglycemia resulting from absolute or relative impairment in insulin secretion and/or insulin action.*

(For gestational diabetes, see Diabetes Mellitus in Ch. 251.)

Patients with type I diabetes mellitus (DM), also known as insulin-dependent DM (IDDM) or juvenile-onset diabetes, may develop diabetic ketoacidosis (DKA). Patients with type II DM, also known as non-insulin-dependent DM (NIDDM), may

| The Merck Manual of Diagnosis and Therapy |
| Section 2. Endocrine And Metabolic Disorders |
| Chapter 13. Disorders Of Carbohydrate Metabolism |
| *Topics* |
| Diabetes Mellitus |
| Diabetic Ketoacidosis |
| Alcoholic Ketoacidosis |
| Nonketotic Hyperglycemic-Hyperosmolar Coma |
| Hypoglycemia |
| navigation help |

develop nonketotic hyperglycemic-hyperosmolar coma (NKHHC). Common late microvascular complications include retinopathy, nephropathy, and peripheral and autonomic neuropathies. Macrovascular complications include atherosclerotic coronary and peripheral arterial disease.

## Classification and Pathogenesis

General characteristics of the major clinical types of DM are detailed in Table 13-1.

**Type I DM:** Although it may occur at any age, type I DM most commonly develops in childhood or adolescence and is the predominant type of DM diagnosed before age 30. This type of diabetes accounts for 10 to 15% of all cases of DM and is characterized clinically by hyperglycemia and a propensity to DKA. The pancreas produces little or no insulin.

About 80% of patients with type I DM have specific HLA phenotypes associated with detectable serum islet cell cytoplasmic antibodies and islet cell surface antibodies (antibodies to glutamic acid decarboxylase and to insulin are found in a similar proportion of cases).

In these patients, type I DM results from a genetically susceptible, immune-mediated, selective destruction of > 90% of their insulin-secreting $\beta$ cells. Their pancreatic islets exhibit insulitis, which is characterized by an infiltration of T lymphocytes accompanied by macrophages and B lymphocytes and by the loss of most of the $\beta$ cells, without involvement of the glucagon-secreting $\alpha$ cells. Cell-mediated immune mechanisms are believed to play the major role in the $\beta$-cell destruction. The antibodies present at diagnosis usually become undetectable after a few years. They may be primarily a response to $\beta$-cell destruction, but some are cytotoxic for $\beta$ cells and may contribute to their loss. The clinical onset of type I DM may occur in some patients years after the insidious onset of the underlying autoimmune process. Screening for these antibodies is included in numerous

ongoing preventive studies.

In white populations, a strong association exists between type I DM diagnosed before age 30 and **specific HLA-D phenotypes** (HLA-DR3, HLA-DR4, and HLA-DR3/HLA-DR4). One or more genes that convey susceptibility to type I DM are believed to be located near or in the HLA-D locus on chromosome 6. Specific HLA-DQ alleles appear to be more intimately related to risks for or protection from type I DM than HLA-D antigens, and evidence suggests that genetic susceptibility to type I DM is probably polygenic. Only 10 to 12% of newly diagnosed children with type I DM have a first-degree relative with type I DM, and the concordance rate for type I DM in monozygotic twins is <= 50%. Thus, in addition to the genetic background, **environmental factors** affect the appearance of type I DM. Such environmental factors may be viruses (congenital rubella, mumps, and coxsackie B viruses may incite the development of autoimmune β-cell destruction) and exposure to cow's milk rather than maternal milk in infancy (a specific sequence of albumin from cow's milk may cross-react with islet protein). Geography may play a role in exposure, as the incidence of type I DM is particularly high in Finland and Sardinia.

**Type II DM:** Type II DM is usually the type of diabetes diagnosed in patients > 30 yr, but it also occurs in children and adolescents. It is characterized clinically by hyperglycemia and insulin resistance. DKA is rare. Although most patients are treated with diet, exercise, and oral drugs, some patients intermittently or persistently require insulin to control symptomatic hyperglycemia and prevent NKHHC. The concordance rate for type II DM in monozygotic twins is > 90%. Type II DM is commonly associated with obesity, especially of the upper body (visceral/abdominal), and often presents after a period of weight gain. Impaired glucose tolerance associated with aging is closely correlated with the typical weight gain. Type II DM patients with visceral/abdominal obesity may have normal glucose levels after losing weight.

Type II DM is a heterogeneous group of disorders in which hyperglycemia results from both an impaired insulin secretory response to glucose and decreased insulin effectiveness in stimulating glucose uptake by skeletal muscle and in restraining hepatic glucose production **(insulin resistance)**. However, insulin resistance is common, and most patients with insulin resistance will not develop diabetes, because the body compensates by adequately increasing insulin secretion. Insulin resistance in the common variety of type II DM is not the result of genetic alterations in the insulin receptor or the glucose transporter. However, genetically determined postreceptor intracellular defects likely play a role. The resulting hyperinsulinemia may lead to other common conditions, such as obesity (abdominal), hypertension, hyperlipidemia, and coronary artery disease **(the syndrome of insulin resistance).**

Genetic factors appear to be the major determinants for the development of type II DM, yet no association between type II DM and specific HLA phenotypes or islet cell cytoplasmic antibodies has been demonstrated. (An exception is a subset of nonobese adults with detectable islet cell cytoplasmic antibodies who carry one of the HLA phenotypes and who may eventually develop type I DM.)

The pancreatic islets in type II DM retain β cells in ratios to α cells that are not consistently altered, and normal β-cell mass appears to be preserved in most patients. Pancreatic islet amyloid, resulting from a deposition of amylin, is found in a high percentage of type II DM patients at autopsy, but its relationship to the pathogenesis of type II DM is not well established.

Before diabetes develops, patients generally lose the early insulin secretory response to glucose and may secrete relatively large amounts of proinsulin. In established diabetes,

Docket No. (-06-349
A. Ex. 20
Page 2 of 13

although fasting plasma insulin levels may be normal or even increased in type II DM patients, glucose-stimulated insulin secretion is clearly decreased. The decreased insulin levels reduce insulin-mediated glucose uptake and fail to restrain hepatic glucose production.

Hyperglycemia may not only be a consequence but also a cause of further impairment in glucose tolerance in the diabetic patient (**glucose toxicity**) because hyperglycemia decreases insulin sensitivity and increases hepatic glucose production. Once a patient's metabolic control improves, the insulin or hypoglycemic drug dose is usually lowered.

Some cases of type II DM occur in young, nonobese adolescents (**maturity-onset diabetes of the young [MODY]**) with an autosomal dominant inheritance. Many families with MODY have a mutation in the glucokinase gene. Impairments in insulin secretion and in hepatic glucose regulation have been demonstrated in these patients.

**Insulinopathies:** Rare cases of DM, with the clinical characteristics of type II DM, result from the heterozygous inheritance of a defective gene, leading to secretion of insulin that does not bind normally to the insulin receptor. These patients have greatly elevated plasma immunoreactive insulin levels associated with normal plasma glucose responses to exogenous insulin.

**Diabetes attributed to pancreatic disease:** Chronic pancreatitis, particularly in alcoholics, is frequently associated with diabetes. Such patients lose both insulin-secreting and glucagon-secreting islets. Therefore, they may be mildly hyperglycemic and sensitive to low doses of insulin. Given the lack of effective counterregulation (exogenous insulin that is unopposed by glucagon), they frequently suffer from rapid onset of hypoglycemia. In Asia, Africa, and the Caribbean, DM is commonly observed in young, severely malnourished patients with severe protein deficiency and pancreatic disease; these patients are not DKA-prone but may require insulin.

**Diabetes associated with other endocrine diseases:** Type II DM can be secondary to Cushing's syndrome, acromegaly, pheochromocytoma, glucagonoma, primary aldosteronism, or somatostatinoma. Most of these disorders are associated with peripheral or hepatic insulin resistance. Many patients will become diabetic once insulin secretion is also decreased. The prevalence of type I DM is increased in patients with certain autoimmune endocrine diseases, eg, Graves' disease, Hashimoto's thyroiditis, and idiopathic Addison's disease.

**Insulin-resistant diabetes associated with acanthosis nigricans (type A and type B insulin resistance syndromes):** Two rare syndromes result from marked insulin resistance at the insulin receptor level associated with acanthosis nigricans. Acanthosis nigricans is a velvety hyperpigmentation on the neck (see Plate 13-1 and Plate 13-2), axillae, and groin and is probably the skin manifestation of severe and chronic hyperinsulinemia. Type A results from genetic alterations in the insulin receptor. Type B results from circulating antibodies to the insulin receptor and may be associated with other evidence of autoimmune disease.

**Lipoatrophic diabetes:** This is a rare syndrome in which insulin-resistant DM is associated with an extensive symmetric or virtually complete disappearance of subcutaneous adipose tissue. It has been linked to genetic alterations in the insulin receptor

**Diabetes induced by β-cell toxins:** Vacor, a rodenticide commonly used in Korea in suicide attempts, is cytotoxic for human islets and can cause type I DM in survivors. Streptozocin can induce experimental diabetes in rats but rarely causes diabetes in humans.

## Symptoms and Signs

DM has diverse initial presentations. Type I DM usually presents with symptomatic hyperglycemia or DKA. Type II DM may present with symptomatic hyperglycemia or NKHHC, but is frequently diagnosed in asymptomatic patients during a routine medical examination or when patients present with clinical manifestations of a late complication.

Often following the acute onset of type I DM, there is substantial secretion of insulin. Type I DM patients may experience a honeymoon period characterized by a long phase of near-normal glucose levels without any treatment.

**Symptomatic hyperglycemia:** Polyuria followed by polydipsia and weight loss occur when elevated plasma glucose levels cause marked glucosuria and an osmotic diuresis, resulting in dehydration. Hyperglycemia may also cause blurred vision, fatigue, and nausea and lead to various fungal and bacterial infections. In type II DM, symptomatic hyperglycemia may persist for days or weeks before medical attention is sought; in women type II DM with symptomatic hyperglycemia is frequently associated with itching due to vaginal candidiasis.

**Late complications:** Late complications occur after several years of poorly controlled hyperglycemia. Glucose levels are increased in all cells except where there is insulin-mediated glucose uptake (mainly muscle), resulting in an increase in glycolysation and in the activity of other metabolic pathways, which may be caused by complications. Most microvascular complications can be delayed, prevented, or even reversed by tight glycemic control, ie, achieving near-normal fasting and postprandial glucose levels, reflected by near-normal glycosylated hemoglobin (Hb $A_{1c}$). Macrovascular disease such as atherosclerosis may lead to symptomatic coronary artery disease, claudication, skin breakdown, and infections. Although hyperglycemia may accelerate atherosclerosis, many years of hyperinsulinemia preceding the onset of diabetes (with insulin resistance) may play a major initiating role. Amputation of a lower limb for severe peripheral vascular disease, intermittent claudication, and gangrene remains common. Background **retinopathy** (the initial retinal changes seen on ophthalmoscopic examination or in retinal photographs) does not significantly alter vision, but it can progress to macular edema or proliferative retinopathy with retinal detachment or hemorrhage, which can cause blindness. About 85% of all diabetics eventually develop some degree of retinopathy (see Diabetic Retinopathy in Ch. 99).

Diabetic **nephropathy** develops in about one third of type I DM patients and in a smaller percentage of type II DM patients. In patients with type I DM, GFR may be increased initially with hyperglycemia. After about 5 yr of type I DM, clinically detectable albuminuria (>= 300 mg/L), which is unexplained by other urinary tract disease, may develop. Albuminuria signals a progressive decrease in GFR with a high likelihood of development of end-stage renal disease within 3 to 20 yr (median, 10 yr). Albuminuria is almost 2.5 times higher in type I DM patients with diastolic BP > 90 mm Hg than in those with diastolic BP < 70 mm Hg. Thus, both hyperglycemia and hypertension accelerate the progression to end-stage renal disease. Diabetic nephropathy is usually asymptomatic until end-stage renal disease develops, but it can cause the nephrotic syndrome. Albuminuria and renal disease may be prevented or delayed with the ACE inhibitor captopril. While aggressive treatment of hypertension prevents the deterioration of renal function, ACE inhibitors have shown added benefits over other classes of antihypertensives. In fact, ACE inhibitors prevent proteinurea in hypertensive and nonhypertensive diabetics. Recent evidence suggests that ACE inhibitors also help prevent retinopathy.

Docket No. C-06-349
A. Ex. 20
Page 4 of 13

Diabetic neuropathy commonly occurs as a distal, symmetric, predominantly sensory **polyneuropathy** that causes sensory deficits, which begin with and are usually most marked by a stocking-glove distribution. Diabetic polyneuropathy may cause numbness, tingling, and paresthesias in the extremities and, less often, debilitating, severe, deep-seated pain and hyperesthesias. Ankle jerks are usually decreased or absent. Other causes of polyneuropathy must be excluded (see Ch. 183). Acute, painful **mononeuropathies** affecting the 3rd, 4th, or 6th cranial nerve as well as other nerves, such as the femoral, may spontaneously improve over weeks to months, occur more frequently in older diabetics, and are attributed to nerve infarctions. **Autonomic neuropathy** occurs primarily in diabetics with polyneuropathy and can cause postural hypotension, disordered sweating, impotence and retrograde ejaculation in men, impaired bladder function, delayed gastric emptying (sometimes with dumping syndrome), esophageal dysfunction, constipation or diarrhea, and nocturnal diarrhea. A decrease in heart rate response to the Valsalva maneuver or on standing and unchanged heart rate variation during deep breathing are evidence of autonomic neuropathy in diabetics.

**Foot ulcers and joint problems** are important causes of morbidity in DM. The major predisposing cause is diabetic polyneuropathy--the sensory denervation impairs the perception of trauma from such common causes as ill-fitting shoes or pebbles. Alterations in proprioception lead to an abnormal pattern of weight bearing and sometimes to the development of Charcot's joints.

The risk of **infection** from fungi and bacteria is increased because of decreased cellular immunity caused by acute hyperglycemia and circulatory deficits caused by chronic hyperglycemia. Peripheral skin infections and oral and vaginal thrush are most common. A mycotic infection may be the initial process, leading to wet interdigital lesions, cracks, fissures, and ulcerations that favor secondary bacterial invasion. Patients with infected foot ulcers frequently feel no pain because of neuropathy and have no systemic symptoms until late in a neglected course. Deep ulcers and particularly those associated with any detectable cellulitis require immediate hospitalization, since systemic toxicity and permanent disability may develop. Osteomyelitis should be ruled out by bone scan. Early surgical debridement is an essential part of management, but amputation is sometimes necessary.

## Diagnosis

In asymptomatic patients, DM is established when the diagnostic criterion for fasting hyperglycemia recommended by the National Diabetes Data Group (NDDG) is met: a plasma (or serum) glucose level of >= 140 mg/dL (>= 7.77 mmol/L) after an overnight fast on two occasions in an adult or child. Recently, the American Diabetes Association recommended that fasting plasma glucose levels of > 126 mg/dL ( > 6.99 mmol/L) be considered diagnostic for DM.

An **oral glucose tolerance test** (OGTT) may be helpful in diagnosing type II DM in patients whose fasting glucose is between 115 and 140 mg/dL (6.38 and 7.77 mmol/L) and in those with a clinical condition that might be related to undiagnosed DM (eg, polyneuropathy, retinopathy). However, various conditions other than DM, such as effects of drugs, and normal aging can cause abnormalities in the OGTT.

The NDDG also recommends criteria for the diagnosis of **impaired glucose tolerance** in patients who do not meet the OGTT diagnostic criteria for DM. Patients with impaired glucose tolerance may be at increased risk of developing fasting or symptomatic hyperglycemia, but in many patients the condition does not progress or it resolves. The diagnostic criteria of the NDDG are shown in Table 13-2.

## Treatment

**General considerations:** The IDDM Diabetes Control and Complications Trial (DCCT proved that hyperglycemia is responsible for most of the long-term microvascular complications of diabetes. It demonstrated a linear relationship between the levels of Hb $A_{1c}$ (see <u>below</u>) and the rate at which complications developed. Other studies have suggested that Hb $A_{1c} < 8\%$ is a threshold below which most complications can be prevented. Thus, therapy for type I DM should try to intensify metabolic control to lower Hb $A_{1c}$ while avoiding hypoglycemic episodes. However, treatment must be individualized and should be modified when circumstances make any risk of hypoglycemia unacceptable (eg, in patients with a short life expectancy and in those with cerebrovascular or cardiac disease) or when the patient's risk of hypoglycemia is increased (eg, in patients who are unreliable or who have autonomic neuropathy).

**Diet** to achieve weight reduction is most important in overweight patients with type II DM. If improvement in hyperglycemia is not achieved by diet, trial with an oral drug should be started.

**Patient education,** together with diet and exercise, is essential to ensure the effectiveness of the prescribed therapy, to recognize indications for seeking immediate medical attention and to ensure appropriate foot care. **On each physician visit,** the patient should be assessed for symptoms or signs of complications, including a check of feet and pulses and sensation in the feet and legs, and a urine test for albumin. Periodic laboratory evaluation includes lipid profile, BUN and serum creatinine levels, ECG, and an annual complete ophthalmologic evaluation (see <u>Diabetic Retinopathy</u> in Ch. 99).

Because diabetics are at increased risk of acute renal failure, x-ray studies that require IV injection of contrast dyes should be performed only when absolutely necessary and only when the patient is well hydrated.

Hypercholesterolemia or hypertension increases the risks for specific late complications and requires special attention and appropriate treatment (see <u>Chs. 15</u> and <u>199</u>). Although β-blockers (eg, propranolol) can be used safely in most diabetics, they can mask the β-adrenergic symptoms of insulin-induced hypoglycemia and can impair the normal counterregulatory response. Thus, ACE inhibitors and calcium antagonists are often the drugs of choice.

**Plasma glucose monitoring:** All patients should learn self-monitoring of glucose, and insulin-treated patients should be taught to adjust their insulin doses accordingly. Glucose levels can be tested with easy-to-use home analyzers using a drop of fingertip blood. A spring-powered lancet is recommended to obtain the fingertip blood sample. The frequency of testing is determined individually. Insulin-treated diabetic patients ideally should test their plasma glucose daily before meals, 1 to 2 h after meals, and at bedtime. However, in practice, two to four measurements may be obtained each day at different times, so that an overall assessment can be made after a week or so of treatment.

Most physicians periodically determine **glycosylated hemoglobin (Hb $A_{1c}$)** to estimate plasma glucose control during the preceding 1 to 3 mo. Hb $A_{1c}$ is the stable product of nonenzymatic glycosylation of the β-chain of Hb by plasma glucose and is formed at rates that increase with increasing plasma glucose levels. In most laboratories, the normal Hb $A_{1c}$ level is about 6%; in poorly controlled diabetics, the level ranges from 9 to 12%. Hb

Docket No. C-06-349
A. Ex. 20
Page 6 of 13

$A_{1c}$ is not a specific test for diagnosing diabetes; however, elevated Hb $A_{1c}$ often indicates existing diabetes.

Another test is of the **fructosamine** level. Fructosamine is formed by a chemical reaction o glucose with plasma protein and reflects glucose control in the previous 1 to 3 weeks. Therefore, this assay may show a change in control before Hb $A_{1c}$ and is often helpful when intensive treatment is applied and in short-term clinical trials.

Patients with type I DM should be instructed to **test for urine ketones** with commercially available reagent strips and be advised to test for urine ketones whenever they develop symptoms of a cold, flu, or other intercurrent illness; nausea, vomiting, or abdominal pain; or polyuria; or if they find an unexpectedly high plasma glucose level on self-monitoring. Testing for ketones in all urine samples is recommended for type I DM patients who exhibi persistent, rapid, and marked fluctuations in their degree of hyperglycemia.

**Insulin:** Human insulin is often preferred in initiating insulin treatment because it is less antigenic than animal-derived varieties (see also the discussion of insulin resistance, below). However, detectable insulin antibody levels, usually very low, develop in most insulin-treated patients, including those receiving human insulin preparations.

Insulin is routinely provided in preparations containing 100 U/mL (U-100 insulin) and is injected subcutaneously with disposable insulin syringes. The 1/2-mL syringes are generally preferred by patients who routinely inject doses of <= 50 U, because they can be read more easily and facilitate the accurate measurement of smaller doses. A multiple-dose insulin injection device (NovolinPen), commonly referred to as an insulin pen, is designed to use a cartridge containing several days' dosage. Insulin should be refrigerated *but never frozen;* however, most insulin preparations are stable at room temperature for months, which facilitates their use at work and when traveling.

Insulin preparations are classified as short-acting (rapid-acting), intermediate-acting, or long-acting. The usual onset of action, time of peak action, and duration of action of the most commonly used preparations are listed in Table 13-3; *these data should be used only as rough guidelines,* because there is considerable variation among individuals and with different doses of the same preparation in the same patient. The critical determinant of the onset and duration of action of an insulin preparation is the rate of insulin absorption from the injection site.

Rapid-acting insulins include regular insulin, which is a preparation of zinc insulin crystals in a suspending solution; regular insulin is the only insulin preparation that can be given IV Lispro, a form of regular insulin that is genetically engineered with a substitute of one amino acid, provides more rapid absorption of insulin and therefore may be administered with food. Semilente insulin is a slightly slower rapid-acting insulin, containing zinc insulin microcrystals in an acetate buffer. Intermediate-acting insulin includes neutral protamine Hagedorn, which contains a stoichiometric mixture of regular and protamine zinc insulin, and Lente, which contains 30% Semilente insulin and 70% Ultralente insulin in an acetate buffer. Long-acting protamine zinc insulin contains insulin that is negatively charged, combined with an excess of positively charged fish sperm protamine. Ultralente contains large zinc insulin crystals in an acetate buffer.

**Mixtures of insulin preparations** with different onsets and durations of action are frequently given in a single injection by drawing measured doses of two preparations into the same syringe immediately before use. The manufacturers recommend that Semilente be mixed only with Lente or Ultralente to maintain the same buffer solution. However,

individual doses of regular insulin and neutral protamine Hagedorn or Lente insulin are commonly drawn up into the same syringe to combine rapid- and intermediate-acting insulin in a single injection. A preparation that contains a mixture of 70% neutral protamine Hagedorn and 30% regular human semisynthetic insulin (Novolin 70/30 or Humulin 70/30) is also available, but its fixed ratio of intermediate- to rapid-acting insulin may restrict its use. *Protamine zinc insulin must always be injected separately,* because it contains an excess of protamine.

***Initiation of insulin therapy in adults:*** In DCCT, type I DM patients received an average total dose of about 40 U insulin a day. Because type II DM patients are insulin resistant, they require more insulin. Thus, those who are severely hyperglycemic and obese may be started on about 40 U insulin a day. The initial total daily dose may be divided so that 1/2 will be administered before breakfast, 1/4 before dinner, and 1/4 at bedtime. Because of severe insulin resistance, type II DM patients may need twice that much and often more. After the initial dose is selected, adjustments in the amounts, types, and timing are made based on plasma glucose determinations. The dose is adjusted to maintain preprandial plasma glucose between 80 and 150 mg/dL (4.44 and 8.33 mmol/L). Increments in insulin dose are generally restricted to 10% at a time, and the effects are assessed over about 3 days before any further increment is made. More rapid adjustments o regular insulin are indicated if hypoglycemia threatens.

***Initiation of insulin therapy in children:*** Children who present at an early stage of type I DM with moderate hyperglycemia but without ketonuria or acidosis may be started with a single daily subcutaneous injection of 0.3 to 0.5 U/kg of intermediate-acting insulin alone. Children who present with both hyperglycemia and ketonuria but who are not acidotic or dehydrated may be started on 0.5 to 0.7 U/kg of intermediate-acting insulin and then supplemented by subcutaneous injections of 0.1 U/kg of regular insulin at 4- to 6-h intervals. Insulin doses are usually adjusted to maintain preprandial plasma glucose levels between 80 and 150 mg/dL (4.44 and 8.33 mmol/L) or sometimes between 80 and 120 mg/dL (4.44 and 6.66 mmol/L).

***Insulin schedules:*** The goal of insulin therapy is to control hyperglycemic surges after meals and to provide baseline levels that support normal glucose metabolism. Regimens must always be individualized, and some diabetics will achieve tight control with highly idiosyncratic schedules. However, the approach should include:

1. **Bedtime intermediate-acting insulin.** This helps control nocturnal hepatic glucose production. Starting the day with lower morning glucose levels will improve glucose tolerance throughout the day. Bedtime insulin is associated with less weight gain than is daytime insulin alone. Bedtime insulin is also a reasonable way to initiate insulin therapy in type II DM patients who are not controlled by oral drugs alone.
2. **Before-breakfast mixed insulin.** This often is accomplished with a mixture of about 30% short-acting and 70% intermediate-acting insulin. Most diabetic patients will need about half the daily insulin dose before breakfast.
3. **Before-lunch-and-dinner regular insulin.** For tight control, supplemental rapid-acting insulin should be taken before meals. The dose should be taken 15 to 30 min before a meal for regular or Semilente and with a meal for Lispro.

***Multiple subcutaneous insulin injections:*** These are designed to maintain normal or near-normal plasma glucose levels throughout the day in patients with type I DM. Such treatment may increase the risks for frequent and severe episodes of hypoglycemia. Patients should be highly motivated, well educated in DM, informed of the risks and uncertain benefits, competent in self-monitoring of glucose, and under the supervision of a physician experienced in its use. In a typical multiple subcutaneous insulin injection regimen, about

Docket No. C-06-349
A. Ex. 20
Page 8 of 13

25% of the total daily dose is given as intermediate-acting insulin at bedtime, with additional doses of rapid-acting insulin given before each meal (a four-dose regimen). Type I DM patients may require intermediate- or long-acting insulin in the morning to give coverage throughout the day. The patient adjusts daily dosage on the basis of self-monitoring of glucose before each meal and at bedtime; the plasma glucose level between 2 and 4 am is assessed at least once/wk.

**Continuous subcutaneous insulin infusion:** This mode of intensive insulin treatment in patients with type I DM involves a small battery-powered infusion pump that provides a continuous subcutaneous infusion of rapid-acting insulin through a small needle usually inserted in the abdominal wall. The pump is programmed to infuse a selected basal rate of insulin, supplemented by manually triggered or programmed increased rates before each meal. The patient measures glucose levels several times a day to adjust the dosage. Control obtainable with this method is superior to that obtained with multiple injections. Hypoglycemic episodes are common with pump therapy, especially during the establishment of metabolic control. However, once metabolic control is established, pumps are not associated with more hypoglycemia than are multiple injections. Experimental pump implants and intraperitoneal deliveries of insulin to the portal system may prove superior. However, the indwelling needle increases the risk of infections at needle sites.

**Insulin treatment of brittle diabetes:** Brittle diabetics are type I DM patients who exhibit frequent, rapid swings in glucose levels without apparent cause.

Brittle diabetes is most common in patients with no residual insulin secretory capacity. The metabolic processes through which insulin affects the plasma levels of glucose, albumin-bound free fatty acids, and ketones are normally regulated by shifts in the balance between the effects of insulin and the opposing effects of glucagon (in the liver) and the adrenergic autonomic nervous system. These counterregulatory mechanisms are independently regulated and normally increased during fasting, exercise, and other conditions that require protection against hypoglycemia. Insulin doses must be adequate to deal with a sudden increase in counterregulatory mechanisms and to prevent rapidly developing symptomatic hyperglycemia and hyperketonemia, but this frequently produces transient plasma insulin excess.

Many of these patients improve when switched to a modified multiple subcutaneous insulin regimen that provides most of the daily insulin as rapid-acting insulin in daily adjusted dosages before each meal, with some intermediate-acting insulin in the morning, before the evening meal, or at bedtime. The aim is not to maintain the diurnal plasma glucose level in a near-normal range but to stabilize the fluctuations in a range that prevents symptomatic hyper- and hypoglycemia.

**Complications of insulin treatment: Hypoglycemia** (see below) may occur because of an error in insulin dosage, a small or missed meal, or unplanned exercise (patients are usually instructed to reduce their insulin dose or to increase their carbohydrate intake befor planned exercise) or without apparent cause. Patients are taught to recognize symptoms of hypoglycemia, which usually respond rapidly to the ingestion of sugar. All diabetics should carry candy, lumps of sugar, or glucose tablets. An identification card, bracelet, or necklace indicating that the patient is an insulin-treated diabetic aids in recognizing hypoglycemia in emergencies. Close family members should be instructed to administer glucagon with an easy-to-use injection device. Emergency medical personnel, after confirming the hypoglycemia with a glucostick, should initiate therapy with a rapid bolus injection of 25 mL of 50% glucose solution followed by a continuous IV infusion of glucose.

The **dawn phenomenon** refers to the normal tendency of the plasma glucose to rise in the

A. Ex. 20
Page 9 of 13
Docket No. C-06-349

early morning hours before breakfast, which is frequently exaggerated in patients with type I DM and in some patients with type II DM. Fasting glucose levels rise because of an increase in hepatic glucose production, which may be secondary to the midnight surge of growth hormone. In some patients with type I DM, nocturnal hypoglycemia may be followed by a marked increase in fasting plasma glucose with an increase in plasma ketone (**Somogyi phenomenon**). Thus, both the dawn and Somogyi phenomena are characterized by morning hyperglycemia, but the latter is due to rebound (counterregulation) hyperglycemia. The frequency with which the latter phenomenon actually occurs is disputed. When it is suspected, the patient should wake between 2 and 4 am to monitor blood glucose levels. If intermediate insulin is administered at bedtime, the dawn and Somogyi phenomena can often be prevented.

**Local allergic reactions** at the site of insulin injections are less common with purified porcine and human insulins. These reactions can produce immediate pain and burning, followed after several hours by local erythema, pruritus, and induration, the latter sometimes persisting for days. Most reactions spontaneously disappear after weeks of continued insulin injection and require no specific treatment, although antihistamines are sometimes used.

**Generalized insulin allergy** (usually to the insulin molecule) is rare but can occur when treatment is discontinued and restarted after a lapse of months or years. Such reactions may occur with any type of insulin, including human biosynthetic insulin. Symptoms usually develop shortly after an injection and may include urticaria, angioedema, pruritus, bronchospasm, and, in some cases, circulatory collapse. Treatment with antihistamines may suffice, but epinephrine and IV glucocorticoids may be required. If continued insulin treatment is required after the condition stabilizes, skin testing with a panel of purified insulin preparations and desensitization should be performed by an experienced physician.

**Insulin resistance** is an increase in insulin requirement to >= 200 U/day and is associated with marked increases in the plasma insulin-binding capacity. Most patients treated with insulin for >= 6 mo develop antibodies to insulin. The relative antigenicity of purified insulin preparations is bovine > porcine > human, but genetic factors also affect individual response. Circulating insulin-binding antibodies can modify the pharmacokinetics of free insulin, but treatment usually is not adversely affected. In patients with insulin resistance, switching to purified porcine or human insulin may lower the requirement. Remission may be spontaneous or may be induced in some type II DM patients who can stop insulin treatment for 1 to 3 mo. Prednisone may decrease insulin requirements within 2 wk; treatment is usually initiated with about 30 mg bid and is tapered as the requirements decrease.

**Local fat atrophy or hypertrophy** at injection sites is relatively rare and usually improves by switching to human insulin and injecting it directly into the affected area. No specific treatment of local fat hypertrophy is required, but injection sites should be rotated.

**Oral antidiabetic drugs:** These drugs are used for type II DM but not for type I DM because they cannot prevent symptomatic hyperglycemia or DKA in such patients. Oral hypoglycemic drugs are the sulfonylureas. Oral antihyperglycemic drugs are the biguanides, the α-glucosidase inhibitors, and the insulin sensitizers (thiazolidinediones ["glitazones"]). Characteristics of the oral antidiabetic drugs are shown in Table 13-4.

*Sulfonylureas:* The sulfonylureas lower plasma glucose primarily by stimulating insulin secretion. Secondary effects on improving peripheral and hepatic insulin sensitivity may be due to the decrease in both glucose toxicity and insulin clearance. Sulfonylureas differ in potency and duration of action (see Table 13-4). All of the sulfonylureas are metabolized in

Docket No. C-06-349
A. Ex. 20
Page 10 of 13

the liver, but only tolbutamide and tolazamide are inactivated exclusively by the liver. About 30% of chlorpropamide is normally excreted in the urine, and the principal hepatic metabolite of acetohexamide is highly active and excreted in urine; both drugs carry an increased risk of prolonged hypoglycemia in patients with impaired renal function and in the elderly. The 2nd-generation sulfonylureas (such as glipizide and glyburide) are about 100 times more potent than the 1st-generation ones, are absorbed rapidly, and are metabolized mainly in the liver. Clinically, the 2nd-generation sulfonylureas are similar in effectiveness.

**Allergic reactions and other side effects** (eg, cholestatic jaundice) are relatively uncommon. Acetohexamide may be used in patients who are allergic to other sulfonylureas Chlorpropamide and acetohexamide should not be used in patients with impaired renal function. In addition, chlorpropamide should not be used in elderly patients, because it can potentiate the action of antidiuretic hormone, often leading to hyponatremia and a deterioration in mental status, which in an elderly patient may often not be recognized as a drug-induced effect.

**For the initial treatment,** many authorities prefer the shorter-acting sulfonylureas, and most do not recommend using a combination of different sulfonylureas. Treatment is started with a low dose, which is adjusted after several days until a satisfactory response is obtained or the maximum recommended dosage is reached. About 10 to 20% of patients fail to respond to a trial of treatment (primary failures), and patients who fail to respond to one sulfonylurea often fail to respond to others. Of patients who initially respond, 5 to 10% per year experience secondary failures. In such cases, insulin may be added to sulfonylurea treatment.

Hypoglycemia is the most important complication of sulfonylurea treatment. Hypoglycemi can occur in patients treated with any of the sulfonylureas but occurs most frequently with long-acting ones (glyburide, chlorpropamide). Sulfonylurea-induced hypoglycemia can be severe and may last or recur for days after treatment is stopped, even when it occurs in patients treated with tolbutamide, whose usual duration of action is 6 to 12 h. A mortality rate of 4.3% in patients hospitalized with sulfonylurea-induced hypoglycemia has been reported recently. Therefore, all sulfonylurea-treated patients who develop hypoglycemia should be hospitalized, because even if they respond rapidly to initial treatment for hypoglycemia, they must be closely monitored for 2 to 3 days. Most of these patients may not require further treatment with sulfonylureas.

***Antihyperglycemic drugs:*** Metformin (a **biguanide**) has been used as primary therapy in type II DM patients for over 30 years in most of the world. It has been recently approved for use in the USA. It acts by decreasing hepatic glucose production and may improve insulin sensitivity in those who lose weight. It is as effective as a sulfonylurea as monotherapy (when used alone it rarely causes hypoglycemia) and is synergistic in combination with sulfonylurea therapy. Metformin also promotes weight loss and decreases lipid levels. Unlike phenformin, metformin rarely causes severe lactic acidosis. GI side effects are common, but often transient, and may be prevented if the drug is taken with meals and if the dosage is gradually increased (by 500 mg/wk up to 2.5 g). Metformin is contraindicated in patients with kidney and liver diseases or alcoholism. It is also contraindicated in patients with lactic acidosis and should be withheld during acute hospitalization in most patients.

Acarbose is an **α-glucosidase inhibitor** that competitively inhibits hydrolysis of oligo- and monosaccharides. This delays carbohydrate digestion in the small intestine and subsequent absorption, resulting in less postprandial elevation of blood glucose levels. Because its mechanism of action differs from that of other oral hypoglycemics, it can be used in

Docket No. C-06-349
A. Ex. 20

combination therapy with other oral agents. GI side effects are very common, but often transient. The drug must be taken with meals, and the dosage should be gradually increased from 25 mg up to 50 to 100 mg with each meal.

**Thiazolidinediones** are the insulin-sensitizer drugs that improve insulin sensitivity in skeletal muscle and suppress hepatic glucose output. The only such drug available in the USA is troglitazone. It has been recently approved for use in the treatment of type II DM patients requiring insulin and has moderate effects on decreasing plasma glucose and triglyceride levels. This drug is administered once a day and has potentially idiosyncratic hepatotoxicity. Patients should be instructed to decrease their daily insulin dosage with the initiation of therapy.

**Diet management:** In **insulin-treated diabetics,** diet management aims to restrict variations in the timing, size, or composition of meals, which could make the prescribed insulin regimen inappropriate and result in hypoglycemia or marked postprandial hyperglycemia. All insulin-treated patients require detailed diet management, including a prescription for their total daily caloric intake; guidelines for proportions of carbohydrate, fat, and protein in their diets; and instruction on distributing calories among individual meals and snacks. A professional dietitian can tailor the diet plan and education to meet the patient's individual needs. Flexibility, however, helps maintain patient motivation.

Publications are available from the American Diabetes Association and other sources for diet planning and patient education. Exchange lists providing information on the carbohydrate, protein, fat, and caloric contents of individual servings are used to translate the dietary prescription into a diet plan, which should contain foods that the patient likes to eat, provided there is no specific reason to exclude a particular food. Foods with similar exchange values (ie, similar calories and contents of carbohydrate, protein, and fat) may have different effects on postprandial hyperglycemia in any individual diabetic. However, exchange lists are helpful in reducing the variation in the size and composition of the patient's usual breakfasts, lunches, dinners, and snacks.

In **obese type II DM patients,** the aims of diet management are losing weight and controlling hyperglycemia. The diet should meet the patient's minimum daily protein requirement (0.9 g/kg) and be designed to induce a gradual and sustained weight loss (abou 2 lb/wk) until ideal body weight is approached and maintained. A dietitian can assist in developing a diet that the patient will follow. Increased physical activity in sedentary obese type II DM patients is valuable and may decrease insulin resistance over time. Diabetics with hypertension should be treated with ACE inhibitors, which have been shown to be more protective against coronary artery disease than Ca channel blockers.

**Management of diabetics during hospitalization:** Diabetic patients admitted to hospitals commonly have coexisting illnesses that aggravate hyperglycemia, such as an infection or coronary artery disease. Bed rest and a regular diet may also aggravate hyperglycemia. Conversely, if the patient is anorectic or vomits, or if food intake is reduced, continuation of drugs may cause hypoglycemia. The popular insulin coverage with a sliding scale for insulin administration should not be the only intervention, because it is reactive rather than proactive in correcting hyperglycemia. It may also be inappropriately used when hyperglycemia reflects hepatic gluconeogenesis in response to previously uncorrected hypoglycemia.

Hospitalized type II DM patients often do well without any change in drugs. Hypoglycemic drugs may be discontinued during an acute condition associated with decreased food intake or one that has a tendency to cause hypoglycemia. Insulin may be added if plasma glucose levels remain high.

Docket No. C-06-349
A. Ex. 20
Page 12 of 13

In type I DM patients, intermediate (NPH or Lente) insulin should be continued at 50 to 70% of the daily dose divided bid or tid. Supplemental regular insulin can be given on a sliding scale. In patients receiving total or partial parenteral nutrition, hyperglycemia may be treated with a continuous IV infusion of insulin or divided doses of intermediate-acting insulin. Blood glucose should be measured four times a day before meals.

**Management of diabetics during surgical procedures:** Surgical procedures (including the prior emotional stress, the effects of general anesthesia, and the trauma of the procedure) can markedly increase plasma glucose in diabetics and induce DKA in type I DM patients. In patients who normally take one or two daily injections of insulin, 1/3 to 1/2 of the usual morning dose can be given in the morning before the operation and an IV infusion of 5% glucose in either 0.9% sodium chloride solution or water at a rate of 1 L (50 g of glucose) over 6 to 8 h started. After the operation, the plasma glucose and the plasma reaction for ketones are checked. Unless a change in dosage is indicated, the preoperative dose of insulin is repeated when the patient has recovered from the anesthesia and the glucose infusion is continued. Plasma glucose and ketones are monitored at 2- to 4-h intervals, and regular insulin is given q 4 to 6 h as needed to maintain the plasma glucose level between 100 and 250 mg/dL (5.55 and 13.88 mmol/L). This is continued until the patient can be switched to oral feedings and a one- or two-dose insulin schedule.

Some physicians prefer to withhold subcutaneous insulin on the day of the operation and to add 6 to 10 U of regular insulin to 1 L of 5% glucose in 0.9% sodium chloride solution or water infused initially at 150 mL/h on the morning of the operation based on the plasma glucose level. This is continued through recovery, with insulin adjusted based on the plasma glucose levels obtained in the recovery room and at 2- to 4-h intervals thereafter.

Insulin is not required for diabetics who have maintained a satisfactory plasma glucose level by diet alone or in combination with a sulfonylurea before the operation. Sulfonylureas should be withheld 2 to 4 days before the operation, and plasma glucose levels should be measured pre- and postoperatively and q 6 h while patients receive IV fluids.

Back to top of page

CONTACT MERCK  |  SITE MAP  |  ⊘ PRIVACY POLICY  |  TERMS OF USE  |  COPYRIGHT © 1995-2006 MERCK & CO., INC.

Docket No. C-06-349
A. Ex. 20
Page 13 of 13

# Managing
# Diabetes
## in the Long-Term Care Setting

CLINICAL PRACTICE GUIDELINE

**amda**
American Medical Directors Association

Docket No. C-06-349
A. Ex. 21
Page 1 of 54

Panel Members:

Naushira Pandya, MD, CMD, Chair
*Harlan Martin, RPH, CCP, FASCP, Co-Chair
Paul Block, LCSW-C
Kristen Graves, CNT, TMA
E. Coy Irvin, MD
Barbara Kopelman, R.Ph
Jay LeBow, DPM
Lin Nyce, RD
Ann O'Malley, GNP
Carolyn D. Philpot, MSN, CS, GNP
Roger A. Shewmake, Ph.D., L.N.
Deborah Vincent, RN, DON

*Steering Committee Member

AMDA Staff:
Jacqueline Vance, RNC, CPG Project Manager, Director of Clinical Affairs

This clinical practice guideline is provided for discussion and
educational purposes only and should not be used or in any way
relied upon without consultation with and supervision of a qual-
ified physician based on the case history and medical condition
of a particular patient. The American Medical Directors Associa-
tion, its heirs, executors, administrators, successors, and assigns
hereby disclaim any and all liability for damages of whatever
kind resulting from the use, negligent or otherwise, of this clini-
cal practice guideline.

For more information about the AMDA guidelines or to order copies
of these clinical practice guidelines, call 800/876-2632 or 410/740-
9743 or visit our web site at www.amda.com.

KREIN

# Preface

This clinical practice guideline has been developed and revised under a project conducted by the American Medical Directors Association (AMDA), the national professional organization representing attending physicians and medical directors who care for patients in the long-term care setting. This is one of a number of guidelines undertaken as part of the association's mission to improve the quality of care delivered to patients in these settings.

Original guidelines are developed by interdisciplinary workgroups, using a process that combines evidence and consensus-based thinking. Workgroups are composed of practitioners and others involved in patient care in long-term care institutions. Beginning with a general guideline developed by an agency, association, or organization such as the Agency for Healthcare Research and Quality (AHRQ), pertinent articles and information, and a draft outline, each group works to make a concise, user-friendly guideline that is tailored to the long-term care setting. Because scientific research in the long-term care population is scarce, many recommendations are based on the expert opinion of practitioners in the field.

Revisions of guidelines are completed under the direction of the Clinical Practice Guideline Steering Committee. The committee incorporates information published in peer-reviewed journals after the original guidelines appeared, as well as comments and recommendations not only from experts in the field addressed by the guideline but also from "hands-on" long-term care practitioners.

## Purpose

AMDA seeks to develop and revise guidelines that focus on specific concerns in the long-term care setting and that are applicable to the interdisciplinary care team. Although AHRQ and other agencies, organizations, and associations have developed a number of guidelines for conditions that occur in nursing facility patients, many of



Docket No. C-06-349
A. Ex. 21
Page 3 of 54

these guidelines omit considerations that are unique to this patient population. In addition, many nursing facility staff requested guidelines that were more process oriented and could be used to define roles and responsibilities of appropriate care staff.

These clinical practice guidelines are tools to guide care decisions. They should be used in conjunction with information recorded in the Minimum Data Set and relevant Resident Assessment Protocols (RAPs). Guidelines are concise documents that are intended to be useful to and useable by most nursing facilities. A bibliography is provided for individuals who desire more detailed information.

Guidelines and their revisions are meant to be used in consultation with the members of the interdisciplinary care team and in a manner appropriate to the population and practice of a particular facility. Implementation of guidelines will be affected by resources available in the facility, including staffing, and will require the involvement of all those in the facility who have a role in patient care. In addition, those responsible for implementation should identify operational areas within the facility that would be affected by the guideline's implementation and should seek input from staff and managers in those areas on the development of other relevant facility-specific protocols, policies, and procedures.

### Audience

This guideline is intended to guide the members of the interdisciplinary and direct care team in long-term care facilities, including the medical director, director of nursing, physicians, nursing staff, consultant pharmacist, and other professionals such as therapists, social workers, dietitians, and nursing assistants who care for residents of long-term care facilities.

### Assumptions

Guidelines in the long-term care setting should be consistent with the fundamental OBRA 1987 requirement that each patient achieve the highest practicable level of physical, mental, and psychosocial well-being. Operationally, this requirement means that the nursing facility care team implements systematic processes and practices to (1) reduce each individual patient's risk factors for a number of diseases and conditions and (2) minimize the adverse consequences of the diseases and conditions on the patient's functioning and quality of life.

However, because a substantial proportion of nursing facility patients are at or near the end of life, it will be necessary at some

216



CLINICAL PRACTICE GUIDELINE



point for the team to discuss with the patient or advocate a transition from the rehabilitative or restorative approach to one of palliation or comfort care. Guidelines intended for use in long-term care settings address this transition and provide suggestions for appropriate modification of the patient's care plan.

The typical patient in the long-term institutional care setting is very old and frail and suffers from multiple comorbidities that increase the complexity of diagnosis and treatment and require a careful sorting-out of problems and balancing of choices. When a workup is considered, it is crucial to consider if such a step is appropriate. A workup may not be indicated if the patient has a terminal or end-stage condition, if it would not change the management course, or if the patient or his or her proxy would refuse treatment. Always weigh the effects of the workup on the patient. If the burden of the workup is greater than the potential benefit, the workup may not be appropriate and therefore not indicated.

Long-term care regulations do not require that any possible treatment be undertaken. In reality, the patient's wishes should take precedence and be respected. However, it is most important to carefully document in the patient's medical record the reasons for all decisions not to treat or perform a workup or for choosing one treatment approach over another.

## How to Use These Guidelines

Each guideline includes a narrative portion that covers definition, recognition, assessment, treatment, and monitoring of the condition being addressed. The guideline also includes an algorithm that summarizes the steps involved in addressing the condition. In the algorithm, rectangles signify points where action is to be taken; diamonds indicate points where a decision must be made.

## Terminology

We recognize that people who reside in long-term care facilities are "residents." However, we have used the term "patient(s)" throughout these guidelines because we are addressing individuals within the context of treating a medical condition. When referring to pharmaceutical products, we have avoided the use of brand names and refer to classes of drugs whenever possible.

217

Docket No. C-06-349
A. Ex. 21
Page 5 of 54



Docket No. C-06-349
A. Ex. 21
Page 6 of 54

# Managing Diabetes
## in the Long-Term Care Setting

### Definition

Diabetes mellitus is a chronic metabolic condition characterized by hyperglycemia resulting from defects in insulin action, insulin secretion, or both. Type 2 diabetes, the form most prevalent in long-term care settings, is caused by a combination of resistance to insulin action and the subsequent inability of the pancreas to compensate for this resistance by secreting sufficient insulin. The chronic hyperglycemia of diabetes is associated with multiple organ dysfunction and failure, especially affecting the eyes, kidneys, nerves, heart, feet, and blood vessels.

### INTRODUCTION

Currently about 17 million people in the United States have type 2 diabetes; however, one third (5.9 million) of these people are unaware of this diagnosis. In addition, about 13.4 million have impaired fasting glucose (IFG), a risk factor for the development of diabetes in the future. Each year, 798,000 Americans develop diabetes. The prevalence of diabetes has increased worldwide over the past two decades.

The prevalence of type 2 diabetes increases with age. One third of people aged 60 and over have diabetes, undiagnosed diabetes, or IFG.[1, 2] Among people aged 65 and older, about 16% to 20% have type 2 diabetes. In this guideline, the term *diabetes* refers to type 2 diabetes.

Diabetes causes serious morbidity and mortality from macrovascular and microvascular complications. Heart attacks and strokes occur two to four times more frequently in persons with diabetes



MANAGING DIABETES

Docket No. C-06-349
A. Ex. 21
Page 7 of 54



than in those without the disease.[1] Diabetic retinopathy is the leading cause of blindness in the United States and diabetic nephropathy is the leading cause of end-stage renal failure. Peripheral vascular disease and peripheral neuropathy are major risk factors for foot ulcers and non-traumatic limb amputations. Autonomic neuropathy is responsible for multiple gastrointestinal, urological, and cardiovascular symptoms as well as for sexual dysfunction. Evidence is mounting that diabetes increases the risk of cognitive impairment and dementia.[3,4,5] People with diabetes also are more likely to experience depression, which has been shown to be a major factor in hospital admissions and death.[6,7,8]

Undiagnosed diabetes is a serious condition. Epidemiologic studies suggest that retinopathy begins to develop at least 7 years before the clinical diagnosis of type 2 diabetes is made. Individuals with IFG, impaired glucose tolerance (IGT), or undiagnosed type 2 diabetes are at increased risk for coronary heart disease and stroke.[9] They are also more likely to have dyslipidemia, hypertension, obesity, and microalbuminuria (the metabolic syndrome). The Cooperative Cardiovascular Project, in which 35,000 patients with diabetes participated, revealed that mortality following myocardial infarction (MI) was higher in elderly patients who had diabetes than in those who did not. Elderly patients with diabetes were also less likely to receive aspirin and beta-blockers or undergo revascularization.[10]

It is important to note that there is little information from randomized controlled studies on the benefits of improved glucose control in long-term care populations. Hence, it is difficult to extrapolate conclusions from studies of community-dwelling adults with type 2 diabetes to the frail elderly in long-term care facilities, who generally have shorter life expectancies. In this context, it is extremely important to take patient preferences and values into account when approaching diabetes management.

### Scope of the Problem in the Long-Term Care Setting

Diabetes is common in the long-term care setting. A major American survey found that 18.3% of nursing facility residents had the disease.[11] The United States National Nursing Home Survey estimated in 1997 that 14.5% of nursing facility residents had diabetes.[12] A British survey of 30 nursing facilities revealed a total prevalence of diabetes of 26.7% and a calculated overall prevalence of IGT of 30.2%.[13] There is general agreement that the prevalence of diabetes in nursing facilities is underestimated. Possible reasons for this include inadequate record review, a reliance on self-reporting, and the use of inconsistent methods of identification.



220



Docket No. C-06-349
A. Ex. 21
Page 8 of 54

Diabetes care in the elderly accounts for about 25% of the Medicare budget. The estimated annual cost of treating diabetes and its associated complications in the United States is more than $100 billion annually; 38% of this total is accounted for by hospitalization costs.[14] The cost of caring for patients with diabetes aged 65 and over in nursing facilities is estimated to be $6 billion per year.[15] Diabetes is an independent predictor of nursing facility placement in the elderly.[16] Nursing facility residents who have diabetes are a vulnerable group who experience increased cardiovascular complications, frequent infections (especially of the skin and urinary tract), increased rates of dehydration, hyperosmolar states, hospitalization, and increased physical and cognitive disability.

The prevalence of functional disability and multiple comorbid conditions in the long-term care population increases the complexity of diabetes management. Hyperglycemia impairs cognition and, when untreated, may contribute to further functional decline in patients with dementia. Additionally, hyperglycemia decreases pain thresholds, impairs vision, and may increase the risk for falls.[17]

The hyperosmolar hyperglycemic state (HHS) is a particularly serious complication of type 2 diabetes in older persons that carries a 15% mortality rate. Its prognosis worsens with extreme old age as well as in the presence of coma and hypotension. HHS results from a relative decline in insulin action, elevation of counter-regulatory hormones, increased hepatic and renal glucose output, decrease in glucose utilization, and a parallel rise in serum osmolality. Common precipitating factors are infection, MI, trauma, pancreatitis, certain drugs, new onset of diabetes, and cognitive impairment in a patient who is unable to take fluids independently.

Frail elderly people with diabetes are also at higher risk for hypoglycemia, which when untreated may cause falls or permanent neurological impairment. Symptoms of hypoglycemia are often atypical in the elderly. Residents of long-term care facilities are frequently unable to perceive or communicate hypoglycemic symptoms. Unrecognized hypoglycemic symptoms may be attributed to dementia, psychosis, behavior changes, cardiovascular events, seizures, or other conditions and treated inappropriately.[17,18,19]

### Barriers to Optimal Management of Diabetes in the Long-Term Care Setting

For a variety of reasons, patients with diabetes may not receive optimal care in long-term care facilities. A review of the records of 76,000 elderly nursing facility residents between 1992 and 1996 found that 47% of those who were diagnosed with diabetes were

221



Docket No. C-06-349
A. Ex. 21
Page 9 of 54

**TABLE 1**

**Patient-Specific Issues That Can Affect Diabetes Management**

- Inadequate knowledge of diabetes self-management or belief in its value
- Specific food preferences or cultural practices (e.g., fasting)
- Impaired cognition or dementia
- Frailty and physical impairment
- Multiple coexisting medical conditions
- Undernutrition, anorexia, dysphagia
- Dependence on caregivers for feeding and hydration
- Increased propensity for infections and hyperglycemia
- Increased risk of hypoglycemia
- Presence of severe existing diabetic complications
- Increased risk of adverse drug reactions
- Terminal illness

not receiving any medical therapy. However, the study did not examine the reasons for nontreatment or the quality of diabetes care.[20]

In general, aging, comorbidity, and nursing facility residence appear to be associated with reduced rates of diabetes treatment.[21] The systemic issues listed below may interfere with diabetes management in the long-term care setting. Patient-specific issues (Table 1) and cultural and social barriers, including racial, ethnic, and gender biases, can also hinder appropriate management of diabetes in the long-term care setting.

- Lack of standards or guidelines for optimal management of diabetes in the long-term care setting.
- Pessimism about the care of elderly nursing facility residents with diabetes, characterized by the assumption that worsening complications are inevitable.
- Physicians' ambivalence about the benefits and risks of glycemic control in nursing facility residents with diabetes.
- A relative lack of scientific studies of diabetic patients in long-term care.
- Knowledge deficiencies among direct caregivers regarding current effective approaches to diabetes management (Table 2).
- Knowledge deficiencies among patients and family members regarding diabetes management.
- Insufficient use of diabetes assessment and management protocols in long-term care facilities.



Docket No. C-06-349
A. Ex. 21
Page 10 of 54

## TABLE 2
### Knowledge and Skills Needed by Staff Caring for Patients with Diabetes in the Long-Term Care Setting

+ Risk factors for the development of diabetes
+ Medical nutrition therapy
+ Glucose monitoring
+ Preventive foot care, oral care, and skin care
+ Medical treatment and insulin administration
+ Hypoglycemia detection and treatment
+ Symptoms of hyperglycemia
+ Appreciation of special medical and psychosocial needs
+ Managing diabetes in the context of coexisting conditions

♦ A lack of appropriate involvement by registered dietitians in the care of patients with diabetes.

♦ Insufficient discussion and documentation of individual patient goals and values and dietary and therapeutic preferences.

♦ Inadequate definition of the roles of members of the interdisciplinary care team.

♦ Inadequate metabolic monitoring and review of treatment by the physician.

♦ Inadequate medical records from community physicians or hospitals.

♦ Insufficient structured diabetes education for nursing facility staff, residents, and families.

♦ High staff turnover.

♦ Insufficient appropriate involvement by specialist health care providers (e.g., podiatrists, ophthalmologists, endocrinologists, wound care specialists, psychiatrists, consultant pharmacists).

Strong evidence now exists that appropriate intervention to control hyperglycemia reduces or slows the development of microvascular complications such as retinopathy and nephropathy in patients with type 2 diabetes. A 1995 study in 110 lean Japanese subjects with type 2 diabetes showed that intensive insulin therapy resulting in better glycemic control significantly reduced the microvascular complications of diabetes.[22] In the United Kingdom Prospective Diabetes Study (UKPDS), intensive blood-glucose control with sulfonylureas or insulin substantially decreased the risk of microvascular complications.[23] This multicenter study involved 5,102 patients with newly diagnosed type 2 diabetes who were followed for an average of 10

223



Docket No. C-06-349
A. Ex. 21
Page 11 of 54



years. It established that retinopathy, nephropathy, and possibly neuropathy were reduced in the intensive treatment group (median glycosylated hemoglobin [A1c] 7% compared to 7.9% in the conventional therapy group). The overall rate of microvascular complications was reduced by 25%.

The relevance of these findings to the nursing facility population is unclear. However, a comprehensive approach to diabetes management may improve glycemic control and reduce the risk of complications that result in morbidity and premature mortality. Such an approach includes careful attention to diet and (when feasible) activity levels, the use of oral medications and insulin injections, and management of cardiovascular risk factors where appropriate.

### Components of a Systematic Facility Approach to Diabetes Management

A systematic approach to diabetes management may include the following components:

◆ Adopting an interdisciplinary care model in which the roles of all the members of the health care team are explicitly defined and communication is facilitated.[4]

◆ Assuring that members of the interdisciplinary care team are competent to perform their assigned tasks.

◆ Individualizing therapy. Although intensive treatment to control blood glucose levels has been shown to reduce diabetic complications, such treatment may not be appropriate for all individuals in the long-term care setting. To maintain the highest quality of life, consideration of therapeutic and diagnostic interventions must take into account the patient's cognitive and functional status, severity of disease, coexisting conditions, expressed preferences, and life expectancy.

◆ Involving patients in the management of their diabetes to the extent feasible.

◆ Continuing education of direct patient care staff on the recognition, assessment, and treatment of diabetes and its complications. The education of nursing assistants is vital because this group of staff has such a high level of patient contact.[18]

◆ Regular review of glycemic control and medical, functional and psychosocial issues by the physician, with the participation of nursing staff, nursing assistants, and appropriate members of the interdisciplinary care team (including staff involved in completion of the Minimum Data Set).

◆ Use of outcome and process indicators by which a facility can measure its performance in managing diabetes. (See Step 16.)

CLINICAL PRACTICE GUIDELINE



224



◆ Use of a treatment monitoring system that incorporates assessment of the patient's clinical condition and laboratory review of glycemic control.

## Expected Outcomes from Implementation of Diabetes Clinical Practice Guideline

This guideline recommends processes that, if implemented, should help long-term care facilities to systematically manage *and* improve the care of residents with diabetes. Potential benefits associated with the implementation of this guideline include the following:

◆ Greater individualization of care.
◆ Enhanced quality of life.
◆ Earlier identification of diabetes and its complications.
◆ Better documentation of, and rationale for, patients' personal goals and decision-making processes regarding their disease and its treatment.
◆ A decline in the rate of hypoglycemic and hyperglycemic events.
◆ A decline in the frequency of infection, electrolyte imbalance, and dehydration.
◆ A decline in the rate of development or progression of diabetic complications.
◆ A reduction in emergency room visits and hospitalizations caused by uncontrolled diabetes.
◆ A reduction in direct and indirect patient care costs as a result of more appropriate resource utilization.
◆ Improved monitoring and treatment protocols.
◆ Improved staff education and awareness of this complex progressive disease.

## RECOGNITION

Because of the high prevalence of undiagnosed diabetes in the elderly population, the possibility that a newly admitted patient may have diabetes must always be considered. IGT is a common condition in older people, but it is not normal and should not be ignored. Abnormal blood glucose values or other signs and symptoms that may indicate diabetes must be followed up as soon as possible. The steps outlined below will help to ensure that undiagnosed diabetes is not overlooked.

### STEP 1

Is diabetes present? On admission or during the pre-admission assessment, ask the patient and family members if the patient has



MANAGING DIABETES

225

Docket No. C-06-349
A. Ex. 21
Page 13 of 54

diabetes or has shown signs or symptoms that suggest diabetes. Examine the patient's records for a diagnosis of diabetes or for diabetes risk factors (Table 3). Evaluate the patient critically for signs and symptoms consistent with diabetes or diabetic complications (Table 4). Be alert for laboratory test results that may indicate diabetes. Remember that signs and symptoms of hypoglycemia and hyperglycemia are atypical in the frail elderly (Tables 5 and 6). Evaluate current and known previous medications that may impair glucose metabolism or cause diabetes (Table 7). If the patient has already been diagnosed with diabetes, go to Step 4.

### Recognition of Hypoglycemia and Hyperglycemia in the Frail Elderly

Both hypoglycemia and hyperglycemia often present with atypical symptoms in the frail elderly. Neurological symptoms of hypoglycemia such as confusion or lethargy are more common than autonomic symptoms such as palpitations or anxiety. The physician may also need to consider other important causes of altered mentation, such as adverse drug reactions and fluid and electrolyte imbalance.

It is also recognized that a longer history of diabetes is associated with less intense hypoglycemic symptoms and an altered symptom complex. Typical symptoms of hypoglycemia in younger people (shaking, sweating, irritability, dizziness, headache, nausea, dry mouth) may be uncommon in the frail elderly. In the case of hyperglycemia, the elderly may not exhibit increased thirst or complain of urinary frequency or polyuria.

Physicians should educate and empower nurses and nursing



**TABLE 3**

**Factors That Increase Risk for Type 2 Diabetes**

- Age ≥45 yr
- Ethnicity (Native Americans, African Americans, Latino/Hispanic Americans, Asian Americans, and Pacific Islanders are at higher risk)
- Overweight (BMI >25 kg/m²)
- Family history (a parent or sibling with diabetes)
- Hypertension (blood pressure >140/90 mm Hg)
- Abnormal lipid profile (HDL cholesterol level ≤35 mg/dL; triglyceride level ≥250 mg/dL)
- Impaired glucose tolerance (2-hr post-challenge glucose 140–199 mg/dL)
- Impaired fasting glucose (glucose 110–125 mg/dL)
- History of gestational diabetes or baby >9lb

Adapted from American Diabetes Association[24]



Docket No. C-06-349
A. Ex. 23
Page 14 of 54

## TABLE 4
## Symptoms, Signs, and Consequences of Diabetes in the Elderly Patient

- Recent change in weight (gain or loss)
- Frequent infections
- Urinary frequency, nocturia, urinary incontinence
- Polydipsia, polyphagia
- Dehydration
- Excessive skin problems (infections, ulcers, delayed wound healing)
- Eye problems (visual blurring, visual loss)
- Oral health problems (caries, periodontal disease, tooth loss, dry mouth, burning mouth)
- Foot ulcers, foot deformities, gangrene, other foot problems
- Increased pain perception, neuropathy
- Worsening cardiac ischemia, silent ischemia,
- Depression
- Confusion, acceleration of cognitive impairment
- Abnormal laboratory results (renal insufficiency, proteinuria, hyperlipidemia)
- Decline in ability to perform activities of daily living
- Falls

assistants, if applicable, to perform a fingerstick blood glucose test on any patient who has altered mentation or just does not "seem right." The role of nursing assistants in recognizing hypo-

## TABLE 5
## Possible Symptoms, Signs and Consequences of Hypoglycemia in the Frail Elderly

- Confusion or disorientation
- Poor concentration and coordination
- Drowsiness
- Generalized weakness
- Altered behavior, aggression
- Altered personality and mood (apathy, depression)
- Falls
- Hallucinations
- Myocardial infarction
- Seizures
- Stroke
- Cognitive impairment
- Coma, death



MANAGING DIABETES

227

Docket No. C-06-349
A. Ex. 21
Page 15 of 54



**TABLE 6**

**Possible Symptoms, Signs and Consequences of Hyperglycemia in the Frail Elderly**

◆ Blurred vision
◆ Weight loss
◆ Dehydration
◆ Confusion, worsening dementia
◆ Lethargy
◆ Falls
◆ Functional decline
◆ Nonketotic hyperosmolar coma
◆ Worsening incontinence

glycemia and hyperglycemia is crucial because they have close patient contact and may be the first members of the care team to notice subtle changes in a patient's behavior or clinical condition. Facilities may wish to consider incorporating blood glucose testing in the assessment of patients in whom a change of condition is observed.

**TABLE 7**

**Commonly Used Medications That May Cause Hyperglycemia[25,26]**

◆ Corticosteroids
◆ Beta blockers
◆ Beta adrenergic agonists
◆ Thiazides, furosemide
◆ Antipsychotic agents (both conventional and newer)
◆ Phenothiazines
◆ Thyroid hormone preparations
◆ Calcium channel blockers
◆ Estrogens
◆ Phenytoin
◆ Megestrol acetate
◆ Opiates
◆ Nicotinic acid
◆ Protease inhibitors
◆ Echinacea





Docket No. C-06-349
A. Ex. 21
Page 16 of 54



### STEP 2

Screen high-risk patients who have not been diagnosed with diabetes. Complete a nursing assessment within 8 hours if possible whenever diabetes is suspected, for example:

◆ On admission.
◆ At a required visit by a medical practitioner.
◆ If a significant change occurs in the patient's condition, with signs or symptoms that suggest diabetes.

If indicated, do a fingerstick test promptly to check the patient's blood glucose level. Communicate the result and any other abnormal findings to the treating physician.

In a newly admitted patient in whom the diagnosis of diabetes is suspected but not yet established, the medical practitioner should complete a comprehensive history (including a psychosocial history), a medication review, and a physical examination within a timeframe jointly established by the facility and the medical director. Because blood glucose levels may be affected by over-the-counter and alternative medicines as well as by prescribed medications, the medication review should consider all products that the patient may be taking, including herbal remedies and dietary supplements.

The established resident in whom diabetes is suspected should be evaluated by the treating physician at the next scheduled visit to the facility or as soon as clinically appropriate. In the meantime, confirmatory laboratory tests may be ordered.

### STEP 3

Determine whether the patient has diabetes by ordering appropriate laboratory tests. At any time it is suspected that a patient has undiagnosed diabetes, the physician should order laboratory tests as soon as possible within the framework of a medically necessary or scheduled visit. Testing should include a fasting or casual blood glucose test. Depending on the degree of abnormality of the blood glucose, fingerstick tests may immediately need to be ordered several times a day or repeated at least once during the following week. Diet or acute illness may cause significant variation in the results of blood glucose tests. If pertinent to the patient's condition, renal function, lipid levels, and the presence of proteinuria can also be determined.

### ASSESSMENT



Even in the presence of abnormal blood glucose values, the diagnosis of diabetes is frequently overlooked in frail community-dwelling

229



Docket No. C-06-349
A. Ex. 21
Page 17 of 54

or hospitalized elderly patients. The abnormal values may be ascribed to stress, acute illness, or a medication side effect. In a patient of any age, sustained hyperglycemia is a criterion for a diagnosis of diabetes.

The diagnosis of diabetes in an older adult should be based on the widely accepted criteria developed by the Expert Committee on the Diagnosis and Classification of Diabetes Mellitus of the American Diabetes Association in 1998[25] (Table 8). However, clinicians should be aware that older patients who are in the early stages of diabetes may have normal fasting glucose values. In these patients, postprandial hyperglycemia (resulting from delayed insulin release in response to a glucose load) is indicative of diabetes.

It is important that patients with IFG or IGT are correctly classified as such. Although these patients have a high risk of developing diabetes and cardiovascular complications, they do not have diabetes. The patient who is thought to have diabetes during an acute illness or hospital stay may have IFG or IGT when medically stable.

NOTE: Although the diagnostic process has been broken down into a number of steps, in practice several steps may be performed simultaneously and it may be unnecessary to complete all steps for every patient. The step-by-step breakdown of the process is intended to assure that a systematic and thorough assessment is undertaken for any patient in whom diabetes is suspected.



**TABLE 8**

**Criteria for the Diagnosis of Diabetes Mellitus**

| Metabolic Stage | Diagnostic Test | | |
|---|---|---|---|
| | Fasting Plasma Glucose | Casual Plasma Glucose | Oral Glucose Tolerance |
| Diabetes (two abnormal readings on subsequent days) | ≥126 mg/dL | ≥200 mg/dL with symptoms | two-hour plasma glucose >200 mg/dL |
| Impaired Fasting Glucose (IFG) | ≥110 mg/dL <126 mg/dL | | |
| Impaired Glucose Tolerance (IGT) | | | Two-hour plasma glucose ≥140 mg/dL and <200 mg/dL |
| Normal | <110 mg/dL | | Two-hour <140 mg/dL |

Notes:  1. The oral glucose tolerance test is not recommended for routine clinical use.
        2. A1c measurement is not currently recommended for the diagnosis of diabetes.

Adapted from American Diabetes Association[25]





---

**TABLE 9**

## Other Conditions That May Cause Hyperglycemia in Older Adults

◆ Acute infections

◆ Genetic defects of beta cell function or insulin action

◆ Diseases of the pancreas (e.g., pancreatitis, pancreatic trauma, pancreatectomy, pancreatic cancer, hemochromatosis)

◆ Terminal illness (Hyperglycemia may occur when a decision is made to forego aggressive treatment in a terminally ill patient who has diabetes.)

◆ Endocrine diseases (e.g., Cushing's syndrome, hyperthyroidism, acromegaly, glucagonoma, pheochromocytoma, aldosteronoma)

◆ Other genetic syndromes (e.g., Down's syndrome, Klinefeller's syndrome, Friedreich's ataxia, Huntington's chorea, myotonic dystrophy, etc. Although these syndromes are rare, they are now being seen in the long-term care population.)

◆ Ethnic and cultural practices (e.g., prolonged fasting for religious or cultural reasons)

## STEP 4

Assess the patient's hyperglycemia. A critical appraisal of the patient's hyperglycemia should be performed within 1 week of initiation of laboratory testing (see Step 3). The appraisal should be based on available history, physical findings, additional medical records, and a review of medications and laboratory tests. Verify all abnormal glucose values on a subsequent day.

Consider all factors that may result in abnormal glucose levels, such as medications (including over-the-counter and alternative remedies) and endocrine and genetic conditions (Tables 7 and 9 respectively). For example, long-term therapy with corticosteroids for chronic rheumatological, gastrointestinal, or pulmonary conditions is an important cause of hyperglycemia and insulin resistance in the long-term care population. Contributing factors such as medications may be modifiable, whereas acute infections and some endocrine diseases may be treatable.

## STEP 5

Identify the cause(s) of the patient's hyperglycemia. On the basis of information obtained from the patient history and physical examination, laboratory tests, available records, and information from the patient's family or caregivers, the physician should be able to identify the likely cause(s) of the patient's hyperglycemia within 7 days of admission (for a new patient) or of physician evaluation (for an established patient).



MANAGING DIABETES

231

Docket No. C-06-349
A. Ex. 21
Page 19 of 54

### STEP 6

Confirm the diagnosis. Perform additional diagnostic testing as indicated to confirm a diagnosis of diabetes or the presence of a contributing disorder such as an endocrinopathy, pancreatic disorder, or adverse medication effect.

### STEP 7

Evaluate the nature and severity of diabetic complications. The UKPDS found that at diagnosis, between 3% and 21% of patients with diabetes had already developed some complications.[27] This figure is as high as 50% if the 1998 American Diabetes Association diagnostic criteria are used (Table 8). Older adults often spend more than 2 years in a nursing facility. During that time pre-existing complications can worsen, causing detrimental physical and emotional consequences.

Individuals with diabetes have an increased incidence of skin problems and foot ulcers. Poor oral hygiene and inadequate glucose management increase the risk of oral infections and progressive periodontal disease. Periodontal disease is now recognized as a significant complication of diabetes.[28] Continuous low-grade inflammation and bacterial infection may also be implicated in the increased risk of heart disease in patients with diabetes.

The threshold glucose level at which adverse effects of diabetes appear has not been defined. However, it is clear that previously established goals for glycemic control in adults with type 2 diabetes were associated with significant complications. Patients with blood glucose levels consistently >200 mg/dL are at higher risk for stroke-related disability and for adverse outcomes from heart disease. No goals for diabetes control have been established for the institutionalized frail elderly with multiple comorbidities.

The assessment of diabetic complications in long-term care patients is complicated by the presence of multiple comorbidities in the elderly that may resemble complications associated with diabetes but have a separate etiology. The following conditions, which are often associated with diabetic complications, may also be caused by other medical conditions.

* Foot ulcers.
* Skin problems (cellulitis, delayed wound healing).
* Blurred vision or visual loss.
* Vomiting, diarrhea, constipation.
* Orthostatic hypotension.
* Congestive heart failure (CHF).
* Coronary artery disease (CAD).





- Hypertension (especially nocturnal hypertension).
- Stroke.
- Tingling, burning, numbness in extremities (peripheral neuropathy).
- Neuropathic pain (deep, gnawing pain).
- Peripheral vascular disease.
- Oral infections, severe caries, and periodontal disease.
- Proteinuria (in the absence of infection) and renal insufficiency.
- Weight loss.
- Urinary retention or frequent urinary tract infections.
- Hyperlipidemia.

Evaluate patients with any of the above conditions to determine whether the problem is caused by diabetes or by another medical condition. If another medical condition is identified as the cause of the problem, determine whether treatment of that condition is appropriate, considering the patient's overall prognosis, advance directives, and preferences.

### STEP 8

Obtain input from all members of the interdisciplinary team. Within 1 month of admission or recognition of diabetes, team members from relevant disciplines involved in the patient's care (e.g., dietitian, pharmacist, physical therapist, activity therapist, social worker, podiatrist, mental health professional) should evaluate the burden of the patient's diabetes. The evaluations and recommendations by relevant team members (e.g., specific admission evaluations and subsequent progress notes) should be included in the patient's medical record. All recommendations should be made in the broader context of the individual's overall prognosis and care goals.

### STEP 9

Summarize the patient's condition. At the next required or medically necessary visit following admission or recognition of diabetes, it is recommended that the medical practitioner write a summary of the resident's medical condition. It is helpful for this progress note to

- Describe the patient's medical conditions and stability, including control of diabetes and severity of associated complications.
- Assess the impact of diabetes on the patient's functioning and quality of life.
- Describe conditions possibly contributing to hyperglycemia.
- Where relevant, provide reasons why other suspected diagnoses were not pursued (e.g., patient too frail, terminal, unwilling to undergo further interventions.)




MANAGING DIABETES

233

Docket No. C-06-349
A. Ex. 21
Page 21 of 54

◆ List potential treatments for the patient's diabetes and coexisting medical conditions. (See *Treatment* section).

◆ Give reasons for recommending the use or non-use of identified treatment options in this patient, considering his or her overall state of health, advance directives, and preferences. (See *Treatment* section).

It may be useful for future planning and determination of prognosis to categorize the patient as one of the following:[17]

◆ Minimally impaired.

◆ Medically complex and/or suffering from dementia.

◆ Terminally ill.

## TREATMENT

Appropriate management of diabetes can decrease the burden of this disease and improve quality of life for patients in long-term care facilities. For the individual patient, the goal of treatment should be to improve blood glucose control and, if possible, minimize complications while taking into account, individual preference, life expectancy, and quality of life as defined by the patient.

### STEP 10

Develop an individualized care plan and define treatment goals. The physician and nursing staff, with input from all disciplines, should coordinate development of the care plan related to diabetes management. It is important that the patient's individual goals and preferences are incorporated into the care plan. The patient's acceptance of and participation in his or her treatment plan is crucial. Key components of the care plan (e.g., glucose monitoring, meal plan, activity and physical therapy, treatment with oral antidiabetic agents and/or insulin, foot/wound care, and pain management) should be clearly documented in the physician's orders.

Establish both short- and long-term goals that address the patient's disease severity, cardiovascular risk factors, and overall prognosis. The patient and/or family member (or surrogate decision-maker) should be involved in this process to ensure that their wishes and values are incorporated into the care plan. Treatment goals for the individual patient may include

◆ Setting target ranges for blood glucose control (fasting and/or postprandial glucose and A1c).

◆ Achieving or maintaining adequate nutritional status.



234



Docket No. C-06-349
A. Ex. 21
Page 22 of 542

Case 1:06-cv-02144-RCL    Document 19-12    Filed 05/08/2007    Page 13 of 18

* Reducing the risk of lower-extremity infections, ulcers, and limb loss.
* Educating the patient and his or her family about diabetes and its management.
* Controlling pain and neuropathic symptoms.
* Setting a target range for blood pressure management.
* Trying to reduce the progression of other diabetic complications.
* If appropriate, setting goals for the management of dyslipidemia.
* Maximizing functional status and increasing physical activity within the limits of the patient's comorbidities.
* Discussing and documenting advance directives and end-of-life care.

The commonly held belief that good glycemic control is hard to achieve in patients with diabetes and concurrent chronic disease may not be valid.[29] However, not all frail patients with diabetes, comorbidities, and impaired cognition can tolerate the "tight" glucose levels recommended by national organizations such as the American Diabetes Association and the American Association of Clinical Endocrinologists. More modest goals may be prudent in individuals who

* Have hypoglycemia unawareness or recurrent hypoglycemic episodes.
* Have anorexia, gangrene, malignancy, or severe dementia.
* Are at increased risk for hypoglycemia (e.g., sporadic or fussy eaters).
* Are dependent for feeding or generally have a poor prognosis.

### STEP 11

Implement the care plan. Type 2 diabetes is a progressive disorder. A three-tiered approach to diabetes management is recommended.

1. Begin with lifestyle modification if feasible. Although diet and exercise are the cornerstones of diabetes management, lifestyle modification may be difficult to implement in some frail elderly patients, especially those with multiple comorbidities and limited mobility.
2. Initiate oral agents if lifestyle modification is not feasible or if diet and exercise fail to achieve adequate blood glucose control.
3. Initiate insulin therapy when diet, exercise, and oral agents do not achieve adequate control or when oral agents are contraindicated. It may be appropriate to use insulin as a first-line therapy when the patient's blood glucose levels are consistently higher than 180 mg/dL.



MANAGING DIABETES

235

Docket No. C-06-349
A. Ex. 21
Page 23 of 54



### Documentation

A systematic approach to documentation is an essential aspect of the implementation of an individualized care plan. Without adequate documentation, it is difficult to know whether treatment goals are being achieved or whether modification of the care plan is appropriate. In addition to recording blood glucose values, food intake, and level of activity, it is important to document the reason(s) for treatment decisions, including decisions not to treat or to choose one treatment approach over another. For example, the rationale to support a palliative care approach should be documented, as should patient nonadherence to recommended treatments.

Members of the care team may use their specific section of the chart or an interdisciplinary progress note for documentation purposes. Other forms of communication and discussion between team members may include scheduled meetings, discussions with family members and specialist physicians in the community, and use of established communication tools in the facility. Pertinent issues should then be documented in the patient's chart and any required changes made in the care plan.

### Lifestyle Modification

The notion of a "diabetic diet" is outdated and is no longer endorsed by the American Diabetes Association or other diabetes-care organizations. Diets such as "no concentrated sweets," "no added sugar," and "liberal diabetic diet" are inappropriate and perpetuate the false notion that restricting sucrose-sweetened foods will improve glycemic control.[30,31] Rather, individualized medical nutrition therapy (MNT) is used to integrate nutrition into diabetes management.

Particularly in the long-term care population, in which undernutrition is far more prevalent than overnutrition, dietary restriction should be avoided. A restricted diet may also be detrimental to quality of life in the frail elderly patient for whom food is one of life's few remaining pleasures. This is especially true in those with depression, dependency, chewing difficulty, and functional disability.[32]

Obese individuals with diabetes are frequently advised to lose weight. However, both weight loss and weight maintenance are difficult for older patients with diabetes, who are less active for multiple reasons. If weight loss is not feasible, the patient's care plan should emphasize achieving and maintaining glucose levels that are as close to normal as tolerated. An increase in physical activity (with the involvement of physical or activity therapists) could increase caloric expenditure.

When available, a registered dietitian knowledgeable in MNT may perform a nutritional assessment, educate the patient about the



236

importance of nutrition in diabetes, and formulate a mutually acceptable nutrition plan.[33] This approach allows the patient's usual eating habits and ethnic or cultural food preferences to be taken into consideration. Menus in nursing facilities are generally well planned with regard to portion size, meal times, and nutritional adequacy. The nursing assistant plays an important role in encouraging regular food intake and reporting changes in appetite or difficulty with eating.

The following approach to diet is now recommended for the patient with diabetes in the long-term care setting:

◆ Provide a regular diet that contains a variety of foods and consistent amounts of carbohydrates at meals and snacks.
◆ Provide meals at consistent times of the day.
◆ Adjust dosages of oral agents and/or insulin to balance food consumption.
◆ Control portion size and total calorie consumption. Base caloric need on the individual's weight and activity level.
◆ Increase consumption of dietary fiber, which contributes to blood glucose control and reduces gastrointestinal problems.
◆ Avoid restricting fat. Fat restriction reduces the palatability of food and is not indicated for the majority of patients in long-term care, many of whom are at risk of undernutrition.
◆ Talk with the patient and family about the central role of meal planning in diabetes management. Encourage family members who like to bring in food treats for the patient to do so openly as part of the meal plan.

## Oral Antidiabetic Agents

Because of the importance of individualizing therapy and because the available range of oral medications and insulins is continually changing, this guideline does not recommend specific drug or insulin regimens. Instead, it recommends a systematic approach to pharmacotherapy to achieve optimal blood glucose control.

Oral agents are generally most effective in patients whose fasting plasma glucose (FPG) level is less than 300 mg/dL.[16] These agents may be initiated if adequate glycemic control is not achieved by lifestyle and diet modifications within 3 months of diagnosis or sooner if the patient remains persistently hyperglycemic or becomes acutely ill.

The choice of an oral agent, like other aspects of diabetes therapy, should be individualized. Consider the patient's comorbidities (e.g., renal insufficiency, liver disease, alcohol use, CHF, gastrointestinal disorders, extreme age), the likelihood of adverse drug reactions and



MANAGING DIABETES

237



interactions, and the patient's preferences when selecting a medication (Table 10). A more expensive medication may ultimately be more cost-effective than a less-expensive alternative if it has fewer side effects, reduces nursing time, or can be given at a lower dose. Table 11 offers guidelines to assist the clinician in the selection of oral antidiabetic agents and currently accepted choices for combination therapy.

## Combination Oral Therapy

The new biguanides, thiazolidinediones, meglitinides, and alpha-glucosidase inhibitors, as well as second-generation sulfonylureas and shorter-acting insulin secretagogues, may be used alone or in combination to take advantage of their respective mechanisms of action. If the initial oral agent fails to achieve adequate blood glucose control, consider combination therapy (Table 12). The following guidelines may be used when deciding to initiate combination therapy:

◆ If despite initial treatment, FPG >140 mg/dL OR A1c > 7.0%, a second drug of another class may be added.
◆ A *third* oral agent of a different class may be added if the addition of a second agent does not result in achievement of the above values and if improved control is deemed a worthwhile goal for the patient. There is no evidence that two insulin secretagogues in combination (e.g., a sulfonylurea and repaglinide) are beneficial.



### Categories of Oral Medications

Sulfonylureas. These agents work by enhancing insulin secretion. They have historically been the mainstay of diabetes treatment in older patients. Weight gain is common with the use of sulfonylureas. First-generation agents are more likely than the newer drugs to cause hypoglycemia. Patients with renal, cardiac, or liver problems should not take the older sulfonylureas and chlorpropamide should be avoided entirely in the elderly. Of the most widely prescribed second-generation agents, glipizide (Glucotrol) appears to be associated with less hypoglycemia than glyburide (Micronase, DiaBeta).

Alpha-glucosidase inhibitors. These medications work by slowing carbohydrate digestion, which allows time for the body to augment insulin secretion. They are less likely than sulfonylureas and biguanides to cause hypoglycemia. They have no significant effect on body weight. About 30% of patients experience gastrointestinal side effects, including bloating, abdominal discomfort, diarrhea, and flatulence. However, these effects tend to diminish with con-



tinued use of the drug. Initiating therapy at a low dose with slow titration helps to minimize these adverse effects. Currently available agents in this category are acarbose (Precose) and miglitol (Glycet).

Thiazolidinediones. Drugs in this class lower blood glucose levels by improving insulin-mediated glucose uptake in muscle, adipose tissue, and to a lesser extent the liver. They also reduce hepatic glucose output, the combined effect being to reduce insulin resistance. Studies show that these agents have a modest effect on blood glucose levels. They reduce triglyceride levels but slightly increase levels of LDL cholesterol and may cause weight gain. Several cases of severe liver toxicity were reported in patients taking troglitazone, the first available drug in this category. Therapy should not be initiated if liver enzyme levels are more than 50% above the upper limit of normal. After therapy is initiated, liver enzymes should be monitored monthly for the first 6 months, every 2 months for the subsequent 6 months and periodically thereafter. Thiazolidinediones should not be used in patients with moderately severe CHF. Rosiglitazone (Avandia) and pioglitazone (Actos) are the two currently available agents in this category.

Meglitinides (shorter-acting insulin secretagogues). These nonsulfonylurea drugs work by stimulating insulin secretion. Currently available agents in this group are repaglinide (Prandin) and nateglinide (Starlix). They are effective in reducing blood glucose levels and have no effect on lipids. They may cause weight gain and hypoglycemia, although studies suggest that repaglinide presents a lower risk of hypoglycemia than sulfonylureas.

Biguanides. These agents work by suppressing glucose production in the liver and enhancing the insulin sensitivity of muscle tissue. In addition to reducing blood glucose levels, they also reduce triglyceride and low-density-lipoprotein (LDL) cholesterol levels. Metformin (Glucophage) is currently the only drug in this class available in the United States. Most patients treated with metformin lose weight or fail to gain weight.

Metformin is contraindicated in diabetic patients with impaired renal function because it may cause lactic acidosis. It is not recommended for men whose creatinine is >1.5 mg/dL, women whose creatinine is >1.4 mg/dL, or for individuals with abnormal creatinine clearance. For this reason, it is not recommended for patients aged over 80. Metformin must be discontinued for at least 48 hours before and after contrast-enhanced radiologic studies.



Docket No. C-06-349
A. Ex. 21
Page 27 of 54



TABLE 1.0

**Oral Medications for Diabetes and Their Pharmacokinetics**

| Medication class | Primary mode of action | Agent | Trade name | Year FDA approved | Onset of action | Typical dose |
|---|---|---|---|---|---|---|
| | | | | | | |