IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LOUISE BAILEY,                          )
                                        )
              Plaintiff,                )
                                        )
       v.                               )    Case No. 1:06-cv-2144
                                        )    Judge Royce C. Lamberth
MUTUAL OF OMAHA INSURANCE               )
COMPANY, MICHAEL O. LEAVITT,            )
and LESLIE V. NORWALK,                  )
                                        )
              Defendants.               )
_____)

## DEFENDANTS' ADDITIONAL ATTACHMENTS
## IN SUPPORT OF THEIR MOTION TO DISMISS

                                   Respectfully submitted

OF COUNSEL:
DANIEL MERON                       PETER D. KEISLER
General Counsel                    Assistant Attorney General

KATHLEEN H. MCGUAN                 JEFFREY A. TAYLOR
Associate General Counsel          United States Attorney

MARK D. POLSTON                    SHEILA M. LIEBER
Deputy Associate                   PETER ROBBINS
General Counsel for Litigation     United States
                                   Department of Justice
WILLIAM A. CONNELLY                20 Massachusetts Avenue, N.W., Room 7142
Attorney                           Washington, D.C.  20530
Department of Health               Tel:  (202) 514-3953
and Human Services                 Attorneys for Defendants

This policy has been adopted from the Medicare National Coverage Decisions for Blood Glucose Testing. This policy was developed through the Medical Coverage Negotiated Rule making process. The sources of information used in developing this policy can be found on the HCFA web site, and are listed below;

• 2000 CPT Physicians' Current Procedural Terminology, American Medical Association

• AACE Guidelines for the Management of Diabetes Mellitus, *Endocrine Practice* (1995)1:149-157. Bower, Bruce F. And Robert E. Moore, Endocrine Function and Carbohydrates.

• Clinical Laboratory Medicine, Kenneth D. McClatchy, editor. Baltimore/Williams & Wilkins, 1994. p 321-323.

• Report of the Expert Committee on the Diagnosis and Classification of Diabetes Mellitus, Diabetes Care, Volume 20, Number 7, July 1997, pages 1183 et seq.

• Roberts, H. J., Difficult Diagnoses. W. B. Saunders Co., pp 69-70.

Docket No. C-06-349
A. Ex. 1

# Other Researched Information

## Clinical Studies:

## Government Publications:
Medicare intermediary Manual, Transmittal 1879, April 18, 2003

HIPPA Administrative Simplification – Transactions & Code Sets,
http://www.cms.hhs.gov/hippa/hippa2/regulations/transactions/default.asp

Clinical Laboratory Updates – Blood Glucose Tests, Medicare Bulletin – GR 96-4,
July/August 1996

## Journals, Articles:
King, D., New Diabetes Testing Guidelines Published, www.ADVANCEforMLP.com , March
11, 2002

Sacks, D., Bruns, D., et al, Guidelines and Recommendations for Laboratory Analysis in
the Diagnosis and Management of Diabetes Mellitus, Clinical Chemistry, 48:3, 436-472
(2002)

Sacks et al, Laboratory Analysis in Diabetes Mellitis, Diabetes Care, 25:4, April 2002,
458-472

Blood Glucose Testing, C&S Administrative Services for Medicare, October/November
1996

## Other FI's/ Carriers:

## Other information:

653

*Clinical Chemistry* 48, No. 3, 2002

glucose analysis should have analytical imprecision ≤3.3%, bias ≤2.5%, and total error ≤7.9%.

### Portable meters

Portable meters are used by healthcare workers in acute and chronic care facilities, in physicians' offices, and by patients. Because of the imprecision and variability among meters, they should not be used to diagnose diabetes and have limited value in screening.

Self-monitoring of blood glucose (SMBG) is recommended for all insulin-treated patients. It should be performed at least three times a day for patients with type 1 diabetes. The efficacy of SMBG in patients with type 2 diabetes has not been established.

Multiple performance goals for portable glucose meters have been proposed. These targets vary widely and lack consensus. Clinical studies are needed to determine these analytical goals. We recommend meters that measure and report plasma glucose concentrations.

### Oral glucose tolerance test (OGTT)

We do not recommend the OGTT for the routine diagnosis of type 1 or 2 diabetes. This issue is controversial, and the WHO supports its use. The key limitation of the OGTT is its poor reproducibility. Proponents, however, argue that it has slightly higher sensitivity than fasting glucose for diagnosing diabetes.

### Noninvasive or minimally invasive glucose analyses

Noninvasive glucose analyses cannot be recommended at present as replacements for SMBG or glucose measurements by an accredited laboratory. Although promising, clinical studies remain limited. Several methodologies are available, but no analytical performance goals have been established.

### KETONES

Ketones should be measured in urine or blood by patients with diabetes at home and in hospitals or clinics as an adjunct to the diagnosis of diabetic ketoacidosis (DKA). Methods based on the nitroprusside reaction should not be used to monitor treatment of DKA. Although specific measurement of β-hydroxybutyrate is available, further studies are needed to ascertain whether this offers clinical advantage.

### GLYCATED HEMOGLOBIN (GHb)

GHb should be measured at least biannually in all patients with diabetes to document their glycemic control. Treatment goals should be based on the results of prospective randomized clinical trials, such as the Diabetes Control and Complications Trial (DCCT), that documented the relationship between glycemic control (quantified by GHb analysis) and the risks for the development and progression of chronic complications of diabetes.

US laboratories should use GHb assays certified by the National Glycohemoglobin Standardization Program (NGSP) as traceable to the DCCT reference. GHb concentrations should be maintained at <7%, and the treatment regimen should be reevaluated if GHb is >8% as measured by NGSP-certified methods. Laboratories should participate in proficiency testing. Efforts to achieve global harmonization of GHb testing, an important goal, are underway.

### GENETIC MARKERS

Routine measurement of genetic markers is not recommended at this time for the diagnosis or management of patients with diabetes.

### AUTOIMMUNE MARKERS

Several autoantibodies have been detected in individuals with type 1 diabetes. However, these lack specificity and are not recommended for routine diagnosis or screening of diabetes. Until type 1 diabetes can be prevented, islet cell autoantibody measurement should be essentially confined to research protocols.

### MICROALBUMINURIA

Diabetes is the leading cause of end-stage renal disease. Annual microalbuminuria testing should be performed in patients without clinical proteinuria. To be useful, semiquantitative or qualitative screening tests must be shown to be positive in >95% of patients with microalbuminuria. Positive results of such tests must be confirmed by quantitative testing in an accredited laboratory.

### MISCELLANEOUS POTENTIALLY IMPORTANT ANALYTES

Several other analytes are measured in patients with diabetes. All adults with diabetes should receive annual lipid profiles. There is no role for routine testing for insulin, C-peptide, or proinsulin in most patients with diabetes. These assays are useful primarily for research purposes. Similarly, measurement of amylin or leptin is not of value at this time in the management of patients with diabetes.

## Introduction

Diabetes mellitus is a group of metabolic disorders of carbohydrate metabolism in which glucose is underutilized, producing hyperglycemia. The disease is classified into several categories. The revised classification, published in 1997 (1) is shown in Table 1[1]. Type 1 diabetes mellitus, formerly known as insulin-dependent diabetes mellitus or juvenile-onset diabetes mellitus, is caused by autoimmune destruction of the β-cells of the pancreas, rendering the pancreas unable to synthesize and secrete insulin (2). Type 2 diabetes mellitus, formerly known as non-insulin-dependent diabetes mellitus or adult-onset diabetes, results from a combination of insulin resistance and inadequate insulin secretion (3, 4). Other types of diabetes are rare. Type 2 is the most common form, accounting for 90–95% of diabetes in developed countries.

In 1992, the costs of diabetes in the US were estimated

Docket No. C-06-349
A. Ex. 2
Page 2 of 37

438                         Sacks et al.: Laboratory Analysis in Diabetes Mellitus

**Table 1. Classification of diabetes mellitus.**[a]

Type 1 diabetes
  A. Immune mediated
  B. Idiopathic
Type 2 diabetes
Other specific types
  Genetic defects of $\beta$-cell function
  Genetic defects in insulin action
  Diseases of the exocrine pancreas
  Endocrinopathies
  Drug or chemical induced
  Infections
  Uncommon forms of IMD
  Other genetic syndromes sometimes associated with diabetes
GDM

  [a] From ADA (1).

to be $98 billion (5). The mean annual per capita health-care costs for an individual with diabetes are approximately fourfold higher than those for individuals who do not have diabetes (5). Similarly, in the United Kingdom, diabetes accounts for roughly 10% of the National Health Service budget (£49 billion).

The high costs of diabetes are attributable to care for both acute conditions (such as hypoglycemia and ketoacidosis) and debilitating complications (6). The latter include both microvascular complications—predominantly retinopathy, nephropathy, and neuropathy—and macrovascular complications, particularly stroke and coronary artery disease (CAD).[8] Together these make diabetes the seventh most common cause of death in the developed world (7).

The American Diabetes Association (ADA) publishes in January each year a supplement, entitled *Clinical Practice Recommendations*, to *Diabetes Care*. This is a compilation of all ADA position statements related to clinical practice and is an important resource for healthcare professionals who care for people with diabetes. The National Academy of Clinical Biochemistry has developed evidence-based guidelines for the practice of laboratory medicine. The guidelines in this document are based on the best available published evidence. An as-

sessment was made of virtually all analytes used in the diagnosis and management of individuals with diabetes. The resulting guidelines, intended for use by laboratorians and providers of patient care, have been reviewed by the ADA Professional Practice Committee and found to be consistent in those areas where the ADA has also published *Clinical Practice Recommendations*. The guidelines in this document are not intended to supplant the ADA Recommendations. The objective is to supplement the ADA Recommendations, with an emphasis on the laboratory aspects of diabetes.

The ADA has developed a system to grade the quality of scientific evidence (Table 2). This scheme has been used in this report to describe the quality of the evidence on which each recommendation is based. The ratings range

**Table 2. ADA evidence grading system for clinical practice recommendations.**

| Level of evidence | Description |
|---|---|
| A | Clear evidence from well-conducted, generalizable, randomized controlled trials that are adequately powered, including: |
| | Evidence from a well-conducted multicenter trial |
| | Evidence from a metaanalysis that incorporates quality ratings in the analysis |
| | Compelling nonexperimental evidence, i.e., "all or none" rule developed by Center for Evidence Based Medicine at Oxford[a] |
| | Supportive evidence from well-conducted randomized controlled trials that are adequately powered, including: |
| | Evidence from a well-conducted trial at one or more institutions |
| | Evidence from a metaanalysis that incorporates quality ratings in the analysis |
| B | Supportive evidence from well-conducted cohort studies |
| | Evidence from a well-conducted prospective cohort study or registry |
| | Evidence from a well-conducted prospective cohort study |
| | Evidence from a well-conducted metaanalysis of cohort studies |
| | Supportive evidence from a well-conducted case–control study |
| C | Supportive evidence from poorly controlled or uncontrolled studies |
| | Evidence from randomized clinical trials with one or more major or three or more minor methodologic flaws that could invalidate the results |
| | Evidence from observational studies with high potential for bias (such as case series with comparison to historical controls) |
| | Evidence from case series or case reports |
| | Conflicting evidence, with the weight of evidence supporting the recommendation |
| E | Expert consensus or clinical experience |

[a] Either all patients died prior to therapy and at least some survived with therapy, or some patients died without therapy and none died with therapy. Example: use of insulin in the treatment of DKA.

[8] Nonstandard abbreviations: CAD, coronary artery disease; ADA, American Diabetes Association; FPG, fasting plasma glucose; OGTT, oral glucose tolerance test; GHb, glycated hemoglobin; CAP, College of American Pathologists; CI, confidence interval; DKA, diabetic ketoacidosis; SMBG, self-monitoring of blood glucose; GDM, gestational diabetes mellitus; DCCT, Diabetes Control and Complications Trial; UKPDS, United Kingdom Prospective Diabetes Study; NHANES, National Health and Nutrition Examination Survey; IGT, impaired glucose tolerance; IFG, impaired fasting glucose; FDA, Food and Drug Administration; AcAc, acetoacetate; $\beta$HBA, $\beta$-hydroxybutyrate; Hb, hemoglobin; NGSP, National Glycohemoglobin Standardization Program; IMD, immune-mediated diabetes; MODY, maturity onset diabetes of youth; HNF, hepatocyte nuclear factor; IPF-1, insulin promoter factor-1; ICA, islet-cell cytoplasm antibody; IAA, insulin autoantibody; GAD$_{65}$, 65-kDa isoform of glutamic acid decarboxylase; IA, insulinoma-associated antigen; JDF, Juvenile Diabetes Foundation; and apo, apolipoprotein.

655

*Clinical Chemistry* 48, No. 3, 2002

439

from A to C, with A exhibiting the highest quality of evidence. Category E, expert opinion, is used for recommendations for which no evidence from clinical trials is available or where conflicting evidence has been published.

To facilitate comprehension and assist the reader, each analyte is divided into several headings and subheadings. These are use (diagnosis, screening, monitoring, and prognosis), rationale (diagnosis and screening), analytical considerations [preanalytical (including reference values) and analytical (such as methods)], interpretation (including frequency of measurement and turnaround time), and where applicable, emerging considerations, which alert the reader to ongoing studies and potential future aspects relevant to that analyte.

## Glucose

USE
*Diagnosis/Screening*

> Recommendation: Glucose should be measured in plasma in an accredited laboratory to establish the diagnosis of diabetes.
>
> Level of evidence: A
>
> Glucose should be measured in plasma in an accredited laboratory for screening of high-risk individuals.
>
> Level of evidence: E
>
> Analysis in an accredited laboratory is not necessary for routine monitoring.
>
> Level of evidence: E

The diagnosis of diabetes is established exclusively by the documentation of hyperglycemia (increased glucose concentrations in the plasma). In 1997, the diagnostic criteria (8) were modified (1) to better identify individuals at risk of retinopathy and nephropathy. The revised (current) criteria include: (a) symptoms of diabetes and casual (i.e., regardless of the time of the preceding meal) plasma glucose ≥11.1 mmol/L (200 mg/dL); (b) fasting plasma glucose (FPG) ≥7.0 mmol/L (126 mg/dL); or (c) 2-h postload glucose ≥11.1 mmol/L (200 mg/dL) during an oral glucose tolerance test (OGTT) (1). If any one of these three criteria is met, confirmation by repeat testing on a subsequent day is necessary to establish the diagnosis. (Note that repeat testing is not necessary in patients who have unequivocal hyperglycemia with acute metabolic decompensation.) Although included as a criterion, the OGTT was not recommended for routine clinical use in nonpregnant individuals (see below).

Population screening for type 2 diabetes, previously controversial, is now recommended for those at risk of developing the disease (1, 9). The ADA proposes that FPG should be measured in all asymptomatic people ≥45

years of age. If results are <6.1 mmol/L (110 mg/dL), testing should be repeated at 3-year intervals. Screening should be considered at a younger age or be carried out more frequently in individuals at increased risk of diabetes [see Ref (1) for conditions associated with increased risk]. Because of the increasing prevalence of type 2 diabetes in children, screening of children has been suggested recently (10). Starting at age 10 years, testing should be performed every 2 years in overweight individuals who have two other risk factors, namely family history, race/ethnicity, and signs of insulin resistance (10). Despite these recommendations, there is no published evidence that treatment based on screening has value. The cost-effectiveness of screening for type 2 diabetes has been estimated. The incremental cost of screening all persons 25 years or older was estimated to be $236 449 per life-year gained and $56 649 per quality-adjusted life-year gained (11). Interestingly, screening was more cost-effective at ages younger than the 45 years currently recommended.

*Monitoring/Prognosis*

> Recommendation: Although there is evidence linking high plasma glucose concentrations to adverse outcome, substantially more data are available that directly correlate increased glycated hemoglobin (GHb) with complications of diabetes. Routine measurement of plasma glucose concentrations in an accredited laboratory is not recommended as the primary means of monitoring or evaluating therapy in individuals with diabetes.
>
> Level of evidence: E

There is a direct relationship between the degree of plasma glucose control and the risk of late renal, retinal, and neurologic complications. This correlation has been demonstrated for type 1 (12) and more recently for type 2 (13) diabetes. Persons with type 1 diabetes who maintained lower average plasma glucose concentrations exhibited a significantly lower incidence of microvascular complications, namely diabetic retinopathy, nephropathy, and neuropathy (12). Although intensive insulin therapy reduced hypercholesterolemia by 34%, the risk of macrovascular disease was not significantly decreased. Similar results were obtained in patients with type 2 diabetes (13). Intensive plasma glucose control in patients with type 2 diabetes significantly reduced microvascular complications, but no significant difference was detected for macrovascular disease (myocardial infarction or stroke) (13). In both studies, patients in the intensive group maintained lower median plasma glucose concentrations. Analyses of the outcomes were linked to GHb, which was

used to evaluate glycemic control, rather than glucose concentration. Moreover, most clinicians use the ADA recommendations, which define a target GHb concentration as the goal for optimum glycemic control (14).

There is some evidence directly linking higher glucose concentrations to a poor prognosis. For example, the 10-year survival of 6681 people in a Japanese town was reduced if FPG was ≥7.8 mmol/L (140 mg/dL) (15). Similar findings were obtained in 1939 patients with type 2 diabetes followed for a mean of 15 years; multiple logistic regression revealed that the risk of death was significantly increased for patients with FPG ≥7.8 mmol/L (140 mg/dL) (16). Individuals with type 2 diabetes with FPG >7.8 mmol/L (140 mg/dL) had increased cardiovascular mortality (17). Furthermore, comparison of 300 patients with a first myocardial infarction and 300 matched controls revealed that a moderately increased FPG was a risk factor for infarction (18). Notwithstanding these observations, neither random nor fasting glucose concentrations should be measured in an accredited laboratory as the primary means of routine monitoring of patients with diabetes. Laboratory plasma glucose testing can be used to supplement information from other testing, to test the accuracy of self-monitoring (see below), or when adjusting the dose of oral hypoglycemic agents (9). In addition, individuals with well-controlled type 2 diabetes who are not on insulin therapy can be monitored with periodic measurement of FPG, although analysis need not be done in an accredited laboratory (19, 20).

### RATIONALE

#### Diagnosis

The disordered carbohydrate metabolism that underlies diabetes manifests as hyperglycemia. Therefore, measurement of plasma glucose is the sole diagnostic criterion. This strategy is indirect as hyperglycemia reflects the consequence of the metabolic derangement, not the cause. However, until the underlying molecular pathophysiology of the disease is identified, plasma glucose concentrations are likely to remain an essential diagnostic modality.

#### Screening

Screening is recommended for several reasons. The onset of type 2 diabetes is estimated to occur ~4–7 years before clinical diagnosis (21), and epidemiological evidence indicates that complications may begin several years before clinical diagnosis. Furthermore, at least 30% of people in the US with type 2 diabetes are undiagnosed (22). Notwithstanding this recommendation, there is no evidence that population screening of plasma glucose concentrations provides any benefit. Outcome studies should be performed to justify screening.

### ANALYTICAL CONSIDERATIONS
#### Preanalytical

> Recommendation: Blood for fasting plasma glucose analysis should be drawn after the individual has fasted overnight (at least 8 h). Plasma should be separated from the cells within 60 min; if this is not possible, a tube containing a glycolytic inhibitor such as sodium fluoride should be used for collecting the sample.
>
> Level of evidence: B

Blood should be drawn in the morning after an overnight fast [no caloric intake for at least 8 h, during which time the individual may consume water ad libitum (1)]. Recent evidence revealed a diurnal variation in FPG, with mean FPG higher in the morning than in the afternoon, indicating that many cases of undiagnosed diabetes would be missed in patients seen in the afternoon (23). Glucose concentrations decrease ex vivo with time in whole blood because of glycolysis. The rate of glycolysis, reported to average 5–7% [~0.6 mmol/L (10 mg/dL)] per hour (24), varies with the glucose concentration, temperature, white blood cell count, and other factors (25). Glycolysis can be attenuated by inhibition of enolase with sodium fluoride (2.5 mg fluoride/mL of blood) or, less commonly, lithium iodoacetate (0.5 mg/mL of blood). These reagents can be used alone or, more commonly, with anticoagulants such as potassium oxalate, EDTA, citrate, or lithium heparin. Although fluoride maintains long-term glucose stability, the rates of decline of glucose in the first hour after sample collection in tubes with and without fluoride are virtually identical (24). (Note that leukocytosis will increase glycolysis even in the presence of fluoride if the white cell count is very high.) After 4 h, the glucose concentration is stable in whole blood for 72 h at room temperature in the presence of fluoride (24). In separated, nonhemolyzed, sterile serum without fluoride, the glucose concentration is stable for 8 h at 25 °C and 72 h at 4 °C (26).

Glucose can be measured in whole blood, serum, or plasma, but plasma is recommended for diagnosis. The molality of glucose (i.e., amount of glucose per unit water mass) in whole blood and plasma is identical. Although red blood cells are essentially freely permeable to glucose (glucose is taken up by facilitated transport), the concentration of water (kg/L) in plasma is ~11% higher than that of whole blood. Therefore, glucose concentrations in plasma are ~11% higher than whole blood if the hematocrit is normal. Glucose concentrations in heparinized plasma are reported to be 5% lower than in serum (27). The reasons for the latter difference are not apparent, but may be attributable to the shift in fluid from erythrocytes to plasma caused by anticoagulants. The glucose concentrations during an OGTT in capillary blood are significantly higher than those in venous blood [mean of 1.7

*Clinical Chemistry* 48, No. 3, 2002

441

mmol/L (30 mg/dL), equivalent to 20–25% *(28)*], but the mean difference in fasting samples is only 0.1 mmol/L (2 mg/dL) *(28, 29)*.

**Reference values.** Glucose concentrations in healthy individuals vary with age. Reference intervals in children are 3.3–5.6 mmol/L (60–100 mg/dL), similar to the adult interval of 4.1–5.9 mmol/L (74–106 mg/dL) *(26)*. Note that the ADA criteria *(1)*, not the reference values, are used for the diagnosis of diabetes. Moreover, the threshold for diagnosis of hypoglycemia is variable. The reference values are not useful to diagnose these conditions. In adults, mean fasting plasma glucose increases with increasing age from the third to the sixth decade *(30)*, but does not increase significantly after age 60 *(31, 32)*. By contrast, glucose concentrations after a glucose challenge are substantially higher in older individuals *(31, 32)*. Evidence of an association of increasing insulin resistance with age is inconsistent *(33)*.

*Analytical*

Recommendation: Enzymatic methods for glucose analysis are relatively well standardized. Despite the low imprecision at the diagnostic decision limits of 7.0 mmol/L (126 mg/dL) and 11.1 mmol/L (200 mg/dL), classification errors may occur. Because of the relatively large intraindividual biological variability (CVs of ~5–7%), FPG values of 5.8–6.9 mmol/L (105–125 mg/dL) should be repeated and individuals with FPG of 5.3–5.7 mmol/L (96–104 mg/dL) should be considered for follow-up at intervals shorter than the current ADA recommendation of every 3 years.

Level of evidence: E

Glucose is measured almost exclusively by enzymatic methods. Analysis of proficiency surveys conducted by the College of American Pathologists (CAP) revealed that hexokinase or glucose oxidase is used in virtually all analyses performed in the US *(26)*. A few laboratories (~1%) use glucose dehydrogenase. At a plasma glucose concentration of ~8.2 mmol/L (147 mg/dL), imprecision among laboratories using the same method had a CV <4%, excluding glucose dehydrogenase *(26)*. Similar findings have been reported for glucose analysis in samples from patients. For example, comparison of plasma samples from 240 patients revealed a 5% difference in mean glucose concentrations measured by the hexokinase and glucose oxidase methods *(34)*.

No consensus has been achieved on the goals for glucose analysis. Numerous criteria have been proposed to establish analytical goals. These include expert opinion (consensus conferences), opinion of clinicians, regulation, state of the art, and biological variation *(35)*. A rational

and realistic recommendation that has received some support is to use biological criteria as the basis for analytical goals. It has been suggested that imprecision should not exceed one-half of the within-subject biological CV *(36, 37)*. For plasma glucose, a CV ≤2.2% has been suggested as a target for imprecision, with 0% bias *(37)*. Although this recommendation was proposed for within-laboratory error, it would be desirable to achieve this goal for interlaboratory imprecision to minimize differences among laboratories in the diagnosis of diabetes in individuals whose glucose concentrations are close to the threshold value. Therefore, the goal for glucose analysis should be to minimize total analytical error, and methods should be without measurable bias. A national program using samples (e.g., fresh-frozen plasma) that eliminate matrix effects should be developed to assist in the achievement of this objective.

INTERPRETATION
Knowledge of intraindividual variability of FPG concentrations is essential for meaningful interpretation of patient values. An early study, which repeated the OGTT in 31 nondiabetic adults at 48-h intervals, revealed that FPG varied by <10% in 22 participants (77%) and by <20% in 30 participants (97%) *(38)*. Biological variation includes within- and between-subject variation. Careful examination over several consecutive days revealed that intraindividual variation of FPG in healthy individuals [mean glucose, 4.9 mmol/L (88 mg/dL)] exhibited within- and between-subject CVs of 4.8–6.1% and 7.5–7.8%, respectively *(39, 40)*. Larger studies have revealed CVs of 6.4–6.9% for FPG in 246 apparently healthy *(41)* and 193 newly diagnosed untreated patients with type 2 diabetes *(42)*. The latter study, which measured FPG by glucose oxidase (intra- and interassay CVs <2%) on 2 consecutive days, obtained 95% confidence intervals (CIs) of ± 14.8% for total variability and ± 13.7% for biological variability. If a CV (biological) of 6.9% is applied to a true glucose concentration of 7.0 mmol/L (126 mg/dL), the 95% CI would encompass glucose concentrations of 6.1–7.9 mmol/L (109–143 mg/dL). If the CV of the glucose assay (~4%) is included, the 95% CI is approximately ± 18%. Thus, the 95% CI for a fasting glucose concentration of 7.0 mmol/L (126 mg/dL) would be 7.0 mmol/L ± 18% (126 mg/dL ± 18%), namely, 5.7–8.3 mmol/L (103–149 mg/dL). Use of an assay imprecision of 4% (CV) only (excluding biological variability), would yield a 95% CI of 6.4–7.6 mmol/L (116–136 mg/dL) among laboratories for a true glucose concentration of 7.0 mmol/L (126 mg/dL). One should bear in mind that these ranges include 95% of individuals and that other individuals will be outside this range. The biological variability is substantially greater than analytical variability. Using biological variation as the basis for deriving analytical performance characteristics *(35)*, Ricos et al. *(43)* have proposed the following

desirable specifications for glucose: analytical imprecision ≤3.3%, bias ≤2.5%, and total error ≤7.9%.

A short turnaround time for glucose analysis is not usually necessary for the diagnosis of diabetes. In some clinical situations, such as acute hyper- or hypoglycemic episodes in the Emergency Department or treatment of diabetic ketoacidosis (DKA), rapid analysis is desirable. A turnaround time of 30 min has been proposed *(44)*. However, this value is based on requirements by clinicians, and no outcome data have been published that validate this value. Inpatient management of diabetic patients may on occasion require a rapid turnaround time (minutes, not hours). Bedside monitoring with glucose meters (see below) has been adopted by many as a practical solution *(45)*.

**Frequency of measurement.** The frequency of measurement of plasma glucose is dictated by the clinical situation. The ADA recommends that an increased FPG or abnormal OGTT must be confirmed to establish the diagnosis of diabetes *(1)*. Screening by FPG is recommended every 3 years if it is <6.1 mmol/L (<110 mg/dL), more frequently in high-risk individuals; however, frequency of analysis in the latter group is not specified. Monitoring is performed by patients themselves, who measure glucose with meters, and by assessment of GHb in an accredited laboratory (see below). Appropriate intervals between measurements of glucose in acute clinical situations (e.g., patients in hospital or patients with DKA or neonatal hypoglycemia) are highly variable and may range from 30 min to ≥24 h.

EMERGING CONSIDERATIONS
Noninvasive or minimally invasive analysis of glucose is addressed below.

**Meters**
Portable meters for measurement of blood glucose concentrations are used in three major settings: *(a)* in acute and chronic care facilities (at the patient's bedside and in clinics or hospitals); *(b)* in physicians' offices; and *(c)* by patients at home, work, and school. The last, self-monitoring of blood glucose (SMBG), is performed at least once a day by 40% and 26% of individuals with type 1 and 2 diabetes, respectively, in the US *(46)*. The worldwide market for SMBG is $2.7 billion per year, with annual growth estimated at 10–12% *(47)*. The ADA lists the following indications for SMBG: *(a)* achieving and maintaining glycemic control; *(b)* preventing and detecting hypoglycemia; *(c)* avoiding severe hyperglycemia; *(d)* adjusting to changes in lifestyle; and *(e)* determining the need for initiating insulin therapy in gestational diabetes mellitus (GDM) *(48)*. It is recommended that most individuals with diabetes attempt to achieve and maintain blood glucose concentrations as close to those found in nondiabetic individuals as is safely possible *(14)*.

USE
*Diagnosis/Screening*

> Recommendation: There are no published data to support a role for portable meters in the diagnosis of diabetes or for population screening. The imprecision of the meters, coupled with the substantial differences among meters, precludes their use in the diagnosis of diabetes and limits their usefulness in screening for diabetes.
>
> Level of evidence: E

The criteria for the diagnosis of diabetes are based on outcome data (the risk of micro- and macrovascular disease) correlated with plasma glucose concentrations, both fasting and 2 h after a glucose load, assayed in an accredited laboratory *(1)*. Whole blood is used in portable meters. Although many portable meters have been programmed to report a plasma glucose concentration, the imprecision of the current meters (see below) precludes their use in the diagnosis of diabetes. Similarly, screening by portable meters, although attractive because of convenience, ease, and accessibility, would generate many false positives and false negatives.

*Monitoring/Prognosis*

> Recommendation: SMBG is recommended for all insulin-treated patients with diabetes. For type 1 patients, SMBG is recommended three or more times a day. SMBG may be desirable in patients treated with sulfonylureas or other insulin secretagogues and in all patients not achieving goals.
>
> Level of evidence: B
>
> In patients with type 2 diabetes, SMBG may help achieve better control, particularly when therapy is initiated or changed. However, there are no data to support this concept. The role of SMBG in patients with stable type 2 diabetes controlled by diet alone is not known.
>
> Level of evidence: C

SMBG is recommended for all patients with diabetes who are receiving insulin. Tight glycemic control can decrease microvascular complications in individuals with type 1 *(12)* or type 2 *(13)* diabetes. Intensive plasma glucose control in patients with type 1 diabetes was achieved in the Diabetes Control and Complications Trial (DCCT) by participants performing SMBG at least four times per day *(12)*. Therapy in patients with type 2 diabetes in the United Kingdom Prospective Diabetes Study (UKPDS) *(13)* was adjusted according to FPG concentrations; SMBG was not evaluated.

Faas et al. *(49)* reviewed 11 studies, published between

*Clinical Chemistry* 48, No. 3, 2002

443

1976 and 1996, that evaluated SMBG in patients with type 2 diabetes. Only one of the published studies reported that SMBG produced a significantly positive improvement, namely lower GHb. The authors of the review concluded that the efficacy of SMBG in type 2 diabetes is questionable (49). Similar conclusions were drawn in a recent metaanalysis (50) and in a sample of patients with type 2 diabetes in the National Health and Nutrition Examination Survey (NHANES) (51). Although SMBG may be useful in initiating or changing therapy in patients with type 2 diabetes, clinical studies are needed to define its role in outcome in patients with type 2 diabetes.

RATIONALE

SMBG allows patients with diabetes to achieve and maintain specific glycemic goals. Knowledge of plasma or blood glucose concentrations is necessary for insulin-requiring patients, particularly those with type 1 diabetes, to determine appropriate insulin doses at different times of the day (48). Patients adjust the amount of insulin according to their plasma or blood glucose concentration. Frequent SMBG is particularly important for tight glycemic control in type 1 diabetes.

Hypoglycemia is a major, potentially life-threatening complication of the treatment of diabetes. The risk of hypoglycemia increases significantly with pharmacologic therapy directed toward maintaining the glycemic range as close to those found in nondiabetic individuals as possible (12, 13). The incidence of major hypoglycemic episodes, requiring third-party help or medical intervention, was two- to threefold higher in the intensive group than in the conventional group in clinical trials of patients with type 1 and type 2 diabetes (12, 13). Furthermore, many diabetic patients, particularly those with type 1 diabetes, lose the autonomic warning symptoms that usually precede neuroglycopenia ("hypoglycemic unawareness") (52), increasing the risk of hypoglycemia. SMBG can be useful for detecting asymptomatic hypoglycemia and allowing patients to avoid major hypoglycemic episodes.

ANALYTICAL CONSIDERATIONS
*Preanalytical*

> Recommendation: Patients should be instructed in the correct use of glucose meters, including quality control. Comparison between SMBG and concurrent laboratory glucose analysis should be performed at regular intervals to evaluate the accuracy of patient results.
>
> Level of evidence: B

Multiple factors can interfere with glucose analysis with portable meters. Several of these, such as improper application, timing, and removal of excess blood (26), have been eliminated by advances in technology. Important variables that may influence the results of bedside glucose monitoring include changes in hematocrit (53), altitude, environmental temperature or humidity, hypotension, hypoxia, and high triglyceride concentrations (54). Furthermore, most meters are inaccurate at very high or very low glucose concentrations. Another important factor is variability of results among different glucose meters. Different assay methods and architecture lead to lack of correlation among meters, even from a single manufacturer. In fact, two meters of the same brand have been observed to differ substantially in accuracy (55, 56). Patient factors are also important, particularly adequate training. Recurrent education at clinic visits and comparison of SMBG with concurrent laboratory glucose analysis improved the accuracy of patients' blood glucose readings (57). In addition, it is important to evaluate the patient's technique at regular intervals (9).

*Analytical*

> Recommendation: Multiple performance goals for portable glucose meters have been proposed. These targets vary widely and are highly controversial. No published study has achieved the goals proposed by the ADA. Manufacturers should work to improve the imprecision of current meters.
>
> Level of evidence: E
>
> We recommend meters that measure and report plasma glucose concentrations to facilitate comparison with assays performed in accredited laboratories.
>
> Level of evidence: E

At least 25 different meters are commercially available and are reviewed annually in the ADA's Buyer's Guide to Diabetes Products (58). Virtually all the meters use strips that contain glucose oxidase or hexokinase. A drop of whole blood is applied to a strip that contains all the reagents necessary for the assay. Some meters have a porous membrane that separates erythrocytes, and analysis is performed on the resulting plasma. Meters can be calibrated to report plasma glucose values, even when glucose is measured in whole blood. An IFCC working group recently recommended that glucose meters be harmonized to the concentration of glucose in plasma, irrespective of the sample type or technology (59). The meters use reflectance photometry or electrochemistry to measure the rate of the reaction or the final concentration of the products. The meter provides a digital readout of glucose concentration. Most meters claim a reportable range of 1.7–33.3 mmol/L (30–600 mg/dL).

Several important technologic advances that decrease operator error have been made in the last few years. These include "no wipe" strips, automatic commencement of timing when both the sample and the strip are in the meter, smaller sample volume requirements, an error

signal if sample volume is inadequate, "lock out" if controls are not assayed, barcode readers, and the ability to store up to several hundred results that can subsequently be downloaded for analysis. Together these improvements have produced superior performance by new meters (60).

Multiple analytical goals have been proposed for the performance of glucose meters. The rationale for these is not always clear. In 1987, the ADA recommended a goal for total error (user plus analytical) of <10% at glucose concentrations of 1.7–22.2 mmol/L (30–400 mg/dL) 100% of the time (61). In addition, it was proposed that values should differ by ≤15% from those obtained by a laboratory reference method. The recommendation was modified in response to the significant reduction in complications by tight glucose control in the DCCT. The revised performance goal, published in 1996 (21), is for analytical error <5%. To our knowledge, there are no published studies of glucose meters that have achieved the ADA goal of analytical error of <5%.

The CLIA '88 goal is less stringent than that of the ADA; results with meters should be within 10% of target values or ± 0.3 mmol/L (6 mg/dL), whichever is larger. NCCLS recommendations (62) are ± 20% of laboratory glucose at >5.5 mmol/L (100 mg/dL) and ± 0.83 mmol/L (15 mg/dL) of laboratory glucose if the glucose concentration is ≤5.5 mmol/L (100 mg/dL). These are undergoing revisions. New NCCLS guidelines, anticipated to be published in 2002, propose that for test readings >4.2 mmol/L (75 mg/dL), the discrepancy between meters and the central laboratory should be <20%; for a glucose concentrations ≤4.2 mmol/L (75 mg/dL), the discrepancy should not exceed 0.83 mmol/L (15 mg/dL; NCCLS, in preparation).

A different approach was proposed by Clarke et al. (63), who developed an error grid that attempts to define clinically important errors by identifying fairly broad target ranges. In addition, two novel approaches were suggested very recently. In the first, 201 patients with longstanding type 1 diabetes were questioned to estimate quality expectations for glucose meters (64). On the basis of patients' perceptions of their needs and of their reported actions in response to changes in measured glucose concentrations, a goal for analytical quality at hypoglycemic concentrations was a CV of 3.1%. Excluding hypoglycemia, the analytical CV to meet the expectations of 75% of the patients was 6.4–9.7%. The authors recommended an analytical CV of 5%, with a bias ≤5% (64). The second method used simulation modeling of errors in insulin dose (65). The results revealed that meters that achieve both a CV and a bias <5% rarely lead to major errors in insulin dose. However, to provide the intended insulin dosage 95% of the time, the bias and CV needed to be <1–2%, depending on the dosing schedule for insulin and the ranges of glucose concentrations for individual patients (65). No meters have been shown to achieve CVs of 1–2% in routine use. Given the bias and imprecision of

meters, no studies have evaluated this target, which is based on simulation modeling. The lack of consensus on quality goals for glucose meters reflects the absence of agreed objective criteria. Using the same biological variation criteria described in the "Interpretation" section above for glucose analysis in accredited laboratories, we suggest a goal for total error (including both bias and imprecision) of ≤7.9%. However, additional studies are necessary to accurately define this goal.

There is a very large variability in the performance of different meters. Although current meters, as predicted, exhibit performance superior to prior generations of meters (60), imprecision remains high. For example, in a study conducted under carefully controlled conditions where all assays were performed by a single medical technologist, only ~50% of analyses met the ADA criterion of <5% deviation from reference values (60). The performance of older meters was substantially worse: two of the four meters produced results within 5% of reference values for only 33% of analyses. Another recent study that evaluated meter performance in 226 hospitals by split samples analyzed simultaneously on meters and laboratory glucose analyzers revealed that 45.6%, 25%, and 14% differed from each other by >10%, >15%, and >20%, respectively (66). Recent analysis of the clinical and analytical accuracy of portable glucose meters (all measurements done by one person) demonstrated that none of the meters met the ADA criterion and that only two meters had 100% of the estimations in the clinically acceptable zones by error grid analysis (67).

> Recommendation: Clinical studies are needed to determine the analytical goals for glucose meters. At a minimum, the end-points should be GHb and frequency of hypoglycemic episodes. Ideally, outcomes (e.g., long-term complications and hypoglycemia) should also be examined.
>
> Level of evidence: E

**Frequency of measurement.** SMBG should be performed at least four times per day in patients with type 1 diabetes. Monitoring less frequently than four times a day can lead to deterioration of glycemic control (48, 68, 69). Published studies reveal that self-monitoring is performed by patients much less frequently than recommended. Data from NHANES III collected between 1988 and 1994 revealed that SMBG was performed at least once a day by 39% of patients taking insulin and by 5–6% of those treated with oral agents or diet alone (51). Moreover, 29% and 65% of patients treated with insulin and oral agents, respectively, monitored their blood glucose less than once per month. However, no evaluation has been performed to verify that four times a day is ideal or whether some other frequency or timing (e.g., postprandial testing) would improve glycemic control. For example, adjustment of insulin therapy in women with GDM

*Clinical Chemistry* 48, No. 3, 2002

445

according to the results of postprandial, rather than preprandial, plasma glucose concentrations improved glycemic control and reduced the risk of neonatal complications (70). The optimal frequency of SMBG for patients with type 2 diabetes is unknown.

Current ADA recommendations suggest daily SMBG for patients treated with insulin or sulfonylureas (14) to detect hypoglycemia. However, published evidence shows no correlation between the frequency of SMBG in type 2 diabetes and glycemic control (49–51). There is no known role for SMBG in patients with type 2 diabetes who are treated with diet alone.

## OGTT

> Recommendation: The OGTT is not recommended for the routine diagnosis of type 1 or 2 diabetes mellitus. It is recommended for establishing the diagnosis of GDM.
>
> Level of evidence: B

### USE
The OGTT, once the gold standard for diagnosing diabetes mellitus, is now not recommended by the ADA for diagnosing either type 1 or 2 diabetes, but it continues to be recommended in a limited fashion by the WHO (71, 72). The oral glucose challenge (or glucose tolerance test) continues to be recommended by both the ADA and the WHO for establishing the diagnosis of GDM. Neither group recommends use of the extended 3- to 5-h glucose tolerance test in routine practice.

### RATIONALE
Inability to respond appropriately to a glucose challenge, i.e., glucose intolerance, represents the fundamental pathologic defect in diabetes mellitus. The rationale for the ADA not recommending that the glucose tolerance test be used routinely to diagnose type 1 and 2 diabetes is that appropriate use of FPG could identify approximately the same prevalence of abnormal glucose metabolism in the population as the OGTT. Furthermore, the OGTT is impractical in ordinary practice. The consensus was that a 2-h plasma glucose cutoff of ≥11.1 mmol/L (200 mg/dL) should be used because it was predictive of the occurrence of microangiopathy (72). The rationale was that approximately one-fourth of individuals with 2-h plasma glucose ≥11.1 mmol/L (200 mg/dL) have a FPG ≥7.8 mmol/L (140 mg/dL), which was the FPG previously recommended to diagnose diabetes mellitus. The currently recommended FPG value of 7.0 mmol/L (126 mg/dL) corresponds better to a 2-h value in the OGTT of >11.1 mmol/L (200 mg/dL), and thus with development of complications.

Use of the OGTT to classify individuals with impaired glucose tolerance (IGT) and diabetes remains controversial. Recent studies (73–76) indicate that individuals classified with IGT by the OGTT (WHO criteria) have increased risk of cardiovascular disease, but many of these individuals do not have impaired fasting glucose (IFG) by the new ADA criteria. Furthermore, the OGTT (WHO criteria) identifies diabetes in ~2% more individuals than FPG (ADA criteria) (77). Finally, diabetic patients with abnormal FPG and 2-h OGTT have a higher risk of premature death than those with only an increased FPG concentration (78).

The 2-h glucose tolerance test continues to be recommended for the diagnosis of GDM by both the ADA and WHO (71, 72). Deterioration of glucose tolerance occurs frequently in pregnancy, especially in the third trimester. Diagnosing and treating GDM is essential to prevent associated perinatal morbidity and mortality.

### ANALYTICAL CONSIDERATIONS
The reproducibility of the OGTT has received considerable attention. In numerous studies, the reproducibility of the OGTT in classifying patients was 50–66% (79). Possible factors contributing to the lack of reproducibility include biological variation of plasma glucose concentrations, the variable effects of administration of a hyperosmolar glucose solution on gastric emptying, and effects of ambient temperature (41, 79–81). The accuracy and reproducibility of glucose assays are not limiting factors in this regard.

### INTERPRETATION
*Diagnosing type 1 and 2 diabetes*
The ADA and WHO have different recommendations:

ADA: Not recommended for routine clinical use except in pregnant women (72).

WHO: When the FPG concentration is in the IFG range [6.1 mmol/L-7.0 mmol/L (110–126 mg/dL)], an OGTT is recommended (71). After 3 days of unrestricted diet and an overnight fast (8–14 h), FPG is measured, followed by the oral ingestion of 75 g of anhydrous glucose (or partial hydrolysates of starch of the equivalent carbohydrate content) in 250–300 mL of water over 5 min. For children, the dose is 1.75 g glucose/kg up to 75 g of glucose. Blood samples are collected 2 h after the load, and plasma glucose is analyzed. Results are interpreted as detailed in Table 3.

**Table 3. WHO criteria for interpreting 2-h OGTT.[a]**

| | Plasma glucose concentration, mmol/L (mg/dL) | |
|---|---|---|
| | 0 h | 2 h |
| IFG | ≥6.1 (110) <7.0 (126) | <7.8 (140) |
| IGT | <7.0 (126) | ≥7.8 to <11.1 (140–200) |
| Diabetes | ≥7.0 (126) | ≥11.1 (200) |

[a] Any single abnormal value should be repeated on a separate day.

Docket No. C-06-349
A. Ex. 2
Page 10 of 37

446                                    Sacks et al.: Laboratory Analysis in Diabetes Mellitus

## GDM

The ADA modified their recommendations for laboratory diagnosis of GDM in 2000 (82). Their guidelines are as follows:

1. Low-risk patients require no testing. Low risk status is limited to women meeting all of the following:

 · Age <25 years
 · Weight normal before pregnancy
 · Member of an ethnic group with a low prevalence of GDM
 · No known diabetes in first-degree relatives
 · No history of abnormal glucose tolerance
 · No history of poor obstetric outcome

2. Average-risk patients (all patients who fall between low and high risk) should be tested at 24–28 weeks of gestation (see below for testing strategy).
3. High-risk patients should undergo immediate testing. They are defined as having any of the following:

 · Marked obesity
 · Personal history of GDM
 · Glycosuria
 · Strong family history of diabetes

The first step in laboratory testing is identical to that for diagnosing type 1 or 2 diabetes, i.e., a FPG ≥7.0 mmol/L (126 mg/dL) or a casual plasma glucose ≥11.1 mmol/L (200 mg/dL) confirmed on a subsequent day. However, if the above tests are normal, the ADA recommends that average- and high-risk patients receive a glucose challenge test following one of two methods:

1. One-step: Perform either a 100-g or 75-g OGTT. This one-step approach may be cost-effective in high-risk patients or populations (e.g., some Native-American groups).
   · The 100-g OGTT is the most commonly used, standard test supported by outcome data. Two or more of the venous plasma glucose concentrations indicated in Table 4 must be met or exceeded for a positive diagnosis.
   · Alternatively, a 75-g OGTT can be performed, but it is not as well validated as the 100-g test. In the 75-g test, diagnostic criteria for plasma glucose values are

the same as for the 100-g test, except that there is no 3-h measurement. Two or more of the venous plasma glucose values must equal or exceed the cutoffs to diagnose GDM.

2. Two-step: The first step is a 50-g oral glucose load (the patient does not need to be fasting), followed by a plasma glucose determination at 1 h. A plasma glucose value ≥7.8 mmol/L (140 mg/dL) indicates the need for definitive testing. A value ≥7.2 mmol/L (130 mg/dL) may be used because it will detect ~10% more diabetic patients. The second and definitive test is one of the two OGTTs described above.

### EMERGING CONSIDERATIONS

The main issues of controversy are: (a) the lower sensitivity of FPG compared with the OGTT in diagnosing diabetes mellitus (2% of cases missed with FPG); (b) the value of classifying individuals as having IGT (recommended by WHO, but not the ADA); and (c) the appropriate use in GDM.

The lower sensitivity of the FPG compared with the OGTT in diagnosing diabetes mellitus is closely linked to epidemiologic evidence that the OGTT better identifies patients at risk for developing complications of diabetes. This includes assessment of the risk of developing cardiovascular disease (83), macrosomia (84) and of predicting increased risk of death (85). The continuing use of the OGTT to diagnose diabetes mellitus has been supported by Australian and New Zealand diabetes professional organizations (86).

The appropriate use of the OGTT for diagnosing GDM is particularly controversial. The recommendation at the Fourth International Workshop—Conference on Gestational Diabetes Mellitus (87), that 5–10% lower glucose values be adopted for diagnosing gestational diabetes, is now adopted by the ADA.

There remains a lack of consensus regarding the use of the 100-g vs 75-g OGTT for the definitive diagnosis of GDM. It would seem practical and probably diagnostically acceptable to use primarily the 75-g OGTT. However, appropriate diagnostic thresholds continue to be in dispute (86, 88). These discrepancies in recommendations reflect the state of knowledge about GDM, which continues to evolve with enhanced and expanded clinical research.

### Urinary Glucose

> Recommendation: Semiquantitative urine glucose testing is not recommended for routine care of patients with diabetes mellitus.
>
> Level of evidence: C

### USE

Semiquantitative urine glucose testing, once the hallmark of diabetes care in the home setting, has now been

---

#### Table 4. Criteria for intepreting 100-g OGTT.ᵃ

|  | Plasma glucose concentration | |
| --- | --- | --- |
|  | mmol/L | mg/dL |
| Fasting | 5.3 | 95 |
| 1 h | 10.0 | 180 |
| 2 h | 8.6 | 155 |
| 3 h | 7.8 | 140 |

ᵃ The test should be done in the morning after an overnight fast of between 8 and 14 h and after a unrestricted diet (≥150 g carbohydrate per day) and unlimited physical activity. The subject should be seated and should not smoke throughout the test.

*Clinical Chemistry* 48, No. 3, 2002

replaced by SMBG (see above). Semiquantitative urine glucose monitoring should be considered only for patients who are unable to or refuse to perform SMBG because urine glucose concentration does not accurately reflect plasma glucose concentration *(89, 90)*.

### RATIONALE

Although glucose is detectable in the urine in patients with grossly increased blood glucose concentrations, it provides no information about blood glucose concentrations below the variable renal glucose threshold [~10 mmol/L (180 mg/dL)]. This alone limits its usefulness for monitoring diabetes under modern care recommendations. Furthermore, the concentration of the urine affects urine glucose concentrations, and only average glucose values between voidings are reflected, further minimizing the value of urine glucose determinations.

### ANALYTICAL CONSIDERATIONS

Semiquantitative test-strip methods using specific reactions for glucose are recommended. Most commercially available strips use the glucose oxidase reaction *(26)*. Test methods that detect reducing substances are not recommended because they are subject to numerous interferences, including numerous drugs and nonglucose sugars. When used, single voided urine samples are recommended *(90)*.

### INTERPRETATION

Because of the limited use of urine glucose determinations, semiquantitative specific reaction-based test strip methods are adequate.

## Noninvasive or Minimally Invasive Glucose Analyses

Recommendation: Noninvasive glucose analyses cannot be recommended as replacements for SMBG or glucose measurements by an accredited laboratory. Ongoing developments in the field, such as use of the new Gluco Watch Biographer, may influence this recommendation.

Level of evidence: E

### USE

The need for a device for "continuous" in vivo monitoring of glucose concentrations in blood is a very high priority because patients are required to control their plasma glucose more closely *(12, 72, 90)*. Currently, there are only two devices that have been approved by the Food and Drug Administration (FDA) for noninvasive or minimally invasive glucose sensing: the Gluco Watch Biographer (Cygnus), and the Continuous Glucose Monitoring System (MiniMed). Although promising, routine use of these devices cannot be recommended at this time because clinical studies remain limited. Both devices require cali-

bration and confirmation of accuracy with conventional SMBG.

### RATIONALE

The first goal for developing a reliable in vivo glucose sensor is to detect unsuspected hypoglycemia. The importance of this goal has been increasingly appreciated with the recognition that strict glucose control is accompanied by a marked increase in the risk of hypoglycemia *(12, 90)*. Therefore, a sensor designed to detect severe hypoglycemia alone would be of value. In contrast, a full-range, reliable in vivo glucose monitor is a prerequisite for the development of an artificial pancreas that measures blood glucose concentrations and automatically adjusts insulin administration.

### ANALYTICAL CONSIDERATIONS

The goal here is not to comprehensively review the status of research in this important area, but to make recommendations for current use. There have been several reviews recently on this topic *(91, 92)*, and it has been the subject of national conferences. For example, noninvasive testing technology was the subject of the AACC Oak Ridge Conference in 1999, with considerable attention focused on glucose-sensing technology *(93)*, and a symposium at the 1999 ADA meeting concentrated on noninvasive glucose sensing *(94)*.

Key technologic advances in minimally invasive or noninvasive glucose monitoring can be summarized as shown in Table 5.

The transcutaneous sensors and implanted sensors use multiple detection systems, including enzyme-based (usually glucose oxidase), electrode-based, and fluorescence-based techniques. Alternatives to enzymes as glucose recognition molecules are being developed, including artificial glucose "receptors" *(95, 96)*. Fluorescence technologies include the use of engineered molecules that exhibit altered fluorescence intensity or spectral characteristics upon binding glucose or the use of competitive binding assays incorporating two fluorescent molecules

**Table 5. Minimally invasive and noninvasive methodologies for in vivo glucose monitoring.[a]**

| |
|---|
| Transcutaneous needle-type enzyme electrodes |
| Totally implanted sensors |
|   Enzyme electrodes |
|   Near-infrared fluorescence-based |
| Sampling technologies |
|   Microdialysis |
|   Reverse iontophoresis |
| Noninvasive technologies |
|   Near-infrared spectroscopy |
|   Light scattering |
|   Photoacoustic spectroscopy |

[a] From Pickup et al. *(91)*.

Docket No. C-06-349
A. Ex. 2
Page 12 of 37

in the fluorescent resonance energy transfer technique (97–101).

Methods to sample tissue, often referred to as "noninvasive" but are in fact "minimally invasive", vary among test systems. The underlying fundamental concept is that the concentration of glucose in the interstitial fluid correlates with blood glucose. Most microdialysis systems are inserted subcutaneously (102–105). In contrast, "reverse iontophoresis", which is the basis of the FDA-approved "Gluco Watch" (Cygnus), uses a low-level electrical current on the skin, which by convective transport (electroosmosis) moves glucose across the skin. The concentration of glucose is then measured by a glucose oxidase electrode detector (106, 107).

Finally, considerable research has been focused on developing totally noninvasive technology for glucose sensing. Of these, near-infrared spectroscopy has been most intensively investigated, but unpredictable spectral variations continue to hinder progress (108–112). Similar problems have impaired the successful use of light scattering (113, 114). Finally, photoacoustic spectroscopy, although less studied, has yielded some encouraging preclinical results. In this technique, pulsed infrared light, when absorbed by molecules, produces detectable ultrasound waves, the intensity and patterns of which can theoretically be tuned to detect glucose (115–117).

## INTERPRETATION

Only the Gluco Watch Biographer and the Continuous Monitoring System have received FDA approval at the time of writing. Therefore, only they will be considered here. The two devices have vastly differing applications. The Gluco Watch is designed to analyze "glucose" approximately three times per hour for up to 12 h and appears best suited for detecting unsuspected hypoglycemia. In contrast, the Continuous Monitoring System is intended for one-time or occasional use, rather than ongoing daily use. The information derived by these devices is intended to assist physicians to guide patients to improve their diabetes control, the values being downloaded into a computer in the physicians' offices.

The Continuous Monitoring System consists of a subcutaneous glucose sensor, which is connected to a monitor worn externally. Glucose is monitored every 5 min for up to 72 h, and at the end of that period the data are transferred to another computer for analyses. Values are not displayed on the externally worn monitor.

The Gluco Watch provides frequent measurements for up to 12 h after a single calibration. Calibration with reference plasma glucose values is required, and sampling time limits the frequency of measurements to approximately three per hour. In limited but promising clinical trials, the Gluco Watch provided reasonable correlation with SMBG (106, 107). For example, in 28 patients with type 1 diabetes tested in a clinical setting, the Gluco Watch values had a correlation of 0.90 (n = 1554 pairs of data) with capillary blood glucose. In 12 patients in the home setting, the correlation of Gluco Watch values with SMBG values was r = 0.85 (205 paired data points). The correlation between two Gluco Watches worn simultaneously was r = 0.94 (107). Despite the recent approval of the Gluco Watch by the FDA, its use has not been rigorously tested in a clinically relevant home setting, nor has it been tested in children. However, if it is demonstrated to reliably detect unsuspected hypoglycemic episodes in such settings, we may see widespread use of the Gluco Watch and continued improvement of the technology.

Currently, there are no analytical standards for noninvasive and minimally invasive glucose analyses. Such standards will clearly need to be different for different proposed uses. For example, the reliability, precision, and accuracy requirements for a glucose sensor that is linked to a system that automatically adjusts insulin doses will be vastly different from the requirements for a sensor in a system designed to sound an alarm in cases of apparent extreme hyper- or hypoglycemia. It seems intuitively obvious that a larger imprecision can be tolerated in instruments that make frequent readings during each hour than in an instrument used only two or three times per day to adjust a major portion of a person's daily insulin dose.

## EMERGING CONSIDERATIONS

With the first approvals of self-monitoring, noninvasive glucose sensors by the FDA, it is anticipated that there will be renewed efforts to bring other technologies forward into clinical studies. Ultimately, we shall see improved methods for noninvasive or minimally invasive glucose measurements that will complement current self glucose monitoring techniques.

## Ketone Testing

USE

> Recommendation: Ketones should be measured in urine or blood by patients with diabetes in the home setting and in the clinic/hospital setting as an adjunct to the diagnosis of DKA.
>
> Level of evidence: E

The ketone bodies acetoacetate (AcAc), acetone, and $\beta$-hydroxybutyric acid ($\beta$HBA) are catabolic products of free fatty acids. Determinations of ketones in urine and blood are widely used in the management of patients with diabetes mellitus as adjuncts for both diagnosis and ongoing monitoring of DKA. Measurements of ketone bodies are routinely performed both in an office/hospital setting and by patients at home.

The ADA recommends that initial evaluation of patients with diabetes mellitus include determination of urine ketones and that urine ketone testing should be available in the physician's office for immediate use as

Docket No. C-06-349
A. Ex. 2
Page 13 of 37

*Clinical Chemistry* 48, No. 3, 2002

449

needed *(14)*. The ADA further recommends that urine ketone testing is an important part of monitoring by patients with diabetes, particularly in those with type 1 diabetes, pregnancy with preexisting diabetes, and GDM *(9)*. All patients with diabetes mellitus should test their urine for ketones during acute illness, stress, persistent hyperglycemia [plasma glucose >16.7 mmol/L (300 mg/dL)] pregnancy, or symptoms consistent with DKA, such as nausea, vomiting, or abdominal pain *(9, 14)*.

### RATIONALE

Ketone bodies are usually present in urine and blood, but in very low concentrations (e.g., total serum ketones <0.5 mmol/L). Increased ketone concentrations in patients with known diabetes mellitus or in previously undiagnosed patients presenting with hyperglycemia suggest impending or established DKA, a medical emergency. The two major mechanisms for the high ketone concentrations in patients with diabetes are increased production from triglycerides and decreased utilization in the liver; both are results of absolute or relative insulin deficiency and increased counterregulatory hormones, including cortisol, epinephrine, glucagon, and growth hormone *(118)*.

The principal ketone bodies, $\beta$HBA and AcAc, are usually present in approximately equimolar amounts. Acetone, usually present in only small quantities, is derived from spontaneous decarboxylation of AcAc. The equilibrium between AcAc and $\beta$HBA is shifted toward formation of $\beta$HBA in any condition that alters the redox state of hepatic mitochondria to increase concentrations of NADH, such as hypoxia, fasting, metabolic disorders (including DKA), and alcoholic ketoacidosis *(119–121)*. Thus, assay methods for ketones that do not include measurement of $\beta$HBA may provide misleading clinical information by underestimating total ketone body concentration *(90, 122)*.

### ANALYTICAL CONSIDERATIONS

#### Urine ketones

**Preanalytical.** Usually the concentrations of ketones in the urine are below the detection limits of commercially available testing materials. False-positive results have been reported with highly colored urine and in the presence of several sulfhydryl-containing drugs, including angiotensin-converting enzyme inhibitors *(123)*. Urine test reagents deteriorate with exposure to air, giving false-negative readings; testing material should be stored in tightly sealed containers and discarded after the expiration date on the manufacturer's label *(124)*. False-negative readings have also been reported with highly acidic urine specimens, such as after large intakes of ascorbic acid. Loss of ketones from urine attributable to microbial action can also cause false-negative readings. Because acetone is a highly volatile substance, specimens should be kept in a closed container. For point-of-care analyses in medical facilities and for patients in the home

setting, control materials (giving both negative and positive readings) are not commercially available but would be desirable to assure accuracy of test results.

**Analytical.** Several assay principles have been described. Most commonly used is the colorimetric reaction that occurs between ketones and nitroprusside (sodium nitroferricyanide), which produces a purple color *(26)*. This method is widely available in the form of dipsticks and tablets and is used to measure ketones in both urine and blood (either serum or plasma). Several manufacturers offer dipsticks that measure glucose and ketones; a combination dipstick is necessary only if the patient monitors urine glucose instead of or in addition to blood glucose. The nitroprusside method measures only AcAc unless the reagent contains glycine, in which case acetone is also measured. The nitroprusside-containing reagent is much more sensitive to AcAc than acetone with respect to color generation. Importantly, this reagent does not measure $\beta$HBA *(122)*.

#### Blood ketones

**Preanalytical.** Serum/plasma ketones can be measured using tablets or dipsticks routinely used for urine ketone determinations. Although specimens can be diluted with saline to "titer" the ketone concentration (results are typically reported as "positive at a $1/x$ dilution"), as with urine ketone testing, $\beta$HBA, the predominant ketone body in DKA, is not detected.

For specific determinations of $\beta$HBA, as described below, specimen requirements differ among methods. In general, blood samples can be collected into heparin, EDTA, fluoride, citrate, or oxalate (for the BioScanner Ketone system, fluoride and oxalate have not been tested, according to the manufacturer). Ascorbic acid interferes with some assay methods. AcAc interferes with some assay methods unless specimens are highly dilute. Specimen stability differs among methods, but in general, whole blood specimens are stable at 4 °C for up to 24 h. Serum/plasma specimens are stable for up to 1 week at 4 °C and for at least several weeks at –20 °C. Long-term stability data are not available for most assay methods.

**Analytical.** Although several different assay methods (e.g., colorimetric, gas chromatography, capillary electrophoresis, and enzymatic) have been described for blood ketones, including specific measurement of $\beta$HBA, enzymatic methods for quantification of $\beta$HBA appear to be the most widely used for routine clinical management *(125–127)*. The principle of the enzymatic methods is that $\beta$HBA in the presence of NAD$^+$ is converted to AcAc and NADH by $\beta$-hydroxybutyrate dehydrogenase. Under alkaline conditions (pH 8.5–9.5), the reaction favors formation of AcAc from $\beta$HBA. The NADH produced can be quantified spectrophotometrically (usually kinetically) with use of a peroxidase reagent (Analox Instruments USA). One manufacturer offers a method that uses a test card impregnated with the reagents (KetoSite; GDS Diagnostics). Most methods permit use of whole blood,

450                     Sacks et al.: Laboratory Analysis in Diabetes Mellitus

plasma, or serum specimens (required volumes are generally ≤200 µL). Some methods permit analysis of multiple analytes and are designed for point-of-care testing. Several methods are available as hand-held meters, which are FDA approved for both laboratory use and for over-the-counter use by patients [e.g., BioScanner Ketone (PolymerTechnology Systems) and MediSense Precision Xtra (Abbott Laboratories)] (127). These methods use dry-chemistry test strips to which a drop of whole blood, serum, or plasma is added. Results are displayed on the instruments within ~2 min.

INTERPRETATION
*Urine ketone determinations*

> Recommendation: Urine ketone determinations should not be used to diagnose or monitor the course of DKA.
>
> Level of evidence: A

In a patient with known diabetes mellitus or in a patient not previously diagnosed with diabetes but who presents with typical symptoms of diabetes and hyperglycemia, the presence of positive urine ketone readings suggests the possibility of impending or established DKA. Although DKA is most commonly associated with type 1 diabetes mellitus, it may rarely occur in type 2 patients (128). Patients with alcoholic ketoacidosis will have positive urine ketone readings, but hyperglycemia is not usually present. Positive urine ketone readings are found in up to 30% of first morning void urine specimens from pregnant women (with or without diabetes), during starvation, and after hypoglycemia (90, 122, 129).

*Blood ketone determinations*

> Recommendation: Blood ketone determinations that rely on the nitroprusside reaction should be used only as an adjunct to diagnose DKA and should not be used to monitor treatment of DKA. Specific measurement of βHBA in blood can be used for diagnosis and monitoring of DKA. Further studies are needed to determine whether the test offers any clinical advantage over more traditional management approaches (e.g., measurements of serum $CO_2$, anion gap, or pH).
>
> Level of evidence: E

Blood ketone determinations that rely on the nitroprusside reaction should be used with caution for diagnosis of DKA because results do not quantify βHBA, the predominant ketone in DKA. The test should not be used to monitor the course of therapy because AcAc and acetone may increase as βHBA decreases during successful therapy (90, 118–122). Blood ketone determinations that mea-

sure βHBA specifically are useful for both diagnosis and ongoing monitoring of DKA (121, 130–132). Reference intervals for βHBA differ among assay methods, but concentrations in healthy individuals fasted overnight are generally <0.5 mmol/L. Patients with well-documented DKA [serum $CO_2$ <17 mmol/L; arterial pH <7.3; plasma glucose >14.9 mmol/L (250 mg/dL)] generally have βHBA concentrations >2 mmol/L.

Further studies are also needed to determine whether blood ketone determinations by patients with diabetes mellitus are preferable (e.g., better accepted by patients than urine testing, with more prompt diagnosis of DKA) to urine ketone determinations.

## GHb

USE

> Recommendations: GHb should be measured routinely in all patients with diabetes mellitus to document their degree of glycemic control. Treatment goals should be based on the results of prospective randomized clinical trials such as the DCCT and UKPDS. These trials have documented the relationship between glycemic control, as quantified by serial determinations of GHb, and risks for the development and progression of chronic complications of diabetes.
>
> Laboratories should be aware of potential interferences, including hemoglobinopathies, that may affect GHb test results. In selecting assay methods, laboratories should consider the potential for interferences in their particular patient population.
>
> Level of evidence: A

Measurement of glycated proteins, primarily GHb, is widely used for routine monitoring of long-term glycemic status in patients with diabetes mellitus.[9] GHb is used both as an index of mean glycemia and as a measure of risk for the development of diabetes complications (90, 122, 133). This test is also being used increasingly by quality assurance programs to assess the quality of diabetes care, e.g., requiring that healthcare providers document the frequency of GHb testing in patients with

---

[9] The terms glycated hemoglobin, glycohemoglobin, "glycosylated" (which should not be used) hemoglobin, Hb A$_1$, and Hb A$_{1c}$ have all been used to refer to hemoglobin that has been modified by the nonenzymatic addition of glucose residues. However, these terms are not interchangeable. Glycated hemoglobins comprise Hb A$_1$ and other hemoglobin-glucose adducts, whereas Hb A$_1$ is made up of Hb A$_{1a}$, Hb A$_{1b}$, and Hb A$_{1c}$. Hb A$_{1c}$ is the major component of Hb A$_1$, accounting for ~80% of Hb A$_1$. To eliminate this confusing nomenclature, the term "A1c test" has been suggested. As described in the text, most of the clinical outcome data that are available for the effects of metabolic control on complications (at least for the DCCT and UKPDS) used assay methods that quantified Hb A$_{1c}$. In this report, we use the abbreviation GHb to include all forms of glycated hemoglobin.

*Clinical Chemistry* 48, No. 3, 2002

451

diabetes and the proportion of patients with GHb values below a specified value *(134, 135)*.

The ADA and other organizations that have addressed this issue recommend measurement of GHb in patients with both type 1 and 2 diabetes, first to document the degree of glycemic control, then as part of continuing care *(14)*. The ADA has recommended specific treatment goals for GHb based on the results of prospective randomized clinical trials, most notably the DCCT *(12, 133)*, but also the more recent UKPDS *(13)*. Because different GHb assays can give different GHb values, the ADA recommends that laboratories use only assay methods that are certified as traceable to the DCCT GHb reference *(122, 133)*; these results are reported as hemoglobin (Hb) $A_{1c}$.

### RATIONALE

Glycated proteins are formed posttranslationally from the slow, nonenzymatic reaction between glucose and amino groups on proteins *(136)*. For hemoglobin, the rate of synthesis of GHb is principally a function of the concentration of glucose to which the erythrocytes are exposed. GHb is a clinically useful index of mean glycemia during the preceding 120 days, the average life span of erythrocytes *(90, 136–143)*. Although carefully controlled studies have documented a close relationship between the concentration of GHb and mean glycemia, routine determinations of blood glucose by patients or by their healthcare providers are not considered as reliable as GHb to quantify mean glycemia *(19, 90, 137, 138, 144–146)*. Concentrations of other blood-based glycated proteins (e.g., glycated serum/plasma proteins, "fructosamine") also reflect mean glycemia, but over a much shorter time than GHb: 15–30 days and 60–120 days, respectively *(90, 136–144, 147, 148)*. However, the clinical utility of glycated proteins other than hemoglobin has not been clearly established, and there is no convincing evidence that relates their concentration to the chronic complications of diabetes *(90, 122)*.

### ANALYTICAL CONSIDERATIONS

Recommendations: Laboratories should use only GHb assay methods that are certified by the National Glycohemoglobin Standardization Program (NGSP) as traceable to the DCCT reference. In addition, laboratories that measure GHb should participate in a proficiency-testing program, such as the CAP Glycohemoglobin Survey, that uses fresh blood samples with targets set by the NGSP Laboratory Network.

Level of evidence: B

There are many (>30) different GHb assay methods in current use. These range from low-throughput research laboratory component systems and manual minicolumn methods to high-throughput automated systems dedicated to GHb determinations. Most methods can be classified into one of two groups based on assay principle *(90, 139, 149)*. The first group includes methods that quantify GHb based on charge differences between glycated and nonglycated components. Examples include cation-exchange chromatography and agar gel electrophoresis. The second group includes methods that separate components based on structural differences between glycated and nonglycated components. Examples include boronate affinity chromatography and immunoassay. Most charge-based and immunoassay methods quantify Hb $A_{1c}$, defined as Hb A with glucose attached to the $NH_2$-terminal valine of one or both $\beta$ chains. Other methods quantify "total glycated hemoglobin", which includes both Hb $A_{1c}$ and other hemoglobin-glucose adducts (e.g., glucose-lysine adducts and glucose-$\alpha$ chain $NH_2$-terminal valine adducts). Generally, results of methods using different assay principles show excellent correlation, and there are no convincing data to show that any one method or analyte is clinically superior to any other. However, the reported GHb results from the same blood sample could differ considerably among methods unless they are standardized to a common reference, e.g., without standardization, the same blood sample could be read as 7% in one laboratory and 9% in another *(90, 139, 149–155)*.

In 1996, the NGSP was initiated to standardize GHb test results among laboratories to DCCT-equivalent values *(154–156)*. The rationale for standardizing GHb test results to DCCT values was that the DCCT had determined the relationship between specific GHb values and long-term outcome risks in patients with diabetes mellitus *(12, 14, 90, 122)*. The NGSP was developed under the auspices of the AACC and is endorsed by the ADA, which recommends that laboratories use only GHb methods that have passed certification testing by the NGSP. In addition, the ADA recommends that all laboratories performing GHb testing participate in the CAP proficiency-testing survey for GHb, which uses fresh whole blood specimens *(157)*.

The NGSP Laboratory Network includes a variety of assay methods, each calibrated to the DCCT reference. The DCCT reference is a HPLC cation-exchange method that quantifies Hb $A_{1c}$ and is a NCCLS-designated comparison method *(140, 158)*. The assay method has been used since 1978 and has demonstrated good long-term imprecision (between-run CVs consistently <3%) *(157)*. The laboratories in the network interact with manufacturers of GHb methods to assist them first in calibrating their methods and then in providing comparison data for certification of traceability to the DCCT. Certification is valid for 1 year. An important adjunct to the program is the GHb proficiency-testing survey administered by CAP. Since 1996 (starting with a pilot project that included 500 laboratories and expanded to all laboratories in 1998), the survey has used fresh whole blood samples with NGSP-assigned target values. Since initiation of the NGSP in

1996, the survey has documented a steady improvement in comparability of GHb values among laboratories, both within and between methods. In general, NGSP-certified methods have demonstrated less variability and better comparability to NGSP-assigned target values than non-certified methods (157). The NGSP website (http://www.missouri.edu/~diabetes/ngsp.html) provides detailed information on the certification process and maintains a listing of certified assay methods.

### Preanalytical

**Patient variables.** There are no clinically significant effects of age, sex, ethnicity, or season on GHb or GHb test results. The effects of age on GHb are controversial (159–161). Some studies have shown age-related increases in GHb, ~0.1% per decade after age 30. Other reports have shown little or no increase. Differences in results among the studies are probably attributable to differences in the selection of study participants; when studies were restricted to participants with normal glucose tolerance (i.e., fasting and postprandial plasma glucose concentrations within established reference intervals), little or no age-related increase in GHb was found. Results were also not significantly affected by acute illness.

Any condition that shortens erythrocyte survival or decreases mean erythrocyte age (e.g., recovery from acute blood loss, hemolytic anemia) falsely lowers GHb test results regardless of the assay method (90). Vitamins C and E are reported to falsely lower test results, possibly by inhibiting glycation of hemoglobin (162, 163), but vitamin C may increase values with some assays (162). Iron-deficiency anemia is reported to increase test results (164). There is no substantial effect of food intake on test results. Hypertriglyceridemia, hyperbilirubinemia, uremia, chronic alcoholism, chronic ingestion of salicylates, and opiate addiction are reported to interfere with some assay methods, falsely increasing results (139, 165–167).

Several hemoglobinopathies (e.g., Hb S, C, Graz, Sherwood Forest, D, and Padova) and chemically modified derivatives of hemoglobin interfere with some assay methods, independent of any effects attributable to shortened erythrocyte survival [(168–170); for a review, see Ref. (171)]. Depending on the particular hemoglobinopathy and assay method, results can be either falsely increased or decreased. Some methods may give a value in the reference interval for a nondiabetic patient with a hemoglobin variant, but this is not an assurance that no interference is present; the interference may be subtle in the reference interval, but may increase steadily with increasing GHb. Boronate affinity chromatographic assay methods are generally considered to be less affected by hemoglobinopathies than methods that separate glycated and nonglycated components based on charge differences. In some cases, such as with most cation-exchange HPLC methods, manual inspection of chromatograms can alert the laboratory to the presence of either a variant or a possible interference. Alternative nonhemoglobin-based methods for assessing long-term glycemic control may be useful in these situations (171).

Because interferences are method specific, product instructions from the manufacturer should be reviewed before use of the GHb assay method. In selecting an assay method, the laboratory should take into consideration characteristics of the patient population served, i.e., high prevalence of hemoglobinopathies.

**Sample collection, handling, and storage.** Blood can be obtained by venipuncture or by fingerprick capillary sampling (172, 173). Blood tubes should contain anticoagulant as specified by the manufacturer of the GHb assay method (EDTA can be used unless otherwise specified by the manufacturer). Sample stability is assay method specific (174, 175). In general, whole blood samples are stable for up to 1 week at 4 °C. For most methods, whole blood samples stored at −70 °C or colder are stable long term (at least 1 year), but specimens are not stable at −20 °C. Improper handling of specimens, such as storage at high temperatures, can introduce large artifacts that may not be detectable, depending on the assay method.

Recently, several convenient blood collection systems have been introduced, including filter paper and small vials containing stabilizing/lysing reagent (176–178). These systems are designed for field collection of specimens with routine mailing to the laboratory. These systems are generally matched to specific assay methods and should be used only if studies have been performed to establish comparability of test results using these collection systems with standard sample collection and handling methods for the specific assay method used.

### Analytical

> Recommendations: Laboratories should use GHb assay methods with an interassay CV<5% (ideally <3%). At least two control materials with different mean values should be analyzed as an independent measure of assay performance. Laboratories should verify specimens below the lower limit of the reference interval or >15% by repeat testing. If Schiff base (labile pre-Hb $A_{1c}$) interferes with the assay method, it should be removed before assay.
>
> Level of evidence: C

**Performance goals and quality control.** Several expert groups have presented recommendations for assay performance. Early reports recommended that the interassay CV be <5% at the GHb concentrations found in apparently healthy and diabetic individuals (179). More recent reports suggested lower CVs, e.g., intralaboratory <3% and interlaboratory <5% (180). These recommendations are reasonable: intraindividual CVs are very small (<2%), and many current assay methods can achieve CVs <3%. We recommend intralaboratory CV <3%.

The laboratory should include two control materials with different mean values (high and low) at the beginning and end of each day's run. Frozen whole blood controls stored at −70 °C or colder in single-use aliquots are ideal and are stable for months or even years depending on the assay method. Lyophilized controls are commercially available but, depending on the assay method, may show matrix effects when new reagents or columns are introduced. It is recommended that the laboratory consider using both commercial and in-house controls to optimize performance monitoring.

**Reference intervals.** The laboratory should determine its own reference interval according to NCCLS guidelines (NCCLS Document C28A) even if the manufacturer has provided one. Test participants should be nonobese and have FPG <6.1 mmol/L (110 mg/dL). For NGSP-certified assay methods, the SD for the reference interval is generally ≤0.5% GHb, producing a 95% CI of ≤2% GHb (e.g., mean Hb $A_{1c}$ ± 2 SD = 5.0% ± 1.0%). For NGSP-certified assay methods, reference intervals should not deviate significantly (e.g., >0.5%) from the 4–6% range. Note that ADA target values derived from the DCCT and UKPDS (9), not the reference values, are used to evaluate metabolic control in patients.

**Out-of-range specimens.** The laboratory should repeat testing for all sample results below the lower limit of the reference interval, and if confirmed, the physician should be informed to see whether the patient has an abnormal hemoglobin or evidence of red cell destruction. In addition, sample results >15% GHb should be repeated, and if confirmed, the possibility of a hemoglobin variant should be considered (171).

**Removal of labile GHb.** Formation of GHb includes an intermediate Schiff base that is called "pre-$A_{1c}$" or labile $A_{1c}$ (181, 182). This material is formed rapidly with hyperglycemia and interferes with some GHb assay methods, primarily those that are charge based. For methods that are affected by this labile intermediate, manufacturer's instructions should be followed for its removal.

## INTERPRETATION

### Laboratory—physician interactions

The laboratory should work closely with physicians who order GHb testing. Proper interpretation of test results requires an understanding of the assay method, including its known interferences. For example, if the assay method is affected by hemoglobinopathies (independent of any shortened erythrocyte survival) or uremia, the physician should be made aware of this.

An important advantage of using a NGSP-certified assay method is that the laboratory can provide specific information relating GHb test results to both mean glycemia and outcome risks as defined in the DCCT and UKPDS (12, 90, 122). This information is available on the NGSP website. For example, each 1% change in GHb is related to a change in mean plasma glucose of ~2 mmol/L (35 mg/dL).

Some studies suggest that immediate feedback to patients at the time of the clinic visit with GHb test results improves their long-term glycemic control (183). However, additional studies are needed to confirm these findings before this strategy can be recommended. It is possible to achieve the goal of having GHb test results available at the time of the clinic visit by either having the patient send in a blood sample shortly before the scheduled clinic visit or by having a rapid assay system convenient to the clinic.

### Clinical application

> **Recommendations:** Treatment goals should be based on ADA recommendations, which include maintaining GHb concentrations <7% and reevaluation of the treatment regimen for GHb values >8%. (Note that these values are applicable only if the assay method is certified as traceable to the DCCT reference.) GHb testing should be performed at least biannually in all patients and quarterly for patients whose therapy has changed or who are not meeting treatment goals.
>
> Level of evidence: B

**Treatment goals.** GHb measurements are now a routine component of the clinical management of patients with diabetes mellitus. Principally on the basis of the results of the DCCT, the ADA has recommended that a primary goal of therapy is a GHb value <7% and that physicians should reevaluate the treatment regimen in patients with GHb concentrations consistently >8% (9, 10). These GHb values apply only to assay methods that are certified as traceable to the DCCT reference, with a reference interval of ~4–6% Hb $A_{1c}$ or Hb $A_{1c}$-equivalent. In the DCCT, each 10% reduction in GHb (e.g., 12% vs 10.8% or 8% vs 7.2%) was associated with ~45% lower risk for the progression of diabetic retinopathy (184). Similar risk reductions were found in the UKPDS (133). It should also be noted that in the DCCT and UKPDS, decreased GHb was associated with increased risk for serious hypoglycemia.

**Testing frequency.** There is no consensus on the optimal frequency of GHb testing. The ADA recommends that "for any individual patient, the frequency of GHb testing should be dependent on the judgment of the physician. In the absence of well-controlled studies that suggest a definite testing protocol, expert opinion recommends GHb testing at least two times a year in patients who are meeting treatment goals (and who have stable glycemic control) and more frequently (quarterly assessment) in patients whose therapy has changed or who are not meeting glycemic goals" (14). These testing recommendations are for patients with either type 1 or type 2 diabetes. Diabetes quality assurance programs, e.g., ADA Provider Recognition Program and HEDIS 2000 (134, 135), have generally required documentation of the

Docket No. C-06-349
A. Ex. 2
Page 18 of 37

percentage of patients with diabetes who have had at least one GHb determination during the preceding year. Studies have established that serial (quarterly for 1 year) measurements of GHb produce large improvements in GHb values in patients with type 1 diabetes (185).

**Interpretation.** GHb values in patients with diabetes are a continuum: they range from normal, in a small percentage of patients whose mean plasma glucose concentrations are close to those of nondiabetic individuals, to markedly increased values, e.g., two- to threefold increases in some patients, reflecting an extreme degree of hyperglycemia. Multiple comparisons between the two systems are required to generate this equation, which will be used only by manufacturers (not by individual clinical laboratories) to establish traceability. Proper interpretation of GHb test results requires that physicians understand the relationship between GHb values and mean plasma glucose, the kinetics of GHb, and specific assay limitations/interferences (90). Small changes in GHb (e.g., ± 0.5% GHb) over time may reflect assay variability rather than a true change in glycemic status.

### EMERGING CONSIDERATIONS
*Use of GHb for diabetes screening/diagnosis*
At present, the ADA does not recommend GHb for diabetes screening or diagnosis (186). There is considerable controversy surrounding this issue, and further studies are needed to determine whether GHb is useful for screening and/or diagnosis of diabetes (187–190). Harmonization of GHb assays has obviated one of the most commonly stated reasons for not using GHb for screening and/or diagnosis. Optimal clinical utility of GHb for screening and/or diagnosis will also require highly precise assay methods.

*Use of other glycated proteins, including advanced glycation end-products for routine management of diabetes mellitus*
Further studies are needed to determine whether other glycated proteins, such as fructosamine, are clinically useful for routine monitoring of patients' glycemic status. Further studies are also needed to determine whether measurements of advanced glycation end-products are clinically useful as predictors of risk for chronic diabetes complications (191). None of these analytes was evaluated in the DCCT or UKPDS.

*Global harmonization of GHb testing*
In 1995, the IFCC formed a Working Group on $HbA_{1c}$ Standardization (IFCC-WG). This committee, which includes members from the NGSP Steering Committee and Laboratory Network, has been evaluating several candidate reference methods and purified GHb materials (purified Hb $A_{1c}$) that potentially could provide firm links between the NGSP and GHb standardization programs in other countries (192). Such a scheme is particularly attractive because it would allow GHb test results worldwide to be comparable to those in the DCCT and UKPDS. The

IFCC has established a laboratory network, using both mass spectroscopy and capillary electrophoresis as candidate reference methods. The candidate reference material is a mixture of highly purified Hb $A_{1c}$ and Hb $A_0$ (193–195). Initial comparisons between samples analyzed by the IFCC Laboratory Network and the NGSP Laboratory Network are encouraging; there appears to be a linear relationship between the two reference systems (personal communication from Kor Miedema, Chairperson, IFCC-WG, January 17, 2000). If further studies confirm a consistent relationship between the two networks, it will be possible to use one of the IFCC reference methods to replace the current NGSP anchor (a designated comparison method with far less specificity for Hb $A_{1c}$ than either the mass spectroscopy or capillary electrophoresis methods).

Assuming that the IFCC reference system is adopted by the NGSP and other standardization programs, an important issue that would need to be addressed is the different values obtained between the networks. The IFCC reference system yields GHb concentrations lower than those measured in the DCCT and UKPDS. Therefore, the question is whether the lower IFCC-based values should be adopted along with the new reference system or whether the current values, which are traceable to the DCCT and widely used, should be retained. In the latter event, the results obtained with the IFCC reference system would be converted into DCCT-equivalent concentrations by an equation. Multiple comparisons between the two systems are required to generate this equation, which will be used only by manufacturers (not by individual clinical laboratories) to establish traceability. Proper resolution of this important question will require international consensus with a process that includes both clinicians and laboratorians.

### Genetic Markers
USE
*Diagnosis/Screening*
  **Type 1 diabetes**

> Recommendation: Routine measurement of genetic markers is not of value at this time for the diagnosis or management of patients with type 1 diabetes. For selected diabetic syndromes, valuable information can be obtained with definition of diabetes-associated mutations.
>
> Level of evidence: E

Genetic markers are currently of limited clinical value in the evaluation and management of patients with diabetes. However, they hold promise for the future. For immune-mediated (type 1A) diabetes (IMD), HLA typing can be useful to indicate absolute risk of diabetes (see Table 6), as extended by insulin (*INS*) gene typing (and in some populations by CTLA-4 gene typing), and can assist

### Table 6. Lifetime risk of type 1 diabetes in first-degree relatives (proband diagnosed before age 20).[a]

| Relative | Risk, % |
| --- | --- |
| Parents | 2.2 ± 0.6 |
| Children | 5.6 ± 2.8 |
| Siblings | 6.9 ± 1.3 |
| HLA-nonidentical sibling | 1.2 |
| HLA-haploidentical sibling | 4.9 |
| HLA-identical sibling | 15.9 |
| Identical twin | 30–40 |
| General population | 0.3 |

[a] From Harrison (205).

in assigning a probability of the diagnosis of IMD to diabetes of uncertain etiology (196). As indicated below, HLA-DR/DQ typing can be useful to indicate modified risk of IMD in persons with positive islet cell autoantibodies because protective alleles do not prevent the appearance of islet cell autoantibodies (most often as single autoantibodies), but do protect against clinical diabetes. Typing of class II major histocompatibility antigens or HLA-DRB1, -DQA1, and -DQB1 is not diagnostic for IMD. However, some haplotypes form susceptibility, whereas others provide substantial protection. Thus, HLA-DR/DQ typing can be used only to increase or decrease the probability of IMD presentation and cannot be recommended for routine clinical diagnosis or classification (197).

It is possible to screen newborn children to identify those at increased risk of developing IMD (198, 199). This strategy cannot be recommended until there is a proven intervention available to delay or prevent the disease (200). The rationale for the approach is thus placed below under emerging considerations.

### Type 2 diabetes and maturity onset diabetes of youth (MODY)

> Recommendation: There is no role for routine genetic testing in patients with type 2 diabetes. These studies should be confined to the research setting and evaluation of specific syndromes.
>
> Level of evidence: E

Type 2 diabetes: Fewer than 5% of patients with type 2 diabetes have been resolved on a molecular genetic basis, and not surprisingly, most of these have an autosomal dominant form of the disease or very high degrees of insulin resistance. Type 2 diabetes is a heterogeneous polygenic disease with both resistance to the action of insulin and defective insulin secretion (3, 4). Multiple genetic factors interact with exogenous influences (e.g., environmental factors such as obesity) to produce the phenotype. Identification of the affected genes is therefore highly complex.

MODY: Mutation detection for MODY patients and

their relatives is technically feasible. However, because of the high cost of establishing a facility to detect mutations and the high degree of technical skill required for analysis, few laboratories perform these assays. As direct automated sequencing of genes becomes standard, it is likely that detection of specific diabetes mutations will become more common.

#### Monitoring/Prognosis

Although genetic screening may provide information about prognosis and could be useful for genetic counseling, genotype may not correlate with the phenotype. In addition to environmental factors, interactions among multiple quantitative trait loci expressions may be involved. Genetic identification of a defined MODY will have value for anticipating the prognosis.

#### RATIONALE

The HLA system, which has a fundamental role in the adaptive immune response, exhibits considerable genetic complexity. The HLA complex on chromosome 6 contains class I and II genes that code for several polypeptide chains (201). The major (classic) class I genes are HLA-A, -B, and -C. The loci of class II genes are designated by three letters: the first (D) indicates the class, the second (M, O, P, Q, or R) the family, and the third (A or B) the chain. Both classes of molecules are heterodimers: class I consists of an $\alpha$ chain and $\beta_2$-microglobulin, whereas class II has $\alpha$ and $\beta$ chains. The function of the HLA molecules is to present short peptides, derived from pathogens, to T cells to initiate the adaptive immune response (201). Genetic studies have revealed an association between certain HLA alleles and autoimmune diseases. These diseases include, but are not confined to, ankylosing spondylitis, celiac disease, Addison disease, and type 1 diabetes (201).

Genetic testing for syndromic forms of diabetes is the same as that for the underlying syndrome itself (1). Such diabetes may be secondary to the obesity associated with Prader-Willi syndrome, which maps to chromosome 15q, or to the absence of adipose tissue inherent to recessive Seip–Berardinelli syndrome of generalized lipodystrophy, which maps to chromosome 9q34 (1, 202). There are >60 distinct genetic disorders associated with glucose intolerance or frank diabetes. Most forms of type 2 diabetes (which are usually strongly familial) will probably be understood in defined genetic terms, but this is far from realized at present. Some genes for MODY have been identified, but there are large numbers of individual mutants. Persons at risk within MODY pedigrees can be identified through genetic means. Depending on the specific MODY mutation, the disease can be mild (e.g., glucokinase mutation) and not usually associated with long-term complications of diabetes or as severe as typical type 1 diabetes [e.g., hepatocyte nuclear factor (HNF) mutations] (203). The interest in the genetics of MODY is

Docket No. C-06-349
A. Ex. 2
Page 20 of 37

456      Sacks et al.: Laboratory Analysis in Diabetes Mellitus

the hope that insight will be obtained into type 2 diabetes. (Note that MODY is not a form of type 2 diabetes.)

Five different MODY types have been identified. MODY-1, -3, -4, and -5 all result from mutations in the genes encoding transcription factors that regulate the expression of genes in pancreatic $\beta$ cells. These genes are HNF-4$\alpha$ in MODY-1, HNF-1$\alpha$ in MODY-3, HNF-1$\beta$ in MODY-5, and insulin promoter factor-1 (IPF-1) in MODY-4. It has been shown that homozygous mutations of the IPF-1 gene lead to pancreatic agenesis and that heterozygous mutations of IPF-1 gene lead to MODY-4 (202). The modes of action of the HNF lesions in MODY are still not clear. It is likely that mutation in HNF-1$\alpha$, -1$\beta$, and -4$\alpha$ cause diabetes because they impair insulin secretion. MODY-2 is caused by mutations in the glucokinase gene. The product of the gene is an essential enzyme in the glucose-sensing mechanism of the $\beta$ cells, and mutations in this gene lead to partial deficiencies of insulin secretion.

ANALYTICAL CONSIDERATIONS

A detailed review of analytical issues will not be attempted here because genetic testing for diabetes outside of a research setting is currently not recommended for clinical care. Serologic HLA typing should be replaced by molecular methods, such as sequence-specific priming, because antibodies with a mixture of specificities and cross-reactivities have been estimated to give inaccurate results in ~15% of typings.

Preanalytical

Detection of mutations is performed using genomic DNA extracted from peripheral blood leukocytes. Blood samples should be drawn into test tubes containing EDTA, and the DNA preparations should be harvested within 3 days; longer periods both lower the yield and degrade the quality of the DNA obtained. Genomic DNA can be isolated from fresh or frozen whole blood by lysis, digestion with proteinase K, extraction with phenol, and then dialysis. The average yield is 100–200 $\mu$g of DNA from 10 mL of whole blood. DNA samples are best kept at $-80$ °C in Tris-EDTA solution, where the integrity of the sample lasts virtually indefinitely.

Analytical

Methods for the detection of mutations differ for different types of mutation. The different MODY types have substitution, deletion, or insertion of nucleotides in the coding region of the genes. These are detected by PCR. The detailed protocols for the detection of specific mutations are beyond the scope of this review.

EMERGING CONSIDERATIONS

To screen for the propensity for IMD in general populations, HLA-D genes are the most important, contributing as much as 50% of the genetic susceptibility (196).

HLA-DQ genes appear to be central to the HLA-associated risk of IMD, albeit HLA-DR genes may be independently involved [for a review, see Refs. (204, 205)]. The heterodimeric proteins that are expressed on antigen-presenting cells, B lymphocytes, platelets, and activated T cells, but not other somatic cells, are composed of cis- and trans-complemented $\alpha$- and $\beta$-chain heterodimers. Thus, in any individual, four possible DQ dimers are encoded. Positive risks for IMD are associated with $\alpha$ chains that have an arginine at residue 52 and $\beta$ chains that lack an aspartic acid at residue 57. Persons at the highest genetic risk for IMD are those in whom all four HLA-DQ combinations meet this criterion. Thus, persons heterozygous for HLA-DRB1*04-DQA1*0301-DQB1*0302 and DRB1*03-DQA1*0501-DQB1*0201 are the most susceptible, with an absolute lifetime risk for IMD in the general population of ~1:12. Persons who are protected from IMD are those with DRB1*15-DQA1*0201-DQB1*0602 (Asp 57+) haplotypes in particular (206), albeit those with DRB1*11 or *04 who also have DQB1*0301 (Asp 57 +) are protected. HLA-DR is also involved in susceptibility to IMD in that the B1*0401 and *0405 subtypes of DRB1*04 are susceptible, whereas the *0403 and *0406 subtypes are protective, even when found in HLA haplotypes of the susceptible DQA1*0301-DQB1*0302. DR molecules are also heterodimers, but the DR$\alpha$ chain is invariant in all persons. Additional DR$\beta$ chains (B3, B4, and B5) are not important.

Class II MHC is involved in antigen presentation to CD4 helper cells, and the above associations are likely to be explained by defective affinities to islet cell antigenic peptides, leading to persistence of T-helper cells that escape thymic ablation. Class I HLA is also implicated in IMD. Multiple non-HLA loci also contribute to susceptibility to type 1 diabetes (204). For example, the variable nucleotide tandem repeat upstream from the insulin (INS) gene on chromosome 11q is also useful for predicting the development of IMD, with alleles with the longest variable nucleotide tandem repeat having protective effects. Typing newborn infants for both HLA-DR/DQ, and to a lesser degree the INS gene, improves prediction of IMD to better than 1:10 in the general population. The risk of IMD in HLA-identical siblings of a proband with IMD is 1:4, whereas siblings who have HLA haplotype identity have a 1:12 risk and those with no shared haplotype a 1:100 risk (205). The numerous other putative genomic intervals suggested to be linked to IMD remain to be confirmed in multiple data sets, and discussion of these is outside the scope of this report. The sequencing of the human genome and the formation of consortia should lead to advances in the identification of the genetic bases for both type 1 and type 2 diabetes. This progress should ultimately lead to family counseling, prognostic information, and the selection of optimal treatment (202, 207).

673

*Clinical Chemistry* 48, No. 3, 2002

457

## Autoimmune Markers

USE

> **Recommendation:** Islet cell autoantibodies are recommended for screening of nondiabetic family members who wish to donate part of their pancreas for transplantation to a relative with end stage, immune-mediated (type 1) diabetes. Islet cell autoantibodies are not recommended for routine diagnosis of diabetes or for screening.
>
> Level of evidence: E

No therapeutic intervention has been identified that will prevent diabetes *(204, 205)*. Therefore, although several autoantibodies have been detected in individuals with type 1 diabetes, measurement of these has very limited use outside of clinical studies. Because of the minimal indication for use of autoantibodies in routine management of patients with diabetes, this section will focus on the pragmatic aspects of clinical laboratory testing for autoantibodies at present and briefly address some areas of controversy.

### Diagnosis/Screening

**Diagnosis.** In type 1 diabetes, the insulin-producing $\beta$ cells of the pancreas are destroyed. In the vast majority of these patients, the destruction is mediated by T cells *(1)*. This is termed type 1A diabetes or (Table 1). Islet cell autoantibodies comprise autoantibodies to islet cell cytoplasm (ICAs); to native insulin, referred to as insulin autoantibodies (IAAs) *(208)*; to glutamic acid decarboxylase (GAD$_{65}$A) *(209–211)*; and to two tyrosine phosphatases [insulinoma-associated antigens IA-2A *(212)* and IA-2$\beta$A *(213)*]. Autoantibody markers of immune destruction are usually present in 85–90% of individuals with IMD when fasting hyperglycemia is initially detected *(1)*. Autoimmune destruction of the $\beta$ cells has multiple genetic predispositions and is modulated by undefined environmental influences. The autoimmunity may be present for months or years before the onset of symptoms. Patients with type 1A diabetes have a significantly increased risk of other autoimmune disorders, including celiac disease, Graves disease, thyroiditis, Addison disease, and pernicious anemia *(63)*. As many as 1 in 4 females with IMD have autoimmune thyroid disease, whereas 1 in 280 patients develop adrenal autoantibodies and adrenal insufficiency. A minority of patients with type 1 diabetes (type 1B; idiopathic) have no known etiology and no evidence of autoimmunity. Most of these patients are of African or Asian origin.

Approximately 10–15% of Caucasian adult patients who present with the type 2 diabetes phenotype also have islet cell autoantibodies *(214)*, particularly GAD$_{65}$A, which predict insulin dependency. This has been termed latent autoimmune diabetes of adulthood *(215)*. Although ICA- or GAD$_{65}$A-positive diabetic patients

progress faster to absolute insulinopenia than do antibody-negative patients, many antibody-negative (type 2) diabetic adults also progress (albeit more slowly) to insulin dependency with time. There is no role for islet cell autoantibody testing in patients with type 2 diabetes because the institution of insulin therapy is based on glucose control.

### Screening

> **Recommendation:** Screening of relatives of patients with type 1 diabetes or of persons in the general population for islet cell autoantibodies is not recommended at present.
>
> Level of evidence: E

The risk of developing IMD in relatives of patients with type 1 diabetes is ~5%, which is 15-fold higher than the risk in the general population (1:250–300 lifetime risk). Screening relatives of patients with IMD for islet cell autoantibodies can identify those at high risk of IMD. However, as many as 1–2% of healthy individuals have a single autoantibody and are at low risk of developing IMD *(216)*. Because of the low prevalence of IMD (~0.3% in the general population), the positive predictive value of a single autoantibody will be low *(205)*. The presence of multiple islet cell autoantibodies (IAA, GAD$_{65}$A, and IA-2A/IA-2$\beta$A) is associated with a risk of IMD >90% *(216, 217)*. However, until cost-effective screening strategies can be developed for young children and effective intervention therapy to prevent the clinical onset of the disease become available, such testing cannot be recommended outside of a research setting.

Children and young adults with certain HLA-DR and/or DQB1 chains (*0602/*0603/*0301) are mostly protected from IMD, but not from developing islet cell autoantibodies *(218)*. Because islet cell autoantibodies in these individuals have substantially reduced predictive significance, consideration should be given to excluding them from prevention trials.

### Monitoring/Prognosis

> **Recommendation:** There is currently no role for measurement of islet cell autoantibodies in the monitoring of patients in clinical practice. Islet cell autoantibodies are measured in research protocols and some clinical trials as surrogate end-points.
>
> Level of evidence: E

No acceptable therapy has been demonstrated to prolong survival of islet cells once diabetes has been diagnosed or to prevent the clinical onset of diabetes in islet cell autoantibody-positive individuals *(204)*. Thus, repeated testing for islet cell autoantibodies to monitor islet cell autoimmunity is not clinically useful at present. In

Docket No. C-06-349
A. Ex. 2
Page 22 of 37

islet cell or pancreas transplantation, the presence or absence of islet cell autoantibodies may clarify whether subsequent failure of the transplanted islets is attributable to recurrent autoimmune disease or to rejection (219). When a partial pancreas has been transplanted from an identical twin or HLA-identical sibling, appearance of islet cell autoantibodies may raise consideration of the use of immunosuppressive agents to try to halt recurrence of diabetes. Notwithstanding these theoretical advantages, the value of this therapeutic strategy has not been established.

Some experts have proposed that testing for islet cell autoantibodies may be useful in the following situations: (a) to identify a subset of adults initially thought to have type 2 diabetes but who have islet cell autoantibody markers of type 1 diabetes and progress to insulin dependency (220); (b) to screen nondiabetic family members who wish to donate a kidney or part of their pancreas for transplantation; (c) to screen women with GDM to identify those at high risk of progression to type 1 diabetes; and (d) to distinguish type 1 from type 2 diabetes in children to institute insulin therapy at the time of diagnosis (221, 222). For example, some pediatric diabetologists are now treating children thought to have type 2 diabetes with oral medications but treat autoantibody-positive children immediately with insulin. However, it is possible to follow patients who are islet cell autoantibody-positive to the point of metabolic decompensation and then institute insulin therapy. A small pilot trial from Japan suggests that insulin therapy in islet cell autoantibody-positive patients may preserve C-peptide (a measurement of insulin secretion) compared with oral medications (223), but this observation requires confirmation.

During the review of this manuscript by a panel of experts, it became evident that there is wide variability in clinical practice regarding the use of islet cell autoantibodies. Although some indicate that the results of autoantibody assays are clinically useful, others point to a lack of evidence. Although some clinicians, particularly those who treat pediatric patients, use autoantibody assays as outlined in the preceding paragraph, clinical studies are necessary to provide outcome data to validate this approach. There is no systematic review that addresses these questions.

RATIONALE

The presence of autoantibodies suggests that insulin therapy is the most appropriate therapeutic option, especially in a young person. Conversely, in children or young people without islet cell autoantibodies, consideration may be given to a trial of oral agents and lifestyle changes other than insulin therapy. There is no unanimity of opinion, but the presence of autoantibodies may alter therapy for subsets of patients, including Hispanic and African-American children with a potential diagnosis of non-IMD, adults with autoantibodies but clinically classified as having type 2 diabetes, and children with transient

hyperglycemia. The majority of nondiabetic individuals who have only one autoantibody will never develop diabetes. Although expression of multiple anti-islet cell autoantibodies is associated with greatly increased diabetes risk (216, 217), ~20% of individuals presenting with new-onset diabetes express only a single autoantibody.

ANALYTICAL CONSIDERATIONS

Recommendation: It is important that autoantibodies be measured only in an accredited laboratory with an established quality-control program and participation in a proficiency-testing program.

Level of evidence: E

ICAs are determined by indirect immunofluorescence on frozen sections of human pancreatic tails (224). ICAs measure the degree of binding of immunoglobulin to the islets and are compared with a standard serum of the Immunology of Diabetes Workshop group (225). The results are reported in Juvenile Diabetes Foundation (JDF) units. Positive results depend on the study or context in which they are used, but many laboratories use 10 JDF units determined on two separate occasions or a single result of $\geq$20 JDF units as significant titers that may convey an increased risk of IMD.

For IAAs, a radioisotopic method that calculates the displaceable insulin radioligand binding after the addition of excess nonradiolabeled insulin (226) is recommended. Results are reported as positive when the specific antibody binding is greater than the mean + 2 (or 3) SD for healthy persons. Each laboratory needs to assay at least 100 healthy individuals to determine its own values. Many laboratories use a cutoff value between 80 and 110 milliunits/L. An important caveat concerning IAA determination is that insulin antibodies develop after insulin therapy even in those persons who use human insulin.

For IA-2A and GAD$_{65}$A, a dual micromethod and RIA performed with $^{35}$S-labeled recombinant human IA-2 and $^3$H-labeled human recombinant GAD$_{65}$ in a rabbit reticulocyte expression system is currently used by many laboratories (216). Methods for both GAD$_{65}$A and IA-2A have recently become commercially available. GAD$_{65}$A, IA-2A, and IA-2$\beta$A are reported as positive when the signal is >99.7% (3 SD) of values in healthy controls (216). Comparison by multiple laboratories worldwide of a small number of quality-control sera sent out from the laboratory of one of the authors (N.M.) revealed a concordance >90% for classification of individuals as antibody positive or negative. The CDC is working with the Immunology of Diabetes Society to develop the Diabetes Autoantibody Standardization Program. A limited pilot proficiency-testing program using samples obtained from patients with type 1 diabetes was begun recently. It is not yet clear whether this program will become generally available.

Docket No. C-06-349
A. Ex. 2
Page 23 of 37

*Clinical Chemistry* 48, No. 3, 2002

459

## INTERPRETATION

In newly diagnosed patients with type 1 diabetes, ICAs are found in ~75–85%, $GAD_{65}As$ in ~60%, IA-2As in ~40%, and IA-2βAs in ~20%. IAAs are positive in >90% of children who develop type 1 diabetes before age 5, but in <40% in individuals developing diabetes after age 12.

In some laboratories, the ICA assay is considered to be the most sensitive and specific single test for the detection of type 1 diabetes. However, the ICA assay is labor-intensive and difficult to standardize, and marked inter-laboratory variability in sensitivity and specificity has been demonstrated in workshops *(207, 227)*. Few clinical laboratories are likely to implement this test. The immunoassays are more reproducible. Measurement of T-cell reactivity in peripheral blood is theoretically appealing (because T cells mediate islet destruction), but the variability of such assays precludes their use in a clinical setting *(228, 229)*.

Autoantibody-positivity is reported (by definition) in some healthy individuals despite an absence of family history of autoimmune diseases. Islet cell autoantibodies are no exception. If one autoantibody is found, the others should be assayed because the risk of IMD increases if two or more autoantibodies are positive *(205, 217)*. For the standardized ICA assay, replicate titers in excess of 10 JDF units predict an increased risk of diabetes. Similarly, IAA concentrations above the mean + 3 SD of healthy controls also predict an increased risk of diabetes, and when associated with ICA or another antibody, carry a risk of 20–50%.

The following suggestions have been proposed by Atkinson and Eisenbarth *(204)* as a rational approach to the use of autoantibodies in diabetes: (*a*) antibody assays should have specificity >99%; (*b*) proficiency testing should be documented; (*c*) multiple autoantibodies should be assayed; and (*d*) sequential measurements should be performed. These strategies will reduce false-positive and -negative results.

## EMERGING CONSIDERATIONS

Because immunoassays for IAA, GAD, and IA-2A/IA-2βA are now available, it is likely that a panel of these autoantibodies will eventually be used for screening purposes, possibly with ICAs used for confirmatory testing. Because ICAs may represent either $GAD_{65}$ or IA-2 autoantibodies and ICA assays are difficult to standardize, some experts in the field do not use ICA testing at all. Cost considerations aside, the best screening would be through all of the above autoantibodies, including ICAs. However, this recommendation is controversial and some experts disagree.

It is likely that other islet cell antigens will be discovered, which could lead to additional diagnostic and predictive tests for IMD. For example, GLIMA-38 *(230)* is associated with IMD, but its prognostic significance has not been established. Autoantibody screening on fingerstick blood samples appears quite feasible in the future. In those individuals who are islet cell autoantibody positive, *HLA-DR/DQ* genotyping can help define absolute risks of diabetes.

Several clinical trials to prevent IMD are being actively pursued *(205)*. Such trials can now be done in relatives of patients with type 1 diabetes or in the general population on the basis of the islet cell autoantibody and/or *HLA-DR/DQ* genotype status. Risk can be assessed by islet cell autoantibodies alone, without the need for evaluation of endogenous insulin reserves as was done for the US DPT-1 trial. Autoantibody positivity rates are distinctly lower in the general population than in relatives of individuals with IMD, so that trials in the latter group are more economical. Potential interventional therapies (for IMD) undergoing clinical trials include oral or nasal insulin given to patients at the time of diagnosis of diabetes or to nondiabetic, but islet cell autoantibody-positive, relatives of individuals with IMD. Trials of a vaccine based on immunization by an insulin β-chain peptide or $GAD_{65}$ are scheduled to begin soon. Additional trials of other antigen-based immunotherapies, adjuvants, cytokines, and T-cell accessory molecule-blocking agents are likely in the future *(200)*. Decreased islet cell autoimmunity will be one important outcome measure of these therapies.

## Microalbuminuria

### USE

*Diagnosis/Screening*

Diabetes is the leading cause of end-stage renal disease in the US and Europe *(231)*. Early detection of diabetic nephropathy relies on tests for urinary excretion of albumin. Conventional qualitative tests (chemical strips or dipsticks) for albuminuria do not detect the small increases in urinary albumin excretion seen in early stages of nephropathy. For this purpose, tests for "microalbuminuria" are used. Microalbuminuria is defined *(231)* as excretion of 30–300 mg of albumin/24 h (or 20–200 $\mu$g/min or 30–300 $\mu$g/mg of creatinine; Table 7) on two of three urine collections.[10]

The ADA recommends periodic qualitative (dipstick) testing for urine albumin in adults with diabetes *(231)*. Positive tests represent "clinical albuminuria" or "overt nephropathy" in the ADA recommendations, corresponding to protein excretion >300 mg/24 h (>200 $\mu$g/min or >300 $\mu$g/mg of creatinine; Table 7). In these patients, quantitative measurement of urine protein excretion is used in the assessment of the severity of proteinuria and its progression, in planning treatment, and in determining the impact of therapy. Measurement of creatinine clearance as an index of glomerular filtration rate can be

---

[10] Although the term microalbuminuria is recognized as a misnomer (the albumin is not small), the term is well entrenched and not likely to be replaced by alternatives, e.g., paucialbuminuria or increased urinary albumin excretion (UAE) rate.

676

Docket No. C-06-349
A. Ex. 2
Page 24 of 37

**Table 7. Definitions of microalbuminuria and clinical albuminuria.[a]**

|  | Albumin excretion | | |
|---|---|---|---|
|  | mg/24 h | µg/min | µg/mg of creatinine |
| Normal | <30 | <20 | <30 |
| Microalbuminuria | 30–300 | 20–200 | 30–300 |
| Clinical albuminuria[b] | >300 | >200 | >300 |

[a] From ADA (14).
[b] Also called "overt nephropathy".

performed on the same timed (usually 12-h or 24-h) urine collection. Negative dipstick tests for "clinical proteinuria" (albumin excretion <300 mg/day) should be followed with a test for microalbuminuria. For children with type 1 diabetes, testing for microalbuminuria is recommended to begin after puberty and after duration of diabetes for 5 years.

The recommendation to screen for microalbuminuria is based on expert opinion that considered such things as the natural history of diabetic nephropathy and the evidence from many randomized controlled clinical trials on the benefit of treatment of those patients found to have microalbuminuria.

In the ADA algorithm for urine protein testing (231), the diagnosis of microalbuminuria requires the demonstration of increased albumin excretion (as defined above) in two of three tests repeated at intervals of 3–6 months as well as exclusion of conditions that "invalidate" the test.

*Prognosis*
Microalbuminuria has prognostic significance. In 80% of people with type 1 diabetes and microalbuminuria, urinary albumin excretion increases at a rate of 10–20% per year, with development of clinical proteinuria (>300 mg albumin/day) in 10–15 years. After development of clinical grade proteinuria, most (>80%) patients go on to develop decreased glomerular filtration rate and, given enough time, end-stage renal disease. In type 2 diabetes, 20–40% of patients with microalbuminuria progress to overt nephropathy, but by 20 years after overt nephropathy, only ~20% develop end-stage renal disease. In addition, patients with diabetes (type 1 and 2) and microalbuminuria are at increased risk for cardiovascular disease.

*Monitoring*
The roles of routine urinalysis and albumin measurements are less clear in patients with a diagnosis of microalbuminuria. Some have advocated urine protein testing to monitor treatment, which may include improved glycemic control, more assiduous control of hypertension, dietary protein restriction, and therapy with angiotensin inhibitors (231). Therapy (e.g., with angiotensin-converting enzyme inhibitors) has been shown to slow the rate of increase of urinary albumin excretion or to

prevent it in short-term studies, and intensive glycemic control is associated with delayed progression of urinary albumin excretion [for a recent study, see Ref. (232)]. Patients who were prescribed angiotensin-converting enzyme inhibitors are not being tested as frequently as others (233). This finding points to an ambiguity in current guidelines because recommendations for renal screening in patients on angiotensin-converting enzyme inhibitors are not clearly defined.

RATIONALE

Recommendation: Annual microalbumin testing of patients without clinical proteinuria should begin in pubertal or postpubertal individuals 5 years after diagnosis of type 1 diabetes and at the time of diagnosis of type 2 diabetes. The role of testing is unclear in patients under treatment with angiotensin-converting enzyme inhibitors and in those with a short life expectancy.

Level of evidence: E

Early detection of microalbuminuria allows early intervention with a goal of delaying the onset of overt diabetic nephropathy. As stated earlier, microalbuminuria is a marker of increased risk of cardiovascular morbidity and mortality in both type 1 and type 2 diabetes. Thus, it is a signal for more intensive efforts to reduce cardiovascular risk factors.

Microalbuminuria rarely occurs with a short duration of type 1 diabetes or before puberty. Thus, testing is less urgent in these situations. Although the difficulty in precisely dating the onset of type 2 diabetes warrants initiation of annual testing early after the diagnosis of diabetes, older patients (age >75 years or life expectancy <20 years) may never be at risk for clinically significant nephropathy in view of a projected life span that is too brief for renal dysfunction to develop. In such patients, the role of treating microalbuminuria is far from clear, and the need to screen for it thus is uncertain at best.

ANALYTICAL CONSIDERATIONS
*Analytical*

Recommendation: The analytical CV of methods to measure microalbuminuria should be <15%.

Level of evidence: E

Analytical goals can be related to the degree of biological variation, with less precision required for analytes that vary widely in individuals to be tested. The within-person variation of albumin excretion is large in people without diabetes and even higher in patients with diabetes. Howey et al. (234) studied day-to-day variation, over 3–4 weeks, of the 24-h albumin excretion, the concentra-

Docket No. C-06-349
A. Ex. 2
Page 25 of 37

**Table 7. Definitions of microalbuminuria and clinical albuminuria.**[a]

| | Albumin excretion | | |
|---|---|---|---|
| | mg/24 h | μg/min | μg/mg of creatinine |
| Normal | <30 | <20 | <30 |
| Microalbuminuria | 30–300 | 20–200 | 30–300 |
| Clinical albuminuria[b] | >300 | >200 | >300 |

[a] From ADA (14).
[b] Also called "overt nephropathy".

performed on the same timed (usually 12-h or 24-h) urine collection. Negative dipstick tests for "clinical proteinuria" (albumin excretion <300 mg/day) should be followed with a test for microalbuminuria. For children with type 1 diabetes, testing for microalbuminuria is recommended to begin after puberty and after duration of diabetes for 5 years.

The recommendation to screen for microalbuminuria is based on expert opinion that considered such things as the natural history of diabetic nephropathy and the evidence from many randomized controlled clinical trials on the benefit of treatment of those patients found to have microalbuminuria.

In the ADA algorithm for urine protein testing (231), the diagnosis of microalbuminuria requires the demonstration of increased albumin excretion (as defined above) in two of three tests repeated at intervals of 3–6 months as well as exclusion of conditions that "invalidate" the test.

*Prognosis*
Microalbuminuria has prognostic significance. In 80% of people with type 1 diabetes and microalbuminuria, urinary albumin excretion increases at a rate of 10–20% per year, with development of clinical proteinuria (>300 mg albumin/day) in 10–15 years. After development of clinical grade proteinuria, most (>80%) patients go on to develop decreased glomerular filtration rate and, given enough time, end-stage renal disease. In type 2 diabetes, 20–40% of patients with microalbuminuria progress to overt nephropathy, but by 20 years after overt nephropathy, only ~20% develop end-stage renal disease. In addition, patients with diabetes (type 1 and 2) and microalbuminuria are at increased risk for cardiovascular disease.

*Monitoring*
The roles of routine urinalysis and albumin measurements are less clear in patients with a diagnosis of microalbuminuria. Some have advocated urine protein testing to monitor treatment, which may include improved glycemic control, more assiduous control of hypertension, dietary protein restriction, and therapy with angiotensin inhibitors (231). Therapy (e.g., with angiotensin-converting enzyme inhibitors) has been shown to slow the rate of increase of urinary albumin excretion or to

prevent it in short-term studies, and intensive glycemic control is associated with delayed progression of urinary albumin excretion [for a recent study, see Ref. (232)]. Patients who were prescribed angiotensin-converting enzyme inhibitors are not being tested as frequently as others (233). This finding points to an ambiguity in current guidelines because recommendations for renal screening in patients on angiotensin-converting enzyme inhibitors are not clearly defined.

RATIONALE

Recommendation: Annual microalbumin testing of patients without clinical proteinuria should begin in pubertal or postpubertal individuals 5 years after diagnosis of type 1 diabetes and at the time of diagnosis of type 2 diabetes. The role of testing is unclear in patients under treatment with angiotensin-converting enzyme inhibitors and in those with a short life expectancy.

Level of evidence: E

Early detection of microalbuminuria allows early intervention with a goal of delaying the onset of overt diabetic nephropathy. As stated earlier, microalbuminuria is a marker of increased risk of cardiovascular morbidity and mortality in both type 1 and type 2 diabetes. Thus, it is a signal for more intensive efforts to reduce cardiovascular risk factors.

Microalbuminuria rarely occurs with a short duration of type 1 diabetes or before puberty. Thus, testing is less urgent in these situations. Although the difficulty in precisely dating the onset of type 2 diabetes warrants initiation of annual testing early after the diagnosis of diabetes, older patients (age >75 years or life expectancy <20 years) may never be at risk for clinically significant nephropathy in view of a projected life span that is too brief for renal dysfunction to develop. In such patients, the role of treating microalbuminuria is far from clear, and the need to screen for it thus is uncertain at best.

ANALYTICAL CONSIDERATIONS
*Analytical*

Recommendation: The analytical CV of methods to measure microalbuminuria should be <15%.

Level of evidence: E

Analytical goals can be related to the degree of biological variation, with less precision required for analytes that vary widely in individuals to be tested. The within-person variation of albumin excretion is large in people without diabetes and even higher in patients with diabetes. Howey et al. (234) studied day-to-day variation, over 3–4 weeks, of the 24-h albumin excretion, the concentra-

Docket No. C-06-349
A. Ex. 2
Page 25 of 37

*Clinical Chemistry* 48, No. 3, 2002

tion of albumin, and the albumin:creatinine ratio. The latter two were measured in the 24-h urine sample and also in (*a*) the first morning void and (*b*) random untimed urine. In healthy volunteers, the lowest within-person CVs were found for the concentration of albumin in the first morning void (36%) and for the albumin:creatinine ratio in that sample (31%). They recommended use of the urine albumin concentration in the first morning void rather than the 24-h urinary excretion of albumin, which had a higher within-person CV.

To keep the analytical CV less than one-half the biological CV, Howey et al. (*234*) proposed an analytical goal of CV = 18%. Alternatively, if the albumin:creatinine ratio is to be used, one may calculate the need for somewhat lower imprecision (i.e., a better precision) to accommodate the lower biological CV for the ratio and the imprecision contributed by the creatinine measurement. Assuming a CV of 5% for the measurement of creatinine, we calculate a goal of 14.7% for the analytical CV for albumin when it is used to estimate the albumin:creatinine ratio. A goal of 15% appears reasonable to accommodate use of the measured albumin concentration for calculation of either the timed excretion rate or the albumin:creatinine ratio.

In individuals with diabetes, the within-person variation (CV) was 61% for the albumin concentration in the first morning void and 39% for the albumin:creatinine ratio. Thus, the goals above appear more than adequate for use in individuals with diabetes.

### Premeasurement

Recommendation: Acceptable samples to test for increased urinary albumin excretion are timed (e.g., 12 or 24 h) collections for measurement of albumin concentration and timed or untimed samples for measurement of the albumin:creatinine ratio. For screening, an untimed sample for albumin measurement (without creatinine) may be considered if a concentration cutoff is used that allows high sensitivity for detection of an increased albumin excretion rate.

Level of evidence: E

Collection of 24-h samples has advantages (e.g., possibility to measure creatinine clearance), but the albumin:creatinine ratio appears to be an acceptable alternative. The ratio has a within-person biological variation similar to that of the excretion rate and correlates well with timed excretion as well as with albumin concentration in a first morning void of urine (*234*). A first morning void sample is somewhat preferable for the ratio because the ratio in a

first morning void sample had a lower within-person variation than does the ratio in a random sample of urine during the day (*234*). Although the ratio appears entirely acceptable for screening, limited data are available for its use in monitoring the response to therapy, and 12- or 24-h collections may be preferable.

Albumin is stable in untreated urine stored at 4 or 20 °C for at least 1 week (*235*). Neither centrifugation nor filtration appears necessary before storage at −20 or −80 °C (*236*). Whether centrifuged, filtered, or not treated, albumin concentration decreased by 0.27% per day at −20 °C but showed no decrease over 160 days at −80 °C (*236*).

The urinary albumin excretion rate reportedly has no marked diurnal variation in diabetes, but it does in essential hypertension (*237*).

### Measurement: detection limit, imprecision

Commercially available quantitative methods for microalbuminuria have documented detection limits of ~20 $\mu g/L$ or lower. Within-run imprecision and day-to-day (total) imprecision are well within the analytical goal of ~15%, and often are much lower. A recent study showed that most methods, but not all, agree well with each other and support a reference interval of 2–20 $\mu g$ albumin/mg of creatinine (*238*).

Recommendation: Semiquantitative or qualitative screening tests for microalbuminuria should be positive in >95% of patients with microalbuminuria to be useful for screening. Positive results must be confirmed by analysis in an accredited laboratory.

Level of evidence: E

Qualitative (or semiquantitative) tests for microalbuminuria have been proposed for use as screening tests for microalbuminuria. To be useful, screening tests must have high detection rates for abnormal samples, i.e., a high clinical sensitivity. Although many studies have assessed the ability of reagent strips (dipstick methods) for microalbumin to detect increased albumin concentrations in urine, the important question is whether the method can detect microalbuminuria, i.e., increased albumin excretion rate or its surrogate, increased albumin:creatinine ratio. We can find no published study in which the sensitivity for detection of an increased albumin excretion rate reached 95%.

In a large study (*239*), the sensitivity for detection of an albumin excretion rate >30 mg/24 h was 91% when the test was performed by a single laboratory technician, 86% when performed by nurses, and 66% when performed by general practitioners. In two more recent studies (*240, 241*), the sensitivities were 67–86%. False-positive results also appear to be common, with false-positive rates as high as 15% (*239*). Thus it appears that at least

Docket No. C-06-349
A. Ex. 2
Page 26 of 37

some of the tests, especially as used in practice, have the wrong characteristics for use in screening because of low sensitivity (high false-negative rates), and positive results must be confirmed by a laboratory method.

The available dipstick methods for microalbumin do not appear to lend themselves to viable screening strategies either in the physician's office or for home testing. The usual screening tests (e.g., for phenylketonuria) have low false-negative rates, and thus, only positive results require confirmation by a quantitative method. When a screening test has low diagnostic sensitivity, negative results also must be confirmed, a completely untenable approach. With semiquantitative tests, it may be possible (or indeed necessary) to use a cutoff <20 mg/L to ensure detection of samples with albumin >20 mg/L as measured by laboratory methods.

We recommend evaluation of chemical strip methods by testing of samples with albumin concentrations in the range of 20–50 mg/L because it is insufficient to show that the methods can detect albumin at higher concentrations.

Further studies are needed before the dipstick tests for microalbuminuria can be recommended as replacements for the quantitative tests. The use of the qualitative tests at the point of care is reasonable only when it can be shown to avoid quantitative testing in a sizeable proportion of patients and to ensure detection of those patients who have early renal disease.

### INTERPRETATION
#### Nonanalytical sources of variation
Transient increases of urinary albumin excretion have been reported with short-term hyperglycemia, exercise, urinary tract infections, marked hypertension, heart failure, and acute febrile illness (231).

#### Frequency of measurement
The ADA recommends annual measurement for microalbumin in patients with negative (dipstick) results for overt proteinuria. After the documentation of a diagnosis of microalbuminuria (i.e., with results as defined above in two of three tests performed within a period of 3–6 months), repeated testing is reasonable to determine whether a chosen therapy is effective. It may also be useful in determining the rate of progression of disease and thus support planning for care of end-stage renal disease. Although the ADA recommendations suggest that such testing is not generally needed before puberty, testing may be considered on an individual basis if it appears appropriate because of early onset of diabetes, poor control, or family history of diabetic nephropathy. A recent study indicated that the duration of diabetes before puberty is an important risk factor in this age group and thus can be used to support such testing in individual patients (232).

### Miscellaneous Potentially Important Analytes
INSULIN AND PRECURSORS

> Recommendation: There is no role for routine testing for insulin, C-peptide, or proinsulin in most patients with diabetes. Differentiation between type 1 and type 2 diabetes may, in most cases, be made based on the clinical presentation and subsequent course. There is no role for measurement of insulin concentration in the diagnosis of the metabolic syndrome because knowledge of this value does not alter the management of these patients.
>
> These assays are useful primarily for research purposes and, in rare cases, to identify patients with an absolute requirement for insulin before switching to oral agents, or to assist patients in obtaining insurance coverage for continuous subcutaneous infusion pumps.
>
> A possible role for measurement of fasting insulin or the assessment of insulin resistance is in the evaluation of patients with polycystic ovary syndrome who may be candidates for treatment aimed at lowering insulin resistance in the absence of overt diabetes or glucose intolerance.
>
> Level of evidence: E

#### Use
In the last several years, interest has increased in the possibility that measurements of the concentration of plasma insulin and its precursors might be of clinical benefit. In particular, evidence has been published that increased concentrations of insulin and/or proinsulin in nondiabetic individuals predict the development of CAD (242). Although this possibility may be scientifically valid, its clinical utility is questionable. An increased insulin concentration is a surrogate marker that can be used to estimate resistance to insulin-mediated glucose disposal and can identify individuals at risk for developing syndrome X, also known as the insulin resistance syndrome (243). Accurate measurement of insulin sensitivity requires the use of complex methods, such as the hyperinsulinemic euglycemic clamp technique, which are generally confined to research laboratories (244, 245).

However, important as these changes may be in identifying such individuals, it is not clear that they are responsible for the increased risk of CAD. Consequently, it seems of greater clinical utility to quantify the consequences of the insulin resistance and hyperinsulinemia (or hyperproinsulinemia) rather than the hormone values themselves, i.e., by measuring blood pressure, degree of glucose tolerance, and plasma triglyceride and HDL-cholesterol concentrations. It is these changes that are the

*Clinical Chemistry* 48, No. 3, 2002

focus of clinical interventions, not plasma insulin or proinsulin concentrations.

The clinical utility of measuring insulin, C-peptide, or proinsulin concentrations to help select the best antihyperglycemic agent for initial therapy in patients with type 2 diabetes is a question that arises from consideration of the pathophysiology of type 2 diabetes. In theory, the lower the pretreatment insulin concentration, the more appropriate might be insulin, or an insulin secretagogue, as the drug of choice to initiate treatment. Although this line of reasoning may have some intellectual appeal, there is no evidence that measurement of plasma insulin or proinsulin concentrations will lead to more efficacious treatment of patients with type 2 diabetes.

In contrast to the above considerations, measurement of plasma insulin and proinsulin concentrations is necessary to establish the pathogenesis of fasting hypoglycemia *(246)*. The diagnosis of an islet cell tumor is based on the persistence of inappropriately increased plasma insulin concentrations in the face of a low glucose concentration. In addition, an increase in the ratio of fasting proinsulin to insulin in hypoglycemic patients who have difficulty maintaining euglycemia strongly suggests the presence of an islet cell tumor. The absence of these associated changes in glucose, insulin, and proinsulin concentrations in an individual with fasting hypoglycemia makes the diagnosis of an islet cell tumor most unlikely, and alternative explanations should be sought for the inability to maintain fasting euglycemia.

Measurement of the C-peptide response to intravenous glucagon can aid in the rare cases in which it is difficult to differentiate between the diagnosis of type 1 and type 2 diabetes *(247)*. However, even in this clinical situation, the response to drug therapy will provide useful information, and measurement of C-peptide is not clinically necessary. In rare cases, it may be helpful to measure C-peptide concentrations before discontinuation of insulin. An example would be an obese adolescent presenting with DKA who may have type 2 diabetes and could be safely managed with an oral agent after resolution of glucotoxicity *(248)*. Measurement of C-peptide is essential in the investigation of possible factitious hypoglycemia attributable to surreptitious insulin administration *(249)*.

Finally, an emerging use for insulin assays is in the evaluation and management of patients with the polycystic ovary syndrome. Women with this syndrome manifest insulin resistance by androgen excess as well as by abnormalities of carbohydrate metabolism; emerging evidence suggests that both abnormalities may respond to treatment with metformin or thiazolidinediones. Although clinical trials have generally used the hyperinsulinemic euglycemic clamp to evaluate insulin resistance, fasting glucose-to-insulin ratios, and other modalities, the optimal laboratory evaluation of these patients is not yet clearly defined. It is certainly reasonable to document insulin resistance in a patient with polycystic ovary syndrome who does not have diabetes or IGT before begin-

ning an insulin-sensitizing agent such as metformin or a thiazolidinedione *(10)*.

*Analytical considerations*

Although assayed for >40 years, there is no standardized method available to measure serum insulin *(248)*. Measurement of insulin, proinsulin, and C-peptide is accomplished by immunometric methods. Reference intervals have not been firmly established. Proinsulin reference intervals are dependent on methodology, and each laboratory should establish its own reference interval. Although it has been suggested by some, insulin measurement should not be used in an OGTT to diagnose diabetes. In the case of C-peptide, there is a discrepancy in reliability because of variable specificity among antisera, lack of standardization of C-peptide calibration, and variable cross-reactivity with proinsulin. Of note is the recent requirement of the US Centers for Medicare and Medicaid Services (CMS) that Medicare patients must have C-peptide measured to be eligible for coverage of insulin pumps. Initially, the requirement was that the C-peptide be ≤0.5 μg/L; however, because noncomparability of results from different assays led to denial of payment for some patients with values >0.5 μg/L, the requirement now states that the C-peptide should be less than the lower limit of the reference interval for the particular assay, plus 10% to account for the imprecision of the test *(250)*.

INSULIN ANTIBODIES

> Recommendation: There is no published evidence to support the use of insulin antibody testing for routine care of patients with diabetes.
>
> Level of evidence: E

Given sufficiently sensitive techniques, insulin antibodies can be detected in any patient being treated with exogenous insulin *(248)*. In the vast majority of patients, the titer of insulin antibodies is low, and their presence is of no clinical significance. Very low values are seen in patients treated exclusively with human recombinant insulin *(251)*. However, on occasion, the titer of insulin antibodies in the circulation can be quite high and associated with dramatic resistance to the ability of exogenous insulin to decrease plasma glucose concentrations. This clinical situation is quite rare and usually occurs in insulin-treated patients with type 2 diabetes, and the cause-and-effect relationships between the magnitude of the increase in insulin antibodies and the degree of insulin resistance is unclear. There are several therapeutic approaches for treating these patients, and a quantitative estimate of the concentration of circulating insulin antibodies does not appear to be of substantial benefit.

Docket No. C-06-349
A. Ex. 2
Page 28 of 37

464

Sacks et al.: Laboratory Analysis in Diabetes Mellitus

AMYLIN

> Recommendation: Assays for amylin are not clinically useful in the management of diabetes. These studies should be confined to the research setting.
>
> Level of evidence: E

Amylin is a 37-amino acid pancreatic peptide first described in 1987 (252, 253). Amylin is cosecreted and colocated with insulin by the pancreatic β cells in response to nutrient intake. The peptide appears to help regulate glucose metabolism by delaying gastric emptying and decreasing glucagon production. Amylin deficiency may occur in insulinopenic type 2 patients. Trials of an amylin analog, pramlintide, are currently underway. At the present time, there is no clinical utility in measuring amylin.

LEPTIN

> Recommendation: Routine measurement of plasma leptin concentrations is not of value at this time for the evaluation or management of patients with diabetes or obesity.
>
> Level of evidence: E

Leptin is a recently discovered 167-amino acid protein synthesized by adipose tissue that appears to play a role in regulating appetite and energy intake via the hypothalamus, as well as influencing thermogenesis and reproductive functions (254, 255). Although certain strains of genetically obese mice have a deficiency of leptin and lose weight when leptin is replaced, many obese humans have increased leptin concentrations.

Aside from rare cases of leptin deficiency, plasma leptin concentrations seem to vary directly with adiposity and plasma insulin concentrations. At this stage of knowledge, the only situation in which knowing the leptin concentration would be useful is in suspected cases of leptin deficiency, characterized by early-onset, massive obesity (256). Obese persons usually have increased serum concentrations of leptin and appear to be resistant to its thermogenic and appetite suppressant effects.

LIPIDS

> Recommendation: All adults with diabetes should receive annual lipid profiles. Individuals at low risk, i.e., those with LDL <2.6 mmol/L (100 mg/dL) and HDL >1.15 mmol/L (45 mg/dL) for men and >1.4 mmol/L (55 mg/dL) for women, may be screened less frequently. Because many patients with diabetes are candidates for lipid-lowering therapy, more frequent measurements may be required until control is achieved.
>
> Level of evidence: A

*Use*

CAD is the major cause of morbidity and mortality in patients with type 2 diabetes (257, 258), and attempts to ameliorate this situation must emphasize the diagnosis and treatment of dyslipidemia when present. Consequently, measurement of lipids is an important clinical practice recommendation for people with diabetes, especially type 2, although type 1 patients are also at increased risk for cardiovascular disease. Because this topic is covered in detail elsewhere (257, 260), only brief mention of it is made here.

Small, dense LDL particles, hypertriglyceridemia, and low HDL concentrations characterize diabetic dyslipidemia. Generally speaking, diabetic patients can have lipid profiles measured in the same manner as the general population of patients appropriate for lipid screening.

The clinical evaluation of patients with type 2 diabetes should include quantification of plasma cholesterol, LDL-cholesterol, HDL-cholesterol, and triglyceride concentrations. The ADA categorizes patients as high risk with LDL ≥3.35 mmol/L (130 mg/dL), HDL ≤0.90 mmol/L for men and <1.15 mmol/L for women (35 mg/dL for men and 45 mg/dL for women), and triglycerides ≥4.5 mmol/dL (400 mg/dL); intermediate risk as LDL ≥2.60–3.35 mmol/L (100–129 mg/dL), HDL concentrations of 0.9–1.15 mmol/L (35–45 mg/dL), and triglyceride concentrations of 2.30–4.5 mmol/L (200–399 mg/dL); and low risk as LDL ≤2.6 mmol/L (100 mg/dL), HDL >1.15 mmol/L (45 mg/dL) for men and >1.40 mmol/L (55 mg/dL) for women (259). These guidelines are also in agreement with the new Adult Treatment Panel III (ATP-III) guidelines recently issued by the National Cholesterol Education Program (260, 261).

*Analytical considerations*

**Preanalytical.** Lipid profiles should be performed in the fasting state because LDL and especially triglyceride concentrations are dramatically affected by food intake.

**Analytical.** In most cases, accurate measurement can be accomplished by the usual clinical laboratory approach of directly measuring total plasma cholesterol and triglyceride concentrations, precipitating HDL and measuring the cholesterol concentration of the precipitate, and calculating the LDL-cholesterol concentration. This approach is satisfactory under most conditions, but it is inadequate if the plasma triglyceride concentrations are ≥4.5 mmol/L (400 mg/dL). In this situation, ultracentrifugation separation and measurement of the cholesterol and triglyceride concentrations in the specific lipoprotein fractions will be necessary to ensure accurate quantification of LDL- and HDL-cholesterol concentrations. Methods for the direct analysis of LDL are also available.

Extensive national and international programs exist to ensure the accuracy and reliability of lipid and lipoprotein assays. The Lipid Standardization Program of the CDC and National Heart, Lung, and Blood

681

*Clinical Chemistry* 48, No. 3, 2002

465

Institute provides standardization for lipid and lipoprotein measurements. The CDC has established a Cholesterol Reference Laboratory Network to facilitate access to the National Reference System for Cholesterol and provide a means for clinical laboratories and manufacturers to verify traceability to the CDC reference method *(259)*.

*Emerging considerations: new cardiovascular risk factors*

> Recommendations: Measurement of nontraditional cardiovascular risk factors, such as C-reactive protein, fibrinogen, apolipoprotein (apo) B, and homocysteine, is not recommended for routine assessment of risk in patients with diabetes because the results would not lead to changes of therapy. Should ongoing trials support the use of folic acid to lower CAD by lowering homocysteine concentrations, or the use of other specific therapies aimed at one or more nontraditional risk factors, this recommendation may change.
>
> Level of evidence: E

Recently, evidence has been emerging that nontraditional risk factors may play an important role in the pathogenesis of CAD. Traditional laboratory risk factors, including hyperlipidemia, decreased HDL and an increased ratio of total cholesterol to LDL, clearly do not explain all of the variance in cardiovascular event rates. These nontraditional or novel risk factors include plasma homocysteine, fibrinolytic capacity, fibrinogen, and C-reactive protein *(262)*.

Lipid fractions that have been studied include $HDL_2$ and $HDL_3$, lipoprotein(a), apo A-1, and apo B. In particular, apo B has been shown in prospective observational studies to be strongly associated with cardiovascular events *(263)*. However, the therapeutic implications of this association are unclear because therapy that decreases LDL-cholesterol concentrations reduces event rates without altering apo B concentrations. Current recommendations of the ADA, the National Cholesterol Education Program, and the American Heart Association are that treatment decisions should be based on results of conventional lipid profiles, including total cholesterol, LDL, HDL, and triglycerides, as well as consideration of other risk factors. There are no published studies showing that measurement of additional lipid fractions is associated with improved treatment outcomes.

Inflammatory processes may play a role in the pathogenesis of atherosclerotic disease. C-reactive protein is a sensitive marker for inflammation and adds to the predictive value of total and HDL-cholesterol in predicting the risk of a future coronary event *(264)*. Several immunometric assays are commercially available, but reference intervals vary among assays *(264)*. The clinical value of these assays has yet to be established, but it is possible

that measurement of C-reactive protein may eventually be helpful in risk stratification of persons at average risk based on lipid determinations; patients with average risk based on the ratio of total to HDL-cholesterol but who have higher than normal C-reactive protein concentrations may be more likely to benefit from aspirin or hydroxymethylglutaryl-CoA reductase inhibitors than those with low or normal concentrations. For patients with diabetes, all of whom are categorized as high risk, measurement of C-reactive protein may be less informative.

A hypercoagulable state may contribute to cardiovascular risk in diabetes. Fibrinogen has been shown, in several prospective studies, to be positively associated with cardiovascular events. Other thrombogenic factors that may be associated with cardiovascular disease include plasminogen activator inhibitor-1, factor VII, and tissue-type plasminogen activator *(262)*. The clinical utility of these analytes has not been established.

Homocysteine has also received considerable attention as a possible modifiable risk factor for CAD. A recent systematic review concluded that there is strong epidemiologic evidence of a link between homocysteine concentrations and CAD *(265, 266)*. Homocysteine may also be associated with increased mortality after a coronary event and with microvascular complications. Increased total homocysteine concentrations are associated with increased cardiovascular mortality in patients with type 2 diabetes *(260)*. Although relatively simple and inexpensive measures, such as supplemental folate, vitamin $B_6$, and vitamin $B_{12}$ therapy, may reduce homocysteine concentrations, it is unclear whether this will produce a reduction of CAD. Clinical trials are currently underway to resolve this issue. Additionally, the fortification of all enriched grain products with folic acid, mandated in the US since 1998, has lowered homocysteine concentrations in the general population *(267)*. Until the effectiveness of lowering homocysteine concentrations is established, it is uncertain what additional benefit may be achieved by measuring homocysteine.

We are deeply indebted to the following experts, who provided insightful and valuable comments on the document: John Eckfeldt, University of Minnesota (Minneapolis, MN); George Eisenbarth, University of Colorado Health Sciences Center (Denver, CO); Callum Fraser, Ninewells Hospital and Medical School (Dundee, Scotland); Len Harrison, Walter and Eliza Hall Institute, Royal Melbourne Hospital (Melbourne, Australia); Ake Lernmark, University of Washington (Seattle, WA); Randie Little, University of Missouri (Columbia, MO); Kor Miedema, Ziekenhuis De Weezenlanden (JW Zwolle, The Netherlands); David Nathan, Harvard Medical School (Boston, MA); and Michael Steffes, University of Minnesota (Minneapolis, MN). We thank the following for comments: Jim Boyd, Robert Dufour, Steven Johnson,

Gerald Kost, Matthew Meerkin, Patricia Mueller, Gary Myers, Kimberly Porter, William Roberts, and Sverre Sandberg.

## References

1. American Diabetes Association. Report of the Expert Committee on the diagnosis and classification of diabetes mellitus. Diabetes Care 1997;20:1183–201.
2. Castano L, Eisenbarth GS. Type-I diabetes. A chronic autoimmune disease of human, mouse, and rat. Annu Rev Immunol 1990;8:647–79.
3. Reaven GM. Role of insulin resistance in human disease. Diabetes 1988;37:1595–607.
4. Sacks DB, McDonald JM. The pathogenesis of type II diabetes mellitus: a polygenic disease. Am J Clin Pathol 1996;105:149–56.
5. American Diabetes Association. Economic consequences of diabetes mellitus in the U.S. in 1997. Diabetes Care 1998;21:296–309.
6. Nathan DM. Long-term complications of diabetes mellitus. N Engl J Med 1993;328:1676–85.
7. Geiss L, Engelgau M, Frazier E, Tierney E. Diabetes surveillance, 1997. Atlanta, GA: Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, 1997.
8. National Diabetes Data Group. Classification and diagnosis of diabetes mellitus and other categories of glucose intolerance. Diabetes 1979;28:1039–57.
9. American Diabetes Association. Tests of glycemia in diabetes. Diabetes Care 2001;24(Suppl 1):S80–2.
10. American Diabetes Association. Type 2 diabetes in children and adolescents. Diabetes Care 2000;23:381–9.
11. CDC. Diabetes Cost-Effectiveness Study Group. The cost-effectiveness of screening for type 2 diabetes. JAMA 1998;280:1757–63.
12. DCCT Research Group. The effect of intensive treatment of diabetes on the development and progression of long-term complications in insulin-dependent diabetes mellitus. N Engl J Med 1993;329:977–86.
13. UK Prospective Diabetes Study (UKPDS) Group. Intensive blood-glucose control with sulphonylureas or insulin compared with conventional treatment and risk of complications in patients with type 2 diabetes (UKPDS 33). Lancet 1998;352:837–53.
14. American Diabetes Association. Standards of medical care for patients with diabetes mellitus. Diabetes Care 2000;23(Suppl 1):S32–42.
15. Sasaki A. Assessment of the new criteria for diabetes mellitus according to 10-year relative survival rates. Diabetologia 1981;20:195–8.
16. Sasaki A, Uehara M, Horiuchi N, Hasegawa K, Shimizu T. A 15-year follow-up study of patients with non-insulin-dependent diabetes mellitus (NIDDM) in Osaka, Japan. Factors predictive of the prognosis of diabetic patients. Diabetes Res Clin Pract 1997;36:41–7.
17. Andersson DKG, Svardsudd K. Long-term glycemic control relates to mortality in type II diabetes. Diabetes Care 1995;18:1534–43.
18. Gerstein HC, Pais P, Pogue J, Yusuf S. Relationship of glucose and insulin levels to the risk of myocardial infarction: a case-control study. J Amer Coll Cardiol 1999;33:612–9.
19. Howie-Davies S, Simpson RW, Turner RC. Control of maturity-onset diabetes by monitoring fasting blood glucose and body weight. Diabetes Care 1980;5:607–10.
20. Muir A, Howe-Davies SA, Turner RC. General practice care of

non-insulin-dependent diabetes with fasting blood glucose measurements. Am J Med 1982;73:637–40.
21. Harris MI. Undiagnosed NIDDM. Clinical and public health issues. Diabetes Care 1993;16:642–52.
22. Harris MI, Flegal KM, Cowie CC, Eberhardt MS, Goldstein DE, Little RR, et al. Prevalence of diabetes, impaired fasting glucose, and impaired glucose tolerance in U.S. adults. Diabetes Care 1998;21:518–24.
23. Troisi RJ, Cowie CC, Harris MI. Diurnal variation in fasting plasma glucose: implications for diagnosis of diabetes in patients examined in the afternoon. JAMA 2000;284:3157–9.
24. Chan AYW, Swaminathan R, Cockram CS. Effectiveness of sodium fluoride as a preservative of glucose in blood. Clin Chem 1989;35:315–7.
25. Ladenson JH. Nonanalytical sources of variation in clinical chemistry results. In: Sonnenwirth A, Jarett L, eds. Clinical laboratory methods and diagnosis. St. Louis, MO: CV Mosby, 1980:149–92.
26. Sacks DB. Carbohydrates. In: Burtis C, Ashwood E, eds. Tietz textbook of clinical chemistry, 3rd ed. Philadelphia: WB Saunders, 1999:750–808.
27. Ladenson JH, Tsai LM, Michael JM, Kessler G, Joist JH. Serum versus heparinized plasma for eighteen common chemistry tests: is serum the appropriate specimen? Am J Clin Pathol 1974;62:545–52.
28. Larsson-Cohn U. Differences between capillary and venous blood glucose during oral glucose tolerance tests. Scand J Clin Lab Invest 1976;36:805–8.
29. Lind T, De Groot HA, Brown G, Cheyne GA. Observations on blood glucose and insulin determinations. BMJ 1972;3:320–3.
30. Tchobroutsky G. Blood glucose levels in diabetic and non-diabetic subjects. Diabetologia 1991;34:67–73.
31. Blunt BA, Barrett-Connor E, Wingard DL. Evaluation of fasting plasma glucose as screening test for NIDDM in older adults. Diabetes Care 1991;14:989–93.
32. DECODE. Consequences of the new diagnostic criteria for diabetes in older men and women. Diabetes Care 1999;22:1667–71.
33. Ferrannini E, Vichi S, Beck-Nielsen H, Laakso M, Paolisso G, Smith U. Insulin action and age. European group for the study of insulin resistance (EGIR). Diabetes 1996;45:947–53.
34. Genter PM, Ipp E. Accuracy of plasma glucose measurements in the hypoglycemic range. Diabetes Care 1994;17:595–8.
35. Fraser CG, Petersen PH. Analytical performance characteristics should be judged against objective quality specifications. Clin Chem 1999;45:321–3.
36. Stockl D, Baadenhuijsen H, Fraser CG, Libeer JC, Petersen PH, Ricos C. Desirable routine analytical goals for quantities assayed in serum. Eur J Clin Chem Clin Biochem 1995;33:157–69.
37. Fraser CG. The necessity of achieving good laboratory performance. Diabet Med 1990;7:490–3.
38. Olefsky JM, Reaven GM. Insulin and glucose responses to identical oral glucose tolerance tests performed 48 h apart. Diabetes 1974;23:449–53.
39. Widjaja A, Morris RJ, Levy JC, Frayn KN, Manley SE, Turner RC. Within- and between-subject variation in commonly measured anthropometric and biochemical variables. Clin Chem 1999;45:561–6.
40. Sebastian-Gambaro MA, Liron-Hernandez FJ, Fuentes-Arderiu X. Intra- and inter-individual biological variability data bank. Eur J Clin Chem Clin Biochem 1997;35:845–52.
41. Mooy JM, Grootenhuis PA, de Vries H, Kostense PJ, Popp-Snijders C, Bouter LM, et al. Intra-individual variation of glucose, specific insulin and proinsulin concentrations measured by two oral glucose tolerance tests in a general Caucasian population: the Hoorn Study. Diabetologia 1996;39:298–305.

Docket No. C-06-349
A. Ex. 2
Page 31 of 37

42. Ollerton RL, Playle R, Ahmed K, Dunstan FD, Luzio SD, Owens DR. Day-to-day variability of fasting plasma glucose in newly diagnosed type 2 diabetic subjects. Diabetes Care 1999;22:394–8.

43. Ricos C, Alvarez V, Cava F, Garcia-Lario JV, Hernandez A, Jimenez CV, et al. Current databases on biological variation: pros, cons and progress. Scand J Clin Lab Invest 1999;59:491–500.

44. Howanitz PJ, Cembrowski GS, Steindel SJ, Long TA. Physician goals and laboratory test turnaround times. A College of American Pathologists Q-Probes study of 2763 clinicians and 722 institutions. Arch Pathol Lab Med 1993;117:22–8.

45. Lewandrowski K, Cheek R, Nathan DM, Godine JE, Hurxthal K, Eschenbach K, et al. Implementation of capillary blood glucose monitoring in a teaching hospital and determination of program requirements to maintain quality testing. Am J Med 1992;4:419–26.

46. Harris MI, Cowie CC, Howie LJ. Self-monitoring of blood glucose by adults with diabetes in the United States population. Diabetes Care 1993;16:1116–23.

47. Thayer AM. Deciphering diseases. Chem Eng News 1999;August 30:19–28.

48. American Diabetes Association. Self-monitoring of blood glucose. Diabetes Care 1996;19(Suppl 1):S62–6.

49. Faas A, Schellevis FG, van Eijk JTM. The efficacy of self-monitoring of blood glucose in NIDDM subjects. Diabetes Care 1997;20:1482–6.

50. Coster S, Gulliford MC, Seed PT, Powrie JK, Swaminathan R. Self-monitoring in type 2 diabetes mellitus: a meta-analysis. Diabet Med 2000;17:755–61.

51. Harris MI. Frequency of blood glucose monitoring in relation to glycemic control in patients with type 2 diabetes. Diabetes Care 2001;24:979–82.

52. Gerich JE, Mokan M, Veneman T, Korytkowski M, Mitrakou A. Hypoglycemia unawareness. Endocr Rev 1991;12:356–71.

53. Tang Z, Lee JH, Louie RF, Kost GJ. Effects of different hematocrit levels on glucose measurements with handheld meters for point-of-care testing. Arch Pathol Lab Med 2000;124:1135–40.

54. American Diabetes Association. Consensus statement on self-monitoring of blood glucose. Diabetes Care 1994;17:81–6.

55. Tate PF, Clements CA, Walters JE. Accuracy of home blood glucose monitors. Diabetes Care 1992;15:536–8.

56. Chan JC, Wong RY, Cheung CK, Lam P, Chow CC, Yeung VT, et al. Accuracy, precision and user-acceptability of self blood glucose monitoring machines. Diabetes Res Clin Pract 1997;36:91–104.

57. Kabadi UM, O'Connell KM, Johnson J, Kabadi M. The effect of recurrent practice at home on the acceptability of capillary blood glucose readings. Accuracy of self blood glucose testing. Diabetes Care 1994;10:1110–23.

58. American Diabetes Association buyer's guide. Diabetes Forecast 2001;54:46–110.

59. Burnett RW, D'Orazio P, Fogh-Andersen N, Kuwa K, Kulpmann WR, Larsson L, et al. IFCC recommendation on reporting results for blood glucose. Clin Chim Acta 2001;307:205–9.

60. Weitgasser R, Gappmayer B, Pichler M. Newer portable glucose meters—analytical improvement compared with previous generation devices? Clin Chem 1999;45:1821–5.

61. American Diabetes Association. Consensus statement on self-monitoring of blood glucose. Diabetes Care 1987;10:93–9.

62. National Committee for Clinical Laboratory Standards. Ancillary (bedside) blood glucose testing in acute and chronic care facilities; approved guideline C30-A. Villanova, PA: NCCLS, 1994;14:1–14.

63. Clarke WL, Cox D, Goder-Frederick LA, Carter W, Pohl SL. Evaluating clinical accuracy of systems for self-monitoring of blood glucose. Diabetes Care 1987;10:622–8.

64. Skeie S, Thue G, Sandberg S. Patient-derived quality specifications for instruments used in self-monitoring of blood glucose. Clin Chem 2001;47:67–73.

65. Boyd JC, Bruns DE. Quality specifications for glucose meters: assessment by simulation modeling of errors in insulin dose. Clin Chem 2001;47:209–14.

66. Novis DA, Jones BA. Interinstitutional comparison of bedside blood glucose monitoring program characteristics, accuracy performance, and quality control documentation. Arch Pathol Lab Med 1998;122:495–502.

67. Brunner GA, Ellmerer M, Sendlhofer G, Wutte A, Trajanoski Z, Schaupp L, et al. Validation of home blood glucose meters with respect to clinical and analytical approaches. Diabetes Care 1998;21:585–90.

68. Schiffrin A, Belmonte M. Multiple daily self-glucose monitoring: its essential role in long-term glucose control in insulin-dependent diabetic patients treated with pump and multiple subcutaneous injections. Diabetes Care 1982;5:479–84.

69. Nathan DS. The importance of intensive supervision in determining the efficacy of insulin pump therapy. Diabetes Care 1983;6:295–7.

70. De Veciana M, Major CA, Morgan MA, Tamerou A, Toohey JS, Lien J, et al. Postprandial versus preprandial blood glucose monitoring in women with gestational diabetes mellitus requiring insulin therapy. N Engl J Med 1995;333:1237–41.

71. Alberti KG, Zimmet PZ. Definition, diagnosis and classification of diabetes mellitus and its complications. Part 1. Diagnosis and classification of diabetes mellitus provisional report of a WHO consultation. Diabet Med 1998;15:539–53.

72. The Expert Committee. The Expert Committee on the diagnosis and classification of diabetes mellitus. Report of the Expert Committee on the diagnosis and classification of diabetes mellitus. Diabetes Care 1999;22:S5–19.

73. Gimeno SGA, Ferreira SRG, Franco LJ, Junes M. The Japanese-Brazilian Diabetes Study Group. Comparison of glucose tolerance categories according to World Health Organization and American Diabetes Association diagnostic criteria in a population-based study in Brazil. Diabetes Care 1998;21:1889–992.

74. Tominaga M, Eguchi H, Manaka H, Igarashi K, Kato T, Sekikawa A. Impaired glucose tolerance is a risk factor for cardiovascular disease, but not impaired fasting glucose. The Funagata Diabetes Study. Diabetes Care 1999;22:920–4.

75. Perry RC, Baron AD. Impaired glucose tolerance. Why is it not a disease? Diabetes Care 1999;22:883–5.

76. Puavilai G, Chanprasertyotin S, Sriphrapradaeng A. Diagnostic criteria for diabetes mellitus and other categories of glucose intolerance: 1997 criteria by the Expert Committee on the Diagnosis and Classification of Diabetes Mellitus (ADA), 1998 WHO consultation criteria, and 1985 WHO criteria. World Health Organization. Diabetes Res Clin Pract 1999;44:21–6.

77. Harris MI, Eastman RC, Cowie CC, Flegal KM, Eberhardt MS. Comparison of diabetes diagnostic categories in the U.S. population according to the 1997 American Diabetes Association and 1980–1985 World Health Organization diagnostic criteria. Diabetes Care 1997;20:1859–62.

78. Balkau B. The DECODE study. Diabetes epidemiology: collaborative analysis of diagnostic criteria in Europe. Diabetes Metab 2000;26:282–6.

79. Ko GT, Chan JC, Woo J, Lau E, Yeung VT, Chow CC, et al. The reproducibility and usefulness of the oral glucose tolerance test in screening for diabetes and other cardiovascular risk factors. Ann Clin Biochem 1998;35:62–7.

80. Moses RG, Patterson MJ, Regan JM, Chaunchaiyakul R, Taylor NA, Jenkins AB. A non-linear effect of ambient temperature on

468                                    Sacks et al.: Laboratory Analysis in Diabetes Mellitus

apparent glucose tolerance. Diabetes Res Clin Pract 1997;36: 35–40.

81. Ganda OP, Day JL, Soeldner JS, Connon JJ, Gleason RE. Reproducibility and comparative analysis of repeated intravenous and oral glucose tolerance tests. Diabetes 1978;27:715–25.

82. American Diabetes Association. Gestational diabetes mellitus. Diabetes Care 2000;23:S77–9.

83. Barzilay JI, Spiekerman CF, Wahl PW, Kuller LH, Cushman M, Furberg CD, et al. Cardiovascular disease in older adults with glucose disorders: comparison of American Diabetes Association criteria for diabetes mellitus with WHO criteria. Lancet 1999;354:622–5.

84. Naylor CD, Sermer M, Chen E, Sykora K. Cesarean delivery in relation to birth weight and gestational glucose tolerance: pathophysiology or practice style? Toronto Trihospital Gestational Diabetes Investigators. JAMA 1996;275:1165–70.

85. DECODE Study Group. Glucose tolerance and mortality: comparison of WHO and American Diabetes Association diagnostic criteria. The DECODE Study Group. European Diabetes Epidemiology Group. Diabetes Epidemiology: Collaborative analysis of diagnostic criteria in Europe. Lancet 1999;354:617–21.

86. Hoffman L, Nolan C, Wilson JD, Oats JJ, Simmons D. Gestational diabetes mellitus—management guidelines. The Australasian Diabetes in Pregnancy Society. Med J Aust 1998;169:93–7.

87. Colman PG, Thomas DW, Zimmet PZ, Welborn TA, Garcia-Webb P, Moore MP. New classification and criteria for diagnosis of diabetes mellitus. Position Statement from the Australian Diabetes Society, New Zealand Society for the Study of Diabetes, Royal College of Pathologists of Australasia and Australasian Association of Clinical Biochemists. Med J Aust 1999;170: 375–8.

88. Metzger BE, Coustan DR. Summary and recommendations of the Fourth International Workshop-Conference on Gestational Diabetes Mellitus. The Organizing Committee. Diabetes Care 1998; 21:B161–7.

89. American Diabetes Association. Tests of glycemia in diabetes. Diabetes Care 1999;22:S77–9.

90. Goldstein DE, Little RR, Lorenz RA, Malone JI, Nathan D, Peterson CM. Tests of glycemia in diabetes. Diabetes Care 1995;18:896–909.

91. Pickup J, Rolinski O, Birch D. In vivo glucose sensing for diabetes management: progress towards non-invasive monitoring [interview by Judy Jones]. BMJ 1999;319:1289–92.

92. Khalil OS. Spectroscopic and clinical aspects of noninvasive glucose measurements. Clin Chem 1999;45:165–77.

93. Smith KM. Oak Ridge Conference introduction. Clin Chem 1999; 45:1586.

94. Bloomgarden ZT. American Diabetes Association annual meeting, 1999. New approaches to insulin treatment and glucose monitoring. Diabetes Care 1999;22:2078–82.

95. Haupt K, Mosbach K. Plastic antibodies: developments and applications. Trends Biotechnol 1998;16:468–75.

96. Chen G, Guan Z, Chen CT, Fu L, Sundaresan V, Arnold FH. A glucose-sensing polymer. Nat Biotechnol 1997;15:354–7.

97. James TC, Sananayake DRAS, Shinkai S. A glucose-selective molecular fluorescence sensor. Angew Chem Int Ed Engl 1994; 33:2207–9.

98. Birch DJS, Imhof RE. Time-domain fluorescence spectroscopy using time-correlated single-photon counting. Top Fluorescence Spectrosc 1994;1:1–95.

99. Tolosa L, Szmacinski H, Rao G, Lakowicz JR. Lifetime-based sensing of glucose using energy transfer with a long lifetime donor. Anal Biochem 1997;250:102–8.

100. Rolinski OJ, Birch DJS, McCartney LJ, Pickup JC. Near-infrared

assay for glucose determination. Soc Photooptical Instrum Eng Proc 1999;3602:6–14.

101. Marvin JS, Hellinga HW. Engineering biosensors by introducing fluorescent allosteric signal transducers: construction of a novel glucose sensor. J Am Chem Soc 1998;120:7–11.

102. Hoss U, Gessler R, Kalatz B, Salgado MI, Sternberg F, Fussganger R. Calibration-free continuous on-line glucose monitoring: the comparative microdialysis technique. Diabetologia 1998; 41(Suppl 1):45A.

103. Bolinder J, Ungerstedt U, Arner P. Microdialysis measurement of the absolute glucose concentration in subcutaneous adipose tissue allowing glucose monitoring in diabetic patients. Diabetologia 1992;35:1177–80.

104. Meyerhoff C, Bischof F, Sternberg F, Zier H, Pfeiffer EF. On line continuous monitoring of subcutaneous tissue glucose in men by combining portable glucosensor with microdialysis. Diabetologia 1992;35:1087–92.

105. Hashiguchi Y, Sakakida M, Nishida K, Uemura T, Kajiwara K, Shichiri M. Development of a miniaturized glucose monitoring system by combining a needle-type glucose sensor with microdialysis sampling method. Long-term subcutaneous tissue glucose monitoring in ambulatory diabetic patients. Diabetes Care 1994;17:387–96.

106. Tamada JA, Garg S, Jovanovic L, Pitzer KR, Fermi S, Potts RO. Noninvasive glucose monitoring: comprehensive clinical results. Cygnus Research Team. JAMA 1999;282:1839–44.

107. Garg SK, Potts RO, Ackerman NR, Fermi SJ, Tamada JA, Chase HP. Correlation of fingerstick blood glucose measurements with GlucoWatch Biographer glucose results in young subjects with type 1 diabetes. Diabetes Care 1999;22:1708–14.

108. Arnold MA. Non-invasive glucose monitoring. Curr Opin Biotechnol 1996;7:46–9.

109. Robinson MR, Eaton RP, Haaland DM, Koepp GW, Thomas EV, Stallard BR, et al. Noninvasive glucose monitoring in diabetic patients: a preliminary evaluation. Clin Chem 1992;38:1618–22.

110. Marbach R, Koschinski T, Gries FA, Heise HM. Non-invasive blood glucose assay by near-infrared diffuse reflectance spectroscopy of the human lip. Appl Spectrosc 1993;47:875–81.

111. Kajiwara K, Uemura T, Kishikawa H, Nishida K, Hashiguchi Y, Uehara M, et al. Noninvasive measurement of blood glucose concentrations by analysing Fourier transform infra-red absorbance spectra through oral mucosa. Med Biol Eng Comput 1993;31:S17–22.

112. Gabriely I, Wozniak R, Mevorach M, Kaplan J, Aharon Y, Shamoon H. Transcutaneous glucose measurement using near-infrared spectroscopy during hypoglycemia. Diabetes Care 1999;22:2026–32.

113. Heinemann L, Schmelzeisen-Redeker G. Non-invasive continuous glucose monitoring in Type I diabetic patients with optical glucose sensors. Non-Invasive Task Force (NITF). Diabetologia 1998;41:848–54.

114. Maier JS, Walker SA, Fantini S, Franceschini MA, Gratton E. Possible correlation between blood glucose concentration and the reduced light scattering coefficient of tissues in the near infrared. Optics Lett 1994;19:2062–4.

115. Christison GB, MacKenzie HA. Laser photoacoustic determination of physiological glucose concentrations in human whole blood. Med Biol Eng Comput 1993;31:284–90.

116. MacKenzie HA, Ashton HS, Spiers S, Shen Y, Freeborn SS, Hannigan J. Blood glucose measurements by photoacoustics. Biomed Optical Spectroscopy Diagnostics 1998;22:156–9.

117. MacKenzie HA, Ashton HS, Spiers S, Shen Y, Freeborn SS, Hannigan J, et al. Advances in photoacoustic noninvasive glucose testing. Clin Chem 1999;45:1587–95.

*Clinical Chemistry* 48, No. 3, 2002

469

118. Kreisberg RA. Diabetic ketoacidosis: new concepts and trends in pathogenesis and treatment. Ann Intern Med 1978;88:681–95.

119. Owen OE, Trapp VE, Skutches CL, Mozzoli MA, Hoeldtke RD, Boden G, et al. Acetone metabolism during diabetic ketoacidosis. Diabetes 1982;31:242–8.

120. Stephens JM, Sulway MJ, Watkins PJ. Relationship of blood acetoacetate and 3-hydroxybutyrate in diabetes. Diabetes 1971; 20:485–9.

121. Porter WH, Yao HH, Karounos DG. Laboratory and clinical evaluation of assays for β-hydroxybutyrate. Am J Clin Pathol 1997;107:353–8.

122. American Diabetes Association. Tests of glycemia [Position Statement]. Diabetes Care 2000;23(Suppl 1):S80–2.

123. Csako G. Causes, consequences, and recognition of false-positive reactions for ketones. Clin Chem 1990;36:1388–9.

124. Rosenbloom AL, Malone JI. Recognition of impending ketoacidosis delayed by ketone reagent strip failure. JAMA 1978;240: 2462–4.

125. McMurray CH, Blanchflower WJ, Rice DA. Automated kinetic method for D-3-hydroxybutyrate in plasma or serum. Clin Chem 1984;30:421–5.

126. Koch DD, Feldbruegge DH. Optimized kinetic method for automated determination of β-hydroxybutyrate. Clin Chem 1987;33: 1761–6.

127. D'arrigo T. Beyond blood glucose. Diabetes Forecast 1999;52: 37–8.

128. Westphal SA. The occurrence of diabetic ketoacidosis in non-insulin-dependent diabetes and newly diagnosed diabetic adults. Am J Med 1996;101:19–24.

129. Jovanovic-Petersen L, Peterson CM. Sweet success, but an acid aftertaste? N Engl J Med 1991;325:959–60.

130. Mercer DW, Losos FJ 3rd, Mason L, Kessler GF Jr. Monitoring therapy with insulin in ketoacidotic patients by quantifying 3-hydroxybutyrate with a commercial kit. Clin Chem 1986;32:224–5.

131. Wiggam MI, O'Kane MJ, Harper R, Atkinson AB, Hadden DR, Trimble ER, et al. Treatment of diabetic ketoacidosis using normalization of blood 3-hydroxybutyrate concentration as the endpoint of emergency management. A randomized controlled study. Diabetes Care 1997;20:1347–52.

132. Umpierrez GE, Watts NB, Phillips LS. Clinical utility of β-hydroxybutyrate determined by reflectance meter in the management of diabetic ketoacidosis. Diabetes Care 1995;18:137–8.

133. American Diabetes Association. Implications of the Diabetes Control and Complications Trial [Position Statement]. Diabetes Care 2000;23(Suppl 1):S24–6.

134. Davidson MB. Diabetes research and diabetes care. Where do we stand? Diabetes Care 1998;21:2152–60.

135. American Diabetes Association. Provider Notes 2000;1:1–4.

136. Bunn HF. Nonenzymatic glycosylation of protein: relevance to diabetes. Am J Med 1981;70:325–30.

137. Jovanovic L, Peterson CM. The clinical utility of glycosylated hemoglobin. Am J Med 1981;70:331–8.

138. Nathan DM, Singer DE, Hurxthal K, Goodson JD. The clinical information value of the glycosylated hemoglobin assay. N Engl J Med 1984;310:341–6.

139. Goldstein DE, Little RR, Wiedmeyer HM, England JD, McKenzie EM. Glycated hemoglobin: methodologies and clinical applications. Clin Chem 1986;32:B64–70.

140. Goldstein DE, Little RR, England JD, Wiedemeyer H-M, McKenzie E. Methods of glycosylated hemoglobins: high performance liquid chromatography and thiobarbituric acid colorimetric methods. In: Clarke WL, Larner J, Pohl SL, eds. Methods in diabetes research, Vol. 2. New York: John Wiley, 1986:475–504.

141. Tahara Y, Shima K. The response of GHb to stepwise plasma glucose change over time in diabetic patients. Diabetes Care 1993;16:1313–4.

142. Svendsen PA, Lauritzen T, Soegaard U, Nerup J. Glycosylated haemoglobin and steady-state mean blood glucose concentration in type 1 (insulin-dependent) diabetes. Diabetologia 1982; 23:403–5.

143. Cefalu WT, Wang ZQ, Bell-Farrow A, Kiger FD, Izlar C. Glycohemoglobin measured by automated affinity HPLC correlates with both short-term and long-term antecedent glycemia. Clin Chem 1994;40:1317–21.

144. Singer DE, Coley CM, Samet JH, Nathan DM. Tests of glycemia in diabetes mellitus. Their use in establishing a diagnosis and in treatment. Ann Intern Med 1989;110:125–37.

145. Molnar GD. Clinical evaluation of metabolic control in diabetes. Diabetes 1978;27:216–25.

146. UK Prospective Diabetes Study. Reduction in HbA1c with basal insulin supplement, sulfonylurea or biguanide therapy in maturity-onset diabetes. Diabetes 1985;34:793–8.

147. Baker JR, Johnson RN, Scott DJ. Serum fructosamine concentrations in patients with type II (non-insulin-dependent) diabetes mellitus during changes in management. BMJ (Clin Res Ed) 1984;288:1484–6.

148. Tahara Y, Shima K. Kinetics of HbA1c, glycated albumin, and fructosamine and analysis of their weight functions against preceding plasma glucose level. Diabetes Care 1995;18:440–7.

149. Little RR, Goldstein DE. Measurements of glycated haemoglobin and other circulating glycated proteins. In: Mogensen CE, Standl E, eds. Research methodologies in human diabetes. Part I. Berlin: W de Gruyter, 1994:299–317.

150. Peterson CM, Jovanovic L, Raskin P, Goldstein DE. A comparative evaluation of glycosylated haemoglobin assays: feasibility of references and standards. Diabetologia 1984;26:214–7.

151. Little RR, Wiedmeyer HM, England JD, Wilke AL, Rohlfing CL, Wians FH Jr, et al. Interlaboratory standardization of measurements of glycohemoglobins. Clin Chem 1992;38:2472–8.

152. Bodor GS, Little RR, Garrett N, Brown W, Goldstein DE, Nahm MH. Standardization of glycohemoglobin determinations in the clinical laboratory: three years of experience. Clin Chem 1992; 38:2414–8.

153. Weykamp CW, Penders TJ, Musklet FA, van der Slik W. Effect of calibration on dispersion of glycohemoglobin values determined by 111 laboratories using 21 methods. Clin Chem 1994;40: 138–44.

154. Little RR, Goldstein DE. Standardization of glycohemoglobin measurements. AACC Endo 1995;13:109–24.

155. Goldstein DE, Little RR. Bringing order to chaos: the National Glycohemoglobin Standardization Program. Contemp Int Med 1997;9:27–32.

156. NGSP Steering Committee. Implementation of the national glycohemoglobin standardization program (NGSP). Diabetes 1997; 46:151A.

157. Little RR, Rohlfing CL, Wiedmeyer H-M, Myers GL, Sacks DB, Goldstein DE. The National Glycohemoglobin Standardization Program (NGSP): a five-year progress report. Clin Chem 2001; 47:1985–92.

158. DCCT Research Group. Feasibility of centralized measurements of glycated hemoglobin in the diabetes control and complications trial: a multicenter study. Clin Chem 1987;33:2267–71.

159. Wiener K, Roberts NB. Age does not influence levels of HbA1c in normal subject. QJM 1999;92:169–73.

160. Kilpatrick ES, Dominiczak MH, Small M. The effects of ageing on glycation and the interpretation of glycaemic control in type 2 diabetes. QJM 1996;89:307–12.

161. Nuttall FQ. Effect of age on the percentage of hemoglobin A1c

Docket No. C-06-349
A. Ex. 2
Page 34 of 37

and the percentage of total glycohemoglobin in non-diabetic persons. J Lab Clin Med 1999;134:451–3.

162. Davie SJ, Gould BJ, Yudkin JS. Effects of vitamin C on glycosylation of proteins. Diabetes 1992;41:167–73.

163. Ceriello A, Giugliano D, Quataro A, Donzella C, Dipalo G, Lefebvre PJ. Vitamin E reduction of protein glycosylation in diabetes. New prospect for prevention of diabetic complications? Diabetes Care 1991;14:68–72.

164. Tarim O, Kucukerdogan A, Gunay U, Eralp O, Ercan I. Effects of iron deficiency anemia on hemoglobin A1c in type 1 diabetes mellitus. Pediatr Int 1999;41:357–62.

165. Nathan DM, Francis TB, Palmer JL. Effect of aspirin on determinations of glycosylated hemoglobin. Clin Chem 1983;29:466–9.

166. Stevens VJ, Fantl WJ, Newman CB, Sims RV, Cerami A, Peterson CM. Acetaldehyde adducts with hemoglobin. J Clin Invest 1981;67:361–9.

167. Ceriello A, Giugliano D, Dello Russo P, Sgambato S, D'Onofrio F. Increased glycosylated haemoglobin A1 in opiate addicts: evidence for a hyperglycaemic effect of morphine. Diabetologia 1982;22:379.

168. Roberts WL, Chiasera JM, Ward-Cook KM. Glycohemoglobin results in samples with hemoglobin C or S trait: a comparison of four test systems. Clin Chem 1999;45:906–9.

169. Weykamp CW, Penders TJ, Muskiet FA, van der Slik W. Influence of hemoglobin variants and derivatives on glycohemoglobin determinations, as investigated by 102 laboratories using 16 methods. Clin Chem 1993;39:1717–23.

170. Schnedl WJ, Krause R, Halwachs-Baumann G, Trinker M, Lipp RW, Krejs GJ. Evaluation of HbA1c determination methods in patients with hemoglobinopathies. Diabetes Care 2000;23:339–44.

171. Bry L, Chen PC, Sacks DB. Effects of hemoglobin variants and chemically modified derivatives on assays for glycohemoglobin. Clin Chem 2001;47:153–63.

172. Rendell M, Brannan C, Nierenberg J, Rasbold K, Hestorff T. Fingerstick glycosylated hemoglobin, plasma protein, and albumin. Diabetes Care 1987;10:629–32.

173. Ferrell RE, Hanis CL, Aguilar L, Tulloch B, Garcia C, Schull WJ. Glycosylated hemoglobin determination from capillary blood samples. Utility in an epidemiologic survey of diabetes. Am J Epidemiol 1984;119:159–66.

174. Little RR, England JD, Wiedmeyer HM, Goldstein DE. Effects of whole blood storage on results for glycosylated hemoglobin as measured by ion-exchange chromatography, affinity chromatography, and colorimetry. Clin Chem 1983;29:1113–5.

175. Little RR, England JD, Wiedmeyer HM, Goldstein DE. Glycosylated hemoglobin measured by affinity chromatography: micro-sample collection and room-temperature storage. Clin Chem 1983;29:1080–2.

176. Baglin SK, Brown AS. Two capillary blood-collection techniques for estimating glycohemoglobin compared. Clin Chem 1995;41:330–2.

177. Voss EM, Cembrowski GS, Clasen BL, Spencer ML, Ainslie MB, Haig B. Evaluation of capillary collection system for HbA1c specimens. Diabetes Care 1992;15:700–1.

178. Little RR, Wiedmeyer HM, Huang DH, Goldstein DE, Parson RG, Kowal R, et al. A simple blood collection device for analysis of glycohemoglobin (GHB). Clin Chem 1998;44:A139.

179. Baynes JW, Bunn HF, Goldstein D, Harris M, Martin DB, Peterson C, et al. National Diabetes Data Group: report of the Expert Committee on glucosylated hemoglobin. Diabetes Care 1984;7:602–6.

180. Marshall SM, Barth JH. Standardization of HbA1c measurements: a consensus statement. Ann Clin Biochem 2000;37:45–6.

181. Goldstein DE, Peth SB, England JD, Hess RL, Da Costa J. Effects of acute changes in blood glucose on HbA1c. Diabetes 1980;29:623–8.

182. Bannon P. Effect of pH on the elimination of the labile fraction of glycosylated hemoglobin. Clin Chem 1982;28:2183.

183. Cagliero E, Levina EV, Nathan DM. Immediate feedback of HbA1c levels improves glycemic control in type 1 and insulin-treated type 2 diabetic patients. Diabetes Care 1999;22:1785–9.

184. DCCT Research Group. The relationship of glycemic exposure (HbA1c) to the risk of development and progression of retinopathy in the diabetes control and complications trial. Diabetes 1995;44:968–83.

185. Larsen ML, Horder M, Mogensen EF. Effect of long-term monitoring of glycosylated hemoglobin levels in insulin-dependent diabetes mellitus. N Engl J Med 1990;323:1021–5.

186. The Expert Committee on the Diagnosis and Classification of Diabetes Mellitus. Report of the Expert Committee on the diagnosis and classification of diabetes mellitus. Diabetes Care 2000;23:S4–18.

187. Peters AL, Davidson MB, Schriger DL, Hasselblad V. A clinical approach for the diagnosis of diabetes mellitus: an analysis using glycosylated hemoglobin levels. Meta-analysis Research Group on the Diagnosis of Diabetes Using Glycated Hemoglobin Levels. JAMA 1996;276:1246–52.

188. Harris MI, Eastman RC. Early detection of undiagnosed non-insulin-dependent diabetes mellitus. JAMA 1996;276:1261–2.

189. Rohlfing CL, Little RR, Wiedmeyer HM, England JD, Madsen R, Harris MI, et al. Use of GHb (HbA1c) in screening for undiagnosed diabetes in the U.S. population. Diabetes Care 2000;23:187–91.

190. McCance DR, Hanson RL, Charles MA, Jacobsson LT, Pettitt DJ, Bennett PH, et al. Comparison of tests for glycated haemoglobin and fasting and two hour plasma glucose concentrations as diagnostic methods for diabetes. BMJ 1994;308:1323–8.

191. Makita Z, Radoff S, Rayfield EJ, Yang Z, Skolnik E, Delaney V, et al. Advanced glycosylation end products in patients with diabetic nephropathy. N Engl J Med 1991;325:836–42.

192. Hoelzel W, Miedema K. Development of a reference system for the international standardization of HbA1c/glycohemoglobin determinations. J Int Fed Clin Chem 1996;9:62–4,66–7.

193. Kobold U, Jeppsson JO, Dulffer T, Finke A, Hoelzel W, Miedema K. Candidate reference methods for hemoglobin A1c based on peptide mapping. Clin Chem 1997;43:1944–51.

194. Eckfeldt JH, Bruns DE. Another step toward standardization of methods for measurement of hemoglobin A$_{1c}$ [Editorial]. Clin Chem 1997;43:1811–3.

195. Miedema K. Electrospray mass spectrometry for measurement of glycohemoglobin. Clin Chem 1997;43:705–7.

196. Todd JA. Genetics of type 1 diabetes. Pathol Biol (Paris) 1997;45:219–27.

197. She JX. Susceptibility to type I diabetes: HLA-DQ and DR revisited. Immunol Today 1996;17:323–9.

198. Ziegler AG, Bachmann W, Rabl W. Prophylactic insulin treatment in relatives at high risk for type 1 diabetes. Diabetes Metab Rev 1993;9:289–93.

199. Rewers M, Bugawan TL, Norris JM, Blair A, Beaty B, Hoffman M, et al. Newborn screening for HLA markers associated with IDDM: diabetes autoimmunity study in the young (DAISY). Diabetologia 1996;39:807–12.

200. Kukreja A, Maclaren NK. Autoimmunity and diabetes. J Clin Endocrinol Metab 1999;84:4371–8.

201. Klein J, Sato A. The HLA system. First of two parts. N Engl J Med 2000;343:702–9.

202. Taylor SI, Arioglu E. Genetically defined forms of diabetes in children. J Clin Endocrinol Metab 1999;84:4390–6.

*Clinical Chemistry* 48, No. 3, 2002

203. Fajans SS, Bell GI, Bowden DW, Halter JB, Polonsky KS. Maturity onset diabetes of the young (MODY). Diabet Med 1996;13: S90–5.

204. Atkinson MA, Eisenbarth GS. Type 1 diabetes: new perspectives on disease pathogenesis and treatment. Lancet 2001;358: 221–9.

205. Harrison LC. Risk assessment, prediction and prevention of type 1 diabetes. Pediatr Diabetes 2001;2:71–82.

206. Redondo MJ, Kawasaki E, Mulgrew CL, Noble JA, Erlich HA, Freed BM, et al. DR- and DQ-associated protection from type 1A diabetes: comparison of DRB1*1401 and DQA1*0102-DQB1*0602*. J Clin Endocrinol Metab 2000;85:3793–7.

207. Maclaren NK, Kukreja A. Type 1 diabetes. In: Scriver CR, Sly WS, Childs B, Beaudet AR, Vaile D, Kinzler KW, Vogelstein B, eds. The metabolic and molecular bases of inherited disease, 8th ed. St. Louis: McGraw-Hill, 2001:1471–88.

208. Palmer JP, Asplin CM, Clemons P, Lyen K, Tatpati O, Raghu PK, et al. Insulin antibodies in insulin-dependent diabetics before insulin treatment. Science 1983;222:1337–9.

209. Baekkeskov S, Aanstoot HJ, Christgau S, Reetz A, Solimena M, Cascalho M, et al. Identification of the 64K autoantigen in insulin-dependent diabetes as the GABA-synthesizing enzyme glutamic acid decarboxylase [published erratum appears in Nature 1990;347:782]. Nature 1990;347:151–6.

210. Kaufman DL, Erlander MG, Clare-Salzler M, Atkinson MA, Maclaren NK, Tobin AJ. Autoimmunity to two forms of glutamate decarboxylase in insulin-dependent diabetes mellitus. J Clin Invest 1992;89:283–92.

211. Atkinson MA, Maclaren NK. Islet cell autoantigens in insulin-dependent diabetes. J Clin Invest 1993;92:1608–16.

212. Lan MS, Wasserfall C, Maclaren NK, Notkins AL. IA-2, a transmembrane protein of the protein tyrosine phosphatase family, is a major autoantigen in insulin-dependent diabetes mellitus. Proc Natl Acad Sci U S A 1996;93:6367–70.

213. Lu J, Li Q, Xie H, Chen ZJ, Borovitskaya AE, Maclaren NK, et al. Identification of a second transmembrane protein tyrosine phosphatase, IA-2β, as an autoantigen in insulin-dependent diabetes mellitus: precursor of the 37-kDa tryptic fragment. Proc Natl Acad Sci U S A 1996;93:2307–11.

214. Turner R, Stratton I, Horton V, Manley S, Zimmet P, Mackay IR, et al. UKPDS 25: autoantibodies to islet-cell cytoplasm and glutamic acid decarboxylase for prediction of insulin requirement in type 2 diabetes. UK Prospective Diabetes Study Group [published erratum appears in Lancet 1998;351:376]. Lancet 1997;350:1288–93.

215. Pozzilli P, Di Mario U. Autoimmune diabetes not requiring insulin at diagnosis (Latent Autoimmune Diabetes of the Adult): definition, characterization, and potential prevention. Diabetes Care 2001;24:1460–7.

216. Maclaren N, Lan M, Coutant R, Schatz D, Silverstein J, Muir A, et al. Only multiple autoantibodies to islet cells (ICA), insulin, GAD65, IA-2 and IA-2β predict immune-mediated (type 1) diabetes in relatives. J Autoimmun 1999;12:279–87.

217. Verge CF, Gianani R, Kawasaki E, Yu L, Pietropaolo M, Jackson RA, et al. Prediction of type I diabetes in first-degree relatives using a combination of insulin, GAD, and ICA512bdc/IA-2 autoantibodies. Diabetes 1996;45:926–33.

218. Schott M, Schatz D, Atkinson M, Krischer J, Mehta H, Vold B, et al. GAD65 autoantibodies increase the predictability but not the sensitivity of islet cell and insulin autoantibodies for developing insulin dependent diabetes mellitus. J Autoimmun 1994;7:865–72.

219. Braghi S, Bonifacio E, Secchi A. Di Carlo V, Pozza G, Bosi E. Modulation of humoral islet autoimmunity by pancreas allotrans-plantation influences allograft outcome in patients with type 1 diabetes. Diabetes 2000;49:218–24.

220. Zimmet P, Turner R, McCarty D, Rowley M, Mackay I. Crucial points at diagnosis. Type 2 diabetes or slow type 1 diabetes. Diabetes Care 1999;22:B59–64.

221. Petersen JS, Dyrberg T, Damm P, Kuhl C, Molsted-Pedersen L, Buschard K. GAD65 autoantibodies in women with gestational or insulin dependent diabetes mellitus diagnosed during pregnancy. Diabetologia 1996;39:1329–33.

222. Fuchtenbusch M, Ferber K, Standl E, Ziegler AG. Prediction of type 1 diabetes postpartum in patients with gestational diabetes mellitus by combined islet cell autoantibody screening: a prospective multicenter study. Diabetes 1997;46:1459–67.

223. Kobayashi T, Nakanishi K, Murase T, Kosaka K. Small doses of subcutaneous insulin as a strategy for preventing slowly progressive β-cell failure in islet cell antibody-positive patients with clinical features of NIDDM. Diabetes 1996;45:622–6.

224. Gleichmann H, Bottazzo GF. Progress toward standardization of cytoplasmic islet cell-antibody assay. Diabetes 1987;36:578–84.

225. Mire-Sluis AR, Gaines Das R, Lernmark A. The World Health Organization International Collaborative Study for islet cell antibodies. Diabetologia 2000;43:1282–92.

226. Williams AJ, Bingley PJ, Bonifacio E, Palmer JP, Gale EA. A novel micro-assay for insulin autoantibodies. J Autoimmun 1997;10: 473–8.

227. Verge CF, Stenger D, Bonifacio E, Colman PG, Pilcher C, Bingley PJ, et al. Combined use of autoantibodies (IA-2 autoantibody, GAD autoantibody, insulin autoantibody, cytoplasmic islet cell antibodies) in type 1 diabetes: Combinatorial Islet Autoantibody Workshop. Diabetes 1998;47:1857–66.

228. Ellis TM, Schatz DA, Ottendorfer EW, Lan MS, Wasserfall C, Salisbury PJ, et al. The relationship between humoral and cellular immunity to IA-2 in IDDM. Diabetes 1998;47:566–9.

229. Atkinson MA, Bowman MA, Campbell L, Darrow BL, Kaufman DL, Maclaren NK. Cellular immunity to a determinant common to glutamate decarboxylase and Coxsackie virus in insulin-dependent diabetes. J Clin Invest 1994;94:2125–9.

230. Aanstoot HJ, Kang SM, Kim J, Lindsay LA, Roll U, Knip M, et al. Identification and characterization of glima 38, a glycosylated islet cell membrane antigen, which together with GAD65 and IA2 marks the early phases of autoimmune response in type 1 diabetes. J Clin Invest 1996;97:2772–83.

231. American Diabetes Association. Diabetes nephropathy. Diabetes Care 1999;22(Suppl 1):S66–9.

232. Holl RW, Grabert M, Thon A, Heinze E. Urinary excretion of albumin in adolescents with type 1 diabetes: persistent versus intermittent microalbuminuria and relationship to duration of diabetes, sex, and metabolic control. Diabetes Care 1999;22: 1555–60.

233. Sikka R, Waters J, Moore W, Sutton DR, Herman WH, Aubert RE. Renal assessment practices and the effect of nurse case management of health maintenance organization patients with diabetes. Diabetes Care 1999;22:1–6.

234. Howey JE, Browning MC, Fraser CG. Biologic variation of urinary albumin: consequences for analysis, specimen collection, interpretation of results, and screening programs. Am J Kidney Dis 1989;13:35–7.

235. Collins AC, Sethi M, MacDonald FA, Brown D, Viberti GC. Storage temperature and differing methods of sample preparation in the measurement of urinary albumin. Diabetologia 1993;36:993–7.

236. MacNeil ML, Mueller PW, Caudill SP, Steinberg KK. Considerations when measuring urinary albumin: precision, substances that may interfere, and conditions for sample storage. Clin Chem 1991;37:2120–3.

Docket No. C-06-349
A. Ex. 2
Page 36 of 37

472                          Sacks et al.: Laboratory Analysis in Diabetes Mellitus

237. Hishiki S, Tochikubo O, Miyajima E, Ishii M. Circadian variation of urinary microalbumin excretion and ambulatory blood pressure in patients with essential hypertension. J Hypertens 1998;16: 2101–8.

238. Roberts WL, Calcote CB, Cook CB, Gordon DL, Moore ML, Moore S, et al. Comparison of four commercial urinary albumin (microalbumin) methods: implications for detecting diabetic nephropathy using random urine specimens. Clin Chim Acta 1998; 273:21–33.

239. Poulsen PL, Hansen B, Amby T, Terkelsen T, Mogensen CE. Evaluation of a dipstick test for microalbuminuria in three different clinical settings, including the correlation with urinary albumin excretion rate. Diabetes Metab 1992;18:395–400.

240. Fernandez Fernandez I, Paez Pinto JM, Hermosin Bono T, Vazquez Ganjo P, Ortiz Camunez MA, Tarilonte Delgado MA. Rapid screening test evaluation for microalbuminuria in diabetes mellitus. Acta Diabetol 1998;35:199–202.

241. Leong SO, Lui KF, Ng WY, Thai AC. The use of semi-quantitative urine test-strip (Micral Test) for microalbuminuria screening in patients with diabetes mellitus. Singapore Med J 1998;39: 101–3.

242. Grundy SM. Hypertriglyceridemia, insulin resistance, and the metabolic syndrome. Am J Cardiol 1999;83:25F–9F.

243. Reaven GM. Insulin resistance and its consequences; non-insulin dependent diabetes mellitus and coronary heart disease. In: LeRoith D, Taylor SI, Olefsky JM, eds. Diabetes mellitus: a fundamental clinical text. Philadelphia: Lippincott-Raven, 1996: 509–19.

244. Chevenne D, Trivin F, Porquet D. Insulin assays and reference values. Diabetes Metab 1999;25:459–76.

245. Del Prato S. Measurement of insulin resistance in vivo. Drugs 1999;58:3–6.discussion 75–82.

246. Marks V. Recognition and differential diagnosis of spontaneous hypoglycaemia. Clin Endocrinol (Oxf) 1992;37:309–16.

247. Faber OK, Binder C. C-Peptide. an index of insulin secretion. Diabetes Metab Rev 1986;2:331–45.

248. Robbins DC, Andersen L, Bowsher R, Chance R, Dinesen B, Frank B, et al. Report of the American Diabetes Association's Task Force on standardization of the insulin assay. Diabetes 1996;45:242–56.

249. Marks V. Hypoglycemia: factitious and felonious. Endocrinol Metab Clin North Am 1999;28:579–601.

250. Health Care Financing Administration. C-Peptide levels as a criterion for use of the insulin pump. http://www.hcfa.gov/ coverage/8b3-ss2.htm (May 14, 2001).

251. Burge MR, Schade DS. Insulins. Endocrinol Metab Clin North Am 1997;26:575–98.

252. Cooper GJ, Willis AC, Clark A, Turner RC, Sim RB, Reid KB. Purification and characterization of a peptide from amyloid-rich pancreases of type 2 diabetic patients. Proc Natl Acad Sci U S A 1987;84:8628–32.

253. Westermark P, Wernstedt C, Wilander E, Hayden DW, O'Brien TD, Johnson KH. Amyloid fibrils in human insulinoma and islets of Langerhans of the diabetic cat are derived from a neuropeptide-like protein also present in normal islet cells. Proc Natl Acad Sci U S A 1987;84:3881–5.

254. Zhang Y, Proenca R, Maffei M, Barone M, Leopold L, Friedman JM. Positional cloning of the mouse obese gene and its human homologue. Nature 1994;372:425–32.

255. Friedman JM, Halaas JL. Leptin and the regulation of body weight in mammals. Nature 1998;395:763–70.

256. Clement K, Vaisse C, Lahlou N, Cabrol S, Pelloux V, Cassuto D, et al. A mutation in the human leptin receptor gene causes obesity and pituitary dysfunction. Nature 1998;392:398–401.

257. Wingard DL, Barrett-Connor E. Heart disease in diabetes in America, 2nd ed. Bethesda, MD: National Diabetes Data Group, NIH, 1995.

258. Haffner SM, Lehto S, Ronnemaa T, Pyorala K, Laakso M. Mortality from coronary heart disease in subjects with type 2 diabetes and in nondiabetic subjects with and without prior myocardial infarction. N Engl J Med 1998;339:229–34.

259. Warnick GR. Measurement of cholesterol and other lipoprotein constituents in the clinical laboratory. Clin Chem Lab Med 2000;38:287–300.

260. Haffner SM. Management of dyslipidemia in adults with diabetes [Technical Review]. Diabetes Care 1998;21:160–78.

261. Expert Panel on Detection, Evaluation, And Treatment of High Blood Cholesterol in Adults. Executive summary of the third report of the National Cholesterol Education Program (NCEP) Expert Panel on Detection, Evaluation, And Treatment of High Blood Cholesterol In Adults (Adult Treatment Panel III). JAMA 2001;285:2486–97.

262. Ridker PM. Evaluating novel cardiovascular risk factors: can we better predict heart attacks? Ann Intern Med 1999;130:933–7.

263. Danesh J, Collins R, Peto R. Lipoprotein(a) and coronary heart disease. Meta-analysis of prospective studies. Circulation 2000; 102:1082–5.

264. Morrow DA, Ridker PM. C-reactive protein, inflammation, coronary risk. Med Clin North Am 2000;84:149–61,ix.

265. Harjai KJ. Potential new cardiovascular risk factors: left ventricular hypertrophy, homocysteine, lipoprotein(a), triglycerides, oxidative stress, and fibrinogen. Ann Intern Med 1999;131:376–86.

266. Saito I, Folsom AR, Brancati FL, Duncan BB, Chambless LE, McGovern PG. Nontraditional risk factors for coronary heart disease incidence among persons with diabetes: the Atherosclerosis Risk in Communities (ARIC) Study. Ann Intern Med 2000; 133:81–91.

267. Jacques PF, Selhub J, Bostom AG, Wilson PW, Rosenberg IH. The effect of folic acid fortification on plasma folate and total homocysteine concentrations. N Engl J Med 1999;340:1449–54.

Docket No. C-06-349
A. Ex. 2
Page 37 of 37

Blood Glucose Testing (HCPC 82962) claims by Carol's Provider List
# of Claims, # of Patients and Total Service Charges
Paid dates between 06/01/2001 and 05/31/2002
Out of 64 Provider 46 of them have Blood Glucose Testing claims

| Provider Number | # of Claims | # of Patients | Total Service Charges | Charge Per Pt | Claims Per Pt |
|---|---|---|---|---|---|
| | 559 | 106 | $104,829.69 | $988.96 | 5 |
| | 342 | 64 | $95,230.07 | $1,487.97 | 5 |
| | 209 | 53 | $91,107.22 | $1,719.00 | 4 |
| | 205 | 35 | $74,376.00 | $2,125.03 | 6 |
| | 254 | 43 | $66,876.80 | $1,555.27 | 6 |
| | 221 | 23 | $62,946.00 | $2,736.78 | 10 |
| | 242 | 35 | $60,626.42 | $1,732.18 | 7 |
| | 294 | 42 | $59,994.24 | $1,428.43 | 7 |
| | 284 | 39 | $55,361.80 | $1,419.53 | 7 |
| | 141 | 44 | $51,778.47 | $1,176.78 | 3 |
| | 154 | 51 | $50,757.26 | $995.24 | 3 |
| | 134 | 24 | $41,162.87 | $1,715.12 | 6 |
| | 222 | 50 | $40,308.13 | $806.16 | 4 |
| | 185 | 23 | $39,876.28 | $1,733.75 | 8 |
| | 108 | 22 | $37,211.07 | $1,691.41 | 5 |
| | 162 | 37 | $36,696.00 | $991.78 | 4 |
| | 92 | 23 | $32,979.77 | $1,433.90 | 4 |
| | 141 | 26 | $31,216.33 | $1,200.63 | 5 |
| | 91 | 18 | $24,205.43 | $1,344.75 | 5 |
| | 94 | 21 | $23,208.87 | $1,105.18 | 4 |
| | 108 | 25 | $22,585.01 | $903.40 | 4 |
| | 111 | 19 | $22,423.24 | $1,180.17 | 6 |
| | 125 | 17 | $20,085.86 | $1,181.52 | 7 |
| | 139 | 34 | $19,547.56 | $574.93 | 4 |
| | 92 | 22 | $17,253.20 | $784.24 | 4 |
| | 56 | 16 | $14,460.04 | $903.75 | 4 |
| | 67 | 16 | $13,444.77 | $840.30 | 4 |
| | 52 | 13 | $13,246.25 | $1,018.94 | 4 |
| | 146 | 24 | $12,756.03 | $531.50 | 6 |
| | 85 | 24 | $12,720.00 | $530.00 | 4 |
| | 95 | 25 | $10,399.75 | $415.99 | 4 |
| | 61 | 8 | $10,116.93 | $1,264.62 | 8 |
| | 101 | 13 | $10,004.68 | $769.59 | 8 |
| | 100 | 38 | $9,952.20 | $261.90 | 3 |
| | 67 | 12 | $7,985.00 | $665.42 | 6 |
| | 15 | 11 | $5,091.05 | $462.82 | 1 |
| | 16 | 15 | $4,852.40 | $323.49 | 1 |
| | 17 | 5 | $4,311.40 | $862.28 | 3 |
| | 10 | 3 | $3,936.00 | $1,312.00 | 3 |
| | 12 | 6 | $3,524.75 | $587.46 | 2 |
| | 23 | 8 | $3,250.00 | $406.25 | 3 |
| | 11 | 6 | $2,370.00 | $395.00 | 2 |
| | 1 | 1 | $393.30 | $393.30 | 1 |
| | 1 | 1 | $353.97 | $353.97 | 1 |
| | 1 | 1 | $155.00 | $155.00 | 1 |
| | 1 | 1 | $5.00 | $5.00 | 1 |
| TOTAL | 5647 | 1143 | $1,325,972.11 | $1,160.08 | 5 |

g:\claims\data_sta\Med Director\Data for Blood Glucose

Docket No. C-06-349
A. Ex. 3

Blood Glucose Testing (HCPC 82962) claims by Carol's Provider List
# of Claims, # of Patients and Total Service Charges
Paid dates between 06/01/2001 and 05/31/2002
Out of 64 Provider 46 of them have Blood Glucose Testing claims

| Provider Number | # of Claims | # of Patients | Total Service Charges |
|---|---|---|---|
| | 559 | 106 | $104,829.69 |
| | 342 | 64 | $95,230.07 |
| | 209 | 53 | $91,107.22 |
| | 205 | 35 | $74,376.00 |
| | 254 | 43 | $66,876.80 |
| | 221 | 23 | $62,946.00 |
| | 242 | 35 | $60,626.42 |
| | 294 | 42 | $59,994.24 |
| | 284 | 39 | $55,361.80 |
| | 141 | 44 | $51,778.47 |
| | 154 | 51 | $50,757.26 |
| | 134 | 24 | $41,162.87 |
| | 222 | 50 | $40,308.13 |
| | 185 | 23 | $39,876.28 |
| | 108 | 22 | $37,211.07 |
| | 162 | 37 | $36,696.00 |
| | 92 | 23 | $32,979.77 |
| | 141 | 26 | $31,216.33 |
| | 91 | 18 | $24,205.43 |
| | 94 | 21 | $23,208.87 |
| | 108 | 25 | $22,585.01 |
| | 111 | 19 | $22,423.24 |
| | 125 | 17 | $20,085.86 |
| | 139 | 34 | $19,547.56 |
| | 92 | 22 | $17,253.20 |
| | 56 | 16 | $14,460.04 |
| | 67 | 16 | $13,444.77 |
| | 52 | 13 | $13,246.25 |
| | 146 | 24 | $12,756.03 |
| | 85 | 24 | $12,720.00 |
| | 95 | 25 | $10,399.75 |
| | 61 | 8 | $10,116.93 |
| | 101 | 13 | $10,004.68 |
| | 100 | 38 | $9,952.20 |
| | 67 | 12 | $7,985.00 |
| | 15 | 11 | $5,091.05 |
| | 16 | 15 | $4,852.40 |
| | 17 | 5 | $4,311.40 |
| | 10 | 3 | $3,936.00 |
| | 12 | 6 | $3,524.75 |
| | 23 | 8 | $3,250.00 |
| | 11 | 6 | $2,370.00 |
| | 1 | 1 | $393.30 |
| | 1 | 1 | $353.97 |

691

Docket No. C-06-349
A. Ex. 3
Page 2 of 8

| | | | |
|---|---|---|---|
| ▬▬▬▬ | 1 | 1 | $155.00 |
| | 1 | 1 | $5.00 |
| TOTAL | 5647 | 1143 | $1,325,972.11 |

Docket No. C-06-349
A. Ex. 3
Page 3 of 8



**Adam Hanson**
08/05/2002 01:21 PM

To: UR Edit Group
cc: Mike Gillott/MutualOMA@Mutual of Omaha, Scott Tomsu/MutualOMA@Mutual of Omaha, Jared Holy/MutualOMA@Mutual of Omaha, Asuman Kaya/MutualOMA@Mutual of Omaha
Subject: Edit 8CJ

<u>8CJ   SND ALL DOC TO SUPPORT REV 300,301, HCPC 82962 BLOOD GLUCOSE</u>
Edit activated 08/05/02. This edit will screen 100% of all electronic claims submitted by provider 05-6411 with bill type 22x, rev codes 300 and/or 301 and HCPC 82962.

693

| TOB | Rev Code | HCPCS | # of Prov | # of Claims | Total Service Charges |
|---|---|---|---|---|---|
| 12 | 300 301 | 82947 | 140 | 356 | $46,605.36 |
| 12 | 300 301 | 82948 | 8 | 744 | $730,012.1 |
| 12 | 300 301 | 82962 | 6 | 202 | $138,698.8 |
| TOTALS | | | 291 | 1,30 | $915,316.3 |
| | | | | | |
| 13 | 300 301 | 82947 | 497 | 11,334 | $354,819.3 |
| 13 | 300 301 | 82948 | 188 | 2,68 | $152,421.3 |
| 13 | 300 301 | 82962 | 177 | 3,76 | $201,646.3 |
| TOTALS | | | 862 | 17,787 | $708,887.0 |
| | | | | | |
| 14 | 300 301 | 82947 | 226 | 4,64 | $124,584.0 |
| 14 | 300 301 | 82948 | 1 | 2 | $489.06 |
| 14 | 300 301 | 82962 | 1 | 4 | $1,295.79 |
| TOTALS | | | 251 | 4,71 | $126,368.9 |
| | | | | | |
| 21 | 300 301 | 82947 | | | $6.7 |
| 21 | 300 301 | 82948 | | | $4,479.00 |
| 21 | 300 301 | 82962 | 1 | 4 | $10,055.54 |
| TOTALS | | | 1 | 4 | $14,541.26 |
| | | | | | |
| 22 | 300 301 | 82947 | 3 | 345 | $82,481.19 |
| 22 | 300 301 | 82948 | 4 | 559 | $229,998.5 |
| 22 | 300 301 | 82962 | 1,12 | 20,562 | $4,035,008.47 |
| TOTALS | | | 1,20 | 21,466 | $4,347,488.17 |
| | | | | | |
| 23 | 300 301 | 82947 | | 1 | $3,618.00 |
| 23 | 300 301 | 82948 | 1 | 231 | $62,482.95 |
| 23 | 300 301 | 82962 | 423 | 7,97 | $1,571,803.47 |
| TOTALS | | | 439 | 8,22 | $1,637,904.42 |
| | | | | | |
| 71 | 300 301 | 82962 | | | $30.00 |
| | | | | | |
| 72 | 300 301 | 82947 | | | $755.30 |
| | | | | | |
| TOTALS - All TOB's | | | 3,07 | 53,551 | $7,751,291.41 |



| Col A | Col B | Bonus | Amount | Code |
|---|---|---|---|---|
| 32 | 17 | $472.15 | $10,673.63 | 300 |
| 80 | 14 | $235.98 | $10,439.17 | 300 |
| 40 | 6 | $600.00 | $10,056.00 | 300 |
| 65 | 68 | $1,393.07 | $9,848.21 | 301 |
| 99 | 11 | $0.00 | $9,805.52 | 300 |
| 32 | 9 | $681.72 | $9,198.85 | 300 |
| 84 | 20 | $395.00 | $9,106.30 | 300 |
| 107 | 8 | $2,856.00 | $9,084.00 | 300 |
| 99 | 9 | $1,972.58 | $9,078.58 | 300 |
| 107 | 16 | $0.00 | $9,020.06 | 300 |
| 60 | 15 | $122.36 | $8,891.81 | 300 |
| 57 | 14 | $218.50 | $8,881.93 | 300 |
| 73 | 16 | $275.12 | $8,337.77 | 300 |
| 38 | 18 | $480.13 | $8,092.67 | 300 |
| 55 | 16 | $0.00 | $8,010.00 | 300 |
| 46 | 8 | $40.00 | $7,780.00 | 300 |
| 23 | 10 | $21.85 | $7,767.39 | 300 |
| 34 | 8 | $1,548.73 | $6,621.20 | 300 |
| 90 | 8 | $12.00 | $6,558.00 | 300 |
| 07 | 9 | $393.30 | $6,353.98 | 300 |
| 54 | 18 | $0.00 | $6,341.25 | 300 |
| 20 | 15 | $192.28 | $5,210.75 | 300 |
| 66 | 11 | $144.21 | $4,421.49 | 300 |
| 29 | 9 | $2,260.00 | $4,315.00 | 300 |
| 34 | 11 | $0.00 | $4,222.37 | 300 |
| 13 | 8 | $14.06 | $3,977.46 | 300 |
| 8 | 13 | $78.00 | $3,714.00 | 300 |
| 77 | 2 | $0.00 | $2,071.19 | 300 |
| 32 | 3 | $1,998.00 | $1,998.00 | 300 |
| 29 | 3 | $0.00 | $1,932.00 | 300 |
| 10 | 10 | $0.00 | $1,750.00 | 301 |
| 18 | 24 | $199.50 | $1,542.25 | 300 |
| 9 | 10 | $253.46 | $1,494.54 | 300 |
| 10 | 3 | $0.00 | $1,158.00 | 301 |
| 1 | 5 | $0.00 | $1,090.60 | 300 |
| 4 | 6 | $0.00 | $910.00 | 300 |
| | 1 | $600.00 | $600.00 | 301 |
| | 1 | $340.00 | $600.00 | 300 |

Docket No. C-06-349
A. Ex. 3

L PROVIDERS IN OKLAHOMA

| ADDRESS | CITY | ZIP | REV CODE | TOTAL CHARGES | DENIED CHARGES | # OF BENEFICIARIES | # OF CLAIMS |
|---|---|---|---|---|---|---|---|
| | | | 300 | $41,520.00 | $174.00 | 19 | 144 |
| | | | 300 | $32,474.42 | $1,093.45 | 42 | 290 |
| | | | 300 | $29,415.00 | $4,350.00 | 30 | 148 |
| | | | 300 | $27,230.23 | $1,144.94 | 33 | 202 |
| | | | 300 | $25,737.40 | $480.70 | 25 | 221 |
| | | | 300 | $24,635.02 | $142.31 | 26 | 215 |
| | | | 300 | $23,769.57 | $217.36 | 15 | 124 |
| | | | 300 | $21,887.62 | $380.19 | 34 | 204 |
| | | | 300 | $21,078.00 | $2,448.00 | 14 | 62 |
| | | | 300 | $19,817.95 | $183.54 | 20 | 84 |
| | | | 300 | $19,540.00 | $0.00 | 25 | 103 |
| | | | 300 | $19,414.01 | $301.72 | 33 | 165 |
| | | | 300 | $18,912.00 | $42.00 | 26 | 127 |
| | | | 300 | $18,612.02 | $930.81 | 30 | 167 |
| | | | 300 | $18,518.16 | $0.00 | 26 | 141 |
| | | | 300 | $18,105.86 | $183.54 | 25 | 170 |
| | | | 300 | $16,778.71 | $96.14 | 19 | 145 |
| | | | 300 | $15,675.71 | $0.00 | 22 | 84 |
| | | | 300 | $15,356.56 | $148.58 | 17 | 122 |
| | | | 300 | $15,266.31 | $0.00 | 21 | 122 |
| | | | 300 | $15,045.72 | $415.15 | 21 | 94 |
| | | | 300 | $14,557.99 | $0.00 | 22 | 125 |
| | | | 300 | $14,437.72 | $279.68 | 18 | 133 |
| | | | 300 | $13,683.80 | $157.32 | 23 | 89 |
| | | | 300 | $13,425.40 | $835.43 | 22 | 85 |
| | | | 300 | $13,101.26 | $707.94 | 16 | 72 |
| | | | 300 | $12,457.92 | $860.89 | 18 | 112 |
| | | | 300 | $12,420.00 | $0.00 | 12 | 54 |
| | | | 301 | $12,196.29 | $428.26 | 16 | 81 |
| | | | 300 | $12,105.00 | $475.00 | 10 | 120 |
| | | | 300 | $12,073.55 | $83.98 | 11 | 105 |
| | | | 300 | $11,544.00 | $0.00 | 11 | 47 |
| | | | 300 | $11,137.99 | $524.40 | 17 | 80 |

Docket No. C-06-349
A. Ex. 3

| | Pay | T.P. | Deducible % | | |
|---|---|---|---|---|---|
| 74960 | 300 | $588.00 | $588.00 | 6 | 7 |
| 73034 | 301 | $550.00 | $0.00 | 5 | 5 |
| 74362 | 300 | $455.00 | $455.00 | 1 | 3 |
| 73110 | 301 | $446.68 | $0.00 | 1 | 1 |
| 74023 | 300 | $405.00 | $0.00 | 4 | 6 |
| 74354 | 300 | $350.35 | $0.00 | 2 | 3 |
| 73506 | 301 | $54.00 | $10.75 | 9 | 10 |
| 74702 | 301 | $46.22 | $0.00 | 1 | 2 |
| TOTAL | | $835,780.41 | $35,937.08 | 1201 | 6102 |

697

Docket No. C-06-349
A. Ex. 3
Page 8 of 8



**Mark Pilley**
06/11/2001 03:10 PM

To: Carol Richards/MutualOMA@Mutual of Omaha
cc:
Subject: blood glucose testing

Carol, will you please respond to this provider's E-Mail.

----- Forwarded by Mark Pilley/MutualOMA on 06/11/2001 03:09 PM -----



**Valarie Finney**
06/11/2001 10:48 AM

To: Mark Pilley/MutualOMA@Mutual of Omaha, Sue Heng/MutualOMA@Mutual of Omaha
cc:
Subject: blood glucose testing

FYI - I wasn't to sure who else to pass this information on to.  Thanks

----- Forwarded by Valarie Finney/MutualOMA on 06/11/2001 10:47 AM -----

"pam burnett" <burnett_pam@hotmail.com> on 06/08/2001 02:26:51 PM

To:    medicare@mutualofomaha.com
cc:
Subject: blood glucose testing

FROM: ████████████████████████████████████████
████████████████████████

WE DO NOT AGREE WITH THE PROPOSED RULING ABOUT BLOOD GLUCOSE TESTING. THE
ONLY WAY WE HAVE OF ASSESSING THE CONDITION OF SOME OF OUR RESIDENTS IS WITH
THE GLUCOMETER.  THEY ARE UNABLE TO COMMUNICATE SOME OF THE SIGNS & SYMPTOMS
OF HYPO OR HYPERGLYCEMEIA, & THEIR BODIES DO NOT ALWAYS GIVE THE STAFF THE
NEEDED SIGNS.  WE DO NOT FEEL THE STAFF NEED TO SPEND MORE TIME ON THE PHONE
BEFORE EACH GLUCOMETER GETTING AN ORDER FROM THE PHYSICIAN WHEN THE
PHYSICIAN HAS ALREADY GIVEN THE ORDER FOR DAILY OR QID OR WEEKLY BLOOD
SUGARS VIA GLUCOMETER.  QUALITY OF LIFE & CARE WILL BE GRAVELY ENDANGERED
WITH THIS RULING IF PASSED.
THANK YOU

Get your FREE download of MSN Explorer at http://explorer.msn.com

_Blood Glucose LMRP_

698

Docket No. C-06-349
A. Ex. 4



**"Susan Jesse"**
<SJesse@cms.hhs.go
v>

11/04/2002 12:51 PM

To: "Jacquelyn Stanard" <JStanard@cms.hhs.gov>,
Carol.Richards@mutualofomaha.com
cc: "Darcy Jakopchek" <DJakopchek@cms.hhs.gov>, "Kathleen De Hart"
<KDeHart@cms.hhs.gov>, "Kathryn Nichols"
<KNichols@cms.hhs.gov>, "Rebecca Dillender"
<RDillender@cms.hhs.gov>
Subject: Fwd: Blood Glucose Testing NCD

I agree with the providers - I think lifting language from AB-00-108 and
AB-00-99 is inappropriate and is in conflict with the NCD. I believe all
items in red should be deleted. Those PMs were written 2 yrs ago - pending a
NCD.
From what I can tell the LMRP is word for word the same as the NCD (with the
exception of the items in red) so I don't see any real need for them to even
have one. If however, they do - it can not go beyond the NCD and some of the
red items do. Also they need to list AB-02-030 and AB-02-110 in the section
that addresses CMS policies.
I am forwarding all of this information to Becky Dillenger (our lab expert) to
see what her opinion of the situation is.

Susan Jesse Pennington
Nurse Consultant
Region VII - Kansas City
Division of Health Plans and Providers

e-mail: SJesse@CMS.HHS.GOV
phone: (816) 426-5783 ext.3420

----- Message from Carol.Richards@mutualofomaha.com on Mon, 28 Oct 2002 11:17:51 -0600 -----
    To: KDehart@cms.hhs.gov, KNichols@cms.hhs.gov,
        JStanard@cms.hhs.gov
 Subject Blood Glucose Testing NCD
        :

I have been reviewing Mutual's policies for Lab services and comparing them
to the NCD's that will be final and effective on November 25, 2002. I have
made corrections, additions, and deletions, to codes only, so there is no
conflicting information in all but one policy. The only policy that has
any addition information is the blood glucose testing. I am going to
resend this policy to you for review. The language that appears in RED is
the language from PM AB-00-99 and AB-00-108. There has been some
controversy and some providers indicate that the language from the PM's are
in conflict with the NCD. I do not feel there is any conflict, we address
the frequency, which, when CMS is silent regarding this, the contractor has
the discretion to add. I know from he Baltimore meeting that Administar
had updated their policy, which is more limiting than ours, and had both
their RO and the CO review for conflicting information. There were no
recommendations from either of these offices for change to the language of
Administars policy.

I will include the langue of the other policy, I would like to have you
consider this language as I would like to add this to the existing policy
ONLY IF it would not have to be sent out for a 45 day comment period. This
langue says essentially what Mutual's policy says, only much more clearly.
If this would require the 45 day comment period I will leave the existing
language that has already been out for comment.

Here are sections of the LMRP I would like to add to Mutual's:

Clinical examples-Medicare does not provide separate payment in a Skilled Nursing Facility (SNF) seting for
1.Periodic blood gulcose monitoring in a diabetic such as is routinely performed in the patient 's own home 2. Periodic blood glucose monitoring in a diabetic residing in a nursing home for custodial care(not in a SF covered stay) who receives routine care provided by the nursing home staff, including periodic blood glucose monitoring services.
Medicare may provide sparate payment for - 1. blood glusoce monitoring services ordered by a physician.  The physician must be promptly notified of the results in order to provide active medical care to treat the patient.  2.  blood glucose monitoring services for a diabetic who develops complications that may requrie changes in the patient's diabetic management.  The physician would order the blood glucose monitoring service, be promptly notified of the results, and provide active treatment (such as a medication adjustment) based upon those results.

If home- use glucose monitoring devices are used in thenursing home settings, a glucos monitoring servie must be performed in accordance with laboratoyr coverage criteria to qualify for separate payment under the Medicar laboratory beneftr......for a laboratory service to be reasonabel and necessay:
    it must be ordered by the physician
    the ordering physician must use the result in the management of the
    beneficiary's specific medical problem; and
    the laborator result must be reported to the physician promptly in order
    for the physician to use the result and instruct continuation or a
    modification of patient care.

I am attaching our blood glucose testing policy.

Thanks(See attached file: Blood  Glucose Testing.doc)

Blood  Glucose Testing.dc Susan Jesse.vcf

Docket No. C-06-349
A. Ex. 5
Page 2 of 2

Carol Richards

07/06/2001 06:33 AM

To: Mcmcnall@aol.com
cc:
cc: Carol.richards@mutualofomaha.com
Subject: Re: CBG's

The instructions that are in the local medical review policy for blood glucose testing are taken from a program memorandum from HCFA. Having several years of SNF experience myself I do not think that the physician should be notified each and every time a ROUTINE blood sugar is performed (as in your example of a QID accucheck and a sliding scale order) As a general rule Medicare does not provide coverage for routine testing, there are a few exceptions, blood glucose testing is not one of them. HCFA, nor Mutual of Omaha, does not intend to restrict the performance of blood glucose testing, but without an indication that there is an unstable condition, and documentation that the physician is aware of the condition and some type of medical management is considered this would not meet the laboratoy guidelines, nor does it show that the accucheck is anything other that routine. This should not discourage repeat testing, that would be a standard of care issue. It would not seem reasonable to not perform accuchecks based on reimbursement for a service.   If there is documentation to support physician involvement and intervention, and an unstable condition the billing of accuchecks would be considered for coverage.

As you are aware diabetic care is not longer considered a skilled service in a SNF unless there is an indication of an unstable condition and physician involvement in the medical management (order changes).

I appreciate your comments regarding this LMRP. Please call or e-mail again if you have any other comments or suggestions.
Mcmcnall@aol.com



Mcmcnall@aol.com

07/05/2001 03:27 PM

To: Carol.richards@mutualofomaha.com
cc:
Subject: CBG's

Carol,
I do not believe that a physician should be notified each and every time a CBG result is taken. If a patient is in a SNF and requires testing QID (4x a day) and a sliding scale is in place and the P.O. states to contact the physician if levels are "X" then the facility should contact the doctor. CBG testing is very important - remember it used to be that a diabetic would qualify for catastrophic care in past years (this was considered skilled care) and now if you require calling each time this will discourage repeat testing and/or facilities seeking reimbursement.

Mike McNall

DEPARTMENT OF HEALTH AND HUMAN SERVICES

DEPARTMENTAL APPEALS BOARD

CIVIL REMEDIES DIVISION

| | |
|---|---|
| *In re* CMS LCD Complaint:　　　　　　)<br>　　　　　　　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　　　)<br>Blood Glucose Testing　　　　　　　　)<br>(LCD Database ID No. L19657)　　　　)<br>　　　　　　　　　　　　　　　　　　)<br>Contractor: Mutual of Omaha Insurance )<br>Company (Fiscal Intermediary).　　　　)<br>　　　　　　　　　　　　　　　　　　)<br>Region VII, Midwest Consortium　　　　)<br>　　　　　　　　　　　　　　　　　　) | Docket No. C-06-349 |

RECEIVED

AUG 3 1 2006

CRD

## RESPONSE TO BENEFICIARY'S COMPLAINT

Pursuant to the Order issued in this matter by the Honorable Judge Sickendick ("ALJ") on April 19, 2006, as extended thereafter, Mutual of Omaha Insurance Company ("Mutual of Omaha"), as a fiscal intermediary under contract with the Department of Health and Human Services, Centers for Medicare & Medicaid Services, files the following response to the Beneficiary's Complaint.

1. The ALJ should dismiss the Complaint because the Beneficiary is not an "aggrieved party" and, therefore, has no standing to bring this LCD Complaint. Under 42 C.F.R. 426.320, only an aggrieved party may initiate a review of an LCD by filing an acceptable complaint.

2. 42 C.F.R. 426.110 defines "aggrieved party" as follows:

   For the purposes of this part, the following definitions apply:

   Aggrieved party means a Medicare beneficiary, or the estate of a Medicare beneficiary, who--

   (1) Is entitled to benefits under Part A, enrolled under Part B, or both (including an individual enrolled in fee-for-service Medicare, in a Medicare+Choice plan, or in another Medicare managed care plan);

**(2) Is in need of coverage for a service that is denied based on an applicable LCD (in the relevant jurisdiction) or an NCD, regardless of whether the service was received**; and

(3) Has obtained documentation of the need by the beneficiary's treating physician. (Emphasis supplied)

3.  Subsection (2) of 42 C.F.R. 426.110 requires the Medicare beneficiary to have coverage for a needed service that is "denied based on an applicable LCD . . . regardless of whether the service was received". The Beneficiary's Complaint refers to Exhibit 2 of the Complaint as the document evidencing the "intent" of Mutual of Omaha to deny the Beneficiary's blood glucose monitoring claims on the basis of its LCD.

4.  Exhibit 2 of the Beneficiary's Complaint is not a claim denial, but rather a request for additional information to allow Mutual of Omaha to determine if the claim is payable under the Medicare Program. If such additional information is <u>not</u> received within 45 days, the claims will not be paid. The denial, however, is not on the basis of the LCD, but rather on the lack of submitted documentation supporting that the claim should be paid under the Medicare Program. If the records are received, the claims are adjudicated. If adjudicated blood glucose monitoring claims are denied, a remittance advice notifies the provider of the denial stating that "THESE ARE NON-COVERED SERVICES BECAUSE THIS IS NOT DEEMED A 'MEDICAL NECESSITY' BY THE PAYER . . . CONTRACTUAL OBLIGATION (PATIENT MAY NOT BE BILLED FOR THESE AMOUNTS)". Again, the LCD is not cited as authority for the denial of any blood glucose monitoring claims.

5.  As further support that the Beneficiary is not an aggrieved party because her claims have not been nor will be denied based on the LCD, Mutual of Omaha does not cite the LCD as the authority for reviewing the appropriateness of the denial of blood glucose monitoring. During the review of the denial of these types of claims in the appeal process, Mutual of Omaha looks to the following regulations and references in making its decision:

    1.  Program Memorandum, Transmittal AB-00-108;
    2.  Centers for Medicare and Medicaid Services Online Only Manual, Publication 100-4, Medicare Claims Processing, Chapter 7 – SNF (Skilled Nursing Facility) Part B Billing, Section 90.1 – Blood Glucose Monitoring; and
    3.  Code of Federal Regulations, Title 42, Volume 2, Section 410.32.

A copy of the letter used by the Medicare Division's Appeals Department at Mutual of Omaha is attached hereto as Exhibit 1. Exhibit 1 does not refer to the LCD as a basis for denial.

703

6. Mutual of Omaha denies the allegations of the Beneficiary that it "has documented its intent to deny coverage, based upon the LCD, for blood glucose testing services the Beneficiary received, and continues to receive, while a resident of a skilled nursing facility ("SNF"). <u>See Exhibit 2</u>." The LCD is not the basis on which any denial of claims for blood glucose monitoring would be made. This is evidenced by Exhibit 2 which is a copy of a March 30, 2006 letter sent by Mutual of Omaha's Medicare Division's Medical Director to SNFs reminding them of the regulations on blood glucose monitoring which Mutual of Omaha intends to follow (see page 2 of Exhibit 2). Again, there is no mention of the LCD in the letter.

7. Mutual of Omaha specifically denies that its LCD conflicts with the NCD for Blood Glucose Testing.

8. Mutual of Omaha denies that there are no material facts in dispute.

9. Mutual of Omaha has not responded to all of the specific allegations contained in the Complaint, or to each allegation on a paragraph- by-paragraph basis because of the lack of standing for the Beneficiary to bring this Complaint. Therefore, this Response is not an admission of any statements in the Complaint not specifically addressed and such statements are generally denied.

10. As further grounds for the dismissal of the Beneficiary's Complaint, Mutual of Omaha retired its LCD 19657 Blood Glucose Testing effective August 11, 2006 because of the issuance of the NCD on Blood Glucose Testing by CMS covering the same subject matter and because the LCD is not cited in any adjudication of claims by Mutual of Omaha.


**WHEREFORE**, Mutual of Omaha respectfully requests that the ALJ dismiss the Beneficiary's Complaint on the grounds that the Beneficiary is not an aggrieved party as provided in 42 C.F.R. 426.110 and based on Mutual of Omaha's retirement of the LCD which is the subject of Beneficiary's Complaint.

Respectfully submitted,

Martha K. Zajicek
First Vice President & Counsel
Law Operation
Mutual of Omaha Insurance Company
Mutual of Omaha Plaza
Omaha, NE 68175-1008
(402) 351 2421 phone
(402) 351-2000 fax

704

CERTIFICATE OF SERVICE

I hereby certify, on penalty of perjury, that on August 11, 2006, I caused this Response to Complaint to be served by first class mail, postage prepaid, on:

Mr. Thomas C. Fox, Esq.
Reed Smith LLP
1301 K. Street, N.W.
Suite 1100 – East Tower
Washington, DC 20005-3317

Mr. Jason M. Healy, Esq.
Reed Smith LLP
1301 K. Street, N.W.
Suite 1100 – East Tower
Washington, DC 20005-3317

CMS LCD Challenge Staff
Mail Stop C3-02-16
7500 Security Blvd.
Baltimore, MD 21244-1850

Martha K. Zajicek
First Vice President & Counsel
Law Operation
Mutual of Omaha Insurance Company
Mutual of Omaha Plaza
Omaha, NE 68175-1008
(402) 351 2421 phone
(402) 351-2000 fax

705

# FILE COPY - Medicare Appeals

March 9, 2006



Medicare Number of Beneficiary:

**Contact Information:**
If you have questions, write or call:
Mutual of Omaha Medicare
PO Box 1602
Omaha NE 68101

## MEDICARE APPEAL DECISION

Dear Administrator:

This letter is to inform you of the decision on your Medicare Appeal. An appeal is a new and independent review of a claim. You are receiving this letter because a request was made for an appeal for laboratory services.

**The appeal decision is unfavorable.** Our decision is that your claim is not covered by Medicare.

More information on the decision is provided below. You are not required to take any action. However, if you disagree with the decision, you may appeal to a Qualified Independent Contractor (QIC). You must file your appeal, in writing, within 180 days of receiving this letter.

A copy of this letter was also sent to ███████████. Mutual of Omaha Medicare was contracted by Medicare to review your appeal. For more information on how to appeal, see the section titled "Important Information About Your Appeal Rights."

### Summary of the Facts

| Provider | Date(s) of Service | Type(s) of Service |
|---|---|---|
| ███████████ | October 2, 2005 through October 31, 2005 | Laboratory |

- A claim was submitted for laboratory services.

- An initial determination on this claim was made on January 9, 2006.

- The laboratory services were denied because the glucose monitoring was not reasonable and/or necessary - provider liable.

Docket No. C-06-349
CMS. Ex. 1

2

- On February 6, 2006 we received a request for a redetermination.

**Documentation Submitted with Request**

- Physician's orders
- Physician's progress notes
- Medical history records
- Medication administration records
- Laboratory results
- Blood glucose results
- Dated itemization of blood glucose services billed

**Decision**

We have determined that the above claim is not covered by Medicare. We have also determined that you are responsible for payment for this service.

**Explanation of the Decision**

Upon review, the documentation did not support that the blood glucose monitoring services billed met criteria for coverage as evidenced by the following:

· No signs/symptoms of a clinically unstable medical condition
· No prompt notification of the physician regarding the abnormal blood glucose values
· No physician's medical management of the patient regarding the abnormal blood glucose values

Under Medicare regulations, glucose monitoring may only be covered when the services provided meet specific criteria. Signs and symptoms of hyperglycemia or hypoglycemia and/or a clinically unstable condition must be present and documented within the records submitted. The physician must order the blood glucose test, and use the results in the treatment, medical management, and modification of the beneficiary's specific medical problem. Furthermore, the physician must be promptly notified of the results of the ordered services prior to subsequent blood glucose services.

In conclusion, the blood glucose monitoring services provided from October 2, 2005 through October 31, 2005 did not meet criteria for coverage.

**Medicare Regulations and References Used for Decision**

- Program Memorandum, Transmittal AB-00-108, dated December 1, 2000, Glucose Monitoring, effective January 1, 2001
- Centers for Medicare and Medicaid Services (CMS), Medicare Claims Processing Manual, Chapter 7-SNF (Skilled Nursing Facility) Part B Billing, Section 90.1-Glucose Monitoring
- Code of Federal Regulations, Title 42, Volume 2, Chapter IV, Section 410.32 - Diagnostic X-Ray Tests, Diagnostic Laboratory Tests, and Other Diagnostic Tests; Conditions

Docket No. C-06-349
CMS. Ex. 1

3

## Who is Responsible for the Bill?

Because we determined that the care was not reasonable and necessary, we must determine, in accordance with Section 1879 of Title XVIII of the Social Security Act, whether the beneficiary and/or provider knew or could reasonably have been expected to know that the services would not be covered under Medicare. It has been determined that you knew or could reasonably have been expected to know that Medicare would not pay for the services outlined above. Therefore, it has been determined that you will remain liable for the cost of the noncovered services.

## What to Include in Your Request for an Independent Appeal

For October 2, 2005 through October 31, 2005:

- Nurses' progress notes
- Prompt physician notification of abnormal blood glucose values prior to a similar subsequent laboratory order
- Physician's response to notification of abnormal blood glucose values
- Physician's medical management of the patient after notification of abnormal blood glucose values
- Signs and symptoms of hyperglycemia/hypoglycemia/clinically unstable medical condition

## Special Note to Medicare Providers Only

Any evidence indicated in this notice must be submitted to the QIC. It should accompany the request for reconsideration. All evidence, including evidence that is not indicated in this notice, must be presented before the reconsideration is issued. If all evidence is not submitted, you will not be able to submit any new evidence in subsequent appeals unless you can demonstrate good cause for not presenting the evidence to the QIC. This evidence requirement also applies to providers who represent beneficiaries in the appeals process.

Sincerely,

Supervisor, Medicare Claims Appeals
Mutual of Omaha Medicare
A Medicare Contractor

Enc.

cc: 

Docket No. C-06-349
CMS. Ex. 1

# IMPORTANT INFORMATION ABOUT YOUR APPEAL RIGHTS

**Your Right to Appeal this Decision:** If you do not agree with this decision, you may file an appeal. An appeal is a review performed by people independent of those who have reviewed your claim so far. The next level of appeal is called a reconsideration. A reconsideration is a new and impartial review performed by a company that is independent from Mutual of Omaha Medicare.

**How to Appeal:** To exercise your right to an appeal, you must file a request, in writing, within 180 days of receiving this letter. Under special circumstances, you may ask for more time to request an appeal. You may request an appeal by using the form enclosed with this letter.

If you do not use this form, you can write a letter. You must include: your name, your signature, the name of the beneficiary if you are not the beneficiary requesting the appeal, the Medicare number, a list of the service(s) or item(s) that you are appealing and the date(s) of service, and any and all evidence you wish to submit. You must also include that Mutual of Omaha Medicare made the redetermination. You may also attach supporting materials such as medical records, doctors' letters, or other information that explains why this service should be paid. If you are a beneficiary, your doctor may be able to provide supporting materials.

If you want to file an appeal, you should send your request to:

> First Coast Service Options, Inc.
> QIC Part A West Reconsiderations
> PO Box 45029
> Jacksonville FL 32202 - 5029

**Who May File an Appeal:** You or someone you name to act for you (your **appointed representative**) may file an appeal. You can name a relative, friend, advocate, attorney, doctor, or someone else to act for you.

If you want someone to act for you, you and your appointed representative must sign, date and send us a statement naming that person to act for you. Call us to learn more about how to name a representative.

**Help With Your Appeal:** If you want help with an appeal, or if you have questions about Medicare, you can have a friend or someone else help you with your appeal. You can also contact your State Health Insurance Assistance Program (SHIP). You can call 1-800-MEDICARE (1-800-633-4227) for information on how to contact your local SHIP. Your SHIP can answer questions about payment denials and appeals.

Docket No. C-06-349
CMS. Ex. 1
Page 4 of 6

**Other Important Information:** If you want copies of statutes, regulations, policies, and/or manual instructions we used to arrive at this decision, please write to us at the following address and attach a copy of this letter.

> Mutual of Omaha Medicare
> A Medicare Contractor
> PO Box 1602
> Omaha NE 68101

If you need more information or have any questions, please call us at the phone number provided on the first page of this notice.

**Other Resources To Help You:**

1-800-MEDICARE (1-800-633-4227), TTY/TDD: 1-877-486-2048

Docket No. C-06-349
CMS. Ex. 1





MUTUAL of OMAHA INSURANCE COMPANY
Medicare Area
P.O. Box 1602 · Omaha, NE 68101
1-800-MEDICARE (1-800-633-4227)
TTY (Hearing Impaired) 877 486 2048
www.mutualmedicare.com
A CMS Contracted Intermediary

# Reconsideration Request Form

**Directions:** If you wish to appeal this decision, please fill out the information below and mail this form or a copy of this form to:

> First Coast Service Options, Inc.
> QIC Part A West Reconsiderations
> PO Box 45029
> Jacksonville FL 32202 – 5029

1.  Name of Beneficiary: _____

2.  Medicare Number: _____

3.  Provider Name: _____

4.  Person Appealing:  ☐ Beneficiary    ☐ Provider of Service    ☐ Representative

5.  Address of the Person Appealing: _____

    _____

6.  Item or service you wish to appeal: _____

    _____

7.  Date of the service:  From ____/____/____  To ____/____/____

8.  Why do you disagree? Or what are your reasons for your appeal? (Attach additional pages, if necessary.) _____

    _____

9.  You may also include any supporting material to assist your appeal. Examples of supporting materials include:

    ☐ Medical Records          ☐ Office Records/Progress Notes
    ☐ Copy of the Claim        ☐ Treatment Plan
                               ☐ Certificate of Medical Necessity

10. Printed Name of Person Appealing: _____

11. Signature of Person Appealing: _____  Date: ____/____/____

| Contractor Number | Redetermination Number: |
|---|---|
|  | |_____ __ _____ ___ |

711

Docket No. C-06-349
CMS. Ex. 1





MUTUAL *of* OMAHA INSURANCE COMPANY
Medicare Division
P.O. Box 1602 • Omaha, NE 68101
mutualmedicare.com
A CMS Contracted Intermediary

March 30, 2006

**Attention Nursing Home Administrator, Director of Nursing and Staff:**

Re:  Blood Glucose Monitoring, HCPCS 82962
(Glucose, Blood, by Glucose Monitoring Device) in Skilled Nursing Facilities (SNF's).
Bill Types 22x (Skilled Nursing-Medicare Part B) and 23x (Skilled Nursing-Outpatient).

As you know, all claims submitted to Mutual of Omaha-Medicare for Blood Glucose Monitoring were sub-
ject to medical review and/or automated systems edits that began October 13, 2005. Despite our educa-
tional interventions including the prepay claim review process, data analysis by Mutual of Omaha-
Medicare continues to show a high incidence of erroneous billing (repeated billing for services which are
not medically necessary).  We shall continue to monitor SNF billing patterns for this service.  Please be
advised that inappropriate billing is serious no matter the number of claims involved nor the amount of
dollars billed. **Your facility is receiving notification that if inappropriate billing for blood glucose
monitoring services continues after April 30, 2006, the facility will be referred to the Medicare Pro-
gram Safeguard Contractor for further investigation of potential abuse of the Medicare Program.**

If you have any questions, please contact:

Carol Richards, RN                              or        Mary Sue Gardner, RN, BSN
Policy Coordinator                                           Senior Medical Review Nurse
(402)351-5102                                                   (402)351-5207

The current regulations for Blood Glucose Monitoring are outlined again for you (see below).

Ellen R. Evans, M.D., FAAFP
Diplomate, ABFP
Diplomate, ABQAURP
CAQ Geriatric Medicine, ABFP/ABIM
Vice President and Medical Director
Mutual of Omaha Medicare
(402) 351-6794

Docket No. C-06-349
CMS. Ex. 2
Page 1 of 2

1.  Addendum: Regulations Summary:

SSA 1862(a)(1)(A) requires that items and services *be "reasonable and necessary for the diagnosis or treatment of illness or injury..."* The reasonable and necessary requirement was further defined in 42 CFR §410.32 that requires the physician to use *"the results in the management of the beneficiary's specific medical condition."* How the physician must use the test results was further defined in HCFA Pub. 60AB Transmittal No. AB-))-108, Dec 1, 2000, which states the following:

> *Section 1862(a)(1)(A) of the Social Security Act requires the service [glucose monitoring] to be reasonable and necessary for diagnosis and treatment in order to be covered by Medicare. Section 42 CFR 410.32 and 411.15 specify that for a laboratory service to be reasonable and necessary, it must not only be ordered by a physician but the ordering physician must also use the result in the management of the beneficiary's specific medical problem. Implicitly, the laboratory result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of patient care. . . .*

Furthermore the CMS Manual System, Publication (hence Pub) 100-04, Medicare Claims Processing, Chapter 7 – SNF Part B, Section 90.1 – Blood Glucose Monitoring (Rev, 1, 10=-01-03) AB-00-108 states this:

> *Medicare Part B may pay for a glucose monitoring device and related disposable supplies under its durable medical equipment benefit if the equipment is used in the home or in an institution that is used as a home. A hospital or SNF is not considered a home under this benefit (1861(h) of the ACT, 42 CFR$ 410.38).*

The CMS NCD provides instructions for the documentation of active management by the physician that is required for diagnostic testing of blood glucose:

> *The ordering physician must include evidence in the patient's clinical record that an evaluation of history and physical preceded the ordering of glucose testing and that manifestations of abnormal glucose levels were present to warrant the testing.*

Chapter 7, Section 90.1 of Pub 100-4 continues:

> *Routine glucose monitoring of diabetics is never covered in a SNF, whether the beneficiary is in a covered Part A stay or not. Glucose monitoring may only be covered when it meets all the conditions of a covered laboratory service, including use by the physician in modifying the patient's treatment.*

The various regulations do not preclude the nursing facility nursing staff from doing daily or more frequent blood glucose monitoring using a home glucose monitor in much the same way as they would record the beneficiary's daily blood pressure or weight. It does, however, preclude the facility from billing the intermediary for this service as a medically necessary diagnostic laboratory test under 1862(a)(1)(A) and 42 CFR$ §410.32.

Docket No. C-06-349
CMS. Ex. 2





MUTUAL *of* OMAHA INSURANCE COMPANY
Medicare Division
P.O. Box 1602 • Omaha, NE 68101
mutualmedicare.com
A CMS Contracted Intermediary

Martha K. Zajicek
1st Vice President & Counsel
*t* 402 351 2421  *f* 402 351 2000
martha.zajicek@mutualofomaha.com

August 11, 2006

VIA FIRST CLASS MAIL
Hon. Keith W. Sickendick
Department of Health & Human Services
Departmental Appeals Board, MS 6132
Civil Remedies Division
330 Independence Avenue, SW
Cohen Building, Room G-644
Washington, D.C. 20201

     Re:    *In re* CMS LCD Complaint
             Blood Glucose Testing (LCD Database ID No. L19657)
             Contractor:  Mutual of Omaha Insurance Company (Fiscal Intermediary)
             Region VII, Midwest Consortium
             Docket No. C-06-349

Dear Judge Sickendick:

This letter is to inform you that Mutual of Omaha Insurance Company ("Mutual of Omaha"), as a fiscal intermediary under contract with the Department of Health & Human Services, Centers for Medicare & Medicaid Services, retired the LCD, which is the subject of the above-referenced Complaint, effective August 11, 2006.  Mutual of Omaha notifies you of the retirement in accordance with 42 CFR 426.420(c)(1).

Very truly yours,

Martha K. Zajicek
First Vice President & Counsel
Law Operation

cc:   Elaine Knapp, ARNP, CMS Seattle RO
      Janet Kyle
      Ellen Evans, MD

CERTIFICATE OF SERVICE

I hereby certify, on penalty of perjury, that on August 11, 2006, I caused this letter by Mutual of Omaha Insurance Company to be served by first class mail, postage prepaid, on:

Mr. Thomas C. Fox, Esq.
Reed Smith LLP
1301 K. Street, N.W.
Suite 1100 – East Tower
Washington, DC 20005-3317

Mr. Jason M. Healy, Esq.
Reed Smith LLP
1301 K. Street, N.W.
Suite 1100 – East Tower
Washington, DC 20005-3317

CMS LCD Challenge Staff
Mail Stop C3-02-16
7500 Security Blvd.
Baltimore, MD 21244-1850

Martha K. Zajicek
First Vice President & Counsel
Law Operation
Mutual of Omaha Insurance Company
Mutual of Omaha Plaza
Omaha, NE 68175-1008
(402) 351 2421 phone
(402) 351-2000 fax

715

DEPARTMENT OF HEALTH AND HUMAN SERVICES

DEPARTMENTAL APPEALS BOARD

CIVIL REMEDIES DIVISION

|  |  |
|---|---|
| *In re* CMS LCD Complaint: ) <br> ) <br> ) <br> Blood Glucose Testing ) <br> (LCD Database ID No. L19657) ) <br> ) <br> Contractor: Mutual of Omaha Insurance ) <br> Company (Fiscal Intermediary). ) <br> ) <br> Region VII, Midwest Consortium ) <br> ) | Docket No. C-06-349 |

**RESPONSE TO AGGRIEVED PARTY'S MOTION FOR SUMMARY JUDGMENT**

Because the Beneficiary is not an "aggrieved party" as that term is defined in 42 C.F.R. 426.110 and based on the fact that the Medicare Division of Mutual of Omaha Insurance Company ("Mutual of Omaha") has withdrawn the LCD which is the subject of this Complaint, Mutual of Omaha has requested that the ALJ dismiss the Complaint in its Response to Complaint filed with the ALJ. Therefore, Mutual of Omaha respectfully requests that the ALJ also dismiss the Beneficiary's Motion for Summary Judgment.

Respectfully submitted,

*Martha K. Zajicek*

Martha K. Zajicek
First Vice President & Counsel
Law Operation
Mutual of Omaha Insurance Company
Mutual of Omaha Plaza
Omaha, NE 68175-1008
(402) 351 2421 phone
(402) 351-2000 fax

CERTIFICATE OF SERVICE

I hereby certify, on penalty of perjury, that on August 11, 2006, I caused this Response to Aggrieved Party's Motion for Summary Judgment to be served by first class mail, postage prepaid, on:

Mr. Thomas C. Fox, Esq.
Reed Smith LLP
1301 K. Street, N.W.
Suite 1100 – East Tower
Washington, DC 20005-3317

Mr. Jason M. Healy, Esq.
Reed Smith LLP
1301 K. Street, N.W.
Suite 1100 – East Tower
Washington, DC 20005-3317

CMS LCD Challenge Staff
Mail Stop C3-02-16
7500 Security Blvd.
Baltimore, MD 21244-1850


Martha K. Zajicek
First Vice President & Counsel
Law Operation
Mutual of Omaha Insurance Company
Mutual of Omaha Plaza
Omaha, NE 68175-1008
(402) 351 2421 phone
(402) 351-2000 fax

**Reed**Smith

Jason M. Healy
Direct Phone: 202.414.9245
Email: jhealy@reedsmith.com

Reed Smith LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C. 20005-3373
202.414.9200
Fax 202.414.9299

September 1, 2006

RECEIVED
SEP -5 2006
CRD

<u>VIA OVERNIGHT MAIL</u>

Hon. Keith W. Sickendick
Department of Health & Human Services
Departmental Appeals Board, MS 6132
Civil Remedies Division
330 Independence Avenue, SW
Cohen Building, Room G-644
Washington, D.C. 20201

> Re: *In re* CMS LCD COMPLAINT
> Blood Glucose Testing (LCD Database ID No. L19657)
> Contractor: Mutual of Omaha Insurance Company (Fiscal Intermediary)
> Region VII, Midwest Consortium
> Docket No. C-06-349

Dear Judge Sickendick:

Enclosed please find three copies of the following items:

(1)    Aggrieved Party's Motion for Leave to File Reply to Mutual of Omaha Insurance Company's Response to Beneficiary's Complaint;

(2)    Aggrieved Party's Reply to Mutual of Omaha Insurance Company's Response to Beneficiary's Complaint; and

(2)    Certificate of Service, certifying that service was accomplished upon the contractor (Mutual of Omaha) and CMS.

If you have any questions about these enclosures, please contact me at (202) 414-9245.

Sincerely,

*Jason M. Healy*

Jason M. Healy

LONDON ♦ NEW YORK ♦ LOS ANGELES ♦ SAN FRANCISCO ♦ WASHINGTON, D.C. ♦ PHILADELPHIA ♦ PITTSBURGH ♦ OAKLAND
PRINCETON ♦ FALLS CHURCH ♦ WILMINGTON ♦ NEWARK ♦ MIDLANDS, U.K. ♦ CENTURY CITY ♦ RICHMOND ♦ LEESBURG

reedsmith.com

718

DCLIB-476691.1-JMHEALY 9/1/06 12:43 PM

Departmental Appeals Board
September 1, 2006
Page 2

**ReedSmith**

Encls.

cc:    Martha K. Zajicek, Esq.
       First Vice President & Counsel
       Mutual of Omaha Insurance Company
       Medicare Division
       P.O. Box 1602
       Omaha, NE 68101

       CMS LCD Challenge Staff
       Mail Stop C3-02-16
       7500 Security Blvd.
       Baltimore, MD 21244-1850

DEPARTMENT OF HEALTH AND HUMAN SERVICES

DEPARTMENTAL APPEALS BOARD

CIVIL REMEDIES DIVISION

| | |
|---|---|
| *In Re* LCD Complaint:                   ) | |
| ) | |
| Blood Glucose Testing                    ) | |
| (LCD Database ID No. L19657)        ) | Docket No. C-06-349 |
| ) | |
| Contractor: Mutual of Omaha Insurance ) | |
| Company (Fiscal Intermediary)         ) | |
| ) | |
| Region VII, Midwest Consortium       ) | |

## AGGRIEVED PARTY'S MOTION FOR LEAVE TO FILE REPLY TO MUTUAL OF OMAHA INSURANCE COMPANY'S RESPONSE TO BENEFICIARY'S COMPLAINT

The Aggrieved Party, by and through her undersigned counsel, hereby files the following motion for leave in the above-referenced matter to file a reply to the Mutual of Omaha Insurance Company ("Mutual") Response to Beneficiary's Complaint.

1.      The ALJ's Order dated April 19, 2006 instructed Mutual, as the contractor, or the Centers for Medicare & Medicaid Services ("CMS") to file the LCD record with the ALJ and the Aggrieved Party no more than 30 days from the date of the Order. We note that the ALJ's April 19 Order did *not* state that submission of the LCD record by CMS or Mutual was contingent on their receipt of the marked Beneficiary's Complaint. With the April 19 Order in hand, CMS and Mutual should have filed the LCD record with the ALJ and the Aggrieved Party within the allotted 30-day period. Both Mutual and CMS failed to submit the LCD record within this time period. It was not until June 14, 2006 that Mutual filed the LCD record with the Aggrieved Party.

RECEIVED

720

2.     On June 28, 2006, the ALJ granted for good cause the Aggrieved Party's request for an extension of time to file her Statement after her review of the LCD record.

3.     On July 18, 2006, the Aggrieved Party timely filed the Aggrieved Party's Statement pursuant to 42 C.F.R. § 426.425(a) in support of the Aggrieved Party's request that the LCD at issue be invalidated. The Statement summarizes the Aggrieved Party's analysis of the LCD record and concludes that the LCD record is incomplete and wholly inadequate to support the policies enunciated in the LCD language challenged by the Aggrieved Party in her Complaint, when evaluated under the reasonableness standard at 42 C.F.R. § 426.425(a). The Aggrieved Party found no dispute as to any material facts and virtually no documented support for the LCD in the LCD record. Significantly, the Aggrieved Party found that the LCD record includes no medical evidence to support the policies in the LCD. Accordingly, the Aggrieved Party requested that the ALJ invalidate the LCD as a matter of law, upon summary judgment.

4.     On August 11, 2006, Mutual mailed its Response to Beneficiary's Complaint, its Response to Aggrieved Party's Motion for Summary Judgment, and a letter to the ALJ. These documents were filed in lieu of a response to the Aggrieved Party's Statement, as required by 42 C.F.R. § 426.425(b). Mutual states that, as of the same date (August 11, 2006), it has retired its LCD on blood glucose testing. Mutual also argues that the LCD is not being used to deny claims for blood glucose testing submitted by the Aggrieved Party; rather, Mutual states that claims for blood glucose testing are denied if they are not medically necessary based upon three authorities: (1) Program Memorandum, Transmittal AB-00-108; (2) ; Medicare Claims Processing Manual (CMS Pub. 100-4) § 90.1; and (3) 42 C.F.R. § 410.32. Response to Beneficiary's Complaint, pgs. 1-2. As a result, Mutual believes that the Aggrieved Party did not have standing to bring this appeal. Id., pg. 1.

5.     The Aggrieved Party accepts Mutual's decision to retire the LCD. However, as discussed more fully in the enclosed Reply, the Aggrieved Party does not agree with Mutual's position that it can continue to deny needed blood glucose testing services to Medicare Part B residents of skilled nursing facilities ("SNFs") now that the LCD, and the policies described

- 2 -

therein, are invalid as a matter of law.

6.    Mutual is trying to perpetuate a fraud upon this tribunal. With the LCD now retired, Mutual cannot be permitted to continue to enforce the illegal policies enunciated in that coverage policy to deny coverage of needed blood glucose testing services for the Aggrieved Party and thousands of other similarly-situated Medicare Part B SNF residents. Therefore, it is extremely important that the ALJ consider the accompanying Reply of the Aggrieved Party before ruling on the Aggrieved Party's Motion for Summary Judgment and before issuing a final decision in this appeal.

WHEREFORE, the Aggrieved Party respectfully requests that the ALJ:

(1) Grant this motion for leave to file the enclosed Reply to Mutual of Omaha Insurance Company's Response to Beneficiary's Complaint;

(2) Consider the Aggrieved Party's Reply before ruling on the Aggrieved Party's Motion for Summary Judgment and before issuing a final decision in this appeal; and

(3) Schedule a hearing to permit counsel for the Aggrieved Party to present oral argument in support of the Aggrieved Party's Reply.

Respectfully submitted,

Thomas C. Fox, Esq.
Jason M. Healy, Esq.
REED SMITH LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C. 20005-3317
(202) 414-9200

Attorneys for the Aggrieved Party

September 1, 2006

722

- 3 -

RECEIVED

SEP - 4 2006

DEPARTMENT OF HEALTH AND HUMAN SERVICES

DEPARTMENTAL APPEALS BOARD

CIVIL REMEDIES DIVISION

| | |
|---|---|
| *In Re* LCD Complaint: )<br><br>Blood Glucose Testing )<br>(LCD Database ID No. L19657) )<br><br>Contractor: Mutual of Omaha Insurance )<br>Company (Fiscal Intermediary) )<br><br>Region VII, Midwest Consortium ) | Docket No. C-06-349 |

## <u>AGGRIEVED PARTY'S REPLY TO MUTUAL OF OMAHA INSURANCE COMPANY'S RESPONSE TO BENEFICIARY'S COMPLAINT</u>

### <u>PROCEDURAL HISTORY</u>

On March 28, 2006, the Aggrieved Party (or Beneficiary), by and through her undersigned counsel, filed a Complaint with supporting exhibits challenging the validity of Mutual of Omaha's ("Mutual's") local coverage determination ("LCD") on blood glucose testing as legal authority for denying Medicare coverage of her blood glucose tests. The Aggrieved Party is a 72 year old individual with advanced diabetes and blindness as a result of that illness. Her condition requires blood glucose testing four times a day to maintain control over her blood glucose levels. <u>See</u> Beneficiary's Complaint, <u>A. Ex.</u> 8. This frequency of blood glucose testing is supported by the orders of her physician. <u>See id.</u>, <u>A. Ex.</u> 4.

Although the administrative law judge ("ALJ") ordered Mutual, as the contractor, or the Centers for Medicare & Medicaid Services ("CMS") to file the LCD record with the ALJ and the Aggrieved Party no more than 30 days from April 19, 2006, both Mutual and CMS failed to submit the LCD record within this time period. Twenty seven (27) days late, on June 14, 2006,

Mutual filed the LCD record with the Aggrieved Party and it contained virtually no documented support for the LCD.[1]

On July 18, 2006, the Aggrieved Party timely filed the Aggrieved Party's Statement pursuant to 42 C.F.R. § 426.425(a) in support of the Aggrieved Party's request that the LCD at issue be invalidated. The Statement summarizes the Aggrieved Party's analysis of the LCD record. It shows in great detail that the LCD record is incomplete and wholly inadequate to support the policies enunciated in the LCD when evaluated under the reasonableness standard at 42 C.F.R. § 426.425(a). There is virtually no documented support for the LCD in the LCD record. Significantly, the LCD record includes *no medical evidence* to support the policies in the LCD. Accordingly, the Aggrieved Party requested that the ALJ invalidate the LCD as a matter of law, upon summary judgment.

On August 11, 2006, six days before Mutual's response to the Aggrieved Party's Statement and Motion for Summary Judgment were due, Mutual mailed a Response to Beneficiary's Complaint, a Response to Aggrieved Party's Motion for Summary Judgment, and a letter to the ALJ. The first item was filed in lieu of a response to the Aggrieved Party's Statement, as required by 42 C.F.R. § 426.425(b). With amazing coincidence, Mutual states that, as of the same date (August 11, 2006), it has "retired" its LCD on blood glucose testing. Mutual then proceeds to argue that the LCD – which was then on its fifth publication, publicly available on its web site, and widely distributed to interested parties as its official statement of coverage policy for blood glucose testing – is not being used to deny claims for blood glucose testing submitted by the Aggrieved Party. Rather, Mutual states that claims for blood glucose testing are denied if they are not medically necessary. See Response to Beneficiary's Complaint, pg 2. With this slight of hand maneuver, Mutual argues that the Aggrieved Party did not have standing

---

[1] Because the regulation at 42 C.F.R. § 426.425(a) gives the Aggrieved Party 30 days (or more for good cause) after receipt of the LCD record to file a Statement, on June 15, 2006 we moved for an extension of 30 days to file the Aggrieved Party's Statement. The ALJ issued an Order dated June 28, 2006 extending the schedule for filing the Aggrieved Party's Statement by amending the date of the April 19, 2006 Order to May 19, 2006.

724

to bring this appeal. Id., pg. 1.

The Aggrieved Party accepts Mutual's decision to retire the LCD. However, as discussed more fully below, the Aggrieved Party strongly objects to the trickery Mutual now seeks to engage in to continue to deny needed blood glucose testing services to Medicare Part B residents of skilled nursing facilities ("SNFs") now that the LCD has been exposed to be without any medical support, and the policies described therein invalid as a matter of law.

## A RETIRED LCD IS INVALID AND ITS POLICIES CAN NO LONGER BE ENFORCED

Mutual is trying to perpetuate a fraud upon this tribunal, the Aggrieved Party, and thousands of other Medicare beneficiaries whose claims for blood glucose testing have been or will be denied even after the LCD has been invalidated as part of these proceedings. Mutual seeks to convince the ALJ that it can continue to enforce the restrictive coverage policies enunciated in its LCD on blood glucose testing even *after* it has voluntarily retired that policy. When confronted with overwhelming evidence that the LCD is unsubstantiated, Mutual thinks that it can simply withdraw the LCD – its official coverage policy on blood glucose testing – to discontinue these proceedings *and* continue to enforce the very same coverage policy to deny claims.

Mutual insists that it can do this because the LCD is not referenced by name on claims denials that it sends to beneficiaries, although in five different versions it represented Mutual's official policy on blood glucose testing. The Aggrieved Party submits that this is nothing more than a "slight of hand" or mirage. The ALJ simply cannot condone this conduct for two primary reasons: (1) the restrictive coverage policies discussed in the LCD are now invalid by operation of law; and (2) Mutual's deliberate choice not to reference the LCD by name on claims denials is a mere technicality that does not protect the LCD policies from challenge by affected parties, including this Beneficiary.

725

- 3 -

## I.   THE LCD'S RESTRICTIVE COVERAGE POLICIES ARE NOW INVALID BY OPERATION OF LAW

Mutual's withdrawal of its blood glucose testing LCD has the same legal effect as an ALJ decision to invalidate that LCD under the reasonableness standard, pursuant to 42 C.F.R. § 426.460(b). As such, Mutual is required to reopen denied claims of the Beneficiary and adjudicate those claims, and any new claims submitted by the Beneficiary, for blood glucose testing services without using the invalid policies reflected in the LCD, now that it is withdrawn. Any and all claims submitted to Mutual for blood glucose testing services with dates of service on or after August 11, 2006 must be adjudicated without using the invalid policies in the LCD.

CMS stated very clearly in the preamble to the rules governing these LCD appeal procedures that it is the policy or policies discussed in the LCD that are invalid when the LCD is retired, not just the document itself:

> Retiring an LCD or withdrawing an NCD would result in the retired/withdrawn *policy* no longer applying in the claims adjudication process for services rendered on or after the date that the *policy* is retired/withdrawn. Moreover, the aggrieved party would be granted individual claim review. Since a claimant would receive the same relief that would have been available had the adjudicator found that the relevant LCD or NCD was not valid, there would be no reason to continue the appeal.

*Medicare Program: Review of National Coverage Determinations and Local Coverage Determinations; Final Rule*, 68 Fed. Reg. 63,692, 63,698 (November 7, 2003) (emphasis added). CMS added that:

> When we retire/withdraw an LCD/NCD *we will not apply those policies for services furnished after the retirement/withdrawal date* and we will reprocess the aggrieved party's affected claims *without applying the retired/withdrawn policy.*

Id. (emphasis added).

Therefore, the Aggrieved Party respectfully requests that the ALJ take official notice, pursuant to his authority granted under 42 C.F.R. § 426.405(c), of the fact that Mutual cannot deny claims for blood glucose testing services on or after August 11, 2006 (i) using any of the restrictive coverage policies discussed in the now-retired and invalid LCD on blood glucose testing, or (ii) based on its policy interpretations discussed in the LCD of other authorities

726

(including Transmittal AB-00-108, Medicare Claims Processing Manual § 90.1, and 42 C.F.R. § 410.32).

## II.    MUTUAL'S DELIBERATE CHOICE NOT TO REFERENCE THE LCD BY NAME ON CLAIMS DENIALS IS A MERE TECHNICALITY THAT DOES NOT PROTECT THE LCD POLICIES FROM CHALLENGE BY AFFECTED PARTIES, INCLUDING THIS BENEFICIARY

The Medicare statute defines an LCD as "a determination by a fiscal intermediary or carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary—or carrier—wide basis under such parts, in accordance with section 1862(a)(1)(A)." 42 U.S.C. § 1395ff(f)(2)(B). Simply stated, the LCD is an official statement of the contractor's policies on the coverage of specific items or services for Medicare reimbursement. It applies to claims for the listed items or services whether the contractor proclaims it on every claim determination, or chooses not to mention it on any. It is binding on claimants until retired or otherwise invalidated. And once it is no longer valid – as is the case here – the coverage policies enunciated in that LCD can no longer be enforced by the contractor.

Other contractors may have similar local coverage policies still in effect, but this contractor (Mutual) does not. Other contractors may continue to deny Medicare Part B claims for blood glucose testing services based upon their own LCDs, but Mutual cannot. Mutual's LCD on blood glucose testing is now retired and invalid, and so are all of its policies discussed in that LCD interpreting Medicare authorities (including Transmittal AB-00-108, Medicare Claims Processing Manual § 90.1, and 42 C.F.R. § 410.32) to establish when Mutual will and will not reimburse claims for blood glucose testing services. This proposition is indisputable.

The LCD record shows how Mutual created the LCD. In December 2000, CMS issued Transmittal AB-00-108. Mutual's LCD on blood glucose testing, now in its fifth version, had an original effective date of September 4, 2001. However, the LCD record includes documentation that indicates Mutual was aware of the soon-to-be-published national coverage determination ("NCD") on blood glucose testing, and that the NCD would not contain the limiting policies that Mutual borrowed from Transmittal AB-00-108 and further elaborated upon in its LCD. In fact,

- 5 -

727

after the NCD was published, Mutual was given a clear written warning by the CMS Region VII office that the challenged LCD language does not appear in the NCD and should *not* be included in the LCD because it conflicts with the NCD, as health care providers had argued. See Aggrieved Party's Statement, A. Ex. 5. Others who reviewed the draft LCD internally expressed similar concerns about the legitimacy of language in the LCD that does not appear in the NCD and the negative impact the LCD would likely have on patient care by discouraging testing. See id., A. Ex. 6. Mutual chose to ignore these warnings and publish the LCD anyway, with the same objectionable language, knowing full well that its LCD is not supported by the NCD and that patient care could suffer.

Effective November 23, 2001, CMS promulgated the NCD to address Medicare coverage of blood glucose testing. The NCD specifically encourages frequent testing of blood glucose levels for diabetic patients and acknowledges that it may be reasonable and necessary to measure quantitative blood glucose in stable, non-hospitalized patients who are unable or unwilling to do so. The NCD does not provide any specific limitations to testing. In plain language, the NCD acknowledges that specific diagnosis codes, such as diabetes, support repeat testing, especially where there is a confirmed continuing risk of glucose metabolism abnormality.

The restrictive coverage policies in Mutual's now-retired and invalid LCD on blood glucose testing can no longer be applied to providers and beneficiaries that Mutual services. The LCD was Mutual's attempt to reflect, in one document, its coverage limitations on blood glucose testing services. Mutual started with the broadly permissive coverage policy of the NCD on blood glucose testing. Mutual then added the restrictive coverage policy language from Transmittal AB-00-108 (*e.g.*, "prompt" notification of test results to the ordering physician). Mutual finished with its own unsupported policy interpretations of Transmittal AB-00-108 (that "prompt" means before the next test); the Medicare Claims Processing Manual § 90.1 (which Mutual interprets to prohibit coverage of blood glucose testing for SNF residents, as opposed to coverage for beneficiaries in their own homes); and 42 C.F.R. § 410.32 (which Mutual interprets to prohibit standing physician orders for blood glucose testing). Now that the LCD is retired and

- 6 -

invalid, all of the coverage limitations on blood glucose testing services reflected in the LCD are unenforceable by law. Any other conclusion or result would be total perversion of justice and fraud upon the Aggrieved Party and the thousands of other Medicare beneficiaries whose claims have been or will be denied.

## THIS BENEFICIARY IS AN AGGRIEVED PARTY

The Beneficiary is an "aggrieved party," as that term is defined in 42 C.F.R. § 426.110, and had standing to bring this appeal. The regulation defines an aggrieved party as:

> [A] Medicare beneficiary, or the estate of a Medicare beneficiary, who—
>
> (1) Is entitled to benefits under Part A, enrolled under Part B, or both (including an individual enrolled in fee-for-service Medicare, in a Medicare+Choice plan, or in another Medicare managed care plan);
>
> (2) Is in need of coverage for a service that is denied based on an applicable LCD (in relevant jurisdiction) or an NCD, regardless of whether the service was received; and
>
> (3) Has obtained documentation of the need by the beneficiary's treating physician.

42 C.F.R. § 426.110.

This Beneficiary met all of these requirements for an aggrieved party. First, she is a Medicare Part B beneficiary. Second, at the time she filed her Complaint, to her knowledge no claims had been denied, but she anticipated that her claims would be denied based upon the restrictive coverage policies in the LCD – a publicly-available official statement of Mutual's policy on coverage of blood glucose testing services. Third, she is in need of blood glucose testing services, as evidenced by the orders of her treating physician attached to her Complaint. See Beneficiary's Complaint, A. Ex. 4. Moreover, the ALJ certified the Beneficiary's Complaint by order dated April 19, 2006, pursuant to 42 C.F.R. § 426.410(b)-(d). Finally, Mutual's deliberate omission of any reference to the LCD on its denials of claims for blood glucose testing services cannot prevent Medicare beneficiaries from challenging the LCD through this appeal process because – stated or not – Mutual is clearly denying such claims based upon the LCD and the restrictive coverage policies therein. See Beneficiary's claim denied by Mutual, A. Ex. 1.

- 7 -

729

## RELIEF REQUESTED

The Aggrieved Party respectfully requests that the ALJ issue a decision in this appeal that includes the following findings:

(1)    Mutual's withdrawal of its blood glucose testing LCD has the same legal effect as an ALJ decision to invalidate that LCD under the reasonableness standard, pursuant to 42 C.F.R. § 426.460(b);

(2)    As such, Mutual is required to reopen denied claims of the Beneficiary and adjudicate those claims, and any new claims submitted by the Beneficiary, for blood glucose testing services without using the policies reflected in the LCD that are now invalid, and for which the record shows there is no medical support;

(3)    Any and all claims submitted to Mutual for blood glucose testing services with dates of service on or after August 11, 2006 will be adjudicated without using the policies reflected in the LCD that are now invalid;

(4)    Official notice, pursuant to the ALJ's authority in 42 C.F.R. § 426.405(c), of the fact that Mutual cannot deny claims for blood glucose testing services on or after August 11, 2006 (i) using any of the restrictive coverage policies discussed in the now-retired LCD on blood glucose testing, or (ii) based on its policy interpretations of other authorities (including Transmittal AB-00-108, Medicare Claims Processing Manual § 90.1, and 42 C.F.R. § 410.32), that are discussed in that LCD;

(5)    The Beneficiary is an Aggrieved Party with standing in this appeal; and

(6)    Mutual must issue a public notice that its blood glucose testing LCD has been withdrawn and the policies reflected in that LCD are now invalid as a result of these proceedings.

730

Respectfully submitted,

Thomas C. Fox, Esq.
Jason M. Healy, Esq.
REED SMITH LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C. 20005-3317
(202) 414-9200

Attorneys for the Aggrieved Party

September 1, 2006

731

- 9 -

## CERTIFICATE OF SERVICE

I hereby certify that on this First day of September, 2006, one copy of the Aggrieved Party's Motion for Leave to File Reply to Mutual of Omaha Insurance Company's Response to Beneficiary's Complaint, and one copy of the Aggrieved Party's Reply to Mutual of Omaha Insurance Company's Response to Beneficiary's Complaint were served via Certified Mail to:

> Martha K. Zajicek, Esq.
> First Vice President & Counsel
> Mutual of Omaha Insurance Company
> Medicare Division
> P.O. Box 1602
> Omaha, NE 68101
>
> and
>
> CMS LCD Challenge Staff
> Mail Stop C3-02-16
> 7500 Security Blvd.
> Baltimore, MD 21244-1850

Jason M. Healy, Esq.

732

CONFIDENTIAL:
Patient Information

Period: 03/08/2006
Report: ARRADetail
Level: Facility
Node: F0992

# KINDRED HEALTHCARE, INC.
## Remittance Advice - Medicare

Mutual Of Omaha Life Ins Co.
3301 Farnam St    P.O. Box 1602
Omaha, NE 68131
(402) 351-8169

Page: 1 of 7
Run Date: 03/08/2006

Provider: 465109
RA Number: 8012

**SNF Part B**

Patient Name: Health

Claim Status

SALT LAKE CITY UT-HOLLADA
4782 S HOLLADAY BLVD SALT LAKE CITY, UT 84117-5464

| Insurance No. (Control Number) | Coverage Date From Days | Cost Days | Cov. Days | Non Cov. Days | Coverage Date Thru | Status | Total Charges | Deductible Amount | Co-ins Amount | Non-Cov Charges | Patient Lib. Met. | Contract Adjust | Provider Payment Interest Included |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/01/2005 | 0 | 0 | | 12/31/2005 | | 202.74 | 0.00 | 0.00 | 0.00 | | 202.74 | 0.00 |
| | | | | | Denied Charges: | | 0.00 | | | | | | 0.00 |
| | | | | | Covered Charges: | | 0.00 | | | 0.00 | | | |

**Claim Adjustments:**

Adj Group:
Contractual Obligations    Adj Code: 50    Amount: 202.74    Quantity: 62    Code Meaning:
These are non-covered services because this is not deemed a "medical necessity" by the payer.

**Service Lines:**
HCPCS: 82962    Charges: 202.74    Paid: 0.00    Revenue Code: 0300    Units: 0

BAILEY, LOUISE    Insurance No: 2053440260002402    Adj Code: 04

Denied

| | 11/01/2005 | 0 | 0 | | 11/30/2005 | | 261.60 | 0.00 | 0.00 | 0.00 | | 261.60 | 0.00 |
| | | | | | Denied Charges: | | 0.00 | | | | | | 0.00 |
| | | | | | Covered Charges: | | 0.00 | | | 0.00 | | | |

**Claim Adjustments:**

Adj Group:
Contractual Obligations    Adj Code: 50    Amount: 261.60    Quantity: 80    Code Meaning:
These are non-covered services because this is not deemed a "medical necessity" by the payer.

**Service Lines:**
HCPCS: 82962    Charges: 261.60    Paid: 0.00    Revenue Code: 0300    Units: 0

BAILEY, LOUISE    Insurance No: 2060360232657002    Adj Code: 04

Denied

| | 12/01/2005 | 0 | 0 | | 12/31/2005 | | 287.76 | 0.00 | 0.00 | 0.00 | | 287.76 | 0.00 |
| | | | | | Denied Charges: | | 0.00 | | | | | | 0.00 |
| | | | | | Covered Charges: | | 0.00 | | | 0.00 | | | |

**Claim Adjustments:**

Adj Group:
Contractual Obligations    Adj Code: 50    Amount: 287.76    Quantity: 88    Code Meaning:
These are non-covered services because this is not deemed a "medical necessity" by the payer.

**Service Lines:**
HCPCS: 82962    Charges: 287.76    Paid: 0.00    Revenue Code: 0300    Units: 0

733

Docket No. C-06-349
A. Ex. 1



DEPARTMENT OF HEALTH & HUMAN SERVICES     Office of the Secretary

SEP 1 9 2008

Departmental Appeals Board, MS6132
Civil Remedies Division
330 Independence Avenue, S.W.
Cohen Building, Room G-644
Washington, D.C. 20201

**CERTIFIED MAIL -- RETURN RECEIPT REQUESTED**

Jason M. Healy, Esq.
Reed Smith LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C. 2005-3317

> Re:     <u>*In re* CMS LCD COMPLAINT:</u>
> <u>Blood Glucose Testing (LCD Database ID No.</u>
> <u>L19657)Title Contractor: Mutual of Omaha</u>
> <u>Insurance Company (Fiscal Intermediary).</u>
> <u>Region VII, Midwest Consortium</u>
> Docket No. C-06-349
> Decision No. CR1509

Dear Mr. Healy:

Enclosed is your copy of the decision of Administrative Law Judge Keith W. Sickendick
in the above referenced case. If the decision is adverse to you, and you wish to appeal,
your appeal should be sent to the Appellate Division of the Departmental Appeals Board.

In your notice of appeal, you should identify (by number) each finding of fact and
conclusion of law with which you take exception and state why you think the
administrative law judge was wrong, or any other reasons for your appeal. Where your
reasons are supported by the record, you must cite each part of the record that you want
the Board to consider, identifying the document and page number. Also, you must cite
the particular sections or subsections of statutes, regulations, or other authorities on which
you rely. If you are presenting arguments previously relied upon, set them out again in
your brief; it is not enough to incorporate by reference your brief(s) before the judge. Do
not submit exhibits which were submitted to the judge; the record contains all exhibits
which were offered, even if the judge rejected them.

FILE COPY

2

You will find the procedures for appeal at 42 C.F.R. Part 426. The form, filing and service of such an appeal should follow the regulations (enclosed). If you have any questions, please call Carolyn Reines-Graubard (her number is (202) 565-0116).

The Appellate Division will notify you that it has received an appeal. If you are the party filing an appeal, it is your obligation to serve the other party with a copy of the appeal.

By direction of the Administrative
Law Judge.

Oliver A. Potts
Chief, Civil Remedies Division

cc:

CMS LCD Challenge Staff
Mail Stop C3-02-16
7500 Security Boulevard
Baltimore, Maryland 21244-1850

Enclosures:

Medicare K. Zajicek
First Vice President & Counsel
Mutual of Omaha Insurance Company
Medicare Area
P.O. Box 1602
Omaha, Nebraska 68101

  

MUTUAL OF OMAHA INSURANCE COMPANY
Medicare Division
P.O. Box 1602 • Omaha, NE 68101
mutualmedicare.com
A CMS Contracted Intermediary

Martha K. Zajicek
1st Vice President & Counsel
t 402 351 2421  f 402 351 2000
martha.zajicek@mutualofomaha.com

August 11, 2006

VIA FIRST CLASS MAIL
Hon. Keith W. Sickendick
Department of Health & Human Services
Departmental Appeals Board, MS 6132
Civil Remedies Division
330 Independence Avenue, SW
Cohen Building, Room G-644
Washington, D.C. 20201

Re:     *In re* CMS LCD Complaint
        Blood Glucose Testing (LCD Database ID No. L19657)
        Contractor: Mutual of Omaha Insurance Company (Fiscal Intermediary)
        Region VII, Midwest Consortium
        Docket No. C-06-349

Dear Judge Sickendick:

This letter is to inform you that Mutual of Omaha Insurance Company ("Mutual of Omaha"), as a fiscal intermediary under contract with the Department of Health & Human Services, Centers for Medicare & Medicaid Services, retired the LCD, which is the subject of the above-referenced Complaint, effective August 11, 2006. Mutual of Omaha notifies you of the retirement in accordance with 42 CFR 426.420(c)(1).

Very truly yours,

Martha K. Zajicek
First Vice President & Counsel
Law Operation

cc:    Elaine Knapp, ARNP, CMS Seattle RO
       Janet Kyle
       Ellen Evans, MD

736

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LOUISE BAILEY,                              )
                                            )
              Plaintiff,                     )
                                            )
       v.                                   )          Case No. 1:06-cv-2144
                                            )          Judge Royce C. Lamberth
MUTUAL OF OMAHA INSURANCE                    )
COMPANY, MICHAEL O. LEAVITT,                 )
and LESLIE V. NORWALK,                       )
                                            )
              Defendants.                    )
_____)

**DEFENDANTS' EXHIBIT E**

Generally speaking, collagen crosslink testing is useful mostly in "fast losers" of bone. The age when these bone markers can help direct therapy is often pre-Medicare. By the time a fast loser of bone reaches age 65, she will most likely have been stabilized by appropriate therapy or have lost so much bone mass that further testing is useless. Coverage for bone marker assays may be established, however, for younger Medicare beneficiaries and for those men and women who might become fast losers because of some other therapy such as glucocorticoids. Safeguards should be incorporated to prevent excessive use of tests in patients for whom they have no clinical relevance.

Collagen crosslinks testing is used to:

1.    Identify individuals with elevated bone resorption, who have osteoporosis in whom response to treatment is being monitored.

2.    Predict response (as assessed by bone mass measurements) to FDA approved antiresorptive therapy in postmenopausal women.

3.    Assess response to treatment of patients with osteoporosis, Paget's disease or the bone, or risk for osteoporosis where treatment may include FDA approved antiresorptive agents, anti-estrogens or selective estrogens receptor moderators.

Limitations

Because of significant specimen to specimen collagen crosslink physiologic variability (15-20 percent), current recommendations for appropriate utilization include: one or two base-line assays from specified urine collections on separate days; followed by a repeat assay about 3 months after starting anti-resorptive therapy; followed by a repeat assay in 12 months after the 3-month assay; and thereafter not more than annually, unless there is a change in therapy in which circumstance an additional test may be indicated 3 months after the initiation of new therapy.

Some collagen crosslink assays may not be appropriate for use in some disorders, according to FDA labeling restrictions.

## 190.20 - Blood Glucose Testing
**(Rev. 28, Issued: 02-11-05, Effective:  01-01-05, Implementation:  03-11-05)**

This policy is intended to apply to blood samples used to determine glucose levels. Blood glucose determination may be done using whole blood, serum or plasma. It may be sampled by capillary puncture, as in the fingerstick method, or by vein puncture or arterial sampling. The method for assay may be by color comparison or an indicator stick, by meter assay of whole blood or a filtrate of whole blood, using a device approved for home monitoring, or by using a laboratory assay system using serum or plasma. The convenience of the meter or stick color method allows a patient to have access to blood

glucose values in less than a minute or so and has become a standard of care for control of blood glucose, even in the inpatient setting.

Indications

Blood glucose values are often necessary for the management of patients with diabetes mellitus, where hyperglycemia and hypoglycemia are often present.  They are also critical in the determination of control of blood glucose levels in the patient with impaired fasting glucose (FPG 110-125 mg/dL), the patient with insulin resistance syndrome and/or carbohydrate intolerance (excessive rise in glucose following ingestion of glucose or glucose sources of food), in the patient with a hypoglycemia disorder such as nesidioblastosis or insulinoma, and in patients with a catabolic or malnutrition state. In addition to those conditions already listed, glucose testing may be medically necessary in patients with tuberculosis, unexplained chronic or recurrent infections, alcoholism, coronary artery disease (especially in women), or unexplained skin conditions (including pruritis, local skin infections, ulceration and gangrene without an established cause).

Many medical conditions may be a consequence of a sustained elevated or depressed glucose level.  These include comas, seizures or epilepsy, confusion, abnormal hunger, abnormal weight loss or gain, and loss of sensation.  Evaluation of glucose may also be indicated in patients on medications known to affect carbohydrate metabolism.

Effective January 1, 2005, the Medicare law expanded coverage to diabetic screening services.  Some forms of blood glucose testing covered under this national coverage determination may be covered for screening purposes subject to specified frequencies. See 42 CFR 410.18 and section 90, chapter 18, of the Claims Processing Manual, for a full description of this screening benefit.

Limitations

Frequent home blood glucose testing by diabetic patients should be encouraged.  In stable, non-hospitalized patients who are unable or unwilling to do home monitoring, it may be reasonable and necessary to measure quantitative blood glucose up to four times annually.

Depending upon the age of the patient, type of diabetes, degree of control, complications of diabetes, and other co-morbid conditions, more frequent testing than four times annually may be reasonable and necessary.

In some patients presenting with nonspecific signs, symptoms, or diseases not normally associated with disturbances in glucose metabolism, a single blood glucose test may be medically necessary.  Repeat testing may not be indicated unless abnormal results are found or unless there is a change in clinical condition.  If repeat testing is performed, a specific diagnosis code (e.g., diabetes) should be reported to support medical necessity. However, repeat testing may be indicated where results are normal in patients with

conditions where there is a confirmed continuing risk of glucose metabolism abnormality (e.g., monitoring glucocorticoid therapy).

## 190.21 - Glycated Hemoglobin/Glycated Protein
**(Rev. 17, Issued: 07-02-04) (Effective/Implementation: Not Applicable)**
**PM AB-02-110**

The management of diabetes mellitus requires regular determinations of blood glucose levels. Glycated hemoglobin/protein levels are used to assess long-term glucose control in diabetes. Alternative names for these tests include glycated or glycosylated hemoglobin or Hgb, hemoglobin glycated or glycosylated protein, and fructosamine.

Glycated hemoglobin (equivalent to hemoglobin A1) refers to total glycosylated hemoglobin present in erythrocytes, usually determined by affinity or ion-exchange chromatographic methodology. Hemoglobin A1c refers to the major component of hemoglobin A1, usually determined by ion-exchange affinity chromatography, immunoassay or agar gel electrophoresis. Fructosamine or glycated protein refers to glycosylated protein present in a serum or plasma sample. Glycated protein refers to measurement of the component of the specific protein that is glycated usually by colorimetric method or affinity chromatography.

Glycated hemoglobin in whole blood assesses glycemic control over a period of 4-8 weeks and appears to be the more appropriate test for monitoring a patient who is capable of maintaining long-term, stable control. Measurement may be medically necessary every 3 months to determine whether a patient's metabolic control has been on average within the target range. More frequent assessment, every 1-2 months, may be appropriate in the patient whose diabetes regimen has been altered to improve control or in whom evidence is present that intercurrent events may have altered a previously satisfactory level of control (for example, post-major surgery or a s a result of glucocorticoid therapy). Glycated protein in serum/plasma assesses glycemic control over a period of 1-2 weeks. It may be reasonable and necessary to monitor glycated protein monthly in pregnant diabetic women. Glycated hemoglobin/protein test results may be low, indicating significant, persistent hypoglycemia, in nesidioblastosis or insulinoma, conditions which are accompanied by inappropriate hyperinsulinemia. A below normal test value is helpful in establishing the patient's hypoglycemic state in those conditions.

Indications

Glycated hemoglobin/protein testing is widely accepted as medically necessary for the management and control of diabetes. It is also valuable to assess hyperglycemia, a history of hyperglycemia or dangerous hypoglycemia. Glycated protein testing may be used in place of glycated hemoglobin in the management of diabetic patients, and is particularly useful in patients who have abnormalities of erythrocytes such as hemolytic anemia or hemoglobinopathies.

Limitations

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LOUISE BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-cv-2144 |
| | ) | Judge Royce C. Lamberth |
| MUTUAL OF OMAHA INSURANCE | ) | |
| COMPANY, MICHAEL O. LEAVITT, | ) | |
| and LESLIE V. NORWALK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' EXHIBIT F**

CASE | DECISION |JUDGE | FOOTNOTES

Department of Health and Human Services
DEPARTMENTAL APPEALS BOARD
Civil Remedies Division

IN THE CASE OF

SUBJECT:

*In re* CMS LCD COMPLAINT:          DATE: December 22, 2006

Local Coverage Determination:
Blood Glucose Testing, LCD L1316
(Lillian Spooner and Delores Shaw)

Docket No.**C-06-568**
Decision No. **CR1548**

Docket No. **C-06-569**
Decision No. **CR1549**

...TO TOP

DECISION

## *DECISION*

I issue these two decisions deciding hearing requests brought by aggrieved Medicare beneficiaries Lillian Spooner (Civil Remedies Division Docket No. C-06-568) and Delores Shaw (Civil Remedies Division Docket C-06-569) challenging Local Coverage Determination L1316 (LCD), issued by Blue Cross/Blue Shield of Tennessee (Riverbend Government Benefits Administrator), governing payment by the Medicare program for blood glucose testing. [1] I find the LCD determination to be reasonable. As part of my decision, I find to be without merit the aggrieved beneficiaries' arguments that the LCD is superseded by, or inconsistent with, a National Coverage Determination (NCD) or that it is inconsistent with other law, policy, or regulations.

## I. Background and undisputed facts

I hear and decide these cases pursuant to regulations governing challenges to LCDs published at 42 C.F.R. Part 426, Subparts C and D. For purposes of these decisions I accept as true the following facts alleged by the two aggrieved beneficiaries (Ms. Spooner and Ms. Shaw). Each of them is a resident of a long term care facility (apparently, a skilled nursing facility) that participates in the Medicare program pursuant to Part A of that program, the part that provides reimbursement to institutional

providers.[2] Each of the aggrieved beneficiaries is diabetic. In each case the beneficiary received routine blood glucose monitoring by finger stick testing, performed by the nursing staff of her long term care facility. The facility submitted reimbursement claims for this blood glucose testing as Part B Medicare items or services. The rationale for each of the reimbursement claims was that it was for a Part B covered laboratory procedure. Each claim was denied based on the terms of the LCD.

In each case, the aggrieved beneficiary submitted a hearing request with various attachments. I directed the intermediary to provide me with a copy of its LCD record. In each case the intermediary submitted its LCD record under cover of a letter dated August 29, 2006. I provided the aggrieved beneficiaries with the opportunity to comment on the LCD record and to provide supplemental evidence. The parties' representative made a submission on Ms. Spooner's behalf on October 12, 2006, and made a submission on Ms. Shaw's behalf on October 16, 2006. I then provided the intermediary with an opportunity to file a response to the aggrieved beneficiaries' submissions. The intermediary did so with responses that it filed on November 8, 2006.


The beneficiaries' representative has not requested that there be an in-person hearing. He has not proffered testimony on behalf of Ms. Spooner or Ms. Shaw. Therefore, I find the records of these cases to be closed. I am designating the hearing request and its attachments in C-06-568 as 06-568 Exhibit (Ex.) 1, the LCD record as 06-568 Ex. 2, the October 12 submission as 06-568 Ex. 3, and the intermediary's November 8 response as 06-568 Ex. 4. I am designating the hearing request and its attachments in C-06-569 as 06-569 Ex. 1, the LCD record as 06-569 Ex. 2, the October 16 submission as 06-569 Ex. 3, and the intermediary's November 8 response as 06-569 Ex. 4. I receive these exhibits into the records of the two cases.

## II. The LCD

In relevant part the LCD provides as follows:

> The routine or standing order use of a home glucose monitoring device . . . will only be considered medically necessary as a laboratory procedure when the physician is PROMPTLY informed of the result PRIOR to the next testing episode. Blood glucose monitoring . . . without this reporting is part of the patients' self-care. If the patient is in a skilled nursing facility, routine glucose monitoring (including any tests, which are not promptly reported) is a part of routine personal care and is not a separately reportable or billable procedure . . . .

C-06-568 Ex. 1, Attachment D, at 4; C-06-569 Ex. 1, Attachment D, at 4.

The LCD precludes reimbursement under Medicare Part B for blood glucose monitoring that is performed on a routine basis, either by a Medicare beneficiary at home, or by a skilled nursing facility's staff, where the result of each test is not

promptly reported to the beneficiary's treating physician. Thus, blood glucose monitoring that is done several times daily to check blood sugar levels and to adjust the correct dosage of daily insulin injections, but which is not promptly reported to a beneficiary's treating physician, is not covered as a Part B reimbursable item or service. In the nursing facility setting, reimbursement for such services is considered to be an element of the global compensation that Medicare reimburses the facility under Part A of the Medicare program beneficiary's institutional care.

The LCD does not categorically deny reimbursement under Part B for all blood glucose testing. A blood glucose test is reimbursable under Part B as a separate item or service if a physician orders a specific test for a diagnostic purpose and the result of that test is reported back to the physician promptly and prior to the next test being performed. The obvious distinction created by the LCD is to allow per-test compensation under Part B for tests that are ordered specifically for diagnostic purposes, as opposed to those that consist of routine self-monitoring by the beneficiary or routine monitoring that is performed for the beneficiary by a nursing facility staff. These latter tests are reimbursed as part of the Part A fee.

## III. Issues, findings of fact and conclusions of law

### A. Issue

The issue in this case is whether the LCD unreasonably prohibits Part B Medicare reimbursement for routine glucose monitoring performed at a long term care facility under circumstances where the result of the testing is not promptly reported to a beneficiary's physician prior to the next testing episode.

### B. Findings of fact and conclusions of law

I make findings of fact and conclusions of law (Findings) to support my decision in these cases. I set forth each Finding below as a separate heading. I discuss each Finding in detail.

#### 1. There is no dispute that the tests that are at issue in these cases were not "promptly" reported to the aggrieved beneficiaries' treating physicians.

What the aggrieved beneficiaries seek here is a decision that the distinction drawn by the LCD between tests that are promptly reported and those that are not is unreasonable. The beneficiaries would have me hold that it is unreasonable to preclude payment under Part B of Medicare for *each test result*, whether or not it is promptly reported, and whether or not it is for routine monitoring as opposed to being ordered by a physician for a specific diagnostic purpose. The undisputed factual premise that underlies the beneficiaries' argument is that the blood glucose monitoring that they received consisted of routine monitoring that was not promptly reported to the residents' physicians. Otherwise, there would be no factual basis for the beneficiaries'

challenge of the LCD.

### 2. The LCD does not conflict with, nor is it superseded by, a National Coverage Determination (NCD).

The aggrieved beneficiaries contend that an NCD entitled, "Medicare National Coverage Determination 190.20 - Blood Glucose Testing," directs that *all* blood glucose testing, whether performed for a specific diagnostic purpose and immediately reported, or performed as routine monitoring and not immediately reported, be reimbursed under Part

B of Medicare. [3] They assert that, as a matter of law, an NCD will supersede an LCD that is in conflict with the NCD. They contend, therefore, that the LCD in this case is invalid because it is in conflict with the NCD and is superseded by it.

I agree with the aggrieved beneficiaries that an LCD may be superseded by an NCD. An NCD establishes national reimbursement policy for the Medicare program and such policy will supersede or overrule any conflicting regional or local policy. However, there is no conflict between the NCD cited by the aggrieved beneficiaries and the LCD that is at issue here. The aggrieved beneficiaries' arguments notwithstanding, the NCD does not direct payment under Medicare Part B for routine blood glucose monitoring. In a manner that is completely consistent with the LCD, the NCD establishes ground rules for reimbursing blood glucose screening tests under Part B. It allows for reimbursement for such tests under Medicare Part B in some very limited and clearly defined circumstances. It says nothing to suggest that routine screening tests will be reimbursed as Part B items or services.

The NCD does not express a general policy that Medicare will reimburse under Part B for all blood glucose testing. Rather, it states that some forms of blood glucose testing "may be covered" for screening purposes subject to specified frequencies. 06-568 Ex. 4; 06-569 Ex. 4. This is not a mandate to pay under Part B for *all* blood glucose testing including self-testing or testing done on a routine basis in a nursing facility. To the contrary, it is an indication that blood glucose testing may be reimbursable under Part B in limited circumstances. The NCD goes on to state that these limited circumstances *may* include blood glucose testing in diabetic patients who are unable or unwilling to do home monitoring, but generally only up to four times annually. The NCD allows for Part B reimbursement for blood glucose testing in such patients more than four times annually:

> Depending upon the age of the patient, type of diabetes, degree of control, complications of diabetes, and other co-morbid conditions . . . .

In sum, the NCD states no policy that routine blood glucose monitoring - as distinguished from specific tests performed in enumerated circumstances - is a Part B reimbursable item or service. Rather, it implies strongly by specifically stating that monitoring generally will be reimbursed up to four times annually, and by enumerating

a narrow exception to this rule, that additional monitoring normally is not reimbursable under Part B. That is completely consistent with the LCD's distinction between a non-Part B reimbursable routine blood glucose monitoring test and a reimbursable test that is ordered for a diagnostic purpose and which is promptly reported to a treating physician.

The NCD in these cases is authorized by a regulation governing payment under Part B of Medicare for diabetes screening tests. 42 C.F.R. § 410.18. The regulation, which incorporates the NCD by reference, is consistent with the LCD. 42 C.F.R. § 410.18(c)(3). Nothing in the regulation states or suggests that routine blood glucose monitoring is reimbursable under Part B. Indeed, the specific circumstances in which tests are covered, enumerated at 42 C.F.R. § 410.18(c), do not mention routine blood glucose monitoring.

### 3. The LCD does not conflict with law regulating certification of clinical laboratories.

The aggrieved beneficiaries assert that the facilities at which they reside have received waivers under the Clinical Laboratory Improvements Amendments of 1988 (CLIA) and implementing regulations to perform certain types of tests which, according to them, include routine blood glucose testing. *See* 42 C.F.R. Part 493. These facilities, according to the aggrieved parties, are "clinical laboratories" within the meaning of CLIA and its implementing regulations. The aggrieved beneficiaries contend that the routine blood glucose tests that are provided to them are CLIA-certified laboratory tests by virtue of the CLIA waivers received by the facilities in which they reside. They argue that the Medicare program pays for all CLIA-certified laboratory tests and, as a result, the tests that are at issue here must be compensated by Medicare. Consequently, according to the aggrieved beneficiaries, the LCD is invalid as a matter of law to the extent that it conflicts with the asserted requirement that Medicare pay for all CLIA-approved laboratory tests.

I find this argument to be without merit. CLIA and its implementing regulations regulate the types of laboratory facilities that may be certified to conduct clinical testing and the types of tests that these facilities may perform. They do not govern what types of tests will be compensated by the Medicare program, or how the program will compensate for these tests. There is nothing in CLIA or in implementing regulations that directs the Medicare program to reimburse clinical laboratories for all CLIA-certified tests. Nor is there anything in CLIA that defines the type of reimbursement (Part A versus Part B) that Medicare will provide for those services that are covered under Medicare. Thus, the fact that a skilled nursing facility may be approved pursuant to CLIA to provide certain types of clinical laboratory tests does not mean that, as a matter of law, every test that is performed on its premises is compensable under Medicare, or under Medicare Part B as opposed to Medicare Part A.

What may be reimbursable by Medicare, and how it may be reimbursed, is not

regulated by CLIA but elsewhere in federal law and regulations governing the Medicare program. It is consistent with CLIA that a facility may be certified to perform a particular type of test that is not reimbursable under Part B of Medicare. Moreover, the Medicare program does not reimburse for every clinical laboratory test but only for those which it has approved as covered items or services. As I discuss above, at Finding 2, reimbursement for blood glucose testing is regulated explicitly by federal regulations, an NCD, and the LCD that is at issue here. These authorities make it plain that blood glucose monitoring will be reimbursed by Part B of Medicare in certain circumstances but not automatically in all circumstances.

In addition to the specific law and regulations governing blood glucose testing, there is a regulation that states the general rule governing payment under Part B for diagnostic laboratory tests. That is 42 C.F.R. § 410.32 and it states in relevant part that Medicare Part B pays for *covered* diagnostic laboratory tests. 42 C.F.R. § 410.32(d). Tests performed by a clinical laboratory are reimbursable if they are covered tests. 42 C.F.R. § 410.32(d)(1)(v). The regulation thus distinguishes between a laboratory test and a *covered* laboratory test. Only a *covered* test is reimbursable under Medicare Part B and, as I have discussed above, the tests that are at issue here are not covered by Part B.

### 4. The LCD is reasonable.

The test that I am required to apply in deciding whether an LCD is valid - as opposed to deciding whether the LCD conflicts with or is superseded by an NCD or conflicts with other law - is defined in regulations as the "reasonableness standard." Specifically:

> In determining whether . . . [an LCD] is valid the . . . [administrative law judge] must uphold a challenged policy (or a provision or provisions of a challenged policy) if the findings of fact, interpretations of law, and applications of fact to law by the contractor or CMS [The Centers for Medicare & Medicaid Services] are reasonable based on the LCD . . . record and the relevant record developed before the . . . [administrative law judge].

42 C.F.R. § 426.110.

I have considered the LCD based on the records in each of these cases and I find it to be reasonable. The LCD is consistent with two long-standing CMS policies. First, it conforms to CMS's policy that Medicare will not pay under Part B for routine self-administered glucose screening tests. Second, it conforms to CMS's policy - incorporated in governing regulations - that skilled nursing facility services are not generally compensable under Part B of the Medicare program.

The purpose of the LCD is to apply to the setting of a skilled nursing facility CMS's long-standing and general rule that the Medicare program will not reimburse under Part B for blood glucose self-testing performed by diabetic beneficiaries as part of their routine care. The LCD analogizes the routine testing that may be performed in a skilled

nursing facility, with the assistance of or by facility staff, with that which a beneficiary would perform by himself or herself if at home. This policy expressed in the LCD is consistent with CMS's general policy not to pay for self-testing:

> [U]nderscoring the self-care nature of ongoing monitoring, it is important to note that, if the beneficiary were in a private residence, she or a family member would be expected to self-manage this level of care, as it does not meet the definition of skilled care for Home Health . . . On any given day hundreds of thousands of diabetics nationwide monitor their blood glucoses using home monitors without the benefit of diagnostic labs or skilled staffs of any type.

* * * *

The current CMS manual makes it clear that this distinction is still made between routine home monitoring as self care and physician directed diagnostic testing. CMS Manual 100-4 Ch7 Part B Skilled Nursing facilities; Section 90.1 - Glucose Monitoring states: "Routine glucose monitoring of diabetics is never covered in a . . . [skilled nursing facility], whether the beneficiary is in a covered Part A stay or not. Glucose monitoring may only be covered when it meets all the conditions of a covered laboratory service, including use by the physician in modifying the patient's treatment."

06-568 Ex. 4, at 2-3; 06-569 Ex. 4, at 2-3.

Furthermore, the LCD comports with regulations that require skilled nursing facility services to be paid for under Part A of the Medicare program. 42 C.F.R. § 411.15(p). Under Part A of Medicare the portion of that care that might be devoted to assisting beneficiaries with routine blood glucose screening is compensated as part of the overall compensation that Medicare gives to a facility for each eligible beneficiary's care. Thus, the LCD merely expresses explicitly for blood glucose testing, and entirely consistent with the governing regulation, the general policy of CMS not to pay under part B of Medicare for itemized services provided by a skilled nursing facility.

The aggrieved beneficiaries have offered no evidence to show that routine blood glucose screening is a unique item or service that merits reimbursement separate from the global care fee paid under Part A of the Medicare program. They have not argued that the tests for which they seek reimbursement are anything other than routine screening tests nor have they established anything about these tests - the nature of the tests, the level of skill that is required to administer or interpret them, or the uses to which the results of these tests are put - that would distinguish routine blood glucose testing from the routine services that are performed at a skilled nursing facility and which are reimbursed under Part A. As the intermediary notes, the identical tests to those for which the aggrieved parties demand coverage under the LCD are performed at home, hundreds of thousands of times daily, by beneficiaries, and the costs of these tests are not reimbursed under Part B of Medicare. The aggrieved parties have offered nothing to prove that these tests involve any different methodology or skills when

Page 7

performed by nursing facility staff as than when performed by the beneficiaries themselves.

In case C-06-568, the aggrieved beneficiary attached to her hearing request a decision by an administrative law judge finding that blood glucose monitoring tests furnished to a Medicare beneficiary in a skilled nursing facility were reasonable and necessary as is defined at section 1862(a)(1) of the Social Security Act (Act) and, therefore, reimbursable under Part B of the Medicare program. *DuPage Convalescent Home, Appellant, Eunice Hemby, Beneficiary*, OHA Docket No. 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 (2004). The aggrieved parties evidently urge that I consider this decision to be precedent for concluding that the LCD in these cases is unreasonable. I do not find the decision to be precedential. The decision does not address - or even mention - the LCD that is at issue here.[4] It is not a case in which the reasonableness of the LCD is addressed. Rather, it addresses only the issue of whether denials of payments of individual claims for reimbursement pursuant to Part B of Medicare were proper. That latter issue is not before me. My decisions in these cases find only that the LCD at issue here is reasonable.

Furthermore, Section 1862(a) of the Act does not direct reimbursement under Part B of Medicare for every item or service that is "reasonable and necessary." Section 1862(a) is a proscription against reimbursement under Parts A and B of Medicare for certain defined items or services. It does not state - either explicitly or impliedly - that those items or services that are not listed under the section *must* be reimbursed by Medicare or that they *must* be reimbursed under a specific Part of Medicare.

...TO TOP

**JUDGE**

**Steven T. Kessel**

**Administrative Law Judge**

...TO TOP

**FOOTNOTES**

**1. The governing LCD, law, and relevant facts in the two cases are identical. The aggrieved party in each case is represented by the same individual. I am issuing consolidated decisions for efficiency purposes. However, each of the two aggrieved parties has standing to appeal my decision with respect to her.**

**2. As a general rule, institutional providers such as nursing facilities receive reimbursement for the care that they give to eligible beneficiaries under Part A of the Medicare program. Part A reimbursement consists essentially of a global fee for the services that a facility gives to each eligible beneficiary. Under Part A, specific items or services are not reimbursed separately. By contrast, under Part B, which is used generally to reimburse non-institutional providers such as**

physicians, reimbursement is made for specific items or services.

3. The aggrieved beneficiaries submitted extracts from the NCD as part of their hearing requests. The intermediary provided me with the complete document as an attachment to its submission in each of these cases. 06-568 Ex. 4; 06-569 Ex. 4. I rely on the NCD supplied by the intermediary as the complete and accurate text of the NCD.

4. The administrative law judge in this case cites to a Local Medical Review Policy (LMRP) which he finds not to be binding on him. The text of the LMRP is not made part of the decision. I make no finding here as to whether an LMRP is binding on an administrative law judge. However, it is plain from the decision that the administrative law judge made no findings about the reasonableness of the LCD that is at issue here.

CASE | DECISION | JUDGE | FOOTNOTES

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LOUISE BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-cv-2144 |
| | ) | Judge Royce C. Lamberth |
| MUTUAL OF OMAHA INSURANCE | ) | |
| COMPANY, MICHAEL O. LEAVITT, | ) | |
| and LESLIE V. NORWALK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' EXHIBIT G**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
_____

ST. MARK'S LUTHERAN HOME,                                01 CIV 1034 JEL/JGL

        Plaintiff,

v.                                                                                    **ORDER**

TOMMY THOMPSON, in his capacity as
Secretary of the United States Department of
Health and Human Services, THOMAS SCULLY,
in his capacity as Administrator of the Health Care
Financing Administration (HCFA), DOROTHY
BURK COLLINS, as the Regional Administrator
of Region V of HCFA, and BLUE CROSS/BLUE
SHIELD OF NORTH DAKOTA (d/b/a Noridian),
in its capacity as Fiscal Intermediary,

        Defendants.
_____

MARK R. WHITMORE, Bassford, Lockhart, Truesdell & Briggs, P.A., on behalf of the
plaintiff.

PATRICIA R. CANGEMI, Assistant United States Attorney, on behalf of the defendant.
_____

        This matter came on for hearing before the Court on August 19, 2002 upon the Defendants'

Motion to Dismiss all Defendants Except Tommy Thompson and upon the parties' cross-motions

for summary judgment. For the reasons stated herein, the Court will Grant the Defendants' Motion

to Dismiss all Defendants Except Tommy Thompson. The Court will grant the Defendants' Motion

for Summary Judgment in part and the Plaintiff's Motion for Summary Judgment in part.

I.     **BACKGROUND**

        The case involves the reimbursement of blood glucose monitoring ("BGM") tests. The

plaintiff, St. Mark's Lutheran Home ("the Lutheran Home"), is a skilled nursing facility ("SNF") that

provides various medical services for its residents, including BGM tests. The Secretary of the United

States Department of Health and Human Services ("the Secretary") has delegated the administration

of the Medicare program to the Centers for Medicare and Medicaid Services ("CMS"), formerly

known as the Health Care Financing Administration ("HCFA"). CMS contracts with private

companies, known as fiscal intermediaries, to process the claims. Blue Cross Minnesota was the

FILED
RICHARD D. SLETTEN, CLERK

JUDGMENT ENTERED_____
DEPUTY CLERK'S INITIALS_____

1    intermediary to which Minnesota providers, such as the Lutheran Home, submitted Medicare claims

2    until August 1, 1999, at which time Noridian became the intermediary.

3        Relevant legislation and reimbursement policies for BGM tests have been in a complex state

4    of flux in recent years.  Prior to June 7, 2000, each intermediary made its own determination as to

5    whether BGM tests were reimbursable because a national policy did not exist.  Blue Cross, and later

6    Noridian, took the position that BGM tests were "routine" and therefore not reimbursable.  As a

7    result, submitted claims were returned unprocessed to providers. In an effort to obtain reimbursement

8    of its claims, the Lutheran Home hired James Giger, a billing consultant, to work with on its behalf.

9    On June 7, 2000, the Secretary instructed intermediaries to process BGM tests, but to reimburse on

10   a cost, rather than a fee schedule, basis.  On December 5, 2000, the Lutheran Home submitted claims

11   incurred between October 1, 1998 and June 6, 2000.  Noridian returned the claims unprocessed and

12   without administrative review rights.   On April 1, 2001, the Secretary instituted a policy of

13   reimbursement on a fee schedule basis, but added a requirement that each BGM test must be ordered

14   by and reported to a physician in order to be considered "reasonable and necessary," and therefore

15   reimbursable.

16       The Lutheran Home argues that these policies are contrary to existing legislation and reflect

17   an ongoing effort to avoid reimbursing providers for BGM tests. Specifically, the Lutheran Home

18   challenges the Secretary's policy of reimbursing on a cost basis and the requirement that each BGM

19   test must be ordered by and reported to a physician.  It further argues that the claims it submitted on

20   December 5, 2000 should have been reimbursed and should not have been returned without

21   administrative review rights.  According to the Lutheran Home, it has not filed any additional claims

22   for reimbursement with Noridian for several reasons.  First, it disputes and is not in compliance with

23   all requirements related to these methods of reimbursement. Second, it claims that it was told by Blue

24   Cross Minnesota that the filing of BGM test claims would be considered fraudulent.  Thus, the

25   Lutheran Home anticipates fraud or abuse charges for filing.

26       This action was brought, therefore, seeking a declaration regarding the proper method of

27   reimbursement.   In addition, the Lutheran Home requests an extension for filing its now untimely

28   claims, arguing that its failure to timely file was caused by an error or misrepresentation of Noridian,

1   CMS, or the Secretary. The Secretary argues that the Lutheran Home has not exhausted its

2   administrative remedies as to the claims it never submitted for reimbursement and that the Court

3   therefore lacks subject matter jurisdiction as to those claims. As to the claims the Lutheran Home

4   submitted on December 5, 2000, the Secretary argues that the Court's jurisdiction is limited to

5   ordering the Secretary to process the claims. On the merits, the Secretary argues that its

6   reimbursement policies are proper and that the Lutheran Home is not entitled to an extension for

7   filing its claims.

8   **II.   DISCUSSION**

9       **A.   Summary Judgment Standard**

10       The Supreme Court has held that summary judgment is to be used as a tool to isolate and

11   dispose of claims or defenses that are either factually unsupported or are based on undisputed facts.

12   Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986); Hegg v. United States, 817 F.2d 1328, 1331

13   (8th Cir. 1987). Summary judgment is proper, however, only if examination of the evidence in a light

14   most favorable to the non-moving party reveals no genuine issue of material fact and the moving

15   party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242

16   (1986); Fed. R. Civ. P. 56(c).

17       **B.   Defendants' Motion to Dismiss all Defendant Except Tommy Thompson**

18       The Secretary argues that he is the only proper party defendant and that all other parties

19   should be dismissed. The Lutheran Home has agreed to dismiss Dorothy Burk Collins ("Collins"),

20   as the Regional Administrator of the Health Care Financing Administration ("HCFA"), but argues

21   that the other parties are necessary. In addition to Tommy Thompson, in his capacity as Secretary

22   of the Department of Health and Human Services ("HHS"), and Collins, the named defendants

23   include Thomas Scully, in his capacity as the Administrator of the Health Care Financing

24   Administration ("HCFA"), and Noridian, in its capacity as fiscal intermediary.

25       Fiscal intermediaries are agents of the Secretary and are bound by a judgment against the

26   Secretary, making the Secretary the proper party of interest in an action. DeWall Enter., Inc. v.

27   Thompson, 206 F. Supp.2d 992, 993, n.1 (D. Neb. 2002); 42 C.F.R. § 421.5(b). As the Secretary

28   argues, the other named defendants are bound by the Secretary's directives, which would include

- 3 -

1   adhering to a court order. Accordingly, the Court will dismiss all defendants, except Tommy

2   Thompson, without prejudice.

3       **C.**     <u>**Cross Motions for Summary Judgment**</u>

4          **(1).**     <u>**Jurisdiction Over Unfiled Claims**</u>

5       The Secretary argues that the Court lacks subject matter jurisdiction over the Lutheran Home's

6   unfiled claims. There are two elements to obtaining judicial review of a claim arising under the

7   Medicare Act: 1) an unwaivable requirement of presentment to the Secretary; and 2) a waivable

8   requirement that the claimant must have exhausted its administrative remedies. 42 U.S.C. § 405(g).

9   42 U.S.C. § 405(h) requires exhaustion of administrative remedies as a prerequisite to federal court

10   jurisdiction, unless application of §405(h) would result in no review at all. <u>Shalala v. Illinois Council</u>

11   <u>on Long Term Care, Inc.</u>, 529 U.S. 1, 19 (2000) (requiring exhaustion where a nursing home with

12   deficiencies could test the lawfulness of regulations by refusing to submit a required corrective plan

13   and incurring a minor penalty, such as the denial of payments, incurring a fine, or being subject to

14   state monitoring); <u>see</u> <u>Trade Around the World of Pennsylvania v. Shalala</u>, 145 F. Supp.2d 653, 662

15   (W.D. Pa. 2001).

16       The Lutheran Home argues that it was unable to file because it could have been charged with

17   fraud or abuse for doing so and that, as a result, this is a situation pursuant to <u>Illinois Council</u> where

18   requiring it to file and exhaust administrative remedies would result in no review at all. In making

19   this determination, it is appropriate to consider the severity of the penalty incurred by a violation and

20   the plaintiff's access to administrative review. <u>American Lithotripsy Soc. v. Urology Soc. of</u>

21   <u>America</u>, No. 01-CV-1812, 2002 WL 1831986, at *5 (D. D.C. July 12, 2002) (citing <u>Illinois</u>

22   <u>Council</u>, 529 U.S. at 22); <u>see, e.g.</u>, <u>National Ass'n of Psychiatric Health Sys. v. Shalala</u>, 120 F.

23   Supp.2d 33 (D. D.C. 2000) (holding that the plaintiff did not have the option of violating a rule and

24   incurring a minor penalty to receive an administrative hearing before proceeding to federal court

25   because the penalty for violating rule involved termination from the Medicare program).

26       The Court will first consider the severity of the penalty. While the threat of fraud or abuse

27   charges is undoubtedly troubling for the Lutheran Home, the Court finds that this threat is somewhat

28   remote. At oral argument, the Secretary "invited" the Lutheran Home to submit all of its claims for

1 reimbursement. The Secretary stated that, assuming that the Lutheran Home's claims are made in

2 good faith and are not fabricated, the Lutheran Home will not be charged with fraud or abuse for

3 filing. This is supported by the fact that the Lutheran Home was not charged with fraud or abuse for

4 filing claims on December 5, 2000. Nor is the Court convinced that the threat of fraud or abuse

5 charges rises to the level necessary, pursuant to <u>Illinois Council</u>, to excuse the filing and channeling

6 requirements.

7      The Lutheran Home also complains about the delay involved in seeking administrative

8 review. However, this does not appear to be a situation where requiring exhaustion will result in

9 enormous fines or financial ruin, such as to amount to the equivalent of denying judicial review. <u>C.f.</u>

10 <u>American Lithotripsy Soc.</u>, No. 01-CV-1812, 2002 WL 1831986, at *5 (exhaustion not required

11 where forcing the plaintiff to violate a referral requirement and incur a $15,000 penalty per bill could

12 subject the plaintiff to financial ruin, criminal penalties, and exclusion from participation in any

13 federal health care program). The rationale behind the application of 405(h) is that "it assures the

14 agency a greater opportunity to apply, interpret, or revise policies, regulations, or statutes without

15 possibly premature interference by different individual courts applying 'ripeness and exhaustion'

16 exceptions case by case. But this assurance comes at a price, namely, occasional individual, delay-

17 related hardship." <u>Illinois Council</u>, 529 U.S. at 13; <u>Great Rivers Home Care, Inc. v. Thompson</u>, 170

18 F. Supp.2d 900, 906 (E.D. Mo. 2001).

19      The Court will next consider the Lutheran Home's access to administrative review. The

20 Lutheran Home's skepticism that its claims would be granted administrative review rights is

21 understandable, given the lack of administrative rights afforded the claims submitted on December

22 5, 2000. However, at oral argument, the Secretary guaranteed that the Lutheran Home would be

23 granted access to the administrative review process after the claims are processed. It seems highly

24 unlikely that the Secretary will process and reimburse the Lutheran Home's claims using the

25 methodology desired by the Lutheran Home, and some of its claims probably will be denied as

26 untimely. However, after the claims are filed, processed, and all administrative rights are exhausted

27 (or waived by the Secretary), the Lutheran Home will have access to judicial review. At a minimum,

28 the matter must be presented to the agency prior to review in federal court. <u>Illinois Council</u>, 529 U.S.

- 5 -

1   at 23-24. The Court finds, therefore, that this not a situation where requiring the Lutheran Home to

2   file and exhaust administrative remedies is the equivalent of denying it judicial review.

3           **(2).**    <u>**Jurisdiction Over Filed Claims**</u>

4          The Secretary concedes that the Court has jurisdiction over the Lutheran Home's claims dated

5   October 1, 1998 to June 6, 2000 that the Lutheran Home filed, but which Noridian returned

6   unprocessed and without administrative review rights. The Secretary has directed Noridian to process

7   the claims if the Lutheran Home resubmits them, essentially conceding that they should not have been

8   rejected as "routine" under the Medicare Act. The Secretary also guarantees administrative rights in

9   the event that they are resubmitted. However, the Lutheran Home contends that, in addition to

10  ordering the Secretary to process the claims, the Court should declare the proper method for

11  reimbursement. The Court finds that it would be premature to address the merits of the Lutheran

12  Home's claims and that they should be channeled through the agency. If, upon exhaustion of the

13  administrative process, the claims have not been reimbursed to the Lutheran Home's satisfaction, the

14  Lutheran Home then will have access to judicial review.

15

16

17         Accordingly, upon review of the files, motions, and proceedings herein:

18         **IT IS HEREBY ORDERED** that:

19  1.      The Defendant's Motion to Dismiss all Defendants Except Tommy Thompson is

20          **GRANTED**. All defendants except Tommy Thompson are **DISMISSED** without prejudice;

21  2.      The Plaintiff's Motion for Summary Judgment is **GRANTED** in part. As to claims dated

22          October 1, 1998 to June 6, 2000 that the plaintiff filed, but which were returned unprocessed

23          and without administrative appeal rights, the Secretary is hereby ordered to process those

24          claims in accordance with applicable law;

25  3.      The Plaintiff's Motion for Summary Judgment is **DENIED** in all other respects;

26  4.      The Defendant's Motion for Summary Judgment is **GRANTED** in part. As to all claims

27          other than those dated October 1, 1998 to June 6, 2000 that the plaintiff filed, but which

28          returned unprocessed and without administrative appeal rights, the plaintiff's Complaint is

- 6 -

1  **DISMISSED** without prejudice; and

2  5.  The Clerk of Court shall enter judgment as follows:

3  **IT IS HEREBY ORDERED, ADJUDGED, and DECREED** that
   the Secretary shall process, in accordance with applicable law, the
4  plaintiff's claims dated October 1, 1998 to June 6, 2000 that the
   plaintiff filed, but which were returned unprocessed and without
5  administrative appeal rights.

6

7

   DATED: ~~September~~ _____, 2002
8        *Oct   2*

9  _____
   JOAN E. LANCASTER
10 United States District Court Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 7 -

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

*This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.*

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1.  Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2.  Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3.  Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4.  Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LOUISE BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-cv-2144 |
| | ) | Judge Royce C. Lamberth |
| MUTUAL OF OMAHA INSURANCE | ) | |
| COMPANY, MICHAEL O. LEAVITT, | ) | |
| and LESLIE V. NORWALK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>ORDER</u>

Upon consideration of defendants' motion to dismiss plaintiff's complaint and plaintiff's

opposition thereto, and the entire record, it is hereby

ORDERED that defendants' motion is GRANTED, and plaintiff's complaint is

DISMISSED.

_____                _____
Date                                            UNITED STATES DISTRICT JUDGE