UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

| | | |
|---|---|---|
| LOUISE BAILEY, Individually,<br>And On Behalf of All Other<br>Similarly Situated Medicare<br>Part B Beneficiaries<br><br>            Plaintiffs,<br><br>    v.<br><br>MUTUAL OF OMAHA INSURANCE<br>COMPANY, MICHAEL O. LEAVITT,<br>SECRETARY, U.S. DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES and<br>LESLIE V. NORWALK, ACTING<br>ADMINISTRATOR, CENTERS FOR<br>MEDICARE & MEDICAID SERVICES,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:06-cv-2144<br>Judge Royce C. Lamberth |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiffs in the above-
captioned action, by their undersigned counsel, for the
reasons set forth in the Memorandum of Points and Authorities
and Statement of Material Facts Not in Dispute that accompany
this Motion, respectfully move this Court for Summary Judgment
as to Counts I (Violation of the Medicare Act and Applicable
Regulations) and II (Violation of Fifth Amendment Due Process)
of Plaintiffs' Amended Complaint, filed on February 9, 2007.
A proposed order is also attached.

Respectfully submitted,

__/s/ Thomas C. Fox____

Counsel:                          Thomas C. Fox
Carol C. Loepere                  D.C. Bar #4473
Antony B. Klapper                 REED SMITH, LLP
Jason M. Healy                    1301 K Street, N.W.
Catherine A. Durkin               Suite 1100 – East Tower
Cassia M. McCamon                 Washington, D.C. 20005
REED SMITH, LLP                   (202) 414-9222
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, D.C. 20005
(202) 414-9200


Dated:  June 22, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

| | | |
|---|---|---|
| LOUISE BAILEY, Individually, And On Behalf of All Other Similarly Situated Medicare Part B Beneficiaries | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:06-cv-2144 Judge Royce C. Lamberth |
| v. | ) ) | |
| MUTUAL OF OMAHA INSURANCE COMPANY, MICHAEL O. LEAVITT, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES and LESLIE V. NORWALK, ACTING ADMINISTRATOR, CENTERS FOR MEDICARE & MEDICAID SERVICES, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of June, 2007, I caused a true copy of the foregoing Plaintiffs' Motion for Summary Judgment, supporting Memorandum, Statement of Material Facts Not in Dispute, and proposed Order to be served via first-class mail, postage pre-paid, to:

Mr. Peter Robbins
United States Department of Justice
20 Massachusetts Avenue, N.W.
Room 7142
Washington, D.C. 20530

_____/s/ Thomas C. Fox_____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

—————————————————— )
                                                    )
LOUISE BAILEY, 4782 S. Holladay    )
Blvd. Salt Lake City, Utah              )
84117, Individually, And On           )
Behalf of All Other Similarly          )
Situated Medicare Part B               )
Beneficiaries                                )
                                                    )
         Plaintiffs,                        )          Case No. 1:06-cv-2144
                                                    )          Judge Royce C. Lamberth
     v.                                           )
                                                    )
MUTUAL OF OMAHA INSURANCE      )
COMPANY, a Medicare Fiscal          )
Intermediary, Medicare Division,   )
P.O. Box 1602, Omaha, NE 68101;  )
                                                    )
         and                                      )
                                                    )
MICHAEL O. LEAVITT, SECRETARY,  )
U.S. DEPARTMENT OF HEALTH AND   )
HUMAN SERVICES, 200 Independence )
Avenue, S.W., Washington, D.C.     )
20201                                           )
                                                    )
         and                                      )
                                                    )
LESLIE V. NORWALK, ACTING         )
ADMINISTRATOR, CENTERS FOR        )
MEDICARE & MEDICAID SERVICES,    )
7500 Security Boulevard,              )
Baltimore, MD 21244                     )
                                                    )
         Defendants.                      )
—————————————————— )


**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................i

TABLE OF AUTHORITIES.............................................iv

I.   STATEMENT OF THE CASE........................................1

     A.   The Parties; and the Policies In the Local Coverage
          Determination...........................................1

     B.   The Administrative Proceeding; Invalidation of the
          Policies In the Local Coverage Determination; and
          This Federal Court Action for Judicial Review..........4

     C.   The History of the Coverage Policies in CMS Program
          Memoranda AB-00-98 and AB-00-108, Mutual's LCD, and the
          Conflict With the National Coverage Determination......8

II.  DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED.............12

     A.   Judicial Review of Plaintiff Bailey's Challenge
          Of Defendants' Coverage Policies Is Available
          Without Further Administrative Review..................12

          1.   Congress Created a New Process for Medicare
               Beneficiaries to Obtain Administrative and
               Judicial Review of Coverage Decisions...........12

          2.   The Statute and CMS Regulations Make Clear the LCD
               Appeal Process Provides A Separate and Independent
               Administrative Review of A Challenge to Defendants'
               Coverage Policies...............................14

          3.   Plaintiff Bailey Has Standing as An Aggrieved Party
               to Utilize This New Process.....................14

          4.   Plaintiff Bailey Challenged the Coverage Policies in
               Mutual's LCDs in Accordance With CMS Regulations
               Implementing 42 U.S.C. § 1395ff(f) .............17

          5.   Withdrawal of the LCD Constitutes Final Agency
               Action on Plaintiff Bailey's Challenge to
               The Defendants' Coverage Policies and
               Exhaustion of Her Administrative Remedy .........18

B.  The Secretary Has Waived Any Further Exhaustion
    Requirements or This Court May Do So....................24

    1.  The Secretary Has Waived Any Further Exhaustion
        Requirements Under 42 U.S.C. § 1395ff(f)(2) ........24

    2.  This Court May Waive Any Further Exhaustion
        Requirements .......................................26

C.  The Statute Provides an Independent Right to
    Judicial Review Without Prior Administrative
    Review.................................................30

D.  Plaintiff Bailey Has Standing to Bring A Cause of
    Action for Due Process Violations, Both in Her
    Own Right, and On Behalf of the Class..................31

    1. Plaintiff Bailey Has Personal Standing to
       Bring a Cause of Action for Due Process
       Violations .........................................31

    2. Plaintiff Bailey Has Standing to Bring A
       Cause of Action for Due Process Violations
       On Behalf of the Class .............................34

III.  ARGUMENT IN SUPPORT OF PLAINTIFF BAILEY'S MOTION FOR
      SUMMARY JUDGMENT.......................................39

    A.  Applicable Legal Standard for Summary Judgment........39

    B.  Mutual's LCD and the Coverage Policies
        Incorporated therein by CMS Program
        Memoranda AB-00-99 and AB-00-108 To Deny
        Coverage to Medicare Beneficiaries Residing
        in Skilled Nursing Facilities For Blood
        Glucose Testing Are Now Invalid by Operation
        Of Law.................................................42

        1.  Legal Effect of Plaintiff Bailey's LCD
            Challenge .........................................42

    C.  The CMS Policy to Deny Coverage for Medicare
        Beneficiaries Residing in SNFs Contained in its
        Program Memoranda, Incorporated into Mutual's LCD,
        and Now Reflected in 42 C.F.R. § 424.24(f) and
        Effective for Periods Commencing Jan. 1, 2007 is

Invalid Because it Conflicts with the November 23, 2001 National Coverage Determination................. 45

1.   Balanced Budget Act of 1997.......................45

2.   March 10, 2002 Proposed Rule to Establish National Coverage and Administrative Policies..........................................46

3.   November 23, 2001 Final National Coverage Determination For Blood Glucose Testing..........48

4.   CMS Program Memorandum AB-00-99...................50

5.   CMS Program Memorandum AB-00-108..................51

6.   Mutual's Local Coverage Determination on Blood Glucose Monitoring...........................53

D.   Defendants Have Failed to Provide Adequate Notice to Plaintiffs and Have Violated Their Fifth Amendment Due Process Rights........................................58

1.   Plaintiffs have a Private Interest in Part B Covered Laboratory Services.....................59

2.   Defendant's Actions Pose a Risk of Erroneous Deprivation.......................................60

3.   The Cost of Additional Procedure Does Not Justify Defendant's Actions...............................65

IV.   CONCLUSION .............................................66

# TABLE OF AUTHORITIES

## Cases

American Chiropractic Assoc. v. Shalala, 131 F.Supp. 2d 174 (D.D.C. 2001)..................................................26,27

Am. Lithotripsy Soc'y. v. Thompson, 215 F. Supp. 2d 23 (D.D.C. 2002)..........................................................26

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)..........39,40,42

Baker v. Carr, 369 U.S. 186 (1962)..................................32

Bartlett Mem. Med. Ctr. v. Thompson, 3477 F. 3d 828(10th Cir. 2003)............................................................25,28

Carter v. Greenspan, 304 F. Supp. 2d 13, 21 (D.D.C. 2004)...........41

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)...................40,41

DeWall Enterprises v. Thompson, 206 F.Supp. 2d 992 (D. Neb. 2002)..............................................passim

Erringer v. Thompson, 189 F. Supp. 2d 985 (D. Ariz. 2001)...........25

Ford v. Shalala, 87 F. Supp. 2d 163 (E.D.N.Y. 1999).................63

Furlong v. Shalala, 238 F. 3d 227 (2d Cir. 2001)...................27

Goldberg v. Kelly, 397 U.S. 254 (1970)..........................58,63

Grey Panthers v. Schweiker, 652 F. 2d 146 (1972)................passim

Grijalva v. Shalala, 152 F. 3d 1115 (2d Cir. 1998), vacated and remanded on other grounds 526 U.S. 1096 (1999)..............passim

Kowalski v. Tesmer, 543 U.S. 125 (2004)............................37

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992)..............31,33

Massachusetts v. EPA, No. 05-1120, 2007 U.S. Dist. LEXIS 3785 (U.S. Jan. 18, 2007).........................................32,35

Mathews v. Eldridge, 424 U.S. 319 (1976).........................59,60

Mullane v. Central Hanover Bank and Trust, 339 U.S. 306 (1950).......63

National Ass'n of Psychiatric Health Sys v. Shalala,
120 F. Supp. 2d 33 (D.D.C. 2000)....................................26

Powers v. Ohio, 499 U.S. 400, 414 (1991).........................36,37

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)......40

Singleton v. Wulff, 428 U.S. 106 (1976)......................35,36,37

Shalala v. Illinois Council on Long Term Care, Inc.,
529 U.S. 1 (2000)...............................................passim

Warth v. Seldin, 422 U.S. 490 (1975)..............................35

Washington Post Co. v. United States Dep't of Health & Human
Servs., 865 F. 2d 320, 325 (D.C. Cir. 1989).......................41

Youngblood v. Vistronix, Inc., 2006 U.S. Dist. Lexis 51460,
*4-5 (D.D.C. 2006)................................................40

### Statutes and Regulations

Balanced Budget Act of 1997, Public Law No. 105-33
(effective July 1, 1998)........................................passim

BBA Conference Report Accompanying H.R. 2015, Report 105-217,
July 30, 1997.....................................................46

CMS Program Memorandum AB-00-99 (Oct. 24, 2000)................50,51

CMS Program Memorandum AB-00-108 (Dec. 1, 2000, effective
January 1, 2001)............................................51,52,53

Fed. R. Civ. P. 56(c).............................................39

Fed. R. Civ. P. 56(e).............................................41

H. R. Rep. No. 106-703 (2000).....................................13

Section 1862(a)(1)(A) of the Social Security Act............20,42,50

Medicare Claims Processing Manual, § 90.1.....................passim

Medicare Program:  Review of National Coverage Determinations
and Local Coverage Determinations; Final Rule, 68 Fed. Reg.
63,692, 63,698 (November 7, 2003).............................passim

42 C.F.R. § 405.1060(a)(1)........................................49

42 C.F.R. §§ 410.21, 411.15.......................................50

42 C.F.R. § 410.32............................................passim

42 C.F.R. § 420.100-420.587.......................................12

42 C.F.R. §§ 426.300, 426.320.....................................15

42 C.F.R. § 426.410(b)-(d).......................................5,17

42 C.F.R. § 426.420(a)........................................30,45,58

42 C.F.R. § 426.425(a)............................................6

42 C.F.R. § 426.460(b).......................................passim

42 U.S.C. § 1395ff(f)..........................................63,65

42 U.S.C. § 1395ff(f)(2)......................................passim

42 U.S.C. § 1395ff(f)(2)(B)....................................20,42

42 U.S.C. § 1395ff(f)(3).......................................30,31

65 Fed. Reg. 13,128 (March 10, 2000)..............................47

66 Fed. Reg. 58,788 (Nov. 23, 2001)............................50,54

66 Fed. Reg. 58,846 (Nov. 23, 2001)...............................48

68 Fed. Reg. 63,692.........................................passim

68 Fed. Reg. 63,693...........................................12,14

68 Fed. Reg. 63,714...............................................13

I.    **STATEMENT OF THE CASE**

    A.    **The Parties; and the Policies In the Local Coverage Determination**

This is a proposed class action brought by Plaintiff Louise Bailey, individually, and on behalf of other similarly situated Medicare Part B beneficiaries residing in skilled nursing facilities ("SNFs") (hereinafter collectively referred to as the "Plaintiffs").  Like Plaintiff Bailey, hundreds of thousands of Medicare beneficiaries throughout the United States reside in Medicare-certified SNFs, where they receive care for their disease, including the administration of blood glucose tests.  (Administrative Record (hereinafter "R.") at 220-21.)

Defendant Mutual of Omaha Insurance Company ("Mutual") acts as a Medicare fiscal intermediary and adjudicates the Medicare claims of Plaintiff Bailey and the proposed class members.  (Plaintiffs' Statement of Material Facts Not in Dispute (hereinafter "Pls.' Statement") ¶ 3.)  Defendants, the Secretary ("the Secretary") of the Department of Health and Human Services ("HHS"), and the Acting Administrator ("Acting Administrator") of the Centers for Medicare & Medicaid Services ("CMS," previously the Health Care Financing Administration ("HCFA"), but referred to herein for all periods as CMS) (collectively, with Mutual, the "Defendants"), are responsible for administration of the Medicare program.  (Pls.' Statement ¶ 4.)

CMS also was a party to the administrative appeal proceeding challenging Mutual's Local Coverage Determination described below. (Pls.' Statement ¶ 23 and R. at 1.)

This case is about the Defendants concerted and continuing efforts to block coverage of blood glucose tests that are necessary to the health of the Plaintiffs, Medicare Part B beneficiaries residing in SNFs across the country.

Simply stated, a National Coverage Determination ("NCD") on blood glucose testing was published and it supports frequent testing of Plaintiffs' blood glucose levels, as defined by a physician, consistent with the medical evidence and best medical practices. (Pls.' Statement ¶ 41 and R. at 46.)  Defendant CMS knew that the NCD, the statute, and its then-existing regulations allowed for Medicare Part B coverage of Plaintiffs' blood glucose tests and payment of such claims. (Pls.' Statement ¶ 44, 47 and Pls.' Am. Compl. Ex. 2-3.)  To deny payment for these tests, CMS privately developed bogus coverage policies (including requirements for a separate physician order for each test and prompt reporting of the test result to the physician before the next test) under the guise of legitimate medical necessity criteria, published these new requirements in a series of Program Memoranda (namely, AB-00-99 and AB-00-108) without public comment, and instructed its contractors (including Mutual) to incorporate these policies in their Local

Coverage Determinations ("LCDs"). (Pls.' Statement ¶ 45.) Any and all criticism of these policies from health care providers, beneficiaries – and even from those within Mutual and CMS – were quickly discounted and disregarded. (Pls.' Statement ¶ 48.) When Plaintiff Bailey directly challenged these contrived coverage policies in her administrative appeal of Mutual's blood glucose testing LCD before the HHS Departmental Appeals Board ("DAB"), and those policies were exposed by Plaintiff Bailey as conflicting with the NCD and contrary to the medical evidence and medical best practices, CMS and Mutual voluntarily withdrew the LCD to stem any further challenge of those policies. (Pls.' Statement ¶ 22-23 and R. at 736). Those coverage policies are now invalid as a matter of law, but Defendants continue to apply them to the Plaintiffs' claims for blood glucose tests. (Pls.' Statement ¶ 26-29.)

Plaintiff Bailey filed this action to enforce the invalidation of the coverage policies Defendants used and will continue to use to improperly deny Medicare Part B coverage of blood glucose tests administered to her and members of the class. (Pls.' Statement ¶ 24.) Defendants continue to apply these coverage policies even though the Defendants are acting in violation of the Medicare statute and applicable regulations. (Pls.' Statement ¶ 25-26.)

With respect to the Plaintiff class, CMS has allowed and supported Mutual's continued enforcement of the invalid coverage policies in the LCD to deny coverage for blood glucose tests based upon arbitrary and capricious standards of medical necessity, seriously jeopardizing the health and safety of this fragile population of Medicare beneficiaries. (Pls.' Statement ¶ 47-48 and R. at 221). These tests protect institutionalized diabetic patients from cardiovascular disease, heart attacks, strokes, developing blindness, lower-extremity infections that can result in the amputation of limbs, and even death. (R. at 223, 247, 310). Defendants' actions are also contrary to the numerous federal initiatives to combat the debilitating effects of diabetes, which encourage frequent testing of blood glucose levels for diabetic patients. (R. at 322-23.)

> **B. The Administrative Proceeding; Invalidation of The Policies In the Local Coverage Determination; and This Federal Court Action for Judicial Review**

Plaintiff Bailey is 73 years old and resides at the Holladay Healthcare Center, a Medicare SNF. (Pl's Statement ¶ 1.) She has severe diabetes with blindness as a result of her illness. (Pls.' Statement ¶ 1.) Diabetes is a serious, life-threatening, chronic illness, for which there is no cure. (R. at 197-98.) Over 18% of nursing homes residents have this disease. (R. at 220.)

Plaintiff Bailey's physician has determined that she requires blood glucose testing four times per day, and that this is medically necessary in order to maintain control over her blood glucose levels.  (Pls.' Statement ¶ 1.)  This frequency of testing allows her physician and nurses to better manage her disease as Plaintiff Bailey has a propensity to develop hypoglycemia without her knowing it.  (Pls.' Statement ¶ 2.) The medical literature indicates that day-to-day control of insulin levels reduces the severity of existing consequences of diabetes, and can prevent the onset of new symptoms and complications.  (R. at 205-206, 246-247.)

Defendant Mutual is the fiscal intermediary for Plaintiff Bailey and the proposed class.  On or about October 2005, Mutual stopped covering Plaintiff Bailey's blood glucose tests under Medicare Part B.

Plaintiff Bailey, as an aggrieved party, exercised her statutory right to challenge the validity of Mutual's Local Coverage Determination on blood glucose testing as legal authority for denying Medicare coverage of her blood glucose tests.  (Pls.' Statement ¶ 17.)  By Order dated April 19, 2006, the Administrative Law Judge ("ALJ") certified that her complaint met the acceptability requirements set forth in 42 C.F.R. § 426.410(b)-(d).  (Pls.' Statement ¶ 18.)  Twenty-Seven (27) days after Mutual and CMS were ordered by the ALJ to submit

the LCD record for the administrative proceeding (R. at 22),
Mutual filed the LCD record.  (R. at 326).  On July 18, 2006,
Plaintiff Bailey filed the Aggrieved Party's Statement pursuant
to 42 C.F.R. § 426.425(a).  (Pls.' Statement ¶ 19 and R. at 626-
48.)  On the same date, Plaintiff Bailey filed a Motion for
Summary Judgment.  (Pls.' Statement ¶ 20 and R. at 649-51.)

In the Aggrieved Party's Statement, Plaintiff Bailey showed
that Mutual's record for the LCD was incomplete and wholly
inadequate in terms of clinical and medical best practice
evidence to support the denial of coverage, and Mutual's LCD was
inconsistent with the November 23, 2001 NCD promulgated by CMS
to address Medicare coverage of blood glucose testing. (R. at
627-32.)

Just days before Mutual's response to Plaintiff Bailey's
Statement and Motion for Summary Judgment were due, Mutual, with
the agreement or at least the acquiescence of CMS withdrew its
LCD, which divested the ALJ of jurisdiction over her appeal.
(Pls.' Statement ¶ 21.)

Plaintiff Bailey followed every procedural requirement to
protect her claim under 42 U.S.C. § 1395ff(f)(2), and pursued
her LCD appeal as far as she could.  It was the Defendants, not
Plaintiff Bailey, who took action to end that process by
withdrawing the LCD.  (Pls.' Statement ¶ 21 and R. at 736.)  By
withdrawing the LCD, Defendants terminated the administrative

proceeding and effectively waived any right to assert a failure to exhaust administrative remedies, thus curtailing Plaintiff's administrative remedies to challenge the LCD.

Having exhausted the administrative remedies available to her, Plaintiff Bailey individually, and on behalf of the proposed class, sues the Defendants in this action for their participation, and acquiescence in, the continued application of coverage policies for blood glucose testing of Medicare beneficiaries in SNFs that the Defendants knew were in violation of the Medicare statute and applicable regulations, and to enforce the invalidation of those coverage policies.

These policies Plaintiff Bailey challenges are found in Mutual's LCD as well as the CMS Program Memoranda AB-00-99 and AB-00-108 and the recent regulation at 42 C.F.R. § 424.24(f), which was effective January 1, 2007. (Pls.' Statement ¶¶ 34-37.) Notwithstanding withdrawal of Mutual's LCD and the conflict with the NCD, these coverage policies were applied and continue to be applied by Mutual with the acquiescence of CMS, to Plaintiff Bailey and other members of the class to deny coverage for blood glucose tests. (Pls.' Statement ¶¶ 27, 49, 50-52 and R. at 707.)

Plaintiff Bailey is not challenging the denial of payment for her blood glucose tests, she is challenging the policies in

the LCD that were used and continue to be used to deny coverage. (Pls.' Statement ¶¶ 17, 50-52.)

      **C.    The History of the Coverage Policies in CMS Program Memoranda AB-00-98 and AB-00-108, Mutual's LCD, and the Conflict With the National Coverage Determination**

In 1997, Congress passed the Balanced Budget Act of 1997, Public Law No. 105-33 ("BBA"), effective July 1, 1998, which <u>inter alia</u> mandated use of a negotiated rulemaking committee to develop national coverage and administrative policies for clinical diagnostic laboratory services payable under Medicare Part B by January 1, 1999. (Pls.' Statement ¶ 30.) The BBA required that these national policies be designed to promote program integrity and national uniformity and simplify administrative requirements with respect to clinical diagnostic laboratory services payable under Medicare Part B. (Pls.' Statement ¶ 30.) <u>See</u> BBA §§ 4554(b)(1), (2).

Medicare policy did not specifically address blood glucose testing in nursing homes prior to passage of the BBA and the NCD, which followed the mandated negotiated rulemaking. Some Medicare fiscal intermediaries had a local coverage policy that recognized blood glucose tests as a Medicare Part B covered service and paid the claims, other fiscal intermediaries denied coverage.

After the BBA was enacted, internal CMS communications from that time to the present concluded that blood glucose testing in a nursing home setting is a covered service under Medicare Part B. (Pls.' Statement ¶ 42.)

Notwithstanding this conclusion, internal agency communications show a series of actions by CMS with Medicare fiscal intermediaries, including Mutual, to develop trumped-up criteria for "medical necessity" to deny coverage and payment for blood glucose tests in violation of the Medicare statute and the NCD. (Pls.' Statement ¶ 44.)

At the same time CMS was participating in the negotiated rulemaking for the NCD - which, even from early drafts and the proposed decision, it knew would support Medicare coverage of blood glucose testing by diabetic patients like Plaintiff Bailey and other Medicare Part B beneficiaries in nursing homes - the agency was working to develop a policy to deny coverage for blood glucose testing under Medicare Part B purely to prevent payment of those claims (Pls.' Statement ¶ 45.)

CMS internal communications articulated a desire and rationale to deny coverage and prevent payment of blood glucose testing claims even though CMS acknowledges that these tests, when performed in nursing facilities, are covered as CLIA waived tests under Medicare Part B and paid under the fee schedule. (Pls.' Statement ¶ 46.)

Numerous e-mails and meetings took place within the CMS Central Office in an effort to come up with a uniform set of instructions to the intermediaries and providers on blood glucose tests, with the knowledge that CMS was contemporaneously participating in the Negotiated Rulemaking Committee which was developing a NCD pertaining to blood glucose testing. (Pls.' Statement ¶¶ 44-45, 47.)

Members of the Central Office exchanged ideas on how Medicare could <u>avoid</u> paying for these blood glucose tests, notwithstanding the conclusion that they are a <u>covered</u> service under Medicare Part B. (Pls.' Statement ¶ 47.)

The CMS Office of General Counsel warned CMS policy staff that blood glucose tests administered to Part B SNF residents are a covered laboratory test and that intermediaries cannot determine that such tests are outside the scope of covered benefits. (Pls.' Statement ¶ 48.)

Internal documents show that CMS was determined to deny these claims even though it knew all of this, and two program memoranda, CMS Program Memoranda AB-00-99 and AB-00-108, were then issued in quick succession to give Medicare intermediaries "some reason" to deny coverage for blood glucose tests. (Pls.' Statement ¶¶ 34-35, 44, 46.)

After the NCD was published, Mutual was given a clear written warning by the CMS Region VII office that the language

Mutual was planning to add to its LCD from CMS Program Memoranda AB-00-99 and AB-00-108 does not appear in the NCD and should <u>not</u> be included in the LCD because it conflicts with the NCD, as health care providers had argued. (Pls.' Statement ¶ 9.)

Others within Mutual who reviewed the draft LCD internally expressed similar concerns about the legitimacy of language in the LCD that did not appear in the NCD and the negative impact the LCD would likely have on patient care by discouraging testing. (Pls.' Statement ¶ 10.)

Mutual chose to ignore these warnings, publish the LCD anyway with these objectionable policies derived from the two CMS Program Memoranda (the prompt reporting of test results to the physician and a separate physician order for each blood glucose test), knowing full well that incorporating these policies in its LCD placed it in conflict with the NCD. After Plaintiff Bailey's administrative challenge to these coverage policies, and the withdrawal of Mutual's LCD, CMS quickly finalized a new regulation at 42 C.F.R. § 424.24(f) to codify the separate order policy in an effort to legitimize the policy.

Defendants' scheme to illegally deny coverage of Plaintiff Bailey's and the class members' blood glucose tests has been exposed and must now end. For the reasons discussed herein, this Court should grant Plaintiff Bailey's Motion for Summary Judgment and deny Defendants' Motion to Dismiss.

II.    **DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED**

A.    **Judicial Review of Plaintiff Bailey's
Challenge of Defendants' Coverage Policies
Is Available Without Further Administrative
Review**

1.    **Congress Created a New Process for Medicare
Beneficiaries to Obtain Administrative and
Judicial Review of Coverage Decisions**

In 2001, Congress amended Title XVIII of the Social
Security Act (the "Medicare Act" or "Act") to create a new
process to allow Medicare beneficiaries to challenge coverage
policies in NCDs and LCDs, and CMS enacted regulations in 2003
to implement the provisions of these statutory amendments.  See
42 U.S.C. § 1395ff(f); 42 C.F.R. §§ 420.100-420.587.

Under section 1395ff(f) of the Act, an aggrieved party may
directly challenge the validity of a NCD or LCD.  Id.  Before
the addition of this new appeals process, the statute did not
provide an administrative avenue to challenge the validity of
LCDs or NCDs.  See 68 Fed. Reg. 63,692, 63,693.  These appeal
rights to challenge coverage decisions are separate and distinct
from the existing appeal rights for denied Medicare claims.  See
id.  CMS has acknowledged this distinction and the impact of
this type of challenge can have on other Medicare beneficiaries:

> Review of an LCD or NCD requires examination of an
> entire policy, or specific provisions contained
> therein, and not just one claim denial.  Therefore,
> such review may lead to changes that impact other
> beneficiaries if the policies are found to be

> <u>unreasonable</u>.  A beneficiary, thus, may elect to
> pursue a claims denial through the claims appeal
> process, seek review of an LCD using the process in
> this final rule, or both.  <u>In no way does filing a
> [LCD] challenge, or a decision on a [LCD] challenge,
> affect beneficiary appeal rights or other issues that
> may arise in the claims appeal process</u>.

<u>Id.</u> (emphasis added).

In creating this new avenue for appeal, Congress was

concerned that "Medicare beneficiaries have far fewer legal

protections when denied coverage for a requested benefit."  H.

R. Rep. No. 106-703, at 70 (2000) ("House Report").  In the

clearest of terms, Congress stated "Medicare beneficiaries have

to wait much longer periods of time to have claims disputes

resolved . . . and due to administrative delay and obfuscation,

<u>can be effectively precluded from challenging disputed policies

in court</u>."  House Report, 106-703, at 70-71 (emphasis added).

Accordingly, Congress intended this new appeals process "to

correct these deficiencies, and ensure that all beneficiaries

maintain a legitimate right to challenge in a timely manner,

before an independent decision-maker, <u>any adverse coverage or

claims decisions that may impact their ability to obtain quality

health care</u>."  <u>Id.</u> (emphasis added).

CMS has acknowledged it was the intent of Congress that

courts "use the flexibility in this rule to respond to obstacles

that may confront individual aggrieved parties in particular

cases."  68 Fed. Reg. at 63,714.

2.    **The Statute and CMS Regulations Make
Clear the LCD Appeal Process Provides
A Separate and Independent Administrative
Review of A Challenge to Defendants'
Coverage Policies**

CMS has clearly stated that a challenge to the validity of a LCD under 42 U.S.C. § 1395ff(f) is "separate and distinct from the existing appeal rights for denied Medicare claims, as the nature of the challenge and the relevant evidence is different" and "[t]he procedures used in this process will be different from the claims appeals process." 68 Fed. Reg. at 63,693. CMS has further clarified the distinction by noting that "review of an LCD or NCD requires examination of an entire policy, or specific provisions contained therein, and not just one claim denial." Id. Most notably, CMS has stated that "a beneficiary, thus, may elect to pursue a claims denial through the claims appeal process, seek review of an LCD using the process in this final rule, or both [and] [i]n no way does filing a [LCD] challenge, or a decision on a [LCD] challenge, affect beneficiary appeal rights or other issues that may arise in the claims appeal process." Id. Accordingly, Plaintiff Bailey was in no way required to utilize the appeal process for denied Medicare claims in the CMS regulations.

3.    **Plaintiff Bailey Has Standing As An Aggrieved
Party to Utilize This New Process**

Consistent with the statute, the implementing regulation

expressly grants standing to "aggrieved parties," defined as Medicare beneficiaries who: (1) are entitled to benefits under Part A, Part B, or both; (2) are in need of coverage for a service that is denied based on an applicable LCD or NCD, regardless of whether the service was received; and (3) has obtained documentation of the need by the beneficiary's treating physician.  See 42 C.F.R. §§ 426.110; 426.320.

Contrary to the Defendants' assertions (Defs.' Mem. in Supp. of Mot. to Dismiss at 16, 44), neither the statute nor the regulation require a Medicare beneficiary to have been held financially responsible for the denied claim for payment in order to have standing to challenge the LCD.  In fact, an aggrieved party need not have even received the service in order to challenge the LCD, as the regulation grants standing to a beneficiary to challenge an LCD "regardless of whether the service was received."  Id. § 426.110(2).

Moreover, the preamble to the final rule makes clear CMS' intention that the term "aggrieved party" be broadly construed. See 68 Fed. Reg. 63,692.  In response to "over half of all commenters on the rule" who "suggested that the definition [of aggrieved party] was too narrow and should be expanded," the final rule "interpret[s] the statutory requirements more broadly and [] expand[s] the definition of aggrieved party to require

- 15 -

that the beneficiary be in need of coverage of a service." Id. at 63,694-5.  The preamble further states that CMS is "interpreting the standing provision to include individuals who have received the item or service and whose initial claim was denied based on an LCD or NCD and, thus, are in need of Medicare coverage." Id. at 63,694.  The definition of "aggrieved party" "will permit an individual to bring a challenge to an LCD or NCD in advance of receiving an item or service, or after the LCD or NCD is applied to a claim causing the claim to be denied." Id. at 63,694.

Defendants' disagreement with the ALJ's determination that Plaintiff Bailey qualified as an "aggrieved party," (R. at 702-04) is also foreclosed by their own actions and admission.  Rather than challenge that determination by the ALJ by allowing the administrative proceeding to continue, in which case Defendants would have an opportunity to appeal that determination before the DAB, should they disagree, Defendants terminated the proceeding, (R. at 704) which should foreclose further judicial review.  Significantly, Defendants conceded this has the same effect as an adverse decision. (Defs.' Mem. in Supp. of Mot. to Dismiss at 31.)

**4.    Plaintiff Bailey Challenged the Coverage Policies in Mutual's LCD in Accordance With CMS Regulations Implementing 42 U.S.C. § 1395ff(f)**

Plaintiff Bailey, as an aggrieved party, exercised her statutory right to challenge the validity of Mutual's LCD on blood glucose testing as legal authority for denying Medicare coverage of her blood glucose tests.  (Pls.' Statement ¶ 17.)

By Order dated April 19, 2006, the ALJ certified that her Complaint met the acceptability requirements set forth in 42 C.F.R. § 426.410(b)-(d) (Pls.' Statement ¶ 18 and R. at 22; see also R. at 626 ("Aggrieved Party's Statement")), which verified that Plaintiff Bailey was an "aggrieved party" with standing to challenge the LCD.  Mutual confirmed by letter after the complaint was filed that the claims for payment of Plaintiff Bailey's blood glucose tests were re-reviewed and again denied.  (Pls.' Statement ¶ 26.)  On July 18, 2006, Plaintiff Bailey filed the Aggrieved Party's Statement pursuant to 42 C.F.R. § 426.425(a).  (Pls.' Statement ¶ 19 and R. at 626.)  On the same date, Plaintiff Bailey filed a Motion for Summary Judgment.  (Pls.' Statement ¶ 20 and R. at 649.)

On August 11, 2006, Mutual, with the agreement or at least the acquiescence of CMS withdrew the LCD.  (Pls.' Statement ¶ 21 and R. at 736.)  Upon withdrawal of the LCD, the ALJ's jurisdiction to render any decision on the merits of Plaintiff

Bailey challenge to the LCD was removed, and Plaintiff Bailey was unable to further utilize this administrative process to challenge the merits of the coverage policies in the LCD. (Pls.' Statement ¶¶ 22 and 23 and R. at 2.)  Thus, Defendants effectively terminated the administrative process that was available to Plaintiff Bailey.

> **5.  Withdrawal of the LCD Constitutes Final Agency Action on Plaintiff Bailey's Challenge to the Defendants' Coverage Policies and Exhaustion of Her Administrative Remedy**

Pursuant to 42 C.F.R. § 426.460(b), withdrawal of the LCD has the same legal effect as an ALJ's decision to invalidate the LCD under the reasonableness standard (Pls.' Statement ¶ 24), and the CMS coverage policies incorporated therein are invalid as a matter of law (Pls.' Statement ¶¶ 25 and 28).  In addition, Mutual is required to reopen denied claims of Plaintiff Bailey and adjudicate those claims, and any new claims submitted by Plaintiff Bailey, for blood glucose testing services without using the invalid policies reflected in the LCD, now that it is withdrawn.  See 42 C.F.R. § 426.460(b)(1)(i),(iii).  In addition, any and all claims submitted to Mutual for blood glucose testing services with dates of service on or after August 11, 2006 must be adjudicated without using the invalid policies in the LCD.  See 42 C.F.R. § 426.460(b)(iv).

CMS stated very clearly in the preamble to the rules governing these LCD appeal procedures that it is the policy or policies discussed in the LCD that are invalid when the LCD is retired, not just the document itself:

> Retiring an LCD or withdrawing an NCD would result in the retired/withdrawn *policy* no longer applying in the claims adjudication process for services rendered on or after the date that the *policy* is retired/withdrawn.  Moreover, the aggrieved party would be granted individual claim review.  Since a claimant would receive the same relief that would have been available had the adjudicator found that the relevant LCD or NCD was not valid, there would be no reason to continue the appeal.

*Medicare Program: Review of National Coverage Determinations and Local Coverage Determinations; Final Rule*, 68 Fed. Reg. 63,692, 63,698 (November 7, 2003) (emphasis added).  CMS added that:

> When we retire/withdraw an LCD/NCD *we will not apply those policies for services furnished after the retirement/withdrawal date* and we will reprocess the aggrieved party's affected claims *without applying the retired/withdrawn policy*.

Id. (emphasis added).

Therefore, Mutual cannot deny coverage of blood glucose tests any longer (i) using any of the restrictive coverage policies discussed in the now-retired and invalid LCD on blood glucose testing, or (ii) based on its policy interpretations discussed in the LCD of other authorities (including Transmittal AB-00-108, Medicare Claims Processing Manual § 90.1, and 42 C.F.R. § 410.32).

Defendants argue that Mutual did not in the past and does not now deny blood glucose claims based upon the LCD.  (Defs.'

Mem. in Supp. of Mot. to Dismiss at 31, 32.)  However, Mutual's
deliberate choice not to reference the LCD by name on claims
denials is a mere technicality that does not allow Mutual to
continue to use the LCD policies when examining coverage of
Plaintiffs' blood glucose tests.  The Medicare statute defines
an LCD as "a determination by a fiscal intermediary or carrier
under part A or part B, as applicable, respecting whether or not
a particular item or service is covered on an intermediary—or
carrier—wide basis under such parts, in accordance with section
1862(a)(1)(A)."  42 U.S.C. § 1395ff(f)(2)(B).  Simply stated,
the LCD is an official statement of the contractor's policies on
the coverage of specific items or services for Medicare
reimbursement.  It applies to claims for the listed items or
services whether the contractor proclaims it on every claim
determination, or chooses not to mention it on any.  It is
binding on claimants until retired or otherwise invalidated.
And once it is no longer valid – as is the case here – the
coverage policies enunciated in that LCD can no longer be
enforced by the contractor.

    Moreover, Defendants' arguments that Mutual does not rely
on the LCD to deny coverage of blood glucose tests is
contradicted by their own documents, including the ADR request
sent to Plaintiff Bailey's SNF and the sample Medicare Appeal
Decision that Defendants submitted with the administrative

record, which clearly state the same criteria as the policies in the LCD that Plaintiff Bailey challenged in her LCD appeal, and which are found in the CMS Program Memoranda AB-00-99 and AB-00-108 and the new regulation at 42 C.F.R. § 424.24(f). (Pls.' Statement ¶¶ 49-52.)

Finally, Defendants' insistence that Plaintiff Bailey's claims were denied initially and upon readjudication based upon a lack of medical necessity is equally unconvincing. (Defs.' Mem. in Supp. of Mot. to Dismiss at 31, 32.) As Plaintiffs have demonstrated, the facts clearly show that the way Defendants use the term "medical necessity" in this context refers to the bogus coverage policies that were published in the CMS Program Memoranda AB-00-99 and AB-00-108, included in Mutual's LCD and other LCDs, and later included in the new regulation at 42 C.F.R. § 424.24(f). (Pls.' Statement ¶ 49-52.) These "medical necessity" criteria are the same limitations as contained in the LCD policies that are now invalid by operation of law and can no longer be applied to anyone. (Pls.' Statement ¶ 43-52.)

Mutual's LCD on blood glucose testing is now retired and invalid, and so are all of its policies discussed in that LCD interpreting Medicare authorities (including Transmittal AB-00-99 and AB-00-108, Medicare Claims Processing Manual § 90.1, and 42 C.F.R. § 410.32) to establish when Mutual will and will not reimburse claims for blood glucose testing services.

The restrictive coverage policies in Mutual's now-retired and invalid LCD on blood glucose testing can no longer be applied to providers and beneficiaries that Mutual services. The LCD was Mutual's attempt to reflect, in one document, its coverage limitations on blood glucose testing services. Mutual started with the broadly permissive coverage policy of the NCD on blood glucose testing. Mutual then added the restrictive coverage policy language from Transmittal AB-00-108 (*e.g.*, "prompt" notification of test results to the ordering physician). Mutual finished with its own unsupported policy interpretations of Transmittal AB-00-99 and AB-00-108 (that "prompt" means before the next test); the Medicare Claims Processing Manual § 90.1 (which Mutual interprets to prohibit coverage of blood glucose testing for SNF residents, as opposed to coverage for beneficiaries in their own homes); and 42 C.F.R. § 410.32 (which Mutual interprets to prohibit standing physician orders for blood glucose testing). Now that the LCD is retired and invalid, all of the coverage limitations on blood glucose testing services reflected in the LCD are unenforceable by law. Any other conclusion or result would be total perversion of justice and fraud upon Plaintiff Bailey as the aggrieved party in the LCD appeal and the thousands of other members of the proposed class who have been or will be denied coverage of their necessary blood glucose tests.

Without the LCD, Plaintiff Bailey was rendered unable to further utilize the administrative process to challenge the coverage policies in the LCD, and their continuing and unlawful application.  (Pls.' Statement ¶ 23 and R. at 1-2.) Accordingly, Plaintiff Bailey has obtained a final agency decision from the Defendant Secretary, and now may have that decision examined by a federal court, pursuant to 42 U.S.C. § 405(g) and (h).  Section 405(g) and (h) provide federal courts with jurisdiction for final decisions with respect to claims "arising under" the Social Security Act.  See 42 U.S.C. 405(g)-(h).  As Plaintiff Bailey has obtained a final agency decision from the ALJ with respect to her LCD challenge under the Medicare Act, she may have that decision examined by a federal court pursuant to 42 U.S.C. § 405(g) and (h).  Accordingly, Plaintiff Bailey has satisfied the requirements of Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1 (2000) that any claims in which the standing and substantive basis for the presentment of the claims is the Medicare Act have been channeled through the applicable administrative process, and that process exhausted.[1]  Defendants' arguments to the contrary

---

[1]    The Supreme Court in Illinois Council held that the jurisdictional bar precluded an association of nursing facilities from obtaining subject-matter jurisdiction to challenge the validity of certain Medicare regulations. See id. at 5.  Rather, the association and its members were required to proceed through the administrative review

Continued on following page

- 23 -

must be rejected.

**B.    The Secretary Has Waived Any Further Exhaustion Requirements or This Court May Do So**

Assuming arguendo that any further exhaustion requirements apply to Plaintiff Bailey's challenge to the Mutual LCD and the CMS coverage policies incorporated therein, which continue to be applied, the Secretary has effectively waived those requirements or this Court may do so.

**1.    The Secretary Has Waived Any Further Exhaustion Requirements Under 42 U.S.C. § 1395ff(f)(2)**

Plaintiff Bailey has challenged the LCD and its coverage policies as required by § 1395ff(f)(2) and her challenge was terminated by Defendants' withdrawal of the invalid LCD. (R. at 2.) Due to such withdrawal, the ALJ determined that he no longer had jurisdiction over her claim and her administrative appeal was dismissed. (R. at 2.) Plaintiff Bailey is thus not legally able to pursue her challenge to the coverage policies in the LCD any further in the administrative process. Accordingly, Plaintiff Bailey was precluded from continuing her appeal. (R. at 1.)

--------------------------

Continued from previous page
        procedures created by the Medicare program, only then being
        eligible for judicial review. See id. Notwithstanding
        this conclusion, the Supreme Court clarified its earlier
        precedent regarding instances where elements of the
        jurisdiction bar might be excused or excepted entirely.
        See id. at 22-23.

Plaintiff Bailey has no further administrative procedures available to her under § 1395ff(f)(2) and the CMS implementing regulations by which to challenge Mutual's continued use of the coverage policies in the now invalid LCD. Her only redress at this point is to seek relief from this Court. Accord DeWall Enterprises v. Thompson, 206 F.Supp.2d 992, 998 (D. Neb. 2002) ("The Secretary has not challenged the determinations through the appeals process available to it, but has simply ignored the determinations. Under this system, district court review is available only if [Plaintiff] loses. By failing to appeal adverse decisions, but then refusing to follow the dictates of those decisions, the Secretary has, in practice, denied any judicial review to [Plaintiff]."); Bartlett Mem. Med. Ctr. v. Thompson, 347 F.3d 828, 993 (10th Cir. 2003) ("In this case, however, Plaintiffs challenged Ruling 97-2 at the earliest opportunity, and the PRRB declared it had no jurisdiction over the challenge, leaving Plaintiffs no remaining avenues through which to pursue their claims before the agency."); Erringer v. Thompson, 189 F.Supp.2d 985, 993 (D. Ariz. 2001) (noting that "in this case, unlike Illinois Council, the plaintiffs have all initially presented their challenges of the agency's denial of their claims to the agency or its carriers or financial intermediaries.").

### 2.    This Court May Waive Any Further Exhaustion Requirements

This Court has several times waived the general exhaustion requirement for Medicare cases based on exceptions drawn from Illinois Council where further administrative review would effectively mean no review at all.  See American Chiropractic Assoc. v. Shalala, 131 F.Supp.2d 174 (D.D.C. 2001) (waiving the exhaustion requirement because plaintiff did not have practical access to administrative review channels); National Ass'n of Psychiatric Health Sys. V. Shalala, 120 F.Supp.2d 33 (D.D.C. 2000) (waiving the exhaustion requirement where its practical effect would be the denial of any rights to judicial review); Am. Lithotripsy Soc'y v. Thompson, 215 F.Supp.2d 23 (D.D.C. 2002) (waiving the exhaustion requirement where the harsh statutory penalties for the actions required in order to obtain administrative review effectively precluded such review).

In American Chiropractic Assoc. v. Shalala, this Court held that the jurisdictional bar does not preclude federal question jurisdiction because chiropractor-plaintiffs did not have practical access to administrative review channels.  See 131 F.Supp.2d 174, 177 (D.D.C. 2001).  The Court found that plaintiffs could only obtain administrative review to challenge a Medicare regulation by acting as the fiduciary of their patients, Medicare beneficiaries, who did not have an incentive

to pursue the chiropractors' interests in challenging the regulations.  See id.  This lack of incentive foreclosed the plaintiffs' access to the administrative review process mandating that the exhaustion requirement be waived.  See id.

Here, Plaintiff Bailey, and the other members of the proposed class who have been denied coverage, suffer an even more serious foreclosure of access to the administrative review process.  Whereas the plaintiffs in American Chiropractic had some possible administrative avenue by which to claim relief, albeit an avenue that hinged on action by a third party, the Plaintiffs in this case have no available administrative avenue of relief in which to challenge the ongoing application of the coverage policies contained within the LCD.  See id. Accordingly, as in American Chiropractic, Plaintiffs' access to the administrative review process is foreclosed, mandating a waiver of the exhaustion requirement.  See id.

Other courts have also waived the exhaustion requirement based on the exceptions developed from Illinois Council.  In Furlong v. Shalala, 238 F.3d 227 (2d Cir. 2001), the Second Circuit granted pre-exhaustion subject matter jurisdiction in a dispute over Medicare payment methodologies because the doctors challenging CMS's decision did not have standing to dispute the regulations through normal administrative channels.  See 238

F.3d 227, 234 (2d Cir. 2001) (noting that the plaintiffs faced the "kind of scheme which not only postpones judicial review, but forecloses it."). As discussed above, Plaintiff Bailey has no remaining administrative avenue in which to directly challenge the policies in the LCD, which Mutual continues to use to deny coverage of blood glucose tests.

In DeWall Enterprises v. Thompson, a device manufacturer repeatedly appealed CMS's unfavorable coding determinations to an administrative law judge. See DeWall Enterprises v. Thompson, 206 F.Supp.2d 992, 998 (D. Neb. 2002). Although CMS's policy was overturned each time, the agency applied the same policy to all future claims. After several successful administrative appeals did not cause CMS to establish a new policy, the plaintiff finally brought the dispute to federal court, which granted jurisdiction, noting that:

> The Secretary has not challenged the determinations
> through the appeals process available to it, but has
> simply ignored the determinations.  Under this system,
> district court review is available only if [Plaintiff]
> loses.  By failing to appeal adverse decisions, but
> then refusing to follow the dictates of those
> decisions, the Secretary has, in practice, denied any
> judicial review to [Plaintiff].

Id.  See also Bartlett Mem. Med. Ctr. v. Thompson, 347 F.3d 828, 993 (10th Cir. 2003);[2] Erringer v. Thompson, 189 F.Supp.2d 985,

---

[2]    In Bartlett, the Tenth Circuit stated that:

Continued on following page

993 (D. Ariz. 2001) (noting that "in this case, unlike <u>Illinois</u>
<u>Council</u>, the plaintiffs have all initially presented their
challenges of the agency's denial of their claims to the agency
or its carriers or financial intermediaries.").

Like in <u>DeWall</u>, Plaintiff Bailey has exhausted her
administrative remedies, yet Mutual, following withdrawal of the

---

Continued from previous page

      "Although Illinois Council ultimately denied
federal question jurisdiction to the
plaintiffs in that case, the facts of that
case are distinguishable from those of the
instant case. In contrast to Plaintiffs in
this case, the plaintiffs in Illinois
Council had failed even to attempt to
vindicate their complaints through a host of
available agency procedures. Although the
Illinois Council plaintiffs raised a number
of complaints regarding the effectiveness of
the agency procedures as a practical matter,
the Court held this was not the type of
"unavailability of review" required to
bypass. In this case, however, Plaintiffs
challenged Ruling 97-2 at the earliest
opportunity, and the PRRB declared it had no
jurisdiction over the challenge, leaving
Plaintiffs no remaining avenues through
which to pursue their claims before the
agency. Thus, Plaintiffs effectively
received "no review at all" on their
challenge to Ruling 97-2 and should be
permitted to bring their challenge before
this court. Because of this unique
situation, we conclude that we may exercise
federal question jurisdiction over this case
under <u>Michigan Academy</u>."

<u>Id.</u> at 993.

LCD and legal invalidation of the coverage policies incorporated therein, refuses to comply with the ALJ's Decision dismissing the case and the regulations dictating that Mutual can no longer apply the invalid policies contained within the LCD to anyone. (Pls.' Statement ¶ 12; ALJ's Decision dated September 19, 2006 (R. at 1-2); 42 C.F.R. §§ 426.420(a), 426.460(b).)  Accordingly, as in DeWall, "[b]y failing to appeal adverse decisions, but then refusing to follow the dictates of those decisions, the Secretary has, in practice, denied any judicial review to [Plaintiff]." DeWall, 206 F.Supp.2d at 998.  Plaintiff Bailey can only obtain relief at this point from the Court.

      C.    **The Statute Provides an Independent Right to Judicial Review Without Prior Administrative Review**

Congress created an express waiver to any exhaustion requirement under the Medicare Act with the enactment of 42 U.S.C. § 1395ff(f)(3), where the moving party establishes that there are no material issues of fact in dispute and the only issue of law is whether a determination or ruling by the Secretary is invalid.  See 42 U.S.C. § 1395ff(f)(3).

The Defendants argue the withdrawal of the LCD, and its invalidation, does not invalidate the policies of the Secretary incorporated therein, essentially CMS Program Memos (AB-00-99 and AB-00-108) and that these policies, as incorporated in the recent regulations at 42 C.F.R. § 424.24(f), can continue to be

enforced.  (Defs.' Mem. in Supp. of Mot. to Dismiss at 44-47.)

As explained in Section III(B) and (C) below, Plaintiff Bailey submits that there exist no material facts in dispute as grounds for this Court to rule upon the validity and continuing application of these policies under 42 U.S.C. § 1395ff(f)(3). These policies are either invalid by operation of law upon withdrawal of the LCD, as discussed in Section III(B), or invalid because they conflict with the NCD, as discussed in Section III(C).

**D.    Plaintiff Bailey Has Standing to Bring A Cause of Action for Due Process Violations, Both in Her Own Right, and On Behalf of the Class**

**1.    Plaintiff Bailey has Personal Standing to Bring a Cause of Action for Due Process Violations**

To demonstrate standing, a plaintiff must show three things: (1) that he or she "has suffered a concrete and particularized injury that is either actual or imminent;" (2) "that the injury is fairly traceable to the defendant;" and (3) "that a favorable decision will likely redress that injury." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992).

Contrary to the Defendants' discussion relating to third-party standing (Defs.' Mem. in Supp. of Mot. to Dismiss at 47), which largely ignores or mischaracterizes the applicable facts, Plaintiff Bailey meets all three of these requirements in her

own right with respect to her Due Process claims.

Plaintiff Bailey has suffered a concrete injury giving her a significant personal stake in the outcome of this action. Massachusetts v. EPA, No. 05-1120, 2007 U.S. Dist. LEXIS 3785, at *35-36 (U.S. Jan. 18, 2007). ("At bottom, 'the gist of the question of standing' is whether petitioners have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination,'" quoting Baker v. Carr, 369 U. S. 186, 204 (1962)).

First, Plaintiff Bailey, like the other class members, was not adequately apprised of the policies that Mutual used to evaluate coverage of her blood glucose tests.  Prior to the invalidation of the LCD, Mutual never explicitly identified the LCD policies it used to evaluate coverage for Plaintiff Bailey's blood glucose tests.

Second, Mutual has since failed to identify those policies upon which it now allegedly relies in evaluating coverage.  In a letter to Plaintiffs' counsel dated December 19, 2006 Mutual notified Plaintiffs' Counsel that an individual claim review had been performed pursuant to the ALJ's Decision, allegedly without applying the invalid LCD policies, but that such claims had

again been denied. (Pls.' Am. Compl. Ex. 17.)  In this letter,
Mutual provided no suggestion of what policies, if any,
supported the denial.  (Pls.' Am. Compl. Ex. 17.)  Such repeated
failures to provide notice subject Plaintiff Bailey to
substantial risk of harm in the form of past and future coverage
denials.  As a Medicare beneficiary, she is dependent on
adequate explanation of the policies underlying coverage
determinations for meaningful access to the available appeals
processes.  See Grijalva v. Shalala, 152 F. 3d 1115, 1122 (9th
Cir. 1998), vacated and remanded on other grounds, 526 U.S. 1096
(U.S. 1999).  Defendants' failure to provide adequate notice of
the relevant coverage policies, creating a risk that Plaintiff
Bailey has been and will continue to be deprived of covered
services, amounts to an "injury in fact" for the purpose of a
standing analysis.  See Lujan, 504 U.S. at 560.

With regard to the second and third elements of the
standing analysis (that the harm be fairly traceable to the
defendant and that a favorable decision will likely redress that
harm), Mutual is the party that has failed to notify Plaintiff
Bailey of the relevant coverage policies for blood glucose
testing. (Pls.' Am. Compl. Ex. 17, notifying Plaintiffs' counsel
that claims for blood glucose testing were re-reviewed without
application of the LCD policies and again denied, but failing to

indicate what polices, if any, supported the denial.)

Finally, an Order issued by this Court requiring the
Defendants to notify all Plaintiffs of the effect of the
withdrawn LCD policies and to clearly articulate the standards
for future coverage determinations in a manner that does not use
the invalid LCD policies would redress the Plaintiffs' harm by
allowing them to meaningfully evaluate previously denied
coverage and/or challenge invalid coverage policies going
forward, better ensuring receipt of the covered services to
which they are entitled.

### 2. Plaintiff Bailey has Standing to Bring a Cause of Action for Due Process Violations on Behalf of the Class

Plaintiff Bailey meets all the requirements for an
individual to have standing to bring a cause of action on behalf
of others.  First, she has a concrete interest in the outcome of
the dispute by virtue of her status as a Medicare Part B
beneficiary who resides in a SNF, suffers from diabetes, and
receives Part B lab tests for blood glucose testing.  Second,
given their identical private interests, she has a close
relationship with other members of the class.  Third, because of
the Defendants' due process violations, other members of the
class may be unaware of and thus unable to assert their rights
related to the invalid LCD and coverage denials for blood

glucose testing.  See Singleton v. Wulff, 428 U.S. 106, 112-115 (1976).

The threshold requirement for third-party standing is that the litigant must have suffered some injury as a result of the Defendants' conduct, an injury which may be threatened rather than actual. Warth v. Seldin 422 US 490, 498.  Further, a small risk of great harm places a litigant in an appropriately adversarial relationship with a defendant. See Massachusetts v. EPA, 2007 U.S. Dist. LEXIS 3785, at *51.  As the Defendants concede (Defs.' Mem. in Supp. of Mot. to Dismiss at 30-31), neither Plaintiff Bailey nor the other members of the class ever received notice that Mutual was relying on the now invalid LCD policies to deny Part B coverage for blood glucose testing. Further, neither Plaintiff Bailey nor the other members of the class have received any explanation of those alternative policies on which coverage of their blood glucose tests have allegedly been denied since the invalidation of the LCD policy. (Pls.'Am. Compl. Ex. 17.)  Moreover, Plaintiff Bailey faces the threat of continued denials on the basis of the policies from the LCD and an ongoing lack of reliable due process from a program that is supposed to provide coverage for medical services on which her continued health depends (Pls.' Statement ¶ 27).  Denial of coverage can lead directly to a decrease in

medical care.  See Grijalva, 152 F. 3d at 1121.  This risk of injury is certainly enough to meet the underlying justification for the third-party standing doctrine – that is, "sufficiently concrete interest in the outcome of the suit to make it a case or controversy subject to a federal court's Article III jurisdiction."  Singleton, 428 U.S. at 112.

Second, Plaintiff Bailey has an adequately close relationship with other class members due to her "common interest" with the other similarly situated Part B beneficiaries who have not been given accurate notice of the policy reasons for previous denials of coverage for their blood glucose tests or of their rights to challenge those policies.  This "congruence of interest" makes Plaintiff Bailey a "motivated and effective advocate" for the other class members.  Powers v. Ohio, 499 U.S. 400, 414 (1991) (where criminal defendant and juror have common interest in eliminating racial discrimination to maintain confidence in court system, a "congruence of interests" exists such that it is necessary and appropriate for the defendant to raise the rights of the third party juror).

Here, Plaintiff Bailey shares the same status as a Part B beneficiary as the other class members, faces the same challenges to obtaining adequate explanation of coverage policies from the Defendants, and has the same medical condition

(diabetes) and medical need for blood glucose tests as other class members.  Plaintiff Bailey and the other class members' congruence of interests in maintaining confidence in reasonable, adequately explained coverage determinations affecting their basic medical needs is essentially an identity of interests. Where Plaintiff Bailey and the third parties whose rights are raised are in such essentially identical situations, there is even more ground for a finding of the necessary relationship than in a case such as <u>Powers</u>.

Thus, even if the Court finds that Plaintiff Bailey herself was at a certain point in time on notice of the LCD, its withdrawal, and her appeal rights, this contingency ought not to affect the finding of an adequate relationship between Plaintiff Bailey and the other class members for third-party standing purposes.  Plaintiff Bailey has the same Constitutional right to notice as the other class members to adequate notice from Defendants on polices governing coverage of her medical care, and shares the appropriate incentives to vindicate that right. <u>See</u> <u>Kowalski v. Tesmer</u>, 543 U.S. 125, 129 (2004).  Here, the relationship between Plaintiff Bailey and the other class members is certainly such that she is "fully, or very nearly, as effective a proponent of the right as the latter."  <u>Singleton</u>, 428 U.S. at 115.

Finally, with respect to the ability and likelihood that third parties would assert their rights, Defendants argue that "it is clear that nursing home residents can protect their own interests." (Defs.' Mem. in Supp. of Mot. to Dismiss at 50.) There are at least two problems with this argument.

First, the issue here is that the other residents in the class were not provided adequate notice of the existence of an LCD whose policies were used to deny coverage of their tests, right to challenge that LCD, the subsequent withdrawal of the LCD, or their right to challenge the policies Mutual is now using. (R. at 706-08.) Given this lack of information, the other class members (like Plaintiff Bailey, after the LCD was withdrawn and the DAB was divested of jurisdiction) were never in a position to challenge the erroneous deprivation of their property interest in Part B covered services.

Second, as previously discussed, courts and Congress have recognized that elderly, ill nursing home patients are not always positioned to protect their own interests. Grey Panthers, 652 F.2d at 169, quoting S.Rep.No. 1230, 92d Cong., 2d. Sess. 38 (1972). The third parties in question are persons in SNFs with severe diabetes whose attention has never been directed to the existence of the LCD or the legal basis and reasoning for coverage determinations about blood glucose tests.

- 38 -

Any assertion that individuals so situated could be expected to defend a right the existence of which they are likely unaware should be disregarded as contrary to common sense and to the efforts of Congress and courts to ensure meaningful, effective notice to vulnerable beneficiaries of government programs.

Plaintiff Bailey thus has standing to bring due process claims against the Defendants, on behalf of both herself and the class.  The Defendants' arguments are without merit. Accordingly, this Court should deny the Defendant's Motion to Dismiss.

III. **ARGUMENT IN SUPPORT OF PLAINTIFF BAILEY'S MOTION FOR SUMMARY JUDGMENT**

    A.    **Applicable Legal Standard for Summary Judgment**

The Court must grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c). In order to ascertain whether facts are "material," the Court must look to the substantive law on which each claim rests. Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 252 (1986).  A "genuine issue" is one that if resolved could prove an element of a particular claim or defense and provide a basis upon which a jury could reach a verdict for the non-moving party.  Id. at

248; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Moreover, "[t]he movant need not entirely foreclose the possibility that there could exist an issue of material fact, he need only claim that the nonmovant has failed, or by necessity will fail, to appropriately raise the issue." <u>Youngblood v. Vistronix, Inc.</u>, 2006 U.S. Dist. Lexis 51460, *4-5 (D.D.C. 2006) (citing <u>Celotex</u>, 477 U.S. at 323-24).

Although the moving party bears the burden of demonstrating that there is no genuine issue of material fact, Rule 56 further requires that the non-moving party "go beyond the pleadings by [entering evidence] showing there <i>is</i> a genuine issue for trial." <u>Celotex</u>, 477 U.S. at 323-24 (emphasis added). The presence of disputed facts by itself is insufficient to defeat summary judgment. <u>Anderson</u>, 477 U.S. at 247. Any factual dispute that does not constitute a genuine issue of <u>material</u> fact is irrelevant for summary judgment purposes. <u>Id.</u> at 248.

The opposing party must make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322. In making this determination, the Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods.</u>,

Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). See also Washington Post Co. v. United States Dep't of Health & Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989). However, "wholly conclusory statements for which no supporting evidence is offered" need not be taken as true for summary judgment purposes. Carter v. Greenspan, 304 F. Supp. 2d 13, 21 (D.D.C. 2004) (citing Greene v. Dalton, 164 F.3d 671, 674-75 (D.C. Cir. 1999)).

In order to survive a motion for summary judgment, the non-moving party must establish more than the "mere existence of a scintilla of evidence" in support of its claims. Anderson, 477 U.S. at 252. In order to prevail, the non-moving party's opposition must contain more than "unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial." Carter, 304 F. Supp. 2d at 21. See Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50. In fact, summary judgment may be granted where the moving party points to a substantial lack of evidence in the non-moving party's case, see Celotex, 477 U.S. at 322, or where the moving party demonstrates that the non-moving party has failed to proffer "evidence on which the jury could reasonably find for"

the non-moving party.  Anderson, 477 U.S. at 252.

      **B.**    **Mutual's LCD and the Coverage Policies Incorporated Therein by CMS Program Memoranda AB-00-99 and 108 to Deny Coverage to Medicare Beneficiaries Residing in Skilled Nursing Facilities For Blood Glucose Testing Are Now Invalid by Operation of Law**

      **1.**   **Legal Effect of Plaintiff Bailey's LCD Challenge**

The Medicare Act defines an LCD as "a determination by a fiscal intermediary or carrier under Part A or Part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary or carrier—wide basis under such parts, in accordance with section 1862(a)(1)(A)" (i.e., the Medicare reasonable and necessary standard).  See 42 U.S.C. § 1395ff(f)(2)(B).  Simply stated, an LCD is an official statement of the fiscal intermediary's policies on whether specific items or services are reasonable and necessary and thus "covered" for the purpose of Medicare reimbursement.  (Pls.' Statement ¶ 14.)  An LCD applies to claims for the listed items or services, whether the fiscal intermediary chooses to identify it on every claim determination, or not.  It is binding on claimants until retired or otherwise invalidated.  And once it is no longer valid – as is the case here – the coverage policies enunciated in that LCD can no longer be enforced by the fiscal intermediary.  (Pls.' Statement ¶ 28.)

Pursuant to 42 C.F.R. 426.460(b), Mutual's withdrawal of its blood glucose testing LCD has the same legal effect as an

ALJ's decision to invalidate that LCD under the reasonableness standard.  (Pls.' Statement ¶ 24.)  Accordingly, the LCD and the policies incorporated therein – which all affected parties had understood to be Mutual's policy on blood glucose testing coverage – are now invalid as a matter of law, and those policies can no longer be applied to anyone.  (Pls.' Statement ¶ 25.)  Stated otherwise, Mutual's withdrawal of the LCD was the equivalent to a finding of invalidity on the merits, and Mutual's LCD policies for blood glucose testing (including CMS Program Memoranda AB-00-99 and 108, Medicare Claims Processing Manual § 90.1, and 42 C.F.R. § 410.32, which were all incorporated into the LCD) are null and void and can not be used to establish when Mutual will and will not reimburse claims for blood glucose testing services. 42 C.F.R. § 426.460(b).

In addition, Mutual is required to reopen denied claims of Plaintiff Bailey and adjudicate those claims, and any new claims submitted for blood glucose testing services, without using the invalid policies reflected in the LCD, now that it is withdrawn. (Pls.' Statement ¶ 28.)  Similarly, any and all claims submitted to Mutual by other similarly situated Medicare Part B beneficiaries in SNFs for blood glucose testing services with dates of service on or after August 11, 2006 must be adjudicated without using the invalid policies in the LCD.  (Pls.' Statement ¶ 29.)

Regardless of this requirement, Mutual confirmed by letter after the Complaint was filed in this action that Plaintiff Bailey's claims for blood glucose tests were re-reviewed, purportedly without application of its LCD, and again denied. (Pls.' Am. Compl. Ex. 17.)  Not surprisingly and in keeping with the policies in the CMS Program Memoranda AB-00-99 and AB-00-108 which were incorporated into the LCD, the reason for the denials is that the services are not reasonable and necessary. Accordingly, Mutual continues to enforce its retired LCD policy on when it considers blood glucose testing to be reasonable and necessary, which is a violation of the law and the ALJ's Decision in Plaintiff Bailey's LCD challenge.  (Pls.' Statement ¶ 27.)

CMS stated very clearly in the preamble to the rules governing these LCD appeal procedures that it is the policies discussed in the LCD that are invalid when the LCD is retired, not just the document itself:

> Retiring an LCD or withdrawing an NCD would result in the retired/withdrawn <u>policy</u> no longer applying in the claims adjudication process for services rendered on or after the date that the <u>policy</u> is retired/withdrawn.  Moreover, the aggrieved party would be granted individual claim review. Since a claimant would receive the same relief that would have been available had the adjudicator found that the relevant LCD or NCD was not valid, there would be no reason to continue the appeal.

<u>Medicare Program: Review of National Coverage Determinations and Local Coverage Determinations</u>; <u>Final Rule</u>, 68 Fed. Reg. 63,692, 63,698 (November 7, 2003) (emphasis added).  CMS added that:

> When we retire/withdraw an LCD/NCD *we* <u>will not apply those policies for services furnished after the retirement/withdrawal date</u> and we will reprocess the aggrieved party's affected claims <u>without applying the retired/withdrawn policy</u>.

<u>Id.</u> (emphasis added).  Accordingly, Mutual's continued denial of Plaintiff Bailey's claims for blood glucose tests violates the clear intent of the regulation.

Plaintiff Bailey respectfully asks this Court to grant summary judgment in her favor and order that, based upon withdrawal of the LCD and its invalidation by operation of law (42 C.F.R. § 426.420(a)), Mutual cannot continue to deny claims for blood glucose testing services on or after August 11, 2006 (i) using any of the restrictive coverage policies discussed in the now-retired and invalid LCD on blood glucose testing, or (ii) based on its policy interpretations discussed in the LCD of other authorities (including CMS Program Memoranda AB-00-99 and AB-00-108, Medicare Claims Processing Manual § 90.1, and 42 C.F.R. § 410.32).

> **C.    The CMS Policy to Deny Coverage for Medicare Beneficiaries Residing in SNFs Contained in its Program Memoranda, Incorporated into Mutual's LCD, and Now Reflected in 42 C.F.R. § 424.24(f) and Effective for Periods Commencing Jan. 1, 2007, is Invalid Because it Conflicts with the November 23, 2001 <u>National Coverage Determination</u>**

> **1.    <u>Balanced Budget Act of 1997</u>**

In 1997, Congress passed the Balanced Budget Act of 1997, Public Law No. 105-33 ("BBA"), effective July 1, 1998, which <u>inter alia</u> mandated use of a negotiated rulemaking committee to

develop national coverage and administrative policies for
clinical diagnostic laboratory services payable under Medicare
Part B by January 1, 1999.  (Pls.' Statement ¶ 30.)  The BBA
required that national policies be designed to promote program
integrity and national uniformity and simplify administrative
requirements with respect to clinical diagnostic laboratory
services payable under Medicare Part B.  See BBA §§
4554(b)(1),(2).  The Conference Report notes:  "Significant
variations exist among Carriers in rules governing requirements
labs must meet in filing claims for payments."  BBA Conference
Report accompanying H.R. 2015, Report 105-217, July 30, 1997, at
795.  Congress thus recognized that coverage policies were
necessary to stop individual carriers and fiscal intermediaries
from erroneously and inconsistently depriving Medicare
beneficiaries of benefits to which they are entitled, and
determined that negotiated rulemaking was the most effective and
accurate method of Medicare coverage policymaking.

### 2.  March 10, 2000 Proposed Rule to Establish National Coverage and Administrative Policies

As a result of the efforts of the negotiated rulemaking
committee, on March 10, 2000, CMS published a proposed rule to
establish national coverage determinations for clinical
diagnostic laboratory services payable under Medicare Part B.
(Pls.' Statement ¶¶ 31-32.)  The proposed rule includes a

national coverage determination ("proposed NCD") captioned

"Medicare National Coverage Decision for Blood Glucose Testing."

(Pls.' Statement ¶ 31.)  The proposed NCD established that

frequent testing of blood glucose values is necessary for the

management of patients with diabetes. (Pls.' Statement ¶ 33.)

Specifically, the proposed NCD stated:

> Frequent home blood glucose testing by diabetic patients
> should be encouraged.  In stable, non-hospitalized patients
> who are unable or unwilling to do home monitoring, it may
> be reasonable and necessary to measure quantitative blood
> glucose up to four times annually.
>
> Depending upon the age of the patient, type of diabetes,
> degree of control, complications of diabetes, and other co-
> morbid conditions, more frequent testing than four times
> annually may be reasonable and necessary.
>
> In some patients presenting with nonspecific signs,
> symptoms, or diseases not normally associated with
> disturbances in glucose metabolism, a single blood glucose
> test may be medically necessary.  Repeat testing may not be
> indicated unless abnormal results are found or unless there
> is a change in clinical condition.  If repeat testing is
> performed, a specific diagnosis code (e.g., diabetes)
> should be reported to support medical necessity.  However,
> repeat testing may be indicated where results are normal in
> patients with conditions where there is a confirmed
> continuing risk of glucose metabolism abnormality (e.g.,
> monitoring glucocorticoid therapy).

65 Fed. Reg. 13,128 (March 10, 2000) (emphasis added).  Thus,

the negotiated rulemaking committee determined that for patients

with a "continuing risk of glucose metabolism abnormality,"

repeat or frequent blood glucose testing may be reasonable and

necessary and thus covered.  Id.  Whether a patient has a

continuing risk of glucose metabolism abnormality is something

that can only be determined by that patient's physician – not by
Mutual or other Part B carriers. (R. at 205, 224, 234, 155-156
and Pls.' Am. Compl. Ex. 1.)

### 3. November 23, 2001 Final National Coverage Determination for Blood Glucose Testing

After the notice and comment period following its
publication of the proposed NCD, effective November 23, 2001,
CMS promulgated the final national coverage determination
("final NCD") to address Medicare coverage of blood glucose
testing. (Pls.' Statement ¶ 8.)

Specifically, the final NCD states that "[f]requent home
blood glucose testing by diabetic patients should be
encouraged," and that "[t]he convenience of the meter or stick
color method . . . has become a standard of care for control of
blood glucose, even in the inpatient setting." 66 Fed. Reg.
58,846 (Nov. 23, 2001). Consistent with the proposed NCD, the
final NCD also states that "[d]epending upon the age of the
patient, type of diabetes, degree of control, complications of
diabetes, and other co-morbid conditions, more frequent testing
than four times annually may be reasonable and necessary. . . .
[R]epeat testing may be indicated where results are normal in
patients with conditions where there is a confirmed continuing
risk of glucose metabolism abnormality." Id.

Nowhere in the final NCD are there specific limitations in CMS Program Memoranda AB-00-99 and 108 on the frequency of testing with respect to institutionalized diabetics, and nowhere is there mention of requiring a separate order for each blood glucose test administered to patient with a "confirmed continuing risk of glucose metabolism abnormality." The final NCD simply lists the number of maladies that may require blood glucose testing and reiterates that reasonable and necessary tests will be reimbursed. See id. at 58,846, 58,848. Accordingly, the final NCD not only allows, but supports coverage for Plaintiff Bailey's blood glucose testing.

An NCD is a determination by CMS as to whether or not a particular service is covered nationally by Medicare. 42 C.F.R. § 405.1060(a)(1). An NCD is legally binding on all Medicare contractors, including carriers and fiscal intermediaries, as well as the DAB and its ALJs, among others. See id. § 405.1060(a)(4). Moreover, a NCD takes precedence over decisions made on the local level by Medicare contractors, i.e., LCDs, including what were formerly known as Local Medical Review Policies ("LMRPs"), and other non-binding policies. (Pls.' Statement ¶ 41.) An LMRP or LCD thus may not conflict with a NCD once the NCD is effective. (Pls.' Statement ¶ 42.) If a NCD conflicts with a previously established LMRP or LCD, the

contractor must change its LMRP or LCD to conform to the NCD. 66 Fed. Reg. 58,788 (Nov. 23, 2001).

### 4.    CMS Program Memorandum AB-00-99

During the proposed NCD's notice and comment period (between the date the negotiated rulemaking committee first published the proposed NCD and the effective date of the final NCD), CMS Program Memorandum AB-00-99 was issued to Medicare intermediaries and carriers on October 20, 2000 with an effective date of November 1, 2000. (Pls.' Statement ¶ 34.) Entitled "Glucose Monitoring Note," this Program Memorandum acknowledged that blood glucose tests for Part B patients in SNFs are covered and payable under clinical laboratory fee schedule, pursuant to the statutory and regulatory authorities, including Section 1862(a)(1)(A) of the Social Security Act and Sections 410.21 and 411.15 of Title 42 of the Code of Federal Regulations.

However, CMS added an entirely new requirement, never before articulated to the public or found in the existing authorities and not included in the proposed NCD: "Implicitly, the laboratory result must be reported to the physician promptly so that the physician can use the result and instruct continuation or modification of patient care; this includes the physician's order for another laboratory service." CMS Program Memorandum AB-00-99 (Oct. 20, 2000). This single sentence would

be the linchpin of the continuing strategy by CMS to deny coverage for legitimate blood glucose tests of Part B SNF residents.  Further, the "prompt reporting" and "separate order" requirements would be incorporated into Mutual's LCD as discussed further below.  The memorandum instructs intermediaries and carriers to make coverage determinations under their own local coverage policies because the proposed NCD had not been finalized at that time.  Significantly, however, the "prompt reporting" and "separate order" requirements were nowhere mentioned in the negotiated rulemaking committee's proposed NCD.

### 5.    CMS Program Memorandum AB-00-108

Less than two months after CMS issued Program Memorandum AB-00-99 and before the final NCD was published by the negotiated rulemaking committee, CMS issued Program Memorandum AB-00-108 to Medicare intermediaries and carriers.  CMS Program Memorandum AB-00-108 (December 1, 2000; effective January 1, 2001).  Entitled simply "Glucose Monitoring," CMS first states that it has been informed of a "significant increase" in the number of blood glucose test claims submitted to intermediaries and more health care settings, specifically nursing homes and home health agencies.  Id.  CMS acknowledges the standard of practice for frequent testing in saying that "[a]dministration of the service several times a day is common in order to

maintain tight control of glucose to prevent heart disease, blindness, and other complications of diabetes." Id. (emphasis added). CMS also notes that it is permissible for providers, such as SNFs, to administer these tests to patients using a glucose monitoring device if the provider has at least a CLIA certificate of waiver.

However, AB-00-108 then restates the new arbitrary restrictions from AB-00-99 concerning prompt reporting of test results to the physician and new physician orders for tests, with some further explanation:

> Nursing and physician duties, include observing, ordering, administering and interpreting the patient's health status are paid predominately under other payment systems, such as the state nursing home payment system or the physician payment system. If home-use glucose monitoring devices are used in the hospital and nursing home settings, a glucose monitoring service must be performed in accordance with laboratory coverage criteria to qualify for separate payment under the Medicare laboratory benefit. As noted above, for a laboratory service to be reasonable and necessary, it must be ordered by the physician, the ordering physician must use the result in the management of the beneficiary's specific medical problem, and the laboratory result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of patient care.

Id. at 3 (emphasis added). As stated above and shown by internal CMS documents, the last sentence was completely fabricated by CMS to deny coverage for legitimate blood glucose tests. (Pls.' Statement ¶ 45-47.)

CMS added that "[a] standing order is not usually acceptable documentation for a covered laboratory service." CMS Program Memorandum AB-00-108 at 2. CMS urged its contractors to "review their local coverage policies for glucose testing in light of the proposed national coverage policy in order to prepare for the adoption of a national coverage policy," which should have been a warning that contradictory coverage restrictions would need to be removed, as is required by law. Id. Instead, CMS directly instructed its contractors to "review their local coverage [policies] to clarify, if necessary" the new restrictions that CMS has devised regarding "the order and clear use of a laboratory result prior to a similar laboratory order." Id.

### 6. Mutual's Local Coverage Determination on Blood Glucose Monitoring

After CMS issued the Program Memoranda discussed above but before the final NCD was published, Mutual published an LCD titled Blood Glucose Testing, contractor's determination number 2001-B, LCD database ID number L19657. (Pls.' Statement ¶ 5.) LCD version number 5 was the last published version. (Pls.' Statement ¶ 5.) Mutual published its LCD on blood glucose testing as a single statement of the policies it would impose on claimants who submit Medicare claims for blood glucose tests. (Pls.' Statement ¶ 5.)

The LCD record in the administrative proceeding initiated by Plaintiff Bailey shows that Mutual first had a draft of its LCD on blood glucose testing in December 2000. (R. at 410.) The record also shows that Mutual finalized and distributed the LCD to providers on August 6, 2001. (Pls.' Statement ¶ 7.) Other documents in the LCD record show that Mutual was aware of the NCD as it was being developed (R. at 392), yet made no effort to revise its LCD to be consistent with the NCD, as is required.  See 66 Fed. Reg. 58,788 (Nov. 23, 2001).

In fact, after the proposed NCD was published, Mutual was given a clear written warning by the CMS Region VII office that the language Mutual was planning to add to its LCD from CMS Program Memoranda AB-00-99 and 108 does not appear in the proposed NCD and should not be included in the LCD because it conflicts with the proposed NCD, as health care providers had argued. (Pls.' Statement ¶ 9; see also Pls.' Am. Compl. Ex. 15 (S. Pennington email to Mutual and CMS dated Nov. 4, 2002) stating "I agree with the providers – I think lifting language from AB-00-108 and AB-00-99 is inappropriate and is in conflict with the NCD. . . .  Those PMs [program memoranda] were written 2 yrs ago – pending a NCD. . . . [the LCD] can not go beyond the NCD . . . .")

Others at Mutual who reviewed the draft LCD internally expressed similar concerns about the legitimacy of language in the LCD that does not appear in the proposed NCD and the negative impact the LCD would likely have on patient care by discouraging testing.  (Pls.' Statement ¶ 10.)

> I do not believe that a physician should be notified each
> and every time a CBG result is taken.  If a patient is in a
> SNF and requires testing QID (4x a day) and a sliding scale
> is in place and the P.O. [physician order] states to
> contact the physician if levels are "X" then the facility
> should contact the doctor.  CBG testing is very important –
> remember that it used to be that a diabetic would qualify
> for catastrophic care in past years (this was considered
> skilled care) and now if you require calling [the
> physician] each time this will discourage repeat testing
> and/or facilities seeking reimbursement.

(R. at 590 (emphasis added).)  However, Mutual chose to ignore these warnings and publish the LCD anyway with this objectionable language derived from the two CMS Program Memoranda, knowing full well that its LCD was in conflict with the NCD in violation of the law.

On its face, Mutual's LCD conflicted with the proposed NCD on blood glucose testing in numerous ways.  (Pls. Statement ¶ 53.)  First, the LCD emphasizes the word "routine" to deny coverage of a series of blood glucose tests for SNF residents. However, the NCD does not preclude regular and frequent blood glucose testing of SNF residents.  Second, the LCD requires that each test result be reported to the physician "promptly." However no "prompt" notification is mentioned in the proposed

NCD.  Indeed, such a requirement could interfere with frequent

blood glucose testing that is expressly encouraged by the NCD.

Finally, the LCD's statement that there can be no "standing

order" for blood glucose testing for such services to be covered

fails to comport with the proposed NCD.  In fact, the NCD

specifically encourages frequent testing of blood glucose levels

for diabetic patients, does not provide any specific limitations

to testing, and acknowledges that specific diagnosis codes, such

as diabetes, support repeat testing, especially where there is a

confirmed continuing risk of glucose metabolism abnormality.

(Pls. Statement ¶ 53.)

Effective October 1, 2005, Mutual issued a notice that it

would implement system edits to more readily identify all

Medicare Part B claims for blood glucose testing so as to deny

coverage for SNF residents, which included Plaintiff Bailey.[3]

(Pls.' Statement ¶ 11.)  Regardless of whether the LCD was

specifically cited in connection with Mutual's responses to

claims that had been submitted for Plaintiffs' blood glucose

tests, it is clear based on the ADR requests and sample Medicare

Appeal Decision that Mutual used the criteria discussed in its

LCD, which is also found in the CMS Program Memoranda, to

---

[3]    Compare R. at 706-08.

evaluate claims for blood glucose tests. (Pls.' Statement ¶¶ 49-52.)

Specifically, to "support blood glucose services," Mutual's ADRs request "documentation for the medical necessity for each test billed," "documentation of physician notification of each test result noting the use of the results to modify treatment" and "physician order(s) to include blood glucose testing." (R. at 63.) Such items closely mirror the requirements of Mutual's now retired LCD. (Pls.' Statement ¶ 49 and R. at 52 stating inter alia "[f]or laboratory services to be reasonable and necessary, it must not only be ordered by the physician but the ordering physician must also use the results in the management of the beneficiary's specific medical problem. Implicitly, the laboratory result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of patient care: this includes the physician's order for another laboratory service.")

Similarly, the sample Medicare Appeal Decision the Defendants submitted with the administrative record - a case that did not involve Plaintiff Bailey - makes clear that Mutual uses the LCD criteria to evaluate coverage for blood glucose testing. (Pls.' Statement ¶¶ 50-52.) As described above, Mutual's LCD was invalidated through the DAB appeal process and

its continued reliance on those policies violates 42 C.F.R. §§ 426.420(a) and 426.460(b).

> **D.    Defendants Have Failed to Provide Adequate Notice to Plaintiffs and Have Violated Their Fifth Amendment Due Process Rights**

Defendants have violated the Plaintiffs' (collectively Plaintiff Bailey and other similarly situated Medicare Part B beneficiaries in SNFs for which Mutual is the fiscal intermediary) Fifth Amendment rights in two regards.  First, Defendants failed to adequately inform Plaintiffs of the grounds for denying coverage of their blood glucose tests, which were based on the policies in the LCD.  Second, after the LCD was withdrawn and could no longer be used to deny coverage for blood glucose tests, Defendants failed to provide Plaintiffs with adequate notice of the policies and standards that it now uses to evaluate coverage of blood glucose tests.

Individuals have a constitutional right to notice and a meaningful opportunity to be heard where the government revokes a property interest, including a property interest in legislated government entitlements.  U.S. Const. amend. V; see e.g., Goldberg v. Kelly, 397 U.S. 254 (1970).  As the Defendants concede, the Plaintiffs have a property interest in the Part B covered services for which they are eligible.  (Defs.' Mem. in Supp. of Mot. to Dismiss at 50 quoting Gray Panthers v. Schweiker, 652 F. 2d 146, 148 n.2.)  Accordingly, the

Defendants' policy to deny coverage for medically necessary blood glucose testing, as determined by Plaintiffs' physicians, amounted to a deprivation of Plaintiffs' property interest in Part B covered services.  See id.

Courts apply the three part balancing test set forth in Mathews v. Eldridge, 424 U.S. 319 (1976) to determine whether due process norms require a given procedural safeguard, which requires consideration of:  (1) the private interest at stake; (2) the risk that the procedure used will result in an erroneous deprivation of that interest; and (3) the costs of additional or substitute procedural safeguards to protect that interest. Applying this balancing test to the Defendants' notice to Plaintiffs regarding those policies on which it relied to evaluate claims for blood glucose tests, both before and after the LCD policies became invalid, it is apparent that Defendants' have failed to provide adequate notice in violation of Plaintiffs' procedural due process rights.

### 1.    Plaintiffs have a Private Interest in Part B Covered Laboratory Services

Medicare Part B covers diagnostic laboratory services furnished to SNF residents.  42 C.F.R. §§ 410.10(e); 410.32(d). The class members' physicians ordered blood glucose testing on the basis of their finding that it was medically necessary. Plaintiffs have a strong private interest in having physician-

ordered, reasonable and necessary blood glucose testing services

covered, and in the knowledge that such services will be covered

in the future.  As individuals diagnosed with severe diabetes,

who face "confirmed continuing risk of glucose metabolism

abnormality" (R. at  155-56, 220-21, 315 and Pls.' Am. Compl.

Ex. 1), these individuals' private interest should weigh heavily

in the Mathews balancing test.  The property interest at stake

is not in the financial amount of payment denied, but in the

benefit itself.  See Grijalva v. Shalala, 152 F. 3d 1115 (2d.

Cir. 1998), vacated and remanded on other grounds, 526 U.S. 1096

(1999) (holding that HMO denials of claims should weigh heavily

on the first factor since the potential for irreparable damages

is so high).  Plaintiff's interest in a clearly communicated

policy regarding coverage of blood glucose testing is

significant because, as Defendants acknowledge, Plaintiffs

depend on such coverage to "maintain tight control of glucose to

prevent heart disease, blindness, and other complications of

diabetes." CMS Program Memorandum, PM Rev. AB-00-108. (R. at

223-24, 155-56 and Pls.' Am. Compl. Ex. 1)

 **2.    Defendants' Actions Pose a Risk of Erroneous
        Deprivation**

Adequate notice "lies at the heart of due process" because

without adequate explanation of unfavorable actions against

them, claimants cannot determine how to proceed or what evidence

to gather to make their case.  Grey Panthers, 652 F. 2d. at 168.
The Defendants' conduct has posed a high risk of erroneous
deprivation, first by failing to inform Plaintiffs of the
reasoning behind the denial of coverage for blood glucose tests,
which were based on the policies in the LCD, and second by
providing no notice of those policies which would be used to
determine coverage for blood glucose testing when the LCD was
withdrawn going forward.

In failing to inform Plaintiffs that coverage of their
blood glucose tests was denied on the basis of the policies
contained in the LCD, Defendants created a high risk that
Plaintiffs would not challenge the LCD and that they would
continue to be erroneously deprived of coverage for blood
glucose testing.

In 2001, Mutual published its LCD on its website.  (Pls.'
Statement ¶ 5.)  Although Mutual chose not to cite to that LCD
in its subsequent denials of coverage, it is clear from the
document "Request for Additional Information" mailed to
Plaintiff Bailey and her SNF provider that the coverage decision
was in fact based on the precise policies set forth in the LCD.
(Pls.' Statement ¶ 12.)  At the time she initially received
notice of denial, Plaintiff Bailey was in the same situation as
other class members remained throughout this period: she did not
know the real basis for the determination - the policies in the

LCD – and that lack of notice harmed Plaintiffs' ability to protect their interest in continued blood glucose testing.

As Plaintiff Bailey's physician states, she was diagnosed with diabetes and needed regular monitoring in the event that her glucose level fell outside the acceptable range, posing a grave threat to her health (Pls.' Statement ¶ 2 and R. at 155). Because their attention was never directed to the LCD, Plaintiff Bailey and other similarly situated Part B Medicare beneficiaries had no way of knowing that Mutual had suddenly and arbitrarily changed its policies with regard to coverage of blood glucose testing.  This failure of notice left Plaintiffs with no clear direction on how to proceed, and thus failed to "apprise [them] fully of the issue in dispute." Grey Panthers, 652 F.2d at 168.

The Defendants have continued to deny coverage of Plaintiff Bailey's blood glucose test (Pls.' Statement ¶ 12) without notifying her of the coverage policies that are now being applied, which Plaintiffs assert are the policies from the now invalid LCD.  This failure to explain to Part B beneficiaries the basic grounds on which Mutual will recognize that blood glucose tests are covered amounts to a failure to notify them of their right to challenge relevant policies and poses a high risk that they will be erroneously deprived of their property interest in Medicare Part B covered services.  The only

information Plaintiff Bailey ever received after the withdrawal
of the LCD was that her claim had been denied again (Pls.'Am.
Compl. Ex. 17), thereby precluding any further challenge to such
coverage policies and undermining the clear intent of 42 U.S.C.
1395ff(f).  Other similarly situated Part B Medicare
beneficiaries were at all times, including after the LCD
withdrawal, not informed that the same coverage policies in the
LCD were still being used to evaluate Part B coverage of their
blood glucose tests.  Thus, their ability to challenge such
policies in a meaningful way, as well as their rights to have
future blood glucose test evaluated without regard to the LCD
policies is precluded.

     To meet constitutional requirements, the means of notice
employed must be "such as one desirous of actually informing the
absentee might reasonably adopt to accomplish it."  Mullane v
Central Hanover Bank and Trust, 339 U.S. 306, 314 (1950).  Many
courts have pointed out that the nature of the audience for a
notice must be taken into account to determine whether the
notice is adequate. See e.g., Grey Panthers, 652 F. 2d at 169;
Goldberg v Kelley, 397 U.S. 254, 268; Grijalva, 152 F. 3d at
1121; Ford v. Shalala, 87 F. Supp. 2d 163, 178 (E.D.N.Y. 1999).
Congress and Courts have repeatedly recognized that the elderly
as a group are less able to deal with legal notices and a
subject to "'inattention or inability to manage their affairs.'"

Grey Panthers, 652 F.2d at 169, quoting S.Rep.No. 1230, 92d
Cong., 2d. Sess. 38 (1972).

Here, the failure to provide adequate notice is especially
apparent considering the audience – elderly SNF residents with
diabetes, many of whom, like Plaintiff Bailey, suffer from
serious complications of their disease, such as blindness.
(Pls.' Statement ¶ 1 and R. at 197.)  Both Mutual's notice of
the LCD and notice of the LCD withdrawal were defective: rather
than being identified in connection with individual claims
determinations, the LCD (and notice of LCD withdrawal) were
posted on the "LCD" section of Mutual's website on or about
August 11, 2006 (in the case of the LCD withdrawal, under
"Archives"), which beneficiaries affected by it would be highly
unlikely to ever see.[4]

Accordingly, Mutual's inadequate notice made it "virtually
impossible for a Part B Medicare beneficiary to present a well-
reasoned argument," against the LCD coverage policies, posing an
unacceptable risk of erroneous deprivation of Plaintiffs'
interest in Part B covered services.  See Grey Panthers, 652 F.
2d. at 166.  To suggest that notice was sufficient to the SNF
providers who care for Plaintiffs, as defendants have argued, is

---

[4]    This archive is available at http://www.mutualmedicare.com/
       (under "LCDs" click on "Archive").  See also Def. Mot. to
       Dismiss, Ex. C.

equally inadequate because, under 42 U.S.C. 1395ff(f)(2), only a Medicare beneficiary has standing to challenge a coverage determination.

**3.    The Cost of Additional Procedure Does Not Justify Defendants' Actions**

The cost to the Defendants of both identifying those coverage policies it currently uses in evaluating coverage of blood glucose testing and mailing a simple notice to Plaintiffs regarding the invalidation of the LCD upon which it had previously relied to deny coverage in accordance with 42 CFR 426.420(e)(1) would be low in comparison with the private interests of the Plaintiffs which would be protected.  See Grijalva, 152 F. 3d at 1123.

Accordingly, under Mathews, Plaintiffs are entitled to adequate notice of those policies upon which Mutual evaluates coverage for blood glucose tests.  Defendants' failure to provide such notice violates Plaintiffs' procedural due process rights and this Court should grant summary judgment in favor of the Plaintiffs and order Defendants to issue a form of Notice to effectively inform Plaintiff Bailey, the class, and their SNF providers, of the following: (i) Mutual's LCD on blood glucose testing, and the policies stated therein, were declared invalid as a matter of law by the ALJ's Decision dated September 19, 2006; (ii) Mutual will reprocess blood glucose test claims in

- 65 -

accordance with the declarations requested as relief in Part IX, Paragraphs 1-4 of Plaintiff's Amended Complaint; (iii) Mutual will process new blood glucose test claims in accordance with said declarations; and (iv) beneficiaries have the right to seek reversal of the denial of coverage for their blood glucose testing.

IV.  **CONCLUSION**

For the foregoing reasons, and because Defendant's Motion to Dismiss is without merit and there are no material facts in dispute, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss and grant Plaintiffs' Motion for Summary Judgment.

                              Respectfully submitted,

                              /s/ Thomas C. Fox
Counsel:                      Thomas C. Fox (D.C. Bar #4473)
Carol C. Loepere              REED SMITH LLP
Antony B. Klapper             1301 K Street, NW
Jason M. Healy                Suite 1100 – East Tower
Catherine A. Durkin           Washington, D.C. 20005
Cassia M. McCamon             (202) 414-9222
REED SMITH LLP                Attorney for Plaintiffs
1301 K Street, NW
Suite 1100 – East Tower
Washington, D.C. 20005
(202) 414-9200


Dated: June 22, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

```
_____
                              )
LOUIS BAILEY, 4782 S. Holladay )
Blvd. Salt Lake City, Utah    )
84117, Individually, And On   )
Behalf of All Other Similarly )
Situated Medicare Part B      )
Beneficiaries                 )
                              )
        Plaintiffs,           )        Case No. 1:06-cv-2144
                              )        Judge Royce C. Lamberth
    v.                        )
                              )
MUTUAL OF OMAHA INSURANCE     )
COMPANY, a Medicare Fiscal    )
Intermediary, Medicare Division, )
P.O. Box 1602, Omaha, NE 68101; )
                              )
        and                   )
                              )
MICHAEL O. LEAVITT, SECRETARY, )
U.S. DEPARTMENT OF HEALTH AND )
HUMAN SERVICES, 200 Independence )
Avenue, S.W., Washington, D.C. )
20201                         )
                              )
        and                   )
                              )
LESLIE V. NORWALK, ACTING     )
ADMINISTRATOR, CENTERS FOR    )
MEDICARE & MEDICAID SERVICES, )
7500 Security Boulevard,      )
Baltimore, MD 21244           )
                              )
        Defendants.           )
_____)
```

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS
<u>NOT IN DISPUTE</u>**

Plaintiffs, through counsel, pursuant to Local Civil Rule 7(h), respectfully submit the following Statement of Material Facts Not in Dispute in support of Plaintiff's Motion for Summary Judgment and Memorandum of Points and Authorities:

## The Parties

1.    Plaintiff Bailey is 73 years old and resides at the Holladay Healthcare Center, a Medicare skilled nursing facility ("SNF"). (Beneficiary's LCD Complaint (C-06-349) ("LCD Complaint"), Ex. 6 – Provider's Response to Intermediary's Additional Development Requests; Administrative Record ("R.") at 80, 90.) She has severe diabetes with blindness as a result of her illness. (LCD Complaint, Ex. 8 – Statement by C. Steven Fehlauer, M.D.; R. at 155.)

2.    Her physician, Dr. C. Steven Fehlauer, has determined that she requires blood glucose testing four times per day, and that this is medically necessary in order to maintain control over her blood glucose levels. (LCD Complaint, Ex. 4 –Treating Physician's Written Orders for Blood Glucose Testing; R. at 100-01; Ex. 8 – Statement by C. Steven Fehlauer, M.D.; R. at 155-156.)

3.    Defendant Mutual of Omaha Insurance Company ("Mutual") acts as a Medicare fiscal intermediary and adjudicates the

Medicare claims of Plaintiff Bailey. (Intermediary's Response to Beneficiary's LCD Complaint (C-06-349) ("Response to LCD Complaint") at 1; R. at 702.)

4.    The Secretary ("the Secretary") of the Department of Health and Human Services ("HHS"); and the Acting Administrator ("Acting Administrator") of the Centers for Medicare & Medicaid Services ("CMS," previously the Health Care Financing Administration ("HCFA", but referred to herein for all periods as CMS) (collectively, the "Defendants"), are responsible for administration of the Medicare program.  42 U.S.C. § 1395h (Medicare Part A); 42 U.S.C. § 1395u (Medicare Part B); 42 U.S.C. § 1395b-9 (Medicare Parts C and D).

## Mutual of Omaha's Local Coverage Determination ("LCD") On Blood Glucose Testing

5.    Mutual first published an LCD titled Blood Glucose Testing, contractor's determination number 2001-B, LCD database ID number L19657 effective September 4, 2001.  (LCD Complaint, Ex. 1; R. at 49-62)  LCD version number 5 was the last published version. (Response to LCD Complaint at 3; R. at 704) Mutual published its LCD on blood glucose testing as a statement of the policies it would impose on claimants who submit Medicare Part B claims for blood glucose tests.  42 U.S.C. § 1395ff(f)(2)(B); 42

C.F.R. § 400.202; Medicare Program Integrity Manual (CMS Pub.
100-08) § 13.1.3.

6.    At the time the LCD was being developed, Mutual was
aware that a proposed rule was published by CMS to establish a
National Coverage Determination ("NCD") for clinical laboratory
services payable under Medicare Part B, including an NCD for
blood glucose testing entitled "Medicare National Coverage
Decision for Blood Glucose Testing." *Medicare Program;
Negotiated Rulemaking: Coverage and Administrative Policies for
Clinical Diagnostic Laboratory Services; Proposed Rule*
("Proposed NCD"), 65 Fed. Reg. 13,082, 13,128 (Mar. 10, 2000).


7.    Mutual finalized and distributed its LCD to providers
on August 6, 2001.  (Intermediary's LCD Record; R at 329.)

8.    On November 23, 2001, the final NCD for Medicare
coverage of blood glucose testing was published by Defendant
CMS.  *Medicare Program; Negotiated Rulemaking: Coverage and
Administrative Policies for Clinical Diagnostic Laboratory
Services; Final Rule* ("Final NCD"), 66 Fed. Reg. 58,788, 58,846
(Nov. 23, 2001).


9.    After the final NCD was published, Mutual received a
written communication from the CMS Region VII office that the

language Mutual was planning to add to its LCD from CMS Program
Memoranda AB-00-99 and AB-00-108 does not appear in the final
NCD and should not be included in the LCD because it conflicts
with the final NCD as health care providers had argued. (Pls.'
Am. Compl. (hereinafter, "Pls.' Am. Compl.") Ex. 15 – S.
Pennington e-mail to Mutual and CMS dated Nov. 4, 2002.)

10.  Others within Mutual who reviewed the draft LCD
internally expressed similar concerns about language in the LCD
that does not appear in the final NCD and the negative impact
the LCD would likely have on patient care by discouraging
testing. (Pls.' Am. Compl. Ex. 16 – M. McNall e-mail to C.
Richards at Mutual dated Jul. 5, 2001.)

11.  Effective October 1, 2005, Mutual issued a notice that
it would implement system edits to identify all Medicare Part B
claims for blood glucose testing so as to deny coverage for SNF
residents. (Beneficiary's LCD Complaint, Ex. 15; R. at 170-72.)

12.  From the date Mutual put in place system edits
(October 1, 2005), Mutual has denied coverage for Medicare Part
B claims for blood glucose tests provided to SNF residents on
the basis of the policies reflected in its LCD. (LCD Complaint;
Ex. 2 – Intermediary's Additional Development Request; R. at 63,
Ex. 5 – Itemized Statement of Services; R. at 74, and Pls.' Am.

Compl. Ex. 17 – Letter from M. Zajicek to J. Healy with remittance advice attached.)

13.  The Medicare statute defines an LCD as "a determination by a fiscal intermediary or carrier under Part A or Part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary-or-carrier-wide basis under such parts, in accordance with section 1862(a)(1)(a)."  42 U.S.C. § 1395ff(f)(2)(B).

14.  An LCD is an official statement of the fiscal intermediary's policies on the coverage of specific items or services for Medicare reimbursement. 42 U.S.C. § 1395ff(f)(2)(B); 42 C.F.R. § 400.202; Medicare Program Integrity Manual (CMS Pub. 100-08) § 13.1.3.

## Plaintiff Bailey's Challenge to Mutual's LCD

15.  The Medicare Act entitles an aggrieved party to challenge an intermediary's local coverage policy by direct appeal to the U.S. Department of Health and Human Services, Departmental Appeals Board ("DAB").  42 C.F.R. §§ 426.300, 426.320.  This appeal process is separate and distinct from an appeal by a beneficiary of a denied Medicare claim, for which there is a separate claims appeal process.  See 42 C.F.R. § 426.310(a); Medicare Program: Review of National Coverage

*Determinations and Local Coverage Determinations; Final Rule* ("Final Rule for LCD Challenges"), 68 Fed. Reg. 63,692, 63,693-94 (Nov. 7, 2003). An appeal challenging an LCD can be pursued at the same time as an appeal challenging the denial of a claim. See Final Rule for LCD Challenges, 68 Fed. Reg. at 63,694.

16.   The Medicare Act grants federal courts jurisdiction to consider an LCD-related challenge to the validity of a determination or ruling of the Secretary without exhausting the LCD appeal process if there are no material issues of fact in dispute.   See 42 U.S.C. § 1395ff(f)(3).

17.   On March 28, 2006, Plaintiff Bailey filed a Complaint with the DAB, as an aggrieved party under 42 C.F.R. § 426.400. Plaintiff Bailey challenged the validity of Mutual's LCD on blood glucose testing as legal authority for denying Medicare coverage of her blood glucose tests. (LCD Complaint; R at 31-48.)

18.   By Order dated April 19, 2006, the Administrative Law Judge ("ALJ") certified that Plaintiff Bailey's complaint met the acceptability requirements set forth in 42 C.F.R. § 426.410(b)-(d), which verified that she was an "aggrieved party" with standing to challenge the LCD.   (DAB Acknowledgement of Receipt of Acceptable Complaint, Order, and Briefing Schedule (C-06-349) at 2; R. at 22-28)

19.  On July 18, 2006, Plaintiff Bailey filed the Aggrieved
Party's Statement pursuant to 42 C.F.R. § 426.425(a). (Aggrieved
Party's Statement (C-06-349); R at 626.)

20.  On July 18, 2006, Plaintiff Bailey moved for Summary
Judgment on her claims to invalidate Mutual's LCD. (Aggrieved
Party's Motion for Summary Judgment (C-06-349); R at 649.)

21.  On August 11, 2006, Mutual withdrew the LCD, which
divested the ALJ of jurisdiction over Plaintiff Bailey's
challenge of the coverage policies in the LCD. (Response to LCD
Complaint at 3; R at 704.)

22.  The ALJ concluded that Mutual's withdrawal of its LCD
deprived him of jurisdiction under the regulations to further
adjudicate the issues Plaintiff Bailey had raised. In re CMS LCD
Complaint (Departmental Appeals Bd., Civil Remedies Div., Dec.
No. CR1509, Sept. 9, 2006; R. at 1.)

23.  Without an LCD, Plaintiff Bailey was rendered unable
to further utilize the LCD appeal process to challenge the
merits of the coverage policies in the LCD. 42 C.F.R. §
426.405(d)(4); 42 C.F.R. § 426.420(e)(1).

24.  Pursuant to 42 C.F.R. § 426.460(b), Mutual's
withdrawal of its blood glucose testing LCD has the same legal

-8-

effect as an ALJ's decision to invalidate that LCD under the reasonableness standard. 42 C.F.R. §§ 426.420(a); 426.460(b).

25. The LCD and the policies incorporated therein, which contained Mutual's policy on blood glucose testing coverage, are invalid as a matter of law, upon withdrawal of the LCD. 42 C.F.R. § 426.460(b); Final Rule for LCD Challenges, 68 Fed. Reg. 63,692, 63,698 (Nov. 7, 2003).

26. Mutual confirmed by letter after the Complaint was filed in this action that Plaintiff Bailey's claims for blood glucose tests were re-reviewed, and again denied. See letter from M. Zajicek to J. Healy dated December 19, 2006 with remittance advice attached (Pls.' Am. Compl. Ex. 17).

27. Mutual continues to enforce its retired LCD after its withdrawal. See Letter from M. Zajicek to J. Healy dated December 19, 2006 with remittance advice attached (Pls.' Am. Compl. Ex. 17).

28. The policy or policies discussed in the LCD are invalid when the LCD is retired, not just the document itself When an LCD is retired, those policies may not be applied for services furnished after the retirement date, and the aggrieved party's affected claims must be reprocessed without applying the

retired policy. Final Rule for LCD Challenges, 68 Fed. Reg.
63,692, 63,698 (Nov. 7, 2003).


29.  Mutual cannot deny claims for blood glucose testing
services on or after August 11, 2006 using any of the coverage
policies in the now-retired and invalid LCD on blood glucose
testing. 42 C.F.R. §§ 426.420(a); 426.460(b); Final Rule for LCD
Challenges, 68 Fed. Reg. 63,692, 63,698 (Nov. 7, 2003).

**CMS' National Coverage Determination
for Blood Glucose Testing**

30.  In 1997, Congress passed the Balanced Budget Act of
1997, Public Law No. 105-33 ("BBA"), effective July 1, 1998,
which inter alia mandated use of a negotiated rulemaking
committee to develop national coverage and administrative
policies for clinical diagnostic laboratory services payable
under Medicare Part B by January 1, 1999.  The BBA required that
there be national uniformity and simplified administrative
requirements with respect to clinical diagnostic laboratory
services payable under Medicare Part B.  See BBA §§ 4554(b)(1),
(2).


31.  On March 10, 2000, CMS published a proposed rule to
establish an NCD for clinical laboratory services payable under
Medicare Part B, which includes an NCD captioned "Medicare

National Coverage Decision for Blood Glucose Testing." Proposed
NCD, 65 Fed. Reg. 13,082, 13,128 (Mar. 10, 2000).

32.  The March 10, 2000 proposed rule was developed by the
Negotiated Rulemaking Committee, of which CMS was a party.
Proposed NCD, 65 Fed. Reg. 13,082, 13,084 (Mar. 10, 2000).

33.  The proposed NCD captioned "Medicare National Coverage
Decision for Blood Glucose Testing" expressly supports frequent
testing of blood glucose values in the management of patients
with diabetes.  Proposed NCD, 65 Fed. Reg. 13,082, 13,128 (Mar.
10, 2000).

34.  On October 20, 2000, CMS Program Memoranda AB-00-99
("AB-00-99") was issued by CMS to Medicare intermediaries and
carriers with an effective date of November 1, 2000, entitled
"Glucose Monitoring Note."  CMS Program Memorandum, PM Rev. AB-
00-99.

35.  AB-00-99 is a statement of Medicare policy that was
developed by CMS and adopted without public comment.  5 U.S.C. §
533(b); CMS Website, "Regulations and Guidance > Transmittals >
Overview" at http://www.cms.hhs.gov/Transmittals/.

36.  On December 1, 2000 CMS Program Memoranda AB-00-108
("AB-00-108") was issued by CMS to Medicare intermediaries and

carriers effective January 1, 2001, entitled "Glucose Monitoring." CMS Program Memorandum, PM Rev. AB-00-108.

37.  AB-00-108 is a statement of Medicare policy that was developed and adopted by CMS without public comment. 5 U.S.C. § 533(b); CMS Website, "Regulations and Guidance > Transmittals > Overview" at http://www.cms.hhs.gov/Transmittals/.

38.  On November 23, 2001 CMS issued a final NCD for blood glucose testing to address Medicare coverage of blood glucose testing.  Final NCD, 66 Fed. Reg. 58,788, 58,846 (Nov. 23, 2001).

39.  The final NCD did not include certain restrictions on coverage found in AB-00-99 and AB-00-108 that Mutual included in the LCD.  (Pls.' Am. Compl. ¶¶ 52, 57, 63.)

40.  An NCD is a determination by CMS as to whether or not a particular service is covered nationally by Medicare.  42 C.F.R. § 405.1060(a)(1).  An NCD is legally binding on all Medicare contractors, including carriers and fiscal intermediaries, as well as the DAB and its ALJs, among others. See 42 C.F.R § 405.1060(a)(4).

41.  An NCD takes precedence over decisions made on the local level by Medicare contractors, i.e., LCDs, including what

were formerly known as Local Medicare Review Policies ("LMRPs"),
and other non-binding policies. Medicare Program Integrity
Manual (CMS Pub. 100-08) § 13.1.1.

42.  An LMRP or LCD may not conflict with an NCD once the
NCD is effective.  If an NCD conflicts with a previously
established LMRP or LCD, the contractor must change its LMRP or
LCD to conform to the NCD. The LMRP or LCD may not alter the
NCD.  Final NCD, 66 Fed. Reg. 58,788 (Nov. 23, 2001).

## Internal CMS Documents

43.  After the BBA was passed, internal CMS communications
from that time to the present concluded that blood glucose
testing in a nursing home setting is a covered service under
Medicare Part B. (Pls.' Am. Compl. Ex. 2 & 3 – J. Gordon e-
mails.)

44.  Internal communications show a series of actions by
CMS with Medicare fiscal intermediaries, including Mutual, to
develop criteria for "medical necessity" to deny coverage and
payment for blood glucose tests in skilled nursing facilities.
(Pls.' Am. Compl. Ex. 4 – Meeting Report of January 26, 1999;
Ex. 9 – Issues Paper; Ex. 12 – T. Hoyer e-mail dated June 2,
1999.)

45.   At the same time CMS was participating in the
negotiated rulemaking for the NCD which it knew would support
Medicare coverage of blood glucose testing by diabetic patients
like Plaintiff Bailey and other Medicare Part B beneficiaries in
nursing homes – the agency was working to develop a policy to
deny coverage for blood glucose testing under Medicare Part B.
(Pls.' Am. Compl. Ex. 4 – Meeting Report of January 26, 1999;
Ex. 9 – Issues Paper; Ex. 12 – T. Hoyer e-mail dated June 2,
1999; Ex. 13 – T. Hoyer e-mail dated Aug. 11, 2000.)

46.   CMS internal communications articulated a desire and
rationale to deny coverage and prevent payment of blood glucose
testing claims even though CMS acknowledges that these tests,
when performed in nursing facilities, are covered as CLIA waived
tests under Medicare Part B and paid under the fee schedule.
(Pls.' Am. Compl. Ex. 2 & 3 – J. Gordon e-mails; Ex. 4 – Meeting
Report of January 26, 1999; Ex. 6 – T. Hoyer e-mail to J. Gordon
et al. dated Jan. 29, 1999; Ex. 8 – J. Campbell e-mail to
Regional Office dated April 7, 1999; Ex. 9 – Issues Paper; Ex.
12 – T. Hoyer e-mail dated June 2, 1999; Ex. 13 – T. Hoyer e-
mail dated Aug. 11, 2000.)

47.   Members of the CMS Central Office in Baltimore
Maryland exchanged ideas on how Medicare could avoid paying for
these blood glucose tests, notwithstanding the conclusion that

-14-

they are a covered service under Medicare Part B. (Pls.' Am.
Compl. Ex. 4 – Meeting Report of January 26, 1999; Ex. 5 – J.
Harris e-mail dated Jan 28, 1999 and G. Bagley e-mail to
Regional Offices dated Jan 28, 1999; Ex. 6 – T. Hoyer e-mail to
J. Gordon et al. dated Jan. 29, 1999; Ex. 9 – Issues Paper; Ex.
10 – J. Gordon e-mail to J. Campbell dated April 20, 1999; Ex.
12 – T. Hoyer e-mail dated June 2, 1999; Ex. 13 – T. Hoyer e-
mail dated Aug. 11, 2000.)

48.  The CMS Office of General Counsel warned CMS policy
staff that blood glucose tests administered to Part B SNF
residents are covered laboratory tests and that intermediaries
cannot determine that such tests are outside the scope of
covered benefits. (Pls.' Am. Compl. Ex. 14 – T. Hefter e-mail to
P. Patel dated Oct. 13, 2000.)

## Documents Submitted By Defendants

49.  Mutual's Additional Development Request ("ADR"), dated
December 7, 2005 and addressed to Holladay Healthcare Center,
requested the following information to support blood glucose
services for Plaintiff Bailey:

- Physician order(s) to include blood glucose testing.

- Documentation for the medical necessity for each test
  billed.  This may include nurse's notes and/or
  physician progress notes.

- Results of each blood glucose/accucheck test billed.

- Documentation of physician notification of each test result noting the use of the results to modify treatment.

- Detailed itemization of charges billed.

- History and physical supporting the diagnosis of diabetes.

(R. at 63.)

50.  Mutual submitted, as exhibit 1 of its Response to Beneficiary's Complaint (filed with the DAB on August 11, 2006) a redacted copy of a Medicare Appeal Decision dated March 9, 2006, which did not involve Plaintiff Bailey, as evidence that Mutual "does not cite the LCD as the authority for reviewing the appropriateness of the denial of blood glucose monitoring." (R. at 702 to 711.)

51.  The redacted Medicare Appeal Decision cites the following as evidence that blood glucose monitoring services did not meet Mutual's criteria for coverage:

- No signs/symptoms of a clinically unstable medical condition.

- No prompt notification of the physician regarding the abnormal blood glucose values.

- No physician's medical management of the patient regarding the abnormal blood glucose values.

This Medicare Appeal Decision further cited CMS Program Memorandum, AB-00-108 as the basis for its decision to deny claims for blood glucose testing. (R. at 706-707.)

52.  The criteria specified in this Medicare Appeal Decision are substantially the same as the following criteria in Mutual's LCD:

- "confirmed continuing risk of glucose metabolism abnormality";

- "laboratory results [to] be reported to the physician promptly;" and

- use of lab results "in the management of the beneficiary's specific medical problem" including the "physician's order for another laboratory service").

(R. at 51-52.)

## Mutual's LCD Conflicts With the NCD

53.  Mutual's LCD on blood glucose testing conflicts with the NCD on blood glucose testing in the following ways:

- The LCD states both that routine blood glucose testing services are never covered in a SNF because a SNF is not a home, and that blood glucose testing in a SNF is a covered laboratory service that qualifies for separate payment under the Medicare laboratory benefit. (R. at 52.) The NCD does not preclude regular blood glucose testing of SNF residents. (R. at 65-69.) Glucose testing may be covered when it meets all the conditions of a covered laboratory service. 42 C.F.R. §§ 493.15, 410.32(d).

- Contrary to the LCD, CMS Program Memorandum AB-00-108 acknowledges that "[d]enial of payment for a Part B covered laboratory service cannot be made on the basis that the service is routine care." It states, "Under Medicare, routine care determinations are applicable only for Part A nursing home services." CMS Program Memorandum, PM Rev. AB-00-108.

- According to the LCD, for a laboratory service to be reasonable and necessary, it must be ordered by the physician, the ordering physician must use the result in the management of the beneficiary's specific medical problem, and the laboratory result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of the patient care. (R. at 52.) This statement is substantially

the same as CMS Program Memorandum AB-00-108. (CMS Program Memorandum, PM Rev. AB-00-108.) However, the plain language of the Social Security Act, the Medicare regulations, and the NCD do not require "prompt" notification.  42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. §§ 493.15, 410.32(d); Final NCD, 66 Fed. Reg. 58,788, 58,846 (Nov. 23, 2001). The NCD sets the Medicare national coverage criteria for blood glucose testing, and it does not require "prompt" notification of laboratory results to the physician.  Final NCD, 66 Fed. Reg. 58,788, 58,846 (Nov. 23, 2001).

- The LCD's statement that a standing order for blood glucose testing is unacceptable (R. at 59) contradicts other language both in the LCD itself (R. at 51), and in the NCD that specifically encourages frequent testing of blood glucose levels for diabetic patients and acknowledges that it may be reasonable and necessary to measure quantitative blood glucose in stable, non-hospitalized patients who are unable or unwilling to do so.  (R. at 65.)  The NCD does not provide any specific limitations to testing. (R. at 65-69.)  The NCD acknowledges that specific diagnosis codes, such as diabetes, supports repeat testing, especially where there is a confirmed continuing risk of glucose metabolism abnormality. (R. at 65.)

- The LCD lists "[d]ocumentation to support the physician was notified prior to subsequent testing" under "documentation requirements." (R. at 59.)  The NCD lists "evidence in the patient's clinical record that an evaluation of history and physical preceded the ordering of glucose testing and that manifestations of abnormal glucose levels were present to warrant the testing" under "documentation requirements," but does not specify notice to the physician before another test. (R. at 69.)

54.  Mutual cites "subsequent issuance of an NCD by CMS on the same subject matter" as the basis for its retirement of the LCD. Retired LCD, L19657 (Defs.' Mot. to Dismiss, Ex. C).

Respectfully submitted,

/s/ Thomas C. Fox

Counsel:
Carol C. Loepere
Antony B. Klapper
Jason M. Healy
Catherine A. Durkin
Cassia M. McCamon
REED SMITH LLP
1301 K Street, NW
Suite 1100 – East Tower
Washington, D.C. 20005
(202) 414-9200

Dated: June 22, 2007

Thomas C. Fox (D.C. Bar #4473)
REED SMITH LLP
1301 K Street, NW
Suite 1100 – East Tower
Washington, D.C. 20005
(202) 414-9222
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

|  |  |  |
|---|---|---|
| LOUISE BAILEY, Individually, And On Behalf of All Other Similarly Situated Medicare Part B Beneficiaries | ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) | Case No. 1:06-cv-2144 Judge Royce C. Lamberth |
| v. | ) ) |  |
| MUTUAL OF OMAHA INSURANCE COMPANY, MICHAEL O. LEAVITT, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES and LESLIE V. NORWALK, ACTING ADMINISTRATOR, CENTERS FOR MEDICARE & MEDICAID SERVICES, | ) ) ) ) ) ) ) ) ) |  |
| Defendants. | ) ) ) |  |

**ORDER**

Upon consideration of Defendants' Motion to Dismiss, Plaintiffs' Opposition thereto, Plaintiffs' Motion for Summary Judgment, and the record herein, it is on this _____ day of _____ 2007:

ORDERED that Defendants' Motion to Dismiss is DENIED, that Plaintiffs' Motion for Summary Judgment is GRANTED, and that judgment shall enter on all claims against Defendants.

_____
DATE

_____
UNITED STATES DISTRICT JUDGE